# 11 MAG 108

☐ ORIGINAL

Approved: _____
PETER M. SKINNER
Assistant United States Attorney

Before: _____
HON. DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

U.S. DISTRICT COURT
FILED
JAN 14 2011
S.D. OF N.Y.

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :      **SEALED COMPLAINT**

          - v. -              :      Violation of
                                     18 U.S.C. § 1956(h)
VIKRAM DATTA,                 :
                                     COUNTY OF OFFENSE:
          Defendant.         :      NEW YORK

- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          ANTHONY MADDALONE, being duly sworn, deposes and says
that he is a Task Force Officer with the Drug Enforcement
Administration ("DEA"), and charges as follows:

### COUNT ONE

          1.   From at least in or about October 2009, up to and
including in or about January 2011, in the Southern District of
New York and elsewhere, VIKRAM DATTA, the defendant, and others
known and unknown, unlawfully, wilfully and knowingly did
combine, conspire, confederate and agree together and with each
other to violate Title 18, United States Code, Sections
1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1957(a).

          2.   It was a part and an object of the conspiracy that
VIKRAM DATTA, the defendant, and others known and unknown, in an
offense involving and affecting interstate and foreign commerce,
knowing that the property involved in certain financial
transactions, to wit, cash and wire transfers, represented the
proceeds of some form of unlawful activity, unlawfully,
willfully, and knowingly would and did conduct and attempt to
conduct such financial transactions which in fact involved the
proceeds of specified unlawful activity, to wit, the proceeds of
illegal narcotics transactions, with the intent to promote the

carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

3.   It was a further part and an object of the conspiracy that VIKRAM DATTA, the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, cash and wire transfers, represented the proceeds of some form of unlawful activity, unlawfully, willfully, and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of illegal narcotics transactions, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

4.   It was a further part and an object of the conspiracy that VIKRAM DATTA, the defendant, and others known and unknown, within the United States and involving United States persons, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity, to wit, narcotics trafficking activities, in violation of Title 18, United States Code, Section 1957(a).

<u>OVERT ACTS</u>

5.   In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about September 13, 2010, VIKRAM DATTA, the defendant, agreed to purchase perfume from a perfume dealer located in New York, New York;

b.   On or about September 16, 2010, an undercover law enforcement officer ("UC-1"), while in New York, New York, called DATTA on the telephone to discuss a potential money laundering transaction.

c.   Between on or about October 5, 2010, and on or about October 6, 2010, a company owned by VIKRAM DATTA, the

defendant, wired more than $100,000 to three different perfume dealers located in New York, New York; and

      d.   On or about January 10, 2011, VIKRAM DATTA, the defendant, told UC-1, in sum and substance, that DATTA would travel to New York, New York on or about January 15, 2011 to meet with UC-1 to discuss future laundering activities.

      (Title 18, United States Code, Section 1956(h).)

      The bases for deponent's knowledge and for the foregoing charge are, in part, as follows:

      6.   I am a Task Force Officer with the DEA, and I have been personally involved in the investigation of this matter.  I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, my examination of reports and records, and my conversations with law enforcement officers and witnesses.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part.

## Money Laundering and the Black Market Peso Exchange

      7.   As set forth in greater detail below, there is probable cause to believe that VIKRAM DATTA, the defendant, and others known and unknown, are receiving narcotics proceeds in the United States and knowingly and unlawfully facilitating the laundering of those proceeds through the Black Market Peso Exchange ("BMPE").

      8.   Based on my training, experience, and investigation of this matter, and my discussions with experts in the BMPE, I know the following about the BMPE, among other things:

      a.   Narcotics traffickers in Colombia, Venezuela, Mexico, and other countries from which narcotics are grown, processed or transported to the United States (collectively, "Countries of Origin"), generate billions of dollars of cash narcotics proceeds in the United States.

      b.   To profit effectively from their illegal activities, narcotics traffickers must find a way to "launder" these vast sums of cash, that is, to have the funds transferred

to a place and in a form that the narcotics traffickers can use them and in a manner that avoids detection by law enforcement.

c.   Banking laws in the United States, Europe, and Mexico, among other locations, prevent narcotics traffickers from simply depositing drug monies into accounts in the United States and transferring them to Mexico or other third countries. As a result, narcotics traffickers must disguise, or "launder," the funds in order to hide their true source and enable them to be repatriated back to Countries of Origin undetected.

d.   The BMPE is one of the primary methods used by narcotics traffickers to launder their narcotics proceeds. The basic BMPE scheme typically operates as follows.  In Countries of Origin, a narcotics trafficker owning narcotics proceeds generated in the United States or Europe contacts a third party -- generally referred to as a "peso broker" -- who agrees to exchange domestic currency he controls in Countries of Origin, e.g., Mexican Pesos, Colombian Pesos or Venezuelan Bolivars, for the cash narcotics proceeds outside of the Countries of Origin, e.g., in dollars in the case of the United States.  Once this exchange occurs, the narcotics trafficker, having received domestic currency from the peso broker, has effectively laundered his money and is out of the BMPE process. The peso broker, on the other hand, must now do something with the drug dollars that he has acquired in the United States and elsewhere so that he can obtain more currency and begin the BMPE process again.

e.   To do so, the peso broker uses contacts in the United States and elsewhere to receive the drug proceeds that the peso broker has purchased, often arranging for criminal associates to receive the drug proceeds in suitcases or bags from the narcotics trafficker's operatives who control the money. After the money is physically transferred, the peso broker uses contacts in the United States to get the drug proceeds into the "legitimate" banking or commercial systems.  With respect to money laundering through the banking system, funds may be deposited into accounts that appear legitimate but are in fact used as vehicles to transmit narcotics proceeds to Countries of Origin.  Money may be deposited into these accounts in a manner that is designed to avoid federally-required cash transaction reporting requirements, e.g., for bank deposits of greater than $10,000 cash.  With respect to money laundering through the commercial system, this is often done through purchases of "legitimate" commercial products using the narcotics proceeds. The peso broker, still operating in the Country of Origin, now has a pool of narcotics-derived proceeds in the United States or

elsewhere, in the form of "legitimate" goods, to sell to individuals or companies in the Country of Origin. The peso broker then can arrange for the products to be shipped down to the Country of Origin and sold to individuals or companies who wish to purchase products with United States dollars at a favorable exchange rate and in a manner that avoids United States and other currency exchange and income reporting requirements.

