UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| -v- | :  11 Cr. 102 (LAK) |
| VIKRAM DATTA, | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
### DEFENDANT VIKRAM DATTA'S BAIL APPLICATION

        PREET BHARARA
        United States Attorney
        Southern District of New York

By:   Peter Skinner
      Howard Master
      Alvin Bragg
      Assistant United States Attorneys
      (212) 637-2601 /2248 /1085

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

    -v-                              :          11 Cr. 102 (LAK)

VIKRAM DATTA,                     :

        Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT VIKRAM DATTA'S BAIL APPLICATION

The Government respectfully submits this memorandum in opposition to defendant Vikram Datta's application for bail. Datta should be detained because he poses a serious risk of flight and an ongoing danger to the community. The risk of flight that Datta would present were he released on bail is made more extreme by the strength of the Government's case, and the severeسentence that Datta faces following conviction.

### Background

**A.     Datta's Illegal Money Laundering Enterprise**

As set forth in the Complaint in this matter, a copy of which is attached hereto as Exhibit A, Datta used his perfume business, La Versailles, as well as numerous financial institutions and associates, as a vehicle for laundering narcotics proceeds. The Government has developed multiple sources of evidence establishing not only that Datta facilitated the international drug trade by laundering bulk cash narcotics proceeds through his business, but that Datta laundered this money knowingly and intentionally, out of greed. These sources include cooperating witness information; Title III intercepts of Datta and his workers, which were obtained over a period of several months in 2010; analysis of La Versailles's voluminous

banking records, and regulatory filings concerning La Versailles in 2009 and 2010; and evidence from numerous conversations and transactions engaged in between Datta and Drug Enforcement Administration ("DEA") cooperating witnesses and undercover officers in 2010.[1]

In addition to the conversations intercepted over wiretaps that are summarized in the Complaint and that help to establish Datta's knowledge of the illegal nature of his enterprise, several intercepted conversations also are particularly pertinent to the issue of Datta's danger to the community and risk of flight. Among these conversations are a series of conversations concerning Datta's efforts to collect from customers who do not pay. These conversations include one on September 17, 2010 in which Datta describes his efforts to send minions to collect from a customer in Mexico by force, if necessary.[2] During that call, Datta states of the target of his collection efforts, in response to an associate's request that he forgo collecting by force, "I have to take my money. It is like you know, if one fucker is taking money from all over, we have to kill that fucker." During another call, Datta's worker is making arrangements with the Bank of India to wire funds abroad.[3]

---

[1] Datta's attorney states in his Motion and Supporting Memorandum for Release on Bail Pending Trial ("Def. Mem.") that this conduct occurred only during a "relatively brief period of approximately 15 months from October 2009 until January 2011." (Def. Mem. 5). The Government's allegations cover this time period primarily because it has not yet had the opportunity to complete its analysis of records concerning earlier periods that have been obtained from banks and seized from La Versailles pursuant to search warrant. It expects that the evidence at trial will show that Datta has been engaging in similar conduct for far longer than the time period alleged in the Indictment. In any event, even during the period of time charged in the Indictment, financial records show that Datta was able to launder tens of millions of dollars in narcotics proceeds through his business.

[2] A draft transcript of that conversation is attached hereto as Exhibit B.

[3] A draft transcript of that conversation is attached hereto as Exhibit C. The Government is continuing to investigate the amount of funds sent abroad by Datta and the current location of those funds.

Contrary to the defendant's argument in support of bail, financial and regulatory documents demonstrate that Datta's conduct goes far beyond what any legitimate border business could engage in, consistent with the law. As the defendant sets forth in his brief, he owns 11 stores at key points along the United States-Mexico border in Texas, Arizona, and California. (Def. Mem. 6-7). As statements made by Datta on wiretaps and to undercover agents make clear, those stores were placed there by Datta to enable him to receive bulk cash from all major access points to the border with ease. (See, e.g., Compl. ¶ 12(c) (Datta explaining that due to greater law enforcement scrutiny at border crossings, all of his money was coming from "droppers," i.e., individuals who body-carry bulk cash to his storefronts)). Datta's headquarters, for example, is located in Laredo, Texas, within eyesight of the border crossing at which most of the foot traffic between Mexico and Laredo passes.[4] But unlike a legitimate border business, which may receive payment in cash but which files proper regulatory paperwork, Datta systematically underreported the bulk cash that he was receiving at his many business locations. (Compl. ¶ 15). Moreover, unlike a legitimate border business, Datta received bulk cash in locations around the United States, far from the border. Selected Currency Transaction Reports ("CTRs") concerning Datta's business, for example, show that Datta received bulk cash into his bank accounts in 2010 from third parties in non-border locations including Newark, New Jersey; Des Moines, Iowa; Westchester, Illinois; and Bakersfield, California.[5] Further corroborating the extensive nature of Datta's scheme, and his willingness to receive and legitimize bulk cash,

---

[4] A photograph taken by a law enforcement agent from the vicinity of one of Datta's many business locations in Laredo, located less than a block from the border crossing depicted in the photograph, is attached hereto as Exhibit D.

