12gzdath                    Hearing

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                New York, N.Y.

        v.                               11 CR 102 (LAK)

VIKRAM DATTA,

                Defendant.

------------------------------x
                                         February 16, 2011
                                         3:00 p.m.

Before:

                HON. LEWIS A. KAPLAN,

                                         District Judge

                     APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  PETER M. SKINNER
     HOWARD MASTER
     Assistant United States Attorneys

SETH GINSBERG
     Attorney for Defendant

Also Present:  Joseph Cerar, ICE Agent
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
12gzdath                        Hearing
```

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,              New York, N.Y.

4             v.                          11 CR 102 (LAK)

5  VIKRAM DATTA,

6             Defendant.

7  ------------------------------x

8
                                          February 16, 2011
9                                         3:00 p.m.

10
   Before:
11
                    HON. LEWIS A. KAPLAN,
12
                                          District Judge
13

14                       APPEARANCES

15 PREET BHARARA
        United States Attorney for the
16      Southern District of New York
   BY: PETER M. SKINNER
17      HOWARD MASTER
        Assistant United States Attorneys
18
   SETH GINSBERG
19      Attorney for Defendant

20 Also Present:  Joseph Cerar, ICE Agent

21

22

23

24

25

```
              SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

12gzdath                        Hearing

1    THE DEPUTY CLERK:  All rise.  Please be seated.

2    (Case called)

3    THE DEPUTY CLERK:  Government, are you ready?

4    MR. SKINNER:  We are, your Honor.  Good afternoon.
5  Peter Skinner for the government, joined at counsel table by
6  Howard Master, another Assistant in our office, and Joe Cerar,
7  who is a Special Agent with Immigration and Customs
8  Enforcement, part of the Task Force that was investigating
9  Mr. Datta.

10    THE COURT:  Okay.

11    THE DEPUTY CLERK:  Defendant, are you ready?

12    MR. GINSBERG:  Yes.  Good afternoon, your Honor.  Seth
13  Ginsberg on behalf of Vikram Datta.

14    THE COURT:  All right, Mr. Ginsberg, it's your nickel
15  I think.

16    MR. GINSBERG:  Thank you, sir.

17    Before I begin with my bail argument, one brief
18  housekeeping matter.

19    I've provided to the Court's Deputy a stipulation
20  signed by Mr. Richard Albert, who was appointed CJA counsel at
21  the time of Mr. Datta's presentment.  Mr. Datta has also signed
22  it and I've signed it, and we request that the Court order that
23  Mr. Albert be allowed to withdraw.

24    THE COURT:  Granted.

25    MR. GINSBERG:  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           Your Honor, we request Mr. Datta be released on bail
2  pending trial.  We ask that he be released on home confinement
3  with electronic monitoring, and we ask that he be released on
4  bond of $2 million, secured by collateral consisting of three
5  properties, two residential properties worth approximately
6  $800,000 and a commercial property worth approximately $1
7  million.  This is not a case in which there is a presumption
8  against bail.
9           THE COURT:  That's property is, all the property, is
10 it not, that would be subject to forfeiture in the event of a
11 conviction?
12          MR. GINSBERG:  I don't think so, your Honor.  One is
13 the home in which Mr. Datta lives with his wife and children.
14 That is owned by his wife.  It's fully paid off.  I don't think
15 there is any indication that that property is forfeitable.  The
16 other --
17          THE COURT:  Does she have an independent source of
18 income?
19          MR. GINSBERG:  I know that she's worked during the
20 course of her life, and she's been employed by numerous banks
21 in New York for many years.  I don't -- I think recently she's
22 been working in her husband's company.  But prior to her move
23 to Laredo, Texas in I think '09, she was living in New York and
24 working, yes, sir.
25          The other property is a property that is owned by

1  Mrs. Datta and her brothers, here in New York, and that is a
2  home in which her 82-year-old mother lives, as well as a cousin
3  who is in her late 60's.
4          THE COURT: All right.
5          MR. GINSBERG: So I don't think either of those
6  properties is forfeitable.
7          The commercial property, I suppose, would be subject
8  to an argument of forfeiture, though I don't think that it's a
9  foregone conclusion at this point that it would be forfeitable.
10         But even if the Court's not persuaded to secure the
11 bail with that property, the 800,000 plus dollars in equity by
12 the residential properties I think is still substantial
13 securitization of the bail.
14         The government bears the burden of proving either by
15 clear and convincing evidence that Mr. Data is a danger, such
16 that no combination of conditions can secure the -- can assure
17 the safety of the community, or that -- or by a preponderance
18 of the evidence that he's a risk of flight.
19         With respect to the danger. There's a point in the
20 Government's papers in opposition to our application for bail,
21 and I think epitomizes the Government's argument. On page two
22 of the Government's memorandum, it argues that Mr. Datta is a
23 risk of flight -- excuse me -- is a danger to the community,
24 and it quotes from a recorded conversation. And it attributes
25 to Mr. Datta the following statement; "I have to take my money;

