17dkdata                          Argument

U.S. DISTRICT COURT
FILED
AUG 1 5 2011
D.S
S.D. OF N.Y.

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        11 CR 102  (LAK)

 5   VIKRAM DATTA,

 6              Defendant.                    DOC # 32

 7   ------------------------------x

 8                                       New York, N.Y.
                                         July 13, 2011
 9                                       4:13 p.m.

10

11   Before:

12                 HON. LEWIS A. KAPLAN,

                                         District Judge
13

14                      APPEARANCES

15

     PREET BHARARA,
16       United States Attorney for the
         Southern District of New York
17   PETER M. SKINNER
     HOWARD SETH MASTER
18       Assistant United States Attorney

19   WHITE & WHITE
         Attorneys for Defendant
20   DIARMUID WHITE

21   ALSO PRESENT:  Richard Reinhardt, IRS

22

23

24

25
```

1            (In open court)

2            THE COURT:  Good afternoon, everyone.

3            Mr. White, I'll hear you.

4            MR. WHITE:  Your Honor, on the motion to transfer the

5    case to the Southern District of Texas, I am not going to

6    reiterate what was in my memorandum of law and reply memorandum

7    of law, because I know your Honor has read them.

8            I thought maybe I could just elaborate on three

9    particular Platt factors.  Your Honor, the briefs of the

10   parties, it being an adversary system, we tend to argue from

11   extremes sometimes; and in the government's memorandum of law,

12   they seek to tie this case to New York in whatever way they

13   can, and I've tried to counter that in my reply.

14           THE COURT:  By trying to tie it to Laredo in whatever

15   way you can?

16           MR. WHITE:  That's the adversary system, your Honor.

17           THE COURT:  Right.

18           MR. WHITE:  But I thought an eloquent document, in

19   support of my position is the complaint itself.  You know, it's

20   a 23-page, single-spaced complaint, and not until page 21 in

21   the penultimate paragraph, does the government allege, fairly

22   briefly, that Mr. Datta obtained perfume from dealers in New

23   York City and wired $100,000 to those dealers.  And that is in

24   the complaint, I assume, Judge, as a factual basis to have

25   venue in the Southern District and probably establish venue for

1    purposes of the complaint.

2            But it goes to show how inconsequential that fact is

3    in determining whether the location of the events in this case

4    really occur in New York or in Laredo.  And if you go back to

5    page 6 of the complaint, where the government talks about the

6    investigation of Vikram Datta, they lay it out there as well as

7    I could in my memorandum why the events of this case are

8    centered in Laredo:

9            The perfume that was sold was sold from Laredo into

10   Mexico; the receipt of the payments by wire, cash or check, was

11   received in Laredo; the wiretaps occurred in already; the banks

12   where this money was deposited and where regulatory filings

13   were or were not made were in Laredo; the searches and seizures

14   all occurred in Laredo; the conduct of the employees of

15   Mr. Datta, which in the complaint -- the complaint alleges the

16   co-conspiracies all occurred in Laredo.  I don't think it

17   couldn't be clearer than Laredo is the nerve center of this

18   case.  And I say in my motion, that the connection to New York

19   is negligible, your Honor.  And I don't see any fact to change

20   that.

21           I think the government's position is that the

22   investigation occurred out of the Southern District, and that's

23   why the case should remain here.  But that's an insubstantial

24   reason, your Honor.

25           I wanted to address the location of relevant

17dkdata                          Argument

1    documents.

2              THE COURT:  Why is that so insubstantial?  Platt makes

3    relevant the expenses to be incurred by the parties, and it is

4    to some degree a convenience test, not perfectly identical to,

5    but similar to that, that applies in a civil case under 1404.

6    And what you've got here is a large government investigation

7    with a prosecutorial team, and a transfer to Laredo means

8    uprooting the whole thing and moving halfway across the

9    country.

10             MR. WHITE:  Your Honor, that is a concern.  I don't

11   think it is an important concern under Rule 21(b) because the

12   purpose of Rule 21(b) is fairness to the defendant, your Honor,

13   by trying him in a place remote from where he's located.

14   That's why we have a Rule 21(b).  I cited to you Judge Griesa's

15   observation that the government brings a case in a district

16   where they really shouldn't have brought it because all the

17   acts were someplace else; and then they argue, well, look at

18   the manpower we have here, and we've started this.  That's a

19   circular argument, your Honor, that I just don't think should

20   count heavily in the government's favor, that because they

21   brought it here, well, it should stay here.

22             And if you look at --

23             THE COURT:  But that is the default principle.  Unless

24   the party seeking the transfer can show substantial reason for

25   moving it, the fact that it was brought here actually does, if

17dkdata                        Argument

1      not control, certainly count for something material.

2           MR. WHITE:  Well, Judge, there's disagreement over

3      that.  The cases I cite in my reply brief -- and right in

4      Miller, by the way, they debunk that theory, saying this rule

5      is fairness to the defendant.  It turns it upside down if you

6      say it should be presumed to be in a district that it was

7      brought.

8           In one of the cases cited in my brief is United States

9      versus Hanley, where I think it was Judge Batts said that

10     inconvenience to the government is not, in the cases, given

11     much weight.  And she cites to cases; one is United States

12     versus Gruberg.  And I looked at that this morning, and Gruberg

13     cites a case going all the way back to 1960, before Platt.  And

14     the judge then, whose name escapes me -- I wasn't familiar with

15     the district court judge, but a Southern District judge, said

16     the same thing that Judge Griesa says he says, you know -- the

17     most compelling argument the government has is, gee, they put a

18     lot of work into it in this district; but he says, I'm not

19     going to give that any weight because they shouldn't have

20     brought it here in the first place.

21          They were aware of the facts that I am relying on to

22     say venue -- I mean venue should be transferred to Laredo or

23     the Southern District of Texas.  They were aware of it when

24     they brought the case here, your Honor.  And now for them to

25     rely on that and say, hey, we brought it here, and we're ready

1      to try it here, Judge, I don't see the substance of that.  You

2      say that's a substantial, almost a controlling reason?  I don't

3      see the substance of it at all, your Honor.

4              THE COURT:  I don't mean to suggest it's almost

5      controlling, but we don't litigate transfer motions on the

6      criminal side all the time -- they're pretty unusual -- but

7      many of the factors are very similar to the civil side.  And

8      certainly the policies to some degree are comparable, not

9      completely but to some degree, and on the civil side, the