### The "Grey Market" Perfume Industry's Role in the BMPE

9. Based on my training, experience, and investigation of this matter, and my discussions with experts in the BMPE and perfume markets, I know the following:

a. There is a "grey market" for the sale of perfumes outside of authorized channels of distribution.

b. Perfumes are a product that is well-suited for use in laundering narcotics proceeds, and in transmitting those proceeds to Countries of Origin, for several reasons:

i. Perfumes are an efficient means of storing "value" – i.e., of converting narcotics proceeds into products that can be shipped to Countries of Origin for sale and conversion of products back into currency, because they are expensive for their size. Thus, it is possible to ship hundreds of thousands of dollars worth of perfume, purchased with narcotics proceeds, to Countries of Origin for a relatively small price.

ii. Perfumes have a ready market in Countries of Origin, thus making it relatively easy to liquidate the narcotics proceeds when they arrive in those nations in the form of perfume.

iii. Because perfumes have a legitimate use, they are unlikely to draw scrutiny from customs officials when they are shipped to Countries of Origin.

iv. Because a large shipment of perfumes could involve tens of thousands of units, and hundreds of boxes, it is relatively easy for money launderers to (a) secrete currency in boxes that are shipped to Countries of Origin in order to provide an additional means of laundering funds, and/or (b) issue fraudulent invoices that overstate the amount of actual product shipped in order to permit laundering of currency through other means.

5

c.   The DEA's investigation of the grey market perfume industry has established that on numerous occasions, money launderers from Countries of Origin have used grey market perfume dealers in the United States to receive bulk cash, representing narcotics proceeds, and to facilitate the laundering of those proceeds through shipment of grey market perfumes to Countries of Origin, among other means.

## The Investigation of VIKRAM DATTA

**A.   Background Information on DATTA**

10.   Based on my conversations with a cooperating witness ("CW-1") who has worked in the grey market perfume industry, and in that capacity came to know VIKRAM DATTA, the defendant,[1] my conversations with other agents who have interviewed the cooperating witness, and other information obtained from bank records and public sources of information, I learned, in sum and substance, the following:

a.   DATTA owns and operates grey market perfume operations with many corporate affiliates under numerous corporate names, including La Versailles and Valencia Fragrances. DATTA operates at least seven locations at which grey market perfume is sold that are in close proximity to the United States-Mexico border, including locations in Laredo, McAllen, and Eagle Pass, Texas; Nogales, Arizona; and Calexico and San Ysidro, California.   DATTA's perfume businesses sell the majority of their perfume to Mexican customers, and the companies routinely ship perfume to Mexico.

b.   DATTA previously operated a perfume business in the New York area.   When DATTA was operating in the New York area, he was engaged in operations similar to CW-1, *i.e.*, receiving cash from suspected narcotics traffickers to be used to purchase grey market perfume for shipment to Latin America.

c.   As set forth in greater detail below, DATTA's business receives tens of millions of dollars of bulk cash in bank accounts that are established in the names of La Versailles

---

[1]   CW-1 has pleaded guilty in the Southern District of New York to money-laundering charges and is cooperating with the Government in the hope of obtaining a benefit at sentencing. Information from CW-1 has proved reliable in the past and has been corroborated by independent investigation, including the investigation described below.

and affiliates.  As described by DATTA in recorded conversations over Court-authorized Title III wiretaps and with UC-1, DATTA is aware that the vast majority of the bulk cash that comes into his businesses comes from Mexican drug cartels, and he is knowingly facilitating his customers' illegal activities using La Versailles and affiliates in order to dramatically increase the profitability and market share of his business.

## B.   Information from Judicially-Authorized Wiretaps

11.   Based on information obtained from CW-1, as well as financial analyses and other investigative techniques, the Government obtained court authorization to intercept wire communications over telephones used by DATTA and employees of La Versailles.  Based on my review of conversations intercepted from March 2010 through November 2010 via these judicially-authorized wiretaps, I learned that individuals who came into the United States from Mexico delivered millions of dollars in cash to various La Versailles locations in Texas, Arizona and California to purchase perfume.  The bulk of the perfume purchased with these cash deliveries was subsequently shipped to Mexico.

12.   Based on my review of conversations intercepted from March 2010 through November 2010 via judicially-authorized wiretaps on telephones used by DATTA and employees of La Versailles, I learned, among other things, the following[2]:

a.   On or about March 22, 2010, at approximately 5:11 p.m., a co-conspirator not named as a defendant herein ("CC-1") whom is an employee of La Versailles, spoke via telephone with an employee of a money exchange shop, or *casa de cambio,* located near La Versailles in Laredo, Texas (the "*Casa de Cambio* Employee").  During the telephone conversation, CC-1 asked the *Casa de Cambio* Employee, "You are not going to report to the IRS that we gave you that money, right?"  The *Casa de Cambio* Employee replied, "No."  Based on my experience, training, and investigation of this matter, I believe that La Versailles uses the *Casa de Cambio* Employee to exchange pesos for dollars, and vice-versa.  I further believe that CC-1, on behalf of La

---

[2] All of the references in this Complaint to statements made in recorded telephone calls or meetings are based on draft transcripts and translations (certain of the conversations were in Spanish and Hindi and have been translated into English) pf those recordings and are subject to revision.  However, I believe the substance of the statements described in this Complaint to be accurate.