[5] Copies of these CTRs are attached hereto as Exhibit E.

wherever located, numerous La Versailles receipts and deposit instructions were found in the possession of an individual who had no connection to the perfume industry, and who was apprehended in Newark in March 2010 while carrying tens of thousands of dollars in bulk cash that he admitted he was paid to receive and deliver.[6]

Datta further knew that he was engaged in illegal conduct because most banks with whom he had done business sought to close his accounts due to concerns that the accounts were being used to engage in money laundering activities. He attempts to explain away the conversations that occurred with employees of a national bank expressing concern about Datta's activities (Compl. ¶¶ 12(c)-(d)), but neglects to mention that that bank was intending to close Datta's account as well before he reached out to powerful political contacts, and engaged in other efforts, to get the bank to rescind its decision.

Among the most devastating evidence against Datta set forth in the Complaint is a conversation that Datta had with one of the undercover officers ("UC-1") in Las Vegas, Nevada that was recorded by the Government and excerpted in the Complaint. The conversation, in which UC-1 described himself as someone who was "moving kilos" for the Sinaloa drug cartel and sought Datta's assistance with laundering the proceeds of those drug sales, further establishes that Datta understood he was laundering bulk drug money through his business, and in fact viewed his various business enterprises as a means of "moving" or "washing" money. Datta's contention in his bail motion that when UC-1 described himself explicitly as a narcotics trafficker, Datta continued to engage with UC-1 only because he was "petrified and sought to

---

[6] Copies of receipts and deposit instructions found on the bulk cash dropper are attached hereto as Exhibit F.

pacify these men who he assumed were exceptionally dangerous" (Def. Mem. 11), is preposterous. It is belied by the full conversation, in which UC-1's explicit discussion of the origin of his money was followed by Datta's lengthy discussion of his efforts to move his operations abroad, and the ways in which he could help UC-1 launder his money through transactions to India, Latin America and other countries, concluded by Datta's statement "I feel very good with you."[7]

### B. Procedural History

#### 1. Datta's Travel to New York and Post-Arrest Statements

Datta's bogus assertion that he engaged in an explicit discussion with UC-1 about laundering drug money in December 2010 out of fear of UC-1 is further belied by the circumstances of Datta's arrest. In early January 2011, Datta and UC-1 made plans to meet in Manhattan to discuss, among other things, the next steps in their efforts to create corporations and other vehicles through which UC-1 could launder drug money generated in New York and elsewhere. On January 14, 2011, in anticipation of Datta's arrival in New York, Datta was charged in the Complaint with conspiring to launder narcotics proceeds.

On January 15, 2011, Datta voluntarily and willingly met again with UC-1, this time at a steakhouse in Manhattan. During the conversation, which again was recorded, Datta engaged in further explicit discussion concerning, among other things, his plans to assist UC-1 with laundering drug money.[8] At the conclusion of the conversation, Datta was placed under

---

[7] An initial draft transcript of the entire conversation is attached hereto as Exhibit G.

[8] Datta also believed that, because of UC-1's drug cartel connections, UC-1 was able to obtain a partial refund of the ransom that Datta had paid to a cartel for the release of his associate whose kidnaping is discussed in the Complaint, and that UC-1 was prepared to provide that

arrest by DEA agents and Task Force Officers. In his statement, which was made in relevant part before Datta realized that UC-1 was in fact a Government agent, Datta falsely stated, among other things, that he had not arranged any payments to kidnappers of the associate referenced in the Complaint, and had never done business with the Sinaloa cartel or mentioned the Sinaloa cartel previously. Of course, this statement was false, as he had, among other things, previously told UC-1 that he believed the Sinaloa cartel provided the cash to his business, and UC-1 had previously stated that he worked for that cartel. Datta also admitted that he had approximately $6 million in perfume located in warehouses in Laredo alone.