1    it's like, you know, if one f'er is taking money from all over,
2    we have to kill that f'er."  That, I grant you, on its face,
3    sounds problematic.  In the context of the conversation,
4    however, I think it's a complete misrepresentation of what
5    Mr. Datta was saying.  The conversation is between Mr. Datta
6    and a customer in Mexico who's purchased perfume from
7    Mr. Datta, and they're discussing a third person, another
8    customer who owes Mr. Datta money.  And what Mr --
9              THE COURT:  And the guy he's talking with is trying to
10   persuade him not to go after the other guy; right?
11             MR. GINSBERG:  Right.  And what they're talking about
12   is retrieving merchandise.  Mr. Datta is saying, if he doesn't
13   pay me, I'm taking my merchandise back.  The person with whom
14   he's speaking says -- excuse me.  Mr. Datta said to that
15   person, tell him to pay me in 15 days or take the merchandise
16   from him.  Later on the person to whom he's speaking says, "If
17   you send somebody to take that merchandise, my friend, that
18   merchandise is mine."  Apparently, they have some business
19   relationship, the two customers.  The customer goes on to say,
20   "I don't want somebody to take that merchandise because it's
21   both mine.  I have to depend on that merchandise."  Then
22   Mr. Datta makes the statement about killing the f'er.  They go
23   back on discussing how to deal with the situation.
24             The customer again says, "The best thing I can do I
25   think give him the merchandise to him.  You give him the

1   merchandise, give him $10,000."  And Mr. Datta says, "I'm not
2   going to sell him never again in my life, I'm done with him;
3   it's the third time; once an f'er, always an f'er.  I have to
4   protect my business.  You're trying to protect your business,
5   please don't tell me to destroy my business."  There's a few
6   more exchanges and Mr. Datta concludes by saying, "For you I
7   have the whole warehouse.  For him, I do not even have $1
8   credit."
9           There is absolutely nothing in that conversation,
10  apart from the one statement that the government plucks out of
11  the conversation, puts into its memorandum --
12          THE COURT:  Aside from that, Mrs. Lincoln, how did you
13  like the show.
14          MR. GINSBERG:  I don't think it's equivalent to that,
15  your Honor.
16          There's one statement, people talk about in arguments
17  and discussions all the time, I'm going to kill him if I get my
18  hand on them.  They don't mean they're going to kill him.
19  Everything he's saying in that conversation says, he owes me my
20  money, I want my merchandise.  There's nothing in there that he
21  says if he doesn't pay me, I'm going to hurt him.  They're
22  talking about retrieving merchandise.  And this customer is
23  pleading with Mr. Datta not to take the merchandise back,
24  because it's going to harm his business.  And Mr. Datta is
25  insistent that this person has dealt with him dishonorably,

he's not going to be bitten again; he's been deceived two previous times, and this is a third time, and he's done.  I don't think that the government -- that argument supports the Government's application.

With respect to the risk of flight.  There is one point in the Government's memorandum on page 12 where they say that Mr. Datta has plans to live abroad.  The conversation that the government attaches to its memorandum, it's a lengthy conversation, it's the last exhibit of the Government's memorandum.  In that conversation Mr. Datta doesn't say that he plans to live abroad.  At page four of that conversation on the bottom of the page Mr. Datta says, "I want to open an office in Panama."

I found no indication where he says that he wants to move to Panama or anywhere else.  Mr. Datta, in fact, has strong ties, if not to New York, to the community in Laredo, but to New York as well, I submit.  He emigrated to the United States from India 30 years ago, more or less, in the early 1980's.  He's a naturalized citizen since 1994.  He's an educated man.  He earned his MBA in India.  He's been married to his wife, Michelle, who is here seated in the second row in the court, for 25 years.  They have two children, one of whom goes to New York University in the City, the other of whom is 23 and lives at home with her parents.