10     principle is that normally the plaintiff's choice of forum is

11     entitled to a great deal of weight.  But the extent to which

12     it's entitled to weight is undermined the more remote the

13     plaintiff's chosen forum is to what's really going on.

14              Now, the plaintiff's choice -- I'm not sure if it's

15     ever denied any weight but certainly the degree of the weight

16     diminishes.  I'm not sure you're really saying anything

17     different, right?

18              MR. WHITE:  Not really, not really.

19              But I don't see -- I just don't see the ties to

20     New York at all.  They're really insubstantial.  So if the

21     government had -- you decided a Rule 21(b) motion in Stein.

22     The government brought that here, but there was a lot going on

23     in New York and I think that was probably the pivotal point

24     that you decided that motion on it's ephemeral; they shouldn't

25     have brought it here.

17dkdata                    Argument

1          THE COURT:  It's not like nothing; the business

2   started here.

3          MR. WHITE:  It did not start here.

4          THE COURT:  He lived here, the family was here.

5          MR. WHITE:  Those are insubstantial.  The business did

6   not start.  Mr. Datta had many, many jobs in New York, and he

7   broke into the perfume business in New York but then he moved

8   to Laredo ten years ago and he started a whole new business

9   there.  It's not like he transferred his business.  That's just

10  not true.

11         THE COURT:  Isn't there evidence that he was back and

12  forth in the year two or three before the indictment came down,

13  and that the family was still here?

14         MR. WHITE:  Yes, your Honor, yes.  But he lived in

15  Laredo and he worked in Laredo.  His family, in order that his

16  two daughters could continue their education in New York

17  because the family believed the schools were better here than

18  Laredo, the family stayed here.  He lived and worked in Laredo.

19  Of course, as a father and a husband, he came to New York to

20  see them.  But what does that have to do with the case?  What

21  does that have to do with the case?

22         THE COURT:  You say he lived and worked in Laredo.

23         MR. WHITE:  Yes.

24         THE COURT:  To this day, his driver's license is

25  New York, right, to this very day, not Texas?

17dkdata                        Argument

1              MR. WHITE:  Yes.

2              THE COURT:  And until, what is it, nine months or a

3     year ago the family was here and he was really residing in both

4     places for all practical purposes; isn't that true?

5              MR. WHITE:  Not really, Judge.  He wasn't residing in

6     both places.  He was visiting here, he lived in Laredo, he

7     worked in Laredo.  It's a big operation he had down there.

8     That's all he was doing, a guy who he was working seven days a

9     week in Laredo.  But what does it matter he didn't change his

10    driver's license to Texas?  What does that have to do with the

11    case?  It doesn't.  I mean, Judge, this is grasping at straws.

12    That's the best the government has as to why this case belongs

13    in New York.  What about the crimes?  Where were the crimes

14    committed?  Isn't that what it should be, not these peripheral

15    ephemeral tidbits?

16             THE COURT:  But you're making assumptions there too, I

17    think, really.  The government alleges very large quantities of

18    these perfume-for-dollar and perfume-for-peso transactions.

19    The guy is dealing with 17 perfume suppliers in New York.  I

20    take it that's not really controverted.

21             Now, whether his business was 10 percent, 50 percent

22    or 80 percent black market peso exchange, some proportion of

23    what he's buying in New York, assuming the allegations of the

24    indictment are true, is for the purpose of carrying out the two

25    conspiracies alleged in the complaint and at least some of

17dkdata                         Argument

1    those purchases, at least in some part, are overt acts in

2    furtherance of the conspiracy committed in this district, no?

3            MR. WHITE:  They may be overt acts, your Honor.  But

4    as we know, overt acts, it doesn't take much to constitute an

5    overt act.

6            THE COURT:  I know, but it's good enough for venue.

7            MR. WHITE:  It is good enough for venue.  If that were

8    established, it's probably good enough for venue for the

9    conspiracy count.

10           But, Judge, in terms of what a jury is going to have

11   to decide in this case, the fact that he ordered the perfume

12   from New York, as he did from Florida and as he did from

13   Los Angeles, it's so inconsequential to this case.  As I say in

14   my motion, we could stipulate to it in a one-page stipulation.

15   What does it say about the crime committed, that -- it's

16   irrelevant where he got the perfume from.  What the crime is,

17   what they have to prove is, what he did with the perfume,

18   selling it as part of this so-called black market peso

19   exchange.  Where he got it from, Judge, it's almost immaterial.

20   For that to have the weight to keep it here, I just don't see

21   it at all, your Honor.  I think the government has gone through

22   their case and their complaint and any time they see New York,

23   they've tried to make an argument, but it really has nothing to

24   do with the case that's going to be tried.

25           THE COURT:  OK, anything else?

1           MR. WHITE:  Yes.

2           THE COURT:  Sure.

3           MR. WHITE:  Let me talk, as a criminal defense lawyer

4    trying to figure out how to try this case, about some of the

5    practicalities.  These are just two Platt factors that I didn't

6    elaborate on in written -- I didn't really make clear what my

7    thinking is in the written submissions.

8           The location of the documents:  There's a lot of

9    documents, 65,000 pages of documents.  It was made available

10   through discovery --

11          THE COURT:  That used to be a lot of documents.

12   That's not a lot of documents anymore.

13          MR. WHITE:  I guess.

14          It was made available on one CD.  Now, these

15   documents, a lot of them are invoices, sales receipts, cash

16   receipts, just the government, when they searched the

17   warehouse, they basically took out all the records and I have

18   them now on a CD in PDF form.  But I really need the staff of

19   the business to explain documents to me, what they are.

20   Mr. Datta, he really didn't engage in the day-to-day

21   transactions himself; he was running around opening stores, he

22   was dealing with suppliers, he was dealing with wholesale

23   customers.  But the actual transaction was done by staff,

24   bookkeepers, salespeople in Laredo.  Whenever I ask him about a

25   particular transaction he tells me, oh, you've got to go ask

17dkdata                    Argument

1    so-and-so.

2         I've been on trial in this courthouse where the

3    government introduces a lot of documents that are somehow seen

4    in discovery but I'm never sure which ones they're going to

5    introduce into evidence and I'm trying to figure out what it

6    is.  I need to have the staff of his business nearby so if

7    things come up during trial about a particular transaction --

8    look at this suspicious deposit, what was this -- I can go to

9    them at night or over the weekend and say, explain this

10   transaction.  It's a very practical consideration, Judge.