Versailles, was trying avoid reporting currency transactions and was verifying that *Casa de Cambio* Employee would not report a La Versailles currency transaction to the IRS.

   b.   On or about March 29, 2010, at approximately 1:12 p.m., DATTA made a call to an unidentified female ("UF-1"), who was using a cellphone.  DATTA asked, "Where are you now?" UF-1 replied, "We are on our way to the bank."  Later in the call, DATTA said, "So it is $300,000, you have to bring fifteen bundles."  UF-1 then stated, "In bundles?"  DATTA replied, "Fifteen."  Based on my training, experience, and investigation of this matter, I believe that UF-1 was a La Versailles employee and that DATTA was instructing her to break up into smaller bundles $300,000 in cash that La Versailles was depositing to make it less likely to arouse suspicion at the bank.

   c.   On or about March 29, 2010 at approximately 1:45 p.m., DATTA received a call from an individual not named herein ("Individual-1").  During the call, DATTA stated, "Border been closed for last two months.  They were shot at.  That's why every one is quiet.  Every day some man dies.  They posted military there."  Individual-1 replied, "Yes, if the people can't come, how you gonna sell the products?"  DATTA replied, "All the stuffs we sent, it's still sitting there.  Once it's gone I'll get the money fast.  Border been closed for two months.  Every path is sealed."  Later in the call, Individual-1 asked, "Didn't you open something?"  DATTA replied, "I opened two in McAllen."  Individual-1 asked, "Is it ok?"  DATTA replied, "Due to borders being closed, all the money comes from droppers."  Based on my training, experience, and investigation of this matter, I believe that, during this call, DATTA was explaining to Individual-1 that his business had been adversely affected by increased security around the United States-Mexico border, which had effectively closed the border to narcotics smuggling; the border has not been "closed" to legal traffic of goods or people.  I further believe that, when DATTA explained that he had recently opened two warehouses in McAllen, but that all the money came from "droppers," he was explaining that all of the money used to pay for the products he sells from the McAllen, Texas location of La Versailles is supplied by individuals delivering cash proceeds in individual bags, rather than larger amounts by vehicle, because the increased security along the border has limited the smuggling of bulk currency as well as narcotics.

   d.   On or about April 14, 2010 at 8:50 p.m., DATTA called an unidentified female ("UF-2").  During the call, DATTA received another call over a cellphone and was overheard talking to another individual whom I believe, based on the digits

dialed and the context of the call, was located in Mexico
("Individual-2").  While Individual-2's voice was not audible
during the overheard portion of the call, during the
conversation, DATTA stated, "[Individual-2], how far is Sinaloa
from you? . . . Okay, very good.  No, no just like you know, like
the business because in San Ysidro[3] sometimes the customers come
from Sinaloa.  And they buy a thousand dollars, two thousand
dollars, three thousand dollars.  So I was wondering, like why
. . . of course I understand that Sinaloa is a big drug cartel,
you know."  Later in the call, DATTA explained to Individual-2
his plans to begin building in Mexico:  "So anyway in Cancun I'm
planning to . . . once I settle down a little bit towards the end
of this year, I am planning to open up a warehouse in Cancun
also.  Cancun in a duty free zone.  Once we bring all the goods
into Mexico, then we just pay fifteen percent duty and then we
become legal."  Based on my training, experience, and
investigation of this matter, I believe that, DATTA was
explaining to Individual-2 his awareness that customers for his
San Ysidro, California fragrance operation along the United
States-Mexico border, who buy in round dollar amounts, are likely
members of the Sinaloa drug cartel, a violent narcotics
trafficking operation that I believe, based on my training,
experience, and participation in the investigation, including
DATTA's statements set forth below, launders money through
DATTA's operation and through other means.  I further believe
that, when DATTA stated that, upon opening a warehouse in Mexico
he would "become legal," he was acknowledging that his current
business relies on illegal smuggling of goods across the United
States-Mexico border, and other illegal conduct, for its success.

          e.   On or about September 9, 2010, at
approximately 5:50 p.m., DATTA placed a call to a manager ("Bank
Employee-1") at a bank ("Bank-1") located in Laredo, Texas.  Bank
Employee-1's assistant took the call and stated that Bank
Employee-1 was not available.  DATTA stated that it was "very
important" that he meet with Bank Employee-1 as soon as possible
so that they could speak about his "three accounts."  DATTA
further stated he was "thinking" about bringing one of his
accounts into another bank located in Laredo ("Bank-2").  Based
on my conversations with other agents who have reviewed documents
received in response to a subpoena served upon Bank-1, I know
that La Versailles and DATTA have accounts at Bank-1 and that La
Versailles and DATTA deposited significant amounts of cash in

---

[3] I know from my participation in the investigation that
DATTA operates a store in San Ysidro, California, adjacent to the
California-Mexico border.

those accounts.  Based on other intercepted telephone calls
described below, I believe that at the time of this call, Bank-1
was considering whether to close the accounts controlled by DATTA
and La Versailles.  In this call, I believe that DATTA was trying
to reach Bank Employee-1 to convince Bank Employee-1 to keep
DATTA's and La Versailles' bank accounts open, and that DATTA was
threatening to bring his business to a rival bank ("Bank-2") if
the accounts were not left open.