### 2. Magistrate Judge Cott Denies Datta's Bail Application

On January 18, 2011, Datta was presented before the Honorable James L. Cott. Datta made a bail application, which was denied. Magistrate Judge Cott concluded, "I am not confident, at least on the present record[,] that there are a set of conditions that I can fashion to ensure the defendant's return." See January 18, 2011 Transcript ("Tr.") at 21, which was provided to the Court by the defendant. Judge Cott reasoned that the following factors weighed against granting bail:

- Datta's significant cash assets;
- Datta's ties to both India and, more significantly, Mexico;
- the proximity of Datta's residence to Mexico;
- the serious allegations in the Complaint;
- Datta's plans to live abroad;
- the significant period of incarceration Datta faces if convicted; and

---

refund to Datta at the conclusion of the meeting.

 • the nature of the charges.

Id. at 21-22.

        3.      Execution of Search and Seizure Warrants

Following Datta's arrest, DEA agents and Task Force Officers executed search warrants at Datta's home and businesses in Laredo, Texas. Datta's wife told the agents that Datta, who had been incarcerated following his arrest and did not yet have telephone privileges, had had another inmate call her to tell her not to cooperate with any law enforcement officers who appeared at the house. Evidence from the searches, as well as evidence recently obtained from other sources of information, is still being analyzed, but points to more extensive criminal conduct than had been understood at the time the Government initially charged Datta with money laundering crimes.

Following execution of the search warrants in mid-January and visual inspection of the perfume located in Datta's Laredo locations, the DEA obtained seizure warrants on February 1, 2011 enabling the seizure of the perfume that was being used as an instrumentality of the laundering offense, and that had been purchased with proceeds of the crime. On February 2, 2011, DEA agents and Task Force Officers began executing the seizure warrant. While in one of Datta's Laredo businesses executing the seizure warrants, they encountered a male employee who was in the process of concealing something. The agents approached the employee and determined that he was trying to conceal garbage bags containing a large amount of United States currency. The bags were seized pursuant to warrant, and a subsequent inventory of their contents revealed approximately $190,000 in bulk United States currency.

        4.      The Indictment

On February 3, 2011, a grand jury in the Southern District of New York returned

Indictment 11 Cr. 102 (LAK) against Datta.  The Indictment charges Datta with two money laundering conspiracy counts—one related to his efforts to launder actual drug money, and another related to his efforts to launder "sting" drug money supplied by the DEA undercover operation.

## Argument

### I.  Applicable Law

Title 18, United States Code, Section 3142(e) provides that if a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the defendant shall be detained pending trial.  In assessing the defendant's risk of flight and the safety of the community, Congress has directed courts to consider a variety of factors:

> (1)  the nature and circumstances of the offense charged;
>
> (2)  the weight of evidence against the person;
>
> (3)  the history and characteristics of the person, including . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; . . . and
>
> (4)  the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

### B.  Discussion

#### 1.  Nature and Circumstances of the Offenses

The nature and circumstances of the offenses charged are serious, and justify the

8

defendant's continued detention in view of the risks of flight and danger to the community that they present. See 18 U.S.C. § 3142(g)(1). Datta is charged with leading a major money laundering conspiracy, involving tens of millions of dollars of the drug money that feeds violence along the United States-Mexico border, and that enables those who distribute dangerous drugs in the United States to profit from the drug trade. Based on Datta's own statements, it is clear he was knowingly aiding the Sinaloa cartel, a notorious Mexican cartel, through his operations, and was unafraid to use his cartel connections, or to use violence or the threat of violence, for financial gain. His crime, and his statements, indicate a level of sophistication in concealing the location and nature of large amounts of money that he could employ to finance a flight from justice. As a leader of a large-scale laundering business, Datta is facing a Sentencing Guidelines range at the current statutory maximum of 40 years' imprisonment, were he convicted after trial.[9] The seriousness of the charges facing Datta is thus plain.