One of the homes, as I mentioned, is -- to secure his

1     bail is a home in New York, in which an 82-year-old lives with
2     another woman who is 67 or 68.
3             The government talks a lot about ties to other
4     countries.  With respect to Mr. Datta's ties to India, yes, he
5     has ties to India.  He was born there.  His father lives there.
6     He's lived here for 30 years, though.  I don't think there is
7     any indication that Mr. Datta is fleeing back to India.  He
8     moved here on his own volition.  That was his choice.  He
9     worked hard to build a business, to start a family, and he
10    became a citizen.  He's not a citizen of India.  He holds a
11    United States passport only, which of course he would surrender
12    were the Court to grant him bail.  He has no particular --
13            THE COURT:  How is it that he is not a citizen of
14    India; did he renounce?
15            MR. GINSBERG:  I don't know.  It's not been
16    represented to me, but I can ask him.
17            (Pause)
18            MR. GINSBERG:  I'm not clear on exactly the
19    formalities of the process, but he does not hold a passport in
20    India.  If he wanted to go to India, he would have to obtain a
21    visa to go to India.  He has a U.S. passport.  He's a --
22            THE COURT:  Or possibly an Indian passport.
23            MR. GINSBERG:  Or possibly an Indian passport.  But if
24    my statement of his citizenship in India is somewhat
25    inaccurate, I'm relying on representations that have been made

to me. I am confident that he has no passport to allow him to go to India. He owns only a U.S. passport, which he would surrender.

He's lived here a long time. He's not fleeing to India.

In terms of contacts in Mexico, he has business contacts in Mexico. That's his business. He sells perfume to Mexicans, Mexican businesses. There is no indication that he is planning to move to Mexico or Panama or anywhere else. The indications in the conversations are that he wants to open offices abroad.

In terms of all the money that he supposedly has, the government seized the vast majority of the liquid assets that he's had at his disposal. They froze his business bank accounts. They've drained the money from those accounts. They claim that he was caught or his employees were caught secreting $190,000 in what they call bulk United States currency. I'm not really sure what the significance of the word "bulk" is. It's $190,000 of currency.

THE COURT: Suitcases full.

MR. GINSBERG: It's not suitcases full, your Honor. It's the proceeds of a cash business that was continuing from the time of Mr. Datta's arrest when his bank accounts were frozen, until February 1st when the agents came to seize his inventory. In the interim, they had no bank account into which

```
 1   to deposit the cash that the stores were generating.  And it's
 2   my understanding that with that cash were deposit slips,
 3   because it was due to go into a bank.  That's their normal
 4   practice.  They take the cash each day and they isolate it to
 5   prepare for bank deposit.  The banks wouldn't accept the cash
 6   because the government had frozen the accounts.
 7              The government also suggests that, well, the banks
 8   were suspicious of Mr. Datta and they were looking to get rid
 9   of him.  Not true.  As is common, the government subpoenaed
10   Mr. Datta's banking records.  The banks didn't want to deal
11   with the expense or the headache, and they told him to leave
12   the bank.  He then struggled to try maintain those
13   relationships.  And when the bank asked for verification of the
14   business that he'd been conducting, he said on tape, the
15   government quotes, "sure, no problem, absolutely fine."  And
16   they've offered no indication that they have records that show
17   that actually was a problem, that it wasn't fine.
18              They write in a persuasive manner, I grant you, and
19   they write with conviction, but there's not a lot of substance
20   to what they're saying.  There are -- it's a lot of inference,
21   a lot of innuendo.  There is not much there.
22              I think the Government's tactics in this case also are
23   relevant.  They arrested Mr. Datta on a Saturday afternoon of a
24   three day weekend.  They brought him to New Jersey and they
25   held him in a New Jersey jail.  And they pressured him, as I
```

1  understand it, fairly forcefully, to go out and wear a wire to
2  try to record other people.  Apparently, if they were watching
3  him, they weren't worried he is going to run off.  But they
4  would have been perfectly comfortable putting a wire on him and
5  letting him go out and speak to other people in the hopes that
6  he could record people.  He refused to do that.  They were,
7  apparently, unhappy with that decision -- I'm not saying these
8  Assistants -- but I understand from Mr. Datta there were some
9  heavy-handed tactics going on at that time.  The government
10 says, well, he indicated that he was trying to interfere with
11 their investigation because he told his wife, through a third
12 party in the jail, don't talk to the government.  That's just
13 not true, your Honor.  I think this is an actual literal
14 example of the children's game of telephone.  Mr. Datta was
15 locked for three days without any way to communicate to his
16 wife.  He managed to have another inmate call his wife and tell
17 her he was in jail, and say -- the message was supposed to be,
18 if the law enforcement seeks to speak to you, get a lawyer.
19 Not obstruct justice, not interfere with any kind of
20 investigation.  I have no idea exactly what was said
21 specifically from the person on the phone to Mrs. Datta, from
22 Mrs. Datta to the agent, but there was no effort to obstruct
23 justice.  There was no effort to interfere with any
24 investigation.  I think it's a perfectly legitimate message to
25 say to your wife, when you've been snatched off the street and

thrown in jail without an opportunity to speak to her for three days, hey, if some law enforcement comes to you, I've been arrested, get a lawyer.