11   Before all the electronic discovery, that's why this is a Platt

12   factor -- access and location to the records, where will the

13   records be that --

14        THE COURT:  Let me ask you a practical question about

15   this.  You've got a CD with 65,000 PDFs on it.  Now, for a

16   couple of bucks, you could have two CDs, you could have eight

17   CDs, you could have 20.  Long before you get to trial you could

18   have those CDs in the hands of all these people in Laredo, whom

19   you might want to consult.

20        So when at 7:00 o'clock during trial, in the evening,

21   you have a question about document XXX, you pick up the phone,

22   you say, put the CD in your computer and look at this page,

23   explain it to me.  What is the big deal?

24        MR. WHITE:  That's possible.  It's just not as

25   effective as sitting down with a bookkeeper over her desk and

1    having her explain the document to me, going to get another

2    book or ledger or something, to show me where this was entered,

3    and having real access to those documents.  What you describe

4    is theoretically possible.  It's difficult to make telephone

5    calls to another time zone after work.

6              THE COURT:  It's one hour difference.

7              MR. WHITE:  Excuse me?

8              THE COURT:  One hour difference, isn't it?

9              MR. WHITE:  Yes.  But, your Honor, this is, I think,

10   what -- I'm talking about real access to the documents, so I'm

11   on the same page during trial, I can get quick answers to

12   documentary evidence that the government is going to introduce.

13             Just one other Platt factor I want to talk about, your

14   Honor, if you'll indulge me:  These are any other special

15   circumstances.  When I first was engaged in this case, I went

16   down to Laredo and I walked around and I saw the stores,

17   Mr. Datta's stores and all the other stores along the border.

18   I saw thousands of people coming across the international

19   bridge from Nuevo Laredo into Laredo.  And as a matter of fact,

20   I walked across the bridge and came back just to see it.  And I

21   learned a little bit about Laredo.

22             Before I had gone down there, I had tried to learn

23   from reading, I had Google-mapped Laredo to try to figure it

24   out, and I couldn't get a fix on it until I got down there and

25   actually saw this.  And I was very impressed by all these

1    people coming back across the bridge.

2            When I came back, I met about the prosecutors and I

3    talked about Mr. Datta and his business and how there's a

4    tremendous amount of retail sales along the border.  And they

5    said, come on, how does a guy have five perfume stores in

6    Laredo on the border, you know, how could that be?  And to a

7    New Yorker, that's difficult to fathom; it might look

8    suspicious.  The government could argue to the jury here,

9    what's this guy from New York going down to Laredo and opening

10   up five perfume stores?  What's that all about if it's not to

11   launder money for a drug cartel?

12           An Assistant U.S. Attorney assigned to the Laredo

13   office would never make that argument to a jury in Laredo

14   because those people understand the border commerce.  It's been

15   going on for 150 years Laredo.  After the annexation of Texas,

16   Laredo boomed, and it's all been people coming from Mexico,

17   coming across the border to shop in these stores in tremendous

18   volume on weekends, Christmas, Cinco de Mayo, and bringing over

19   U.S. currency, for a lot of reasons, and not just recently,

20   going all the way back 150 years.

21           Now, they're fearful of Mexican drug cartels; then it

22   was banditos; there were security problems.  There was better

23   product available in the United States, it was available at

24   better prices, they didn't have to pay high duties, they

25   preferred -- they didn't trust the banks because of inflation

17dkdata                        Argument

1   with the pesos, they had to pay high tariffs.  And for all

2   these reasons, these border stores have boomed and have boomed

3   for over 100 years.

4          But what is a New York juror -- how can they relate to

5   that the way a Laredo juror would?  It's important, to show --

6   we are going to establish at trial that he ran a legitimate

7   business, your Honor.  But it's not going to look that way to a

8   New York jury because it sounds strange as hell that a guy

9   would have five stores right on the border there, unless he had

10  some pernicious purpose.

11         So when they talk about special circumstances under

12  Platt, that's an important -- it's probably the one factor that

13  motivated me to make this motion, your Honor.  Trying this case

14  in New York would be very difficult, to try to understand

15  Mr. Datta's business and to understand that he is not de facto

16  a criminal because he set up on the border with Mexico where

17  there's a lot of drug cartels.

18         Your Honor, the other Platt factors I've discussed in

19  my memorandum of law, your Honor, and I'm not going to

20  reiterate what I have there.  But if you take all of these

21  factors, your Honor, and on balance ask the question:  What is

22  fair -- fair to the defendant -- and what's in the interests of

23  justice?  In the interests of justice, your Honor, not in the

24  interest of convenience so much but in the interests of

25  justice, I think this case in fairness really should be

17dkdata                        Argument

1     transferred to Texas.

2              THE COURT:  That's what I don't understand, to tell

3     you the truth.  If you say that the conditions in Laredo are so

4     different, why can't you present evidence of that?

5              MR. WHITE:  It could be done, it could be done.  It's

6     just not as effective.  It's not as effective when jurors

7     understand it, just like I used the analogy trying to sum up to

8     or try a case in Laredo about a metropolitan mass transit

9     system.

10             THE COURT:  We have jurors in this courthouse all the

11     time who hear criminal cases in which witnesses get on the

12     stand and say that you've just heard this tape recording and

13     when the witness was talking about the girls in the Cadillacs,

14     he was talking about the cocaine and the heroin.  That's the

15     way it works north of 125th Street or wherever.  And typically,

16     what's being described to them is a culture with which the

17     jurors have no connection, other than the evidence they hear in

18     the courtroom.

19             MR. WHITE:  That's true, your Honor.  I think it's a

20     matter of degree here, is one reason.  And also I think it's

21     inherent in the whole venue provision in Article III and the

22     Sixth Amendment that the right to be tried in the venue where

23     you live, where you work, where the crime occurs and where the

24     jurors will be drawn from, I think that's inherent in that very

25     principle.

17dkdata                        Argument

1           THE COURT:  Well, you're not making a venue argument,

2    an improper venue argument, Constitutional or otherwise, are

3    you?

4           MR. WHITE:  No, I'm not, your Honor.  But I think

5    those principles obtain here in Rule 21(b).  That's why Rule

6    21(b) has this fairness component to it, the fairness to the

7    defendant and the interests of justice component to it.

8           THE COURT:  OK.  Anything else you'd like to add?