       f.   On or about September 10, 2010, at
approximately 4:59 p.m., another Bank-1 employee ("Bank Employee-
2") spoke by telephone with CC-1, a La Versailles employee.  CC-1
asked Bank Employee-2, "How are you?"  Bank Employee-2 responded,
"Well, trying to help.  Trying to survive.  Trying to keep your
account, uh, trying to do as much as we can.  You know, we know
that it has nothing to do with you guys.  You guys are pretty
legit.  But you know, it's really the cash that you guys receive
from the others.  What we're going to try to do, I'm gonna try to
submit and put some sort of formal letter to give it with
everything that Mr. Vikram had left here.  [Bank Employee-1],
also, the president wants to try to keep the account open.  But
if you could give me an opportunity, if you could please do me
the favor, the uh, all the tax returns that you gave us on the
entities, I don't need you to go either 10 years back, but if you
could give me at least three years of each entity's financials so
that we can match them with the tax returns."  CC-1 responded,
"Okay, I . . ."  Voices then overlapped, and Bank Employee-2
interjected, "That you gave us.  So that I could say, 'Hey, you
know what, here is your financial, here is our tax return,
[coughs] here is the match.  There's nothing out of the
ordinary.'"  Bank Employee-2 and CC-1 then continued to discuss
financial statements and tax returns that CC-1 would provide to
Bank Employee-2.  DATTA then got on the phone and spoke with Bank
Employee-2.  Bank Employee-2 told DATTA, "What we're trying to do
is that we sat down, you know, we wanna try to fight, you know,
to keep your account and [Bank Employee-1] had suggested that we
match the financial statements with the returns that you gave us,
not ten years, you know."  DATTA responded, "No problem.
Absolutely fine."  Bank Employee-2 responded, "Okay.  Just to
match them together so that way when we go to this department,
say, 'Look, here it is, here is the financial, it matches the tax
return, here is the 8300 forms,'[4] you know, on and on and on."
DATTA responded, "And this year, I'm going to cross over $40
million because I have already taken a growth of fifteen percent.

_____

    [4] As described in greater detail below, Form 8300 is a form
that must be filed with the IRS under federal currency-reporting
laws in connection with any commercial transaction involving
$10,000 or more in cash.

It is for me because my competition cannot do better because I'm better than them." Bank Employee-2 responded, "Atta boy! That's the way to think and that's the way to do it." DATTA later added, "And that's why I'm going to capture the whole market of Mexico. That's why I went into all the borders. That's because I know what is going to happen two years from today and that all people have to come to the store to buy and that's where I have captured the whole border. They do not have the business like me." At the end of the call, DATTA said, "And you know. Don't be scared because next year my business has to jump more than one hundred million and when my business, the duty free goes, I intend to sell more than three hundred million in next three years." Bank Employee-2 answered, "Oh, good." DATTA then said, "Even if you want me to write that. I can write that, and I will do that." Bank Employee-2 responded, "That would work as well." Based on my experience, training, and investigation of this matter, I believe that Bank-1 was concerned that DATTA was depositing cash in the bank that had not been properly reported to the Government and/or was the proceeds of illegal activities. Shortly before this phone call was intercepted, the Government had served subpoenas on Bank-1 for documents related to La Versailles' accounts, and I believe that after receiving these subpoenas, the bank's legal or compliance department initiated a review of La Versailles' accounts. I further believe that the Laredo branch of Bank-1, where Bank Employee-1 and Bank Employee-2 are believed to work, had been charged with demonstrating that La Versailles was using its accounts for legitimate purposes, and that Bank Employee-2 was asking CC-1 and DATTA for documentation that would help in this endeavor ("that way, we can go this department, say, 'Look, here it is, here is the financial, it matches the tax return, here is the 8300 forms,' you know, on and on and on"). I further believe that Bank Employee-2 knew or had reason to believe that La Versailles, DATTA and CC-1 were accepting cash from criminals ("You guys are pretty legit. But you know, it's really the cash that you guys receive from the others.").

       g.   On or about September 20, 2010, at approximately 3:26 p.m., CC-1 spoke by telephone with an unidentified female ("UF-3"), who was using a telephone located in New York, New York. During the telephone conversation, UF-3 stated, "I was just talking to the IRS auditor lady and she is telling me that IRS has information that there was a large amount of cash deposited into his [DATTA's] account." UF-3 and CC-1 then discussed which account the IRS auditor was referencing. CC-1 stated that "Vikram" had "his personal account" at a bank ("Bank-3"), and then asked, "This is the personal or is it the . . ." UF-3 interjected, "personal." Later in the call, UF-3 explained that the IRS believes the cash deposit was made at a

"downtown" branch of Bank-3.  UF-3 then stated, "That is the bank
where they think that the large transaction . . . is that where
you guys deposit cash?"  CC-1 answered, "Yes, but we deposit cash
in, but I don't think he has deposited cash in his personal
unless . . ."  UF-2 then said, "No.  Okay."  And CC-1 asked, "Is
still the same thing with the last time?"  UF-3 answered, "Is the
same thing.  Because I'm going crazy.  I'm pulling all the
personal accounts all over the place to see if it adds up and it
doesn't add up.  So this is the same thing going on."  Based on
my experience, training, and investigation of this matter, I
believe CC-1 and UF-3 were discussing the reason a large cash
deposit, which had been flagged by an IRS auditor, was made in
DATTA's personal bank account.  I further believe that UF-3 could
not determine the basis for the cash deposit ("it doesn't add
up").

     h.   On or about September 21, 2010, at
approximately 4:58 p.m., DATTA spoke by telephone with a co-
conspirator not named as a defendant herein ("CC-2") who was a La
Versailles employee.  CC-2 told DATTA that another co-conspirator
not named as a defendant herein ("CC-3") "is here" and that CC-3
"came and he brought some money to put in your . . ."  DATTA
interjected, "in the safe."  CC-2 continued, "Safe, yeah.  He
will tell me what to do."  CC-2 then put CC-3 on the phone to
speak with DATTA.  CC-3 asked DATTA, "How are you doing?"  DATTA
responded, "A little busy fighting with people.  But good."  CC-3
responded, "No, no, no fighting."  DATTA answered, "No, but when
I need money I have to fight, right?"  Based on my experience,
training, and investigation of this matter, I believe CC-3 was a
Mexico-based peso broker.  In this call, I believe CC-3 was
visiting a La Versailles store in Laredo, Texas, to make a bulk
cash delivery, which was stored in DATTA's safe.  I further
believe that DATTA's reference to "fighting" was related to
DATTA's efforts to collect cash from peso brokers to whom DATTA
had provided perfume on credit.