### 2. Weight of the Evidence

The weight of the evidence against Datta is quite strong. See 18 U.S.C. § 3142(g)(2). A cooperating witness has provided inculpatory evidence against Datta. Wiretaps

---

[9] The Guidelines range is calculated as follows. The base offense level for the crime of conviction would be 8 pursuant to U.S.S.G. § 2S1.1. Pursuant to U.S.S.G. § 2S1.1(a)(2), which incorporates the table in U.S.S.G. § 2B1.1, 22 levels are added because the Government currently estimates that the defendant is responsible for laundering at least $20 million. Because the defendant knew or believed that the laundered funds were the proceeds of, and were intended to promote an offense involving the manufacture, importation or distribution of, a controlled substance, 6 levels are added pursuant to U.S.S.G. § 2S1.1(b)(1). Because the defendant would be convicted under 18 U.S.C. § 1956 and the defendant was in the business of laundering funds, 4 levels are added pursuant to U.S.S.G. § 2S1.1(b)(2)(C). Because the defendant was an organizer or leader of a criminal activity that involved five or more participants and was otherwise extensive, 4 levels are added pursuant to U.S.S.G. § 3B1.1(a). This results in a total offense level of 44, which translates into sentence of life imprisonment under the Guidelines. Because the total statutory maximum for the two currently-charged crimes is 40 years' imprisonment rather than life, the applicable Guideline sentence is the statutory maximum, 40 years' imprisonment, pursuant to U.S.S.G. § 5G1.1(a).

on five different phones over a four-month period have corroborated the cooperating witness's information and revealed the staggering scope of Datta's operation.  Datta has been recorded in multiple conversations with undercover officers discussing in detail his means of laundering money.  Financial and border crossing records further confirm the scope of Datta's crimes.  And the Government is still in the process of reviewing inculpatory evidence, including cash and business records, seized from Datta's home and businesses.

Datta's efforts to minimize the weight of the evidence are unavailing.  (See Def. Mem. at 6-12).  Focusing on the wiretaps in isolation, Datta argues that they demonstrate only that he was engaged in a cash business.  (See Def. Mem. at 7-10).  As described in the Complaint, Datta's intercepted conversations certainly demonstrate more than his mere participation in a cash business.  Moreover, the wiretap conversations cannot be viewed in a vacuum.  When coupled with the undercover investigation, the information from the informant, and the financial and border crossing records, it is clear that the wiretap interceptions, which describe daily bulk-cash deliveries, provide evidence of the scope and magnitude of Datta's money laundering enterprise.

Datta's interpretation of the money laundering investigation is simply incorrect.  (See Def. Mem. at 10-11).  As described above, Datta was not reluctant to be involved with criminals.  See id.  From the first meeting in August 2010, Datta readily engaged with undercover agents representing themselves to be criminals.  Indeed, Datta boasted of his ability to move millions of dollars and described, within hours of meeting UC-1, how he could conceal the source of cash deliveries from UC-1 and conceal cash in perfume shipments sent to Mexico.  (See Compl. ¶¶ 13(a)-(b)).  And he later sold the undercover agents perfume for $40,000 in cash that was packaged to resemble narcotics proceeds without ensuring that identification was

provided or required forms were completed. (See id. ¶¶ 13(c)-(g)).

Later, when the agents tried to get Datta to wire cash without selling them perfume, Datta balked and, after learning that the agents did not want to purchase any more perfume, returned their money. (See id. ¶¶ 13(j)-(k)). It is clear from Datta's statements at the meeting and afterwards, however, that he was willing to launder the agents' money, but he wanted the coverage of a perfume transaction so that the transaction would not be suspicious. (See id. ¶ 13(k)). This demonstrates that he was careful, not that he was scared.

Moreover, two months after returning the money, Datta was meeting again with UC-1 to discuss laundering activities. Datta's willingness to engage with UC-1, who by this point was in no way hiding his purported affiliation with the Sinaloa cartel, is self-evident from the transcript of that meeting. (See Ex. G; see also Compl. ¶ 13(m)).[10] Datta's willingness to engage in money laundering for UC-1 is self-evidence from the transcript of the December 7, 2010 meeting.

Datta's arguments concerning the financial records are similarly unavailing. (See Def. Mem. at 12). Datta has seen "no evidence" of his failure to file necessary disclosure records because the Government is still in the process of producing discovery, although Datta assuredly is aware of his conduct in this regard. Further, it is not inconsistent with the operation of the Black Market Peso Exchange for Datta to have been receiving United States currency

---

[10] Datta notes that the agents had "successfully convinced [him] that they were drug traffickers from Central America" before he returned their money, see Def. Br. at 11, which occurred at the end of September 2010, see Compl. ¶ 13(k). Nevertheless, Datta also suggests that he did not know the illegal nature of his dealings with the undercovers until December 7, 2010, when UC-1 stated that he/she worked for the Sinaloa cartel. See Def. Br. at 11. Putting aside the inconsistencies in Datta's arguments, the undercover officers suggested all along that they were narcotics traffickers; they simply did not make their purported affiliations with drug cartels explicit until December 2010.

from Mexico. See Def. Br. at 12. The Government does not allege that Datta was trying "to get dollars into Mexico from the United States," see id., but rather that he participated in a scheme to legitimize bulk U.S. dollars held by narcotics traffickers all over the United States and in Mexican border towns, where traffickers can store the bulk cash securely, by laundering it through his business.