The government also talks about the lengthy sentence that Mr. Datta faces here. I note just that when he was presented just a few weeks ago, the government stood before the Court at that time and said he was facing 108 to 135 months. That was the Government's guideline calculation. Now they say he's a level 44 and he's facing life imprisonment, and certainly the maximum of 40 years on the two counts if he were convicted. I think perhaps that's an exaggeration aimed at argument today, and not something on which the Court should rely.

I pointed out in my application that Mr. Datta's been running his business for approximately 11, 12 years, something to that effect. And if the allegations are that he was involved in misconduct for a period of 15 years -- 15 months, excuse me -- the Government's responded that, well, they assumed that when they look into his records, they're going to find out that he's actually been involved in misconduct for a much longer period of time.

Two responses to that, your Honor. First, the government told us, just last week, that it doesn't anticipate a superseding indictment in this case. So I'm not sure why they're so sure that if they look into his records from prior

1   years, he is going to be found to have been doing this for a
2   much longer period of time.
3         The second is, any party's always free to come back to
4   the Court and say the circumstances have changed and that the
5   bail status of a party should be reconsidered.
6         The evidence before the court now is that he perhaps
7   was involved in this conduct for 15 months, not for 11 or 12
8   years. And the Government's speculation, that it's going to
9   find out evidence of further misconduct, I don't think is
10  something on which the Court should reasonably rely.
11        That's pretty much where I stand at this point. If
12  the Court has any questions, I'm happy to answer them. But I
13  do think that the package that we proposed is sufficient to
14  ensure both Mr. Datta's presence in court as required, and the
15  safety of the community. I, frankly, think there's absolutely
16  no showing that there's been any risk to the community
17  whatsoever. But I think that the fact that he's willing to
18  post the homes of his wife and children, and his wife is
19  willing to put up her mother's home, I think speaks volumes
20  about what his family thinks about him. The fact that they're
21  elderly people that live here and that his children live
22  here -- he's got strong ties. I don't think it's required that
23  he have strong ties specifically to New York City. He's not
24  going to any other country. I just don't think the record
25  shows that. And it's our position the Government's failed to

12gzdath                         Hearing

1   meet its burden and that Mr. Datta should be released on bail.
2          THE COURT: All right, thank you.
3          I've reviewed the materials, and I've looked at Judge
4   Cott's decision. And I must say that at least as regards risk
5   of flight, I agree entirely with Judge Cott's take. If I have
6   any disagreement with him at all -- and I don't think I do at
7   this point because I don't think he ever formulated a view on
8   it -- I'm not so sure that I'd be much more favorably disposed
9   to release if Mr. Datta were in New York. But I'm surely not
10  disposed to release him back to Laredo, Texas, within virtual
11  sight of Mexico. No way.
12          MR. GINSBERG: May I address that, your Honor?
13          THE COURT: Well, you already had your chance, but
14  I'll allow you if you want.
15          MR. GINSBERG: If the Court is suggesting that it
16  would be comfortable releasing Mr. Datta in New York, we could
17  arrange for him to be confined to the home in which his
18  mother-in-law lives.
19          THE COURT: Well, what I just got finished saying was,
20  if I had any disagreement with the magistrate judge at all, it
21  was that I was not as receptive to that idea as he was or may
22  have been, and he wasn't too receptive. I just don't see it.
23  I see here somebody as to whom there's very substantial reason
24  to believe that he's got extensive relationships with the
25  Mexican drug cartels. He has lived and conducted his business

12gzdath                        Hearing

1  within sight of Mexico for years.  He's got massive incentives
2  to flee, and given the relationships that appear to exist, in
3  all likelihood, the means and the assistance to enable him to
4  do so.  I just think he is quite plainly a flight risk.  So the
5  application is denied.
6          Anything else?
7          MR. GINSBERG:  No.  Thank you, your Honor.
8          THE COURT:  Thank you.
9          (Adjourned)