9           MR. WHITE:  No, your Honor.

10          THE COURT:  Thank you, Mr. White.

11          Mr. Skinner?

12          MR. SKINNER:  Thank you, your Honor.

13          Your Honor, the crimes in this case were committed in

14   Mexico, Texas, Arizona, California, Florida, New York, all over

15   the United States, all over the world.  And Mr. Datta ran a

16   national, international money laundering operation.  And the

17   connections with New York are neither remote nor unfair for

18   this defendant in this case.  He bought a significant amount of

19   perfume from this city, from this state, from this

20   jurisdiction.  He could not have committed the crimes he

21   committed without that perfume as a crucial part of his scheme.

22   He got into a business up here.  He had significant --

23          THE COURT:  Well, the business he got into up here was

24   what exactly?

25          MR. SKINNER:  The perfume business.  And he got

17dkdata                        Argument

1    into --

2             THE COURT:  Nothing wrong with that, right?

3             MR. SKINNER:  No.  And we proffer that at trial we

4    intend to call cooperating witnesses from the New York area who

5    know the defendant who were in business with the defendant, who

6    had business dealings with the defendant before he moved to

7    Texas, who were familiar with the reasons why he went to Texas,

8    in their belief, to capitalize on the proximity of all this

9    narcotics cash that was sitting there on the border, and they

10   continued to deal with him.

11            THE COURT:  Let's pause on that for a minute.

12            Are you telling me you are going to present evidence

13   from witnesses based up here who will say that he told him he

14   was going down there to launder drug money across the border?

15            MR. SKINNER:  No, your Honor, I don't think the

16   witnesses -- and, frankly, I'm still in the process of

17   debriefing and proffering them, but I don't think they're going

18   to get up and say the defendant told us back in 2000, hey, I've

19   got to pick up camp here and move down to Texas in order to

20   capitalize on all this drug money.  I think what they're going

21   to say is that they themselves were involved in the black

22   market peso exchange, that they themselves were accepting bulk

23   cash deliveries of narcotics proceeds in New York City.

24            THE COURT:  Your cooperator.

25            MR. SKINNER:  Our cooperator is going to say this.

17dkdata                          Argument

1          And that they understood, through their dealings with

2    Mr. Datta before he left for Texas as well as after he was in

3    Texas -- because they continued to deal with him right up until

4    the time of his arrest -- that it was their belief and their

5    understanding from his communications in general and one of the

6    reasons he was down there was to take advantage of these

7    proceeds.

8          THE COURT:  By what stretch of the imagination is

9    their beliefs as to his motives admissible in evidence?

10         MR. WHITE:  Maybe it won't be admissible, your Honor,

11   but what I'm trying to explain -- I got a little off track.

12   What I'm trying to point out here is, the defendant had

13   significant contacts with New York, both before he left and

14   then after he moved to Texas he continued to deal with these

15   particular cooperators, he continued to buy his product up

16   here, his family moved up here, he had a driver's license that

17   he never changed, his cell phone was up here.  Some of these

18   factors are more significant than others, but the point is that

19   this district, this jurisdiction, is neither remote nor

20   unfamiliar to this defendant.  He's well acquainted with New

21   York City.

22         And perhaps most importantly, in the course of the

23   undercover operation, he was dealing with individuals who

24   identified themselves as being from New York and New Jersey,

25   who needed to move money that they got from up here down South.

17dkdata                          Argument

1    And in the course --

2                THE COURT:  Money that you're going to prove he knew

3    to be drug money?

4                MR. SKINNER:  He knew to be drug money, precisely,

5    your Honor; it was represented to him to be drug money.

6                THE COURT:  From New York?

7                MR. SKINNER:  From -- I believe so.  I don't want to

8    overstate things now, your Honor, because I'm not sure if we go

9    back and look at the recordings if the statements would

10   actually be, "I got drug money on Fifth Avenue and I've got to

11   get it down to you."

12               THE COURT:  No, no, what I'm trying to find out is

13   whether the government is offering to prove that he either

14   dealt with people in New York who told him they wanted to move

15   drug money wherever the New Yorkers got the drug money, or that

16   he dealt with people for the purpose of moving drug money that

17   came from New York, either/or.

18               MR. SKINNER:  The former.  He dealt with people who

19   represented that they were from New York and New Jersey, who

20   represented that they needed to move drug money down South.

21               THE COURT:  Where did he deal with those people?

22               MR. SKINNER:  He dealt with them in Arizona, in

23   Las Vegas, where he met with them multiple times; he met with

24   them in San Diego, California; he spoke with them multiple

25   times on the phone when they were located back up here in

1    New York and New Jersey and they made their location to him

2    apparent.  They flew down and they made a $40,000 bulk cash

3    delivery in California.

4         I'm not sure, I think defense counsel may have

5    represented that delivery to have been made in Texas.  That's

6    incorrect.  The $40,000 in cash that the undercover delivered

7    was in California.  They wired money to the defendant from

8    banks in New York.  It was clear to the defendant from what

9    these undercovers were telling him, that they were a

10   New York-focused operation.  The defendant even told them, "I'm

11   thinking about opening up a warehouse up in New Jersey."  It's

12   apparent in the conversations between them.

13        THE COURT:  So the witnesses you've just referred to

14   with whom he dealt, who identified themselves in one way or

15   another as New Yorkers wanting to move drug money, were they

16   all undercovers, that is, government agents, or were some of

17   them nonagent witnesses?

18        MR. SKINNER:  There were two undercover agents, both

19   of whom are government witnesses, both of whom are residents of

20   New Jersey, who were introduced to defendant by a cooperating

21   witness, who was also from the New York City area.  And I don't

22   believe there are any other witnesses involved in the

23   undercover aspect of the operation.  The defendant had

24   interactions with one undercover in particular, and a second

25   undercover traveled to Southern California to deliver the

17dkdata                    Argument

1    $40,000 in bulk cash proceeds.

2           Really the point I'm trying to make here is that the

3    crimes were committed all over the United States, and there was

4    certainly, in this defendant's mind, a significant connection

5    to this particular area of the country.  It's not as if we're

6    plucking him out of southern Texas and bringing him to a

7    jurisdiction that he's never been to, that he had unwitting