     i.   On or about September 13, 2010, at
approximately 1:55 p.m., DATTA spoke by telephone to a perfume
dealer ("Dealer-1") located in New York, New York.  During the
call, Dealer-1 offered to sell perfume to DATTA but questioned
where it would be sold by DATTA.  DATTA explained that "all of
[his] stores are on the border" and that his customers were "all
Mexicans, no no no Americans."  DATTA further explained that
"nothing will go into the local market."  Dealer-1 agreed to
provide perfume to DATTA, "as long as it disappears."  Dealer-1
further explained that he didn't want the perfume "getting caught
up by anybody checking."  Based on my experience, training, and
investigation of this matter, I believe Dealer-1 is a New
York-based perfume supplier who sells grey market perfume to

DATTA. Perfume that is sold in the United States must be marked for sale in the United States. I believe Dealer-1 intended to sell DATTA perfume that was not marked for sale in the United States, and that Dealer-1 was worried the perfume might be "checked" if it was sold in the United States market. DATTA assured Dealer-1 that he would sell the perfume to Mexican customers and that none of it would end up in the United States.

      j.   On or about November 18, 2010, at approximately 4:40 p.m., another co-conspirator not named as a defendant herein ("CC-4"), who was a La Versailles employee, spoke by telephone with DATTA. CC-4 told DATTA that another co-conspirator not named as a defendant herein ("CC-5") had been "kidnapped." Based on my experience, training and investigation of this matter, I believe CC-5 was a Mexico-based peso broker. DATTA asked CC-4 where, and CC-4 answered that he/she did not know, but that "they need money." DATTA asked how much money, and CC-4 responded ten million pesos, or $900,000. DATTA and CC-4 then discussed who in Mexico owed DATTA money. Based on my experience, training, and investigation of this matter, including discussions between DATTA and UC-1 concerning the kidnapping set forth below, I believe this call concerned the kidnapping of CC-5 by Mexican narcotics traffickers.

## C.   Information Obtained from Undercover Operation

      13.   Based on my conversations with UC-1 and another undercover law enforcement officer ("UC-2"), and my review of recordings of meetings and telephone conversations recorded by UC-1 and UC-2, I learned, in sum and substance, the following:

      a.   On or about August 9, 2010, at approximately 4:00 p.m., UC-1 and others met with VIKRAM DATTA, the defendant, in Las Vegas, Nevada. During this meeting, UC-1 represented himself/herself to be a Guatemalan national based in New York, New York, who was interested in hiring DATTA to move large amounts of cash. DATTA advised UC-1 that DATTA could, in sum and substance, move $7-8 million in cash out of Laredo, Texas, "without a problem." DATTA further instructed UC-1 to hire a "chilango" (a term used when referring to a Mexican national) with a Mexican passport to deliver the money to DATTA, and further instructed that a different "chilango" be used for each delivery of currency.

      b.   Later that day, on or about August 9, 2010, at approximately 11:00 p.m., UC-1 and others met again with DATTA in Las Vegas, Nevada. During this meeting, UC-1 told DATTA that he was "dealing with Guatemalans and Mexicans" and that his/her customers were "getting aggravated" because his/her perfume

supplier in New York took "two to three weeks" to make deliveries. UC-1 further stated that he/she had "called down south and told them we met with you [DATTA] and everything looks good." DATTA stated that he could handle "$5 million" from Laredo. DATTA advised UC-1, "I need a passport every time they bring money to the shop; every time send me a different guy, don't send me the same guy." DATTA further told UC-1, "Do not send me twenties." UC-1 responded, "No, no, that's like sending dollar bills, we throw them in the garbage." DATTA answered, "Send me hundreds, send me a new guy, I don't want to see the same guy again." DATTA further advised UC-1 that he could provide UC-1 with "garments" and "electronics" in addition to "perfume." Later in the meeting, UC-1 told DATTA that his/her "ultimate goal" was to "send it back home, to South America, Colombia. Bogota or Medellin." DATTA subsequently stated, in sum and substance, that he could conceal cash in perfume shipments that would move across the border. DATTA advised UC-1 that UC-1 or UC-1's representatives would be dealing with CC-4, who was an employee who had worked for DATTA for over ten years and was "trustworthy." During this meeting, UC-1 asked DATTA whether he used a push-to-talk, or two-way radio telephone, and whether DATTA would provide that number to UC-1. DATTA responded that he only uses his push-to-talk telephone with customers in Mexico and declined to provide that number to UC-1.

c.    On or about August 20, 2010, UC-1 placed three recorded telephone calls to DATTA. During those conversations, UC-1 explained to DATTA that UC-1 had $40,000 in cash located in San Diego, California that UC-1 wanted to deliver to DATTA in exchange for an order of perfume. DATTA instructed UC-1 to deliver the money to his store located in San Ysidro, California.

d.    On or about August 23, 2010, UC-1 placed a recorded telephone call to DATTA. During this conversation, UC-1 advised DATTA that the money delivery would occur within the next day or two and that the money would be delivered in two payments of $20,000 each. DATTA agreed and advised that he would contact the store and let the employees know.

e.    On or about August 24, 2010, UC-2 placed a recorded telephone call to the La Versailles store located in San Ysidro, California and spoke to a co-conspirator not named as a defendant herein ("CC-6"). During the call, UC-2 explained that he/she was a "friend of [UC-1]" and would be making a large purchase with "cash." CC-6 responded that he/she had spoken with DATTA and was aware of the pending transaction. UC-2 further explained that he/she would deliver $20,000 on or about August 24, 2010, and would place an order for $40,000 worth of perfume.