For all of these reasons, as well as the description of the evidence contained in the Complaint, the weight of the evidence against Datta is quite strong.

### 3. Datta Poses a Significant Flight Risk

Datta would present an extremely serious risk of flight were he to be released on bail. As noted by Magistrate Judge Cott, he has significant cash assets, strong ties to India and Mexico, plans to live abroad, and a residence and businesses in extremely close proximity to the border with Mexico. This is corroborated by, among other things, intercepted communications in which Datta's employees are transferring money abroad, particularly to India and Mexico. Datta himself describes his ties to India and Mexico, and his plans to leave the country and engage in business abroad in his December 7, 2010 meeting with UC-1. While the DEA has seized some of Datta's assets, it does not yet know how much money Datta has concealed in other locations, using the sophisticated means described in his conversations with UC-1, that could be used to finance a flight from justice. In addition, as reflected by the DEA's seizure of approximately $190,000 in bulk cash from Datta's Laredo store in February 2011, early even after Datta's arrest, his perfume business has continued to bring in significant amounts of cash that could be concealed and used to finance a flight from justice.

Further, Datta seeks a bail package that will permit him to remain in his residence, within shouting distance of the border, and to operate his business, which is within

direct eyesight of the border. Datta also has close business ties to individuals engaged in smuggling activities along the border, and would be in a position to seek these smugglers' services were he to be permitted to return to Laredo pending trial. It would be extremely difficult in these circumstances to formulate a package that would reasonably ensure Datta's appearance at trial, particularly in view of the strength of the evidence and the high sentence he would face after conviction.

Datta's blatant false statements to DEA agents following his arrest further demonstrate his willingness to flee. Datta was of course under no obligation to answer questions or admit his wrongdoing. But rather than remaining silent, he sought to actively mislead the agents, making statements that, as described above, were provably false. Datta has also taken steps while in jail to hinder the investigation and to continue his suspect business dealings. Taken together, Datta's actions since being arrested demonstrate that he has little regard for the criminal justice system and that his signature on a bond, even a bond secured by property and co-signed by others, is meaningless.

In short, Datta has the means, motive and opportunity to flee, and the evidence establishes well beyond a preponderance of the evidence that his continued presence in Court cannot be adequately secured were he to be released on bail.

### 4. Datta is a Danger to the Community

Finally, Datta is plainly a danger to the community. See 18 U.S.C. § 3142(g)(4). His money laundering facilitated the operations of a ruthless cartel that has terrorized Mexico and the border regions of the United States. His actions further facilitated the mass distribution of narcotics in the United States, the danger of which is self-evident. As described above, Datta has also demonstrated his willingness to use violence or the threat of violence in furtherance of

his criminal scheme. Moreover, his efforts to instruct others to decline to cooperate with the Government, and to continue to direct his business enterprise, while incarcerated, indicates that he is even less likely to refrain from continuing to engage in illegal conduct were he to be released prior to trial.

Datta suggests that the Government has reached an agreement with Datta in which eight of his locations would be allowed to continue to operate as they did before, and in which the other locations may continue operations as they had previously. (Def. Mem. at 5). This assertion is entirely inaccurate. The Government searched seized inventory from Datta's center of operations in Laredo because it had strong evidence that these searches and seizures would enable critical evidence to be preserved and prevent Datta's workers from destroying or concealing proceeds or instrumentalities of the crimes. It did not obtain an ex parte pretrial order closing or giving the Government control over all of Datta's businesses to avoid potential legal challenges to such orders, and because of the practical and safety-related concerns associated with placing a Government representative in charge of a border-based business that trafficked in bulk cash. But in no way should the Government's cautious approach be read as authorization for Datta or his organization to continue engaging in illegal conduct, or as an indication that the Government's investigation of Datta's extensive operations and his co-conspirators has concluded.

**Conclusion**

For all of the foregoing reasons, the Court should deny Datta's bail application and detain Datta pending trial.

                Respectfully submitted,

                PREET BHARARA
                United States Attorney
                Southern District of New York

By:   s/
                Peter Skinner
                Howard Master
                Alvin Bragg
                Assistant United States Attorneys
                (212) 637-2601 /2248 /1085