8    contact with through some kind of wire transfer that he wasn't

9    aware of, that he doesn't know anything about, that he doesn't

10   have any connections to.  To the contrary, the defendant was

11   well aware that some of his criminal activity was touching

12   New York.  He was well aware that it was touching a number of

13   other jurisdictions on top of that.

14          And just when we're talking about the overall fairness

15   of whether this defendant should be tried here, as we've

16   established in our papers, and as I think the Court is well

17   aware from the bail arguments and such, this is a defendant

18   with a longstanding tie to this particular jurisdiction.  So it

19   doesn't seem to us that this is a case that cries out, for

20   unfairness or in the interests of justice, for being sent

21   someplace else where the defendant happens to reside.  This is

22   a man who was born in India, came to the United States, lived

23   in New York, has lived in Texas for a period of time, travels

24   widely.  There's no inherent unfairness in having him up here.

25          The defendant said that he just doesn't see the

17dkdata                          Argument

1    substance and the connections with the Southern District of New

2    York.  We tried in our papers to explain what we think we're

3    trying to elaborate on here, but I think what matters here is

4    the substance of the defendant's arguments about why this case

5    shouldn't be tried here, and they're nonexistent.  We don't

6    have any evidence from the defendant as to witnesses who are

7    unable or unwilling to travel to New York in order to testify

8    on his behalf.  We don't have any evidence from the defendant

9    about whether he's financially unable to bring people here.

10   And if he were, of course he would have access to Rule 17(b)

11   and can make an application to this Court to have the

12   government bear that expense if that were actually the case.

13   There's no substance to the defendant's argument that his

14   position is somehow untenable or unfair or that things will be

15   substantively better down there.

16            On the other hand, Rule 21(b) doesn't talk about

17   fairness to defendants; it talks about fairness to the parties.

18   The word "parties" appears in there.  And the rule in the case

19   law plainly contemplates fairness to the government as well as

20   to the plaintiff.  And as the Court has observed, significant

21   effort has gone into the case from this district, the

22   prosecution team is up here, virtually all of the government's

23   witnesses, whether they're law enforcement, cooperators or lay

24   witnesses, with the exception of the employees from California

25   who the government may call to establish that the money was

17dkdata                        Argument

1    delivered, virtually all the government's witnesses are from up

2    here.  Causing us to uproot everything we have up here and

3    moving everyone down there would be a significant burden to us,

4    would be a significant expense and burden to the personnel

5    involved in trying this case.

6              Just to respond briefly to the practicalities argument

7    that the defendant raised:  I don't really follow it, to be

8    totally honest with you.  The documents are in electronic form,

9    they have Bates numbers on them.  The original documents are in

10   our custody.  They're located here in New York, they're all

11   here.  So the easiest way for defense counsel to go through the

12   physical documents would be to bring the witnesses up here so

13   he could sit down with them and go through them.  If he wants

14   to -- otherwise he's going -- out of court, he'd do exactly

15   what he could do if they're located in Texas, which is copy the

16   disks, send it down to them and say go to page 5067 and take a

17   look at that and tell me what it is.  I'm not sure I entirely

18   follow the practicalities of the argument.  Given the

19   technology of today, it's a little different than when Platt

20   was decided, back in the late '60s.

21             And the only other thing I want to emphasize is where

22   we are in this case.  We have a trial set to start in a little

23   under two months.  This Court wanted to have that trial even

24   earlier, but through the request of defense counsel, given the

25   volume of discovery, set a trial date further out, in

17dkdata                         Argument

1   September.

2           If we were to transfer the case down to Texas now,

3   regardless of what the respective docket loads might be in the

4   Southern District of Texas versus this Court, there's just no

5   way it's actually going to happen in September.   A new judge is

6   going to have to get up to speed, and, probably more

7   importantly, I would imagine defendants are going to have local

8   counsel there who's going to say, I need to get up to speed,

9   and we're going to need to get a local prosecutor up to speed.

10  Even if all of us go down, we'll want a local prosecutor from

11  the Southern District of Texas helping us out.

12          THE COURT:   You'll all on both sides have to be fitted

13  for your boots.

14          MR. SKINNER:   Precisely, perhaps a hat and belt

15  buckle.

16          THE COURT:   And the string ties.

17          MR. SKINNER:   In any event, we didn't get wind of this

18  motion until shortly before it was filed.   It wasn't filed at

19  the beginning of the case.   I really don't know why this isn't

20  like Judge Sotomayor's case in the spie case, where a lot has

21  happened that's involved a lot of time and energy of the Court,

22  and I think that factored into her analysis but this is a case

23  where the government is ready to try the case up here in

24  September.   And if the motion to transfer is granted, it's not

25  going to happen as quickly down in Laredo, Texas, and I don't

17dkdata                    Argument

1      think that that factor weighs in here.

2              In sum, I think I'm not going to go through all the

3      Platt factors.  I think if you look at all of the Platt

4      factors, they either favor the government or are neutral.  And

5      I don't think there's any real substance to defendant's claim

6      that he's being prejudiced, that it's unfair for him to be

7      here.  And I think under those circumstances, he hasn't met the

8      burden of establishing that the interests of justice require a

9      transfer of venue.  And in those circumstances the Court should

10     follow the general rule, which is reiterated in decision after

11     decision, that the case should be kept in its original

12     district.

13             THE COURT:  Thank you.

14             Mr. White, anything else?

15             MR. WHITE:  Yes, your Honor, if I may.

16             Just to touch on one of the last things that was

17     mentioned:  This motion was actually made on May 17th,

18     approximately two months ago.  So I came into the case in

19     March, your Honor, so the government has had notice since then

20     that this is something we wanted to do.  And it was made then

21     because it was only then that we were able to assess the case

22     and understand it actually.

23             THE COURT:  Well, you had a predecessor.

24             MR. WHITE:  I don't think it ever occurred to the

25     predecessor, your Honor.

1          THE COURT:  Well, that may be, but the fact of the

2     matter is, it certainly didn't amount to ineffective assistance

3     not to make a venue motion on his watch.