UC-2 further explained that he/she would deliver another $20,000 the following day, and take possession of the ordered perfume.

f.   On or about August 24, 2010, at approximately 6:00 p.m., UC-2 went to the La Versailles store in San Ysidro, California and met with CC-6.  During this meeting, CC-6 advised UC-2 that he/she was unable to complete the order placed by UC-2, and that it would take another day to complete.  UC-2 agreed to leave the $20,000 and retrieve the order when available, within a day or two.  UC-2 provided CC-6 with a brown paper bag containing $20,000 in United States currency, which was further wrapped in aluminum foil and rubber-banded together.  CC-6 proceeded to count the money and provided UC-2 a hand written receipt on plain white paper.  CC-6 did not request any identification from UC-2, as required to comply with currency reporting requirements, nor did CC-6 ask UC-2 to complete a Form 8300, as required by currency reporting laws.  At the conclusion of the meeting, UC-2, overheard CC-6 make a telephone call to an individual UC-2 believed, based on the content and context of the call, to be DATTA.  During this call, CC-6 stated that, "the gentlemen came in, I took $20,000 cash, and everything is fine."  Based on my review of pen register data for one of DATTA's telephones, I learned that DATTA received a telephone call from the La Versailles store located in San Ysidro, California, at the time UC-2 was meeting with CC-6.

g.   On or about August 30, 2010, UC-2 returned to the La Versailles store in San Ysidro, California, paid CC-6 an additional $18,649.34 in United States currency, and took possession of perfume.

h.   On or about September 16, 2010, UC-1, while in New York, New York, called DATTA on the telephone.  UC-1 told DATTA that UC-1 was in New York, New York, and that he/she wanted to wire transfer $50,000 for an order of perfume.  DATTA agreed to accept the money prior to receiving an order for perfume and instructed UC-1 to contact CC-6 to obtain the wire instructions.

i.   On or about September 17, 2010, after further discussions with CC-4, a La Versailles Employee, CC-4 emailed wire instructions to an undercover email account.

j.   On or about September 24, 2010, $50,000 was wired from an undercover bank account to a La Versailles account at Bank-1.

k.   On or about September 27, 2010, UC-1 and UC-2 met with DATTA in San Diego, California.  During the meeting UC-1 advised DATTA that he/she had been awarded a contract to pick up large amounts of United States currency in different cities in

the United States.  UC-1 informed DATTA that UC-1 had no need for perfume, and UC-1 asked DATTA whether DATTA could take cash from UC-1 and wire it to bank accounts specified by UC-1.  DATTA responded, in sum and substance, that he was "running a legitimate business," that he did not want his employees or accountant to find out what he was doing, and that the banks were watching his money movements so he needed to justify his company's money movements with invoices.  UC-1 responded that it appeared that DATTA could only help by selling perfume.  However, later in that meeting, DATTA informed UC-1 that when UC-1 delivered cash to purchase perfume, DATTA did not want "round numbers," and that UC-1 should deliver ten Mexican passports. DATTA stated, in sum and substance, that he would open accounts in the names of the individuals on the Mexican passports and use those names every time an order was placed by UC-1.  UC-1 then advised DATTA that UC-1 was picking up "a lot of money" that UC-1 needed to get "down south."  UC-1 then asked again whether DATTA could help.  DATTA responded, in sum and substance, that he would find a person to open a corporation, that this corporation could be used for one year to make wire transfers, and that large amounts of money could be moved in this manner.  Later in the meeting, after DATTA confirmed with his employees that La Versailles had received the $50,000 wire transfer, DATTA told UC-1 that he wanted to return the money if UC-1 was not going to place an order for perfume.  UC-1 agreed, and the money was subsequently wired back to the undercover account.  For reasons stated below, however, including statements made by DATTA at a subsequent December 7, 2010 meeting with UC-1, I believe that DATTA requested that the transaction be canceled at that time because he, among other things, uses the purchase of perfume to disguise the movement of narcotics proceeds, and was concerned that consummating the $50,000 transaction with UC-1 absent the purchase of perfume would raise too many suspicions.

l.   On or about November 18, 2010, at approximately 5:54 p.m. (roughly one hour and fifteen minutes after the intercepted telephone call described above in which DATTA learned that CC-5 had been kidnapped), DATTA called UC-1. DATTA asked UC-1 to "call me on the cell" because he needed to "ask you something very important."  Shortly thereafter, UC-1 called DATTA back, and DATTA informed UC-1 that CC-5, a "very big customer in Mexico," had been "kidnapped."  DATTA asked for UC-1's "help."  Later that night, UC-1 called DATTA, told DATTA that he/she had "just made a phone call" and that "they asked me to find out a few things."  Based on my conversations with UC-1, I believe UC-1 was telling DATTA that he had been in contact with narcotics traffickers and that he needed additional information about the kidnapping of CC-5 to assist DATTA.  In another telephone call later that same night, DATTA informed UC-1 that

CC-5 was kidnapped by the "Zetas," a Mexican narcotics cartel distributing drugs to the United States.  Later in that conversation, DATTA stated that CC-5 was a "normal business man" and denied that CC-5 was involved in narcotics trafficking. Subsequently, UC-1 learned from DATTA that CC-5 had been freed after CC-5's family, with DATTA's assistance, paid a ransom to the Zetas.

      m.   On or about December 7, 2010, UC-1 met with DATTA in Las Vegas, Nevada.  During that meeting, the following conversations, among others, occurred:

      i.   DATTA told UC-1 that he "had been thinking since last time about how to do everything very, very clean."  DATTA continued that he needed "two to three months to set up everything" and that he would be established in "Hong Kong, Panama, Dubai" and well as "Singapore" and "some store in Europe."  UC-1 asked, "How do we open the accounts?"  DATTA responded, "I will open the accounts.  They will be under my company."  UC-1 understood this to be a reference to DATTA's statement on or about September 27, 2010 that DATTA would get a corporation created that UC-1 could use to wire money "down south."