4          MR. WHITE:  No.  We are prepared to try the case in

5     September.  We want to try the case in September.  Mr. Datta is

6     detained.  We think we can get on the docket very quickly in

7     Laredo.  So we're not doing this to delay; it's the last thing

8     we want to do, is delay.

9          Mr. Skinner said that Mr. Datta's business was

10    international and national.  And that's really not -- that's

11    kind of a mischaracterization.  It was international with

12    Mexico.  National?  It really wasn't; it was regional.  All the

13    sales were along that one border there.  It's not like spy

14    factory where they were in every major city in the United

15    States or other cases like that.

16          The government talked kind of cryptically about people

17    who would say that they had dealings in New York or with

18    Mr. Datta.  And I'd like to address those.  One of the them was

19    a supplier; there's a cooperating witness who was a supplier,

20    who had supplied perfume to Mr. Datta's businesses for many

21    years.

22          In October of 2009, Mr. Datta came up here, met with

23    this cooperating witness to order perfume.  And the cooperating

24    witness recorded that conversation because he was cooperating

25    at that time.  It's one of the most boring conversations you'll

17dkdata                              Argument

1   ever listen to because it's about an hour and a half long, an

2   hour and 15 minutes, is actually ordering perfume, how many

3   bottles of this, how many of that.  But the cooperator and his

4   father pumped Mr. Datta about how's business going, and it

5   comes out that he does a lot of cash business, he does a lot of

6   cash business from his Mexican customers.

7         So the cooperating witness, actually his father, says

8   to him, is it drug money?  He comes right out there.  And

9   Mr. Datta replies -- and it's in Hindi because the father spoke

10  Hindi and he replied in Hindi -- he said, I don't know, OK.  So

11  as far as these witnesses from New York saying they have

12  knowledge of him being involved in drug trafficking, it's not

13  going to happen.  The other witnesses from New York are the

14  undercovers, the DEA agents.  Count One is basically, your

15  Honor, the wholesale sale of perfume into Mexico, to Mexican

16  perfume distributors.  Count Two is the sting operation.

17        The sting operation was born in Las Vegas when an

18  undercover was introduced to him as somebody who, first, who

19  had customers in Mexico and was looking for somebody to handle

20  his business in Mexico.  The undercover later gradually moved

21  into a sting.  This happened in Las Vegas.  At the undercover's

22  insistence -- he said, I'd like to buy perfume in San Diego.

23  Money, $38,000 worth, was paid for the perfume in San Diego,

24  actually San Ysidro.  That money apparently obviously was

25  government money.  To attribute that to New York, yes, the

1    undercover said in some of these conversations that he works

2    out of New York but, again, your Honor, it's so insubstantial

3    to apply to New York.  That the money came from New York?

4    These are government funds, your Honor, it's not like there are

5    witnesses in New York who will say that --

6           THE COURT:  I think the point is that your client, the

7    government would say, understood that it was drug money and

8    given the witnesses' statements about where the witness was

9    working out of, it was likely drug money off the streets of

10   New York.  Isn't that what they would say?

11          MR. WHITE:  The witness would say that?

12          THE COURT:  No, the government would make that

13   argument.

14          MR. WHITE:  Assume that that were true and admissible

15   as a proper argument, your Honor, that the --

16          THE COURT:  It would be an inference.

17          MR. WHITE:  Is that enough to try -- say that this

18   crime, 98 percent of which occurred in the Southwest, is a

19   New York-based crime?

20          THE COURT:  They don't have to show it's a

21   New York-based crime.

22          MR. WHITE:  No, no, but the Rule 21(b) cases, most of

23   them, a lot of them, talk about where is the nerve center of

24   the crime that was committed.  It was clearly Laredo, Texas,

25   your Honor, clearly.  In this day and age of mass

17dkdata                    Argument

1      communications, you're going -- you could find a link to

2      probably every district in the country, you know, but where is

3      the nerve center of the crime that was committed?

4              This idea of having the bookkeeper from Laredo come up

5      to New York and stay on hand for as long as the trial so I can

6      consult with her up here about what did these records -- it's

7      so impractical, your Honor.   The government has the original

8      records --

9              THE COURT:   How is it impractical?   I don't understand

10     that.

11             MR. WHITE:   To have the people come up here to

12     New York to be on hand?

13             THE COURT:   Yeah.   How is it impractical?

14             MR. WHITE:   It's expensive, it's expensive.   It's

15     expensive --

16             THE COURT:   He's paying the bookkeeper anyway, right.

17     What's a plane ticket from Laredo here?

18             MR. WHITE:   But, your Honor, to have her on hand,

19     isn't that -- I mean the inconvenience to the witnesses to have

20     them come up here to do that?

21             THE COURT:   Maybe she likes New York.   Let's not get

22     carried away.   We've all been in this business a long time.   I

23     once had to take a deposition of a witness for days, as I

24     remember it, in New Mexico, on the subject of highly

25     technological subject.   And I full well understood that if I

1   didn't have the right person with me to translate the answers

2   into English I could understand, I could be snowed and come

3   back without really getting what I went for.  So I hired a

4   professor of computer science from Princeton and he came to New

5   Mexico with me for as long as it took.  Now, it wasn't weeks

6   and weeks, but there it was.

7          Now, the person you are concerned about, the

8   bookkeeper, this gentleman or his companies, they're already

9   paying to work full time for him.  So it's not quite as big a

10  deal really, is it?

11         MR. WHITE:  We're talking about convenience, your

12  Honor, convenience, cost.  To move the -- the government said

13  virtually all their witnesses are from New York.  It's hard for

14  me to fathom, when they have represented in their opposition to

15  my bail motion that they are going to have witnesses who will

16  testify that the money he was receiving in Laredo was in fact

17  the proceeds of narcotics activity.  Who are those witnesses?

18  The government is ignoring the Laredo side of their case by

19  telling you that it's all New York.  New York is the agents.

20  The agents can testify in Laredo very, very easily.  The

21  defense witnesses will be --

22         THE COURT:  It will be very inconvenient for them,

23  right?

24         MR. WHITE:  Yes.  But the defense witnesses will be

25  predominantly from Laredo.  It will be inconvenient to the

17dkdata                    Argument

1    agents but that's what they do for a living, your Honor, so

2    it's not --

3              THE COURT:  Bookkeepers do that for a living too.

4              MR. WHITE:  Yes, your Honor, but these are civilians,

5    these are civilians, these are people with families, these are