      ii.   DATTA stated, "With some people, trust is built very, very quick.  With you, I have that trust."  UC-1 responded, "I hope we do a lot of millions."

      iii.  UC-1 stated, "I was very interested when you mentioned Panama."  DATTA responded, "I know what I'm doing. I know exactly what I'm doing.  I don't want to do nothing here. Anywhere else I can move . . . I can move . . . I don't want to say nothing, I can move."  UC-1 responded, "I understand, we talked about that before."

      iv.  UC-1 stated, "How will it work?  You bring me a number and I put it in the account?  That's how it works?  The bottom line is my people need it down south.  Panama, listen we could drive to Colombia."  DATTA responded, "I will not take any cash in United States."

      v.   DATTA said, "Where is your Mexican concentration?  I do not know where it is."  UC-1 answered, "Well, listen, we're going to work together, so I want to tell you, okay, uh, this is what's going on.  I kind of uhm, haven't been clear with you."  DATTA said, "Uhm hum."  UC-1 said, "Okay, I'm, uh, I'm moving, uh, I'm moving kilos for the uh, Sinaloa. Okay?"  DATTA responded, "Okay."  UC-1 responded, "So, when they send their product up here, I gotta send them money back.  My

problem is, sometimes, getting that money back, sometimes they want it in Mexico, sometimes they want it in Panama, or Colombia. Panama is easy because Panama, they could drive to Panama." DATTA responded, "Uhm hum." Based on my training and experience, I know that the Sinaloa Cartel is a major Mexican narcotics trafficking organization, and that, in this portion of the meeting, UC-1 was explaining to DATTA that UC-1 was a narcotics trafficker working for the Sinaloa Cartel.

      vi.   UC-1 continued to explain that UC-1 wanted to move money by corporate wire transfer, but that "I never opened one myself." DATTA responded, "You never do it under yourself." UC-1 understood this to mean that UC-1 should not open a corporation under UC-1's own name when laundering money.

      vii. DATTA explained, "I will have a legitimate business. When you mix up, no one can figure it out. When you open it for that purpose, you're dead." UC-1 understood DATTA to mean that when laundering money, DATTA mixes narcotics proceeds with legitimate business proceeds in order to disguise and conceal the narcotics proceeds from detection.

      viii.   DATTA said, "I ideally don't want to move one or two million, I want to move in hundreds." UC-1 responded that "in one year" this would be "no problem," but that UC-1 would never move that much at one time.

      ix.   DATTA said, "The cash I can move as much as, from the border towns." DATTA continued, "From border towns, from my border stores. I have eleven stores on the border."

      x.   DATTA and UC-1 discussed CC-1's kidnapping, and UC-1 said, "I used to work with the Zetas. They are violent, they're ruthless, so I don't work with them. So I remain with the Sinaloa."

      xi.   DATTA later stated, "I need to know who you are, because I need to know with whom I'm dealing. What I'm going to do. Because I do not want any type, I'm not [U/I]. Because I will do this thing for a very small time. I intend to set up a clean operation. I do not intend to set up a hanky panky operation. A clean operation which should last as long as I live." UC-1 responded, "And I tell you I would love to do just that. Money. Because I'm tired of doing the other stuff." DATTA answered, "I just want to move the money. I don't want to do anything else." UC-1 said, "You know the other stuff?" DATTA answered, "No, I don't want to do anything else. I just want to

move the money." Based on my training and experience, I believe that DATTA was explaining that he would limit his activities to laundering the proceeds of narcotics activities and would not be involved in trafficking narcotics.

xii. UC-1 asked DATTA if DATTA could move money to Panama. DATTA responded affirmatively and stated, "that will be done very fast." UC-1 asked if it could be done "without my customer having to pick up merchandise, once in Panama." DATTA responded, "That's what I am trying to figure out something."

xiii.   DATTA said, "If you can get the money to the border. To the border towns. Over there I can consume that cash. Over there I have a perfect plan." UC-1 responded, "I send you $2 million, what are you going to do with it?" DATTA answered, "$2 million, if it comes, I will tell my customers in Mexico to send the money to the Panama account and I will put the money over there into my account."

xiv. DATTA said, "That's why I'm asking you what is . . . because when I am talking, I'm talking straight. Because when you will tell me this is, 'Vikram, this is the maximum percentage,' then I can start maneuvering. And if God permits, I will maneuver so much money, you will be retired, you will not know what to do. Because I have people in India. I have politicians in India. In their Swiss accounts, wherever. You are sending the wires. From India the wires will hit the Panama. But I have to set up everything. And it will be so much I will just keep on begging you, 'More, more, come on.'" UC-1 answered, "Wow." DATTA responded, "But to get to that level, I have to make my infrastructure."

xv.   DATTA said, "I do not like to do things for pennies. You want to do business?" UC-1 said, "I have access to a lot of money." DATTA responded, "No, no, I do not need to know. Because that's why I asked you, 'Whom do you work with? Who, who it is. For me, it is not my interest." UC-1 responded, "I told you before though. You don't remember, but I did tell you." DATTA responded, "Sinaloa." UC-1 said, "Yeah, I told you that before though." DATTA answered, "I know."

xvi. Later in the conversation, DATTA stated, "Because I know for sure, a lot of customers, there is a lot of cash is coming to me. I'm reporting everything under their names. I'm pretty sure they are taking that discount someplace. It's all Sinaloa money." UC-1 responded, "You think so?" DATTA answered, "People send me, ninety percent sure." UC-1 asked,

"They're dropping it off to you?  Yeah?"  DATTA answered, "I'm ninety percent sure."  UC-1 responded, "I wouldn't be surprised because they're big, they're huge."  DATTA said, "No, they are not middle, they're very big."

    xvii.  DATTA explained that he planned to set up corporations for UC-1 that would buy and sell products, and that he would inflate the invoices above the true cost of the products.  UC-1 responded, "The bottom line is, we're moving merchandise, but the merchandise is a front."  DATTA answered, "Yes."  UC-1 responded, "I understand.  That's got to be the best way to do it."  DATTA answered, "Nobody will know."