6    people of modest circumstances, humble people.  I mean to cart

7    them up here to New York is an inconvenience, and I think

8    that's what Rule 21(b) weighs -- why it weighs on the side of

9    the defendant in this instance, your Honor.

10             THE COURT:  OK, anything else?

11             MR. WHITE:  Not on the transfer motion, your Honor.

12             THE COURT:  OK, I'm going to reserve for now on the

13   transfer motion, but I wouldn't be holding my breath.

14             OK, let's go on to the other --

15             MR. WHITE:  Well --

16             MR. SKINNER:  Your Honor, I apologize for

17   interjecting, but would the Court excuse Mr. Master?  He's due

18   for a plea in another court right now.

19             THE COURT:  Of course.

20             MR. MASTER:  Thank you, your Honor.

21             (Pause)

22             THE COURT:  Let me tell my reaction to your motion and

23   maybe we can save a little time.

24             MR. WHITE:  The bail motion, your Honor?

25             THE COURT:  Yes.  And it's this:  Judge Cott, if I

17dkdata                         Argument

1    remember the magistrate's name -- I mean I remember the name,

2    if I remember which one it was -- ordered detention because he

3    thought your client was a flight risk.  You came to me.  I

4    thought he was a flight risk, and basically the reasons that I

5    thought he was a flight risk are no different today than they

6    were the last time.  And I take it the thrust of your motion to

7    being that I should let him out on bail because the

8    government's case is weak.  Is that about it?

9              MR. WHITE:  Not exactly, your Honor.

10             THE COURT:  OK.

11             MR. WHITE:  Well --

12             THE COURT:  I say it to give you the opportunity to

13   answer my concerns.

14             MR. WHITE:  I know, I know.

15             Judge Cott -- and, your Honor, you're basically

16   working off the complaint at that stage.  Defense counsel knows

17   very little more than is in the complaint and what he's heard

18   in an interview from the client.  There's been no discovery,

19   there's been no opportunity yet to go through the complaint and

20   check those things out to see do they play out.

21             So, your Honor, I was thinking -- I've heard many

22   district judges say the hardest part of their job is

23   sentencing.  And when you sentence, the work that goes into

24   sentencing, to get as accurate a grip of the facts as possible

25   and then determine what an appropriate sentence is, a lot of

17dkdata                         Argument

1   work goes into that.  But Mr. Datta's been in jail for six

2   months, he's been in jail for six months basically on the

3   allegations in the complaint.  And I've been working on this

4   case now for several months, and I see big holes in the

5   government's case and that the complaint was kind of the

6   worst-case scenario for the defendant and the best-case

7   scenario for the government, taking every conceivable

8   inference, not even reasonable inferences, and drawing the

9   worst possible conclusions from it.  And that's basically

10  what's briefed to your Honor and to Judge Cott.  And there's

11  just so much more out there which I tried to highlight.

12          THE COURT:  I appreciate everything you've said, but

13  at the end of the day, I'm dealing here with an individual who

14  is looking, in the event of conviction, at a lot of time, who's

15  been involved in this border trade for a long time, who's got

16  substantial resources, and who, it seems logical for me to

17  infer, has a lot of contacts south of the border.

18          Now, that says to me that if he perceives any real

19  risk that he's going to be convicted, a rational course of

20  action is to go across that bridge you were talking about and

21  never come back.  That's my problem.

22          MR. WHITE:  It just doesn't match the reality.  I

23  understand, your Honor, I understand from your perspective

24  looking at it.  It just doesn't match the reality.  His wife

25  and two daughters are here.  They flew up from Laredo to be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17dkdata                        Argument

1   here today.  Where's he going?  What's he going to do to them?

2   His daughter is a student at NYU, his wife is trying to keep

3   that business afloat.  This man has never been in trouble in

4   his life.

5        The crimes he's charged with -- your Honor, you were

6   very general when he said he has contacts in Mexico.  He sure

7   does, he sure does, and these are his customers.  But the last

8   time we were here on bail, it was substantial ties to the

9   Mexican drug cartel, and there's no evidence of that, your

10  Honor.  Because now we know, which we didn't know at the time

11  of the previous bail arguments, exactly what the government's

12  theory is.  And Mr. Datta is two steps removed from any drug

13  trafficker.  He deals with his customers.  Even under the

14  government's theory, the customers deal with peso brokers.  The

15  peso brokers deal with narcotics traffickers, under their

16  theory.  He doesn't deal with narcotics traffickers.  He deals

17  with his customers.  So he doesn't have contacts in Mexico

18  among drugs cartel members.  It's just -- it's a theory here

19  that could have been believed at the beginning but it can't be

20  sustained now.

21       And to the government's credit, in their papers on

22  this, they say that, well, the evidence suggests that he had

23  contact with drug cartels.  That's as strong a statement as

24  they make.  And even if he didn't, he had contacts with

25  intermediaries of drug cartel members.  Well, that's true;

17dkdata                    Argument

1   that's his customers.   An intermediary is two steps removed.

2   He's actually three steps removed because there are the peso

3   brokers, so he doesn't have nefarious connections in Mexico,

4   your Honor.

5           But here, in the government's response, they make this

6   proffer:  The government intends to call witnesses at trial who

7   will provide direct evidence that the money at issue in Count

8   One was the proceeds of narcotics trafficking, period.  Can you

9   imagine, at the original bail argument, if that's all the

10  government said -- we have witnesses who will say it.  Well,

11  the magistrate judge or your Honor would say, whoa, what

12  witnesses?  Who?  Who are they?  Are they people who worked

13  with him?  Are they people they sold to?  They haven't

14  elaborated on that.  And I think that is the key to the case,

15  that this was drug proceeds, they have to prove it.  And that's

16  why we made this motion.

17          And I think you should -- I don't think they can prove

18  it, your Honor.  They can't prove -- they may be able to prove

19  that he believed it might be drug proceeds but --

20          THE COURT:  That may be, but why does that mean he's

21  likely to show up for trial?

22          MR. WHITE:  Because if your Honor were to determine

23  that the government's case is not strong, which is a bail

24  consideration, he certainly would feel the same way, that he

25  can be acquitted, his businesses can be restored to him, his

17dkdata                        Argument

1   goods and his funds will be returned to him, and this is what

2   he wants.  All this man wants is to be vindicated here, your

3   Honor.  There's no hint in his whole life that he would take

4   flight here and not fight these charges.