    xviii.  DATTA continued, "It is just washing the whole money.  It is washing the whole money."  UC-1 said, "Cleaning it, cleaning it."  DATTA said, "Even if you want it clean in the U.S., you can hold it in U.S."

    n.  On or about January 10, 2011, UC-1 spoke by telephone with DATTA.  DATTA stated, in sum and substance, that he would be traveling to New York, New York on or about January 15, 2011.  UC-1 told DATTA, in sum and substance, that UC-1 had gotten CC-5's kidnappers in Mexico to partially refund ransom money that DATTA had paid for the release of CC-5 in light of the assistance that DATTA had agreed to provide to UC-1, and that UC-1 would deliver the money to DATTA in New York.  DATTA stated, in sum and substance, that he needed to spend some time on his own talking to his contacts in New York in advance of a trip DATTA was planning to take to Panama on January 19, 2011.  UC-1 understood DATTA to mean that DATTA will be working in New York, New York to establish the infrastructure DATTA would need to launder narcotics proceeds for UC-1, as DATTA explained during the December 7, 2011 meeting referenced above.

## D. Information Obtained from Financial Investigation

    14. Based on my training and experience, I learned the following:

    a. The Bank Secrecy Act of 1970 requires financial institutions and businesses to file the following forms with the Financial Crimes Enforcement Network ("FINCEN"): Currency Transaction Reports ("CTR"), Reports of International Transportation of Currency or Monetary Instruments ("CMIR") and Reports of Cash Payments Over $10,000 Received by a Trade or Business ("Form 8300").

b.   A CTR must be filed by a financial institution for each currency deposit greater than $10,000.

c.   A CMIR must be filed by any person who, _inter alia_, physically transports more than $10,000 in currency into or out of the United States.

d.   A Form 8300 must filed by any person who receives more than $10,000 in a single transaction or a series of related transactions while conducting their trade or business.

15.   Based on my conversations with agents who reviewed FINCEN records relating to La Versailles, I learned, among other things, the following:

a.   Between in or about January 2009 and in or about October 2010, $25,236,662 in cash was deposited into bank accounts controlled by VIKRAM DATTA, the defendant, and/or La Versailles.

b.   In addition, during the same period, $4,770,533 was reported via CMIR as being imported from Mexico to the United States for delivery to La Versailles by multiple individuals.  Fifty-nine of the CMIRs, which totaled $3,726,881, were filed by a co-conspirator not named as a defendant herein ("CC-7").  As described below, CC-7 routinely carries large amounts of cash over the border from Mexico to be delivered to La Versailles.  La Versailles did not file any Forms 8300 documenting the receipt of any funds from CC-7, even though CC-7 indicated in many of the CMIRs that he/she was delivering bulk cash to La Versailles.

c.   Based on the above, I believe that La Versailles, at the instruction of VIKRAM DATTA, the defendant, systematically failed to submit required FINCEN reports in an effort to avoid law enforcement scrutiny of its money laundering operations.  I further believe, based on statements DATTA made to UC-1, that DATTA routinely falsified FINCEN reports to frustrate law enforcement monitoring.  For example, as described above, DATTA told UC-1 to provide him with Mexican passports, and that DATTA would use the names on the passports to document transactions with UC-1.

16.   Based on my conversations with an agent who reviewed bank records for La Versailles bank accounts, I learned, among other things, that from on or about October 5, 2010, until on or about October 6, 2010, La Versailles wired more than $100,000 to three different perfume dealers located in New York,

New York.  Based on my training, experience, and participation in
the investigation of this matter, including statements made by
DATTA to UC-1 described above, I believe that the purchase of
perfume from these dealers furthered the money laundering
conspiracy described herein by providing DATTA with perfume
products that he could use to "legitimize" the bulk cash
delivered to him by his Mexican cartel customers, and to conceal
other illegal transactions engaged in by DATTA on behalf of his
customers.

**E.    Information Obtained from Investigation of Border Crossings**

17.  Based on my conversations with another agent who
analyzed border crossing records, I learned, in sum and
substance, the following:

a.    From on or about November 29, 2010, until on
or about December 20, 2010, CC-7 entered the United States from
Mexico at the Laredo, Texas border crossing at least eleven
times.  During these trips, CC-7 was carrying a total of
approximately $1,367,355.00 in United States currency.  During
these crossings, CC-7 reported to Customs and Border Protection,
among other things, the following:

i.    CC-7 stated that he/she owned a perfume
store in Nuevo Laredo, Mexico, which is across the border from
Laredo, Texas.

ii.    CC-7 claimed that he/she brought cash to
Laredo, Texas to purchase perfume from perfume stores, including
La Versailles.  CC-7 stated that he dealt with CC-4, a La
Versailles employee, when dealing with La Versailles.

iii. CC-7 provided an address for his/her
perfume store in Nuevo Laredo, Mexico.  A picture of the building
located at the address provided by CC-7 is attached as Exhibit A.
Based on my training, experience, and participation of the
investigation, I believe that the address provided by CC-7, which
appears to be a small residence in Nuevo Laredo, cannot be a
legitimate perfume store that generates more than $1.3 million
in cash in a three-week period.  Accordingly, I believe that CC-7
is submitting fraudulent CMIRs in order to disguise the fact that
the bulk cash being delivered to La Versailles and other grey
market perfume businesses along the United States-Mexico border

derives from narcotics trafficking activities engaged in by Mexican drug cartels.

WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of VIKRAM DATTA, the defendant, and that he be imprisoned or bailed, as the case may be.

_____
ANTHONY MADDALONE
Task Force Officer
Drug Enforcement Administration

JAN 1 4 2011

Sworn to before me this
___ day of January, 2011

_____
HON. DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

23