5          The fact that he's here six months in jail, when he

6   sold perfume that was two steps or three stops removed from

7   narcotics traffickers, I think the government has a lot of

8   problems with their case, your Honor, and I just don't think

9   this man should be detained on the basis of that, without them

10  even being required to say -- they can do it in camera,

11  ex-parte, but just satisfy you that they're going to be able to

12  prove that.  What they've put in their response as proof

13  doesn't prove anything, as you can see in my reply.  But

14  assuming they have those witnesses, I'm out -- I don't have an

15  argument, your Honor.  But I don't know they have them and you

16  don't know they have them, and nothing in their papers suggest

17  they really have them or who they are.

18         And that's all I really ask at this stage for you to

19  do, your Honor, to get a proffer from them as you would at an

20  initial bail hearing, a real proffer, as to how are you going

21  to prove that this was really -- they're saying every bottle of

22  perfume he ever sold was paid for with drug proceeds.  Absurd,

23  ridiculous.  But here he is six months in the can because this

24  is the government's theory.

25         THE COURT:  OK, thank you.

17dkdata                        Argument

1          Mr. Skinner?

2          MR. SKINNER:  Your Honor, the Court has it absolutely

3     right:  The defendant was a flight risk in February, he remains

4     a flight risk today.  Absolutely nothing has changed with

5     regard to what makes the defendant a flight risk.  All defense

6     counsel is arguing is that postdiscovery, with his own

7     defense-tilted view of the government's evidence, that for some

8     reason the case is weak and because the defendant knows the

9     case is weak and therefore he's going to stick around to try

10    the case.  Defense counsel, first of all, he's just completely

11    ignored Count Two of the indictment, the sting count.   The

12    sting count, which is going to be the bulk of the evidence at

13    the trial, is overwhelming.  The fact that -- I don't see how

14    he can argue with a straight face that the evidence will not

15    establish beyond a reasonable doubt that the undercovers

16    represented to the defendant that they were giving him drug

17    money and that he then continued to deal with them, from when

18    he first met him in October until the day of his arrest, which

19    incidentally was here in Manhattan in January, when he traveled

20    up here to meet with them and to meet with his contacts in

21    furtherance of the money laundering conspiracy.

22          I've never, in my time prosecuting, which is not a

23    significant period of time, not nearly as long as Mr. White's

24    been defending these cases, but I have never heard as express a

25    communication by an undercover officer.  He's on a recording

1    saying, I run kilos for the Sinaloa drug cartel.  I know

2    defense counsel's position is, well, he must have been unclear

3    before if he felt the need to say that then.  Well, that's not

4    the case.  He hinted before -- he did what undercovers always

5    do; you never come out and be express -- but then once we felt

6    he sufficiently represented that he was dealing with narcotics

7    proceeds, we said why not just go for it, put it all out there,

8    we'll see what he does; if he throws up his hands and says,

9    well, I had no idea, I'm out of here, then that will be

10   indicative to us that this is a businessman and maybe we just

11   got it all wrong.  But that's absolutely not what he did.  He

12   said he sat there with the undercover, talked in great detail

13   for an hour about how he was going to wash the money for the

14   undercover, high-fiving the undercover after he said that, and

15   proceeds to then travel a couple weeks later up to New York to

16   meet with the undercover, where he further discusses money

17   laundering activity and then is arrested.  So the idea that our

18   case is weak on Count Two is incorrect, which is probably

19   understating it.

20           And with regard to Count One, the defense counsel is

21   not arguing we can't prove any of the other elements.  He

22   focuses on whether we can prove that it was narcotics proceeds.

23   We have proffered that we will be calling at least one witness

24   who will testify that he or she delivered what he or she knew

25   to be drug money to the defendant.  I don't think we need to

17dkdata                       Argument

1   proffer any more than that.  I don't think this is an

2   opportunity for the defendant to just keep filing bail motions

3   in order to get a free preview of the government's case.  We

4   have proffered that we can do it.  I'm saying it in good faith.

5   I personally have spoken to the witness, and that witness has

6   told me what he or she did.  And if the Court wants more detail

7   than that, I guess I offer to make the proffer ex parte to the

8   Court if that's not satisfactory.

9          But the bottom line is that the evidence in this case

10  is overwhelming on both counts, and nothing has changed since

11  February.  This is a defendant with significant resources, both

12  personal and financial.  He's facing a significant penalty if

13  he's convicted.  He has every incentive to flee, and he's got

14  more opportunity to flee than most defendants who are going to

15  come into this courthouse.  And for those reasons we think he

16  remains a risk of flight and should be detained for the brief

17  period of time until we have a trial in this district.

18         THE COURT:  Do you happen to know whether any

19  extradition treaty we have with Mexico would permit extradition

20  for money laundering?

21         MR. SKINNER:  I don't know off the top of my head,

22  your Honor.  I have not looked at that.

23         THE COURT:  All right, thank you.

24         Mr. White, anything in conclusion?

25         MR. WHITE:  On this sting, your Honor, the sting

17dkdata                      Argument

1    transaction was about $38,000, if that were what Mr. Datta was

2    charged with, I don't think he would have been detained on the

3    basis of just that one transaction.  The important thing,

4    because of the guidelines, what he would be facing if he were

5    convicted of that, I disagree with the government that they

6    have overwhelming proof on that, because the conversations that

7    Mr. Skinner referred to were after the transaction.  Those are

8    after the transaction, your Honor.  Before the transaction --

9    there's a telephone call that the government provided since my

10   motion was made, where this is set up to buy perfume and the

11   undercover wants to buy it in the San Ysidro store.  There's no

12   suggestion in that telephone call that he's representing it to

13   be the proceeds of narcotics.  It's only later that he does,

14   your Honor.  So I don't think the government's case on the

15   string is nearly as strong as the government represents.

16            THE COURT:  OK, thank you.

17            The bail application is denied.  I again find that the

18   defendant, in all the circumstances, remains a substantial

19   flight risk and that no condition, or combination of

20   conditions, could adequately secure his presence for trial.  I

21   will file an order to that effect shortly.

22            OK, I will see you in September, folks, unless I

23   decide to send this case to Texas.

24            MR. SKINNER:  Thank you, your Honor.

25                              * * *