UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
********************************
UNITED STATES OF AMERICA,      *
                               *
                               *
                               *
                               *
                               *
          V                    *
                               *
                               *
VIKRAM DATTA,                  *  11 CR 102
                               *
          DEFENDANT,           *
                               *
                               *
********************************



Doc # 61

BEFORE:    HON. LEWIS A. KAPLAN,
           District Judge

DATES:     SEPTEMBER 12,13,14,15,      2011

SOUTHERN DISTRICT COURT REPORTERS (212) 805-0300

19cddat1                         TRIAL

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4              v.                            (S1) 11 Cr. 102 (LAK)

5   VIKRAM DATTA,

6              Defendant.

7   ------------------------------x

8
                                            September 12, 2011
9                                           11:10 a.m.

10
    Before:
11
                        HON. LEWIS A. KAPLAN,
12
                                            District Judge
13

14                          APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  PETER M. SKINNER
17       ALVIN L. BRAGG, JR.
         Assistant United States Attorneys
18

19  ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN PA
         Attorneys for Defendant
20  BY:  ALAN S. ROSS

21  WHITE & WHITE
         Attorneys for Defendant
22  BY:  DIARMUID WHITE

23            - also present -

24  Vanessa Quinones, Government paralegal
    SA Richard Reinhardt, IRS
25

19cddat1                    TRIAL

1              (Case called)

2              THE COURT:  OK.  You may be seated, folks.  Thank you.

3              OK.  Anything you need to raise with me before we go

4     forward?  And then I have something to tell the government?

5              MR. SKINNER:  Not for the government, your Honor.

6              MR. WHITE:  No, your Honor.

7              THE COURT:  I gather we are reasonably close to having

8     a panel.  The panel will be up quite shortly.

9              I did want to raise for your consideration,

10    Mr. Skinner, this:  I am beginning to work on the charge.  It

11    really becomes clear that if, in fact, the government pursues

12    all three alleged conspiracies, we are going to have one very

13    long charge, and it is not so clear to me that it will be the

14    easiest thing in the world for the jury to sort it out.  And I

15    just offer for your consideration a question -- you don't have

16    to deal with it now, I know you have to talk to people -- as to

17    whether ultimately you want to submit all three to the jury.

18    Maybe a little selectivity would be in order.

19              OK.  Well, if none of you have anything for me, Andy,

20    what is the estimate on when we are going to get the panel?

21              THE CLERK:  I think about ten minutes, Judge.

22              THE COURT:  Ten minutes.  OK.  I will see you in ten

23    minutes.

24              Let's talk about schedule.  I think we have covered

25    this before.

19cddat1                          TRIAL

1           So we are going to work Monday through Thursday this

2    week.  We are going to work Wednesday and Thursday and part or

3    all of Friday, the part being the afternoon.  We are going to

4    see if we can reshuffle the rest of my schedule to free the

5    morning.  That gives us seven days.

6           Then we are going to work the 26th, 27th of September.

7    The religious holidays start the evening of the 28th.  So we

8    will get in at least a half a day on the 28th.  Although,

9    Mr. Ross, I see you are from Miami.  Do you have a view on

10   this?

11          MR. ROSS:  Your Honor, if we work a half a day, I'll

12   manage to get home.  Thank you.

13          THE COURT:  OK.  And then if we are still in business,

14   we will resume on the 3rd, maybe later in the morning than

15   usual to give Mr. Ross a hand.  And I hope we are going to be

16   done by sometime early that week.

17          Anybody have any belief that that is not going to be

18   doable?

19          MR. SKINNER:  Your Honor, I think we should be done by

20   early that week the beginning of October.  The government will

21   have a much better sense of how long its case in chief is going

22   to take after we get through our first witness or two.  So I

23   would be happy to give you a better idea of how things are

24   going to fall out on Wednesday.

25          THE COURT:  OK.

19cddat1                    TRIAL

1            MR. SKINNER:  But at this point, we don't anticipate

2      any problems.  We think our case should be completed by the end

3      of next week, even with only three days next week.

4            THE COURT:  OK.  So as the panel comes up, I will see

5      you again.

6            THE CLERK:  All rise.

7            (Recess)

8            (Jury selection began)

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19cddat2

<div align="center">

**A F T E R N O O N   S E S S I O N**

2:43 p.m.

</div>

1

2

3        (A jury of 12 and four alternates were selected)

4        THE CLERK:  Jury entering.

5        (Jury present)

6        THE CLERK:  Please be seated, everyone.

7        THE COURT:  Andy, please swear the jury.

8        THE CLERK:  Will the jurors please rise and raise your

9   right hands.

10        (A jury of 12 and four alternates were sworn)

11        THE CLERK:  Thank you.  Please be seated.

12        THE COURT:  OK.  Now that you've been sworn, ladies

13   and gentlemen, I'm going to give you some brief preliminary

14   instructions to guide you in the trial.

15        As I said during the jury selection, it is going to be

16   your job to find from the evidence what the facts are.  You and

17   you alone are the judges of the facts.  You then have to apply

18   to those facts the law as I give it to you.  You must follow

19   the law as I give it to you whether you agree with it or not.

20        Nothing I say during the course of the trial should be

21   taken by you as indicating any view on my part as to what your

22   verdict ought to be or as to how you ought to find the facts.

23        The evidence from which you are going to find the

24   facts will consist of the testimony of the witnesses, documents

25   and other things received into the record as exhibits, and any

19cddat2

facts that the lawyers may agree upon or, to use the jargon

with which our profession is afflicted, facts to which the

lawyers have stipulated.

Some things are not evidence and are not to be

considered by you.  They include statements, arguments and

questions by lawyers.  They include objections to questions by

the lawyers.  Lawyers, of course, have an obligation to object

when evidence is offered that they think is not properly

received.  You shouldn't be influenced by those objections or

by my rulings on them.

If I sustain an objection, you will ignore the

question.  If I overrule an objection, you will treat the

answer like any other answer.  There may be occasions when the

cat gets out of the bag before I get to say "sustained."  In

those instances, and maybe in some others, I'll tell you to

disregard or strike the testimony, or if it is a document, the

document.  If I do that, you will of course adhere to that

instruction.

There may be some occasions where a piece of evidence

will be admitted for some narrowly or not so narrowly limited

purpose.  If that happens, I'll explain it in detail later, but

you will in that case then consider the evidence only for the

purpose or purposes that I've told you you may consider it.

Finally, anything you may have seen or heard outside

the courtroom is not evidence and it should not be considered.

19cddat2

1    You must decide the case solely on the evidence presented here

2    in the courtroom.

3          Now, implicit in all of that, of course, is this:

4    Nobody Googles anybody.   Nobody does any research.   Nobody

5    visits any location that may be at issue.   You may not do any

6    of those things.   You shouldn't be looking up who the lawyers

7    or who the witnesses are.   None of that stuff.   Stay off the

8    Internet so far as the case is concerned.

9          There are two kinds of evidence.   Generically

10   speaking, one is called direct evidence; the other is called

11   circumstantial evidence.   I'll talk to you more about that at

12   the end of the trial.

13         But direct evidence, broadly speaking, is direct proof

14   of a fact.   Imagine this pad were an exhibit in the case and

15   you were considering what color the paper is.   This would be

16   direct evidence that it is yellow because you can look at it

17   with your own eyes and see that, or another witness who had

18   seen it could tell you I saw it and I say under oath it was

19   yellow.   Circumstantial evidence refers to the process of

20   inferring a fact you can't observe or the witness can't observe

21   directly from something else you can observe.   I'll talk to you

22   more about that at the end.

23         Because you are the judges of the facts, it is going

24   to be up to you to decide, and I just alert you right up front,

25   the extent to which you believe what the various witnesses have

19cddat2

1   to say and how much weight you attach to the testimony of the

2   various witnesses.  I'll talk to you at the end of the case

3   more about some things you might consider in that regard.

4   Suffice it to say for the present that that's your job, not

5   mine.  I don't tell you at the end who was telling the truth or

6   who was accurate.  I don't do that.  Don't expect it.

7           This is, of course, a criminal case.  You know that.

8   There are three basic rules that you need to keep in mind.

9           First, as I told you, the defendant is presumed

10  innocent.  That presumption stays with him unless and until

11  he's proved guilty beyond a reason doubt to the unanimous

12  satisfaction of the jury.

13          The defendant, of course, was indicted.  An indictment

14  is simply the vehicle by which the government brings a criminal

15  charge against somebody.  In federal court it is not evidence

16  of anything.  The defendant starts out here with a clean slate.

17          Second, the burden of proof is always on the

18  government.  The defendant doesn't have to prove his innocence.

19  He doesn't have to present evidence.  He doesn't have to

20  testify.  He has the right to remain silent.  The law prohibits

21  you in arriving at your verdict from considering that the

22  defendant has not testified if in fact that's what happened,

23  and I don't know what's going to happen in that regard.

24          Finally, as I told you, it's the government burden of

25  proof to prove guilt beyond a reasonable doubt.  I'll explain

1    that term in more detail later.  But you can pretty much

2    understand what it is just from the very words.  It is, I

3    should say, a more exacting and onerous standard of proof

4    because it is a criminal case; people's lives and liberty are

5    on the line.  It is a higher level of proof than you need to

6    collect for somebody who scratches your car in a parking lot.

7    A whole different order of magnitude.

8              I've already explained the charges to you briefly at

9    beginning of the jury selection.  I'll give you detailed

10   instructions on the law at the end of your case.  Those

11   instructions will control your deliberations and your decision.

12             I am going to say something substantive only on one

13   point now, and before I do, I want to emphasize that my

14   instruction on this one point is not entirely complete.  It

15   will be complete at the end of the trial.  It is a quick once

16   over, just to help you follow the evidence and what the purpose

17   of the evidence is.  And in deciding the case, you will apply

18   fully my complete instruction at the end, and to whatever

19   extent what I say to you now is different from or less complete

20   than what I say at the end, you will apply what I say at the

21   end.

22             Now, I told you that each of the three charges, the

23   three counts of the Indictment in this case, charges the

24   defendant with a criminal conspiracy, participating in a

25   criminal conspiracy.  So let me, just in the briefest of terms,

19cddat2

1      tell you what that means.

2            A conspiracy in the criminal law is nothing more than

3      an agreement between or among two or more people to attempt to

4      accomplish one or more illegal objectives. That's what it is.

5      It's different from actually committing a crime, the commission

6      of which is an object of the conspiracy.

7            If two people agree to murder somebody or to hire

8      somebody to murder somebody -- and I'm deliberately picking an

9      example that has nothing to do with this case -- that agreement

10      may be a crime separate and apart from the murder. The murder

11      doesn't ever have to take place for there to be a conspiracy to

12      commit the murder. If the other requirements of conspiracy are

13      satisfied, that agreement is illegal, again, assuming certain

14      other requirements are satisfied. And whether the murder

15      happens doesn't matter one bit on the issue of conspiracy.

16      That's what you need to keep in mind above and beyond

17      everything else. It is really that simple.

18            Now, a couple of things to be said on your conduct as

19      jurors and then we're ready to begin.

20            First of all, you are not to discuss the case among

21      yourselves or with anyone else until the twelve of you who

22      ultimately come to decide this case retire at the end of the

23      case and I've told you to begin your deliberations.

24            Secondly, don't read or listen to anything that

25      relates to this case in any way. If anyone tries to talk to

19cddat2

1    you about it, please bring it to Andy's attention.  He'll tell

2    me, and we will deal with it.

3         Third, as I said, no research, no investigation about

4    this case on your own.

5         Finally, try to keep an open mind until the very end.

6    You know, trials are sort of an interesting thing.  It is one

7    thing when you live through something, you then experience all

8    the stimuli that come into your total knowledge at one time or

9    in sequence.  Trials don't always happen in sequence.

10   Moreover, you get evidence on some issues sometimes that points

11   in one direction; sometimes you get evidence on the very same

12   issue that points in another direction.  So if you leap to

13   conclusions early, you may not be paying the kind of attention

14   you should be paying later on.  So try to keep an open mind

15   until you've heard all the evidence.

16        Now, you are certainly welcome to take notes during

17   the trial.  You are not obliged to do that.  Keep in mind that

18   it sometimes may be difficult to take detailed notes and pay

19   attention at the same time.  If you do take notes, try to make

20   sure that the note taking doesn't distract you to a point where

21   it interferes with the appropriate attention being given to the

22   case.

23        If you do take notes, don't discuss your notes with

24   anyone else before you begin deliberations.  Don't take your

25   notes with you at the end of the day; leave them in the jury

19cddat2

1    room.  At the end of the case Andy is going to collect them, in

2    any case.

3            If you choose not to take notes, remember, it is your

4    own individual responsibility to listen to the evidence.  You

5    can't basically hand off your responsibility to somebody else

6    who is taking notes.  It is, of course, ultimately the judgment

7    of all twelve jurors that counts in this case.  Each of you has

8    to pay attention to the evidence.

9            Now, the trial is going to begin in sort of 60 seconds

10   here.  The government will begin by making an opening

11   statement.  I think of opening statements as kind of like a

12   trailer at the movies.  It is kind of a prediction of what the

13   evidence is going to show.  Sometimes I see trailers at the

14   movies and later on the movie turns out to be right on the

15   money, and sometimes I see trailers at the movies and then I go

16   home and I say what were they thinking.  The same thing happens

17   in trials.  The opening statement is not evidence.  It is just

18   intended to orient you and for the lawyers to predict what they

19   think the evidence is going to show.  Sometimes they are right,

20   sometimes not so right.

21           After the government's opening statement, the defense

22   has the right, but not the obligation, to do the same thing.

23   The government then calls its witnesses.  The defense has the

24   right to cross-examine.

25           After the government is all done with its proof, the

1    defense has the right, but not the obligation, to offer

2    evidence.   The government gets to cross-examine if they do

3    present evidence.

4           The government in a criminal case has an opportunity,

5    if it wishes to avail itself of that opportunity, in the event

6    the defendant has offered some proof, to call additional

7    evidence in a third phase of the trial, in rebuttal.   Sometimes

8    the government does; sometimes it doesn't.

9           When that's all done, I will meet with the lawyers and

10   settle on exactly what the instructions to you on the law will

11   say.   We'll then come back.   You will hear closing arguments

12   from the lawyers, and then I will instruct you on the law and

13   you will retire to deliberate on your verdict.

14          That's the general program, folks.   That's how it

15   should happen and will happen.

16          And with that, we will have the opening statement on

17   behalf the government.

18          MR. BRAGG:   This case is about drug money.   The

19   defendant, Mr. Vikram Datta, owned a business and through that

20   business he took in millions and millions of dollars of drug

21   money.   The money belonged to associates of a drug organization

22   based in Mexico.

23          The organization, drug money, there was an issue --

24   have to make the money look legitimate, look as if it didn't

25   come from drug trafficking.   That's where the defendant came

19cddat2                     Opening - Mr. Bragg

1    in.  He took in the cash through his business and hid the fact

2    that the money came from drug trafficking.  He made it look

3    like it came from a part of his legitimate business.

4           Let me start by telling you a little bit about the

5    defendant's business and then about the process through which

6    the dirty drug money was made clean.

7           The defendant's business is perfume.  He operates a

8    perfume business on the border between Mexico and Texas.  It is

9    the central part of it.  There are some other stores also on

10   the border between Mexico and California.  The business was

11   both a retail business; you walk in and buy from an ordinary

12   store.  It also has a wholesale component, where it was a

13   warehouse that sold to other perfume companies.

14          While the business is based down in Texas, you'll hear

15   much of or some of the defendant's perfume that he buys is from

16   this area here.  He is supplied by businesses in New Jersey and

17   some right here in Manhattan.

18          Let me tell you how the process worked.  First, we

19   start with the drugs as a backdrop.  The drugs start out in

20   Latin America and Mexico.  They come up to the United States.

21   They are sold.  They generate cash, United States dollars.

22          The cash then goes back to Mexico.  And the

23   organization has a problem.  I told you about one of the

24   problems, which is they have to make the money look legitimate.

25   The other problem is that the money is in the form of United

19cddat2                        Opening - Mr. Bragg

1    States dollars.   The national currency of Mexico is pesos.

2            So in order to address both of those problems, the

3    organization goes to what is known as a peso broker.  A peso

4    broker exchanges currency, in this instance dollars for pesos.

5    Because the money is dirty and the peso broker is operating

6    outside of the legitimate banking system, the peso broker

7    charges a better rate; they charge the traffickers more money

8    to exchange the dollars for pesos.   The broker does that.

9            Now the broker has the dirty drug money.   The broker

10   then turns to the defendant.   The broker sends delivery people

11   across the border, literally steps from a point in Mexico, to

12   Laredo, Texas, where the defendant's business is centered.   The

13   money goes across the border, and, again, it is millions of

14   dollars of money, day after day, $20,000, $30,000, up to

15   $200,000 at a time.

16           Once the money is delivered to Mr. Datta's business,

17   the courier places the perfume order.   The actual perfume is

18   then sold, but it is not sent to the delivery person or to the

19   peso broker, it is sent to a third party, to another perfume

20   business.   That perfume business gets the perfume, typically in

21   Latin America, in Mexico.   The perfume is sold.   It generates

22   pesos.   Those pesos then go to the peso broker.

23           A complete circle, and then the process can start over

24   again whereby the drug traffickers can exchange their dollars

25   for pesos and clean the money.

19cddat2                         Opening - Mr. Bragg

1          So how does that process actually clean it?  Now,

2     that's where the defendant's business comes in.

3          You'll hear evidence that businesses based in the

4     United States have an obligation to report cash transactions in

5     excess of $10,000.  And you'll hear evidence that the reason

6     for that -- one of the reasons for that is to detect money

7     laundering, to make sure that dirty money, money from the

8     proceeds of crimes, isn't permitted into the legitimate stream

9     of commerce.  So that is the purpose for the reporting

10    requirement.

11         And you'll hear that for years the defendant didn't

12    report these transactions.  Then there came a point when

13    another perfume company got in some trouble, was arrested for a

14    money laundering crime, and around that time the defendant

15    started to file these reports.

16         You'll hear that the reports were not accurate.  The

17    reports didn't list the peso broker or the courier.  The

18    reports listed the third-party perfume business, making it look

19    as if it was a normal, legitimate business transaction, that

20    the cash had come from the perfume business and the perfume had

21    been sold to the perfume business, when in fact the evidence

22    will show that's not what happened.  Money came and started

23    from associates of the drug trafficking organization.

24         You'll hear that the defendant was informed by the

25    IRS, where these forms go, that the forms were not filled out

19cddat2                    Opening - Mr. Bragg

1    correctly.  You'll also hear that the defendant's bank inquired

2    about the nature and source of the cash.  That's how the system

3    worked and that's how the money was cleaned.

4         And everyone benefited.  The drug trafficker got to

5    off-load the dirty drug money.  The peso broker exchanged the

6    pesos for the dollars and was able to charge more, make more

7    for himself because the money was dirty.  The courier got paid.

8    The perfume business that sat in Mexico or Latin America got to

9    receive goods it didn't have to report to their home country.

10   And the defendant sold millions and millions of dollars of

11   perfume, a tremendous amount of sales.  So that's how it

12   worked.

13        Now, you'll hear evidence that law enforcement was

14   suspicious that the defendant might be engaging in this type of

15   conduct, so law enforcement decided to undertake an undercover

16   investigation.  And you'll hear about a man named Ankur Gupta.

17   He is, as you say, a cooperator, someone who has pled guilty to

18   a money laundering crime and will testify before you in the

19   hopes of leniency at sentencing.

20        Well, he, for many years, was one of those perfume

21   suppliers in this area that sold perfume to Mr. Datta.  He

22   provided an entrée, an introduction, for undercover officers.

23   And undercover agents, two in particular, Mario and Jose, whose

24   names you'll hear and you'll hear from them both, they met with

25   the defendant, and they talked about moving money.  They

19cddat2                          Opening - Mr. Bragg

1     represented themselves to be people who wanted money moved on

2     behalf of an organization, drug organization, in Mexico.  And

3     you'll hear, you'll hear these recordings, because what the

4     defendant didn't know at the time was that the undercover

5     agents were recording the conversations.  So you will hear

6     them.  And you'll hear the defendant talking to the agents

7     about mixing his legitimate perfume business with the dirty

8     business so that it will be difficult for law enforcement to

9     detect.

10              And it proceeded to be more than just talk.  The

11    undercovers and Mr. Datta agreed to do a perfume transaction.

12    The undercovers went to one of his stores, bought $40,000 in

13    cash and perfumes.  The defendant's business took it in.  So

14    there was more than just talk, there was an actual transaction

15    here where money that was represented to be narcotics proceeds

16    was moved, converted, by the defendant's business.

17              And I told you a short while ago about the reporting

18    requirement, that U.S. businesses have an obligation to report

19    cash transactions over $10,000.  So a $40,000 transaction, that

20    obligation was triggered.  And you'll hear evidence that for

21    this transaction, the one where defendant was interacting with

22    the agents who were representing themselves to be money movers

23    on behalf of a drug organization, there was no report made.

24              So that is sort of an overview of the evidence.  And

25    as you've heard a little bit about already, there are three

19cddat2                        Opening - Mr. Bragg

1   charges.   There is a money laundering conspiracy charge for

2   Mr. Datta's involvement with the undercover organization and

3   the agents.   There is a separate money laundering conspiracy

4   charge for the millions and millions of real, actual drug

5   dollars that he moved through his business.   And then there's a

6   third charge, a conspiracy to violate a statute known as the

7   Travel Act.   And, essentially, it is very similar conduct, the

8   movement of the actual millions and millions of dollars in drug

9   money but also involves a component of movement across here

10  from Mexico to Texas, interstate or intercountry, and also use

11  of phones between states.   So those are the three charges.   Two

12  money laundering conspiracy charges and a violation of the

13  Travel Act.

14          So let me just tell you a little bit briefly about how

15  the government intends to prove its case.

16          You'll hear from a number of witnesses.   You'll hear

17  from Jose Mario, the undercover agents.   You are going to hear

18  from a man I didn't talk about yet, Hilario Martinez-Garcia.

19  He, like Ankur Gupta, will come before you as a cooperator,

20  someone who has pled guilty to a money laundering crime and is

21  seeking leniency.   He was a courier.   He works for a peso

22  broker.   And day after day he crossed the border and took

23  millions of dollars to the defendant's business.   In

24  December 2010, alone, he took -- by himself, one person took

25  over a million dollars in cash to the defendant's business.

19cddat2                        Opening - Mr. Bragg

1   And he'll come before you and he'll testify.  He'll tell you

2   that it was drug money.  So you'll hear from Mr. Martinez.

3              You're also going to see records.  You're going to see

4   the forms that have to be filled out for cash transactions over

5   $10,000.  You'll have an opportunity to look at them, and

6   you'll see on them that Mr. Martinez's name isn't on there.

7   The name of his boss, the peso broker's, name is not on there.

8   You'll just see the fact that the money came from there is not

9   disclosed, it was hidden.

10             You'll also see records showing that -- Mr. Martinez's

11  records from the government of border crossings that in fact

12  the evidence will show that he did make those crossings.

13             And you'll hear recordings.  You'll hear wiretaps, as

14  they are colloquially called, of the defendant talking to his

15  employees, talking about the tons of cash the business was

16  receiving.  You'll hear calls between a peso broker and the

17  defendant's employees.

18             And then you'll also hear the recordings.  You'll hear

19  the recordings between Jose and Mr. Datta and between Mario and

20  Mr. Datta.

21             At the conclusion of the trial, we will have a closing

22  and Mr. Skinner will have an opportunity to address you, and he

23  will walk through, I anticipate, a number of calls.  But for

24  the moment, I just want to highlight one because it provides a

25  summary.  It was between Mario and Mr. Datta and it was after

19cddat2                    Opening - Mr. Bragg

1    they had interacted a few times, had met, after the $40,000

2    cash transaction of perfume.  They are out.  They are in a

3    restaurant.  And they were making plans for future business,

4    talking about how they would launder money in the future.

5              And at a certain point Mr. Datta said to Mario, the

6    undercover:  You know, it's just washing the whole money.  It

7    is just washing the whole money.

8              And Mario responded:  Cleaning it.  Cleaning it.

9              And that's what this case is about -- washing money,

10   cleaning money, millions of dollars of drug money, and how

11   Mr. Datta made money for himself in the process.

12             So I'm going to sit down now, and before I sit down

13   I'm just going to ask you to do three things.  The first is

14   listen closely to the evidence, as I'm sure you'll do.  Follow

15   Judge Kaplan's instructions on the law.  To use your common

16   sense, the third thing, as you hear the evidence.  And the

17   government would respectfully submit that if you follow the

18   evidence, follow the law -- excuse me, and pay attention to the

19   evidence, you will return the only verdict that's consistent

20   with the evidence and the law here, and that is that Mr. Datta

21   is guilty as charged.

22             THE COURT:  Thank you, Mr. Bragg.

23             Mr. Ross, you can open.

24             MR. ROSS:  Thank you.

25             Good afternoon, ladies and gentlemen.

19cddat2                            Opening - Mr. Ross

1           The evidence in this case is going to lead you to the

2    conclusion that Vikram Datta is not guilty of any of the

3    charges against him.

4           What you're going to learn is that Vikram Datta ran a

5    perfume business originally in New York, been here for many

6    years.  In about 2000, he moved to Laredo, Texas, and it is

7    going to surprise you but I think you're going to hear evidence

8    that the four perfume capitals in the United States -- I

9    promise you, this is going to surprise you -- New York, Miami,

10   Los Angeles and Laredo, Texas.  That's what the evidence is.

11   Laredo, Texas, is a huge perfume center.

12          Why?  It's on the border between the United States and

13   Mexico.  Across the border, two bridges that connect the two

14   states, Nueva Laredo (New Laredo), and Laredo, Texas.  The same

15   holds true in several locations between the United States and

16   Mexico.

17          Mr. Datta, recognizing the market there, recognizing

18   that perfumes are big in Mexico -- not just retail, those are

19   people that -- and you're going to see this and hear this

20   evidence -- about thousands of people coming across the bridge

21   every day from Mexico.  Not drug dealers.  Not peso brokers.

22   Not money launderers.  Average folk come across.  Some to buy a

23   bottle, two or three of perfume.  Others sort of

24   semi-wholesalers.  They come across.  Buy $3,000, $4,000 worth

25   of perfume.  All of that, all of that being bought from

1    Mr. Datta's business, and others.

2              You're going to see pictures of Laredo.  You're going

3    to hear about Laredo, Texas.  What you're going to find out is

4    that the only business where there are more of them than

5    perfume stores in Laredo, Texas are things called casa de

6    cambios.  That is a money exchange, money exchange houses.

7    Much the same as you may have had in your own experience of

8    going to a foreign country and needing foreign currency, you

9    arrive in an airport in France and you want to get French

10   francs.  You go to different currency exchanges and they tell

11   you how much they are going to give you for each dollar that

12   you give them, and you shop for the best rate.

13             That's exactly what Vikram Datta's clientele did.

14             To be clear, his clientele are not drug dealers.  To

15   be clear, his clientele are not money launderers.  His

16   clientele are perfume people, people who own perfume stores in

17   Mexico.  People who wholesale to other perfume stores in

18   Mexico.  He has had the same clientele, same people in the

19   perfume business for ten years -- for ten years.

20             He's expanded his business over time.  He started in

21   2000 -- actually, in June of 2000 with one store.  He grew it

22   right in Laredo with four stores.  And you will see the layout

23   of the city.  It is the kind of thing where people are coming

24   across the bridges, and they are walking in this very close

25   area, the shopping downtown area.  The more stores you have,

19cddat2                          Opening - Mr. Ross

1    the more product you are going to sell.

19cddat2                          Opening - Mr. Ross

1                And he sold a lot.  He grew that.  He opened in

2      McAllen, Texas; opened in Mexicali, California, opened in San

3      Ysidro, California; opened in Nogales, Texas, a total of eleven

4      stores by the U.S.-Mexican border.

5                His buying power became substantial.  You are going to

6      hear from witnesses as to why he was successful.  He's not

7      successful growing eleven stores because he's selling to drug

8      dealers or drug cartels.  He's successful because he reduced

9      his prices.  His markup is less.  He has a huge volume of

10     people coming to him.  And he grew, legitimately, his business.

11               You're going to hear a lot about the currency market.

12     I've already discussed a little bit about that, this casa de

13     cambio and going into a currency exchange when you arrive in a

14     foreign country and look for a good rate.  The government

15     touched upon it briefly, but I think you are going to hear a

16     lot of testimony about the currency market -- the currency

17     market.

18               And among the things you're going to learn is that in

19     June of 2009, the Mexican government implemented a banking

20     regulation.  The banking regulation cost any person in Mexico

21     who deposits pesos and then wants to do a wire transfer

22     3 percent.

23               You're going to see from business records going back

24     many years of Mr. Datta how his business changed.  Prior to

25     2009, you know what, cash was the exception, not the rule, with

19cddat2                              Opening - Mr. Ross

1    the exception of the retail people coming across the bridge.

2    But wholesale, cash was the exception, not the rule.  But when

3    the law changed in Mexico, people in Mexico, instead of paying

4    3 percent, seek out other ways to buy U.S. dollars to pay for

5    their product.  They go to casa de cambios on the Mexican side.

6    They go to casa de cambios on the United States side.  They go

7    to peso brokers, the sort of unofficial casa de cambios,

8    because they can buy more dollars for their peso.

9            He got paid -- his business got paid sometimes in

10   cash, sometimes a wire transfer, sometimes someone in Mexico

11   would go to a casa de cambio there, deposit pesos there, and

12   they would deliver a check in the United States to him.  From

13   perfume dealers, not from drug dealers.  From perfume dealers.

14           The United States in this case decided to target

15   Vikram Datta.  And you're going to here about that, and it

16   started on October 12th of 2009.  And, actually, this case

17   really starts on September 10, 2009, with the arrest of Ankur

18   and Ajay Gupta, father and son; operated a perfume business

19   here in New York City called Nandansons.  For a long time they

20   had a store here in Manhattan.  Eventually, they moved to

21   Edison, New Jersey and they ran a wholesale-only.  And they

22   were one of many, many perfume suppliers for Vikram Datta, who

23   was supplying eleven retail stores, buying perfume, all

24   legitimately, paying with wire transfers -- not paying with

25   cash.  But the Guptas got arrested and it's important to

19cddat2                          Opening - Mr. Ross

1    understand exactly what they got arrested for.

2              They got arrested for doing the following:

3              They had their wholesale perfume business in Edison,

4    New Jersey.  And the first thing they would do is they would

5    have people bring them cash money and drop off the money to

6    them.  I'll get to where and how.  But drop off the money to

7    them, and they would not, first of all, get the name of the

8    person who dropped off the money.  Nameless people giving them

9    thousands of dollars -- hundreds of thousands of dollars.

10             Cash was delivered before perfume is ordered.  Through

11   the government's opening statement here, he sort of suggested

12   that Mr. Datta did that; you are going to find out to the

13   contrary.

14             Cash delivered secretly in parking lots.  Ankur and

15   Ajay Gupta would receive hundreds of thousands of dollars in

16   Rite Aid and Burger King parking lots in and around the area of

17   New Jersey.

18             They never filed any currency transaction reports.

19   They never deposited money in the bank.  They never required

20   identification from any of these people.  They never kept

21   records because they were destroyed after they shipped their

22   perfume.  Orders did not appear on the books of the business.

23   Customers were given code names rather than real names.  Small

24   bills were exchanged in casinos for large bills.  No income tax

25   was ever paid.  And no receipts were ever given.

19cddat2                        Opening - Mr. Ross

1          That's the model.  That's what the government

2     described in their opening statement just now as what they

3     think the evidence in this case is going to be.

4          We suggest to the contrary.  Mr. Datta's business

5     looks this way, and this is what the evidence is going to show:

6          Names of people who were paying cash are obtained.

7     They are required to sign receipts.  They are required, if they

8     came across the border from Mexico, to produce a CMIR.  That is

9     a -- if you come across the border and you have more than

10    $10,000, you file a report.  You know, you probably heard of it

11    in air ports, an officer asks you, do you have more than

12    $10,000 with you, you file that report.

13         And he would get copies of those reports.  He would

14    get the passport of people who would come to his business.

15    Cash isn't delivered in a parking lot of Rite Aid or Burger

16    King, cash is delivered at his store.  It is receipted.  It is

17    counted.  It's documented.  Currency transaction reports are

18    filed by the bank.  Every dollar -- every dollar that was

19    received was deposited into the bank.

20         A passport is required if you come across the bridge.

21    Records of all sales were maintained.  Orders were all

22    documented on the books of the company.  Customers' true names

23    are used.  Small bills aren't even accepted.  Income taxes paid

24    on every cent that was earned, and receipts are always given.

25         That's the difference.  This man ran a legitimate

1   business.

2           And with nothing more than that, his running a

3   legitimate business, and based on the fact that Ankur and Ajay

4   Gupta got arrested after spending all of this money in these

5   Rite Aid and Burger King parking lots, the government decided

6   they were going to conduct an investigation.  They labeled him

7   a target of their investigation and the investigation began.

8   They had no information who was laundering money, not even a

9   suspicion.  All they had was Ankur Gupta and his father Ajay

10  Gupta facing prison and they're trying to cooperate with the

11  government.

12          So in the course of their interviews, the government

13  says, well, who else do you know in the perfume business who we

14  might try to do an undercover?  And he gives them the names of

15  about ten different perfume dealers.  A couple of them there in

16  Laredo, Texas, a couple here in New York, and one of the names

17  he gives them is his own client, Vikram Datta -- La Versailles

18  Perfumes.  That is the name of his business, La Versailles.

19          But no evidence of any wrongdoing.  The investigation

20  begins.  How does it begin?  They label him a target on

21  October 12th.

22          On October 13th, Vikram Datta arrives in New York.  He

23  had called ahead.  Spoken, as he did, to all of his suppliers,

24  Nandansons just being one.  I'm coming to New York on a buying

25  trip.  And he came to New York and he met with a bunch of

19cddat2                          Opening - Mr. Ross

1    perfume suppliers, including Nandansons, including Ajay Gupta,

2    including Ankur Gupta.

3              In fact, he saw a fellow there for the first time, a

4    fellow named Roberto, who is going to come to play in this

5    case.  And on that date they -- Ankur Gupta principally was

6    talking to Vikram Datta, asking about his business, saying,

7    wow, this is great.  You really -- he can see.  He can see the

8    number of sales because he has talked to him.  He can say this

9    is great.  You've grown to eleven stores.  That's spectacular.

10   And he starts talking to him about his new store in San Diego,

11   a place called San Ysidro, just outside of San Diego, on the

12   U.S.-Mexican border, like all the other stores.

13             And he asks him about that.  And he says, you know,

14   it's great.  You got all this business.  It's coming across the

15   border.  "Is it drug money?"  "I don't know."

16             That's where the investigation begins.  "Is it drug

17   money?"  "I don't know."  Two men who have known each other for

18   years.  They've actually spoken Hindi at that point.  You are

19   going to hear the translation.  An opportunity, if it was drug

20   money, to say it was.  "I don't know."  That's where it begins.

21             OK.  That's a swing and a miss for the government

22   trying to make a case.

23             A month later, November 24th, there is a phone call,

24   November 24, 2009.  First, it's preceded by a plague of six or

25   eight attempts by Ankur Gupta to get Vikram on the phone.

19cddat2                          Opening - Mr. Ross

1    Understand that these two businesses talk all the time because

2    they are always ordering perfume from Laredo, Texas, from

3    Nandansons here in New York.

4              On this particular occasion, he finally gets ahold of

5    him after six or eight efforts on November 24th.  And on

6    November 24th, he proposes -- "he" being Ankur Gupta, as a

7    cooperating witness trying to reduce his own sentence in his

8    case for getting all of this cash money in the parking lots as

9    I've described proposes to him that he engages in a transaction

10   that looks like what they did -- dropping money here and

11   getting product there.

12             And here are the responses you're going to hear on the

13   recording in evidence in this case by Vikram Datta in response

14   to a proposal that he laundered money:  "I do not need to make

15   this money.  I don't need to get involved in this shit."  And I

16   apologize.  "Because I have worked for ten years to make my

17   company.  I don't want it.  I threw out a guy who came into my

18   store with $200,000 in $20 bills, and I'm going to throw out

19   another guy if he comes in and does the same.  Money that is

20   brought to me from Mexico needs to be declared by customs."

21             Another swing and a miss.

22             They should have just walked away from him but they

23   didn't.  They came back yet again.  On January 19, 2010, Ankur

24   Gupta calls Vikram Datta yet again.  On this occasion he

25   proposes again that Vikram Datta accept money in California and

1    goods are going to be in New York, and this is sort of typical

2    of this money laundering scheme that Ankur and his dad Ajay

3    Gupta had been involved in.  And again his answer is one word:

4    "No."

5              Another swing and a miss.  They should have left him

6    alone.  But they didn't.

7              Almost three months goes by after that January phone

8    call.  March 1st, 2010.  Vikram Datta is off the radar.  He

9    hasn't done anything wrong.  He has absolutely not bit at their

10   bait.  He has told them he doesn't want to do it.  "I don't

11   need to get involved," he tells them.  And he was at a perfume

12   show.  Using your common sense as suggested by the government,

13   who do you expect to be at a perfume show?  Money launderers

14   and drug dealers?  No.  People in the perfume business.  People

15   who buy and sell perfume.

16             So the government plans to start this sting operation

17   again.  Undaunted, they are not going to be turned away by the

18   fact that he has not bit their bait on November 24th, didn't

19   take their bait on January 19th, and now they're going to try

20   again at this perfume convention in Las Vegas.

21             Jose Correa is the undercover agent.  He has with him

22   an informant named Roberto.  And if I knew more, I would tell

23   you, but we'll find out together as this trial progresses who

24   that fellow is.  And Roberto is there.  And Ankur and Ajay

25   Gupta are going to introduce Vikram Datta -- that's the plan --

19cddat2                         Opening - Mr. Ross

1     introduce Vikram Datta to the undercover agent so they can do

2     an undercover operation on this guy who has already said no

3     several times.

4            But before it begins, before they find him, you're

5     going to hear testimony, perhaps the recording itself, of a

6     fascinating conversation between Jose Correa, the undercover

7     agent, and Ankur Gupta, Ajay Gupta and Roberto, the informant.

8            It's a pep talk.  It's while they are looking for

9     Vikram, who is busy at the perfume show, while they are out

10    looking to get him involved in some kind of criminal

11    conversation to try yet again, here's the pep talk.  This is a

12    government agent working in a Drug Enforcement Administration

13    Department of Justice Task Force saying to two cooperating

14    witnesses and an informant:  "We don't slow down if something

15    happens."  Something had happened.  He didn't take the bait,

16    but that's not going to slow him down.

17           (Continued on next page)

18

19

20

21

22

23

24

25

19C4DAT3                           Opening - Mr. Ross

1            MR. ROSS:  We have to find someone.  We have to get

2    results.  These are quotes.  You are going to hear these in the

3    tape recorded testimony.  I don't care what you tell him,

4    generate something.  Make sure you make him want to work with

5    us.  Do whatever it takes.  You got to set it up.  We got to

6    figure out what to do to get results.  Let's start with Vikram.

7    Let's get aggressive and get this guy on board.

8            You will hear Ankur Gupta in the background at that

9    very moment and hear him say to the agent words that I think

10   summarize the entire case.  He says, regarding that series of

11   phone calls you had us do with Vikram, we did everything we

12   were supposed to, he wouldn't take our money.  They should have

13   left him alone.  But they didn't.

14           The following day is March 2, 2010.  They find Vikram

15   at the perfume convention.  Now it's Jose Correa, Roberto, the

16   informant.  They are introduced.  How are they introduced.

17   Ankur and Ajay introduce them.  These are wholesale customers

18   from Mexico, very good customers, they have been good customers

19   of ours, and you have some lines, different perfume lines that

20   they want that we don't have.  We know that you have them, so

21   we are going to have our very good customers, you are going to

22   take care of them.

23           That's the introduction.  There is a recording of the

24   conversation and it's not very long and it's a sit-down

25   conversation undercover.  Let me tell you a few things that are

19C4DAT3                         Opening - Mr. Ross

1    not said.  Jose never says this is drug money.  Jose never says

2    there is anything illegal or improper about the money.  Jose

3    never says anything to suggest for even one second that this

4    was some unlawful activity.  What is said is he asks, can I pay

5    cash, can I pay cash, and this man's answer, Vikram Datta's

6    answer, I need your passport, I put it in your name, and I

7    deposit the money.  That's his answer.  They should have left

8    him alone.

9              Fast-forward.  They struck out again.  Five months

10   passes, all the way from March 2 to August 8 of 2010, and

11   during this period of time is there any evidence that Vikram

12   Datta is calling the agents trying to launder money, trying to

13   get involved in their business.  No, no phone calls.  But

14   Ankur, Ajay, they have to work off their case, they have to get

15   a reduction in sentence.  There is another perfume show coming

16   up in Las Vegas in August, another opportunity to take a shot

17   at Vikram Datta.  That's just what they do.

18             Before that they find him, this fellow Roberto, the

19   informant and Ajay Gupta, the father, on August 8, 2010, they

20   find Vikram Datta at the show.  They track him down and they

21   tell Vikram that Roberto and his son, he represented Jose, the

22   agent, to be his son, had lost a lot of money with regard to

23   some merchandise and that they have an investor who was in New

24   York and Mexico and who is going to put up some money, and

25   Robert said to him, Roberto said his whole business was at

19C4DAT3                    Opening - Mr. Ross

1   risk, so whatever the investor asks please do it and make our

2   life easy.  Ajay reassures, these are very good customers.

3        The next day he has a meeting, August 9.  At this

4   meeting, Vikram Datta meets Mario, the second undercover agent

5   in this investigation, no longer Jose but Mario, again with

6   Roberto, the informant, same informant, different agent.  Mario

7   is telling him he wants to do business with him.  He doesn't

8   tell him he is a drug dealer, doesn't tell him his money is

9   from drugs, doesn't tell him any of those things.  He tells him

10  I want to do business with you, I want to buy perfume from you.

11       Vikram Datta asks this question, how much do you want

12  to buy every month.  Here is the answer from Mario: we are

13  talking millions.  Well, the hook is set.  It's called

14  entrapment.  The man said no, he said no again, he said no

15  again, and he said no again.  Now what's on the table is

16  millions of dollars.  Even then, even then, saying yes to

17  wanting to sell millions of dollars, they propose that Vikram

18  Datta receive cash and send a wire.  He says no.  They propose

19  he drop money here and there an deliver goods.  He says no.

20       What he does say yes to ultimately, and he is not told

21  this is drug money, is yes you can buy, I think the government

22  referred to it as $40,000, it's really $38,000 and change of

23  perfume, which is what they did.  They bought perfume at the

24  San Ysidro store and, yes, the paperwork did get screwed up on

25  the 8300 and you are going to hear testimony about how and why

1      that happened but it is nothing to do with laundering money.

2            Right after this transaction in San Ysidro,

3      California, that actually happened on August 23, they picked up

4      the goods on and August 30 and paid in two payments, 20,000 and

5      18,000 for a total of $38,000, then Mario starts calling

6      Vikram.  He says to him I have a customer who wants to give

7      you, wants to drop $50,000, can you receive the money for me,

8      Vikram, in New York.  No.  Another no in a long series of nos.

9      He then finally say, OK, I am going to wire transfer you

10     $50,000.  He wires him $50,000 on September 24, 2010.

11            On September 27, 2010, Vikram Datta is in San Diego

12     looking after his San Ysidro store.  He travels all across the

13     U.S. side of the border to all the stores that he has as you

14     would expect an owner of a store to do.  He goes there.  He

15     goes to San Diego.  He sits down and Mario asks right at the

16     beginning of this recorded meeting, if and even believing, even

17     believing that he was going to get, we are talking millions

18     Mario said in perfume sales, Mario asks him if he would do wire

19     transfers from his companies instead of just selling perfume.

20     No.  The undercover suggests to him let's use phony receipts.

21     No.  The undercover suggests to him sending fake merchandise.

22     No.  Mario is pushing Vikram to get involved in this money

23     laundering scheme he is proposing to send money to Panama and

24     other places.  His answer consistently, repeatedly, no.

25            Vikram is then offered points.  The undercover says to

19C4DAT3                          Opening - Mr. Ross

1    him, let me offer you points, let me offer you a percentage if

2    you will agree to take cash and then wire this money down to

3    South America or actually to Mexico, Guatemala.  Vikram's

4    answer, no.  Let me quote him on that tape.  In saying no, he

5    goes on and says, I cannot do nothing, I will not destroy my

6    very good business for nothing.  No, I cannot do nothing.

7            The undercover agent says, look, Vikram, we have to

8    find a way to help these people to help ourselves, give us some

9    suggestions.  The agent has not been able to get him to do

10   anything so now he is asking him for ideas.  Send the $50,000,

11   the agent says to him, that it's already been wired, it's a

12   wire transfer, not cash, send the $50,000, send the 50 and

13   charge me 5, 6 whatever, 10.  Vikram, no.  Moreover, Vikram

14   says, but even that I will not do.  I can only sell perfumes, I

15   don't want to get involved.  Those are the words that came from

16   that man's mouth while the government was proposing that he

17   involve himself in money laundering.

18           So having failed to get Vikram Datta involved in

19   laundering money and more than a month after, this is one of

20   the interesting things is this September 27 meeting, you have

21   to keep in time referenced here, the transaction that the

22   government says he knowingly engaged in because the agent told

23   him was drug money occurred on August 23 and picked up the

24   goods on August 30.

25           It's a month later on September 27 for the very first

1    time in this case, the undercover agent says to Vikram Datta

2    that he, the agent, is working for the Sinaloa cartel.  That's

3    the game.  The game is let's get him to engage in a transaction

4    not knowing that it's drug money and I will tell him afterwards

5    that it's drug money and then we will bring him into court to

6    prosecute him.  That's what the evidence is going to show you

7    happened here.

8            Now Vikram hears that it's the Sinaloa cartel.  He

9    won't even sell them perfume.  He doesn't want anything to do

10   with them.  When they propose money laundering to him after he

11   hears Sinaloa cartel, here are his answers.  No, no.  My

12   business is earning without that money.  I do not need it.  I

13   have learned to live without that money.  The agents try to get

14   Vikram to do something with the $50,000.  It was all kinds of

15   proposals, just send it here, pretend there was an error,

16   forward it on, any way they could get him to do something that

17   could be called money laundering.

18           Vikram's answer, I have to send it back to the same

19   account it came from.  That is your money.  I do not want it.

20   Lo and behold, folks, you are going to see the records.  Two

21   days later after that meeting, on 29 September, that's exactly

22   what happened.  Vikram Datta gives directions to his employees,

23   you immediately send that wire transfer back because now he has

24   heard it, these are bad people, this is the Sinaloa cartel.

25           At this point, Vikram wants nothing to do, that's what

1    the evidence is going to show you, wants nothing to do with a

2    guy he just found out is working somehow with the Sinaloa

3    cartel.  But for one really one of the most unbelievable

4    unforeseen events, he would never have had contact with them

5    again.  What's that event.  On November 18, 2010, a fellow

6    named Octavio who you are going to hear about, one of the

7    dearest friends of Vikram Datta and had been one of his best

8    perfume customers in Mexico for a number of years who lives in

9    Mexico was kidnapped, was kidnapped, when you hear and read

10   about that, so we have a notion how dangerous that might be.

11         Octavio gets kidnapped.  When Octavio gets kidnapped,

12   if you have a friend who gets kidnapped like Vikram Datta had a

13   friend that got kidnapped and you know that the hoodlums, the

14   cartel, the bad people in Mexico kidnapped your friend, who do

15   you go to for help.  Vikram went to the only hoodlum he knew,

16   Mario, the undercover who a month earlier had told him he works

17   for the Sinaloa cartel.  He calls him.  You will hear the

18   recording of that conversation.  It's not about money

19   laundering.  It's about can you help me get my friend, I will

20   pay his ransom, I just want him to live, I don't want them to

21   hurt him, I don't want them to kill him.

22         This all of a sudden, this undercover make-believe

23   operation, folks, runs head on into reality.  Reality is a guy

24   whose life is at stake in Mexico.  You will hear Vikram Datta.

25   He does everything he can to help his friend, everything he

1    can, and the words he uses to talk to Mario when Mario says I

2    am on it, I will have my people look into it, we will take care

3    of it, he says, I owe you for this.   Thank you very much,

4    Mr. Mario.

5           A couple of weeks later, December 7, Octavio is still

6    kidnapped, he is not yet released.   There has been discussion,

7    there has been consideration, a dialogue.   Mario keeps giving

8    Vikram updates on what's happening with Octavio.   He tells him

9    I heard, I heard it wasn't just him, there were five people,

10   there was one woman and three over guys, and I heard that some

11   of the other people had been released.   And he is giving Vikram

12   that information and Vikram is believing it and Vikram is

13   believing it and Vikram is believing that this guy is really

14   helping him.

15          I don't know, maybe he was; we are going to find out

16   together.   That's what was being said.   Whether it was real or

17   not, that was what was being said.   So on December 7, the agent

18   requests a meeting with Vikram, and Vikram's happy to go

19   because he cares about only one thing, Octavio and getting him

20   released.   He meets him in Las Vegas.   This is not a show.

21   This is different.   This is not a perfume show.   This is just

22   him going to meet Mario thinking that Mario, albeit a criminal,

23   can help him get his friend released.

24          You will hear a recording of that conversation and you

25   will be satisfied that that's what that meeting is all about.

19C4DAT3                          Opening - Mr. Ross

1    He says to him, he wants to thank him, he wants to introduce

2    Octavio to him if and when he gets released so he can say thank

3    you.  Even at this meeting where the concern is about his

4    friend, Mario, the undercover, is going to take another shot at

5    Vikram with the money laundering.  He proposes to Vikram.  He

6    says Vikram what I want you to do is you launder $1 million and

7    just tell me how much are you going to charge me.  Vikram's

8    response, this is something, I have no knowledge of, I have no

9    knowledge of this thing.  Because he doesn't.  Another swing

10   and a miss, another no.

11         Mario says, maybe I haven't been clear with you.  I am

12   moving kilos for the Sinaloas.  Now he's gone from September 27

13   finally telling him he is involved with the Sinaloa after a

14   month after the transaction the government charged here.  Now

15   he is on December 7 and now he is moving kilograms of cocaine.

16   Despite all of that, Vikram Datta, he is scared, he is scared.

17   He says, the undercover says your friend is still there,

18   referring to Octavio, and Vikram says, yes, he is still there.

19   The undercover says how do I know that.  Vikram says that's why

20   I came here.

21         He went to that meeting not to launder money, not to

22   enter into some agreement to launder money.  He said no

23   repeatedly every single time.  He went there to help his

24   friend.  That's the reason he came.  Vikram is not interested

25   in laundering money.  He is interested only in getting his

19C4DAT3                          Opening - Mr. Ross

1    friend released.  On December 15, 8 days after this December 7,

2    2010 meeting, Octavio is released.  A month later, Vikram on a

3    normal trip to New York where he is going to see his suppliers

4    and everything else makes an agreement after plague, another

5    plague of phone calls from the undercover agent.  It's always

6    that way.

7            The only time that Vikram Datta ever calls the agent

8    is on November 18 when Octavio is kidnapped.  All the other

9    phone calls are Ankur calling him, the undercover calling him.

10   That's how it worked.  They are after him.  After that plague

11   of phone calls, they finally have a meeting in New York on

12   January 15, 2011, and the agent asks him, you are going to hear

13   all these things in the conversation about going to Belize and

14   opening up a duty-free store, all this stuff that he spoke to

15   them about, you will hear the tape for yourself, this man was

16   intoxicated.  You will hear it on the tape.  He said all kinds

17   of stuff.

18           They even asked him, have you made any progress in

19   opening the store to Belize.  No.  He had not made any progress

20   in anything because none of that was real.  He tells them

21   again, I thank you that my good friend is out, thank you.

22   Mario is not done, one last shot.  Mario starts talking to him

23   about commissions for money laundering.  Vikram's answer, you

24   don't need me, I really have no idea how does it work, I have

25   no idea, you do not need me for nothing.  The undercover says,

19C4DAT3                        Opening - Mr. Ross

1    that's why I keep calling though.  Vikram, you do not need me.

2    The undercover, we are going to be partners.  Vikram, you don't

3    need me.  Vikram, I did everything by the books, I did

4    everything 100 percent by the books.

5            Then, Vikram Datta got arrested and that brings him

6    here to you.  That's what the evidence is going to be.  When

7    that evidence comes out, we are going to go ask you to return

8    the only verdict you can return, not guilty.  Thank you.

9            THE COURT:  Thank you.

10           Let's take a few minutes and we will move then to the

11   government's first witness.

12           (Recess)

13           (Jury not present)

14           THE COURT:  Mr. Ross, this is my standard practice, so

15   I am going to address your client.

16           Mr. Datta, I need to tell you what you probably know

17   already that you have the right to testify in this case if you

18   wish.  That is your decision and your decision alone.  You have

19   the right to the advice of your attorneys as to whether you

20   ought to do it, but in the last analysis it's not their call,

21   it's yours.  Do you understand that?

22           THE DEFENDANT:  Yes, sir.

23           THE COURT:  If we get to the end of the government's

24   case and your lawyers say they are resting without putting on

25   any evidence or your lawyers put on some evidence and they say

19C4DAT3                          Opening - Mr. Ross

1  they are going to rest without calling you to the stand, if it

2  is your wish to testify, what I want you to do is just stand

3  up, don't say anything, just stand up.  I will send the jury

4  out and find out why you are standing.  If do you not stand up,

5  I am going to take it their decision not to call you as a

6  witness is what you want to do as opposed to what they want to

7  do.  Do we understand each other?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  OK.  Let's go.

10          (Continued on next page)

19C4DAT3                          Opening - Mr. Ross

1           (Jury enters courtroom)

2           THE COURT:  The record will reflect that the jurors

3   and the defendant all are present as they have been throughout.

4           Mr. Skinner, your first witness.

5           MR. BRAGG:  The government calls Mario Recinos, your

6   Honor.

7    MARIO RECINOS,

8        called as a witness by the Government,

9        having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MR. BRAGG:

12  Q.  Where do you work?

13  A.  I work for the Passaic County sheriff's department.

14  Q.  What do you currently do for the sheriff's department?

15  A.  At the present time I supervise the evidence room.

16  Q.  Where is Passaic County?

17  A.  Passaic County is in the State of New Jersey.

18  Q.  How long have you had your current job?

19  A.  Approximately two months.

20  Q.  What did you do prior to your current job?

21  A.  I also worked for the Passaic County sheriff's department.

22  Q.  What did you do when you worked previously for the

23  sheriff's department?

24  A.  I was a lieutenant for the sheriff's department.

25  Q.  How long did you work for the sheriff's department as a law

19C4DAT3                        Recinos - direct

1    enforcement officer?

2    A.  A total of 32 years.

3    Q.  What were your responsibilities in your last position as

4    lieutenant?

5    A.  My last assignment was with the drug enforcement, DEA,

6    which stands for DEA.  I am sorry, it was the other way, DEA

7    which stands for Drug Enforcement Agency.

8    Q.  What did you do with the Drug Enforcement Administration?

9    A.  I was in a task force.

10   Q.  What was the function of the task force?

11   A.  To investigate narcotics and money laundering.

12   Q.  How long were you a member of the task force?

13   A.  Approximately 8 years.

14   Q.  Which agencies compromise the task force?

15   A.  It was all different municipalities throughout the State of

16   New Jersey.  There was IRS agents and DEA agents.

17   Q.  By IRS are you referring to the Internal Revenue Service of

18   the United States?

19   A.  Yes, sir.

20   Q.  Who was in charge of the task force?

21   A.  An agent, a DEA agent.

22   Q.  Did that person have authority to investigate money

23   laundering crimes?

24   A.  Yes, he did.

25   Q.  While you were on the task force, did you act at that

1   person's direction when you were doing money laundering

2   investigations?

3   A.  Yes, sir.

4   Q.  Did there come a time when you were on the task force that

5   you become involved in an investigation of a person named

6   Vikram Datta?

7   A.  Yes, sir.

8   Q.  Do you see Mr. Datta in the courtroom today?

9   A.  Yes, I do.

10          MR. ROSS:  We would stipulate to the identification if

11  the government wishes.

12          MR. BRAGG:  Certainly.

13          THE COURT:  So stipulated.  Members of the jury that

14  means that they agree; they agree that the witness would

15  identify the defendant.

16  BY MR. BRAGG:

17  Q.  Returning to your current job a moment, did you retire from

18  your law enforcement component of work for the state county

19  office?

20  A.  Yes, I did.

21  Q.  When did you retire?

22  A.  June of this year.

23  Q.  You are now working as a civilian so to speak?

24  A.  Yes, sir.

25  Q.  What was your role in the investigation of Vikram Datta?

1   A.   I was one of the undercovers.

2   Q.   As an undercover who did you represent yourself to be?

3   A.   I represented myself to be a Guatemalan national who could

4   move a lot of money and who had a lot of friends in Mexico and

5   Guatemala.

6   Q.   In connection with the undercover investigation did you

7   record meetings that you had with the defendant?

8   A.   Every time I met with him I was wearing a digital recorder.

9   Q.   Approximately how many times did you meet with the

10  defendant?

11  A.   Four times.

12  Q.   What was the first step in the undercover investigation

13  that you are aware of?

14  A.   After the planning it was decided that another undercover

15  and an informant was going to be introduced to Mr. Vikram

16  Datta.

17  Q.   What is the other undercover's name?

18  A.   His name is Jose.

19  Q.   What is the informant's name?

20  A.   Roberto.

21  Q.   When you said informant, what did you mean by that?

22  A.   A person that is cooperating with the government.

23  Q.   Did you understand that Roberto was charged with a crime?

24  A.   Yes.

25  Q.   Why was he working with the government?

19C4DAT3                        Recinos - direct

1    A.   He was cooperating to, he was cooperating with the

2    government because he had a pending charge and he wanted to

3    cooperate and help himself.

4    Q.   Who introduced Jose and Roberto to the defendant?

5    A.   Ankur Gupta and Ajay Gupta.

6    Q.   Who are they?

7    A.   They are also cooperators.

8    Q.   Do you know why they -- withdrawn.

9         Were they also cooperating with the task force

10   investigation?

11   A.   Yes, they were.

12   Q.   Prior to them covering the investigation, what was the

13   Guptas' relationship with the defendant?

14        MR. ROSS:   Objection based on hearsay; I have not

15   objected thus far.

16        THE COURT:   Thank you.   Sustained.

17   Q.   Do you have any understanding as to the relationship

18   between Mr. Gupta and Mr. Datta?

19   A.   Yes.

20        MR. ROSS:   Same objection.

21        THE COURT:   Sustained.   The answer is stricken.

22   Q.   Approximately when was this meeting?

23        THE COURT:   I am sorry, what meeting exactly?

24   Q.   You just testified, lieutenant, that the Guptas introduced

25   Jose and Roberto to the defendant; am I correct?

19C4DAT3                          Recinos - direct

```
 1   A.  Yes, sir.

 2   Q.  When was that introduction?

 3   A.  March 2010.

 4   Q.  Where was it?

 5   A.  It was in Las Vegas, Nevada.

 6   Q.  Where specifically in Las Vegas, Nevada?

 7   A.  It was a perfume exposition.

 8   Q.  Were you present for that introduction?

 9   A.  Yes, I was.

10   Q.  For the introduction in --

11   A.  Not for the introduction.  I was there at Las Vegas also.

12   Q.  When was your first interaction with the defendant?

13   A.  August of 2010.

14   Q.  Where was this interaction?

15   A.  It was also in Las Vegas, Nevada.

16   Q.  Where in Las Vegas, Nevada was that?

17   A.  It was at another perfume exposition.

18   Q.  How did it come to be that you interacted with the

19   defendant?

20   A.  It was an operational decision; we decided, they decided to

21   send me in with Roberto.

22   Q.  When you say they who are you referring to?

23   A.  My group, my supervisors.

24   Q.  How did you meet defendant?

25   A.  I was introduced to the defendant by Roberto who had
```

19C4DAT3                        Recinos - direct

1    already met him and also Ankur and Ajay Gupta.

2    Q.  Who did you represent yourself to be?

3    A.  A Guatemalan national who could move a lot of money.

4    Q.  Where is Guatemala?

5    A.  In Central America south of Mexico.

6    Q.  Why did you say -- withdrawn.

7            After the introduction when was your next interaction

8    with the defendant?

9    A.  I proceeded to ask them we could speak for a few minutes.

10   Q.  Did you in fact speak for a few minutes?

11   A.  Yes.

12           THE COURT:  Was this on the same occasion?

13           THE WITNESS:  Yes, sir.

14   Q.  What time of day was this introduction?

15   A.  It was approximately 2, 3:00 in the afternoon.

16   Q.  After the introduction and the speaking separately did you

17   speak with the defendant later that day?

18   A.  Yes, I did.

19   Q.  Where did you speak with the defendant later that day?

20   A.  Later that day, I spoke with him; we met at his hotel.

21   Q.  Where within the hotel?

22   A.  In a bar.

23   Q.  What as a general matter did you talk about in that

24   conversation?

25   A.  I wanted to discuss moving money.  I explained to him that

19C4DAT3                         Recinos - direct

1    I was having a problem with the people that I was working with

2    because it was taking them too long to move the money and I

3    needed to move it a little quicker and I needed his assistance.

4    Q.   Subsequent to that interaction did you have any additional

5    interaction with the defendant?

6    A.   Yes, I did.

7    Q.   What was that interaction?

8    A.   After that evening, phone calls.

9    Q.   Approximately how long after that evening did you have a

10   phone call conversation with the defendant?

11   A.   I am sorry, are you asking me about the second meeting that

12   day?

13   Q.   Withdrawn.

14   A.   There were two meetings that day.

15   Q.   Tell us about the second meeting.

16   A.   OK.  After I met him at the exposition he agreed to meet me

17   later that evening, and we met at a bar.

18   Q.   Where was that bar?

19   A.   It was at the hotel where he was staying at.

20   Q.   What as a general matter did you talk about at the bar?

21   A.   The same thing, moving money, and I explained to him that I

22   had access to a lot of money, I had a lot of Mexican and

23   Guatemalan friends that needed me to move money for them and

24   that I was having a problem moving it fast enough for them,

25   there was a lot of money and I needed to move it quick.

1   Q.  After that conversation with the defendant, when was the

2   next time you spoke with him?

3   A.  Over the phone, shortly after that meeting.

4   Q.  What as a general matter did you speak with him about on

5   the phone?

6   A.  We continued to speak more or less about the same thing; he

7   had explained to me that he wanted to open duty-free stores in

8   Belize.  That was the conversation, that was what the

9   conversation was about.

10  Q.  Did there come a point in time when as part of the

11  undercover operation, you had discussions about purchasing

12  perfume?

13  A.  Yes.

14  Q.  To your knowledge was a purchase of perfume made in

15  connection with the undercover investigation?

16  A.  Yes, sir.

17  Q.  Approximately how much was paid to the defendant's business

18  for the perfume?

19          MR. ROSS:  Objection based on hearsay.

20          THE COURT:  Well, lay a foundation, counsel.

21  Q.  Did you speak with the defendant prior to the perfume

22  purchase?

23  A.  Yes, I did; I made the arrangements.

24  Q.  In making the arrangements did you speak with the defendant

25  about how much perfume would be purchased?

19C4DAT3                        Recinos - direct

1   A.   Yes, sir.

2   Q.   Did you speak about the method of payment for the perfume?

3   A.   Yes.

4   Q.   How much, what was the dollar value of the transaction?

5   A.   $40,000.

6   Q.   How was payment made?

7   A.   Cash.

8   Q.   After that purchase did you meet with the defendant again?

9   A.   Yes, I did.

10  Q.   When?

11  A.   I believe it was in September of 2010.

12  Q.   Where did you meet?

13  A.   We meet in San Diego, California.

14  Q.   Where in San Diego, California?

15  A.   We met at a restaurant.

16  Q.   Who was present for the meeting?

17  A.   Roberto, the informant, Mr. Datta and myself.

18  Q.   What as a general matter did you discuss at that meeting?

19  A.   We continued talking about moving money, and at that

20  meeting I asked him if he would be willing to do wire

21  transfers.

22  Q.   Did you further identify yourself to the defendant at that

23  meeting?

24  A.   Yes, I did.

25  Q.   How so?

19C4DAT3                        Recinos - direct

1    A.   I told him that I was working for the Sinaloa cartel.

2    Q.   What is the Sinaloa cartel?

3    A.   It's a drug trafficking organization in Mexico, inside of

4    Mexico.

5    Q.   After this meeting in San Diego did you speak again with

6    the defendant?

7    A.   Yes, I did.

8    Q.   Was this a meeting or a call or some other form of

9    communication?

10   A.   We had numerous calls.

11   Q.   What as a general matter were those calls about?

12   A.   We continue speaking about moving money and also about him

13   opening the duty-free stores.

14   Q.   Did there come a time during those calls when the defendant

15   asked you for any type of assistance?

16   A.   Yes.

17   Q.   What type of assistance did the defendant ask you for?

18   A.   His friend had been kidnapped in Mexico by the Zetas and he

19   explained that, he was asking me for my assistance.

20   Q.   Who are the Zetas?

21   A.   Another drug trafficking group based out of Mexico.

22   Q.   What type of assistance did the defendant ask for?

23   A.   He wanted to know if I had any way of accepting a wire

24   transfer from him in the State of Mexico and also he asked me

25   for assistance to help him to have his friend released without

19C4DAT3                          Recinos - direct

1   being harmed.

2   Q.   Subsequent to those calls did you later meet with the

3   defendant in person again?

4   A.   Yes, I did.

5   Q.   When?

6   A.   Early December of 2010.

7   Q.   Where was that meeting in early December?

8   A.   That meeting was also in Las Vegas, Nevada.

9   Q.   What type of venue did you meet in?

10  A.   I am sorry, can you repeat the question.

11  Q.   What type of venue did you meet in?

12  A.   We met in a casino where he was staying.

13  Q.   What as a general matter did you talk about during that

14  meeting?

15  A.   We continued talking about moving money, and he explained

16  that he wanted to meet me, he wanted to see me again to ask me

17  again where exactly was I because he realized or he thought

18  that I had helped him.

19  Q.   When you say thought that I helped him, what are you

20  referring to?

21  A.   I am referring to his friend and four other people that

22  were kidnapped in Mexico.

23  Q.   What is his friend's name?

24  A.   Octavio.

25  Q.   During this meeting in December, did you further identify

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    yourself in any way?

2    A.  Yes, I did.

3    Q.  How so?

4    A.  I explained to him that I was working for the Sinaloa

5    cartel, and that I was moving kilos, kilograms of cocaine for

6    them and also, I was also moving a lot of money for them and

7    that I used to work for the Zetas but I had decided to move on

8    and just work with the Sinaloa cartel because they were violent

9    and ruthless.

10   Q.  When you say they were violent and ruthless, who are you

11   referring to?

12   A.  I am referring to the Zetas.

13   Q.  After this meeting in December, did you meet again with the

14   defendant?

15   A.  Yes, I did.

16   Q.  Where was the meeting?

17   A.  The meeting was in New York.

18   Q.  When was the meeting in New York?

19   A.  The meeting was early January 2011.

20   Q.  What as a general matter -- withdrawn.

21              Who was present for that meeting?

22   A.  Mr. Datta and myself.

23   Q.  What as a general matter did you and Mr. Datta talk about?

24   A.  I wanted to establish that I was going to give him my

25   permission for moving money for me and also I wanted to inform

1   him that I had obtained $150,000 for him from the group that

2   had kidnapped his friend.

3   Q.   Had you actually obtained that money?

4   A.   No.

5   Q.   What if anything happened after your meeting with the

6   defendant in January?

7   A.   Mr. Datta was then arrested.

8           MR. BRAGG:   Your Honor, may I approach.

9           THE COURT:   Yes.  Can you use the viewer.

10          MR. BRAGG:   I have a number of recordings.

11          THE COURT:   OK.

12          MR. BRAGG:   Thank you, your Honor.

13  BY MR. BRAGG:

14  Q.   Lieutenant, I have just handed you in the Redweld there,

15  you can retrieve them, several disks which have been marked for

16  identification as 103 through 108 and, in addition, I have

17  handed you documents that have been marked for identification

18  as 103T through 108T.  Do you recognize, start with the disks,

19  do you recognize the disks?

20  A.   Yes, I do.

21  Q.   How do you recognize them?

22  A.   My initials are on the CDs and the date.

23  Q.   Did you listen to the recordings prior to putting your

24  initials on them?

25  A.   Yes, I did.

19C4DAT3                        Recinos - direct

1   Q.  Take out each of the documents marked with a T.  Do you

2   recognize those documents?

3   A.  Yes, I do.

4   Q.  What are they?

5   A.  This is the transcripts of these recorded conversations.

6   Q.  Can you perhaps take out the transcript and the disk and

7   tell us what the 103 relates to when you say of the

8   conversations.  Let me do this this way; it may be a little

9   more efficient.  Withdrawn.  What does 103 relate to?

10  A.  103 is the first time, it's a recording and transcript of

11  the first time I met Mr. Datta.

12  Q.  Does the recording accurately reflect your conversation

13  during that first meeting?

14  A.  Yes, sir.

15  Q.  Does the transcript reflect the part which is recorded of

16  the conversation?

17  A.  Yes, sir.

18  Q.  Are the attributions as to who is speaking also accurate?

19  A.  Yes, sir.

20  Q.  What does 104 relate to?

21          THE COURT:  Let's break here.  Members of the jury, we

22  will see you at 9:30 tomorrow morning.  The witness can stand

23  down.

24          (Jury leaves courtroom)

25          (Witness excused)

19C4DAT3                          Recinos - direct

1            THE COURT:  Mr. Ross, unless I misunderstood your

2    opening, I would imagine that a stipulation is available for

3    the asking about all these exhibits.

4            MR. ROSS:  Yes, your Honor.

5            THE COURT:  Would you guys work that out overnight and

6    save everybody the time of this witness and any others going

7    through this.

8            MR. ROSS:  We have a number of stipulations and we

9    will be happy to enter those.

10           THE COURT:  Fine.  Let's get it worked out.

11           See you in the morning.

12           (Trial adjourned to September 13, 2011, 9:30 a.m.)

13                              -   -   -

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    MARIO RECINOS

 4    Direct By Mr. Bragg  . . . . . . . . . . . . .46

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

19D4DAT1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                New York, N.Y.

4                  v.                         (S1) 11 Cr. 102 (LAK)

5    VIKRAM DATTA,

6                    Defendant.

7    ------------------------------x

8
                                             September 13, 2011
9                                            10:00 a.m.

10
     Before:
11
                         HON. LEWIS A. KAPLAN,
12
                                             District Judge
13

14                            APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  PETER M. SKINNER
17        ALVIN L. BRAGG, JR.
          Assistant United States Attorneys
18

19   ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN PA
          Attorneys for Defendant
20   BY:  ALAN S. ROSS

21   WHITE & WHITE
          Attorneys for Defendant
22   BY:  DIARMUID WHITE

23            - also present -

24   Vanessa Quinones, Government paralegal
     SA Richard Reinhardt, IRS
25

19D4DAT1

```
 1                (Trial resumed; jury not present)
 2                THE COURT:  Did you work out your stipulations?
 3                MR. BRAGG:  Yes, your Honor; we are going start with
 4     that.
 5                (Jury enters courtroom)
 6                THE COURT:  Good morning everybody.  The record will
 7     reflect that the jurors and the defendant all are present, the
 8     witness is on the stand.  Members of the jury, I know what
 9     inconvenience this is like; I have been doing it for decades.
10     But I would make this simple point.  In a trial of this
11     duration, if we lose as little as 30 minutes a day to lateness
12     and getting started in the morning and after lunch, we are
13     going to be here about an extra two days.  So everybody should
14     perhaps keep that in mind.  Let's proceed.
15                MR. BRAGG:  Your Honor, I would like to read a
16     stipulation.
17                THE COURT:  Yes.  Members of the jury, a stipulation
18     is an agreement among the lawyers as to various facts and you
19     must accept it as true.
20                MR. BRAGG:  It is hereby stipulated and agreed by and
21     among the United States of America, by Preet Bharara, United
22     States Attorney for the Southern District of New York.
23                THE COURT:  Skip the preamble.
24                MR. BRAGG:  That Government Exhibits 101, 102, 103,
25     104, 105, 106, 107, and 108 are recordings of meetings
```

19D4DAT1

1    involving the defendant that occurred either entirely or

2    primarily in English.  Government Exhibit 105 is a recording of

3    a telephone conversation involving the defendant that occurred

4    in English.  Government Exhibits 101T --

5              THE COURT:  Little slower.

6              MR. BRAGG:  -- 102T, 103T, 104T, 105T, 106T, 107T, and

7    108T are transcripts that contain fair and accurate

8    transcriptions of the parts of the conversations that were

9    transcribed.  The meetings and conversations reflected in

10   Government Exhibits 101T, 102T, 103T, 104T, 105T, 106T, 107T,

11   and 108T occurred on the dates and at the times indicated on

12   the transcripts.  Government Exhibit 102 contains statements in

13   Hindi.  Government Exhibit 102T contains fair and accurate

14   English translations of the Hindi language statements contained

15   on Government Exhibit 102.

16             Vikram Datta, the defendant reserves the right to call

17   as witnesses the participants in the recorded conversations

18   contained in the Government Exhibits 101, 102, 103, 104, 105 --

19             THE COURT:  This not a stipulation of fact.  That's

20   not a matter that concerns the jury, that last part.  Is there

21   anything else?

22             MR. BRAGG:  No, your Honor, just that the stipulation

23   may be received into evidence.

24             THE COURT:  What's the designation of the stipulation?

25             MR. BRAGG:  811.

19D4DAT1

1           THE COURT:   Government Exhibit 811.

2           MR. BRAGG:   Is stipulation.

3           THE COURT:   Government Exhibit 811 is received.

4           (Government Exhibit 811 received in evidence)

5           MR. BRAGG:   And it offers in evidence the recordings

6    101 through 108.

7           THE COURT:   Received.

8           (Government Exhibits 101-108 received in evidence)

9           MR. BRAGG:   And stipulates that the transcripts it

10   101T through 108T may be used as aids.

11          THE COURT:   Received for that purposes.

12          (Government Exhibits 101T-108T received in evidence)

13   MARIO RECINOS, resumed.

14   DIRECT EXAMINATION (Continuing)

15   BY MR. BRAGG:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  You testified yesterday at a certain point you were

19   introduced to the defendant.  I want to direct your attention

20   to that day.  Approximately when was that?

21   A.  August 2010.

22   Q.  Who was present?

23   A.  Ajay Gupta, Ankur Gupta, Roberto and myself.

24   Q.  Specifically where were you?

25   A.  Las Vegas, Nevada.

19D4DAT1                    Recinos - direct

1   Q.  Where in Las Vegas, Nevada?

2   A.  At a perfume exposition.

3   Q.  What is a perfume exposition?

4   A.  Where vendors come and they show all the business people

5   the products and try to acquire customers.

6   Q.  How were you introduced?

7   A.  I was introduced as a Guatemalan national.

8   Q.  What happened immediately after you were introduced?

9   A.  Roberto, Mr. Datta and myself, we stepped to the side.

10  Q.  What as a general matter did you talk about in the

11  conversation when you stepped to the side?

12  A.  I explained to him that I had access to a lot of money, I

13  needed to move money and the Ankurs were good people but they

14  were not moving it fast enough for me.

15          MR. BRAGG:  One moment; I apologize, your Honor.

16          THE COURT:  Yes.

17          (Pause)

18          MR. BRAGG:  Your Honor, I was going to refer the

19  witness and the jury to a recording.  I want to pass out the T

20  exhibits which are in a binder.

21          THE COURT:  All right.

22          Members of the jury, they are going to distribute to

23  you binders with transcripts of this and presumably other

24  conversations.  Stay on the page that's relevant at the time.

25  Don't go leafing through the books trying to get what the last

19D4DAT1                          Recinos - direct

1    chapter looks like; just stay with the program.

2            I need to instruct you also that insofar as the

3    conversations that are transcribed in these transcripts took

4    place in English, the evidence of what was said is in the

5    recordings not the transcripts.  So if there is any variance

6    between the transcript of the English and the English that you

7    hear on the recording, you adhere to the recording.  In the

8    case of conversations that took place in Hindi or some other

9    language, it is the transcript which is the evidence that you

10   must rely on, not the original foreign language speech.

11           Go ahead, counsel.

12           MR. BRAGG:  We will start with Exhibit 103, 11:50.

13           THE COURT:  What does 11:50 mean?

14           MR. BRAGG:  The time stamp, 11 minutes 50 seconds; I

15   believe it starts at page 3.

16           THE COURT:  Help we find what you are referring to

17   when you talk about 11:50.

18           MR. BRAGG:  Government Exhibit 103T, page 3, line 29

19   is where the recording will start.

20           THE COURT:  Really?  Show me what you are referring

21   to.  Come up.

22           (Pause)

23           THE COURT:  Counsel is referring to page 3, line 29 of

24   Government Exhibit 103.  That's where you ought to be.  Let's

25   proceed.  There is no 11:50 on this.

1              (Audiotape played)

2    BY MR. BRAGG:

3    Q.   Lieutenant, I am at page 5, line 22 where it says you see

4    there, who is speaking?

5    A.   I was, sir.

6    Q.   What are you referring to when you say just to test it?

7    A.   What I meant was, in the related world, traffickers or

8    people.

9              MR. ROSS:   Your Honor, I object.

10             THE COURT:   Objection sustained.

11             (Audiotape played)

12   BY MR. BRAGG:

13   Q.   At the bottom of page 6, lines 44 to 45, did you have an

14   understanding of what Mr. Datta was referring to when he said

15   they have to report everything to IRS?

16   A.   Yes, sir.

17   Q.   What was that understanding?

18             THE COURT:   Sustained.

19             MR. ROSS:   Thank you.

20             (Audiotape played)

21   BY MR. BRAGG:

22   Q.   Mr. Recinos, at page 8, line 9, did you have an

23   understanding what Mr. Datta was referring to when he said

24   everything started from Miami?

25   A.   Yes, sir.

19D4DAT1                          Recinos - direct

1           THE COURT:  That's going to be for the jury to decide

2   what he was referring to.  He can testify to anything Mr. Datta

3   said; he cannot read his mind.

4           MR. BRAGG:  Thank you, your Honor.

5           (Audiotape played)

6   Q.  What as a general matter did you talk about for the rest of

7   the conversation?

8   A.  We continued discussing moving money.

9   Q.  Did you discuss meeting later that day?

10  A.  Yes, sir.

11  Q.  Did you in fact meet with the defendant later that day?

12  A.  Yes, I did.

13          MR. BRAGG:  We can turn to 104T, start at 530, page 5,

14  line 28.  Before we do, let me ask Mr. Recinos a couple of

15  questions.

16  Q.  When did you meet that night?

17  A.  We met on the same day.  I am just, I just don't have the

18  transcript yet.

19  Q.  104T.

20  A.  I got it.

21  Q.  That night about how long did you meet with the defendant?

22  A.  We met for a couple of hours.

23  Q.  At the beginning of t he conversation, what did you and the

24  defendant talk about?

25  A.  We continued discussing that I needed help to move money.

19D4DAT1                     Recinos - direct

1          MR. BRAGG:  Can we start at -- withdrawn.

2    Q.  Did you and the defendant have any conversation about

3    consuming alcohol?

4    A.  Yes, sir.

5    Q.  What did you say to him and what did he say to you?

6    A.  I was trying to make him feel comfortable, I was trying to

7    gain his confidence, so when he came in, he made me wait a

8    little while, when he came in I said to him, I said, hey, I am

9    getting drunk here waiting for you.

10   Q.  Did he respond?

11   A.  Yes, sir.

12   Q.  As how?

13   A.  He stated I am already drunk.

14   Q.  While you were together that evening, did you see him

15   consume any alcoholic beverages?

16   A.  Yes, I did.

17   Q.  Approximately how many?

18   A.  At the present time, I recall it had to be no more than

19   four or five.

20   Q.  Would you describe the defendant's demeanor throughout the

21   meeting?

22   A.  Yes; very focused, very interested in what I had to say.

23          MR. BRAGG:  Turn to page 5, line 28, 5:30.

24          (Audiotape played)

25          MR. BRAGG:  I am at page 13, line 13, Mr. Recinos.  I

19D4DAT1                         Recinos - direct

1    am going to ask you to turn to page 16, at about line 16.

2              That's time-stamped 20:30.

3              (Audiotape played)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19dddat2                         Recinos - direct

1    BY MR. BRAGG:

2    Q.  Mr. Recinos, just so we don't lose our place, we are up to

3    page 21.

4              (Tape playing)

5              MR. BRAGG:  Can you stop it, Ms. Quinones.

6    Q.  Can I ask you, Mr. Recinos, to turn now to page 31,

7    approximately line 25.

8              MR. BRAGG:  Ms. Quinones, at time stamp 39:10.

9              (Tape played)

10             MR. BRAGG:  Line 37.

11             (Tape played)

12             MR. BRAGG:  Ms. Quinones, if you can stop there.

13             And, Mr. Recinos, I'm turning now to page 36, line 32,

14   at time stamp 44:22.

15             (Tape played)

16             THE COURT:  Counsel, could you stop the tape there?

17             Ms. Simmons.

18             ALTERNATE JUROR NO. 3:  I'm sorry.

19             THE COURT:  Let's go.

20             (Tape played)

21             MR. BRAGG:  Can you stop it right there, Ms. Quinones.

22   BY MR. BRAGG:

23   Q.  Mr. Recinos, who is Juan Valdez?

24   A.  It is just a name that we made up, Juan Valdez.  It could

25   be a coffee brand.

19dddat2                        Recinos - direct

1   Q.  And who is Felipe Calderon?

2   A.  He is the president of Mexico.

3           MR. BRAGG:  We can keep going forward, Ms. Quinones.

4           (Tape played)

5           MR. BRAGG:  Can you stop it there, Ms. Quinones.

6   BY MR. BRAGG:

7   Q.  What is your understanding of when he called you gordo,

8   what that meant?

9   A.  I was trying to set up a code so that whenever we spoke on

10  the phone we would speak on the phone --

11          MR. ROSS:  I object to the response.  Not responsive,

12  your Honor.

13          THE COURT:  Sustained.  The answer is stricken.

14  Q.  What does "gordo" mean?

15  A.  Somebody who is heavy, fat.

16  Q.  Thank you.

17          MR. BRAGG:  If we could turn now to page 54,

18  Lieutenant, line 23.

19          Ms. Quinones, that's time stamped 1:03:57.

20          (Tape played)

21          MR. BRAGG:  Let me stop you for a moment.  This may be

22  obvious.

23  Q.  What is the FBI?

24  A.  The Federal Bureau of Investigation.

25          MR. BRAGG:  If we can go forward, please.

19dddat2                          Recinos - direct

1               (Tape played)

2               MR. BRAGG:  Ms. Quinones, can you stop it right there.

3    I'm at page 59, line 13.

4    BY MR. BRAGG:

5    Q.  Are you familiar with the term -- the word "chillangos"?

6    A.  Yes, sir.

7    Q.  What do you understand it to mean?

8    A.  In Mexico, it means also Mexican.

9               MR. BRAGG:  We can go forward, Ms. Quinones.

10              (Tape played)

11   BY MR. BRAGG:

12   Q.  Mr. Recinos, the recording ended.

13              Did you have additional conversation with the

14   defendant after the recording ended?

15   A.  Yes, I did.

16   Q.  Do you know why the recording ended at that point?

17   A.  I believe the recorder just ran out of time.

18   Q.  What did you talk about with the defendant and Roberto for

19   the rest of the conversation that evening?

20   A.  We continued for a few more minutes to talk about moving

21   money, the different ways of moving the money.

22   Q.  After this meeting, did you -- when did you next speak with

23   the defendant?

24   A.  Over the phone.

25   Q.  And approximately how long after this meeting did you speak

19dddat2                     Recinos - direct

1  with the defendant over the phone?

2  A.   Not long; a couple of weeks.

3           THE COURT:   OK.   Let's take our morning break here,

4  folks, about ten minutes.

5           THE CLERK:   All rise.

6           (Recess)

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19dddat2                        Recinos - direct

1              (Jury not present)

2              MR. BRAGG:  Your Honor, may I address one matter

3       before the jury comes in?

4              THE COURT:  Yes.

5              MR. BRAGG:  The next recording is about ten minutes

6       long; it is a phone call.  And then after that there is a

7       meeting that is approximately two hours.  I have been trying to

8       sort of excise the most relevant portions but particularly

9       after the --

10             THE COURT:  Particularly you are trying to keep in the

11      most relevant portions.

12             MR. BRAGG:  I'm sorry.  I misspoke.  I apologize.

13             THE COURT:  That is all right.

14             MR. BRAGG:  Particularly after the defense opening,

15      and I spoke with defense counsel this morning, particularly for

16      this two-hour meeting, the parts that are relevant to the case

17      and that may be less relevant are interspersed.  So I

18      anticipate we will have to play through the whole thing.  I

19      wanted to let the Court know for scheduling purposes.

20             THE COURT:  What can I do about it?

21             MR. BRAGG:  I understand, your Honor.

22             THE COURT:  All right.  Just two things.

23             "Did you have an understanding of that," or "What did

24      you understand him to be thinking," let's save ourselves a lot

25      of aggravation and not ask those questions anymore.

19dddat2                           Recinos - direct

1             MR. BRAGG:  I tried to take the middle of the court.

2             THE COURT:  Yes.  OK.  Secondly, just for my own

3     edification, what do you think the tape you are just finished

4     playing shows to have been the structure of the movement of

5     goods and money?  I mean, I understand that the jury will

6     ultimately decide that, maybe I will have to decide what I

7     think it means.  But what are you telling me you think it

8     means?

9             MR. BRAGG:  The Mario and undercover was approaching

10    the defendant talking about --

11            THE COURT:  That part I understand.  What exactly do

12    you think the tape shows they agreed would be done?

13            MR. BRAGG:  The use of a bulk cash purchase --

14            THE COURT:  By whom?  Where?  Of what?

15            MR. BRAGG:  To move this perfume from the defendant's,

16    you know, store to a third party in Latin America.  And there

17    are several --

18            THE COURT:  And the cash was coming from where?

19            MR. BRAGG:  The cash, the government would argue, was

20    cash that would be represented to be coming from drug

21    trafficking proceeds.

22            THE COURT:  Where?

23            MR. BRAGG:  From Guatemala or Mexico, down south.

24            THE COURT:  I see.  So you think that that tape shows

25    that the plan that was agreed that day was to move U.S. dollars

19dddat2                         Recinos - direct

1    from outside the U.S. into this defendant's operation in Texas

2    or elsewhere in the U.S., and then he was going to ship perfume

3    back south, right?

4               MR. BRAGG:   Essentially, yes, your Honor.   The dollars

5    may have already been in the United States, but the drugs in

6    this instance I think are coming from Latin America.

7               THE COURT:   Which is it?   Do you say that it shows

8    that the dollars were in the U.S., or do you say that it shows

9    they were coming from outside the U.S., or are you saying it is

10   indeterminate?

11              MR. BRAGG:   I think on this meeting we just talked --

12   you know, had testimony about, it may have been indeterminate.

13   But later, if you --

14              THE COURT:   OK.   That's all I asked.

15              Mr. Ross, don't get excited.   I just want to make sure

16   I'm following the evidence.

17              OK.   Let's get the jury.

18              (Continued on next page)

19

20

21

22

23

24

25

19dddat2                        Recinos - direct

1          THE CLERK:  Jury entering.

2          (Jury present)

3          THE CLERK:  Please be seated, ladies and gentlemen.

4          THE COURT:  The record will reflect that the defendant

5    and the jurors all are present.

6          Members of the jury, just be aware, there are going to

7    be a lot of recordings to listen to.  There is nothing anybody

8    can do about that.  So it is important that we pay attention.

9          Let's go on.

10   BY MR. BRAGG:

11   Q.  You testified before the break about calls with the

12   defendant in August after this meeting.  About how many times

13   did you speak with the defendant following that time period?

14   A.  I believe I spoke with him a few times, a couple of times.

15   Q.  Did you call him?

16   A.  We called each other.

17   Q.  And what did you talk about in the calls?

18   A.  Continued talking business, moving money, and I believe on

19   the last conversation, right after that meeting, I arranged to

20   have perfumes purchased at one of my stores.

21   Q.  If you can turn to Exhibit 105-T.

22          Do you have it in front of you?

23   A.  Yes, I do.

24   Q.  Is this a transcript of one of the calls about that time

25   period you had with the defendant?

19dddat2                          Recinos - direct

1    A.   Yes, sir.

2              MR. BRAGG:   Ms. Quinones, if we can play 105.

3              (Exhibit 105 was played)

4              MR. BRAGG:   Could you stop it for a moment,

5    Ms. Quinones.

6    Q.   Where is San Ysidro?

7    A.   It is in California.

8              MR. BRAGG:   You can go forward.

9              (Tape played)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19D4DAT3                         Recinos - direct

1                    (Pause)

2      BY MR. BRAGG:

3      Q.   Who is Tito?

4      A.   I was referring to Roberto.

5                    (Audiotape played)

6      BY MR. BRAGG:

7      Q.   What is the next step in the undercover investigation?

8      A.   The next step, we placed an order and we dropped the money

9      in one of his stores, one of the defendant's stores.

10     Q.   Which store?

11     A.   The one in San Ysidro.

12     Q.   Do you know why the San Ysidro store was chosen?

13     A.   Yes.

14     Q.   Why?

15                   MR. ROSS:   I object.

16                   THE COURT:   Sustained.

17     Q.   Were you part of the planning for the that purchase?

18     A.   Yes.

19     Q.   Did the task force -- withdrawn.

20                   Does the defendant to your knowledge have other

21     stores?

22     A.   Yes, sir.

23     Q.   Is there any particular reason why that store in San Ysidro

24     was selected?

25                   MR. ROSS:   Objection.

19D4DAT3                        Recinos - direct

1               THE COURT:  Sustained.

2    Q.  After that purchase in San Ysidro did you speak with the

3    defendant again?

4    A.  Yes, sir.

5    Q.  Did you have another in-person meeting with him again?

6    A.  Yes, I did.

7    Q.  When was that?

8    A.  I believe it was September of 2010.

9    Q.  Where was that meeting?

10   A.  That was in San Diego, California.

11   Q.  Where in San Diego?

12   A.  In a restaurant.

13   Q.  Who was present?

14   A.  At that meeting was Roberto and myself and Mr. Datta.

15   Q.  Approximately how long was the meeting?

16   A.  It was approximately 2 hours.

17   Q.  Turn to 106T, was that the recording of that meeting?

18   A.  Yes, sir.

19             MR. BRAGG:  We will start playing 106, starting at

20   8:30, page 1.

21             THE COURT:  Page 1.

22             MR. BRAGG:  It's the beginning -- withdrawn.

23   Q.  Mr. Recinos, did you have any recordings prior to where the

24   transcript picks up on 106T?

25   A.  Yes, I did.

1  Q.  Does the transcript pick up when you first interact with

2  Mr. Datta?

3  A.  Yes, sir.

4          MR. BRAGG:  Start on page 1, time-stamped 8:30, page

5  1, line 1, 106T.

6          (Audiotape played)

7          THE COURT:  This is not where the transcript begins.

8          (Pause)

9          MR. BRAGG:  Start from the beginning.  Go to 8:30.  I

10 believe that is picking up around page 3 at the top.

11 Q.  As a general matter what did you talk about prior to the

12 section on page 3?

13 A.  Prior to that it was just greeting.

14         MR. BRAGG:  Start playing at 8:30 and once it's

15 started, I can indicate the line.

16         (Audiotape played)

17         MR. BRAGG:  We are at line 17, page 3.

18         (Audiotape played)

19 BY MR. BRAGG:

20 Q.  In line 26 you said mero mero, what did you mean?

21 A.  Mero mero in Spanish means the main boss.

22         (Audiotape played)

23 BY MR. BRAGG:

24 Q.  What if anything was the defendant doing at this point?

25 A.  He was writing on a piece of paper.

19D4DAT3                         Recinos - direct

1    Q.  What was he writing?

2    A.  He was trying to explain.

3    Q.  What was he writing; if you recall, what was the content of

4    what he was writing?

5    A.  How the transaction would take place.

6              (Audiotape played)

7    BY MR. BRAGG:

8    Q.  Do you know what happened to the writing by the defendant?

9    A.  Yes; he threw it away.

10             (Audiotape played)

11   BY MR. BRAGG:

12   Q.  What is Nandanson's?

13   A.  He was referring to two cooperators, Ankur and Ajay

14   Nandanson.

15   Q.  Nandanson is the name of the business they operate?

16   A.  I am sorry, yes, that was the business that they operate.

17             (Audiotape played)

18   BY MR. BRAGG:

19   Q.  Returning to the prior page, page 14, line 43, I told

20   Cynthia, who is Cynthia?

21   A.  Cynthia is an employee of Mr. Datta.

22             (Audiotape played)

23             THE COURT:  We are going to break for lunch, folks.

24             2:00 please.

25             (Lunch recess)

19dddat4                          Recinos - direct

1                       A F T E R N O O N   S E S S I O N

2                                  2:05 p.m.

3                THE CLERK:  Jury entering.

4            (Jury present)

5                THE CLERK:  You may be seated.

6                THE COURT:  All right.  The jurors and the defendant

7       all are present.  Let's continue, counsel.

8       MARIO RECINOS,

9            Resumed, and testified further as follows:

10      DIRECT EXAMINATION (Resumed)

11      BY MR. BRAGG:

12      Q.  Before the break, we were at page 18, line 31 of Exhibit

13      106-T.

14                Ms. Quinones, could you just start the recording where

15      you stopped.

16                (Tape played)

17                (Continued on next page)

18

19

20

21

22

23

24

25

19dddat4                        Recinos - direct

1              MR. BRAGG:  Ms. Quinones, could you stop.

2    BY MR. BRAGG:

3    Q.  At this point, lieutenant, was the defendant speaking to

4    you?

5    A.  No, he wasn't.

6    Q.  Do you know who he was speaking to?

7    A.  He was speaking with one of his employees.

8    Q.  Was he speaking on the phone?

9    A.  Yes.

10             MR. BRAGG:  You could continue, Ms. Quinones.

11             (Tape played)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

19D4DAT5                         Recinos - direct

1    BY MR. BRAGG:

2    Q.  What is a casa de cambio?

3    A.  It's where you exchange your currency, pesos to dollars;

4    they are all over the world.

5              (Audiotape played)

6    BY MR. BRAGG:

7    Q.  What was Mr. Datta doing at this point?

8    A.  He was making a phone call to his employee Yolanda.

9              (Audiotape played)

10   BY MR. BRAGG:

11   Q.  Who was Michael Gallos?

12   A.  The money was wired by members of my group; I believe that

13   was a fictitious bank account that we had.

14             (Audiotape played)

15   BY MR. BRAGG:

16   Q.  When you say my worker, who are you referring to?

17   A.  I was referring to Jose, the other undercover in this case.

18             (Audiotape played)

19   BY MR. BRAGG:

20   Q.  Was that near the end of your conversation with him?

21   A.  Yes, sir.

22             THE COURT:  We will break here.  Ten minutes.

23             (Recess)

24             (Continued on next page)

25

19dddat6                           Recinos - direct

1              THE CLERK:  Jury entering.

2              (Jury present)

3              THE CLERK:  Please be seated, everyone.

4              THE COURT:  All right.  Counsel, you may continue,

5     with the defendant and the jurors all being present.

6     BY MR. BRAGG:

7     Q.  I was going to say, how many meetings did you have with the

8     defendant after this one?

9     A.  I had two more, this one being the longest.

10    Q.  The longest.

11             During this meeting that we just listened to, did you

12    consume any alcoholic beverages?

13    A.  No.

14    Q.  Did you observe the defendant consume alcoholic beverages?

15    A.  No, sir.

16    Q.  At the end of the conversation, you and the defendant were

17    talking about the $50,000 wired.  What happened with that

18    $50,000 wire?

19    A.  Mr. Vikram sent the wire back to the company we send it

20    from.

21    Q.  After this meeting that we just listened to in late

22    September, when was the next time you had an interaction with

23    the defendant?

24    A.  He called me shortly just to stay in touch.  There was a

25    call in November, when he called me and he was asking for my

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19dddat6                          Recinos - direct

1   assistance.

2   Q.  What type of assistance did he ask for?

3   A.  By this time we were up on his telephone, we were listening

4   to his phone.  He asked the assistance --

5            MR. ROSS:  Objection.  Not responsive, your Honor.

6            THE COURT:  Strike the answer.

7   BY MR. BRAGG:

8   Q.  The question, Lieutenant, is what type of assistance did

9   the defendant ask for on the telephone conversation?

10  A.  He asked me for assistance.  His friend Octavio had been

11  kidnapped in Mexico.

12  Q.  What type of assistance did he ask from you?

13  A.  He asked me for two things.  He needed to send money to

14  Mexico; he wanted to wire money to Mexico.  He asked me whether

15  I had any account where he could send it to.

16  Q.  What, if anything, was your response?

17  A.  I told him that I had shut down my business for the

18  holidays and I wasn't able to do that.

19  Q.  After -- well, withdrawn.

20           Did there come a point where the defendant asked you

21  for additional assistance in connection with this?

22  A.  Yes, sir.

23  Q.  When was that?

24  A.  He asked me to talk to my friends so that they could find

25  out what was going on.

19dddat6                          Recinos - direct

1   Q.   And was this a phone conversation?

2   A.   Yes, it was.

3   Q.   Approximately when was it?

4   A.   It was around November 19th, around that time.

5   Q.   And when the defendant asked you to talk to your friends,

6   what, if anything, did you tell him you would do?

7   A.   I told him that I was going to make some calls to my

8   friends in Mexico.

9   Q.   Did you in fact make any calls to any friends in Mexico?

10  A.   No, I did not.

11  Q.   Did you inform any other law enforcement officials about

12  this kidnapping?

13  A.   Yes, we did.

14  Q.   Who is "we"?

15  A.   Members of my -- members of the Task Force that I was

16  working for made some phone calls.  They notified DEA in

17  Mexico.

18  Q.   Did you have any additional conversations with the

19  defendant about this kidnapping?

20  A.   Yes, sir.

21  Q.   What did you two talk about?

22  A.   It was a conversation where I was trying to find out why he

23  was kidnapped, what was the reason -- who was the -- what was

24  he into.  Was he selling drugs?  I asked him a lot of

25  questions, and he ended up telling me that what he was doing

19dddat6                         Recinos - direct

1    was moving merchandise in an area where he had been told that

2    he had to pay taxes.

3    Q.   When you say "he," who are you referring to?

4    A.   I am referring to Octavio.

5    Q.   And did you provide any information to the defendant

6    concerning the kidnapping?

7    A.   Yes, I did.

8    Q.   What type of information?

9    A.   I would simply tell him where I was listening on the

10   interceptions.

11   Q.   What was the substance of what you told him?

12   A.   For example, he told me that his friend Octavio had been

13   kidnapped.  Somebody called him, he received a phone call;

14   somebody tell him that there was a total of five people that

15   had been kidnapped, including one female.

16   Q.   Did there -- withdrawn.

17        Did you have any additional telephone conversations

18   with the defendant concerning this matter?

19   A.   Yes, I did.

20   Q.   What was the substance of those conversations?

21   A.   He informed me that the kidnappers wanted I believe it was

22   100 -- I think it was a million in U.S. dollars but he gave me

23   the amount in pesos so I don't recall exactly what that amount

24   was.

25        And, also, it came out during the conversation, I

19dddat6                    Recinos - direct

1   asked him to find out details from the family.  And he informed

2   me that they believe that the group named the Zetas had

3   kidnapped his friend

4   Q.  Who are the Zetas?

5   A.  It is a drug trafficking organization based out of Mexico.

6   Q.  Did there come a point in time after these conversations

7   when you had another in-person meeting with the defendant?

8   A.  Yes, sir.

9   Q.  Approximately when was that?

10  A.  That was December 2010.

11  Q.  OK.  Could you turn to Exhibit 107.

12          (Pause)

13          107-T.  Did you meet with the defendant in early

14  December?

15  A.  Yes, I did.  I don't have the transcript yet.

16          (Pause)

17          I have it.  Sorry.

18  Q.  Where did you meet with him?

19  A.  I met in Las Vegas with him.

20  Q.  What type of establishment did you meet in?

21  A.  It was a lounge area.

22  Q.  Who was present?

23  A.  Mr. Datta and myself.

24  Q.  When you first met, what as a general matter did you talk

25  about?

19dddat6                         Recinos - direct

1    A.  We continued talking about money laundering.

2    Q.  Let me interrupt you.

3           When you first arrived, did you exchange pleasantries?

4    A.  Yes.  We greeted.  And he stated -- he asked me who is the

5    lawyer because you sure knew a lot of details about what

6    happened with the kidnapping.  Who do you work for?

7    Q.  Let me slow you up a moment.  Let's turn to page 4 on

8    107-T.

9           MR. BRAGG:  Ms. Quinones, that is time stamped 6:10.

10   Q.  Prior to that point in the conversation, you just exchanged

11   pleasantries and -- well, withdrawn.

12          Let's just start at 6:10.  It is page 4, line 29.

13          (Government's Exhibit 107 played)

14          MR. BRAGG:  Could you stop, Ms. Quinones.

15          Would you turn to page 6, I believe line 10, time

16   stamped 8:45, page 6, about line 10.

17          (Tape played)

18          MR. BRAGG:  Pause it there, Ms. Quinones.

19          And turn to page 8, line 24, which should be time

20   stamped 11:20.

21          (Tape played)

22          MR. BRAGG:  Ms. Quinones, could you pause right there.

23   Q.  Mr. Recinos, what was the defendant's demeanor at this

24   time?

25   A.  Very focused, paying attention.  We were -- the

19dddat6                          Recinos - direct

1    conversation was very intense.

2    Q.  And I just direct your attention to page 9, line 3:   "I'm

3    moving kilos for the Sinaloa."

4              Why had you not been that explicit prior to that

5    point?

6              THE COURT:   Sustained.

7              MR. BRAGG:   Please play the tape again, Ms. Quinones.

8              (Tape played)

9              MR. BRAGG:   Please pause it.

10   BY MR. BRAGG:

11   Q.  What was the defendant's demeanor at this time?

12   A.  Very focused, and we high-fived each other after that

13   statement.

14   Q.  Who initiated the high-five?

15   A.  I did.

16             MR. BRAGG:   Please proceed with the recording.

17             (Tape played)

18             MR. BRAGG:   Could you pause it for one second?

19   Q.  Lieutenant Recinos, as far as -- withdrawn.

20             In page 14, line 40, it says, "I said Ankur..."

21             Did you know who the defendant was referring to?

22   A.  I believe he might have been mistaken.  He made a mistake.

23   Q.  You didn't take him to refer to Ankur Gupta?

24   A.  He wasn't talking about Ankur Gupta.

25             MR. BRAGG:   You can go forward.

19dddat6                          Recinos - direct

1              (Tape played)

2              MR. BRAGG:  Could we stop it, Ms. Quinones, and turn

3       to page 18, line 29.  It should be time stamped 29:00.

4              (Tape played)

5              MR. BRAGG:  We can stop that for a moment,

6       Ms. Quinones, and we can turn from page 24 to page 30, line 16.

7       It should be time stamped 48:27.

8              (Tape played)

9              MR. BRAGG:  Could you pause it there, and turn to page

10      37, line 26, time stamped 58:16, which should be page 37, line

11      26.

12             (Tape played)

13             MR. BRAGG:  Pause it for a second.

14      BY MR. BRAGG:

15      Q.  At page 39, line 33, what was the defendant's demeanor at

16      that time?

17      A.  Very focused, very into the conversation with me.

18             MR. BRAGG:  Please proceed, Ms. Quinones.

19             (Tape played)

20             MR. BRAGG:  Pause it, Ms. Quinones.

21      Q.  Where were you at this point?

22             I am on page 41, line 12.

23             Where were you and the defendant?

24      A.  We were still at the lunch area.

25      Q.  When you said "take a walk," what were you referring to?

19dddat6                          Recinos - direct

1   A.   I was trying to get him to go into one of the restaurants

2   in the immediate area, away from --

3   Q.   Did you change locations at that time?

4   A.   Yes, we did.

5   Q.   Where did you go?

6   A.   We ended up -- he ended up walking me out, out of the

7   casino.

8   Q.   If you would turn to page 43, line 7.  It is time stamped

9   1:06:50.

10            Where were you at this point?

11  A.   We were walking towards the exit of the casino.  I was

12  trying to leave and he followed me.  He walked me out.

13            MR. BRAGG:   Page 43, line 7, time stamped 1:06:50

14  seconds.

15            (Tape played)

16            MR. BRAGG:   Stop it for a minute, Ms. Quinones.

17  Q.   Approximately how much longer did you speak with the

18  defendant that day?

19  A.   Approximately another five minutes.

20  Q.   And what as a general matter did you talk about in that

21  five minutes?

22  A.   I continued talking about the same thing, about how much

23  money he was going to move for me.

24  BY MR. BRAGG:

25  Q.   After --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19dddat6                          Recinos - direct

1             THE COURT:  OK.  Let's call it a day there.

2        Thank you, members of the jury.  We'll see you

3    tomorrow morning at 9:30.

4             Counsel, remain, please.

5             (Continued on next page)

19dddat6                          Recinos - direct

1              (Jury not present)

2              THE COURT:  You can step down for the afternoon, sir.

3              THE WITNESS:  Thank you, sir.

4              (Witness excused)

5              THE COURT:  Be seated, folks.

6              How much more tape?

7              MR. BRAGG:  We have one more recording, and we spoke

8    with defense counsel on the break.  The government doesn't have

9    much of a recording that it plans to play on direct.  The

10   defense has a few portions.  So we are going to confer this

11   evening and try to streamline it so that what's not played now

12   will be played again on cross.  I anticipate, your Honor -- it

13   is about an hour and change.  I anticipate that we can get it

14   down to about 20/25 minutes of play time.

15             THE COURT:  OK.  How much more direct of this witness'

16   testimony?

17             MR. BRAGG:  About 15 minutes after that, if that, your

18   Honor.

19             THE COURT:  OK.  So we are going to finish with this

20   witness in the morning, Mr. Ross, is that about right?

21             MR. ROSS:  I am prepared to cross the witness as soon

22   as the government tenders.

23             THE COURT:  Well, that I knew.

24             MR. ROSS:  Tough to say.  I would think so but I don't

25   want to tell the Court I know that.  I don't know that.  I

19dddat6

1      don't know --

2              THE COURT:  I've been around awhile; I understand.

3      But it would be a big surprise if we are not done with him

4      tomorrow morning, right?

5              MR. ROSS:  That's quite a commitment the Court is

6      asking for.

7              THE COURT:  It wasn't a commitment at all; it was a

8      forecast.

9              MR. ROSS:  I'm not positive how big a surprise it

10     would be, but I will do what I can, your Honor.

11             THE COURT:  All right.  I appreciate that.

12             Then what's next, counsel?

13             MR. SKINNER:  Your Honor, we had planned at that point

14     to call another one of the undercover officers.  We're

15     actually -- we were talking today about trying to change up the

16     order of our witnesses so that we could get somebody that

17     doesn't involve playing a tape in front of the jury next.  I

18     spoke to --

19             THE COURT:  I can't imagine why.

20             MR. SKINNER:  I spoke to Mr. White about that, and we

21     had provided notice of an expert to testify about what the

22     black market peso exchange is.  We are going to see if we can

23     get him in tonight and prepared to call him as our next

24     witness.  If that is possible, we are going to be calling on

25     Sergeant Frank DiGregorio to testify as an expert as our next

19dddat6

1    witness.

2            THE COURT:  Once we are done with this witness and his

3    tapes and the other cooperator, are we done with the tapes?

4            MR. SKINNER:  There will be -- I mean, there is one

5    other tape that one of the cooperators is going to put in, and

6    there are two more recordings remaining, neither of which are

7    as substantial as the ones we had been dealing with today.  One

8    will have about a half hour of play time; that is one that

9    involves the cooperator.  The other one is just 10/15 minutes

10   at the most; it is the initial introduction in March of 2010.

11           THE COURT:  So by lunchtime tomorrow we are

12   essentially done with the tapes in this case?

13           MR. SKINNER:  We switched the order of our witnesses

14   and we won't be calling those other ones until a little bit

15   later.  But, yes, this is really 90 percent of the tapes.  That

16   is the benefit of the slog and we are almost through it.

17           THE COURT:  I thank you.  Anything else we can

18   usefully accomplish this afternoon?

19           MR. SKINNER:  I don't believe so.

20           THE COURT:  OK.  Thanks, folks.

21           MR. SKINNER:  Thank you, your Honor.

22           THE CLERK:  All rise.

23           (Adjourned to 9:30 a.m., Wednesday, September 14,

24   2011)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1                    INDEX OF EXAMINATION

2     Examination of:                           Page

3     MARIO RECINOS                              66

4     Direct By Mr. Bragg  . . . . . . . . . . . . .66

5                    GOVERNMENT EXHIBITS

6     Exhibit No.                            Received

7      811   . . . . . . . . . . . . . . . .66

8      101-108   . . . . . . . . . . . . . . . .66

9      101T-108T   . . . . . . . . . . . . . .66

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19eddat1                          Trial

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,                New York, N.Y.

 4              v.                            (S1) 11 Cr. 102 (LAK)

 5   VIKRAM DATTA,

 6              Defendant.

 7   ------------------------------x

 8
                                             September 14, 2011
 9                                           9:35 a.m.

10
     Before:
11
                        HON. LEWIS A. KAPLAN,
12
                                             District Judge
13

14                      APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  PETER M. SKINNER
17        ALVIN L. BRAGG, JR.
          Assistant United States Attorneys
18

19   ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN PA
          Attorneys for Defendant
20   BY:  ALAN S. ROSS

21   WHITE & WHITE
          Attorneys for Defendant
22   BY:  DIARMUID WHITE

23              - also present -

24   Vanessa Quinones, Government paralegal
     SA Richard Reinhardt, IRS
25

19eddat1                      Trial

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everybody.

3          ALL COUNSEL:  Good morning, your Honor.

4          THE COURT:  Two things.  First of all, I have a letter

5   today from Juror No. 10, Mr. Herman, which you are welcome to

6   read at your leisure later, but basically he's not happy with

7   the schedule.  He attributes to me the, in effective,

8   representation that the trial will be over by October 3rd and

9   that he has travel plans for the 5th and the 6th.  Whatever.

10         I propose to do nothing other than remind him of what

11  I said yesterday, but you are welcome to read this at your

12  leisure.  We will mark it Court Exhibit A, I guess.

13         Now, secondly, I have this motion that Mr. White

14  filed.

15         Does the government intend to respond?

16         MR. SKINNER:  We do, your Honor.  We received it last

17  night.  We would ask from the Court until Monday to respond?

18         THE COURT:  Sure.  Just, Mr. White, help me out a

19  little bit.  What I have here is a motion claiming undue

20  burden, unsupported by any evidence whatsoever.  And you know

21  what happens to that argument in that posture.

22         MR. WHITE:  The evidence, your Honor?

23         THE COURT:  There is no affidavit.  There is nothing.

24         MR. WHITE:  The --

25         THE COURT:  So if you want to put something in, you

19eddat1                          Trial

1    had better put something in very fast is what I am telling you.

2            MR. WHITE:  Your Honor, my affirmation adopts the

3    facts in the Memorandum of Law.

4            THE COURT:  I didn't see your affirmation.  I don't

5    think it has been electronically filed; at least it hadn't been

6    when I looked at the docket within the last 15 minutes.

7            MR. WHITE:  I will check.

8            THE COURT:  Do the papers that you have have it, Andy?

9            THE CLERK:  (Handing to the Court).

10           THE COURT:  Well, there was an affirmation attached to

11   the courtesy copy but it didn't get filed online, I believe.

12           MR. WHITE:  Your Honor, it must have been a glitch and

13   I'll cure that.

14           THE COURT:  So if there is a problem like that, but

15   you ought to take a close look at whether you've got any

16   evidence really to support it.

17           Now, am I just sadly mistaken?  If the defendant takes

18   the stand, why doesn't that destroy whatever Fifth Amendment

19   active production privilege he might have had?

20           MR. WHITE:  Because I think the Fifth Amendment waiver

21   when you take the stand is not limitless.  I don't think you

22   waive the Fifth Amendment with respect to everything in your

23   life, every misdeed in your life.  I think it's limited to

24   things pertinent to the case and the facts as to which you are

25   waiving your Fifth Amendment privilege.

19eddat1                          Trial

1                THE COURT:  Well, no doubt I'll be educated by counsel

2       on both sides on this subject as we go along.

3                OK.  Let's get the jury in.

4                (Continued on next page)

19eddat1                     Trial

1              THE CLERK:  Jury entering.

2              (Jury present)

3              THE CLERK:  Please be seated, everyone.

4              THE COURT:  Good morning.  The jurors and the

5      defendant all are present.

6              Mr. Miller, Juror No. 10, I have had your letter.  I

7      think it is fair to say that I never certainly intended to say

8      and don't believe I said that this trial would end on

9      October 3rd.  I think I made it clear that the lawyers know a

10     lot more about how long this is going to take than I do and a

11     lot would depend on how fast we move and decisions that they're

12     going to make and whether everybody, as this morning, are

13     basically on time all the time and so forth.

14              I understand what you've said about travel

15     commitments.  I made clear yesterday also that if the case runs

16     to a point where we start to run into somebody's travel

17     commitments, it may be possible to excuse somebody at that

18     time, depending on how many alternates we have left and so

19     forth.

20              This is in a state of flux.  It just is going to be in

21     a state of flux until about the last day.  So I just ask you to

22     bear with us.  I can't release anybody at this point, not on

23     that basis.

24              OK.  Let's proceed.

25     MARIO RECINOS,

19eddat1                    Trial

1        Resumed, and testified further as follows:

2    DIRECT EXAMINATION

3    DIRECT EXAMINATION (Resumed)

4    BY MR. BRAGG:

5    Q.  Good morning.  We ended yesterday with testimony about a

6    meeting you had with the defendant in December of 2010.

7            Approximately when was your next interaction with the

8    defendant after that meeting?

9    A.  During the holidays, December of 2010.  We called to wish

10   each other happy holidays, and then towards the end of the year

11   I made arrangements to meet Mr. Datta in New York.

12   Q.  Did you and Mr. Datta talk about the purpose for that

13   meeting?

14   A.  Yes.

15   Q.  What did you talk about?

16   A.  I told him that I had obtained money -- some of the money I

17   was going to -- my friends in the south had obtained -- we were

18   going to reimburse him for some of the money that he had paid

19   for the ransom that he had paid for his friend Octavio.

20   Q.  Did you in fact meet with Mr. Datta in New York?

21   A.  Yes.

22   Q.  Approximately when?

23   A.  Early January 2011.

24   Q.  And who was present for that meeting?

25   A.  Mr. Datta and myself.

19eddat1                        Recinos - direct

1    Q.   OK.   Did you meet in a restaurant?

2    A.   Yes, sir.

3    Q.   Will you please turn to Exhibit 108-T.

4             Is 108-T a transcript of a part of that meeting?

5    A.   Yes, sir.

6    Q.   OK.   Would you turn to page 5, line 44.

7             MR. WHITE:   Excuse me, your Honor.   May I fetch a pair

8    of earphones?

9             (Pause)

10            MR. WHITE:   Sorry.

11   BY MR. BRAGG:

12   Q.   What did you discuss before this point in the conversation,

13   sir?

14   A.   We continued discussing different ways of moving money.   He

15   was proposing different methods of moving money.

16            MR. BRAGG:   Ms. Quinones, could we start the recording

17   there at time stamped 17:20.   I am at page 5, line 44.

18            (Government Exhibit 108-T played)

19            MR. BRAGG:   Could you stop it at that point,

20   Ms. Quinones.

21            Would you turn now to page 7, line 39, and that's time

22   stamped 22:20, Ms. Quinones.

23            (Tape played)

24            MR. BRAGG:   Could you pause the recording right there,

25   Ms. Quinones.

1              Turn, Mr. Recinos, to page 10, line 26.  That should

2    be time stamped 28:13.

3              (Tape played)

4         MR. BRAGG:  Stop the recording, Ms. Quinones.

5    BY MR. BRAGG:

6    Q.  About how much longer did you talk with the defendant

7    during that meeting?

8    A.  A few more minutes.

9    Q.  What did you talk about during the remainder of the

10   conversation?

11   A.  I informed him that I had $150,000 for him, and then the

12   rest was mostly general conversation.

13   Q.  Did you and the defendant leave the restaurant together?

14   A.  Yes.

15   Q.  What, if anything, happened immediately after the defendant

16   and you left the restaurant?

17   A.  As we were walking out, agents of my group pulled up and

18   arrested Mr. Datta and I walked the other way.

19        MR. BRAGG:  I don't have any further questions at this

20   time, your Honor.

21        THE COURT:  Thank you.

22        MR. ROSS:  May I inquire, your Honor?

23        THE COURT:  Yes, you may.

24   CROSS-EXAMINATION

25   BY MR. ROSS:

19eddat1                          Recinos - cross

1    Q.   Good morning, Mr. Recinos.

2    A.   Good morning.

3    Q.   Now, Mr. Recinos, the testimony that you gave yesterday and

4    today and the recordings that we listened to that you

5    authenticated indicated that on September 27, 2010, that you

6    had told Mr. Datta that you were working for the Sinaloa

7    cartel, is that correct?

8    A.   That's correct.

9    Q.   And then about two months or so later, on December 7th of

10   2010, you had yet another meeting with Mr. Datta; that's when

11   you told him that you were moving kilos?

12   A.   That's correct.

13   Q.   Now, in your direct testimony you said it was -- you used

14   the word kilos of cocaine, but in reality you said the word

15   kilos, isn't that correct?

16   A.   I said the word kilos, yes, sir.

17   Q.   OK.   That's what you understood you were saying?

18   A.   That's what I said.

19   Q.   Kilos of cocaine.

20          Since September 27th, 2010, when you told Mr. Datta

21   that you were working for the Sinaloa cartel, how much perfume

22   has Mr. Datta sold to you?

23   A.   Since September?

24   Q.   September 27, 2010, the day you told him that you were

25   working for the Sinaloa cartel, how much perfume has Mr. Datta

19eddat1                        Recinos - cross

1    sold to you?

2    A.  None.

3    Q.  How much cash since that date has Mr. Datta received from

4    you?

5    A.  Since September?

6    Q.  27th --

7    A.  None.

8    Q.  How much money has Mr. Datta wired to Panama for you, since

9    September 27th?

10   A.  None.

11   Q.  In fact, Mr. Datta never wired any money to Panama?

12   A.  That's correct.

13   Q.  In fact, Mr. Datta never formed a business in Belize that

14   was discussed on these many tape recordings?

15   A.  I have no knowledge of that.

16   Q.  Mr. Datta didn't engage in forming a business in Singapore

17   that you know of?

18   A.  I have no knowledge of that.

19   Q.  Hong Kong?

20   A.  I do not know.

21   Q.  Now, your testimony yesterday began with your having

22   attended a meeting, if I recall correctly, in March of 2010

23   prior to an operational decision to make you an undercover in

24   the case, is that right?

25   A.  No, that's not correct.

19eddat1                          Recinos - cross

1    Q.   What is correct?

2    A.   My first meeting with Mr. Datta was August of 2010.

3    Q.   That wasn't the question.  My question is your first

4    involvement in this case, according to your testimony

5    yesterday, was a March meeting which was prior to your being --

6    A.   That's correct.  It was an ongoing investigation and that's

7    when I got involved.

8    Q.   Was that the first time that you became involved in this

9    case was March, or had you been involved since its inception

10   back in October of 2009?

11   A.   It was an ongoing investigation and I was part of the

12   planning.

13   Q.   I didn't understand the last word.

14   A.   I was part of the planning in the group.

15   Q.   OK.  And were you part of the group from its inception?

16   A.   No, I wasn't.

17   Q.   Prior to your going in an undercover role, do you review

18   transcripts of prior meetings and conversations to get up to

19   speed so that when you walk in you're able to fit right in?

20   A.   Prior to my undercover operations, I am brought to speed by

21   members of my group.

22   Q.   OK.  And did you know, when you were ready to go in an

23   undercover capacity in August of 2010, that this investigation

24   had been ongoing since October 12th of 2009, ten months?

25   A.   I believe I did, yes.

19eddat1                    Recinos - cross

1   Q.  Did you know that prior to your meeting with Mr. Datta on

2   August 9th, 2010, that there had been undercover meetings with

3   Ankur Gupta and Ajay Gupta?

4   A.  That I did not know.

5   Q.  You did know, because you were part of the surveillance,

6   that there was a meeting on March 2nd with Jose Correa in an

7   undercover capacity and Roberto, the same cooperating witness

8   who was with you?

9   A.  I knew about the meeting in March.

10  Q.  Now, prior to the March 2nd meeting with Mr. Datta, Jose

11  Correa, Roberto, Ankur Gupta and Ajay Gupta that we've already

12  heard -- we heard a transcript of that meeting -- prior to

13  that, the day before, you were part of a group of agents who

14  met with the cooperating witnesses to map out a strategy for

15  meeting with Vikram Datta, is that right?

16  A.  Yes, I was.

17          THE COURT:  You might want to break that question

18  down.

19          MR. ROSS:  I shall.

20  Q.  Were you part of a meeting on March 1st with other agents

21  and cooperating witnesses?

22  A.  Yes.

23  Q.  Was the subject matter of that meeting the plan of strategy

24  as to how to approach Mr. Datta in the anticipated

25  undercover --

19eddat1                    Recinos - cross

1  A.  Yes.

2  Q.  Were you present when Jose Correa instructed Ankur Gupta

3  and Ajay Gupta on what to say?

4  A.  No, I was not.

5  Q.  During the course of the --

6          THE COURT:  Just a minute, Mr. Rose.  Let me just

7  caution the jury.

8          A lot of these questions presuppose the existence of

9  facts as to which there is not, at least at this point, any

10  evidence at all.  So I remind you that the evidence is the

11  witness' answers, not the lawyers' questions.  If the lawyer,

12  just to pick a ridiculous example, says, you know, before the

13  Yankees won the 1955 World Series, were you at a meeting with

14  such and such and the witness said I don't know, I don't know

15  if there was ever such a meeting, there is no evidence about

16  who won the 1955 World Series, and those of you who are

17  baseball fans, you will know it certainly wasn't the Yankees.

18          Go ahead.

19          MR. ROSS:  Thank you, your Honor.

20  BY MR. ROSS:

21  Q.  Actually, let me stand corrected.  On March 2nd, that

22  transcript has not yet been played.  I misspoke.  I think I

23  said to you that we played it during your testimony.

24          When you met with Mr. Datta on August 9th of 2010, you

25  were wearing a recording device, is that right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19eddat1                          Recinos - cross

1    A.  Yes, I was.

2    Q.  OK.  Was anyone else -- Roberto, for example -- wearing a

3    recording device?

4    A.  I believe Roberto was, too.

5    Q.  OK.  So there are two of you among the law enforcement side

6    of things that are wearing a wire?

7    A.  Yes.

8    Q.  Ankur Gupta was not?

9    A.  No, he was not.

10   Q.  Ajay Gupta was not?

11   A.  He was not.

12   Q.  OK.  And if I understood you correctly, there was initially

13   a very brief meeting where you were introduced to Mr. Datta and

14   I think you said you stepped outside?

15   A.  Yes.  We stepped away from the booth.

16   Q.  Did you actually go outside?

17   A.  Yes, we did.

18   Q.  Because there was some discussion about how you were going

19   to get back in, is that right?

20   A.  That's correct.

21   Q.  OK.  So it was you and Roberto and Vikram Datta?

22   A.  That's it.

23   Q.  And you went outside and you went out there for just a

24   couple of minutes and had a conversation with him, is that

25   right?

19eddat1                    Recinos - cross

1   A.   That's correct.

2   Q.   Now, you testified yesterday that during that brief

3   conversation you discussed with Mr. Datta that your interest

4   was in moving money; do you recall that?

5   A.   Yes, sir.

6   Q.   OK.  Would you pull that transcript out in front of you.

7   It is 103, sir.

8            (Pause)

9            And it's short but would you take a look through there

10  and tell me where it is you say "moving money"?

11           (Pause)

12           THE COURT:  Counsel, let's be clear.  Are you asking

13  where those words appear in haec verba?

14           MR. ROSS:  Yes, sir.

15           THE COURT:  Mr. Recinos, did you, in describing the

16  tape, use precisely these words at any point, "moving money"?

17           THE WITNESS:  I used them many times.  It was my

18  initial conversation with him, and rather than saying specific

19  words, I used the slang words.  I made sure that he understood

20  that I was moving money, that I had access to a lot of cash,

21  and I made sure he understood that.

22  BY MR. ROSS:

23  Q.   All right.  So the words -- the slang words that you used

24  to convey to him that you were moving money in this

25  conversation was that I have a lot of cash customers?

19eddat1                    Recinos - cross

1   A.  That's correct.

2   Q.  And that conveys that you're moving money and you have a

3   lot of money to spend, right?

4   A.  That's correct.

5   Q.  OK.  And now, prior to this, you knew, walking into this

6   meeting with Roberto, that Roberto had previously been

7   introduced to Mr. Datta?

8   A.  Yes, sir.

9   Q.  And you knew that Roberto had been introduced to Mr. Datta

10  as the father of Jose, the other undercover?

11  A.  Yes, sir.

12  Q.  And you also knew, did you not, that the way they were

13  introduced -- Jose and Roberto were introduced to Mr. Datta by

14  Ankur Gupta -- was as wholesalers of perfume who had Mexican

15  customers?

16  A.  That's correct.

17  Q.  So on this occasion, on August 9th, when you were

18  introduced for the first time, your introduction came through

19  Roberto, did it not?

20  A.  It came from both, Ankur and -- Ankur, Ajay Gupta and

21  Roberto, from the three of them.

22  Q.  OK.  And Roberto -- correct me if I'm wrong -- introduced

23  you as his partner working in Guatemala?

24  A.  That's correct.

25  Q.  So let's put those two together.

19eddat1                         Recinos - cross

1    A.   Sure.

2    Q.   You were introduced at a perfume show?

3    A.   Yes.

4    Q.   To Mr. Datta?

5    A.   Yes.

6    Q.   As a perfume wholesaler who had customers in Mexico, is

7    that right?

8    A.   If I'm not mistaken, I was introduced as a cash customer.

9    Q.   Actually, were you introduced as a person who had cash

10   customers?

11   A.   No.   That's wrong.   As a cash customer.

12   Q.   OK.   Now, prior to August 9th, did you become aware or

13   surveil a meeting between Roberto, Ajay Gupta and Vikram Datta?

14   A.   Yes.

15   Q.   And why was that meeting not recorded?

16   A.   I believe it was.

17   Q.   August 8th?

18   A.   Oh, I believe the recorder didn't work.

19            That was the next day?

20   Q.   The next day is the day you had your meeting.

21   A.   Yeah, something happened with the recorder.   They pressed

22   the button and it didn't go on.

23   Q.   And other than Roberto and Ajay Gupta, who else was present

24   at that meeting?

25   A.   You know, I must say, I do not recall that.   I know that we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19eddat1                          Recinos - cross

1    did have a problem with one of the recorders while we were out

2    there but I don't remember -- I do not recall.

3    Q.  In any event, you were not at that meeting?  In other

4    words, you were not a participant in the meeting?

5    A.  I was not a participant.  That's correct, sir.

6    Q.  Are you able, from any recollection of monitoring the

7    meeting perhaps, to tell us what the content of that meeting

8    was?

9    A.  I believe once they met --

10            THE COURT:  Mr. Recinos, is what you're now telling us

11   what somebody else told you happened, or something that you

12   heard yourself by listening in on the meeting?

13            THE WITNESS:  I did not listen to the conversation as

14   it was going on.

15   BY MR. ROSS:

16   Q.  That's actually what I was asking you, whether or not you

17   had monitored the meeting.  OK.

18            But in any event, there was a meeting.  And if I

19   understand you, this may be the meeting where there was some

20   glitch in the electronic equipment.

21   A.  I believe that might be the meeting, yes.  I'm not a

22   hundred percent sure.

23   Q.  OK.  Now, the place that you were meeting you told us

24   was -- you described it as a perfume exposition, is that right?

25   A.  That's correct.

19eddat1                          Recinos - cross

1   Q.  And you said that's a place where vendors come and show

2   their products and try to acquire customers; is that right?

3   A.  That's my understanding.

4   Q.  OK.  And to your observation, were the people that were

5   there just generally people in the perfume business,

6   buyers/sellers, is that right?

7   A.  Yes.

8   Q.  And you were there at the booth of Nandansons, is that

9   right?

10  A.  That's correct.

11  Q.  And Nandanson is the now New Jersey-based wholesale perfume

12  business of Ajay and Ankur Gupta?

13  A.  That's correct.

14  Q.  So was that the plan, that was they -- Ajay and Ankur were

15  going to get Mr. Datta to come to their booth so that you could

16  be introduced to them?

17  A.  That was not the plan.

18  Q.  No?  The plan was to get him to go where to be introduced

19  to you?

20  A.  The plan was -- Roberto had already met him.  The plan was

21  to just walk into the exposition and see if we could find

22  Mr. Datta.  When we didn't, we walked over to Ankur, to the

23  booth, and we asked him to call him on the phone and ask him if

24  he could come and meet us.  We had missed him a couple of

25  times.

19eddat1                    Recinos - cross

1   Q.  OK.  And is it the case that Ankur Gupta called Mr. Datta

2   and said to him, in your presence --

3           Hello, Mr. Vikram.  Yes, this is Ankur.  Yes, good,

4   good.  Yeah, they're here again.  So I don't know if you want

5   to meet.  And then Ankur said, he's going to come back here for

6   one minute because he has to take someone else to somewhere.

7           -- is that what happened?

8   A.  Yes, sir.

9   Q.  So at the beginning of that conversation, when Ankur said,

10  They're here again, you had not met Mr. Datta to that moment?

11  A.  No.

12  Q.  You were going to meet him then just in the next few

13  minutes, right after that?

14  A.  No.  That's not correct.

15          We couldn't find him.  At one point we asked Ankur to

16  place a phone call to see if he would come and meet us.  And we

17  had missed him.  So he placed another phone call.

18  Q.  OK.

19  A.  He had advised Mr. Datta that we were there.

20  Q.  OK.  Is the phone call that you just acknowledged, then,

21  that second phone call?

22  A.  That's correct.

23  Q.  The first phone call, had that been the day before, on

24  March 1st?

25  A.  I do not recall.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. BRAGG:  Objection.

2          THE COURT:  Overruled.

3   Q.  Now, when you were going to become an undercover in this

4   case, were you going to be the person to control the

5   cooperators who would be working undercover with you?

6   A.  If somebody -- if there is a cooperator with me, yes, I'm

7   the one that controls him, more or less.

8   Q.  In this case you had three cooperators that were going to

9   be with you, is that right?

10  A.  At one point, yes.  I met with the three of them, yes.

11  Q.  Ankur, Ajay, Roberto?

12  A.  That's correct.

13  Q.  All right.  And did you instruct them that there were

14  certain things that they could say as opposed to certain things

15  that they couldn't say in their undercover capacity with

16  Mr. Datta?

17  A.  I instructed Roberto on what the plan was.  Ajay and Ankur

18  were simply doing an introduction.

19  Q.  So you had no conversation with Ankur or Ajay telling them

20  what they could or could not say to --

21  A.  I had told them:  Tell him that I'm here.  I'm the cash

22  customer.

23  Q.  OK.  Now, Mr. Vikram Datta was the, to use the vernacular

24  in your group, the target of your investigation, is that

25  correct?

19eddat1                         Recinos - cross

1    A.   That's correct.

2    Q.   All right.  And from your review of the file, he had been

3    the target since October of 2009, correct?

4    A.   That's correct.

5    Q.   So before you go meet with a target of an investigation

6    undercover, you don't have a meeting to discuss the parameters

7    of what's proper, what's improper for cooperators to say or do?

8    A.   I was controlling him.  I told him what the goal was.  The

9    goal was to get him to move money for us.  We were posing as

10   money launderers.

11   Q.   Now, when you and Roberto stepped outside with Mr. Datta as

12   reflected in the transcript -- do you have that in front of

13   you, 103T?  It is the one you looked at.

14   A.   Yes, I do.

15   Q.   By the way, down on the bottom there, there are some

16   initials and the date of 9/8/11.  Is that your review of the

17   transcript?

18   A.   Yes, it is.

19   Q.   Is that your acknowledgment that you reviewed it?

20   A.   Yes.

21   Q.   Is it also an acknowledgment that it is accurate to your --

22   A.   Yes, sir.

23   Q.   OK.  So when you first meet him, Mr. Datta, he asks you --

24   and I'm drawing your attention to page 5, after the preliminary

25   discussion, line 15, Mr. Datta says:  How many perfumes?  How

19eddat1                    Recinos - cross

1    much do you have to buy in one time?  That's what I need to

2    know.

3              And your response was, We'd like to start out small,

4    just a little.

5              Mr. Datta says, Like how much?

6              And you say, 40 or $50,000.

7              And then it says, a couple of lines down, Every week.

8    A.  Correct.

9    Q.  Every week?

10   A.  Yes, sir.

11   Q.  So within five pages of a recording of your having met

12   Mr. Datta, you're offering him, if my math is correct, 2

13   million to $2-and-a-half million a year in perfume business if

14   he'll do business with you, is that right?

15   A.  Where is that, sir?  Can you point that out?  I don't know

16   what you are referring to.

17   Q.  52 weeks a year, $40,000 a week to $50,000 a week, is $2

18   million to $2,500,000 a year.

19   A.  OK.  The answer is yes.

20   Q.  All right.  And that's when you say to him, Listen, we have

21   a lot of cash customers.

22              You said that?

23   A.  Yes, sir.

24   Q.  Not that you had cash?

25   A.  That's correct.

19eddat1                    Recinos - cross

1   Q.  You had cash customers?

2   A.  That's correct.

3   Q.  And then two pages later, on page 7, line 40, Mr. Datta

4   asked you, How much do you want to buy every month?  And your

5   answer was, Listen, we're talking -- we're also talking

6   millions.

7          That is what you told him?

8   A.  Yes, sir.

9   Q.  OK.  So within just a couple of minutes -- I mean, this

10  whole thing you said took ten minutes -- within a couple of

11  minutes you went from 2 million, $2-and-a-half million a year

12  to millions of dollars each month, is that right?

13  A.  That's the way in the real -- that's the way we operate in

14  the real world.  People that move money and don't know each

15  other, they have to gain their trust first, and that's what I

16  was trying to do.  I told him what the ultimate goal was going

17  to be but I wanted to start small.

18  Q.  OK.  So within minutes of meeting a man who is in the

19  perfume wholesale and retail business, Mr. Datta -- that's what

20  you understood?

21  A.  Yes, sir.

22  Q.  -- within minutes of meeting him, you have offered him,

23  what are we talking, 10 million, $20 million?  How much money

24  is "millions of dollars a month," in your view?

25  A.  Believe it or not, that I offered to do 40,000 first.  That

19eddat1                          Recinos - cross

1    was going to be the test.  If everything went smooth, then I

2    was going to move up; then I was going to do larger amounts.

3    Q.  Right.  Actually, the complaint that you leveled here, and

4    the only complaint that you leveled here in this conversation,

5    was that dealing with the people in New York and buying perfume

6    from them was taking three weeks to get the perfume to its

7    destination, right?

8    A.  Yes.

9    Q.  Did you listen as you were surveilling the

10   March 2nd meeting between Jose Correa, Roberto and Vikram

11   Datta?

12   A.  No.  As the meeting was going on?  No.

13   Q.  Did you review it afterwards, before you had a meeting?

14   A.  I believe I reviewed the reports.

15   Q.  The reports or the transcript?

16   A.  The reports.

17   Q.  Now, in this brief meeting, where you have the discussions

18   of 40 to $50,000 a week and millions of dollars a month, you

19   also are asking Mr. Datta to meet with you that night?

20   A.  That's correct.

21   Q.  And was it true that what you told him was that you had

22   some other obligation or commitment the next morning so it had

23   to be that night?

24   A.  Yes.

25   Q.  And Mr. Datta advised you that he had another commitment

1  with a perfume supplier for dinner?

2  A.  He had another commitment.  I don't recall with who.

3  Q.  That he had another commitment, but he agreed to meet with

4  you at 11 o'clock?

5  A.  8 p.m. that day.

6  Q.  8 p.m.?

7  A.  I believe it was 8 p.m., yes.

8  Q.  OK.  The transcript reflects 11 o'clock.  Are you sure?

9  A.  It was 11 o'clock Eastern Time.  8 p.M. Western time.

10  Q.  Got it.  OK.  That makes sense.  This transcript, I see, it

11  says 8:30.  That's where it begins.

12         All right.  And when Mr. Datta appeared at that

13  meeting, you said to him something about we're getting -- we're

14  sitting here getting drunk waiting for you?

15  A.  I said -- I stated, I'm here getting drunk for you.  But

16  just to make conversation just so that makes him feel

17  comfortable.  I was trying to gain his confidence.

18  Q.  OK.  And although what was played in court started at page

19  5, I would like you to take a look at 104 on page 1.

20  A.  I have it.

21  Q.  Do you have it in front of you?

22  A.  Yes.

23  Q.  OK.  So in response to your announcement, Mr. Datta

24  announces, I'm already drunk.  Is that right?

25  A.  Yes, that's correct.

1   Q.  And if I recall what you said yesterday correctly, you said

2   that after he joined you at this meeting at the Palazzo Hotel,

3   that he had four or five more drinks in your company, is that

4   right?

5   A.  To the best of my recollection, that's what we drank, yes.

6   Q.  And he was drinking Glenlivet?

7   A.  Yes.

8   Q.  Now, when you meet with him, you'd agree with me that

9   Mr. Datta talks a lot?

10  A.  Yes, sir.

11  Q.  He is a chatty kind of guy?

12  A.  Yes.

13  Q.  As a matter of fact, was it true that in several of these

14  meetings you thought the meeting was over and was actually

15  getting up to leave and he continued the conversation?

16  A.  That's correct.

17  Q.  All right.  So you had a hard time shutting him up at

18  times?

19  A.  At times, yes, sir.

20  Q.  OK.  And was that particularly the case when he had been

21  drinking, in your observation?

22  A.  At that meeting I had a lot of patience.  We were talking

23  business, and I would have stayed there all night if I had to

24  because we were talking business.

25  Q.  Now, when you tell Mr. Datta in this second, longer meeting

1   in the evening that you're from Guatemala, he explains to you

2   that if he's going to ship or export to Guatemala, he needs a

3   Guatemalan passport, right?

4   A.   At one point, yes.

5   Q.   And going back just a moment, just to be sure, your first

6   meeting with him was this brief meeting in 103.   You did not

7   tell Mr. Datta that you were working for the Sinaloa Cartel in

8   that meeting, correct?

9   A.   That's correct.   I was just meeting him.

10  Q.   And then in the even lengthier meeting a little later that

11  night that we're now talking about, 104, you did not tell

12  Mr. Datta that you were working for the Sinaloa Cartel?

13  A.   No, I did not.   It was too early to tell him that.

14  Q.   Right.   And as we already discussed at the top of your

15  testimony, September 27th was the date you said that?

16  A.   I would have to refer to the transcripts.   I did -- yes --

17  Q.   San Diego?

18  A.   You are right, yes, sir.

19  Q.   OK.   In between the short ten-minute meeting, where you

20  walked outside with Mr. Datta and Roberto and had that

21  conversation, and the 11 o'clock or 8 Eastern Time

22  conversation, you saw Mr. Datta at the food court at the

23  perfume convention, did you not?

24  A.   No.

25  Q.   You did not?

1   A.   No.

2   Q.   Did you know that Ankur, Ajay or Roberto had?  Do you have

3   any knowledge of that?

4   A.   No.

5   Q.   OK.  Now, during the course of this meeting, it was made

6   clear to you that Mr. Datta -- in fact, he said it to you --

7   that the only reason he was meeting with you was because of

8   Roberto?

9   A.   Yes, sir.

10  Q.   And whatever it was that Roberto may have said to him the

11  day before, on February 8th, you don't know?

12  A.   Roberto didn't talk to him the day before.

13  Q.   You earlier said to us that there was a meeting and that

14  there had been a glitch in the recording device.

15  A.   On what day, sir?

16  Q.   February 8th.  I'm sorry.  August 8th.  I misspoke.

17  August 8th.

18  A.   No.  There was no meeting on August 8th.

19  Q.   OK.  So back to that conversation, if there was none.

20       "They're here again."  Ankur Gupta is calling Vikram

21  Datta, They're here again.  And this is on the 9th of August.

22       If there was no meeting on the 8th of August, when was

23  it that Roberto, or you --

24  A.   On that day that I met with him.  It was on the same date.

25  There was no other meetings prior to that.

19eddat1                    Recinos - cross

1    Q.  OK.  Now, yesterday you said -- and referring to 105,

2    Exhibit 105, which was on August 19th -- you said that -- and

3    let me back up.

4           This is a conversation where, it's pretty clear,

5    Mr. Datta had called you, is that right?

6    A.  Yes.

7    Q.  Right?  Because you're apologizing to him, right?

8    A.  Yes.

9    Q.  It is pretty clear he called you?

10   A.  Yes.

11   Q.  And you said yesterday that you and he had spoken several

12   times and we call each other, is that right?

13   A.  Yes.

14   Q.  In fact, what really happened was that earlier, right

15   before this conversation, you had called Mr. Datta?

16   A.  That's correct.

17   Q.  And you said to him, This is gordo?

18   A.  Yes.

19   Q.  And he said, Who is this, yet again.  And you said, Gordo;

20   I met you in Las Vegas.

21   A.  Yes.

22   Q.  And he said, Can I call you right back?

23   A.  It's possible.

24           (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19E4DAT2                        Recinos - cross

1    BY MR. ROSS:

2    Q.   Let me show you something to refresh your recollection.

3    Does that refresh your recollection as to whether or not

4    Mr. Datta says --

5    A.   I do not see it.  All I see is NO4.

6    Q.   I am sorry.

7    A.   Yes, sir.

8    Q.   Does that refresh your recollection?

9    A.   It doesn't have a date but it says can I call you back.

10   Q.   Let me put the cover sheet there for you.  Does that

11   refresh your recollection to the date?

12   A.   August 19.

13   Q.   Same date.  Isn't that in fact what happened?  You called

14   Mr. Datta, right before Exhibit 105T, and at first he didn't

15   remember you, correct?

16   A.   He didn't remember the call that he had given me, right.

17   Q.   I am sorry?

18   A.   He called me; he didn't remember who Gordo was, right.

19   Q.   He didn't remember you.  After you refreshed his memory, he

20   said I will call you back?

21   A.   Yes.

22   Q.   This call is his simply calling you back?

23   A.   Yes, it is.

24   Q.   Isn't it the case that the only time that Mr. Datta ever

25   called you was on November 18 when his good friend Octavio was

19E4DAT2                         Recinos - cross

1  kidnapped?

2  A.  No, he made some other calls to me.  We called each other.

3  Q.  Did you record those conversations?

4  A.  At times, he would call me at night; sometimes I wouldn't

5  record them.

6  Q.  Is there a log of those calls?

7  A.  No.

8  Q.  Is there any record of those calls?

9  A.  No; it was just, just to stay in touch.

10 Q.  You have been doing this with this particular task force

11 group for 8 years?

12 A.  That's correct.

13 Q.  And if I understood, you have been a police officer a total

14 32 years?

15 A.  Yes, sir.

16 Q.  Before you recently retired?

17 A.  Yes.

18 Q.  You have done these kinds of investigations before?

19 A.  Yes, sir.

20 Q.  You have testified in court plenty of times before?

21 A.  Yes, sir.

22 Q.  So you know, don't you, that you need to document

23 conversations, contacts with the target of your investigations?

24         THE COURT:  Sustained.

25 Q.  During the course of the conversations that you had with

19E4DAT2                    Recinos - cross

1   Mr. Data on the 9th, the first meeting with him at night --

2   A.  OK.

3   Q.  -- during the course of that conversation, you proposed

4   that Mr. Datta sell you perfume, is that right?

5   A.  Yes.

6   Q.  So it was you who initiated the proposal for Mr. Datta to

7   do business with you?

8   A.  Yes.

9   Q.  Roberto also was participating in the conversation?

10  A.  Yes.

11  Q.  At various times it was suggested by you and by Roberto

12  that Mr. Datta could receive cash at various locations,

13  correct?

14  A.  Yes.

15  Q.  Mr. Datta said no to that, receiving money in New York for

16  goods in Laredo, correct?

17  A.  Correct.

18  Q.  What he did say he would do is you could buy perfume at any

19  one of his retail locations including his wholesale location in

20  Laredo, Texas, is that right?

21  A.  That's correct.

22  Q.  That entire conversation happens after the money that we

23  earlier discussed, 40 to $50,000 a week, or millions of dollars

24  a month, is that correct?

25  A.  In September?

19E4DAT2                    Recinos - cross

1    Q.  Yes.

2    A.  Yes, if you are referring to September, yes.

3    Q.  No, August.

4    A.  Yes, sir, I am sorry, August.

5    Q.  All that happened on the outside, walking outside the

6    perfume exhibition?

7    A.  Yes, sir.

8    Q.  There was a discussion, for example, starting right there,

9    there was a discussion about you could buy perfume and you

10   could stuff cash in the boxes of perfume once you picked them

11   up?

12   A.  That was his suggestion.

13   Q.  Did that ever happen?

14   A.  No.

15   Q.  As a matter of fact, none of the things that Mr. Datta

16   talked about, China, Singapore, Belize, wire transfers to here

17   and there and shipping goods and manufacturing goods and the

18   list goes on and on, correct?

19   A.  Correct.

20   Q.  There were a lot of proposals?

21   A.  Correct.

22   Q.  None of that ever happened?

23   A.  That's correct.

24   Q.  You are not aware of any effort being made to see to it

25   that any of those things happened.

19E4DAT2                          Recinos - cross

1  A.  I believe he was in the process of opening a duty-free

2  store in Belize.  That's what he told me.

3  Q.  Do you have any evidence of that?

4  A.  No, that's what he told me.

5  Q.  Right, it's just another thing he told you?

6  A.  Yes.

7  Q.  Is that right?

8  A.  That's correct.

9  Q.  Has it been your experience that people embellish these

10  situations in conversations with an undercover?  You do?

11  A.  Sometimes of course I do; that's my role.

12  Q.  That's your job?

13  A.  Yes.

14  Q.  Everything you are saying is a lie?

15  A.  Yes.

16  Q.  After this, we have been talking about August 19, Exhibit

17  105T, that was Mr. Datta you said returned your call and the

18  purpose of your having called him and his returning your call

19  was because you wanted to buy perfume in his San Ysidro store?

20  A.  That's correct.

21  Q.  You knew from Ankur Gupta and from the earlier conversation

22  ten days earlier when you met Mr. Datta that the San Ysidro

23  store was a retail location?

24  A.  That's correct.

25  Q.  You knew also that it was a new store?

19E4DAT2                          Recinos - cross

1   A.  Yes.

2   Q.  In fact his newest store?

3   A.  I had no knowledge of that.

4   Q.  At the initial introduction with Ankur Gupta and Ajay

5   Gupta, wasn't that how the introduction was made, that is, you

6   and Roberto were from Baja California and he had opened a store

7   right there?

8   A.  No, I don't recall.

9   Q.  I may be confusing that with Jose?

10  A.  I don't think that thing happened with me.

11  Q.  You are calling on the 19th, you are setting up a purchase

12  of perfume from the San Ysidro store, is that right?

13  A.  Yes, sir.

14  Q.  This is one month prior to the September 27 meeting where

15  you tell Mr. Datta that you work for the Sinaloa cartel?

16  A.  That's correct.

17  Q.  When you were talking to Mr. Datta in all of these various

18  meetings, he made it clear to you that he did not want any of

19  his employees to know anything about your business with him?

20  A.  That's correct.

21  Q.  And, for example, he said I don't want anybody to know what

22  is going to happen, right?

23  A.  Yes.

24  Q.  If you need a reference, you don't recall any of that?

25  A.  No, I recall.

19E4DAT2                          Recinos - cross

1   Q.   He told you I don't want anybody to know, right?

2   A.   Yes, correct.

3   Q.   He told you don't even mention his name?

4   A.   That's correct.

5   Q.   He told you my whole employees will jump and will run in

6   one second if they thought I was doing something with you?

7   A.   Yes.

8   Q.   He told you he didn't want his employees to be suspicious?

9   A.   Yes, sir.

10  Q.   He told you that his employees will see what's going on if

11  you are not careful?

12  A.   Yes.

13  Q.   He explained that he had an accountant, that even a junior

14  accountant that would be involved in every transaction?

15  A.   Yes.

16  Q.   In fact, that's why he explained to you, hey, I am not

17  going to take, do any phony invoices, correct?

18  A.   No, you are not correct.

19  Q.   He didn't tell you I am not going to do phony invoices?

20  A.   No, he did not.

21  Q.   He didn't tell you that he would not wire money to Panama?

22  A.   He did tell me that.

23  Q.   OK.  When you say he didn't tell you he wouldn't send phony

24  invoices, are you referring to your December 7 meeting with

25  him?

19E4DAT2                          Recinos - cross

1   A.  I am referring to everything in general.  He didn't want

2   anything coming back to his company.

3   Q.  Well, didn't he explain to you that he couldn't do a phony

4   invoice because then his accountant and junior accountant would

5   say where are the goods and match that up?

6   A.  I believe you are referring to the San Diego meeting when I

7   was proposing to do wire transfers.  It's not that he didn't

8   want to do it but he didn't want it coming back to him or his

9   company.

10  Q.  OK.  Specifically, he told you about an employee Cynthia?

11  A.  Yes, sir.

12  Q.  And that he wasn't going to discuss with her anything about

13  you or your business with his perfume business?

14  A.  Can you rephrase the question.

15  Q.  He told you as he did with the other employees that he

16  didn't want her to know what was going on either?

17  A.  I don't recall exactly what he said about Cynthia.

18  Q.  Look at 104T, page 13, top of the page; does that refresh

19  your recollection about it?

20  A.  Yes, sir.

21  Q.  He didn't want her to know either?

22  A.  That's correct, sir.

23  Q.  It's very clear, therefore, he didn't want to involve

24  anybody at his business with you and your purchase of perfume?

25  A.  Yes, sir.

1    Q.  We talked about some of the propositions that came up along

2    the way.  First, would you agree that there are dozens of

3    propositions?

4    A.  Yes, sir.

5    Q.  And they are being floated out there by you, some by you?

6    A.  Yes.

7    Q.  Some of them by Roberto?

8    A.  That's correct.

9    Q.  Some by Mr. Datta?

10   A.  Yes, sir.

11   Q.  They include Mr. Datta could get garments and electronics

12   to sell to you?

13   A.  Yes.

14   Q.  That never happened?

15   A.  No.

16   Q.  Mr. Datta was going to open up a company in Belize; you

17   already told me that didn't happen that you are aware?

18   A.  I believe, well, apparently it didn't happen.

19   Q.  There was discussion about money being sent to India; you

20   have no knowledge of that happening?

21   A.  No, it didn't happen.

22   Q.  There was discussion of sending merchandise in Bonn, to

23   Chile, to Guatemala to Colombia; that never happened?

24   A.  No.

25   Q.  There was discussion of whether or not there was any way

19E4DAT2                        Recinos - cross

1   Mr. Datta could move cash; that was several times, correct?

2   A.   Can you rephrase the question.

3   Q.   Instead of him selling you perfume you asked him, hey, can

4   I give you cash and you will send it on to whomever?

5   A.   Correct.

6   Q.   He said no?

7   A.   He was reluctant at first then he proposed to do wire

8   transfers under different corporations.

9   Q.   You asked him to take, for example, to allow cash to be

10  picked up in New York and he told you he didn't know anyone in

11  New York to do that for him?

12  A.   Yes, sir.

13  Q.   You proposed to him you could deliver cash, he would turn

14  into a wire and send it to Panama and he said no to that?

15  A.   That's correct.

16  Q.   You proposed to him, what if I gave you $2 million, could

17  you deposit it for a percentage and send it to Guatemala, and

18  he said no to that?

19  A.   That's correct.

20  Q.   With respect to a lot of these proposals that you or

21  Roberto were floating out in these meetings, is it true that

22  Mr. Datta's response to all of them was I will have to do this

23  or I will have to check out that and it was always something he

24  had to do?

25  A.   That's correct.

19E4DAT2                       Recinos - cross

1   Q.  There was never an occasion when he said, yes, that's what

2   we are going to do and went out and did it?

3   A.  He wanted, the only thing that he agreed to was receiving

4   cash in his business, one of his businesses.

5   Q.  In his perfume business?

6   A.  That's correct.

7   Q.  The one thing that he agreed to do was accept cash in his

8   perfume business?

9   A.  That's one thing he did, yes, sir.

10  Q.  He did that as you already told us August 23 and 30 were

11  the pickup dates?

12  A.  I don't recall the exact dates but I know that it happened.

13  Q.  It was before the September meeting?

14          THE COURT:  I think the question, Mr. Recinos, was was

15  there ever anything he agreed to do whether he subsequently did

16  it or not.  That was the question.

17          THE WITNESS:  He subsequently agreed to do wire

18  transfers, to do everything we were proposing, but he said he

19  had to figure out that he was going to do it.

20  Q.  He qualifiedly agreed?

21  A.  Yes, sir.

22  Q.  If I could figure out how to do it I will do it; is that

23  fair?

24  A.  Yes.

25  Q.  Some of the things he told you, he said his business is

1   already international, he is involved in different countries;

2   you were not able to confirm that to be true, were you?

3   A.  No.

4   Q.  He said things that you thought were exaggerated or

5   embellished, didn't he?

6   A.  Yes.

7   Q.  He said he could move 300 to $400 million in liquor?

8   A.  He said that.

9   Q.  You thought that was a bit of a stretch, didn't you?

10  A.  He was simply explaining, I was there, he was simply

11  explaining that he will be able to move a lot of money, not

12  necessarily those amounts.

13  Q.  You started working on him in an undercover capacity in

14  August, he got arrested in January; how long is that, 5 months?

15  A.  Yes, sir.

16  Q.  In the 5 months from the time you started meeting with him,

17  he never did a wire transfer to Panama?

18  A.  No.

19  Q.  You asked him time and time again to do that, correct?

20  A.  We never did it, no.

21  Q.  You said he agreed to do a wire transfer; you just

22  testified to that.  He agreed to do a wire transfer?

23  A.  I said he did a wire transfer?

24  Q.  No, you said he agreed, he agreed to take a wire transfer

25  from you?

19E4DAT2                       Recinos - cross

1    A.  Yes.

2    Q.  But you never did that, 5 months?

3    A.  I sent him a wire transfer and he sent it back.

4    Q.  Right.  Let's get the timing on that.  September 24 you

5    sent him a wire transfer, is that right?

6    A.  Yes.

7    Q.  $50,000?

8    A.  Yes.

9    Q.  Under that name Gallos?

10   A.  Yes, sir.

11   Q.  Which is the account.  Then you met with him on September

12   27 which you already told us is the day you told him you were

13   working for the Sinaloa cartel?

14   A.  Yes, sir.

15   Q.  Two days later on the 29th you received the $50,000 back,

16   correct?

17   A.  After the meeting, yes, sir.

18   Q.  At that meeting when he said I am going to send you that

19   money back, you said, no, wait until I call you?

20   A.  That's correct.

21   Q.  He didn't wait until you called him, did he?

22   A.  You are right.

23   Q.  He just sent the money back?

24   A.  Correct.

25   Q.  How about he discussed doing something in Honduras; were

19E4DAT2                         Recinos - cross

1   you able to find any evidence that anything ever happened in

2   Honduras?

3   A.   No.

4   Q.   He talked about doing things in China and Hong Kong; any

5   evidence that ever happened?

6   A.   No.

7   Q.   He talked about starting a company in Hong Kong; any

8   evidence that that happened?

9   A.   Not to my knowledge.

10   Q.   He talked about selling $100 million in whiskey from

11   Mexico; any evidence that that happened?

12   A.   That never happened.

13   Q.   He talked about opening stores in Panama; any evidence that

14   that happened?

15   A.   No.

16   Q.   You said to him at one of the meetings that Nandanson told

17   you that Mr. Datta wanted to open a store in New York or in New

18   Jersey, right?

19   A.   I don't recall that.

20   Q.   In any event, there was no evidence that Mr. Datta had

21   opened up any kind of business in New Jersey or New York?

22   A.   Correct.

23   Q.   When you asked Mr. Datta to receive cash in New York, his

24   answer was I will try to find some people in New York?

25   A.   Correct.

19E4DAT2                        Recinos - cross

1    Q.  He never did?

2    A.  He never did.

3    Q.  Never called you up said I am working on it, never gave you

4    any names, nothing; is that true?

5    A.  Correct.

6    Q.  Just talk to you, right?

7    A.  He was waiting on me to come up with the money.

8    Q.  The only people that Mr. Datta to your knowledge was

9    talking to was you, and you are a police officer at the time,

10   right?

11   A.  Yes, sir.

12   Q.  Roberto who was a cooperating witness, is that right?

13   A.  That's correct.

14   Q.  Ajay Gupta, also a cooperating witness?

15   A.  Yes, sir.

16   Q.  Ankur Gupta, cooperating witness?

17   A.  Yes.

18   Q.  Jose Correa, another task force officer assigned to the DEA

19   task force?

20   A.  Correct.

21   Q.  There was mention of El Salvador; anything in El Salvador

22   ever happen?

23   A.  No.

24   Q.  Any evidence that there was anything even attempted to

25   happen?

19E4DAT2                         Recinos - cross

1    A.   No.

2    Q.   There was talk about Mr. Datta said he could sell the

3    chilangos, which you already told us were Mexicans, CDs and

4    discos from Hong Kong; did that ever happen?

5    A.   I don't have any knowledge of that.

6    Q.   At various times you or Roberto proposed to Mr. Datta that

7    he would receive points for laundering money, receiving money

8    and moving it on, is that right?

9    A.   That's correct.

10   Q.   That was what the plan was, what was being proposed; he was

11   going to be given money and he was going to wire it and get it

12   to Panama or Guatemala and he was going to receive points, is

13   that right?

14   A.   Yes, sir.

15   Q.   That's a percentage; points are a percentage?

16   A.   Yes, sir.

17   Q.   And at various times you talked about percentages as high

18   as 10, 12 percent?

19   A.   That's correct.

20   Q.   We are talking about offering him millions of dollars to do

21   that, is that right?

22   A.   Depending on the quantity that he would move.

23   Q.   Certainly the numbers you were touting were millions of

24   dollars, is that right?

25   A.   I did discuss that, yes, sir.

19E4DAT2                          Recinos - cross

1   Q.  He never agreed to do it?

2   A.  I am thinking.  Can you rephrase the question.

3   Q.  That never happened.  For all the talk about we are going

4   to give you points, you are going to move money; never

5   happened?

6   A.  Never happened.

7   Q.  There was even regarding the $50,000, the $50,000 you wired

8   you said September 24, when you met on September 27, was it

9   true that both you and Roberto tried every conceivable way to

10  get him to move that money on to Panama?

11  A.  Yes.

12  Q.  Those things included things like just pretend it was a

13  wire in error, take out 5, 6,000 even 10,000, and just wire it

14  on, is that right?

15  A.  That's right.

16  Q.  He said no?

17  A.  Correct.

18  Q.  I can only send back the wire to the person who sent it to

19  me?

20  A.  That's correct.

21  Q.  Which is exactly what he did?

22  A.  That's what he did.  He didn't want it coming back to his

23  company or to himself.

24  Q.  Discussions were had about creating a phantom invoice for

25  goods that were really not shipped, is that right?

1    A.   Yes.

2    Q.   He rejected that as well?

3    A.   Yes.

4    Q.   Then there were just a series of proposals about buying an

5    item for a dollar and bringing it to the United States from

6    China, selling it for 95 cents; do you recall that?

7    A.   Yes.

8    Q.   There were proposals about doing that, all kinds of other

9    machinations.  Did you understand those by the way?

10   A.   They were very tough to understand at times; that's why I

11   kept asking him to explain.

12   Q.   Actually were there a couple of times during your

13   undercover meetings with Mr. Datta that you said to him I

14   understand but in fact you really didn't?

15   A.   That's correct.

16   Q.   Because what he said was confusing?

17   A.   It was confusing.

18   Q.   Very.  Wasn't there even an occasion where you didn't

19   understand it and you asked Roberto who claimed to understand

20   it to explain it to you and he wouldn't; do you recall that?

21   A.   I don't recall that.

22   Q.   There was discussion about selling to Liverpool in England;

23   do you recall that?

24   A.   I don't recall.

25   Q.   How about to Europe?

1    A.   Yes.

2    Q.   None of those things happened either?

3    A.   No.

4    Q.   Finally at the end of things, you have a meeting with

5    Mr. Datta and you say to him send an invoice to or from Mexico

6    for $30,000 and he was going to do that and send it to a friend

7    and he will give them the invoice and then he could then

8    receive the invoice from Panama and send the $30,000; do you

9    recall that?

10   A.   No.  You will have to refer to the transcript.

11            (Pause)

12   Q.   I can't seem to find the reference.  Do you recall a

13   conversation with Mr. Datta where a lot of these confusing and

14   sort of serial discussions occurred and at the end of which you

15   said to him, talk no more before you change your mind?

16   A.   Yes, I did.

17   Q.   The reason you said that to him was because all of the

18   conversations you had with him were sort of up and down, that

19   is, enthusiastic and then for reasons not going to happen?

20   A.   At the beginning of that conversation, I had proposed to

21   him to do wire transfers for me but the wire transfers were

22   going to involve his company and he was reluctant to do that;

23   he didn't want it to come back to his company.

24   Q.   Actually, the kinds of things he told you in response to

25   those proposals are I can't do that, I won't do that; is that

19E4DAT2                         Recinos - cross

1    right?

2    A.  So long as it involved his company, that's correct.

3    Q.  And turning your attention now to November 18, the last

4    conversation prior to this, November 18, that you had with

5    Mr. Datta would have been September 27 in San Diego, is that

6    correct?

7    A.  I will have to refer to the transcripts; I don't know them

8    by heart.

9    Q.  Do you recall after meeting him in San Diego, after telling

10   him that you were working for the Sinaloa but before he called

11   you about his friend Octavio, there was no conversation between

12   you?

13   A.  That's correct.

14   Q.  He called you on November 18.  What he says to you is that

15   his friend had been kidnapped?

16   A.  That's correct.

17   Q.  And he is calling you to assist him in getting the safe

18   return of his friend?

19   A.  Yes.

20   Q.  If I understood your direct testimony you said that what

21   you did was you repeated to him information that other agents

22   were able to tell you from a wiretap to confirm that you really

23   knew what you were talking about, is that right?

24   A.  We were intercepting his phone calls and I was simply

25   repeating what was being said on the wires.

19E4DAT2                          Recinos - cross

1   Q.   That's my point.   My point is the information about there

2   were really five people, three guys, one woman?

3   A.   Yes, sir.

4   Q.   All information that came off a wire?

5   A.   Yes, sir.

6   Q.   You are repeating that information to him, however, as if

7   you are learning it through your cartel sort of connections in

8   Mexico?

9   A.   Yes, sir.

10  Q.   That's to convince him even further that you are a

11  criminal?

12  A.   Yes, sir.

13  Q.   So he is calling you on November 18 to ask you as a

14  criminal to contact the criminals in Mexico who had kidnapped

15  his friend?

16  A.   That's correct.

17  Q.   There was a couple of conversations after that; in other

18  words, you call him back periodically to say my friends are

19  looking into it, stuff like that?

20  A.   Yes, sir.

21  Q.   Then ultimately, December 7, you have another meeting with

22  him, is that right?

23  A.   I had a meeting with him early December.

24  Q.   If you want to look at the transcripts to get the dates

25  right, please do.

19E4DAT2                          Recinos - cross

1   A.   That's correct.

2   Q.   That was not a perfume show, is that right?

3   A.   That's correct.

4   Q.   And your understanding of the circumstances that brought

5   you to that meeting was that Octavio, his dear friend, had not

6   yet been released?

7   A.   That's correct.

8   Q.   The meeting on December 7 was really designed, am I

9   correct, to get your feedback and your assistance with regard

10  to Octavio?

11  A.   He explained that he wanted to know exactly who I was, who

12  I was working with because I had a lot of knowledge of what had

13  transpired with his friend Octavio.

14  Q.   Isn't there a conversation between you and him where he

15  asks, you actually say to him something like how do you think I

16  know that information and he said, well, that's why I am here?

17  A.   That's correct.

18  Q.   So he was trying to find out all he could about his friend

19  who was still kidnapped?

20  A.   Yes.

21  Q.   So, in addition to 40 to $50,000 a week, or millions of

22  dollars a month, now you have put out there as an additional

23  consideration for Mr. Datta that you can help get his friend

24  released, is that right?

25  A.    I presented that to him when he called me, yes; actually I

1      told him I was going to call my friends.

2      Q.   You told him you had?

3      A.   Yes.

4      Q.   You repeated information as though it were real?

5      A.   Yes.

6      Q.   You told him that you had assurances that his friend was

7      going to be taken care of and safe?

8      A.   Yes, I did.

9      Q.   We discussed a lot of these things that were thrown out,

10     these scenarios by you and Roberto or Mr. Datta, and were any

11     of them ever agreed to with you, that is, you and Mr. Datta,

12     did you ever actually agree to do anything in Singapore?

13     A.   No.

14     Q.   Truth of the matter is none of those things was ever agreed

15     to; they were just discussed?

16     A.   That's correct.

17     Q.   There got to a point where Mr. Datta had repeatedly either

18     said no to propositions or raised some insurmountable problem

19     to a proposition that you turned to him and asked him if he had

20     any suggestions?

21     A.   It was one meeting and that was at the meeting in San Diego

22     and the reason he wouldn't agree to it was because he didn't

23     want it coming back to him or to himself or to his company.

24     Q.   That's what you believed to be the case?

25     A.   I was there, I know what he meant; once we discussed all

19E4DAT2                         Recinos - cross

1   the things, he agreed to it.

2   Q.   Did the recording pick up everything that was said?

3   A.   Yes, sir.

4   Q.   Even in the conversation on December 7, which you have

5   already said was really directed at getting information about

6   his kidnapped friend, even then you threw out to Mr. Datta more

7   proposals for money laundering, didn't you?

8   A.   We continued talking about moving money, and he had a lot

9   of ideas.

10  Q.   You were the one who had proposed to him that he somehow

11  find a way to get money wired down to Panama, is that correct?

12  A.   Yes.

13  Q.   He discussed with you all of these various scenarios and

14  repeated them again?

15  A.   Yes.

16  Q.   On this date in December?

17  A.   Yes, sir.

18  Q.   It started up with all the things, some of which you may

19  have understood, some you didn't; fair enough?

20  A.   That's correct, yes, sir.

21  Q.   During the course of the conversations with Mr. Datta, you

22  learned, did you not, that one of the reasons that people hired

23  chilangos and have a chilango, a Mexican show up with a

24  passport, one of the reasons was 8.25 percent sale tax in

25  Texas; do you recall that coming up?

1   A.  Yes, it did.

2   Q.  Do you understand that to mean that if a Mexican national

3   comes across the border with a passport and presents it at a

4   perfume store like Mr. Datta's, because they are exporting it,

5   they wouldn't have to pay 8.25 percent?

6   A.  What I understood was he needed a passport to show that he

7   had done a transaction with somebody, so he needed a Mexican

8   passport; he would open an account with that name.

9   Q.  In addition to 8.25 percent, you learned from your

10  undercover operation and conversations with Mr. Datta that

11  Mexican banks had imposed a 3 percent charge for deposits and

12  wire transfers?

13  A.  He mentioned it, yes, he did.

14  Q.  When you said earlier from his perfume business, he

15  wouldn't do these things?

16  A.  That's correct.

17  Q.  That's right, he would not?

18  A.  He would not.

19  Q.  Actually what he said to you was from my real business, I

20  could not do even one dollar?

21  A.  I misunderstood the question.

22  Q.  From his real business?

23  A.  From his real business he will do cash only; he will sell

24  perfumes and accept all cash.

25  Q.  Right, but that's his perfume business; he sells perfume,

19E4DAT2                         Recinos - cross

1   correct?

2   A.  Yes.

3   Q.  Then you and Roberto in a conversation, with none of these

4   schemes to launder money coming to fruition, propose to collect

5   debts for Mr. Datta in Mexico?

6   A.  Yes, it was proposed.

7   Q.  During the course of that -- strike that.

8           The way that happened was you learned that Mr. Datta

9   had people in Mexico that owed him money?

10  A.  That's correct.

11  Q.  And was it you or Roberto who said, you will give him only

12  two options, pay or pay?

13  A.  At different times we both said it.

14  Q.  Did you gesture?

15  A.  No.

16  Q.  Did Roberto gesture?

17  A.  No.

18  Q.  In addition to this 3 percent bank fee, 8.25 percent sales

19  tax, you also learned that the reason perfume wholesalers in

20  Mexico send chilangos with a passport is because they don't pay

21  taxes?

22  A.  I don't recall that.

23  Q.  Look at 106T, page 34.

24  A.  I have it.  I am on page 34.

25  Q.  Line 32.  Right?

1   A.  That's correct.

2   Q.  So, avoiding a 8.25 percent sales tax has nothing to do

3   with laundering drug money, does it?  Does it?

4   A.  No.

5   Q.  Avoiding a 3 percent bank fee in Mexico has nothing to do

6   with money laundering, does it?

7   A.  No.

8   Q.  Avoiding the payment of income taxes in Mexico has nothing

9   to do with laundering drug money, does it?

10  A.  I have no knowledge of the laws in Mexico.

11          MR. ROSS:  Your Honor, if you give me one moment I may

12  have great news.

13          (Pause)

14  BY MR. ROSS:

15  Q.  Let's go back just to make sure we got those right.  Let's

16  go back to 103, page 5, back to the 40 to 50,000 to see who

17  said what.

18  A.  OK.

19  Q.  You said I am going to start small, 40 to $50,000,

20  Mr. Datta says every month, you say no, and it's Roberto, not

21  you, Roberto who says every week?

22  A.  Correct.  It's in the transcript.

23  Q.  So in fact it was 40 to $50,000 a week that you were

24  talking about?

25  A.  Yes, sir.

1   Q.  Was the operational decision, your words, to put you in the

2   undercover capacity in this case done because neither Ankur nor

3   Ajay nor Roberto nor Jose Correa could get Mr. Datta to launder

4   money?

5   A.  No.

6   Q.  Were you the most senior of the agents available to go

7   undercover?

8   A.  In the group, yes.

9   Q.  Jose Correa is much younger than you?

10  A.  Yes, he is.

11  Q.  From the March 2 meeting with Jose Correa, were you a

12  surveillance officer; was that your role at that time?

13  A.  I was present, yes.

14  Q.  Was that what you basically did?

15  A.  More or less, yes.

16  Q.  You are not undercover; you are there doing surveillance?

17  A.  Yes, sir.

18  Q.  You are doing surveillance on March 2.  Between March 2 and

19  August 9, let's do that, March to April to May to June, July to

20  August, that's another 5 months.  So after Mr. Datta meets with

21  Jose Correa and Roberto and has a recorded conversation, we

22  have not yet heard it, 5 months goes by before the next contact

23  with him which is again at a perfume show in Las Vegas?

24  A.  That's correct.

25  Q.  Do you know what conversations Ankur and Ajay Gupta had

19E4DAT2                         Recinos - cross

1    with Mr. Datta in those 5 months?

2    A.   I do not know.

3    Q.   You know they had conversations though, don't you?

4    A.   I believe they did but I was not part of what they were

5    doing, my group, I was not part of that angle of the

6    investigation.

7                MR. ROSS:   Your Honor, may I have just one moment.

8                THE COURT:   Yes.

9                (Pause)

10               MR. ROSS:   Thank you.   I have nothing else.

11               THE COURT:   Thank you.   We will take our break.

12               (Recess)

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

19eddat3                    Recinos - redirect

1                 (Jury not present)

2            MR. BRAGG:  Your Honor, may we raise an issue before

3    the jury comes in?

4            THE COURT:  Yes.  What's that?

5            MR. BRAGG:  The next witness the government is

6    prepared to call is Frank DiGregorio who we are offering as an

7    expert, and we talked to the defense and we understand there is

8    no objection to his qualification.  We wanted to inquire as to

9    your Honor's procedure as to whether you wanted to qualify him

10   in front of the jury, or not to do that?

11           MR. ROSS:  Well, you qualify him but you are not

12   offering him.

13           MR. BRAGG:  My understanding is some judges do not

14   like the --

15           THE COURT:  I do not want the tender as an expert.

16   That is what I don't want.

17           MR. BRAGG:  OK.

18           THE COURT:  OK.  Let's get the jury.

19                 (Continued on next page)

20

21

22

23

24

25

19eddat3                          Recinos - redirect

1          (Jury present)

2          THE CLERK:  Jury entering.

3          THE COURT:  OK.  The defendant and the jurors are

4    present.

5          Any redirect?

6          MR. BRAGG:  Yes, your Honor.

7    REDIRECT EXAMINATION

8    BY MR. BRAGG:

9    Q.  You were asked, Mr. Recinos, on cross-examination about

10   whether in your first interaction with Mr. Datta on

11   August 9th you used the phrase "move money."  Do you recall

12   that?

13   A.  Yes, sir.

14   Q.  If you could turn to 103T, page 4, lines 16 to 17.

15        Did you say at that meeting, Normally it's about two

16   weeks, two weeks, a couple of days, and we're looking to move

17   it a little faster?

18   A.  Yes, sir.

19   Q.  If you could just turn with me, the same exhibit, to page

20   6, line 4.

21        THE COURT:  Before you go on, it would be helpful, I

22   think, to draw the witness' attention to the preceding page,

23   line 45, which may indeed contain the antecedent of the word

24   "it."

25        MR. BRAGG:  Thank you, your Honor.

1   Q.  At the bottom of page 3, line 45, did you say to Mr. Datta,

2   Yes, because we -- we got to send the money up there?

3   A.  Yes, sir.

4   Q.  And then you made the statement about moving a little

5   faster after that?

6          MR. ROSS:  I object, your Honor.  I object to

7   misstating.  We are skipping half a page.

8          THE COURT:  The jury has the whole transcript.

9   They've heard it all.

10          There is such a thing as opening something up,

11   Mr. Ross.

12   BY MR. BRAGG:

13   Q.  And later that evening you met with the defendant again,

14   and you made a statement to him about the Sinaloa that you were

15   asked about on cross-examination.  And -- pardon me.

16   Withdrawn.  Withdrawn.

17          You were asked on cross-examination why you did not on

18   August 9th refer to the Sinaloa Cartel, and you responded, I

19   believe --

20          MR. ROSS:  Objection, your Honor.  That question was

21   not asked.  Why he did not was not asked.  That he didn't was.

22          THE COURT:  Rephrase.

23   Q.  I believe on cross-examination, sir, you were asked that

24   you did not mention the Sinaloa Cartel on August 9th to

25   Mr. Datta.  And you testified, I believe, it was too early to

19eddat3                        Recinos - redirect

1    tell him that.

2         Why was it too early?

3         MR. ROSS:  I object, your Honor.

4         THE COURT:  Sustained.

5    Q.  There was a little bit of confusion, I believe, on

6    cross-examination just about the time of that

7    August 9th dinner.  What time was it in Las Vegas?

8    A.  It was 8 p.m. in Las Vegas.  There was some confusion, you

9    are right.

10   Q.  Staying with that August 9th dinner.  You testified on

11   cross-examination about discussions concerning purchases of

12   perfume at the defendant's stores.  Did the defendant give you

13   any instructions as to how to go about making those purchases?

14   A.  Yes, he did.

15   Q.  What type of instructions did he give you?

16   A.  No small bills.  No 20s.  He wanted a passport and a

17   national -- a Mexican national.

18   Q.  Give me one moment.

19        (Pause)

20        Can I ask you to turn to 104-T, page 10, lines 20 to

21   21.

22        Here at this point does Mr. Datta give you

23   instructions about perfume purchases at his store?

24   A.  Yes, sir.

25   Q.  And the transcript will speak for itself, but just for the

1   record, did he say, OK, if you want to send the perfumes over

2   there, do two transactions, here to Mexico and Mexico to

3   Colombia; nobody knows nothing?

4   A.   That's correct.

5   Q.   And then turning now to a couple of months later, the

6   December 7th meeting with Mr. Datta.  You were asked, on

7   cross-examination, questions about his friend Octavio and

8   whether that came up at the meeting and also about wires and

9   whether they came up at the meeting.

10           If you could turn to 107-T, page 5, line 5.  At this

11   point the transcript says, I will do the wire transfers but I

12   need to set up the thing in a way -- I need like another two,

13   three months.

14           And you have the transcript before you.

15           Do you know if prior to that statement there was any

16   discussion about Octavio?

17   A.   Yes, sir.

18   Q.   You know?

19   A.   Yes.

20   Q.   Was there?

21   A.   Yes.

22   Q.   Where was it?  If you could point to it in the transcript?

23   A.   When he called me for assistance, and also during the --

24   Q.   Perhaps my question wasn't clear, sir.

25           I pointed you to page 5, line 5.  And what I intended

19eddat3                         Recinos - redirect

1    to ask was was there any conversation about Octavio on

2    December 7, 2010, at this dinner prior to that point in the

3    conversation?

4    A.   Not prior to this conversation.

5    Q.   You were asked on cross-examination about where the cash

6    for perfume purchases was coming from and asked whether

7    Mr. Datta told you the cash was coming over the border to avoid

8    taxes.  Do you recall that?

9    A.   Yes, sir.

10   Q.   Did Mr. Datta give you any other reasons as to where the

11   cash was coming from?

12          MR. ROSS:  I object, your Honor.  There was no

13   discussion about where cash came from.

14   BY MR. BRAGG:

15   Q.   Or as to why it was coming?

16          MR. ROSS:  Does the Court wish a response?

17          THE COURT:  Well, it is a different question now.

18          MR. ROSS:  I think it is a different question, and the

19   same objection.  The discussion was, on cross, regarding

20   chilangos and why they were used, why a Mexican passport was

21   being used to purchase perfume, and those were the reasons.

22          THE COURT:  Mr. Bragg, rephrase the question.

23   BY MR. BRAGG:

24   Q.   Did Mr. Datta give you any other reasons why to use the

25   term chilangos or customers were coming to him with wads of

1    cash to purchase perfume?

2    A.   No.

3    Q.   Can I direct your attention --

4              MR. ROSS:   Objection, your Honor.

5              THE COURT:   What is the objection?   Can I direct your

6    attention?   What is objectionable about those words?

7              MR. ROSS:   I'll wait to hear the question, your Honor.

8              THE COURT:   Thank you.

9              MR. ROSS:   Thank you.

10   BY MR. BRAGG:

11   Q.   I direct your attention to the same exhibit, 107-T, line

12   42.

13             MR. ROSS:   Page?

14             MR. BRAGG:   I'm sorry.   The same exhibit, page 32,

15   line 42.

16   Q.   Are you there, sir?

17   A.   107?   Line 32?

18   Q.   Page 32, line 42.

19   A.   I have it.

20             THE COURT:   OK.   Is there a question now?

21             MR. BRAGG:   Yes.

22   Q.   What did the defendant say to you at this point in the

23   conversation?

24   A.   There's a lot of cash coming in to me.

25   Q.   Would you continue.

19eddat3                           Recinos - redirect

1    A.   I'm reporting everything under their names.   I'm pretty

2    sure they're -- they're taking their discount someplace.   It's

3    all Sinaloa money.

4              MR. BRAGG:   One moment, your Honor.

5              THE COURT:   Yes.

6              (Pause)

7              MR. BRAGG:   No further questions.

8              THE COURT:   Thank you.   Any recross?

9              MR. ROSS:   No, your Honor.   Thank you.

10             THE COURT:   Thank you.   The witness is excused.

11             (Witness excused)

12             THE COURT:   Next witness.

13             MR. BRAGG:   The government calls Frank J. DiGregorio.

14             I believe the agent went to get him.

15             (Pause)

16             THE CLERK:   Sir, if you could please take the stand.

17   FRANK DiGREGORIO,

18        called as a witness by the government,

19        having been duly sworn, testified as follows:

20             THE CLERK:   Thank you.   Please be seated.

21             And can you please state your name and spell your last

22   name for the record.

23             THE WITNESS:   Frank DiGregorio, D-i-G-R-E-G-O-R-I-O.

24             THE COURT:   You may proceed, counselor.

25   DIRECT EXAMINATION

19eddat3                         DiGregorio - direct

1    BY MR. BRAGG:

2    Q.   Where do you currently work, sir?

3    A.   The Queens District Attorney's office.

4    Q.   How long have you worked at the Queens District Attorney's

5    offers?

6    A.   A little over ten years.

7    Q.   What is your current assignment?

8    A.   I am a group supervisor for what has been known as the DHS,

9    Department of Homeland Security El Dorado Task Force.

10   Q.   What is the El Dorado Task Force?

11   A.   It's a financial task force made up of -- represented by

12   most federal agencies, including DEA, IRS, FBI, ICE, the

13   Department of State, NYPD, New York State Police, Nassau

14   Suffolk County police, and detective investigators from

15   throughout the various district attorneys' offices.

16   Q.   What does the Task Force do?

17   A.   Our primary mission is financial investigations.

18   Q.   OK.   How long have you been assigned to the Task Force?

19   A.   21 years.

20   Q.   Where were you employed before you joined the Queens DA's

21   office?

22   A.   The New York City Police Department.   I am a retired

23   detective.

24   Q.   And when you were with the New York City Police Department,

25   were you also on that El Dorado Task Force?

19eddat3                    DiGregorio - direct

1   A.   Yes.   After about ten, about eleven years with the PD, they

2   assigned me to what was to become the El Dorado Task Force.

3   Q.   And as a New York City Police officer prior to that service

4   on the Task Force, what sort of cases did you investigate?

5   A.   When I started, obviously I was routine patrol in a radio

6   car.   Eventually promoted to anticrime, which is plainclothes,

7   concentrating on felony arrests.

8          I then applied and was accepted to the Narcotics

9   Division.   I worked traditional narcotics arrests, narcotics

10  cases, about three-and-a-half years.   I then was promoted to

11  the Organized Crime Investigation Division, where we did

12  traditional organized crime cases.   And from there the United

13  States Customs Service put a request into the PD for ten

14  detectives to begin a pilot program, which would become the El

15  Dorado Task Force.

16  Q.   As a member of the Task Force, have you received training

17  over the years in various types of money laundering?

18  A.   Yes, sir, I have.

19  Q.   What kind of training have you received?

20  A.   What type of?   Financial investigation training.

21  Q.   Training from whom?

22  A.   The Internal Revenue Service; Department of the Treasury;

23  the United States Customs Service; NYPD; HIDTA, which is the

24  High Intensity Drug Trafficking Area; FCEN, which is the

25  Financial Crimes Enforcement Network; the Department of State;

19eddat3                        DiGregorio - direct

1   various seminars.

2   Q.   OK.   In addition to receiving training, have you also

3   provided training to others about money laundering?

4   A.   Yes, I have.

5   Q.   Can you describe briefly what types of training you've

6   given?

7   A.   Basically the training has been done -- I've conducted

8   training for most of the federal agencies, including the Rand

9   Corporation, the CIA, foreign entities, Cambridge University,

10  Malta, the Caribbean, various government officials, several

11  HIDTA-sponsored -- State Department-sponsored training that was

12  given to approximately 50 representatives of law enforcement

13  and regulatory governmental individuals from about 50 different

14  countries.

15  Q.   What were the subjects of those trainings?

16  A.   Primarily the black market peso exchange.

17  Q.   What is the black market peso exchange?

18  A.   It is the number one system used by the narcotics cartels

19  to launder their money.

20  Q.   Approximately how many black market peso exchange

21  investigations have you participated in during your career?

22  A.   In one capacity or another, I would have to say over a

23  thousand.

24  Q.   When you say "in one capacity or another," what do you

25  mean?

1    A.   It was where I was either the case agent, an assistant case

2    agent, or supervisor in those different investigations.

3    Q.   In connection with those investigations, did you have the

4    opportunity to interview people who have been involved in

5    narcotics trafficking?

6    A.   Yes, I have.

7    Q.   How many interviews would you estimate?

8    A.   It's in the hundreds.

9    Q.   And did you have an opportunity to interview people who had

10   been involved in the laundering of narcotics trafficking

11   proceeds?

12   A.   Yes.

13   Q.   And how many --

14   A.   Again, it's hundreds of individuals.

15   Q.   And of those you've interviewed, what types of roles did

16   they play in trafficking and laundering?

17   A.   I've interviewed South American cartel members, U.S. drug

18   traffickers, the owners of businesses both in foreign countries

19   and countries -- and businesses here in the United States,

20   government officials on both sides of the border, what we call

21   couriers, individuals who physically move the drugs or

22   physically move the money, casa de cambios, which is money

23   exchange houses, owners of those businesses located both here

24   in the States and in other countries.

25   Q.   And have you testified on the subject of the black market

19eddat3                    DiGregorio - direct

1    peso exchange before?

2    A.   Yes, I have.

3              MR. BRAGG:   One moment, your Honor.

4              (Pause)

5              MR. BRAGG:   Thank you.

6    Q.   Based on your experience, have you become familiar with the

7    international narcotics trade?

8    A.   Yes, I have.

9    Q.   Have you've become familiar with the international cocaine

10   trade specifically?

11   A.   Yes, I have.

12   Q.   Have you become familiar with the role Colombia plays in

13   the production of cocaine?

14   A.   Yes, I have.

15   Q.   And what route does Colombian cocaine follow to get the

16   U.S., as a general matter?

17   A.   Primarily in today's day and age, after leaving South

18   America it makes its way into Central America, it comes up

19   through Mexico into the United States for distribution.

20   Q.   And based on your experience, what happens once the drugs

21   arrive in the United States?

22   A.   They are distributed throughout the United States.

23   Q.   And how do customers pay for narcotics?

24   A.   Cash.

25   Q.   Is it fair to say that type of sale results in significant

19eddat3                    DiGregorio - direct

1   amounts of cash?

2   A.  Yes, it does.

3   Q.  Do narcotics traffickers typically deposit that cash in

4   bank accounts?

5   A.  No.  Typically, no.

6   Q.  Why not?

7   A.  The laws that we have here in the United States, both the

8   banking laws and our own laws, make it quite easy for us to

9   identify those sums of money.

10  Q.  I now want to ask you about the black market peso exchange

11  in some greater detail.

12          Would it aid your testimony to use a diagram?

13  A.  Yes, it would.

14          MR. BRAGG:  If we could show just to the witness for a

15  moment 1001.

16  Q.  Do you recognize this?

17  A.  Yes, I do.

18  Q.  What is it?

19  A.  This is a drawing that I use during the teaching that I do

20  in the BMP.

21  Q.  Would it aid your testimony here today?

22  A.  Yes, it would.

23          MR. BRAGG:  Your Honor, the government would offer it

24  as a demonstrative aid.

25          MR. ROSS:  No objection, your Honor.

19eddat3                          DiGregorio - direct

1          THE COURT:  Received on that basis.

2          (Government's Exhibit 1001 received in evidence)

3    BY MR. BRAGG:

4    Q.  As you describe it, the jurors have a video as well so just

5    be aware.

6          Looking at 1001, what does the double line in the

7    middle of the exhibit represent?

8    A.  That's a separation between the United States and Colombia.

9    Everything above the double line is here in the United States.

10   Everything below the double line is in Colombia.

11   Q.  OK.  So can you walk us through?  What is the first step in

12   the black market peso exchange process?

13   A.  Well, the first step is the drug dealers, the narcotics

14   cartels, sending their drugs north to the United States.

15   Q.  And where is that, just to --

16   A.  On the bottom left of the diagram.  It says "Colombian drug

17   dealers."  Those dollars represent the dollars being shipped

18   north to the United States.

19   Q.  Excuse me.  What is shipped north?

20   A.  The narcotics are shipped north to the United States.

21   Q.  OK.  What happens after that in the process?

22   A.  Obviously they are spread out -- the drug is sent

23   throughout the country, where they are sold for cash.  The cash

24   is then accumulated in stash houses, where it sits.

25   Q.  Go ahead.

19eddat3                    DiGregorio - direct

1   A.   Shall I continue?   OK.

2           The one thing I might want to make mention of is that

3   this is an extremely generic example.   There are multiple

4   steps.   Things have changed.   Between Colombia and the United

5   States, you now could add in other countries, primarily Mexico.

6   And there are other steps between the various individuals.

7   Q.   So let's just --

8   A.   This is just generic.

9   Q.   Let's stay with 1001.   You said the cash was in stash

10  houses.   Where is that?

11  A.   Those are spread out around the country.

12  Q.   Which country?

13  A.   The United States.

14  Q.   And what is the next step in the movement of that cash?

15  A.   OK.   The next step, on the bottom right you'll see it says

16  "Colombian importer."   OK?   To make it simple, we'll say that

17  the Colombian importer is a farmer and he wishes to buy a

18  tractor.   He is a coffee farmer who wishes to buy a tractor.

19  He wants to buy the tractor from a U.S. exporter, we'll say

20  John Deere for argument's sake.   So on the top right you'll see

21  it says "Exporter."

22           Now, the Colombian farmer has sold his coffee and he

23  has Colombian pesos as his currency.   That is his national

24  currency.   John Deere wants to receive U.S. dollars.   So the

25  Colombian importer can go to his bank.   He could pay the taxes

19eddat3                          DiGregorio - direct

1    and the tariffs that would be due on the exchange of pesos to

2    dollars and request his bank to send a wire transfer to John

3    Deere to pay for that tractor.  Keeping it simple, we'll say a

4    hundred thousand dollars.

5              There is another system that has taken effect within

6    the last 50 years and that's our next player.  On the bottom in

7    the middle, it says "Colombian peso broker."

8    Q.  What is a peso broker?

9    A.  That individual acts similar to a real estate agent.  He

10   has someone who wants to buy something and someone who has

11   something to sell.  So in this case the Colombian importer goes

12   to the peso broker with his hundred thousand dollars in pesos

13   and says I need to send this to John Deere in the United States

14   in dollars.  So he gives the Colombian peso broker a hundred

15   thousand dollars in pesos.  He, in turn, meaning the peso

16   broker, goes to -- has connections with the drug side.  So he

17   goes to the Colombian drug dealer and says do you have a

18   hundred thousand dollars in the U.S. that I can buy?  So they

19   agree and they buy it on a discounted rate.

20   Q.  Now, what you do you mean by that, "on a discounted rate"?

21   A.  Basically, the dollars -- the dollars that he's paying

22   over, the hundred thousand dollars, he'll basically buy for

23   about 80 or 85,000.  So in this case he's going to in reality

24   turn over $85,000 worth of pesos but receive a hundred thousand

25   dollars U.S. in the U.S.

19eddat3                    DiGregorio - direct

1    Q.  Just to be clear, using the 1001, you are talking about the

2    Colombian peso broker who is in the middle on the bottom,

3    correct?

4    A.  That is correct.

5    Q.  Who does the peso broker receive the pesos from?

6    A.  From the importer.

7    Q.  And what is the relationship between -- withdrawn.

8         Does the peso broker give anything to the drug dealer?

9    A.  Yes.  He turns over to him the pesos, in effect paying him

10   for his narcotics that he has sent to the United States.

11   Q.  OK.  What happens with the drug dollars that are in the

12   United States?

13   A.  The Colombian peso broker and the drug dealer will exchange

14   a code, they will agree on a code that they're going to use,

15   along with a phone number, the phone number primarily belonging

16   to the broker's worker in the United States.  So what will

17   happen is the drug dealer will call his U.S. drug worker and

18   give him the phone number and the code.  At the same time the

19   Colombian peso broker will call his worker in the United

20   States, giving him the code.  At that point -- and along with

21   that code will be the amount of money that he's due to pick up.

22   So he will be given the instructions that say you're going to

23   pick up $100,000, here's the number and the code.

24        A phone call will be made from the U.S. drug dealer's

25   worker to the broker's worker in the United States.  They will

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19eddat3                        DiGregorio - direct

1    then meet on the corner of walk and don't walk and they will

2    exchange that bag of $100,000, the drug worker taking the

3    100,000 and giving it now to the broker's worker.

4    Q.   What does the broker's worker do with that money?

5    A.   He will bring it home.  He will secure it.  He'll count it.

6    He will report the count to the broker in Colombia.  And at

7    that point he will wait for instructions as to what to do with

8    that money.

9    Q.   Using the diagram here, 1001, what does the broker's worker

10   ultimately do with the cash?

11   A.   He will get it into the banking system or deliver it,

12   depending on what the instructions are.  So John Deere now will

13   receive payment in the, quote, form of either a wire transfer

14   or theoretically in cash, and he then will export that tractor

15   to Colombia.

16   Q.   And how exactly do the various participants depicted on

17   1001 benefit from participating in this process?

18   A.   Well, the importer does not have to pay any tax or tariff,

19   which, by the way, in Colombia ranges about 25 percent.  So

20   that hundred thousand dollars tractor would have really cost

21   him about $125,000.  So he benefits by saving on the taxes and

22   tariffs.

23            The Colombian drug dealer benefits because he's paid

24   pesos in his native country, as dollars do him no good there.

25   So he's been paid for his drugs in Colombia.

19eddat3                         DiGregorio - direct

1        Obviously, the U.S. drug dealer has gotten rid of the

2   money that he's been responsible to be sitting on in the stash

3   house, and the broker's worker has made his commission for

4   doing the transaction, which is somewhere between 1 and

5   3 percent.

6        John Deere now has received payment for its tractor

7   and has sent that tractor down to Colombia.

8        The only one that loses -- and, obviously, the peso

9   broker has made his money on the exchange for what he bought

10  the dollars for, so he's gotten his benefit up front.   Just

11  like I said, a real estate agent, you have a buyer and a

12  seller.   And the only one that loses in this scheme is the

13  Colombian government, as they get beat on the taxes and

14  tariffs.

15  Q.   Just going back to exporter in the upper right-hand corner.

16  I may have missed it.   What is the benefit as to the exporter

17  in participating in the process?

18  A.   Obviously, increased sales.   Word spreads around amongst

19  the importers and word spreads around amongst the importers as

20  to the benefits of using the system.   So he'll buy -- the

21  exporter himself will have an increased sale.   Also, if they

22  are paid in cash, there is also the benefit of -- it's an

23  anonymous transaction, basically, so it sometimes has tax.

24  There is tax issues that go along with that.

25  Q.   Is there a form of this process that you've encountered in

1    cases involving Mexico?

2    A.   A form?

3    Q.   Is this process used in Mexico?

4    A.   This process has now become used in Mexico, that's correct.

5    Q.   Would it aid your testimony today to use a different

6    diagram to describe the process as it occurs in Mexico?

7    A.   Yes.

8           MR. BRAGG:  If we could have 1002 just for the witness

9    for the moment?

10   Q.   What is Government Exhibit 1002?  Do you recognize it?

11   A.   Yes, I do.

12   Q.   What as a general matter is it?

13   A.   I'm sorry?

14   Q.   What as a general matter is 1002?

15   A.   This is the depiction of how the BMP is nowadays used in

16   Mexico.

17   Q.   Would use of this exhibit aid your testimony?

18   A.   Yes, it would.

19          MR. BRAGG:  The government offers 1002 as a

20   demonstrative exhibit.

21          MR. ROSS:  No objection, your Honor.

22          THE COURT:  Received for that purpose.

23          (Government's Exhibit 1002 received in evidence)

24   BY MR. BRAGG:

25   Q.   Now, using the exhibit on the screen, 1002, Detective, can

19eddat3                    DiGregorio - direct

1  you walk us through how the process works in Mexico?

2  A.  Yes.  Basically it starts out with the Mexican drug dealer.

3  Whether --

4  Q.  Excuse me.  Just to orient us, where is the Mexican drug

5  dealer on this exhibit?

6  A.  On the left-hand side of the map depicting the country of

7  Mexico, just to the right of Baja California there, it says

8  "Mexican drug dealer," about mid-diagram, to the left of "pesos

9  and dollars."

10         THE COURT:  I think everybody can see it.

11         MR. BRAGG:  I interrupted, I'm sorry.

12  Q.  Please describe the process using the exhibit.

13  A.  The Mexican drug dealer receives the cocaine from the

14  Colombian drug dealers, from the exporters.  They now assume

15  the responsibility for those drugs.

16         They ship those drugs north to the United States,

17  where as similar with the Colombian part of it, those drugs are

18  distributed throughout the country and sold, where the cash now

19  accumulates.  The difference being the cash is nowadays brought

20  back over the border and given back to the Mexican drug

21  cartels.

22  Q.  What happens after that?

23  A.  At that point, as what happens similar on the other side of

24  the BMP, those dollars are sold to peso brokers, who then pay

25  the Mexican cartels in pesos, receive the dollars, and arrange

1    for those dollars to be brought back north and delivered to

2    various businesses.

3    Q.  And that's the U.S. exporter, is that correct?

4    A.  The U.S. exporter, correct.  In turn, the U.S. exporter

5    sends the goods back down to Mexico.

6    Q.  How does the importer benefit in the Mexican process?

7    A.  The importer benefits by, first off, although in Mexico

8    there is no taxes and tariffs, there are other taxes that get

9    paid -- state, federal, those type of taxes.  He also benefits

10   by buying -- getting cheap, what we call cheap dollars.  They

11   are able to buy the dollars at a discounted rate.

12   Q.  What are the causes that gave rise to the use of the

13   Mexican black market peso exchange process?

14   A.  Prior to 9/11 -- prior to 9/11, this did not exist.  The

15   primary responsibility -- the movement of the drugs, the

16   collecting of the money -- was basically a Colombian/U.S.

17   entity.  After 9/11 -- much of the money during the Colombian

18   side of it prior to 9/11 would be delivered to New York.  It

19   would be delivered to our major cities.  Needless to say, after

20   9/11 security was extremely tight; moving the cash around the

21   country was extremely tight.  There was a danger to moving it.

22   There was a danger to moving the cash around.  At the same

23   time, some serious laws were passed in this country under the

24   Patriot Act, which made it much more difficult for the bad --

25   for the narcotic traffickers to move their money through our

1     banking system.

2              So what we began to see was much -- a lot of the money

3     going over the border into Mexico.  We were more concerned on

4     exports -- on what was coming into the country, unfortunately,

5     that was what was going out and we were using them as dollars

6     going over the border.  At the same time we began to receive

7     information from working informants that we have in Colombia.

8              The advantage we have is that we're kept up on the

9     trends by our informants.  And what began to shift was requests

10    for undercover operations to be conducted out of Mexico,

11    something that had never happened before.  So they were

12    requesting cash to be picked up in Mexico, wire transfers to be

13    accepted in undercover accounts from Mexico, and, once again,

14    this is something that had never really happened.  So we began

15    to follow those trends.

16             At the same time there was studies done by government

17    regulatory and intelligence agencies studying the amount of

18    cash that was crossing the border into Mexico versus the amount

19    of cash that was coming back over, and it was found that there

20    was billions of dollars discrepancies in those figures.

21    Q.  Let me stop you right there.

22             I believe you testified the dollars are now in Mexico?

23    A.  Mm-hmm.

24    Q.  Were those dollars being put into banks in Mexico?

25    A.  At that time they were -- at that time they were.   There

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19eddat3                    DiGregorio - direct

1   was a loophole in the Mexican law which allowed tremendous

2   amounts of country, U.S. dollars, to be deposited into

3   Mexican-held bank accounts.

4   Q.  And did there come a point where that changed?

5   A.  Yes.  That was eventually changed, based in part by our own

6   investigations in June 2010, where they extremely limited the

7   amount of dollars that could be deposited into Mexican bank

8   accounts.

9   Q.  Prior to the law being passed, were there informal

10  restrictions that had been put in place?

11  A.  Informal?

12  Q.  Or restrictions self-imposed by the banks?

13  A.  Yes.  Well, yes.  In January of '09 several of the banks

14  began stopping the acceptance of dollars, meaning U.S. cash,

15  into their Mexican bank accounts.

16  Q.  OK.  I just want to go back to 1001 for one moment.

17           You testified previously -- among the upper right-hand

18  corner, were broker's worker and the arrow to exporter.  You

19  testified previously about sometimes the cash goes into the

20  banking system.  I just wanted to follow up on that.  How does

21  that process work?

22  A.  Well, most of the time it goes into the banking system on

23  what we call -- by what we call smurfing.

24  Q.  What do you mean by smurfing?

25  A.  Basically, if you deposit more than $10,000 in cash into

19eddat3                    DiGregorio - direct

1    the bank, there are certain reports that are required to be

2    done.  So smurfing is taking a sum of cash that's more than

3    $10,000 but depositing it into the banking system in amounts

4    under $10,000 to avoid the preparation of those reports.

5    Q.  What reports are you referring to?

6    A.  It's called a Currency Transaction Report, a CTR.

7            MR. BRAGG:  One moment, your Honor.

8            (Pause)

9    Q.  Just one last question.

10            You said this as to 1001.  Maybe we can pull up 1002.

11   You described 1001 as basic or generic.  Does the same apply to

12   Government Exhibit 1002?  Are there variations of this process?

13   A.  Oh, absolutely.  Yes.

14            MR. BRAGG:  OK.  No further questions, your Honor.

15            THE COURT:  Thank you.  Cross-examination.

16   CROSS-EXAMINATION

17   BY MR. WHITE:

18   Q.  Good afternoon, Detective --

19   A.  Good afternoon.

20   Q.  -- DiGregorio.

21            I will put this on here, Government Exhibit 1001, in

22   evidence.

23            This refers to the Colombian -- the Colombian peso

24   broker and the Colombian black market peso scheme, correct?

25   A.  Yes.

19eddat3                     DiGregorio- cross

1   Q.  And most of your experience has been with the Colombian

2   black market peso scheme, as you call it, correct?

3   A.  Most of it has been with the Colombians, but for over the

4   last seven, eight years it's been primarily a -- it has

5   changed.  So now obviously it has expanded to other countries.

6   Q.  But in total years of experience, it was the Colombia black

7   market peso exchange that you specialized in?

8   A.  That's correct.

9   Q.  And that whole law enforcement concept of a black market

10  peso exchange grew out of the Colombian drug trade, correct?

11  A.  That's correct.

12  Q.  In countries like Colombia, there are parallel currency

13  systems -- systems parallel to the official banking system --

14  that normally existed, correct?

15  A.  That's correct.

16  Q.  So the black market peso exchange or these parallel

17  currency exchanges were not caused by narcotics trafficking,

18  they preexisted narcotic trafficking; is that true.

19  A.  There is a different system that occurs in the BMP than

20  what occurs in normal parallel banking, which is all over the

21  world.

22  Q.  All over the world; in Latin American countries, including?

23  A.  There is a parallel market all over the world, yes.  That's

24  including Latin American countries.

25  Q.  In Colombia, the reason for the parallel currency market,

19eddat3                    DiGregorio- cross

1    putting drug trafficking aside for the moment, is to avoid the

2    banking system and to avoid government scrutiny, correct?

3    A.   On occasion, yes, that's true.

4    Q.   Well, that's its purpose; that's why there is a parallel

5    currency system independent of narcotics trafficking --

6    A.   There is --

7    Q.   There was prior to narcotic trafficking, that's why it

8    existed?

9    A.   There is also a -- the parallel market -- there's multiple

10   markets in a country like Colombia.  You have the official

11   government exchange rate, as you said.  You have the parallel

12   market.  And then you have the black market, which is below

13   that.  The parallel market depends largely on entities such as

14   Western Union, where you have remittance monies that are

15   sitting in the businesses, people that are sending money home.

16   So that rate fluctuates slightly from what the official

17   government exchange rate is.

18            And then below that is where you have the typical

19   narcotics black market rate.  It's to buy or sell dollars is

20   cheaper in the black market than it is in the parallel market

21   and cheaper in the parallel market than what it is in the

22   official exchange rate.

23   Q.   But the parallel market preexisted the narcotics black

24   market peso exchange?

25   A.   Yes, it did.

19eddat3                    DiGregorio- cross

1    Q.  And in Mexico prior to 2001, was there a parallel currency

2    exchange system?

3    A.  There's always -- yes, there has been a parallel system in

4    Mexico.

5    Q.  For a long, long time, correct?

6    A.  Yes.  I'm not sure how many years but there is a parallel

7    market, yes.

8    Q.  Going back to when it was ruled by Spain?

9    A.  OK.

10   Q.  You are saying "OK."

11           THE COURT:  You are saying OK because you know it?

12   A.  I don't know this back when it was ruled by Spain.  I'm

13   sorry, I don't know that.

14   Q.  Now, you said that there are similarities -- you said these

15   similarities between Mexico and Colombia in the black market

16   peso exchange, and are there similarities in the non-drug

17   trafficking currency exchanges?

18   A.  I don't get involved with non-narcotics currency exchanges.

19   Q.  So your expertise is confined to narcotics trafficking,

20   money exchanges in narcotics trafficking?

21   A.  My expertise is in the black market peso exchange, which

22   involves both the financial and the narcotics end of the

23   spectrum.

24   Q.  But you don't know about the financial end independent of

25   narcotics trafficking; is that what you're saying?

19eddat3                    DiGregorio- cross

1    A.   I don't know about the financial end.

2    Q.   In Mexico.

3    A.   Outside of narcotics trafficking is this?

4    Q.   Yes.

5    A.   No, I don't.

6    Q.   I just wanted to clarify something.  You said there is no

7    import duties in Mexico?

8    A.   No.  I said free trade.  There's free trade with Mexico.

9    That doesn't mean goods when they're shipped and the sale of

10   goods end up with no taxes.  I'm just comparing it with taxes

11   and tariffs.  There are additional taxes and tariffs.  There is

12   no -- is there free trade with Mexico?  Unlike Colombia, where

13   you pay for what you're importing into the country; I was

14   trying to keep that separate.

15   Q.   There are tariffs on some imports into Mexico, correct?

16   A.   Yes, some imports.

17   Q.   For example, perfumes manufactured in France, there would

18   be a tariff on that, correct?

19   A.   If it came from France, that I'm not sure about.

20              (Continued on next page)

21

22

23

24

25

1            MR. WHITE:  I would like to speak to you about

2    Government Exhibit 1001.

3            THE COURT:  I think that's 1002.

4            MR. WHITE:  Let's talk about 1002.

5    BY MR. WHITE:

6    Q.  I want to focus on the right-hand side of that exhibit,

7    where the U.S. exporter sells good to the importer.  Now just

8    assume the U.S. exporter ships goods to the importer in Mexico

9    then sends an invoice to the importer for a certain amount of

10   money to be paid in U.S. dollars.  What are the different

11   methods that that importer could use to pay that invoice?

12   A.  Wire transfers from his own country.

13   Q.  How would a wire transfer work?  How would that occur?

14   What would the importer do to make that wire transfer to the

15   exporter in the United States?

16   A.  Number 1, he could take, if the sale is for pesos, he could

17   deposit an unlimited amount of pesos into his business bank

18   account and request the bank to do a wire transfer into the

19   country that is due.

20           THE COURT:  In what currency?

21           THE WITNESS:  In exchange to U.S. dollars.

22   Q.  He could go to an established bank and operate within the

23   regular banking system --

24   A.  Correct.

25   Q.  -- and have that bank take his pesos and then wire U.S.

1    dollars to the American exporter?

2    A.  Yes.  What actually, I am not an international banker, but

3    what happens is foreign banks have what's called corresponding

4    bank accounts here in the United States, basically it's the

5    bank's bank account or checking account here in the United

6    States, and the pesos would be deposited into the Mexican bank.

7    The payment would come from their dollar accounts, be it in

8    certain countries the dollar is the accepted currency, Uruguay

9    as an example, but in this case it would come from their dollar

10   account from a corresponding bank.

11   Q.  If the importer did that, he would now be showing the

12   transaction and his business to both the bank and to any

13   government regulators and taxing authorities in Mexico, is that

14   correct?

15   A.  I guess if they were looking at his accounts he would be

16   showing it, sure, just like every other business in the world

17   does.

18   Q.  You have heard of cash businesses?

19   A.  Yes, of course.

20   Q.  They don't show all their income; they don't need to show

21   all their income to banks or taxing authorities?

22           THE COURT:  I think there is a problem with that

23   question.  I am pretty confident that there are cash businesses

24   that absolutely show every penny and some that don't.  So let's

25   not get into the realm of speculating.

1              MR. WHITE:   I agree, your Honor.

2    BY MR. WHITE:

3    Q.   There are some that don't, correct?

4    A.   There are some that don't --

5    Q.   There are cash economies that completely bypass the taxing

6    authorities and the regular banking channels all over the

7    world, correct?

8    A.   I am assuming there are people that accept cash that break

9    the law, yes.

10   Q.   They break the law by not declaring their income, paying

11   their taxes in the country that they operate in, correct?

12   A.   Sure, yes, if they don't pay their taxes and their country

13   or their state requires you paying taxes and you are able to

14   bypass it without recording it, it's a criminal offense, at

15   least in this country.

16   Q.   If it's in Mexico you assume it's a criminal offense in

17   Mexico to do it, is that what you are saying?

18              MR. BRAGG:   Objection.

19              THE COURT:   Sustained.

20   Q.   I am talking about Government Exhibit 1002, a Mexican

21   importer, a Mexican importer paying an exporter in the United

22   States.  If he operates through the banking system, he will

23   have to show his income, he will have to show the transaction,

24   he will have to pay a tariff on the product he is importing, he

25   will have to pay a bank fee and he may have to pay the currency

1   exchange rate that's higher than he can get in the parallel

2   market; isn't that true?

3           THE COURT:  Objection sustained.  If he had wheels he

4   might be a bicycle.  Let's go on.

5   BY MR. WHITE:

6   Q.  What other methods could the importer use to pay the

7   American exporter if he wanted to avoid the banking system and

8   wanted to avoid scrutiny by the government, Mexican government?

9   A.  There are several ways that they do that.  They could buy

10  cash that currently is in the United States.  You have to keep

11  in mind there are Colombian money brokers operating out of

12  Mexico.  There is a debt that the Mexicans owe the Colombians

13  for drugs they have given them.  Whether the Mexicans own the

14  drugs and pay up front or whether the Mexicans distribute and

15  then pay for the drugs, there is debt that's owed back to the

16  Colombians, cocaine is not grown in Mexico, so that they ask

17  the Colombians for instructions.

18          So the same way that I described the Colombian system

19  on the first diagram, that same system operates using Mexicans.

20  So it's Mexicans that collect the money and the Mexicans that

21  smurf the money into bank accounts and deliver it to

22  businesses.  It's the same system.  The Colombian brokers and

23  Mexican traffickers are operating in each other's countries,

24  making the system work.

25  Q.  That's a variation of the black market pesos exchange you

1  explained in Government Exhibit 1002?

2  A.  It's not a variation; it is the same.  It's just Government

3  Exhibit 2 is just to show what's happening in Mexico, but as I

4  said in my original explanation, it's the Colombians who

5  deliver the drugs to the Mexican drug dealers, so instead of

6  the Colombians doing it all themselves, they hand off to the

7  Mexicans who now assume the responsibility for the drugs and

8  the money that has been sent up from Colombia.

9  Q.  Could the Mexican importer pay the invoices through a

10  Mexican casa de cambio?

11  A.  Yes, he can.

12  Q.  Mexican casas de cambio are regulated, are they not?

13  A.  Yes, they are.

14  Q.  They are regulated by the Mexican regulatory authorities?

15  A.  Yes.

16  Q.  They have recordkeeping requirements?

17  A.  If they decide to do it, yes.

18  Q.  If a properly law-abiding casa de cambio was in compliance

19  with the regulations, it has recordkeeping obligations and has

20  to maintain certain cash reserves, is that right?

21  A.  If you are lucky to find one that does that, yes, you are

22  right.

23  Q.  What would the importer do, physically do with his pesos to

24  use a casa de cambio to pay, a compliant casa de cambio to pay

25  the invoice that's due in the United States in American

19E4DAT4                    DiGregorio - cross

1   dollars?

2   A.  He would bring his pesos, remember, a casa de cambio is

3   also an exchange house, he would bring his pesos to a casa de

4   cambio and request that the casa de cambio pay his debt.  So

5   the business would receive a wire transfer in the form of

6   dollars in the United States.  He would receive that payment.

7   It would be no different, if it's a legitimate casa de cambio,

8   they would have, which is becoming harder and harder to find,

9   corresponding bank accounts here in the United States.

10          So people in the theory of the scope, people who want

11  to send money to Mexico would go to a casa de cambio and give

12  them dollars to be paid in pesos in Mexico.  People in Mexico

13  wanting to pay a debt in the United States would do just the

14  opposite.  They would bring in pesos and request payment in

15  dollars here in the United States.  No different if we sent $50

16  to our son or daughter in California.  The dollar is never

17  true.  In the casa de cambio, the dollars don't go over the

18  border.  The dollars are deposited here, the pesos there.

19          Again, they have corresponding bank accounts, and many

20  of our major banks nowadays have thrown the casas de cambio out

21  and will not allow them to maintain an account here because

22  they are so corrupt.  So many of the casas are now becoming

23  their own internal banks which allows them to open up a bank

24  account here.  Once again, pesos in U.S. bank account to pay

25  the debt in dollars.

19E4DAT4                         DiGregorio - cross

1   Q.  What do you mean when you say they are becoming their own

2   internal banks?

3   A.  The banks here in the United States are allowing them to

4   maintain bank accounts as a bank simply because banks have much

5   more control, the governments have much more laws and there is

6   more control over a bank than there is over a foreign casa de

7   cambio.

8   Q.  If an American exporter received payment from a compliant

9   casa de cambio in Mexico, you would not maintain that that was

10  a money laundering scheme, would you?

11  A.  Casa de cambio --

12  Q.  A compliant casa de cambio in Mexico?

13  A.  A compliant in the sense of complying with the laws is what

14  you are asking?

15  Q.  Yes.

16  A.  Yes, but the problem with casas de cambio --

17  Q.  I didn't ask you what the problem was; you already told us.

18  You have answered question.  Could the importer in Mexico also

19  pay an invoice from the American exporter by using a casa de

20  cambio in United States on the border, an American regulated

21  casa de cambio?

22  A.  Yes, he can.

23  Q.  How would that transaction work?

24  A.  He would bring his pesos over the border.  I am assuming

25  that's what you are asking me, correct?

1   Q.   I am asking you --

2   A.   You are asking me how would he pay.   What currency is he

3   holding?

4   Q.   He is holding pesos; he is a Mexican importer.

5   A.   So he would carry his pesos over the border, go to an

6   exchange house where he probably would pay a heck of lot more

7   than by not doing it in Mexico, OK, but the point being, he

8   would bring his pesos over, paying his pesos, and ask that the

9   casa de cambio pay his debt.

10   Q.   If that's what occurred, that would not be part of any

11   money laundering scheme?

12   A.   It most certainly could be part of money laundering.   A

13   money laundering scheme is not necessarily the movement of the

14   money, it's the source of the money.   There is a difference.

15   If those pesos were legitimately earned, as I explained with

16   the coffee grower, and those are the pesos that he is

17   delivering to the casa, yes, it would be in my opinion a

18   legitimate transaction.

19            THE COURT:   Let's hold it right there.   Members of the

20   jury, I will tell you what is or is not legal, what is or is

21   not legal money laundering or illegal money laundering, not the

22   witness and not the lawyers.   So you will disregard that

23   assessment of the law.

24   BY MR. WHITE:

25   Q.   If a Mexican importer sells product to his customers paid

19E4DAT4                    DiGregorio - cross

1    in pesos and delivers those pesos across the border to an

2    American casa de cambio and exchanges it for currency, United

3    States dollars, he could pay his invoice that way?

4    A.   He could pay his invoice that way, that's correct.

5    Q.   Couldn't he also deposit the pesos in Mexico into the

6    Mexican account of the American casa de cambio and have the

7    American casa de cambio wire the funds to the American

8    exporter?

9    A.   Yes.

10             THE COURT:  Do you have much more, Mr. White?

11             MR. WHITE:  No.

12             THE COURT:  Give me an idea.

13             MR. WHITE:  Ten minutes.

14             THE COURT:  Let's break for lunch here.

15             2:00 folks.

16             (Lunch recess)

17             (Continued on next page)

18

19

20

21

22

23

24

25

19e4dat4a                          DiGregorio - cross

                              AFTERNOON SESSION

                                 (2:15 p.m.)

          (Jury present)

          THE COURT:  Welcome back everybody.  The defendant and

jurors all are present.  I apologize to you for the late start

here after I remonstrated with you yesterday morning.  I wish I

could tell you this is the only case I am responsible for, but

there are another 300 or something, and something had to be

tended to in one of the others.  Let's continue.

    FRANK DIGREGORIO, resumed.

CROSS EXAMINATION

BY MR. WHITE:

Q.  Detective DiGregorio, before lunch we were reviewing the

different ways a Mexican importer could pay an invoice for

goods received from an American exporter and we talked about

through his bank account, his established bank account.  He can

also do it through a pesos broker that you described in terms

of the black market peso exchange.

          THE COURT:  Mr. White, you will get a chance to sum up

later; just ask a question.

BY MR. WHITE:

Q.  The last thing we were talking about is he can do it

through a casa de cambio located in the United States.  Could

you describe how that process would work?

A.  A casa de cambio is nothing more than an exchange house.

19e4dat4a                    DiGregorio - cross

1    He can go in there with his pesos and ask them to exchange them

2    for dollars, pay the fee, whatever the casa de cambio is

3    charging, and pay his bill, and the casa de cambio in turn

4    would pay his bill.

5    Q.  How would the casa de cambio pay his bill; would they pay

6    it by check to the exporter by wire transfer?

7    A.  It's what he wants.  Certain items are more money than

8    others.  It's the way he wants his bill paid.

9    Q.  Who is he?

10   A.  The importer, the importer that is paying the bill, that is

11   requesting the service.

12   Q.  He could request of the casa de cambio to pay it by wire,

13   by check, pay it by cash, United States dollars?

14   A.  Correct.

15   Q.  Where would the United States dollars, the currency come

16   from that the casa de cambio, the American casa de cambio had

17   on account to pay that?

18   A.  It could have come from Mexico by somebody carrying it over

19   the border and cashing it in at the casa de cambio, it could

20   have come from a casa de cambio's bank account; numerous place

21   it could have come from.

22   Q.  If the casa de cambio paid the invoice by check to the

23   exporter, that would be a check drawn on the casa de cambio's

24   own bank account?

25   A.  That's correct.

19e4dat4a                   DiGregorio - cross

1   Q.   Would the exchange rate of the pesos for the United States

2   dollars be the same between the importer's bank pesos broker,

3   Mexican casa de cambio and American casa de cambio, would it be

4   the same exchange rate of pesos to United States dollars?

5   A.   There is a lot of things that come into play on the

6   exchange rate.

7   Q.   Would it be the same; would they each have the same

8   exchange rate?

9   A.   It could be or it might not be.

10  Q.   What would some of the factors be that regulated -- it's a

11  question of supply and demand, is it not?

12  A.   Yes, it is, but it's also a question of cost, what it would

13  cost you to buy a certain denom -- if a casa de cambio has cash

14  on hand that it has gotten from a courier who had brought it to

15  him, he doesn't have to buy it.  If he doesn't have cash on

16  hand, he has to buy it from his bank, so in that case there is

17  a cost associated with buying those dollars to bring them back

18  to his business.  All of this has to take effect so it depends

19  on the scenario.

20  Q.   So the exchange range fluctuates; they can fluctuate day to

21  day and according to surrounding circumstances?

22  A.   And the individual casa charges its own rate.  It doesn't

23  mean that every casa de cambio charges the exact same rate.

24  Q.   Some can charge more than others, some less than others?

25  A.   Correct.

19e4dat4a                    DiGregorio - cross

1   Q.  Have you been to Laredo, Texas?

2   A.  Not Laredo, no, Texas but not Laredo.

3   Q.  Are you familiar with the cross-border trade along the

4   United States-Mexican border?

5           THE COURT:  I think that's sufficiently vague that we

6   might try something more specific.  It's like asking are you

7   knowledgeable about the American economy.

8   BY MR. WHITE:

9   Q.  Are you aware of the degree of commerce between cities on

10  the Mexican-American border and their twin cities across the

11  Mexican-American border?

12          THE COURT:  Sustained as to form.

13  BY MR. WHITE:

14  Q.  Do you know if Laredo, Texas, do you know if it has a

15  thriving economy, a poor economy, whether they conduct much

16  commerce with Mexico; do you have any knowledge of that?

17          THE COURT:  Sustained as to form; this is under the

18  heading of compared to what.

19  BY MR. WHITE:

20  Q.  Compared to Colombia; Colombia doesn't have a common border

21  with the United States, correct?

22  A.  Correct.

23  Q.  There is no cross-border trade between the United States

24  and Colombia obviously, right?

25  A.  Correct.

19e4dat4a                    DiGregorio - cross

1   Q.  That's not the same as between Mexico and the southwest

2   United States to your knowledge, correct?

3   A.  Not the same as Colombia?

4   Q.  Yes.

5   A.  Yes, that's correct.

6   Q.  Are you aware of the number and concentration of casas de

7   cambio along the border between the United States and Mexico?

8   A.  Absolutely not, no.

9   Q.  Nor would you be of the Mexican casas de cambio?

10  A.  Absolutely not, no.

11          MR. WHITE:  I have nothing further.

12          THE COURT:  Thank you.  Any redirect?

13          MR. BRAGG:  No, your Honor.

14          THE COURT:  Witness excused.  Thank you.

15          (Witness excused)

16          THE COURT:  Next witness.

17          MR. SKINNER:  The government calls Hilario

18  Martinez-Garcia.

19          (Through interpreter)

20   HILARIO MARTINEZ-GARCIA,

21      called as a witness by the Government,

22      having been duly sworn, testified as follows:

23  DIRECT EXAMINATION

24  BY MR. SKINNER:

25  Q.  Where are you from Mr. Martinez?

19e4dat4a                    Martinez-Garcia - direct

1   A.   I am from Mexico.

2   Q.   Where in Mexico are you from?

3   A.   Nuevo Laredo Tamaulipas.

4   Q.   Where is that?

5   A.   It's located on the border with Laredo, Texas.

6   Q.   How old are you?

7   A.   61 years old.

8   Q.   What level of education did you reach?

9   A.   12 to primary school.

10  Q.   How old were you when you left school?

11  A.   12 years old.

12  Q.   After you left school what did you start doing?

13  A.   I started working.

14  Q.   In the 1970s and 1980s what industries did you work in?

15  A.   In an import/export office.

16  Q.   What was the name of that office?

17  A.   Agencia Advanal Omar Santos.

18  Q.   Where was that import/export agency located?

19  A.   In Nuevo Laredo Tamaulipas.

20  Q.   That's a city in Mexico?

21  A.   In Mexico.

22  Q.   What did that company import and export?

23  A.   Transformers for the electrical industry, video planners,

24  and laminate for windshields in cars.

25  Q.   Did your work change at all in the 1990s?

19e4dat4a                    Martinez-Garcia - direct

1   A.   That's correct, yes, sir.

2   Q.   How so?

3   A.   I opened up my own company.

4   Q.   What did your company do?

5   A.   General transportation of cargo.

6   Q.   How did you transport cargo?

7   A.   In trucks or in trailers.

8   Q.   Where did you transport cargo from?

9   A.   From the United States to different cities in Mexico.

10  Q.   When did you open up that transportation business?

11  A.   In 1990.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

19e4dat4a                    Martinez-Garcia - direct

1    19eddat5                     Martinez-Garcia - direct

2    Q.   Did there come a time when you closed that business?

3    A.   That's correct.

4    Q.   When was that?

5    A.   Around 1996.

6    Q.   And why did you close the business in 1996?

7    A.   Because the peso lost its worth, the value of the peso went

8    down.   I had no more clients because the clients themselves

9    shut down their businesses.

10   Q.   After closing the company in in or about 1996, what did you

11   do for work?

12   A.   As a mechanic, as a painter, doing everything.

13   Q.   Let me direct your attention to the year 2007.   What were

14   you doing for work in 2007?

15   A.   I was selling insurance for cars, car insurance, out on the

16   street.

17   Q.   When you say "the street," where were you?   What city were

18   you working in?

19   A.   In Nueva Laredo.

20   Q.   Again, that's in Mexico?

21   A.   In Mexico.

22   Q.   Were you doing this for yourself or were you working for

23   someone else?

24   A.   I was working for someone else.

25   Q.   Who were you working for?

19e4dat4a                    Martinez-Garcia - direct

1    A.   For Mr. Fausto Garza.

2    Q.   When did you first start working for Mr. Fausto Garza?

3    A.   In 2008.

4    Q.   And for how long did you work for Mr. Garza?

5    A.   For about four years.

6    Q.   So did you start in -- I'm not sure I understood.   In 2007

7    or 2008 did you start working for Mr. Garza?

8    A.   Sir, in 2007.

9    Q.   When did you stop working for Mr. Garza?

10   A.   In January of 2011.

11   Q.   And why did you stop working for Mr. Garza in January 2011?

12   A.   Because I was arrested in Laredo, Texas while crossing the

13   border.

14   Q.   Do you know the date you were arrested?

15   A.   January 18, 2011.

16   Q.   Have you been in jail ever since your arrest on

17   January 18th of 2011?

18   A.   That's correct.

19   Q.   We'll get to the details in a moment, but in general terms,

20   for what were you arrested?

21   A.   For money laundering.

22   Q.   What were you doing at the time of your arrest?

23   A.   I was transporting $50,000 in cash.

24   Q.   And where were you bringing the money from?

25   A.   From the office in Nueva Laredo, Mexico.

19e4dat4a                    Martinez-Garcia - direct

1    Q.   Was that Fausto Garza's office?

2    A.   That's correct.

3    Q.   Where did you intend to bring the money to?

4    A.   To Laredo, Texas.

5    Q.   Was this in United States currency, this $50,000?

6    A.   Yes, sir.

7    Q.   Now, have you carried United States currency over the

8    border in connection with your work for Mr. Garza before that?

9    A.   That's correct.

10   Q.   At the time of your arrest in January 2011, for roughly how

11   long have you been carrying money over the border for Fausto

12   Garcia?

13   A.   About a year-and-a-half, two years.

14   Q.   Now, following your arrest on January 18th of 2011, were

15   you charged with a crime?

16   A.   Yes, that's correct.

17   Q.   What crime were you charged with?

18   A.   Money laundering.

19   Q.   After your arrest, did there come a time when you were

20   transported to a jail in New York City?

21   A.   That's correct.

22   Q.   When was that?

23   A.   On February 22nd, 2011.

24   Q.   After your arrest in January, did there come a time when

25   you decided to cooperate with the government?

19e4dat4a                    Martinez-Garcia - direct

1   A.   That's correct.

2   Q.   Did you make that decision to cooperate with the government

3   before or after you came to New York City?

4   A.   After coming to the City of New York.

5   Q.   After deciding to cooperate, did there come a time when you

6   signed a contract, known as a cooperation agreement, with the

7   government?

8   A.   That's correct.

9   Q.   When did you sign this cooperation agreement?

10  A.   July 8th of 2011.

11  Q.   Now, prior to signing this cooperation agreement on

12  July 8th of 2011, did you meet with prosecutors and agents who

13  worked for the federal government of the United States?

14  A.   That's correct.

15  Q.   More or less, how many times did you meet with prosecutors

16  and agents from the time you came to New York until the time

17  you signed the agreement in July of 2011?

18  A.   About four or five times.

19  Q.   All right.  Now, in general terms, what did you tell the

20  prosecutors and agents about in these meetings prior to signing

21  the agreement?

22  A.   Well, the kind of work that I did, about the dollars that I

23  crossed over into Laredo, Texas, and about my other associates.

24  Q.   By type of work that you did, did you tell the government

25  about the money laundering crimes that you had been engaged in?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.   That's correct.

2   Q.   When you say you provided information about other people,

3   did you provide information about other people with whom you

4   had committed these crimes?

5   A.   That's correct.

6   Q.   The cooperation agreement that you signed on July 8, 2011,

7   did it require you to plead guilty to a crime?

8   A.   Yes, that's correct.

9   Q.   To what crime did the agreement require you to plead

10  guilty?

11  A.   To money laundering.

12  Q.   Did you plead guilty to a money laundering crime?

13  A.   That's correct.

14  Q.   When did you plead guilty to money laundering?

15  A.   July 8th of 2011.

16  Q.   The same date that you signed the cooperation agreement?

17  A.   That's correct.

18  Q.   Mr. Martinez, what's the highest possible sentence that you

19  face -- well, withdrawn.

20        Mr. Martinez, have you been sentenced yet for the

21  money laundering crime you pled guilty to?

22  A.   No, sir.

23  Q.   When are you going to be sentenced?

24  A.   In the month of November but I don't have a date yet.

25  Q.   Who is going to sentence you?

19e4dat4a                    Martinez-Garcia - direct

1    A.   A judge, Judge Victor Marrero.

2    Q.   And what's the highest possible sentence you face as a

3    result of having pled guilty to money laundering?

4    A.   20 years.

5    Q.   You said a moment ago that the cooperation agreement

6    required you to plead guilty, correct?

7    A.   That's correct.

8    Q.   Does that agreement require you to do anything else?

9    A.   That's correct.

10   Q.   What else are you required to do under the terms of that

11   agreement?

12   A.   That I tell only the truth, that I commit no further

13   crimes, and that I continue cooperating with the government.

14   Q.   And within the scope of continued cooperation with the

15   government, would that include testifying at a trial such as

16   this?

17   A.   That's correct.

18   Q.   So are you testifying here today because of the cooperation

19   agreement that you entered into?

20   A.   That's correct.

21   Q.   Now, if you satisfy your obligations under the cooperation

22   agreement, what is your understanding of what the government is

23   going to do?

24   A.   Well, the government is going to send a letter to the judge

25   explaining my cooperation and my life, and they're going to

19e4dat4a                    Martinez-Garcia - direct

1   tell the judge all the good and all the bad.

2   Q.  And as far as all the bad, would that include telling the

3   judge what the government knows about the past crimes that

4   you've committed?

5   A.  That's correct.

6   Q.  And by the good, would that include whatever assistance you

7   had provided to the government?

8   A.  That's correct.

9   Q.  What, if anything, do you expect to happen if the

10  government writes this letter to the judge who is going to

11  sentence you?

12  A.  Well, that my sentence will be taken under consideration by

13  the judge.

14  Q.  Do you hope that you might receive a lower sentence than

15  you might receive if the government doesn't send a letter?

16  A.  That's correct.

17  Q.  Do you know for sure whether the government is going to

18  send this letter?

19  A.  No, sir.

20  Q.  Even if the government sends a letter, do you know for

21  certain whether Judge Marrero will reduce your sentence?

22  A.  No, sir.

23  Q.  Has anyone from the government made any promises to you

24  about what your sentence will be?

25  A.  No, sir, no one.

19e4dat4a                     Martinez-Garcia - direct

1   Q.  Has your attorney made you any promises about what your

2   sentence will be?

3   A.  No, sir.

4   Q.  Anyone at all made you any promises about what sentence you

5   will receive?

6   A.  No, sir.

7   Q.  Who is going to decide your sentence?

8   A.  His Honor, the judge.

9   Q.  Is it possible that even if the government sends this

10  letter that you described, you still may get up 'til 20 years

11  in prison?

12  A.  That's correct.

13  Q.  Does your sentence in any way turn on how this case against

14  Mr. Datta turns out?

15  A.  No, sir.

16  Q.  Now, you testified that it is your understanding that if

17  you satisfy your end of the bargain under the agreement the

18  government will send this letter, correct?

19  A.  Excuse me.  I did not hear the question.

20  Q.  Did you testify a moment ago that it is your understanding

21  that if you satisfied your end of the agreement, the

22  cooperation agreement, the government is going to send a letter

23  to Judge Marrero?

24  A.  That's correct.

25  Q.  What is your understanding about what will happen if you do

19e4dat4a                     Martinez-Garcia - direct

1   not live up to your obligations under the agreement?

2   A.  I will get no -- I will receive no benefit.

3   Q.  So would it be fair to say that you'll be sentenced without

4   the benefit of the letter from the government?

5   A.  That's correct.

6   Q.  And it would be the same as if you had never cooperated for

7   the government, if you had just pled guilty to the crime?

8   A.  That's correct.

9   Q.  One of the things the agreement requires you to do is to

10  tell the truth, is that right?

11  A.  That's correct.

12  Q.  So what happens if you lie?

13  A.  The contract is ripped up.

14  Q.  Since signing this cooperation agreement on July 8th of

15  this year, have you met further times with prosecutors and

16  agents working for the government?

17  A.  That's correct.

18  Q.  About how many times have you met with prosecutors and

19  agents since signing the agreement on July 8th of 2011?

20  A.  About three or four times.

21  Q.  Now, you testified earlier that at the time of your arrest

22  in January, you were working for a man named Fausto Garza,

23  correct?

24  A.  That's correct.

25  Q.  How long have you known Fausto Garza?

19e4dat4a                    Martinez-Garcia - direct

1   A.  About 20/25 years, give or take.

2   Q.  How did you first meet him?

3   A.  Well, I worked in Agencia Advanal, the import/export agency

4   that belonged to his father-in-law.

5   Q.  Was that the agency you told us about earlier named Omar

6   Santos?

7   A.  That's correct.

8   Q.  Was Omar Santos Mr. Garza's father-in-law?

9   A.  That's correct.

10  Q.  All right.  Now, you testified a little earlier that you

11  started working for Mr. Garza in or about 2007, is that right?

12  A.  That's correct.

13  Q.  When you first started working for Mr. Garza, what were you

14  doing?

15  A.  I was selling car insurance out on the street.

16  Q.  Right.  Did there come a time when you started doing

17  something different for Mr. Garza?

18  A.  That's correct.

19  Q.  When was this?

20  A.  In 2008 -- in 2008.

21  Q.  And what were you doing?

22  A.  I was crossing American currency in cash over the border

23  into Laredo, Texas.

24  Q.  Did Mr. Garza have some kind of business involved with the

25  transportation of cash over the border?

19e4dat4a                    Martinez-Garcia - direct

1    A.   Yes, sir.

2    Q.   What kind of business was this?

3    A.   He had a casa de cambio.

4    Q.   Where was this casa de cambio located?

5    A.   In Nueva Laredo, Mexico.

6    Q.   And a casa de cambio, is that what we in the United States

7    might call a money exchange business?

8    A.   Yes, that's correct.

9    Q.   Did anyone else work at this money exchange business?

10   A.   That's correct.

11   Q.   Who else worked there?

12   A.   Jesus Garza-Rodriguez, Jose Trinidad de la Rosa, and

13   Hilario Martinez, myself.

14   Q.   Did Mr. Fausto Garza also work there?

15   A.   Well, yes.  He's the owner.

16   Q.   Were there four of you in total?

17   A.   That's correct.

18   Q.   What did Jose Trinidad do at the business?

19   A.   He was the accountant.

20   Q.   And what about Jesus Garza?

21   A.   He also transported money over the border.

22   Q.   And your job was to transport money over the border, is

23   that correct?

24   A.   That's correct.

25   Q.   When you first started carrying money over the border in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19e4dat4a                    Martinez-Garcia - direct

1    2008, about how much would you carry at a time?

2    A.   2, 3, $4,000.

3    Q.   And what would you do with the money once you crossed?

4    A.   I would go and deliver it at perfume stores.

5    Q.   And where were these perfume stores located?

6    A.   In Laredo, Texas.

7    Q.   And the money that you carried over, was that always in

8    cash or was it ever in some other form?

9    A.   No, it was always in cash.

10   Q.   Was it always in United States currency or was it sometimes

11   in other currencies?

12   A.   No, always in dollars.

13   Q.   Now, why were you delivering United States dollars in cash

14   to perfume stores on the U.S. side of the border for Fausto

15   Garza?

16   A.   Well, we paid for invoices for Fausto's clients who had

17   purchased perfumes.

18   Q.   And who were Fausto's clients?

19   A.   The people who purchased perfume in Laredo, Texas.

20   Q.   Where were these people located?

21   A.   In different places in Mexico.

22   Q.   And did they own perfume businesses?

23   A.   That's correct.

24   Q.   Now, why was Mr. Garza paying the invoices for these people

25   at the perfume stores in Laredo, Texas?

1   A.   Well, Fausto Garza would sell dollars to his clients.

2   Q.   That would be the perfume store owners, is that right?

3   A.   That's correct.

4   Q.   And what, if anything, would Mr. Garza receive in exchange

5   from the perfume store owners?

6   A.   He received back the money in Mexican currency.

7   Q.   And those are pesos?

8   A.   In pesos.

9   Q.   So Mr. Garza would receive pesos and then you would deliver

10  dollars in cash to the perfume stores in Texas, is that

11  correct?

12  A.   That's correct.

13  Q.   All right.  After giving the money to the perfume stores in

14  Laredo, Texas, did you take the perfume from them?

15  A.   No, sir.

16  Q.   What would happen to the perfume after you paid the

17  invoices with U.S. dollars?

18  A.   I don't know.  We don't know.  We never saw what happened.

19  Q.   Do you know the names of any of Fausto Garza's customers

20  that he sold dollars to?

21  A.   Yes, that's correct.

22  Q.   What are some of his customers' names?

23  A.   The ones that I remember are Jose Luis Contreras, Jose

24  Antonio Franco, Jose Luis Gonzalez, Gerardo Gonzalez, and

25  others whose names I do not remember.

1   Q.  All right.  Now, did there come a time when you started

2   carrying larger amounts of United States currency over the

3   border from Mexico?

4   A.  That's correct.

5   Q.  And when was that, more or less?

6   A.  Mid-2009.

7   Q.  So June or July of 2009?

8   A.  June of 2009.

9   Q.  Now, prior to June of 2009, did you have a conversation

10  with Fausto Garza about moving larger sums of money over the

11  border?

12  A.  That's correct.

13  Q.  And what did Mr. Garza tell you in this conversation?

14  A.  Well, he said that we were going to get busy, that we would

15  have more customers, more volume, more crossing of money, more

16  purchases, and that we would be crossing larger quantities of

17  money over the border.

18  Q.  OK.  What, if anything, did he tell you about where he was

19  going to get U.S. dollars?

20  A.  Well, he told me that he was going to get dollars at a very

21  cheap price, that the rate was going to be very low, and that

22  these would be narco dollars.

23  Q.  Did he use the term "narco dollars"?

24  A.  Yes, sir.

25  Q.  And what is a narco dollar?

19e4dat4a                    Martinez-Garcia - direct

1   A.  Well, I believe that it's proceeds from the sale of drugs.

2   Q.  What, if anything, did you say to Mr. Garza after he told

3   you that he wanted to get narco dollars that he wanted you to

4   carry over the border?

5   A.  I said to him that it was very dangerous, and I said to him

6   aren't you scared since you've already been in jail for that

7   same crime.

8   Q.  Had Mr. Garza, to your knowledge, been in jail for a

9   similar crime before that, before June of 2009?

10  A.  That's correct.

11  Q.  And what was he in jail for, to the best of your knowledge?

12  A.  For money laundering.

13  Q.  And where was he in jail for money laundering?

14  A.  In a jail in the United States.

15  Q.  So when you said to Mr. Garza aren't you worried because

16  you got in trouble for this before, what, if anything, did he

17  say in response to you?

18  A.  He said to me, Look, don't be afraid.  This is Mexico.  If

19  you get arrested, I'll get you out of jail, and if the money is

20  seized, I'll pay to get it back.

21  Q.  Now, you've been in jail ever since January 11th of --

22  January 18th of 2011, correct?

23  A.  That's correct.

24  Q.  To the best of your knowledge, had Mr. Garza done anything

25  to try and get you out?

19e4dat4a                    Martinez-Garcia - direct

1   A.  No.

2   Q.  Have you gotten any money from Mr. Garza?

3   A.  No.

4   Q.  When you had this conversation with Mr. Garza prior to June

5   of 2009, in addition to asking you to carry the money over, did

6   he ask you to do anything else for him?

7   A.  Exactly, yes.

8   Q.  What else did he ask you to do?

9   A.  He said that I had to renew or activate my business

10  permission.

11  Q.  All right.  Who was this business permission from?

12  A.  From Mexico, from the Treasury Department.

13  Q.  So prior to June of 2009, did you have some type of

14  business permission from the Mexican Treasury Department?

15  A.  That's correct.

16  Q.  When did you first get it?

17  A.  In 1990.

18  Q.  And why did you get it in 1990?

19  A.  That's when I began my business of trailers and trucking.

20  Q.  And did you say a moment ago that Mr. Garza had asked you

21  to renew it?

22  A.  That's correct.

23  Q.  So did there come a time when it was suspended or lapsed in

24  some way?

25  A.  Yes.  It was suspended; it was not activated.

19e4dat4a                    Martinez-Garcia - direct

1    Q.  All right.  And when did it become inactive?

2    A.  In 1998.

3    Q.  All right.  So this would have been after you closed your

4    transportation business?

5    A.  That's correct.

6    Q.  Did Mr. Garza say anything about why he wanted you to

7    reactivate your permission from the Mexican government?

8    A.  Yes.  It's the only way to be able to open up checking

9    accounts in banks in Laredo, Texas -- in Nueva Laredo, Mexico.

10   Q.  So it was needed to open bank accounts in Mexico?

11   A.  That's correct.

12   Q.  Did you need it for anything in connection with carrying

13   larger sums of money over the border?

14   A.  That's correct.

15   Q.  Why did you need it to carry money over the border?

16   A.  Well, it was important to register at the customs in

17   Laredo, Texas.

18   Q.  Was it required by customs in order to transport large sums

19   of money over the border?

20   A.  That's correct.

21   Q.  Was there any reason why Mr. Garza couldn't get this

22   permission from the Mexican Treasury himself?

23   A.  Yes, there is a reason, because he can't have a business in

24   Mexico.

25   Q.  Why not?

19e4dat4a                          Martinez-Garcia - direct

1    A.   Because he's an American citizen.

2    Q.   And where are you a citizen of?

3    A.   I'm in Mexico.

4    Q.   So did Mr. Garza during this conversation prior to June of

5    2009, did he offer you anything in exchange for renewing this

6    permission and for agreeing to carry larger sums of money over

7    the border?

8    A.   That's correct.

9    Q.   What did he offer you?

10   A.   That he offered to pay me $400 a week.

11   Q.   Now, you had been working for him prior to that, correct?

12   A.   That's correct.

13   Q.   And you'd already been carrying smaller sums of money over

14   the border for him, correct?

15   A.   That's correct.

16   Q.   So prior to this conversation with Mr. Garza, how much had

17   he been paying you a week?

18   A.   $150 a week.

19   Q.   Now, after you had this conversation with Mr. Garza, did

20   you in fact renew this permission from the Mexican Treasury

21   that you've described to us?

22   A.   That's correct.

23   Q.   And how did you do that?

24   A.   I went.  I presented myself.  I showed up at the Treasury

25   Department to reactivate my permission.

19e4dat4a                    Martinez-Garcia - direct

1    Q.  And after you reactivated your permission, did you in fact

2    start carrying larger sums of United States currency over the

3    border for Mr. Garza?

4    A.  That's correct.

5    Q.  Did you do this right up until the time of your arrest in

6    January of 2011?

7    A.  That's correct.

8    Q.  Was it always United States currency that you carried over

9    the border?

10   A.  Yes, sir.

11   Q.  How often did you bring money over the border?

12   A.  Five days a week.

13   Q.  All right.  This was -- you were doing this five days a

14   week after June of 2009, once you started carrying the larger

15   sums?

16   A.  That's correct.

17   Q.  And when you say "larger sums," how much would you

18   typically carry over the border?

19   A.  It was -- it varied -- 30,000, 40,000, $60,000.

20   Q.  What's the most you ever carried over at any one time?

21   A.  $250,000.

22   Q.  What would you do with the United States dollars once got

23   over the border?

24   A.  Well, I declared them at customs in Laredo, Texas.

25   Q.  And after declaring it, where did you bring the money?

1   A.  We delivered them to perfume stores.

2   Q.  So were you basically doing the same thing you were doing

3   before but now just with larger sums of money?

4   A.  That's correct.

5   Q.  Paying the invoices at the perfume stores for Fausto

6   Garza's Mexican perfume clients, is that right?

7   A.  That's correct.

8   Q.  All right.  Now, when you started transporting larger sums

9   of money over the border, typically when you did it, where

10  would you first receive the money?

11  A.  In Nueva Laredo.

12  Q.  And where in Nueva Laredo?

13  A.  In Mr. Fausto Garza's office.

14  Q.  Did you ever get it from a bank?

15  A.  No, sir.

16  Q.  And Mr. Fausto Garza's office, was this in a commercial

17  building?

18  A.  No.  It was a private house.

19  Q.  Were there any signs indicating that there was a money

20  exchange business going on in the house?

21  A.  No, sir.

22  Q.  How far from the United States/Mexico border was the house

23  where Fausto Garza conducted his business?

24  A.  More or less, 20 blocks.

25  Q.  Now, when you transported the money over the boarder, after

1   you received the money at Fausto Garza's house, how would you

2   get from the house to the border crossing?

3   A.   Sometimes I was taken in a vehicle and sometimes I drove

4   the vehicle myself.

5   Q.   But you usually drove from the house to the border?

6   A.   That's correct, sir.

7   Q.   Now, how did you carry the money?

8   A.   In my socks and in the pockets of my pants and my jacket.

9   Q.   You would carry ten, sometimes hundreds of thousands of

10  dollars at a time.  You could fit all of this money in your

11  clothing?

12  A.   That's correct.

13  Q.   Why were you carrying all the money in your socks and

14  hidden in your clothes?

15  A.   For safety reasons.

16  Q.   All right.  Did you take any other precautions other than

17  hiding the money in your clothes?

18  A.   No, sir.

19  Q.   Did you ever carry a weapon?

20  A.   No, sir.

21  Q.   What about, were you ever accompanied to the border by

22  anybody else who carried a weapon?

23  A.   No, sir.

24  Q.   So you would just transport the cash from the house to the

25  border and the security precaution was to hide the money in

19e4dat4a                     Martinez-Garcia - direct

1   your clothes?

2   A.   Yes.   I took it to the border, yes.

3   Q.   Now, you testified a moment ago that when you got to the

4   border, you would meet with border crossing officials, is that

5   correct?

6   A.   That's correct.

7   Q.   And when you say you met with border crossing officials,

8   were these officials from the Mexican government or from the

9   U.S. government?

10  A.   From Laredo, Texas, United States.

11  Q.   Now, what would happen when you met with these U.S.

12  officials when you were carrying all of this cash over the

13  border?

14  A.   Well, I would arrive and show them my visa, my statement of

15  the amount of dollars, and then they would send me over to the

16  office so that the money could be counted.

17  Q.   All right.   So you told them that you were carrying the

18  money over, is that right?

19  A.   That's correct.

20  Q.   Did you ever lie to them about how much money you were

21  carrying over?

22  A.   No, sir.

23  Q.   Did you ever cross the border and conceal the money, not

24  tell them about it?

25  A.   No, sir.

19e4dat4a                          Martinez-Garcia - direct

1    Q.   Now, when you told them about the money, was there any

2    paperwork that you needed to complete?

3    A.   Yes.  It's a statement of foreign currency.

4    Q.   All right.  What kind of information were you required to

5    include on this statement of foreign currency?

6    A.   Where I put my name on it, my address, the city that I was

7    coming from, and the business where I was going to bring the

8    dollars.

9    Q.   Would you have to put on the form how much money you were

10   carrying over?

11   A.   That's correct.

12   Q.   Would you have to indicate on the form how much money you

13   were bringing to a business on the U.S. side of the border?

14   A.   That's correct.

15   Q.   After you completed the form, did you receive a copy of it?

16   A.   No.  They don't give you a copy.

17   Q.   Now, did the U.S. border crossing officials, when you were

18   crossing the border with these large sums of money, did they

19   ever ask you what kind of business you worked in?

20   A.   Yes, that's correct.

21   Q.   And what did you tell them?

22   A.   That I had a business that purchased perfumes.

23   Q.   So you told them you were in the perfume business yourself?

24   A.   That's correct.

25   Q.   Did you ever tell them that you worked in fact for a money

1   exchange business?

2   A.   No, sir.

3   Q.   All right.  Now, you didn't actually work for a perfume

4   business, did you?

5   A.   No, I didn't.

6   Q.   So why did you falsely claim to these border crossing

7   officials that you worked in a perfume business?

8   A.   Because that's what Fausto told me to do.  Those were the

9   instructions I received.

10  Q.   Now, you testified that once you got across the border, you

11  would typically deliver money to perfume stores; is that right?

12  A.   That's right.

13  Q.   What were the names of the perfume stores that you

14  delivered cash to?

15  A.   Well, Broadway Perfumes, TM Perfumes, LTO Perfumes, Bombay,

16  Broadway Perfumes, and the warehouse of La Versailles.

17  Q.   Now, how did you know how much money to bring to which

18  store?

19  A.   Because the accountant gave me receipts that told me what

20  amounts of money at which store.

21  Q.   So you had an actual slip of paper with the name of the

22  store and the amount of money to go to that store?

23  A.   That's correct.

24  Q.   Just remind us, who is the accountant?

25  A.   Jose Trinidad de la Rosa.

19e4dat4a                    Martinez-Garcia - direct

1   Q.  So after you crossed the border, declared the money, would

2   you deliver all the cash yourself?

3   A.  Sometimes I delivered the money myself personally and

4   sometimes all four of us did it.

5   Q.  And by the "four of us," do you mean yourself, Mr. Garza,

6   Mr. Jesus Garza, and Mr. Jose Trinidad de la Rosa?

7   A.  That's correct.

8   Q.  Would the other three also carry money over the border?

9   A.  No, they did not.  Only I did.

10  Q.  Why were you the only one who carried the money over the

11  border?

12  A.  Because I was the one who was authorized to do it.  I had

13  the permit.

14  Q.  And that was the permit from where?

15  A.  From the Department of Treasury in Mexico.

16  Q.  So if you crossed and you got some help from the other

17  three, would they just cross at the same time with you?

18  A.  No.  But they would cross over maybe 2 or $3,000, that's

19  all.

20  Q.  What would you do?  Would you meet them on the other side?

21  A.  That's correct.

22  Q.  And then divide up the money that you had carried over?

23  A.  That's correct.

24  Q.  Now, a moment ago --

25              THE COURT:  Excuse me, Mr. Skinner.  We are going to

19e4dat4a                    Martinez-Garcia - direct

1   break here for about ten.

2           MR. SKINNER:  OK, your Honor.

3           THE CLERK:  All rise.

4       (Recess)

5       (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Jury present)

2                    THE COURT:  The record will reflect that the jurors

3       and the defendant all are present.

4                    Please continue, Mr. Skinner.

5                    MR. SKINNER:  Thank you, your Honor.

6       BY MR. SKINNER:

7       Q.   Mr. Martinez, before we took a break you testified you

8       typically delivered cash to a handful of different stores in

9       Laredo, Texas, correct?

10      A.   That's correct.

11      Q.   Was there any one perfume store you delivered money to more

12      than others?

13      A.   That's correct.

14      Q.   Which was that?

15      A.   The warehouse of La Versailles.

16      Q.   When you delivered to La Versailles where would you go?

17      A.   To the warehouse.

18      Q.   Where was the warehouse located?

19      A.   In Laredo, Texas.

20      Q.   Do you know the address?

21      A.   1401 Lincoln.

22      Q.   How far from the border was the warehouse located?

23      A.   More or less four blocks.

24      Q.   When you got to the warehouse what would you do with the

25      money?

1   A.   I would deliver the money and the receipts.

2   Q.   Was there anyone that you typically delivered the money to?

3   A.   Well no one person in particular; there were three ladies

4   there.

5   Q.   Do you know the names of those three women?

6   A.   Mrs. Cynthia Garcia, Mrs. Yolanda, and Mrs. Nina.

7   Q.   Were you ever introduced to Cynthia, Yolanda and Nina?

8   A.   Fausto did.

9   Q.   Mr. Fausto Garza introduced you to these three ladies?

10  A.   Yes; it's when I began working and he introduced them to me

11  there.

12  Q.   What name did he use when he introduced you for you?

13  A.   Fausto Garza.

14  Q.   Did he introduce you as Fausto Garza or did he introduce

15  you as someone else?

16  A.   Here is Mr. Hilario Martinez is the one who is going to

17  keep bringing the money here instead of me.

18  Q.   When you delivered the money would Cynthia and Yolanda and

19  Nina use your name Hilario?

20  A.   Hilario, yes.

21  Q.   When you handed the money to one of these women, what would

22  usually happen?

23  A.   They would count it and they would sign the receipt for me.

24  Q.   When you say the receipt what receipt are you referring to?

25  A.   The one or ones which the accountant gave me.

19E4DAT6                     Martinez-Garcia - direct

1    Q.  Was there any receipt that they gave you?

2    A.  Exactly; they made up a different receipt.

3    Q.  Would you have to sign that receipt?

4    A.  That's correct.

5    Q.  You would sign the receipt that they gave to you and they

6    would sign the receipt that you had received from the

7    accountant, is that right?

8    A.  That's correct.

9         MR. SKINNER:  At this point I would like to read a

10   stipulation.  Government Exhibits 209 and 210 were seized by

11   law enforcement agents during a search of a warehouse operated

12   by La Versailles Perfumes Inc.  The warehouse was located at

13   1401 Lincoln Street, Laredo, Texas.  The seizure occurred on

14   January 18, 2011.  It is stipulated and agreed that this

15   stipulation, Government Exhibits 209 and 210 may be received in

16   evidence at trial.  The government offers this stipulation

17   which is marked Government Exhibit 812 as well as Government

18   Exhibits 209 and 210.

19        THE COURT:  Received, all three.

20        (Government Exhibits 209, 210, 812 received in

21   evidence)

22        MR. SKINNER:  Can I get Government Exhibit 209 on the

23   screen for the witness.

24   BY MR. SKINNER:

25   Q.  Mr. Martinez, can you see on the screen in front of you,

1    the book that I have got on the machine back here?

2    A.   That's correct.

3    Q.   Do you recognize this book?

4    A.   Yes, sir.

5    Q.   What how do you recognize it?

6    A.   That's the book that contained the receipts that I had to

7    sign.

8    Q.   Where do you recall seeing this book?

9    A.   In the warehouse's office.

10           MR. SKINNER:  Has this been published to the jury,

11   your Honor?

12           THE COURT:  It has.

13           MR. SKINNER:  I am going to turn to one page in this

14   book.

15   BY MR. SKINNER:

16   Q.   Do you see, I will draw a circle around it, the receipt I

17   have just drawn a circle around?

18   A.   That's correct.

19   Q.   Just for the record, this is a receipt at the top of the

20   page, the page doesn't have a page number; the receipt says

21   number 112605 in the upper right-hand corner, is that correct?

22   A.   That's correct.

23   Q.   Do you recognize this receipt?

24   A.   Yes, sir.

25   Q.   How do you recognize it?

19E4DAT6                         Martinez-Garcia - direct

1    A.   It's the handwriting of the accountant.

2    Q.   This was the receipt that the accountant would give you

3    when you carried the money over?

4    A.   That's correct.

5    Q.   Do you see where I have just drawn a little dot at the top

6    there?

7              THE INTERPRETER:   I am sorry?

8    Q.   Do you see where I just drew a dot up at the top?

9    A.   Yes.

10   Q.   What does that say right there?

11   A.   What dot?

12   Q.   Let me try again.   Do you see in red?

13   A.   Yes.

14   Q.   What does that say to the left of the red dot?

15   A.   It says December 3, 2010.

16   Q.   Right below that can you read that?

17   A.   Jose Luis Contreras.

18   Q.   Do you know who Jose Luis Contreras is?

19   A.   That's Fausto's client.

20   Q.   Making another little red dot further down, do you see that

21   one?

22   A.   Yes, sir.

23   Q.   What does that one say or next to that what does that say?

24   A.   La Versailles, $67,917.

25   Q.   That's the number that's to the right where it says La

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Versailles?

2    A.   Yes, sir.

3    Q.   So this receipt was given to you by the accountant?

4    A.   That's correct.

5    Q.   This is how you would know how much money to deliver to La

6    Versailles on the date indicated on the receipt?

7    A.   That's correct.

8    Q.   What would you do with this receipt when you got to La

9    Versailles and visited either Ms. Cynthia, Ms. Yolanda or

10   Ms. Nina?

11   A.   I would hand them the money and they would count it.

12   Q.   Would you also give them a receipt?

13   A.   I would give them the receipt, they would sign off on it

14   and I would sign their receipt.

15   Q.   Would you keep a copy of the receipt?

16   A.   That's correct.

17   Q.   This where I have just circled in red where they would

18   sign?

19   A.   That's correct.

20   Q.   If we look underneath, do you recognize this what looks to

21   be another receipt but it's in yellow; do you recognize that?

22   A.   Yes, sir.

23   Q.   Do you see the signature that I just circled?

24   A.   That's my signature, sir.

25   Q.   How would this process work -- withdrawn.

1            What if anything would the women to whom you delivered

2    the money ask you to do with regard to this type of receipt?

3    A.  They would just ask me to sign it.

4    Q.  Would they give you a copy of it or would you take the

5    original?

6    A.  I would take their original and I would leave them with my

7    original.

8    Q.  What would you do with the original that you took?

9    A.  I would give it to the accountant.

10   Q.  Let me turn to another page in Government Exhibit 209.

11   This receipt number 112615 that I have just drawn a box around,

12   is that another one of the receipts from your office?

13   A.  Yes, sir.

14   Q.  Is there any indication on here about for whom the money

15   was being delivered?

16   A.  To La Versailles.

17   Q.  From whom?

18   A.  Mr. Jose Luis Contreras.

19   Q.  In what amount?

20   A.  $80,000.

21   Q.  If we look underneath, draw your attention down to the

22   bottom receipt marked 485712 that I am drawing a box around

23   now; do you recognize your signature anywhere on that receipt?

24   A.  That's my signature; that's a receipt that I signed.

25   Q.  Is your signature in the lower right where I just drew the

1   circle?

2   A.   That's correct.

3   Q.   Is this another one of the receipts from La Versailles that

4   you would sign when you dropped off the money?

5   A.   That's correct.

6   Q.   Just looking at one more, drawing your attention to the

7   receipt marked 112638 that I have drawn another box around, do

8   you recognize that?

9   A.   Yes, sir.

10  Q.   Does this appear to be another receipt from the accountant

11  at the business that you worked for?

12  A.   That's correct.

13  Q.   Where I have just drawn a little red dot, what's the name

14  next to that?

15  A.   Jose Luis Contreras.

16  Q.   That's one of Mr. Garza's customers, correct?

17  A.   Yes, sir.

18  Q.   What's the amount on this receipt?

19  A.   $100,000.

20  Q.   Look at the yellow receipt I have drawn another box around;

21  is this another one of the receipts that you would sign for La

22  Versailles?

23  A.   It's correct.  That's correct.

24  Q.   This was the one marked 48575, the last number is a little

25  hard to make out; did I read the first 5 numbers correctly?

1    A.   That's correct.

2    Q.   Is it your signature in the lower right where I just

3    circled?

4    A.   Yes, sir.

5    Q.   I am going to put Government Exhibit 210 on the viewer.   Do

6    you recognize this book?

7    A.   Yes, sir.

8    Q.   Where have you seen this book before?

9    A.   With the women at la bodega.

10   Q.   Turn to this yellow receipt I drew a rectangle around; do

11   you see that?

12   A.   Yes, sir.

13   Q.   This is receipt 127809?

14   A.   That's correct.

15   Q.   This is your signature on the lower right-hand corner where

16   I just circled?

17   A.   Yes, sir.

18   Q.   Am I correct this is another receipt that you signed

19   following the delivery of cash to La Versailles?

20   A.   Yes, sir.

21   Q.   Mr. Martinez, when you dropped off money to La Versailles,

22   did you ever use any other names other than your own?

23   A.   No, sir.

24   Q.   Did you ever present identification indicating that you

25   were someone else?

1   A.  No, sir.

2   Q.  Did you ever identify yourself as Jose Luis Contreras?

3   A.  No, sir.

4   Q.  From June 2009 until the time of your arrest in January of

5   this year, was the money exchange business owned by Fausto

6   Garza registered with any kind of Mexican government agency?

7   A.  Well, the business was in my name.

8   Q.  Who was the business registered with?

9   A.  In whose name, no.

10  Q.  With whom was it registered?

11  A.  With the Department of Treasury in Mexico.

12  Q.  But it was registered in the Department of Treasury in the

13  name Hilario Martinez-Garcia?

14  A.  That's correct.

15  Q.  Did you own the money change business?

16  A.  Yes, sir.

17  Q.  You owned it or did someone else own it?

18  A.  Well, it was in my name but the owner was Fausto Garza.

19  Q.  You were an employee there?

20  A.  That's correct.

21  Q.  Why wasn't the business registered in the name of the owner

22  Fausto Garza?

23  A.  Because he didn't have authorization and he was not allowed

24  to have a business.

25  Q.  Mr. Martinez, when you were arrested you were carrying

1   United States currency, is that correct?

2   A.   In cash, that's correct.

3   Q.   How much were you carrying?

4   A.   $50,000.

5   Q.   What happened to that money?

6   A.   It was seized.

7   Q.   Let me turn your attention to the United States currency

8   Mr. Fausto Garza started purchasing after June 2009.  Were you

9   ever around the business when the money was delivered?

10  A.   Several times I counted the money.

11  Q.   Did you see the money when it first came in?

12  A.   That's correct.

13  Q.   How was the money packaged when it first arrived at

14  Mr. Garza's business?

15  A.   It was tied with rubberbands.

16  Q.   Did it ever come in paper from a bank indicating the amount

17  that was in the package?

18  A.   No, sir.

19  Q.   Was it ever shrink-wrapped in plastic?

20  A.   No, sir.

21  Q.   Did the money appear to you to be new or old?

22  A.   Old money.

23  Q.   Do you know where the money came from?

24  A.   From different cities in Mexico.

25  Q.   What other cities in Mexico did the money come from?

1   A.   It came from Monterey, from San Luis Potosi, Mexico City,

2   and Ciudad Valles San Luis Portosi.

3   Q.   How far away are these cities in Mexico from Nuevo Laredo,

4   Mexico?

5   A.   3, 6, and 12 hours.

6   Q.   Do you know how the money got from these cities in Mexico

7   to Mr. Garza's business in Nuevo Laredo?

8   A.   It came by car or by bus.

9   Q.   Who brought it?

10  A.   People that were sent by the gentleman.

11  Q.   Did you ever talk to any of these people?

12  A.   Well, I would say hello to them but they never answered;

13  they just didn't talk.

14  Q.   How would they carry the money?

15  A.   In their socks and in their pockets in their pants.

16  Q.   Was the fact that the money was transported from these

17  cities 2 hours away by men via car and bus, was this

18  significant to you in any way?

19  A.   Well, it was something suspicious because right now in

20  Mexico there is a lot of carjacking, truckjacking, kidnappings.

21  Q.   Did any of the people who delivered money to Fausto to your

22  knowledge ever have any problem with carjacking or kidnapping

23  or anything like that?

24  A.   No, they would come without any problem.

25  Q.   Did the fact that they were able to come without any

19E4DAT6                      Martinez-Garcia - direct

1    problem indicate anything to you?

2              MR. ROSS:  Objection to this line of questioning, your

3    Honor.

4              THE COURT:  Sustained.

5    BY MR. SKINNER:

6    Q.  Mr. Martinez, you testified that Fausto Garza told you back

7    in June 2009, that he was going to be buying cheap narco

8    dollars, is that correct?

9    A.  That's correct.

10   Q.  What do you mean by cheap?

11             THE COURT:  He didn't use the term, it's what the

12   other man meant by cheap and he wouldn't know so let's move on.

13   BY MR. SKINNER:

14   Q.  Do you from working at Mr. Garza's business have any idea

15   of the exchange rate that Mr. Garza was able to purchase these

16   dollars at?

17   A.  Well, we would check every day the official rate and we

18   came to the conclusion that for more pesos they would give you

19   more dollars.

20   Q.  Did you have any idea of the number of pesos that Mr. Garza

21   was sending out and how many dollars he was getting back in?

22   A.  That's correct.

23   Q.  From this information, what if anything could you figure

24   out about the exchange rate that Mr. Garza was paying for those

25   U.S. dollars?

19E4DAT6                    Martinez-Garcia - direct

1    A.  He was paying a very low rate, a very low rate.

2    Q.  Was it a rate that was lower than the official exchange

3    rate that you checked every morning?

4    A.  That's correct.

5              MR. SKINNER:  One moment, your Honor.

6              No further questions.

7              THE COURT:  Thank you.  Cross-examination.

8    CROSS EXAMINATION

9    BY MR. WHITE:

10   Q.  Good afternoon, Mr. Martinez.

11   A.  Good afternoon, sir.

12   Q.  You were arrested on January 18, 2011, correct?

13   A.  That's correct.

14   Q.  What were you doing when you were arrested?

15   A.  I was transporting $50,000 in cash.

16   Q.  Where were you arrested?

17   A.  At the border in Laredo, Texas.

18   Q.  Was that part of the border along the international bridge

19   crossing from Nuevo Laredo into Laredo?

20   A.  That's correct, sir.

21   Q.  How many bridges are there that cross from Nuevo Laredo

22   into Laredo?

23   A.  If you count the railroad bridge, there are five.

24   Q.  Is the name of the bridge you were arrested on called the

25   international bridge?

1  A.  We call it bridge number 1.

2  Q.  Does bridge number 1 have pedestrian traffic on it as well

3  as automobile traffic?

4  A.  That's correct.

5  Q.  Where on that bridge or at what point were you arrested?

6  A.  At the point when it's Laredo, Texas.

7  Q.  Had you gone through the American border station there

8  before you were arrested?

9  A.  Yes, sir; it was precisely at the point where I was

10  presenting my documents.

11  Q.  You had $50,000 on you?

12  A.  Yes, sir.

13  Q.  You also had on you the receipt that your accountant had

14  given you to get signed?

15  A.  That's correct.

16  Q.  The receipt that you had with you, did it have any writing

17  on it?

18  A.  Yes, sir.

19  Q.  Who wrote on it?

20  A.  The accountant.

21  Q.  What did he write on it?

22  A.  It said Jose Luis Contreras, $50,000, for La Versailles.

23  Q.  Did you fill out some form at that point?

24  A.  The form had already been filled out.

25  Q.  Who filled it out?

1  A.  We, I mean I filled it out at the office.

2  Q.  I am talking about the form you submitted to the border

3  people at the border.

4  A.  Yes, you submit the form together with the money so they

5  can count it.

6  Q.  You wrote out that form and submitted it?

7  A.  Yes, sir.

8  Q.  Did you put on that form that the money, the $50,000 was

9  going to La Versailles?

10  A.  That's correct.

11  Q.  Were you allowed to then pass through before you were

12  arrested or were you arrested right then?

13  A.  Right then and there, sir.

14  Q.  Who arrested you?

15  A.  Federal agents.

16  Q.  How many federal agents?

17  A.  Well, there were about three or four of them.

18  Q.  Did they question you?

19  A.  Yes, I was questioned, yes.

20  Q.  Where were you; where were you standing when you were

21  questioned?

22  A.  With the customs inspector.

23  Q.  Were you in an office or outside an office or where?

24  A.  Inside an office.

25  Q.  Do you know agent Richard Reinhardt sitting here at the

1    table in the middle; do you know him?

2    A.  Excuse me?

3    Q.  Do you know agent Reinhardt, do you recognize him, do you

4    know him?

5    A.  In the middle?

6    Q.  Yes.

7    A.  Yes, sir.

8    Q.  Was he one of the agents who arrested you and questioned

9    you?

10   A.  Yes, sir.

11   Q.  Do you know another agent named Jose Correa?

12   A.  No, sir.

13   Q.  In addition to agent Reinhardt, there were other agents who

14   were questioning you?

15   A.  Yes, sir.

16   Q.  Did you tell them the truth?

17   A.  Exactly.

18   Q.  When they first questioned you there at the border you told

19   them the truth?

20   A.  I told them that I was going to pay an invoice for

21   perfumes.

22   Q.  You told them that you yourself were in the perfume

23   business, didn't you?

24   A.  That's correct.

25   Q.  Was that true or false?

1   A.   It was false, sir.

2   Q.   They asked you questions about different perfumes and you

3   couldn't answer it, correct?

4   A.   That's correct.

5   Q.   You told them that you stored perfume at an address in

6   Mexico, didn't you?

7   A.   Yes, sir.

8   Q.   Was that true?

9   A.   No, sir.

10  Q.   You told them the money you were carrying today was going

11  to La Versailles, correct?

12  A.   That's correct.

13  Q.   Was that true?

14  A.   Yes, sir.

15  Q.   The agents then gave you your rights; they advised you of

16  your rights, do you remember that?

17  A.   Yes, sir.

18  Q.   You agreed to speak with them?

19  A.   Yes, sir.

20  Q.   And now you admitted that you really weren't in the perfume

21  business, correct?

22  A.   Exactly.

23  Q.   You told them you bring money across the bridge to

24  different businesses, to businesses in Laredo?

25  A.   That's correct.

19E4DAT6                        Martinez-Garcia - cross

1   Q.  You told them that you don't carry any money for anyone

2   else than Jose Luis Contreras; you told them that, correct?

3   A.  I said for several of Fausto's clients.

4   Q.  On the first day, on the first day when you were arrested,

5   did you tell these agents that you do not carry cash for anyone

6   else other than Jose Luis Contreras; did you tell them that?

7   A.  No, I said that the money belonged to Jose Luis Contreras.

8   Q.  You did not say that you don't carry money for anyone else

9   but Jose Luis Contreras, is that right?

10  A.  No, sir.

11  Q.  You were placed under arrest, is that correct?

12  A.  That's correct.

13  Q.  And you were brought to New York City on February 22, 2011?

14  A.  That's correct.

15  Q.  After you arrived in New York City, were you assigned a

16  lawyer to represent you?

17  A.  That's correct.

18  Q.  Did you make a decision after you were assigned a lawyer

19  and after you arrived in New York that you wanted to become a

20  cooperating witness?

21  A.  That's correct.

22  Q.  After you made that decision did you meet with the

23  government a number of times?

24  A.  That's correct.

25  Q.  Were you given a cooperation agreement immediately?

1    A.   Yes, sir.

2    Q.   The contract that you signed, the cooperation agreement,

3    wasn't signed until July 8, 2011, is that correct?

4    A.   That's correct.

5    Q.   What was happening between February 22, 2011 and July 8,

6    2011, between the time you decided to cooperate and the time

7    the government gave you a cooperation agreement; what was

8    happening during that period?

9    A.   Well, I was talking to my attorney and I told him that I

10   had to think about it and then I decided to do it on July 8.

11   Q.   Did you meet with the government between February 22, 2011

12   and July 8, 2011?

13   A.   Yes, sir.

14   Q.   You had a number of meetings where they asked you questions

15   and you gave them answers, correct?

16   A.   That's correct.

17   Q.   The reason you were doing this is that you were hoping that

18   the government would offer you a cooperation agreement after

19   you provided the information to them, correct?

20   A.   Correct.

21   Q.   And you understood, did you not, in those meetings that it

22   was important to tell the government the truth or you wouldn't

23   get a cooperation agreement; is that correct?

24   A.   Well, my attorney from the very beginning told me that I

25   had to tell the truth.

19E4DAT6                         Martinez-Garcia - cross

1    Q.  And you knew that you wouldn't get a cooperation agreement

2    unless you told the truth to the government, correct?

3    A.  Excuse me, sir, I did not understand your question.

4    Q.  You knew that it was important to tell them the truth in

5    these meetings so you would get the cooperation agreement?

6    A.  That's correct.

7    Q.  You met with the government in March 2011, do you recall

8    that?

9    A.  Yes, sir.

10   Q.  You met again with them in April 2011, correct?

11   A.  Yes, sir.

12   Q.  You would meet with agents and you would meet with

13   prosecutors, correct?

14   A.  Yes, sir.

15   Q.  At a meeting in April, 2011, one of the subjects, am I

16   correct, one of the subjects was did you know if this money was

17   from narcotics trafficking; wasn't that one of the subjects at

18   a meeting in April?

19   A.  Yes, sir.

20   Q.  You wanted to give them a truthful answer to that question,

21   correct?

22   A.  That's correct.

23   Q.  Did you tell them that you never had a conversation with

24   anyone about where the money came from but you suspected it was

25   drug money; did you tell them that?

19E4DAT6                    Martinez-Garcia - cross

1    A.  I don't remember, sir.

2            MR. WHITE:  Your Honor, I would like to refresh the

3    witness's memory with a passage from his report.

4            THE COURT:  We have an issue there.

5            Do you read English, sir?

6            THE WITNESS:  No, sir.

7            THE COURT:  Members of the jury, we are going to send

8    you home now.  See you at 9:30 in the morning.

9            Everybody else, stay where you are.

10           (Jury leaves courtroom)

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19E4DAT6                    Martinez-Garcia - cross

1        THE COURT:  Put your exhibit on the viewer.

2        Now what is it?

3        MR. WHITE:  This is Government Exhibit 3506F at page

4   4.  If I could ask the --

5        THE COURT:  I just ask you wait a minute so I can

6   catch up with you.

7        (Pause)

8        THE COURT:  I am now caught up with you.

9        MR. WHITE:  If I could ask the interpreter to read to

10   the witness the first three lines on that page, so starting

11   with Martinez and ending with drug money.

12        THE INTERPRETER:  I am trying to see it.

13        THE COURT:  I will hand you my copy.

14        THE INTERPRETER:  I have it, your Honor.

15        Should I read.

16        THE COURT:  Translate the two full sentences right at

17   the start of the page to the witness.

18        (Pause)

19        THE COURT:  Do you have a question, Mr. White?

20   BY MR. WHITE:

21   Q.  Having heard that sentence read to you, Mr. Martinez, does

22   it refresh your recollection that you told the prosecutor and

23   the agents that most of the money brought over went to La

24   Versailles, but you never had a conversation with anyone where

25   the money came from?

1           THE COURT:  Compound; break it up and focus only on

2    the point we are talking about.  Don't confuse the issue.

3           MR. WHITE:  I am with you, judge.

4    BY MR. WHITE:

5    Q.  Does it refresh your recollection, Mr. Martinez, that you

6    told the government in April in a meeting with them that you

7    never had a conversation with anyone where the money came from

8    but suspected it was drug money?  Does that refresh your

9    recollection that's what you told them?

10   A.  Yes, correct, sir.

11   Q.  Correct meaning it refreshes your recollection that that's

12   what you said?

13   A.  What sentence?

14          THE COURT:  Mr. Martinez, having had the interpreter

15   translate for you what she just read to you, do you now

16   remember telling the government last April that you never had a

17   conversation with anyone about where the money came from?

18          MR. SKINNER:  Your Honor.

19          THE COURT:  Answer the question.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Did you then tell the government last

22   April that you never had a conversation with anyone about where

23   the money came from?

24          THE WITNESS:  Well, I said that with Fausto, that

25   Fausto Garza was the one who told me.

19eddat7                         Martinez-Garcia

1        THE COURT:  And you're saying that you said that to

2   the government last April; is that what you're telling us?

3        THE WITNESS:  I don't remember, sir.

4        THE COURT:  All right.  I think we'll dispense with

5   the witness for the moment -- for the day and then we'll talk

6   about what to do about this.  OK?

7        All right.  We'll see you tomorrow morning,

8   Mr. Martinez.

9        (Witness excused)

10       THE INTERPRETER:  Your Honor, may we go?

11       THE COURT:  You may go.

12       THE INTERPRETER:  Good night.

13       (Interpreters not present)

14       THE COURT:  OK.  I guess my thought -- although

15  obviously I'll hear counsel -- is that the portion of this that

16  consisted of everything other than reading the text of the

17  memorandum to the witness you can just read to the jury

18  tomorrow, and we'll tell them that he so testified outside

19  their presence.

20       Does anybody have a better idea?

21       MR. WHITE:  These two sentences you are referring to,

22  your Honor?

23       THE COURT:  Well, he didn't utter the two sentences.

24  I'm saying the 3500 material, the 302 or whatever it is, DEA

25  form, that's not in evidence so you can't read that in

19eddat7

1    evidence.  So so much of what occurred here, as the translator

2    reading those sentences to him, or you reading the sentences to

3    him and then being translated -- I frankly don't remember if

4    both happened -- that part doesn't get read back to the jury,

5    but the rest of it gets read back, the part where the sense of

6    which was, you know, having had translated for you X, is your

7    memory refreshed, what did you tell the government then, did

8    you tell the government X then, the questions along those

9    lines, that's what I was thinking.

10         MR. SKINNER:  Your Honor, I have one concern, when

11   your Honor asked the defendant about the phrase in the

12   sentence, that you inserted an important word there that is not

13   in the report.  You inserted had he ever had a conversation

14   with anyone "about" where the money came from, whereas the

15   report says had he ever had a conversation with anyone where

16   the money came from.  I know it may sound overly lawyerly, but

17   from having been there, I can say that it is actually

18   significant, because we were asking Mr. Martinez over and over

19   again who gave Fausto the money, where did it come from,

20   because we can't wanted to find drug dealers and we kept asking

21   him that, and he kept saying I don't know the people.  And,

22   frankly, we didn't ask the right question until later, which

23   was did Fausto ever tell you anything about where the money was

24   coming from, and it was at that point that he said, yeah, he

25   told me he was buying cheap narco dollars.

19eddat7

1          THE COURT:  Look, obviously, if I interpolated a word

2     that ought not to have been interpolated, that's regrettable.

3     On the other hand, it's imminently fixable because the question

4     can be put to him again in the presence of the jury without the

5     interpolated word.  So I think that's the way to handle that.

6          MR. SKINNER:  I don't disagree, your Honor.  I mean, I

7     have some concerns that -- I don't have a better suggestion off

8     the top of my head, but I am concerned that trying to refresh

9     this particular witness' recollection with a report, well,

10     let's just say it's difficult because he is not the most

11     sophisticated witness, and I'm frankly not confident that he is

12     even understanding the questions at this point that are being

13     put to him about refreshing recollection and what's going on

14     here.  But I don't have a better suggestion.

15          THE COURT:  You take your witnesses as you find them.

16          MR. SKINNER:  Look, this is what you do.  This is how

17     you refresh a witness' recollection.

18          I think ordinarily if he spoke English, he would be

19     given the report.  He would be said, read the report, does this

20     help you remember.  So I don't think what the report says

21     should be read to the jury.  I think it should be translated to

22     him and he should be asked does that help you remember.

23          THE COURT:  I don't think that anybody has suggested

24     that the report be read to the jury.

25          MR. SKINNER:  All right.  Then I don't have a -- then

19eddat7

1    I think we should do what we would do with any other witness,

2    but since he doesn't speak English, it be translated for him

3    and we'll see what happens.

4             THE COURT:  Of course.  But he gave substantive

5    testimony here in the last five minutes after the two sentences

6    of the report were translated to him which I think the jury is

7    entitled to hear.

8             I take it that would be your position, Mr. White,

9    right?  Or not?  I mean, if you both agree it shouldn't be read

10   to the jury, that's fine, and you can question him tomorrow.

11            MR. WHITE:  I'm not sure what his answer meant.  He

12   was answering the question does it refresh your memory, and he

13   really didn't answer that question; he answered a different

14   question, you know, what --

15            THE COURT:  So maybe he wasn't responsive.

16            So I propose this:  Why don't you both make sure you

17   get the transcript of the last ten minutes, or whatever it is,

18   and see whether you agree on what, if anything, should be read

19   to the jury and exactly how you want to proceed tomorrow.  And

20   if you can't, then, of course, I will decide.  OK?

21            MR. SKINNER:  Very well, your Honor.

22            THE COURT:  Thanks.  Good.  Thank you.

23            What's coming next after this witness?

24            MR. SKINNER:  After this witness, it is the

25   government's intention to call Ankur Gupta, who is another one

19eddat7

1   of the cooperating witnesses.  The next witness after that

2   would be Jose Correa, one of the undercover officers, and,

3   frankly, we're not sure of the next witness after that.  We

4   will be deciding that when we get downstairs.

5           THE COURT:  OK.  Thanks, folks.

6           MR. SKINNER:  Thank you, your Honor.

7           MR. WHITE:  Thank you, your Honor.

8           (Adjourned to 9:30 a.m., Thursday, September 15, 2011)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                        Page

MARIO RECINOS

Direct    . . . . . . . . . . . . . . . . . . . 108

Cross By Mr. Ross  . . . . . . . . . . . . . . 110

Redirect By Mr. Bragg  . . . . . . . . . . . . 163

FRANK DiGREGORIO

Direct By Mr. Bragg  . . . . . . . . . . . . . 170

Cross By Mr. White . . . . . . . . . . . . . . 187

FRANK DIGREGORIO                                        201

Cross By Mr. White . . . . . . . . . . . . . . 201

HILARIO MARTINEZ-GARCIA

Direct By Mr. Skinner  . . . . . . . . . . . . 205

Cross By Mr. White . . . . . . . . . . . . . . 247

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

1001    . . . . . . . . . . . . . . . . . . . 176

1002    . . . . . . . . . . . . . . . . . . . 182

209, 210, 812  . . . . . . . . . . . . . . . 236

19F4DAT1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

        v.                                   (S1) 11 Cr. 102 (LAK)

VIKRAM DATTA,

             Defendant.

------------------------------x

                           September 15, 2011
                           9:40 a.m.

Before:

                HON. LEWIS A. KAPLAN,

                         District Judge

                 APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
BY:  PETER M. SKINNER
    ALVIN L. BRAGG, JR.
    Assistant United States Attorneys


ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN PA
    Attorneys for Defendant
BY:  ALAN S. ROSS

WHITE & WHITE
    Attorneys for Defendant
BY:  DIARMUID WHITE

      - also present -

Vanessa Quinones, Government paralegal
SA Richard Reinhardt, IRS

19F4DAT1

```
 1                    (Trial resumed; jury not present)
 2              THE COURT:  Good morning.
 3              MR. SKINNER:  Your Honor, do you want to iron out what
 4     to do with the issue from the end of the day before we bring
 5     the jury in.
 6              THE COURT:  Yes, thank you.  What's the proposal.
 7              MR. SKINNER:  As we discussed with defense counsel,
 8     the parties' proposal would be that the court simply instruct
 9     the jury that after they left yesterday, a report was
10     translated to the defendant in an effort to refresh his
11     recollection as to the content of an April 2011 conversation
12     with the government, and it failed to refresh his recollection.
13              THE COURT:  Agree, Mr. Ross?
14              MR. ROSS:  Yes, your Honor.
15              MR. SKINNER:  Your Honor, I believe I misspoke.  I
16     said defendant; I meant the witness.
17                    (Jury enters courtroom)
18                    (Continued on next page)
19
20
21
22
23
24
25
```

19F4DAT1

1          THE COURT:  Good morning, everybody.  The record will

2     reflect that the jurors and the defendant all are present.

3          Members of the jury, you remember there was a

4     something going on in cross-examination when you left.  After

5     you departed, a report was translated for the witness, an

6     English language report was translated into Spanish in an

7     effort to refresh his recollection with respect to a

8     conversation he said he had with the government in April 2001.

9          The parties have stipulated that this failed to

10    refresh the witness' recollection.  You must accept that that

11    happened.  You were not here.  The parties agree it happened.

12          Continue with the cross-examination, Mr. White.

13          (Through interpreter)

14     HILARIO MARTINEZ-GARCIA, resumed.

15    CROSS EXAMINATION

16    BY MR. WHITE:

17    Q.  Good morning, Mr. Martinez.

18    A.  Good morning.

19    Q.  Were you born in Nuevo Laredo?

20    A.  No, in Lampazo Nuevo Leon.

21    Q.  You later resided in Nuevo Laredo?

22    A.  Yes, sir.

23    Q.  In total how many years have you lived in Nuevo Laredo?

24    A.  Around 40 years, sir.

25    Q.  In those 40 years, you have crossed over the border to

19F4DAT1                        Martinez - Garcia - cross

1    Laredo many, many times I suppose?

2    A.   Yes, sir.

3    Q.   Too many to number, true?

4    A.   Many times.

5    Q.   Have you ever shopped in Laredo?

6    A.   Yes, sir.

7    Q.   When you shopped in Laredo would you use United States

8    dollars?

9    A.   Sometimes dollars; sometimes Mexican pesos.

10   Q.   When you used dollars where would you get the dollars?

11   A.   In the casa de cambio.

12   Q.   What casa de cambio?

13   A.   Well there is like 20 of them right near the bridge in

14   Nuevo Laredo.

15   Q.   In Nuevo Laredo?

16   A.   In Nuevo Laredo.

17   Q.   Are there any in Laredo?

18   A.   In Laredo, Texas?

19   Q.   Yes.

20   A.   Yes, sir.

21   Q.   How many are in Laredo?

22   A.   Around 20.

23   Q.   Right near the bridge?

24   A.   Yes, sir.

25   Q.   But you yourself, you would get the dollars in Nuevo

19F4DAT1                     Martinez - Garcia - cross

1   Laredo, not Laredo?

2   A.   That's correct, sir.

3   Q.   Did all the casas de cambio have the same exchange rate?

4            MR. SKINNER:   I object; I think we are getting a

5   little far beyond the scope of the direct testimony.

6            THE COURT:   Sustained.

7   Q.   You testified that Fausto, Fausto Garza operated a casa de

8   cambio, correct?

9   A.   That's correct.

10  Q.   Was it really a casa de cambio, a genuine casa de cambio?

11           THE COURT:   I guess you would have to define that,

12  wouldn't you.

13           MR. WHITE:   I am going to ask him to define it.

14           THE COURT:   The question is objectionable in its

15  present form.

16           MR. SKINNER:   We object.

17           THE COURT:   That's a pretty safe one, isn't it.

18  BY MR. WHITE:

19  Q.   The casa de cambio that you say Fausto Garza conducted, it

20  was in your name correct?

21  A.   The commercial name is Divisas Garza but the registration

22  is in my name.

23  Q.   The registration, was that a registration to conduct a casa

24  de cambio?

25  A.   It's similar to a casa de cambio.

Q. It's similar but different?

A. It's different.

Q. How is it different?

A. It's a support for other business; it's a support for let's say selling foreign currency.

Q. It was not specifically to operate a casa de cambio?

A. No, sir.

THE COURT: Come to the sidebar, counsel.

(Continued on next page)

19F4DAT1                          Martinez - Garcia - cross

1                (At the sidebar)

2           THE COURT:  What's going on here, Mr. White?

3           MR. WHITE:  The government's expert testified there

4      were pesos brokers and there were also casas de cambio that

5      were regulated and compliant with regulations and had

6      requirements and cash reserves and recordkeeping, you know, our

7      thesis is that this was not a real casa de cambio, they

8      pretended to be and acted and held themselves out to be a casa

9      de cambio.

10          THE COURT:  Assuming that to be true, so what?

11          MR. WHITE:  That defendant's company when accepting

12     payments from them believed them to be a casa de cambio when in

13     fact they were not, they were a phony casa de cambio.

14          THE COURT:  That's relevant how?

15          MR. WHITE:  Because as the expert testified, payments

16     coming from a bona fide casa de cambio would not necessarily

17     involve narcotics traffics that went through the black market

18     pesos exchange.  These are people who operate outside the

19     regulations of a casa de cambio.

20          THE COURT:  Who are people who operate outside?

21          MR. WHITE:  People like Fausto Garza, somebody who

22     just takes money and holds himself out to be a casa de cambio,

23     takes money say from drug dealers, holds himself out to be a

24     casa de cambio, but it's totally unregulated, there is no

25     oversight, then passes that money on to someone else holding

19F4DAT1                          Martinez - Garcia - cross

1    himself out to be a casa de cambio.

2              THE COURT:  My concern here is that you are taking

3    testimony here that presupposes that this guy is a cross

4    between the head of bank examination for the Republic of Mexico

5    and Rodgin Cohen.  The questions are really calling on him to

6    speculate as to what the Mexican law is and all sorts of

7    things.  It seems to me he is not qualified to testify to any

8    of it.  The government has not objected, but I have a concern

9    that the jury is going to be led astray on the basis of garbage

10   in garbage out.

11             MR. WHITE:  I think I presented our thesis and it's a

12   valid one.

13             THE COURT:  Yes, but the question of whether the

14   evidence you are trying to present has any relevance bearing or

15   any proper bearing on it is what I am concerned with.

16             MR. WHITE:  I told you the relevance.

17             THE COURT:  You are not getting the question.  Let us

18   suppose the question here were whether a plaintiff died of

19   cancer or some other malady and whether if it was cancer it was

20   caused by the defendant's pharmaceutical and you had this

21   witness on the stand and you were asking him whether it was a

22   real drug, whether it was really cancer.  I am sure he would be

23   happy to oblige you with whatever answer pops into his head,

24   but it doesn't make him a cancer specialist, a toxicologist, or

25   whatever.

19F4DAT1                         Martinez - Garcia - cross

1              You talk about terms like a genuine casa de cambio.

2    My lay understanding of what casa de cambio is is a place where

3    people change money.  Maybe that's what he means.  Maybe there

4    is a type of business organization in Mexico that under Mexican

5    law is a casa de cambio and that there are other places that

6    also change money.  Given my assumption, nobody knows what the

7    question is it a genuine casa de cambio means, because it might

8    mean a company organized under Mexican law to be a casa de

9    cambio, it might mean someplace, whether registered or not,

10   that changes money.

11             You could spin this out into an infinite number of

12   variations, the result of which that, granting the theory you

13   are trying to produce, which I am not ruling on, but granting

14   all of that, gets you a record that is incoherent.  That's my

15   concern.  This guy is not an expert on Mexican regulation.  If

16   you want to ask him whether this business, Garza's business

17   filed reports, whether --

18             MR. WHITE:  I was just going to do that.

19             THE COURT:  You are welcome to do that, but let's get

20   away from this notion of using terms that seem likely to be

21   terms of art or even if not terms of art, terms capable of a

22   lot of different meetings and loading up questions with those

23   kinds of things and this guy answers and who knows what it is.

24             MR. WHITE:  OK.

25             THE COURT:  See my point?

1           MR. WHITE:  I see your point.  We expect to have as a

2   witness next week Fausto Garza himself who actually worked in a

3   casa de cambio in Laredo and was much more experienced and a

4   little more sophisticated than this witness.  He may be a

5   better witness to ask these questions.

6           THE COURT:  I will deal with him when he comes.

7           MR. WHITE:  I am giving you a heads-up.

8           THE COURT:  I know; I appreciate it.

9           MR. WHITE:  I do want to ask this witness one question

10  before I go into some others about whether the certificate that

11  he reactivated, what kind of business was he operating when he

12  first --

13          THE COURT:  All right, but you got to the question

14  what certificate.  People do business in New York under

15  certificates all the time.  You go down, you file a d/b/a

16  certificate with the county clerk, subject to whatever the

17  restrictions are on names, you can be the YXZ Company, now you

18  have a certificate.  Does that mean you are entitled to operate

19  a commercial bank?  No.  There are a whole different set of

20  requirements for that.  Just to talk about a certificate or a

21  registration, it tells us nothing.  Maybe it's a certificate of

22  incorporation he is talking about, maybe it's a d/b/a, maybe

23  it's something that says he has a right to have a telephone.

24          MR. WHITE:  He testified on direct about certificates,

25  that he reactivated a certificate he had when he was in some

19F4DAT1                     Martinez - Garcia - cross

other business.

        THE COURT:  It could be as simple as a d/b/a, it could

be some authority to do a trucking business; who knows.

        MR. WHITE:  I have the certificate.

        THE COURT:  It's not in the record.  He didn't say

what it was; he may not know what it is.

        MR. WHITE:  I can offer it in evidence right now

through him.

        THE COURT:  If you think it's relevant and if there is

no objection, if I overrule the objection, go ahead.  To talk

vaguely about a certificate, what does it mean.  It doesn't

mean anything.

        MR. WHITE:  I am trying to get this witness to

acknowledge that this operation, they called it a casa de

cambio but it wasn't registered, it wasn't licensed.

        THE COURT:  There is no evidence in the record that to

operate a casa de cambio under Mexican law, you need a license.

        MR. WHITE:  Can I ask him that question, if he knows.

        THE COURT:  Sure.  Why don't you ask him whether

Obama's healthcare plan is constitutional.

        MR. WHITE:  If he knows.

        THE COURT:  If he thinks Obama's healthcare plan is

constitutional does that make it competent evidence.

        MR. WHITE:  Judge Newman said analogy is just to show

how things are different.

19F4DAT1                           Martinez - Garcia - cross

1            THE COURT:  There is no appellate judge I have more

2      respect for than Judge Newman and he is right.  You have to

3      have a foundation of knowledge.  I don't see an expert on

4      Mexican law here.  I am not sure I see an expert on getting

5      money across the border here.

6            MR. WHITE:  He lived in Nuevo Laredo for 41 years.  He

7      was acting as a casa de cambio.  He is a competent witness to

8      ask do you know whether a casa de cambio has to be licensed;

9      that's a fair question.

10            MR. SKINNER:  I don't think, I agree, I don't think,

11      whatever his answer is, yes or no, I don't think it indicates

12      whether or not a casa de cambio in fact needs to be licensed.

13            MR. WHITE:  It would be some evidence of somebody who

14      has lived in Nuevo Laredo and acted as a casa de cambio.

15            MR. SKINNER:  He acted as a

16      150-a-week-carry-money-over-the-border-I-just-found-you-on-the-

17      street-selling-insurance gofer.

18            THE COURT:  No, Mr. White, no.  If you want to get an

19      expert on this all this, God bless, assuming it's relevant,

20      really.

21            MR. WHITE:  I object.

22            (Continued on next page)

23

24

25

19F4DAT1                          Martinez - Garcia - cross

1                    (In open court)

2    BY MR. WHITE:

3    Q.  Mr. Martinez, is the money exchange business that you

4    worked with Fausto Garza at, did it keep records, did it keep

5    records of the money it was receiving and who was being paid?

6    A.  Yes, sir.

7    Q.  Did you ever see any government official come and look at

8    those records?

9    A.  You mean the government in Laredo, Texas?

10   Q.  In Nuevo Laredo, Mexico?

11   A.  No, sir.

12   Q.  What kind of building did this business operate out of it?

13   A.  It was a private house.

14   Q.  Was the casas de cambio that you went to to exchange money

15   when you went into Laredo, did they operate out of private

16   houses?

17              MR. SKINNER:  Objection?

18              THE COURT:  Ground?

19              MR. SKINNER:  Irrelevant.

20              THE COURT:  Overruled.

21   A.  Well, at that time when I bought dollars I wasn't working

22   with Fausto, if that's the question that you are asking me.

23   Q.  The question is when you did buy dollars at casas de cambio

24   in Nuevo Laredo were those casas de cambio located in houses?

25   A.  In offices in casas de cambio.

19F4DAT1                          Martinez - Garcia - cross

1    Q.  They had offices not houses?

2    A.  Close to the bridge, they were offices.

3            THE COURT:  Could you for identification on the

4    question please, Mr. Martinez.  The question you are being

5    asked is whether any of the offices that these other casas de

6    cambio had were located in homes, houses.

7            THE WITNESS:  Exactly, yes, sir.

8            THE COURT:  I see.  Was the casa de cambio that

9    Mr. Garza was running in his house; did he have an office in

10   his house where he did that business?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  OK.  Let's move on.

13   BY MR. WHITE:

14   Q.  Was that Mr. Garza's house; was it his house, did he live

15   there?

16   A.  No, sir.

17   Q.  The house was just used for that business, correct?

18   A.  Yes, sir.

19   Q.  The offices that you mentioned before on the border casas

20   de cambio, those were not in houses were they; they were office

21   buildings, offices?

22           THE COURT:  Which of those several questions,

23   Mr. White, would you like to have answered?  You are welcome to

24   all of them, but one at a time.

25   Q.  The other casas de cambio where you during your life

1   exchanged pesos for dollars, those were in offices not houses,

2   true?

3   A.  Yes, sir.

4   Q.  You testified yesterday that sometime in the middle of

5   2009, Fausto Garza started receiving a lot more U.S. dollars;

6   do you recall that?

7   A.  Yes, sir.

8   Q.  You yourself would help count that money when it came in;

9   is that true?

10  A.  Yes, sir.

11  Q.  You testified that the money would be in all denominations?

12  A.  Yes, sir.

13  Q.  It would often be wrapped in rubberbands?

14  A.  The whole time.

15  Q.  You would take this money and you would count it out?

16  A.  The four of us.

17  Q.  When you did it, what did you do with that money after you

18  counted it; what did you do?

19  A.  We would give it to Fausto.

20  Q.  Did you break the money down into different denominations?

21  A.  The 100s, the 20s, the 10s, separated and wrapped in

22  rubberbands.

23  Q.  You would give it to Fausto?

24  A.  To both the accountant and Fausto.

25  Q.  When you delivered this money to perfume businesses in

19F4DAT1                    Martinez - Garcia - cross

1    Laredo, was it in $100 bills?

2    A.  Yes, sir, $100 bills.

3    Q.  When you went to La Versailles Fragrances with the $100

4    bills, you gave them to the ladies there you said?

5    A.  Yes, sir.

6    Q.  Did you tell them that you believed that this was narco

7    dollars?

8    A.  No, sir.

9    Q.  Why not?

10   A.  No, we never said that; they had no reason to know that.

11   Q.  You didn't want them to know that, did you?

12   A.  No.  Those were instructions from Fausto; deliver the money

13   and that's it.

14   Q.  If they asked you if it was narco dollars, what would you

15   have said?

16            MR. SKINNER:  Objection.

17            THE COURT:  Sustained.

18   Q.  One more question about the day you were arrested crossing

19   the border.

20   A.  Yes, sir.

21   Q.  You had with you that day the accountant's receipt, the

22   receipt you got from the accountant to get signed when you

23   delivered the money, correct?

24   A.  Yes, sir.

25   Q.  When you got arrest arrested the $50,000 got taken from

19F4DAT1                    Martinez - Garcia - cross

1    you, correct?

2    A.   That's correct.

3    Q.   Did that receipt get taken from you too?

4    A.   I never found out what happened to the receipt.

5    Q.   Was it taken from you?

6    A.   Well, it was inside the bills.

7    Q.   The receipt was with the bills?

8    A.   Yes, sir.

9    Q.   It was all taken when you were arrested?

10   A.   That's correct.

11           MR. WHITE:   Nothing further, your Honor.

12           THE COURT:   Thank you.   Any redirect?

13           MR. SKINNER:   Briefly, your Honor.

14   REDIRECT EXAMINATION

15   BY MR. SKINNER:

16   Q.   You testified a moment ago that when you delivered money to

17   the women at La Versailles you delivered $100 bills to them; do

18   you remember that?

19   A.   That's correct.

20   Q.   Did you also deliver $50 bills to them?

21   A.   Rarely.

22   Q.   Did you also deliver $20 bills to them on occasion?

23   A.   Rarely.

24           MR. SKINNER:   No further questions.

25           THE COURT:   Thank you anything.   Else, Mr. White?

19F4DAT1                        Martinez-Garcia - redirect

 1              MR. WHITE:  No, your Honor.

 2              THE COURT:  Thank you.  The witness is excused.

 3              (Witness excused)

 4              MR. BRAGG:  The government calls Ankur Gupta, your

 5      Honor.

 6       ANKUR GUPTA,

 7           called as a witness by the Government,

 8           having been duly sworn, testified as follows:

 9      DIRECT EXAMINATION

10      BY MR. BRAGG:

11      Q.  How old are you?

12      A.  30.

13      Q.  Where were you born?

14      A.  New York.

15      Q.  Where did you grow up?

16      A.  Edison, New Jersey.

17      Q.  What is your educational background?

18      A.  I went to high school at JP Stevens, Edison, New Jersey,

19      graduated in 1999; I went to NYU, graduated in 2003.

20      Q.  Did you have a major concentration at NYU?

21      A.  Yes.

22      Q.  What was it?

23      A.  In finance.

24      Q.  What type of degree did you receive from NYU?

25      A.  Bachelor's.

19F4DAT1                    Ankur Gupta - direct

1   Q.  Where do you work now?

2   A.  Nandansons.

3   Q.  What does Nandansons do?

4   A.  We are in the import/export and wholesale of branded

5   fragrances.

6   Q.  What are branded fragrances?

7   A.  Brand name perfumes.

8   Q.  Who owns Nandansons?

9   A.  Our family.

10  Q.  When you say our family who are you referring to?

11  A.  My mother and my father, myself and my two brothers.

12  Q.  Does Nandansons operate a wholesale business?

13  A.  Yes.

14  Q.  Does it operate a retail business?

15  A.  No.

16  Q.  Did it at one point raid retail business?

17  A.  Yes.

18  Q.  What's your current role in Nandansons?

19  A.  I am in charge of buying and selling, trading.

20  Q.  When you say buying and selling, trading, what are you

21  referring to?

22  A.  I deal with customers and vendors in the purchase and sale

23  of fragrances.

24  Q.  How long have you had that role?

25  A.  About ten years.

19F4DAT1                    Ankur Gupta - direct

1   Q.  How long have you worked at Nandansons overall?

2   A.  At least 13 years.

3   Q.  13 years ago you would have been 17; what type of role did

4   you have at that time?

5   A.  At that time we had a resale store in Manhattan so I would

6   go during summer breaks or weekends and be working in my

7   family's store.

8   Q.  Is the store still located in Manhattan?

9   A.  No.

10  Q.  Where is it located?

11  A.  We don't have a store anymore; we moved out of New York in

12  2004.

13  Q.  If you don't have a store where do you operate out of?

14  A.  We have an office warehouse facility in Edison, New Jersey.

15  Q.  Why do you no longer have a store?

16  A.  We moved out of the retail into wholesale and international

17  distribution.

18  Q.  When did you do that?

19  A.  2004.

20  Q.  When did Nandansons move from Manhattan to New Jersey?

21  A.  2004.

22  Q.  Do you know a person named Vikram Datta?

23  A.  Yes.

24  Q.  Was he a customer of Nandansons?

25  A.  Yes.

19F4DAT1                    Ankur Gupta - direct

1    Q.   Do you see him in the courtroom today?

2    A.   Yes.

3         MR. ROSS:   We stipulate to the identification if the

4    government wishes.

5         THE COURT:   It is stipulated that the witness would

6    identify Mr. Datta, the defendant.

7    BY MR. BRAGG:

8    Q.   Approximately when did Mr. Datta become a customer of

9    Nandansons?

10   A.   Early 2000.

11   Q.   Around that time what was the volume of his purchases from

12   Nandansons?

13   A.   Smaller purchases, maybe 15, $20,000.

14   Q.   How frequent were those purchases?

15   A.   Not frequently, a few times a year.

16   Q.   Did there come a time Mr. Datta started placing larger

17   orders with Nandansons?

18   A.   Yes.

19   Q.   Around when was that?

20   A.   2005.

21   Q.   What was the volume of the orders around 2005?

22   A.   It would be 30 to $50,000 and the frequency was increasing.

23   Q.   I'm sorry?

24   A.   30 to $50,000 and the frequency was increasing.

25   Q.   Are you currently awaiting sentencing for a money

19F4DAT1                          Ankur Gupta - direct

1    laundering crime?

2    A.   Yes.

3    Q.   Did you plead guilty to that crime?

4    A.   Yes.

5    Q.   Did you plead guilty because you are in fact guilty?

6    A.   Yes, he did.

7    Q.   Did you use the company Nandansons to engage in that crime?

8    A.   Yes.

9    Q.   Approximately how much money did you launder?

10   A.   About $5 million.

11   Q.   Did Nandansons also do lawful business?

12   A.   Yes.

13   Q.   In the late 2000s approximately how much money per year in

14   sales did Nandansons do?

15   A.   50 to 60 million.

16   Q.   Was your father also involved in your money laundering

17   crime?

18   A.   Yes.

19   Q.   Did your father plead guilty to a money laundering crime?

20   A.   Yes.

21   Q.   What is it you and your father did to launder money?

22   A.   We collected cash from some Hispanic customers off-premises

23   and we would sell them fragrances.

24   Q.   What do you mean by off-premises?

25   A.   We would generally meet the delivery person at an off-site

19F4DAT1                         Ankur Gupta - direct

1    location, either a Burger King or some type of public parking

2    lot close to our office but not at our office.

3    Q.   After you received money from them what did you do?

4    A.   We would receive an order and we would ship them product.

5    Q.   Who is going to decide your sentence?

6    A.   A judge.

7    Q.   What's the maximum sentence you face for your charge?

8    A.   20 years.

9    Q.   Did your father enter into a cooperation agreement with the

10   government?

11   A.   Yes.

12   Q.   Did you enter into a cooperation agreement with the

13   government?

14   A.   Yes.

15   Q.   Showing you 3504C marked for identification.  Do you

16   recognize what you see, the first page of the document?

17   A.   Yes.

18   Q.   What is it?

19   A.   It's a cooperation agreement.

20   Q.   Did you review it with the assistance of an attorney?

21   A.   Yes.

22   Q.   After that did you sign it?

23   A.   Yes.

24   Q.   In addition to laundering money did you also tell the

25   government that you failed to report to the taxing authorities

19F4DAT1                        Ankur Gupta - direct

1     the money that you had laundered?

2     A.   Yes.

3     Q.   Did you also tell the government that you avoided filing

4     certain reports that are required for large cash transactions?

5     A.   Yes.

6     Q.   Under this agreement are you required to file prior to your

7     sentencing accurate tax returns?

8     A.   Yes.

9     Q.   Prior to your sentencing are you also required to enter

10    into an agreement with the Internal Revenue Service to pay past

11    taxes and applicable penalties?

12    A.   Yes.

13    Q.   As part of the agreement did you also agree to forfeit

14    approximately $5.7 million to the United States?

15    A.   Yes.

16    Q.   Did you agree to forfeit approximately $4.5 million that

17    has already been seized?

18    A.   Yes.

19    Q.   As part of the agreement are you required to pay the

20    outstanding balance of approximately $1.2 million at least two

21    weeks prior to your sentencing?

22    A.   Yes.

23    Q.   What did you agree to do under the agreement you signed

24    with the government?

25    A.   To cooperate with the government on their ongoing

19F4DAT1                         Ankur Gupta - direct

1    investigations.

2    Q.  At the direction of law enforcement did you set up

3    transactions which were to be money laundering transactions

4    with people you previously engaged in laundering with?

5    A.  Yes.

6    Q.  Approximately how many of those transactions did you set up

7    at the direction of law enforcement?

8    A.  5 to 10.

9    Q.  Did you also agree that as part of the investigation, the

10   government could wiretap your phone in order to record

11   conversations setting up those transactions?

12   A.  Yes.

13   Q.  While you have been cooperating have you been permitted to

14   continue to conduct the lawful business of Nandansons?

15   A.  Yes.

16   Q.  What is your understanding why you have been permitted to

17   continue to conduct lawful business?

18            MR. ROSS:  Objection; relevance.

19            THE COURT:  Sustained.

20   Q.  Turning back to the agreement, does it set out that you are

21   required to testify truthfully if you were called upon to

22   testify?

23   A.  Yes.

24   Q.  Does the agreement require you to do anything when you

25   testify in court other than to tell the truth?

19F4DAT1                          Ankur Gupta - direct

1   A.  No.

2   Q.  Why did you enter into this agreement?

3   A.  To have the best possible outcome for myself.

4   Q.  When you say the best possible outcome, what are you

5   referring to?

6   A.  The government also agrees to provide a letter stating all

7   of the cooperation tasks that I have done, and that would be

8   submitted to the judge for review.

9   Q.  What is your understanding of the information that would be

10  in that letter?

11  A.  They would indicate all the tasks that we have done to

12  cooperate with the government's investigations.

13  Q.  Is it your understanding that letter would also include

14  information about your crime as well?

15  A.  Yes.

16  Q.  Just because the court receives such a letter does the

17  judge have to sentence you to less prison time?

18  A.  No.

19  Q.  What is the most amount of time the judge could impose upon

20  you if the letter is sent?

21  A.  20 years.

22  Q.  As far as you understand does the result in this case here

23  have any effect whether the government would send such a letter

24  to the judge in your case?

25  A.  No.

19F4DAT1                        Ankur Gupta - direct

1    Q.   If the government were ever to determine you testified

2    falsely here, what effect if any would have that on your

3    agreement?

4    A.   It would make it null and void.

5    Q.   Would the government send the letter to the judge you just

6    testified about?

7    A.   No.

8    Q.   With you get any benefit for the cooperation you provided

9    up to this point?

10   A.   No.

11   Q.   Pursuant to your cooperation agreement did you participate

12   in an undercover investigation concerning Mr. Datta?

13   A.   Yes.

14   Q.   How would you describe your relationship with Mr. Datta at

15   the time of the beginning of your involvement in the undercover

16   investigation?

17   A.   We had a friendly business relationship.

18   Q.   When was your first interaction with the defendant in

19   connection with the undercover investigation?

20   A.   We had a meeting with him at our office in October 2009.

21   Q.   Did you schedule that meeting or did he schedule it?

22   A.   He scheduled it.

23   Q.   When did he contact you about scheduling a meeting?

24   A.   Either that day or the day before.

25   Q.   What did you do after the defendant contacted you?

19F4DAT1                    Ankur Gupta - direct

1   A.  I made a call to agent Anthony Maddalone advising him that

2   he was in town.

3   Q.  Did agent Maddalone or another agent equip you with a

4   recording device?

5   A.  Yes.

6   Q.  Did agents give you any guidance as to what to do during

7   this meeting?

8   A.  They asked us to do our normal course of business and they

9   also asked us to get more background information on Vikram and

10  how he conducts his business with customers.

11  Q.  Did the meeting in fact occur?

12  A.  Yes.

13  Q.  Where did it occur?

14  A.  It occurred in our office in our conference room.

15  Q.  Who was present for the meeting?

16  A.  Myself, my father and Mr. Datta.

17  Q.  How long was the meeting?

18  A.  It was about 2 hours.

19  Q.  As a general matter prior to the last 20 minutes of the

20  conversation what did you, your father and Mr. Datta talk

21  about?

22  A.  We did some buying and selling of fragrances and general

23  business conditions.

24  Q.  If I could ask you to look at what you have in front of

25  you, 102T.

19F4DAT1                        Ankur Gupta - direct

1              MR. BRAGG:  May I approach, your Honor.

2              THE COURT:  You may.  Mr. Bragg, there is not a copy

3    of this in my file.

4              MR. BRAGG:  We have an additional copy.

5              If I could have one moment.

6              (Pause)

7    BY MR. BRAGG:

8    Q.  Do you have 102T in front of you?

9    A.  Yes.

10   Q.  Have you seen it before?

11   A.  Yes.

12   Q.  How do you know that?

13   A.  I signed it on the top of the page.

14   Q.  Does 102T contain transcriptions of parts of the

15   conversation of your meeting with Mr. Datta in October 2009?

16   A.  Yes.

17             MR. BRAGG:  Turn to page 4, line 43, time-stamped

18   1:42:50, and follow along.

19             (Audiotape played)

20   Q.  Who is that speaking?

21   A.  That was me speaking.

22             (Audiotape played)

23   Q.  Line 22 to 23, whose voice is that?

24   A.  Mr. Datta.

25             (Audiotape played)

19F4DAT1                    Ankur Gupta - direct

1   Q.  Mr. Gupta, do you speak Hindi?

2   A.  Yes.

3   Q.  Is that language that's in bold on the transcript here,

4   language from the Hindi language?

5   A.  Yes.

6           MR. BRAGG:  Turn to page 9, line 33, time-stamped

7   1:49:45.

8           (Audiotape played)

9   Q.  Is your father's name Ajay Gupta?

10  A.  Yes.

11  Q.  The attributions in the transcript of Ajay Gupta are

12  accurate based on your review?

13  A.  Yes.

14          MR. BRAGG:  Page 11, line 17, time-stamped 1:51:52.

15          (Audiotape played)

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1           MR. BRAGG:  You could stop it there, Ms. Quinones.

2    BY MR. BRAGG:

3    Q.  How much longer after this point in the conversation did

4    you speak with Mr. Datta that day?

5    A.  A few minutes.

6    Q.  And what did you talk about for the remainder of the

7    conversation?

8    A.  Nothing.  It was basically he had to leave.

9    Q.  OK.  Now, you testified previously in the beginning part of

10   the conversation, the other part of the conversation, you were

11   talking about sales, is that right?

12   A.  Yes.

13   Q.  And after this meeting did you fill orders that the

14   defendant placed that day for perfume?

15   A.  Yes.

16   Q.  Prior to the undercover investigation, did you speak

17   regularly on the phone with Mr. Datta?

18   A.  Yes.

19   Q.  What did you talk about?

20   A.  General business conditions and also the buying and selling

21   of fragrances.

22   Q.  After this meeting in October, did you continue to speak

23   regularly with the defendant on the phone?

24   A.  Yes.

25   Q.  To your knowledge, were some of those calls recorded?

19fddat2                          Ankur Gupta - direct

1    A.   Yes.

2    Q.   How?

3    A.   By the recorded sound given to me by the government.

4    Q.   And did law enforcement give you any guidance as to what to

5    say on those calls?

6    A.   They said to keep the business going as it normally would

7    under normal course of business and if we can continue to

8    further collect background information on Mr. Datta or his

9    business or his customers.

10   Q.   When was the next time that you saw Mr. Datta in person?

11   A.   At a trade show in March.

12   Q.   What is a trade show?

13   A.   A trade show is a convention that we have in Las Vegas

14   where it's a general merchandise show where all the exhibitors,

15   they exhibit different products and we meet in one facility.  A

16   lot of customers from around the U.S. as well as

17   internationally attend that show.

18   Q.   Prior to the trade show, did you talk to the agents about

19   the undercover investigation?

20   A.   Yes.

21   Q.   What did you talk about as it applied to Mr. Datta?

22   A.   They would like that I introduce some agents to him

23   directly.

24   Q.   Who did you -- withdrawn.

25              Did you introduce someone to Mr. Datta?

19fddat2                        Ankur Gupta - direct

1    A.  Yes.

2    Q.  When?

3    A.  At the trade show.

4    Q.  Where at the trade show?

5    A.  At our booth, at our exhibition place in the trade show.

6    Q.  When you say "our," are you referring to Nandansons?

7    A.  Yes.

8    Q.  Who did you introduce to Mr. Datta?

9    A.  Two agents, Agent Roberto and Agent Jose.

10   Q.  Was anyone else there?

11   A.  My father.

12   Q.  Did you talk to Jose prior to you introducing Jose to

13   Mr. Datta?

14   A.  Yes.

15   Q.  What did you two talk about?

16   A.  He was telling us that he didn't feel we were cooperating

17   to our full capacity so they want us to be more aggressive in

18   fulfilling the task they requested.

19   Q.  When you introduced Jose and Roberto to Mr. Datta, who did

20   you represent them to be?

21   A.  Customers from the Baja California site.

22   Q.  Did you indicate in what form they paid as customers?

23   A.  We indicated they paid in cash.

24   Q.  After that trade show in March, when was the next time you

25   saw Mr. Datta?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19fddat2                    Ankur Gupta - direct

1    A.   In the August trade show.

2    Q.   Where was the August trade show?

3    A.   In Las Vegas.

4    Q.   Prior to you seeing Mr. Datta at that trade show, did you

5    talk to agents?

6    A.   Yes.

7    Q.   Did they give you any instruction as to what to do at the

8    trade show concerning Mr. Datta?

9    A.   Just reintroduce Agent Roberto.

10   Q.   Did you do that?

11   A.   Yes.

12   Q.   Was anyone else present for that introduction?

13   A.   There was another agent, Agent Mario was there as well.

14   Q.   Where did that introduction take place?

15   A.   At our booth.

16   Q.   Prior to that introduction, had you spoken to Mr. Datta on

17   the phone?

18   A.   Yes.

19   Q.   When?

20   A.   Regularly.  Every month or every three weeks we would speak

21   and do an order.

22   Q.   In the day or so leading up to the introduction in August,

23   did you speak to Mr. Datta?

24   A.   I'm sorry.  Can you repeat that?

25   Q.   Sure.  Let me repeat it and rephrase it.

1            Prior to the introduction in August, in the hours or

2    days lead up to that, did you speak to Mr. Datta?

3    A.   Yes.

4    Q.   Did you speak to him on the phone or in person?

5    A.   Both.

6    Q.   Can you walk us through the sequence of your calls with

7    Mr. Datta and interaction?

8    A.   With the agents as well?

9    Q.   Well, start with prior to -- there came a point in time

10   when you reintroduced Roberto and introduced Mario to

11   Mr. Datta, right?

12   A.   Right.

13   Q.   Prior to that point this time, when was the last time you

14   interacted with Mr. Datta?

15   A.   It was minutes before.  I was speaking with him and the

16   agents were making their rounds but they weren't actually

17   there.  So I had to call Mr. Datta and request him to come back

18   to our place so that he can meet with the agents at our place,

19   once the agents were there.

20   Q.   All right.  When the agents and Mr. Datta arrived, how did

21   you -- what did you say to Mr. Datta?

22   A.   I introduced the customers again -- I introduced the agents

23   as customers again.

24   Q.   As customers of whom?

25   A.   Nandansons.

19fddat2                         Ankur Gupta - direct

1    Q.  After that interaction, did you talk to Mr. Datta --

2    withdrawn.

3           After that introduction, what happened?

4    A.  After that introduction, the agents took Mr. Datta outside

5    the trade show to speak briefly, and then about five to ten

6    minutes later Mr. Datta came back to our booth and he said that

7    the customers, they're talking very large numbers, that he

8    didn't feel that he would be capable to service them.  And at

9    that point in time I mentioned to him just do business as you

10   normally would; they might be just trying to show you large

11   numbers to try to impress you.

12          MR. BRAGG:  May I have one moment, your Honor?

13          THE COURT:  Yes.

14          (Pause)

15          MR. BRAGG:  No further questions at this time, your

16   Honor.

17          THE COURT:  Thank you.

18          Cross-examination.

19          MR. ROSS:  Thank you, your Honor.  May I have just one

20   moment?  I am finishing a note.

21          THE COURT:  Yes.

22          (Pause)

23   CROSS-EXAMINATION

24   BY MR. ROSS:

25   Q.  Good morning, Mr. Gupta.

19fddat2                        Ankur Gupta - cross

1   A.   Good morning.

2   Q.   Mr. Gupta, you're a fairly well educated man.  You went to

3   NYU.  You got a degree in finance.  Is that right?

4   A.   Yes.

5   Q.   And if I understood you correctly, you have been working

6   for not only all of your adult life but even before you became

7   an adult?

8   A.   Yes.

9   Q.   And the relationship between you and Mr. Datta was that for

10  the most part you sold him -- that is, "you" being Nandanson --

11  sold him perfumes?

12  A.   Correct.

13  Q.   And did it occur, albeit it only once in awhile, that

14  Mr. Datta would obtain perfumes at such a good price that he

15  could sell them to you cheaper than you could buy them?

16  A.   Yes.

17  Q.   Now, you said that you had a regular ongoing conversation

18  with Mr. Datta; every couple of weeks he would order?

19  A.   Yes.

20  Q.   And is that how the ordering took place?  Was it done any

21  other way?  In other words, was it always on the phone?

22  A.   On the phone or by e-mail.

23  Q.   OK.  And is it the way it goes that Mr. Datta would run

24  through various names of perfumes, branded perfumes, and you

25  would give him your price?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19fddat2                       Ankur Gupta - cross

1    A.   Yes, or vice versa.  I would give him our list of what we
2    have in stock and I will quote him the price and he would check
3    if he needs that.
4    Q.   OK.  Was it your experience that Mr. Datta is a tough
5    customer?
6    A.   Yes.
7    Q.   And he drove a hard price?
8    A.   Yes.
9    Q.   And he would haggle with you over 25 cents on a bottle of
10   perfume?
11   A.   Yes.
12   Q.   Now, I'd like to go back for a moment to where your
13   testimony started here today and that was with your own
14   problems.
15   A.   OK.
16   Q.   Your own problem is that you were a money launderer?
17   A.   Correct.
18   Q.   And your father, a money launderer, is that right?
19   A.   Yes.
20   Q.   And when you were a money launderer, how long had you done
21   that?  For how many years were you laundering money?
22   A.   For a number of years.
23   Q.   How about back to 2004?
24   A.   Yes.
25   Q.   Even beyond that?

19fddat2                    Ankur Gupta - cross

1   A.   Yes.

2   Q.   And did it happen that the way you became a money launderer

3   was that you had met some people in the late '90's from South

4   America; is that how it started?

5   A.   Yes.

6   Q.   And after you met those people from South America, they had

7   a lot of cash, presumably from drugs, that they wanted to drop

8   off to you and to your father, is that right?

9   A.   Yes.

10  Q.   And what you described as off-site receipt of these

11  drugs -- I'm sorry, of these drug proceeds were places, you

12  mentioned, Burger King, Rite Aid parking lots, is that right?

13  A.   Yes.

14  Q.   What year was it that you got rid of the retail store?

15  A.   2004.

16  Q.   OK.  So even while you had the retail store, you were

17  receiving money drops, is that right?

18  A.   No.

19  Q.   OK.  So that started in 2004?

20  A.   The money drops on off-site locations, yes.

21  Q.   OK.  Is that because you used to receive money at your

22  store until 2004?

23  A.   Correct.

24  Q.   And when you closed the store and opened your warehouse and

25  office in Edison, New Jersey, you didn't want these people

19fddat2                          Ankur Gupta - cross

1   coming into your shop, so to speak?

2   A.   Correct.

3   Q.   That's because they were sort of sinister, weren't they?

4   A.   Yes.

5   Q.   I mean, you were -- you didn't know their names?

6   A.   I did not know their names.

7   Q.   They are clearly not involved in the perfume business, from

8   your observation?

9   A.   The delivery people, yes, they're not involved in the

10  fragrance business.

11  Q.   They would meet you and just hand you a bag or a box of

12  money?

13  A.   Correct.

14  Q.   You wouldn't count it and give them a receipt?

15  A.   No.

16  Q.   You didn't ask them for identification?

17  A.   No.

18  Q.   You didn't deposit the money into the bank?

19  A.   No.

20  Q.   You kept no records of any of these transactions?

21  A.   No.

22  Q.   Obviously there were no currency transaction reports or

23  8300 forms filed?

24  A.   None.

25  Q.   You would put the money in safe deposit boxes, safes, hide

1     it; is that right?

2     A.   Yes.

3     Q.   Your dad was doing the same thing?

4     A.   Yes.

5     Q.   And when you were filing your income tax returns, you

6     didn't declare any of the income?

7     A.   Correct.

8     Q.   And did I understand correctly that you, at the same time

9     that you were taking money from these people in these parking

10    lots, you were also doing 60 to $70 million in perfume sales

11    that were totally legitimate?

12    A.   Correct.

13    Q.   On your tax returns, I heard Mr. Bragg's question and I

14    think you said part of your obligation is that you're going to

15    have to file amended tax returns, pay your taxes, your

16    interest, your penalties, is that right?

17    A.   Correct.

18    Q.   Have you done that?

19    A.   Yes.  We've hired a reputable firm in New Jersey, Rotenberg

20    Meril, and they're taking care of all the filings in question.

21    We have a payment plan with the IRS, and we're on schedule to

22    pay all our back taxes by 2012.

23    Q.   Have you actually filed the returns?

24    A.   Yes.

25    Q.   But you haven't paid the money yet; you have a schedule?

19fddat2                          Ankur Gupta - cross

1    A.   We've already paid two-thirds of it.  We have a third

2    remaining.

3    Q.   OK.  Now, when you would make arrangements for money to be

4    dropped to you in these parking lots and other areas, you would

5    first speak with one of several people who were directed that

6    the money come to you, is that right?

7    A.   Correct.

8    Q.   And those are not people in the perfume business?

9    A.   Correct.

10   Q.   Those are people actually that you believed to be involved

11   in the drug business?

12   A.   Some type of illicit activity.

13   Q.   OK.  And those people would call you.

14           And what name were you known by to them?

15   A.   Alonzo.

16   Q.   Alonzo?

17   A.   Correct.

18   Q.   Not Ankur?

19   A.   Not Ankur.

20   Q.   So you didn't use your own name?

21   A.   I did not.

22   Q.   In addition to speaking Hindi, you also speak Spanish?

23   A.   Yes.

24   Q.   And these people were Hispanic that were calling you?

25   A.   Correct.

19fddat2                    Ankur Gupta - cross

1   Q.   And was at least one of them calling you from Colombia?

2   A.   Yes.

3   Q.   And you would speak to him, and did he know that your real

4   name was not Alonzo, if you could tell us?

5   A.   I don't know.

6   Q.   Because you always represented yourself to be Alonzo?

7   A.   Yes.

8   Q.   And the reason you used a phony name is because you knew

9   you were committing a crime?

10  A.   Yes.

11  Q.   Did your dad have a phony name, too?

12  A.   No.

13  Q.   That's because he never really spoke to those people, you

14  were the point guy?

15  A.   Correct.

16  Q.   OK.  And you said that this offense that you were involved

17  in under the name Alonzo involved $5,725,000, is that right?

18  A.   More or less, yes.

19  Q.   And to be sure that we all understand, Mr. Datta over here,

20  Vikram Datta, had absolutely nothing to do with any of the

21  criminal activity you and your dad were involved in?

22  A.   Nothing.

23  Q.   None at all?

24  A.   None at all.

25  Q.   Now, when you were doing this activity since 2004, you and

19fddat2                         Ankur Gupta - cross

1   your dad kept it a secret, didn't you?

2   A.   Yes.

3   Q.   And because if I understood your family business, you got

4   your mom, you got a couple of siblings involved in addition to

5   your dad, right?

6   A.   Yes.

7   Q.   And you didn't let them know?

8   A.   Correct.

9   Q.   You didn't let the workers know?

10  A.   No.

11  Q.   When I say "workers," you had like 14 people working in

12  your warehouse, isn't that so?

13  A.   Yes.

14  Q.   And you had a bunch of office personnel?

15  A.   The office, we generally manage ourself but we have one

16  person in the office, yes.

17  Q.   OK.  But you managed to keep that from even the one person

18  in the office?

19  A.   Correct.

20  Q.   So you and your dad managed to keep it a secret between the

21  two of you that you were receiving hundreds of thousands of

22  dollars of drug money at a time and not putting it on the

23  books?

24  A.   Correct.

25  Q.   So you had -- ultimately, though, you would actually ship

19fddat2                          Ankur Gupta - cross

1    perfume to somebody somewhere?

2    A.   Correct.

3    Q.   So there was no internal accounting of your goods being

4    shipped?

5    A.   There was.

6    Q.   But the money that you received for the goods never made it

7    onto the books?

8    A.   It was.  We did an adjustment.  I made adjustments to my

9    own books for that.

10   Q.   You sort of phonied up books, though?

11   A.   In this particular case, yes.

12   Q.   Yeah.  To somehow cover up the fact that you were taking

13   drug money and in essence putting it in your pocket?

14   A.   Yes.

15   Q.   OK.  How many years had you dealing with Mr. Datta?

16   A.   Over ten years.

17   Q.   And correct me if I'm wrong, but didn't the relationship

18   between you an Mr. Datta -- you said he started off small in

19   what you described as 20 to $30,000 or so; is that about right?

20   A.   Yes.

21   Q.   And a couple of times a year he'd buy?

22   A.   Right.

23   Q.   And when you first started out with him, did you extend him

24   credit?

25   A.   Yes, on a limited basis.

1    Q.   On a limited basis?

2    A.   Yes.

3    Q.   What does that mean?

4    A.   Small line of credit.

5    Q.   OK.  And is it true that over the years the practice has

6    been that Mr. Datta would pay Nandansons with postdated checks?

7    A.   Yes.

8    Q.   So to understand how that worked, Mr. Datta would call you

9    up and haggle with you on the phone and make an order?

10   A.   Correct.

11   Q.   Then Mr. Datta would send you a -- well, strike that.

12            You would send him an invoice?

13   A.   Pro forma invoice, yes.

14   Q.   You're taking notes, I presume, when you speak to him?

15   A.   Correct.

16   Q.   On how many bottles of this, how many bottles of that, and

17   the price?

18   A.   Yes.

19   Q.   Then you prepare a pro forma invoice, and you would fax it

20   to his business, or you don't?

21   A.   Yes.

22   Q.   And then he would send you a postdated check?

23   A.   Correct.

24   Q.   And how postdated was it?  What's the window here?

25   A.   Initially it started off as 45 days but then it became 60

310

19fddat2                        Ankur Gupta - cross

1     days.

2     Q.   OK.   So he issues a check to you payable 60 days later in

3     payment of the invoice?

4     A.   Correct.

5     Q.   And you all would hold the check until you would deposit it

6     in the bank on the 60th or 61st day?

7     A.   Correct.

8     Q.   In fact, it happened a couple of times that his checks

9     bounced.

10    A.   Yes.

11    Q.   But he made them good right away?

12    A.   Yes.

13    Q.   As a matter of fact, he made them good with a wire transfer

14    right away?

15    A.   Yes.

16    Q.   But never in all these years did he deliver a box of cash

17    to you?

18    A.   Never.

19    Q.   Never in all these years did he deliver a bag of cash to

20    you?

21    A.   No.

22    Q.   Never in all these years did he have money delivered to you

23    by some person whom you didn't know, one of these suspicious

24    people, and have you send goods to him?

25    A.   No.

1    Q.   Never?

2    A.   Never.

3    Q.   One of the bounced checks, in fact, very close in time to

4    when you got arrested, was north of a hundred thousand dollars,

5    wasn't it?

6    A.   Yes.

7    Q.   And he made that good?

8    A.   Yes.

9    Q.   All right.  Let's talk about your arrest.

10          You got arrested on September 10, 2009?

11   A.   Yes.

12   Q.   And your dad, too?

13   A.   Yes.

14   Q.   And you agreed to cooperate with the government

15   immediately?

16   A.   Per advice of our counsel, yes.

17   Q.   And you recognized right away you were in serious trouble?

18   A.   Yes.

19   Q.   You now understand the parameters of that when you say 20

20   years?

21   A.   Yes.

22   Q.   And is it true, however, that after you began to cooperate

23   the day -- the very day of your arrest, that you weren't

24   completely honest with the agents whom you were dealing with?

25   A.   It's possible on the initial steps they might have

19fddat2                    Ankur Gupta - cross

1    misunderstood some of our remarks but it is possible.

2    Q.   They might have misunderstood your remarks?

3    A.   Yes, because they were asking questions right off the bat,

4    which we didn't have all the answers for.  We were still -- I

5    was still processing what was happening at that time.

6    Q.   Did they misunderstand you when you denied being involved

7    in money laundering?

8    A.   No.

9    Q.   You did that, didn't you?

10   A.   Yes.

11   Q.   OK.  So to be sure, you get arrested, you recognize you are

12   in serious trouble, you agree to cooperate, and on the very day

13   that you do that, the first thing you did was lie?

14   A.   No.

15   Q.   The second thing you did was lie?

16   A.   No.

17   Q.   Where is it in the chain of things that happened on

18   September 10th that you said I -- I didn't launder money?

19   A.   It was right in the initial stages, when they were in the

20   process of arresting us.

21   Q.   They were actually driving you, weren't they, in the back

22   of a car on their way to locate the cash that you and your dad

23   had hidden?

24   A.   Yes.

25   Q.   So the fellow you were talking to, at least one of them, is

19fddat2                          Ankur Gupta - cross

1   a federal agent, right?

2   A.   Yes.

3   Q.   Have you been charged with making a false statement to a

4   federal agent?

5   A.   No.

6   Q.   The next day, on September 11th, you signed a proffer

7   agreement with the government under the advice of your counsel,

8   is that right?

9   A.   Yes.

10  Q.   And you were hoping that that was going to turn into a

11  cooperation agreement that would result in your hopefully

12  getting a lesser sentence than the 20 years you're facing?

13  A.   Yes.

14  Q.   And you then began the process of sitting down with

15  government agents and interviewing with them about what you

16  knew about these people that you were laundering money with,

17  who were drug dealers and whatnot; is that right?

18  A.   Yes.

19  Q.   And you met with them on September 17th of 2009?

20  A.   Yes.

21  Q.   September 29th, 2009?

22  A.   Yes.

23  Q.   October 1st, 2009?

24  A.   Yes.

25  Q.   October 8th, 2009?

19fddat2                          Ankur Gupta - cross

1    A.   Yes.

2    Q.   And federal agents seized four-and-a-half million dollars

3    in cash from various places that you and your dad had it

4    hidden?

5    A.   Yes.

6    Q.   For example, you had $2,700,000-plus in a safe deposit box

7    at Indus American Bank?

8    A.   Correct.

9    Q.   You another 900-something-thousand at Wachovia?

10   A.   Correct.

11   Q.   When I say "Wachovia," in a safe deposit box?

12   A.   Correct.

13   Q.   And when you were receiving this money, by the way, in

14   these boxes and bags from people you didn't know, they weren't

15   always big bills, were they?

16   A.   No.  We requested for large bills.

17   Q.   But you didn't always get large bills, did you?

18   A.   No, we did not always get large bills.

19   Q.   And the way that you turned them into large enough bills

20   that you could hide them in a safe deposit box was by taking

21   them to a casino?

22   A.   A portion of it, yes.

23   Q.   And so you would go in with 20s, let's say, and come out

24   with 100s?

25   A.   Yes.

19fddat2                          Ankur Gupta - cross

1    Q.   And your dad also had, you know, a half-a-million dollars

2    in a safe deposit box at TD Bank, is that right?

3    A.   Yes.

4    Q.   And who is Nutan Gupta?

5    A.   My mother.

6    Q.   Your mother?

7    A.   Yes.

8    Q.   $69,400 was seized from your mother in cash?

9    A.   Yes.

10   Q.   And this was cash that you all had received from these drug

11   money droppers, is that right?

12   A.   Yes.

13   Q.   Is your mother being prosecuted?

14   A.   No.

15   Q.   After you were arrested, you were released on $1 million

16   bail?

17   A.   Yes.

18   Q.   And you are still on $1 million bail?

19   A.   Yes.

20   Q.   Now, in these -- and I went through four dates with you --

21   September 17, September 29, October 1, October 8, the interview

22   with the government -- in those various interviews with the

23   government, is it true that the way things went was tell us

24   first about your own crime; that is, what you and your dad did?

25   A.   Correct.

1   Q.   Then, after they got done talking to you about the criminal

2   acts you were involved with, the next thing they got to was

3   tell us who your customers are?

4   A.   Correct.

5   Q.   And tell us where they are?

6   A.   Yes.

7   Q.   And among the things you told them as to who your customers

8   were and where they were is that the four big markets for

9   perfume are New York, Los Angeles, Miami and Laredo, Texas?

10  A.   Yes.

11  Q.   And that's true?

12  A.   That is true.

13  Q.   And you gave them the names of a number of your customers

14  who operate in Laredo, Texas and have stores there?

15  A.   Yes.

16  Q.   And you sell to a bunch of them, don't you?

17  A.   Yes.

18  Q.   How many different stores do you think you sell to in

19  Laredo, Texas?

20  A.   At least ten.

21  Q.   And those -- some of those are Sunny's Perfume?

22  A.   Yes.

23  Q.   They are a bigger customer than was La Versailles?

24  A.   It depends on the year.

25  Q.   Well, they had been in some years certainly?

1   A.   Yes.

2   Q.   TM Perfumes?

3   A.   Yes.

4   Q.   MD Destination -- Distributors?

5   A.   Yes.

6   Q.   Perfume Club South?

7   A.   Yes.

8   Q.   Broadway?

9   A.   Yes.

10  Q.   All of those Laredo, Texas?

11  A.   Yes.

12  Q.   And more, more than I have the names?

13  A.   And more, mm-hmm.

14  Q.   Then you -- well, strike that.

15          Among the list of perfume stores in Laredo, Texas that

16  you said were your customers, one was La Versailles?

17  A.   Correct.

18  Q.   So it was you who had first mentioned La Versailles or

19  Vikram Datta's name to the government?

20          MR. BRAGG:  Objection.

21          THE COURT:  Ground?  How would he know, right?

22          MR. BRAGG:  Yes.

23          THE COURT:  Sustained.

24  Q.   It wasn't the government who asked you about La Versailles

25  or Vikram Datta, it was you who mentioned the name, correct?

1   A.   I don't recall exactly but there was a conversation back

2   and forth regarding La Versailles.

3   Q.   OK.  And so La Versailles first appears, though, on your

4   list of stores of customers, correct?

5   A.   Yes, mm-hmm.

6   Q.   Then you hear from Vikram Datta, as you often did, that he

7   was coming to New York?

8   A.   Yes.

9   Q.   And that was not uncommon?

10  A.   No, not uncommon.

11  Q.   It may not have been frequent but not uncommon, correct?

12  A.   Correct.

13  Q.   It was at least once a year; is that fair enough?

14  A.   Yes.

15  Q.   Sometimes twice, even three times a year?

16  A.   At least once a year, yes.

17  Q.   But at least once a year he would come to New York, and

18  it's a buying trip, in essence, is that right?

19  A.   Correct.

20  Q.   And he would meet with you?

21  A.   Yes.

22  Q.   And you would discuss, as you said, business, different

23  perfumes and prices?

24  A.   Correct.

25  Q.   And that's what you understood was going to happen when he

19fddat2                          Ankur Gupta - cross

1   said he was going to come visit with you in October?

2   A.   Yes.

3   Q.   So the date -- how much in advance of his coming did he

4   tell you he was coming?

5   A.   It was the day before.

6   Q.   So the day before he actually came -- and the transcript

7   and tape we heard parts of was October 13, 2009?

8   A.   Correct.

9   Q.   So he would have called you on October 12, 2009?

10  A.   Yes.

11  Q.   OK.  And if I understood what you said, in response -- not

12  "in response," but after he called you, because his was one of

13  the companies that you had told the agents you did business

14  with, you called Agent Maddalone?

15  A.   Yes.

16  Q.   To tell him hey, this fellow Vikram Datta is going to come

17  to my office tomorrow?

18  A.   Yes.

19  Q.   Now, you already had in place a wiretap on your telephone?

20  A.   Correct.

21  Q.   So presumably the phone call on October 12th would have

22  been recorded?

23  A.   It's possible.

24  Q.   But in response to your phone call to Agent Maddalone, he

25  gave you some recording equipment to record the conversation

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19fddat2                    Ankur Gupta - cross

1  that you and apparently your dad had with Mr. Datta on

2  October 13th?

3  A.   Yes.

4  Q.   And the instructions were just keep it normal and get as

5  much information, background information, about Mr. Datta?

6  A.   Correct.

7  Q.   There was no instruction given that you should propose to

8  Mr. Datta that he commit a crime?

9  A.   No.

10  Q.   There was no restriction given to you on what you shouldn't

11  say?

12  A.   Not that I remember.

13  Q.   OK.

14          THE COURT:  Mr. Ross, are you near done or --

15          MR. ROSS:  No, sir.

16          THE COURT:  All right.  We will take a break now,

17  folks.

18          THE CLERK:  All rise.

19          (Recess)

20          (Jury not present)

21          THE COURT:  How much longer, Mr. Ross?

22          MR. ROSS:  I would think 45 minutes, your Honor, or

23  so.

24          THE CLERK:  Jury entering.

25          (Jury present)

19fddat2                         Ankur Gupta - cross

1              THE CLERK:  Please be seated, everyone.

2              THE COURT:  The jurors and the defendant all are

3     present.  Let's continue.

4              MR. ROSS:  Thank you, your Honor.

5     BY MR. ROSS:

6     Q.  Mr. Gupta, on the recording that we listened to of

7     October 13th, there is mention of a fellow named Octavio.  You

8     knew who that was, did you not?

9     A.  Yes.

10    Q.  Octavio -- and correct me if I'm wrong -- was perhaps the

11    biggest perfume consumer in Mexico?

12    A.  Per our knowledge, yes.

13    Q.  And he wasn't -- Octavio was not just Mr. Datta's client or

14    customer, a lot of the stores in Laredo sold to him?

15    A.  Yes.

16    Q.  And you also knew another of Mr. Datta's perfume customers,

17    a fellow named Polo?

18    A.  Personally, no.

19    Q.  Well, you knew of a person named Polo to be a wholesale

20    perfume customer?

21    A.  Yes.

22    Q.  OK.  Now, Mr. Datta, when he came to see you on

23    October 13th, he also had brought you your new baby's gift?

24    A.  Yes.

25    Q.  You had just had a child?

19fddat2                      Ankur Gupta - cross

1    A.   Yes.

2    Q.   And he came, congratulated you, brought a gift?

3    A.   Yes.

4    Q.   During the course of this meeting, there is an

5    interruption; Mr. Datta's phone would ring periodically?

6    A.   Yes.

7    Q.   And so he was busy with other appointments, based on what

8    you could hear, in the New Jersey/New York area?

9    A.   Correct.

10   Q.   So he only had a limited amount of time to spend with you?

11   A.   Yes.

12   Q.   So, backing up for just a moment, you never gave credit to

13   any of these drug dealing customers of yours that did the

14   $5,725,000 worth of money laundering?

15   A.   Correct.

16   Q.   And Mr. Datta is meeting with you, and there is a

17   discussion.  And your dad asks, on this transcript, a very

18   straightforward question:  Is it drug money from Mexico?

19         And Mr. Datta replied, I don't know.

20   A.   Yes.

21   Q.   Do you recall that?

22   A.   Yes.

23   Q.   Was that part of any kind of plan with the agents in

24   advance of this meeting?

25   A.   No.  It was just -- they instructed us get general

1    background information on him and his customers.

2    Q.  Did you recognize at the time that asking that kind of

3    question might be helpful to the government?

4              MR. BRAGG:  Objection.

5              THE COURT:  Overruled.

6    Q.  Sir?

7    A.  This was one of the first events that we had that we were

8    recording for the government, and we were kind of surprised by

9    his previous remark that he received $1.3 million in cash.  We

10   never handled that kind of money in one shot.  So a lot of this

11   spurred from that, the follow-up questions and the --

12   Q.  OK.

13   A.  That's how the conversation went.

14   Q.  So I guess the backup to the question I asked:  It really

15   wasn't something you thought of, it was just what flowed from

16   the conversation as it laid out?

17   A.  Yes.

18   Q.  OK.  And the conversation is what it is.

19              You knew that this fellow Octavio that we had

20   mentioned before had numerous stores in Mexico?

21   A.  I didn't know that.  I know that he was a large customer

22   for the Mexican market.

23   Q.  You mentioned Tepito.  Are you familiar with Tepito?

24   A.  We heard about it generally.  That's the core market in

25   Mexico.

19fddat2                           Ankur Gupta - cross

1   Q.   OK.   And that's just -- we're talking about hundreds of

2   perfume vendors; is that your understanding?

3   A.   Yes.

4   Q.   And those are customers of Mr. Datta's?

5   A.   Yes.

6   Q.   And customers of some of these other stores in Laredo,

7   Texas?

8   A.   Correct.

9   Q.   And Tepito, just to be clear, those are stores that are in

10  Mexico City.   The Tepito market is a suburb of Mexico City?

11  A.   Yes.

12  Q.   And when Mr. Datta responds, you know, why customers are

13  using dollars, he explained that Mexicans buy dollars because

14  the currency is changing were his words; do you recall that?

15              THE COURT:   This is something on the tape you are

16  inquiring about?

17              MR. ROSS:   Yes, sir.

18              THE COURT:   Sustained.

19  Q.   The words that Mr. Datta used on the tape about currency is

20  changing is something that you are familiar with; you are

21  familiar with the fact that your international customers ebb

22  and flow with the currency exchanging?

23              MR. BRAGG:   Objection.

24              THE COURT:   Sustained.

25  Q.   Is it the case that you have international customers?

1    A.   Yes.

2    Q.   Is it the case that your international customers buy more

3    perfume when the exchange rate is better?

4    A.   Yes.

5    Q.   And is that common knowledge in your industry?

6    A.   Yes.

7    Q.   So as much as you learned in this October 13th first

8    recording with Mr. Datta is that he has some customers who pay

9    cash, he requires a passport, he requires a customs

10   declaration, people in Mexico are buying dollars because of the

11   currency exchange rates, and he does not know that the cash

12   he's receiving is drug money, correct?

13             MR. BRAGG:   Objection.

14             THE COURT:   Sustained.

15             If you would like to give your summation, we could

16   wrap the case up quickly but it's not going to happen now, I

17   think.

18             MR. ROSS:   Thank you.

19             (Continued on next page)

20

21

22

23

24

25

19f4dat3                    Ankur Gupta - cross

1   BY MR. ROSS:

2   Q.  Now, you made reference to going to a trade show in March

3   in Las Vegas and having a discussion with an agent who

4   apparently discussed with you his or their view about the level

5   of cooperation they were getting from you, right?

6   A.  Yes.

7   Q.  You understood even before that conversation that in order

8   for you to get a better result in the outcome of your own

9   criminal case, that you needed to get some results for the

10  agents, didn't you?

11  A.  Can you rephrase that please.

12  Q.  You knew that for your cooperation to result in your

13  getting some kind of reduced sentence, it had to have some

14  result?

15          THE COURT:  Sustained as to form.

16  Q.  You knew that you had to assist the agents in making cases

17  undercover, correct?

18  A.  Yes.

19  Q.  That was an assignment you were given?

20  A.  No.

21  Q.  After October 13, a month later or so, in November, do you

22  recall calling Mr. Datta several times on November 23, trying

23  to reach him?

24  A.  Yes.

25  Q.  It was you calling him, am I correct?

19f4dat3                         Ankur Gupta - cross

1    A.   Correct.

2    Q.   You were unable to reach him on November 23?

3    A.   Correct.

4    Q.   But you were able to reach him on November 24?

5    A.   Right.

6    Q.   On November 24, the call includes your saying to Mr. Datta

7    that you have a wholesale customer in Mexico who wants to buy

8    from you in Newark but pay for it in Laredo; do you recall

9    that?

10   A.   Yes.

11   Q.   You asked Mr. Datta if he had a way that he would take it,

12   that is the money, and send it to you?

13   A.   Yes.

14   Q.   That conversation, was that directed by the agents?

15   A.   Yes.

16   Q.   In other words, that sort of looks like the very crime that

17   you committed, receiving money one place, right?

18   A.   Yes.

19   Q.   So was that the effort that was being made, you should try

20   to get Mr. Datta to commit the same crime?

21   A.   No.  The purpose was to see what his reaction would be.

22   Q.   His reaction you found out was that he declined to do it?

23   A.   Correct.

24   Q.   Moreover, not only did he decline to do it, he told you

25   that he had other people who had come to him with small bills

19f4dat3                    Ankur Gupta - cross

1  and a lot of cash who had made similar proposals and he threw

2  them out?

3  A.   Correct.

4  Q.   He was waiting for another guy that he knew was coming and

5  he was going to throw him out too?

6  A.   Yes.

7  Q.   Did Mr. Datta say to you, you give me a bank transfer

8  because I don't want any problems?

9  A.   I am sorry?

10 Q.   Did Mr. Datta say to you, you give me a bank transfer

11 because I don't want no problems, as opposed to the cash you

12 were proposing?

13 A.   I don't know which context this is referring to because we

14 would never give him a wire.

15 Q.   In the scenario you had proposed to him that you had a

16 customer who wanted to do this and his response not only was

17 that he didn't want to do it, he was proposing to way do it is

18 by wire transfer; do you recall that?

19 A.   I don't recall that, because if it's a wire transfer, the

20 customer can do it directly with us; we don't need Vikram for

21 that.

22 Q.   Look at the screen in front of you, see where I am pointing

23 here?  Does that refresh your memory that Mr. Datta said that

24 to you?

25 A.   Yes, but he was referring to his own customer, he wasn't

1   referring to me.

2   Q.   Just generically?

3   A.   Yes.

4   Q.   A customer?

5   A.   Yes.

6   Q.   Continuing though in response to this proposal, Mr. Datta

7   says to you that he doesn't want any problems, right?

8   A.   Correct.

9   Q.   You question him, you don't want any problems, and

10  Mr. Datta said to you, I do not want, I do not need to make

11  this money; is that correct?

12  A.   Yes.

13  Q.   After Mr. Datta said that to you on November 24, 2009, did

14  you tell the agents that?

15  A.   It was in a recording device, yes.

16  Q.   Did you discuss with the agents, hey listen, I did what you

17  told me to do and he wouldn't take the money?

18  A.   Yes.

19  Q.   Did you tell them that right away or is that only on March

20  1, a month later?

21  A.   No, right away or within a week, whatever it was.  It was

22  Thanksgiving time; I don't know if the agents were there at

23  that time.

24  Q.   A couple months later on January 19, 2010, do you recall

25  having yet another conversation with Mr. Datta that was again a

19f4dat3                        Ankur Gupta - cross

1    purchasing conversation?

2    A.   Yes.

3    Q.   It went the same way, if you recall, as all the others; you

4    would give him a price, he would haggle, he would decide

5    whether he would order or not?

6    A.   Correct.

7    Q.   At the end of the conversation, do you recall making

8    another proposition to him of illegal conduct?

9    A.   At the direction of the agents, yes.

10   Q.   You again propose that cash be dropped in his San Ysidro,

11   California store that you just learned about and goods

12   delivered elsewhere?

13   A.   Yes.

14   Q.   Again Mr. Datta said no?

15   A.   Yes.

16   Q.   Did you tell the agents in January that Mr. Datta said no

17   again?

18   A.   Yes.

19   Q.   So now let's move to March 1.  When you arrived at the show

20   you said you had a booth.  Give us some idea, are we talking

21   about 100s of vendors at these shows?

22   A.   At least 2,000 vendors.

23   Q.   Way more than that.  Is this multiple floors?

24   A.   Yes, the show is two floors.

25   Q.   You had a conversation you said with an agent who talked to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19f4dat3                    Ankur Gupta - cross

1   you about some disappointment in the level of your cooperation,

2   is that right?

3   A.   It wasn't disappointment in the level of our cooperation.

4   He wasn't satisfied; he felt we had potential to do more.

5   Q.   Who was that agent?

6   A.   Agent Jose Correa.

7   Q.   That was going to be the agent that you were going to

8   introduce or have this fellow Roberto, is Roberto also an

9   agent?

10  A.   I believe so.

11  Q.   You were going to introduce Roberto and Jose?

12  A.   Yes.

13  Q.   And on March 1, are the agents waiting to meet Mr. Datta;

14  was that the plan?

15  A.   No.

16  Q.   You said the agents were walking around?

17  A.   Walking around the show, yes.

18  Q.   Were they engaging people in conversations to your

19  knowledge?

20  A.   I don't know.

21  Q.   Were you making introductions?

22  A.   Yes.

23  Q.   You would introduce the undercover agents to other people

24  in the perfume business?

25  A.   Yes.

19f4dat3                        Ankur Gupta - cross

1    Q.   And they would have conversations with them?

2    A.   Yes.

3    Q.   Would they have conversations with them trying to find out

4    if they would take cash money?

5    A.   I don't know; once I introduced them I was out of the

6    conversation.

7    Q.   The conversation that you had with this agent, correct me

8    if I am wrong, but he told you that his group, the group that

9    he works with, they go after things and they don't stop or slow

10   down if something happens; did he tell you that?

11   A.   I believe so.

12   Q.   Did he tell you that what's going to happen if they don't

13   get results is that the lawyers are going to talk and you may

14   not get any help at your sentencing; did he tell you that?

15   A.   Can you repeat that.

16   Q.   Did he tell you that if you don't get any results then the

17   lawyers, prosecutor, your lawyer, are going to talk; they may

18   or may not be helping you at your sentencing?

19   A.   He said, I recall that he said that if, I recall him saying

20   that the attorneys would need to speak, but it had nothing to

21   do with bearing on what we can provide further.

22   Q.   Did he tell you in these words you have to find someone?

23   A.   I don't recall.

24   Q.   Let me go through all of these.  Do you recall being told,

25   if you guys don't come up with something, the lawyers will have

19f4dat3                          Ankur Gupta - cross

1    to speak?

2    A.   Yes.

3    Q.   Do you recall that he told you that we are going to have to

4    be more aggressive?

5    A.   Yes.

6    Q.   And tell you you need to be more aggressive?

7    A.   Yes.

8    Q.   Did he tell you I don't care what you tell him?

9    A.   I don't recall.

10   Q.   Do you recall him telling you, whatever it takes, generate

11   something?

12   A.   Something to that effect.

13   Q.   Do you recall him telling you specifically regarding Vikram

14   Datta, like we said last night, you have to push that angle,

15   you have to push it?

16   A.   Yes.

17   Q.   Do you recall him telling you regarding Vikram Datta, make

18   sure you make him want to work with us?

19   A.   He mentioned that, but we didn't have any control over

20   that.  Our job was to do the introduction.  At that point we

21   were delayed in making the introduction because Mr. Vikram was

22   not at the show.

23   Q.   Do you recall him telling you, you've got to set it up?

24   A.   That was the introduction, the meeting.

25   Q.   Do you recall that you told the agent in response to these

19f4dat3                          Ankur Gupta - cross

1   comments that you, meaning we, you and your father, did

2   everything we were supposed to do and he wouldn't take our

3   money?

4   A.   I don't remember.   In what reference?

5   Q.   In response to the agent telling you, we need to get some

6   results; at the end of the day this is for your benefit.

7   A.   Yes.

8   Q.   You said to him, we did everything you told us to do in

9   that last series of phone calls and he wouldn't take our money;

10  is that correct?

11  A.   I don't follow where he said he wouldn't take our money; it

12  was never our money that was in question.

13  Q.   You don't recall saying that to him?

14  A.   He wouldn't take our money?

15  Q.   Yes, that he, Vikram Datta, wouldn't take the money that

16  you were proposing on one occasion he would take in Laredo, on

17  another occasion that he take in California?

18  A.   No.

19  Q.   Do you recall agent telling you, so let's start with

20  Vikram, let's really try to get aggressive and get these guys

21  on board?

22  A.   Yes, he said that.

23  Q.   Did the agent instruct you to introduce him and Roberto to

24  Vikram Datta as very good customers, cash customers, to plant

25  the seed?

1    A.   Yes.

2    Q.   To be clear, this was not really a pleasant conversation

3    you were having with him, was it?

4    A.   No, but the agent was just doing his job and he was

5    motivating us to be more productive.

6    Q.   He actually started the conversation with you by saying I

7    am going to try to say this as nicely as I can?

8    A.   Yes.

9    Q.   Then went into saying things that really weren't so nice?

10   A.   He was aggressive but he was doing his job.

11   Q.   Then it was after that that you placed a phone call to

12   Vikram Datta; that was I presume on your cellphone?

13   A.   Yes.

14   Q.   You were able to reach Mr. Datta?

15   A.   Yes.

16   Q.   And what you told Mr. Datta to get him to come to your

17   booth was that you have two customers in your booth and they

18   are looking for some lines that I don't have and I know you

19   have; do you recall that?

20   A.   That was a call to somebody else; that wasn't to Mr. Datta.

21   Q.   OK.  You were trying to introduce Roberto and Jose to

22   somebody else?

23   A.   Yes.

24   Q.   All of this at the same perfume show?

25   A.   Yes.

1          MR. ROSS:  Your Honor, I am going to need to refresh

2     the witness' memory by playing a recording outside the presence

3     of the jury.  I can complete and perhaps at the break we can do

4     that.

5          THE COURT:  Complete whatever else you have.

6          MR. ROSS:  Thank you, your Honor.

7     BY MR. ROSS:

8     Q.  In your direct testimony you said that prior to the August

9     9 show, this is the next show, we were just talking about

10    March, now we are talking about 5 months later, August?

11    A.  Yes.

12    Q.  In between the March meeting and show and the August

13    meeting and show, had you talked to Mr. Datta and had he

14    continued to order perfume from Nandansons?

15    A.  Yes.

16    Q.  Everything went on as normal?

17    A.  Yes.

18    Q.  In addition to the two efforts to have Mr. Datta engage in

19    money laundering on November 24 and January 19, did you try any

20    other proposals to engage him in money laundering between those

21    two events?

22    A.  I am sorry, rephrase that.

23    Q.  Other than the two we have already talked about, actually

24    they preceded March, so between the March show in Las Vegas and

25    the August show in Las Vegas, did you call Mr. Datta and make

1    other proposals to him to launder money?

2    A.   I don't recall.

3    Q.   Prior, however, to the August 9 meeting in Las Vegas, you

4    introduced agent Mario?

5    A.   I introduced agent Roberto again and agent Mario was there

6    simultaneously.

7    Q.   Prior to that introduction then, reintroduction of agent

8    Roberto, you said in response to the government's questions

9    that you spoke with Mr. Datta on the phone and in person, is

10   that right?

11   A.   On the phone?  At the trade show, yes, at the trade show on

12   the phone and in person, yes.

13   Q.   You saw him at the trade show the day before, August 8?

14   A.   Mr. Datta, I don't believe so.  I believe I saw him, the

15   agents wanted to meet with him.  I didn't see him.  Then he

16   came to our booth.  Then that time the agents were not there.

17   So, then he left, the agents came, and then I called Mr. Datta

18   that the customers were back so can he come back.

19   Q.   And you had already seen Roberto, the agent you call him,

20   earlier in the day?

21   A.   Yes.

22   Q.   Had you seen him the day before?

23   A.   Yes.

24   Q.   Was your dad there the day before?

25   A.   Yes.

338

19f4dat3                          Ankur Gupta - cross

1   Q.   All of you were there on August 8?

2   A.   Yes.

3   Q.   You don't recall seeing Mr. Datta immediately?

4   A.   No.

5   Q.   You took to heart the admonition and the urging of the

6   agent when he spoke to you on March 1 about your cooperation,

7   did you not?

8   A.   Yes.

9   Q.   Because you knew it was important and it's important to the

10  outcome of your criminal case?

11  A.   Yes.

12  Q.   You got more aggressive, did you not?

13  A.   That's a matter of perspective.  I felt that I was always

14  aggressive but it wasn't achieving the results, so they felt we

15  had potential to do more.

16  Q.   By the way, the people that were there at the time of this

17  talk about about your cooperation, agent Jose, yourself, your

18  dad and Roberto, right?

19  A.   Yes.

20  Q.   Anybody else present?

21  A.   No.

22  Q.   You called Roberto an agent; is that your understanding,

23  that he is an agent?

24  A.   Yes.

25  Q.   As opposed to a cooperating witness of some sort?

1    A.   Yes.

2    Q.   With regard to your taxes, your plea agreement does not

3    give you immunity from prosecution for tax evasion, does it?

4    A.   I am sorry, repeat that.

5    Q.   Your plea agreement in your money laundering case does not

6    give you immunity from prosecution for tax evasion?

7    A.   That's correct.

8    Q.   But in fact you filed false tax returns from 2004 to 2008,

9    did you not?

10   A.   Correct.

11   Q.   You materially misrepresented in there all of this income

12   that you and your dad had taken and not reported?

13   A.   Correct.

14   Q.   You have not been prosecuted for that, have you?

15   A.   No.

16   Q.   You are hoping that you do not ever get prosecuted for it?

17   A.   I am sorry?

18   Q.   You are hoping that you never get prosecuted for that?

19   A.   We have amended all of those issues and we are correcting

20   them now.

21   Q.   This is a different issue; this is a criminal prosecution

22   for tax evasion.  You are not concerned you are going to be

23   charge criminally with tax evasion or having misrepresented

24   your income from 2004 to 2008?

25   A.   That is a concern.

19f4dat3                        Ankur Gupta - cross

1   Q.   You are hopeful it doesn't happen, am I correct?

2   A.   Yes.

3   Q.   When you said on direct examination that the outcome of

4   this case will have no effect on the government's letter to

5   your sentencing judge ultimately, that really is not true, is

6   it?

7   A.   That is true.

8   Q.   You think that you don't get more of a reduction if the

9   government's letter says that Ankur Gupta helped us in an

10  investigation and then testified at trial and we, the

11  government, got a conviction; you don't believe that?

12          MR. BRAGG:   Objection.

13          THE COURT:   The objection is sustained.

14  Q.   You do hope that by pleasing the government in this

15  proceeding, and any others, that they will not charge you with

16  tax evasion?

17          MR. BRAGG:   Objection.

18          THE COURT:   What's the objection.

19          MR. BRAGG:   Characterization, your Honor.

20          THE COURT:   Rephrase it.

21  Q.   You are hopeful that through your testimony in this case,

22  and others if you are testifying, that the government will not

23  prosecute you for tax evasion; is that true?

24  A.   No.   Our understanding is that we have to testify

25  truthfully as per our cooperation agreement; it has no bearing

19f4dat3                          Ankur Gupta - cross

1    on any other issue.

2    Q.   The government has the right but not the obligation to file

3    a motion in your case or letter in your case to request a

4    reduction or consideration of a reduction of your sentence, is

5    that right?

6    A.   I am sorry, repeat that.

7    Q.   The government is the one who will file a letter with your

8    sentencing judge asking the judge to consider your cooperation

9    to reduce your sentence?

10   A.   Yes.

11   Q.   And who is it that decides if the government is going to

12   file that letter?

13   A.   The government.

14   Q.   The prosecutors?

15   A.   Yes.

16   Q.   These prosecutors?

17   A.   These or from their office.

18   Q.   Who decides what the recommendation is going to be at your

19   sentencing hearing to your sentencing judge; is that again the

20   prosecutors?

21   A.   Yes.

22            MR. BRAGG:  Objection.

23            THE COURT:  The objection is sustained.  The answer is

24   stricken.  It presupposes there will be a recommendation.

25   Q.   Do you recall at the end of your conversation with

1   Mr. Datta on November 24 where you had proposed, this was the

2   first time you had proposed that he receive cash in Laredo and

3   he turned you down, do you recall any of the conversation by

4   telling him that it's fine, if you can't do it, you can't do

5   it?

6   A.   Yes.

7           MR. ROSS:   Thank you.   Nothing else.

8           THE COURT:   Do you want to take up that matter out of

9   the presence of the jury or not.

10          MR. ROSS:   Yes.

11          THE COURT:   Members of the jury, step into the jury

12  room for a minute so we can take care of something.

13          (Jury leaves courtroom)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          MR. ROSS:  Your Honor, there is a recording of a March

2     1 discussion between the witness and the agent, and several of

3     the key issues I would like the jury to hear from this witness,

4     he did not recall.  What I am requesting is that the government

5     play for the witness, outside the presence of the jury, this is

6     disk L session 2, it is what I characterized in my opening as a

7     pep talk between the agent and this witness, that includes

8     actually substantially more than I have already asked this

9     witness.

10         THE COURT:  What is it you propose, that we just

11    listen to 5 minutes, 10 minutes, 60 minutes; I don't know.

12         MR. ROSS:  No, your Honor.  What I suggest is that we

13    play it out of the court's presence, let the witness listen to

14    it.  After he listens to it, I will come back and ask him if it

15    refreshes his recollection in the presence of the jury.

16         THE COURT:  What are the specific points as to which

17    you say he professed a lack of recollection.  Give me the

18    references if you can do that.

19         MR. ROSS:  I will, your Honor.  Your Honor, the

20    witness did not recall that the agents said to him what's going

21    to happen if we don't get results, we need to start getting

22    some results.  I asked him specifically did the agent tell you

23    you have to find someone, those words, and he did not recall.

24         THE COURT:  The specific point is you have to find

25    someone, is that the specific point.

1          MR. ROSS:  That is the specific point in that little

2    vignette there.  The next one is at 17:09:50.  I asked the

3    witness if he recalled the agent saying I don't care what you

4    tell them, whatever it takes, generate something.  He did not

5    recall that.  Those are really the two.

6          THE COURT:  You have given the government the

7    references to these two?

8          MR. ROSS:  Yes, your Honor.  I know it's on disk L.

9    The second one, the latter one, I don't care what you tell

10   them, is at 17:09:50.

11         THE COURT:  The first one.

12         MR. ROSS:  The first one I will have to dig out but it

13   is, the whole conversation, this conversation between the agent

14   and him runs for about 15 minutes.

15         THE COURT:  Please answer my question.

16         MR. ROSS:  Your Honor, I tell the court as closely I

17   can, the last reference was 17:07:12, so it's somewhere between

18   17:07:12 and 17:09:50.  Both are included therefore in about

19   two minutes of this.

20         THE COURT:  Mr. Bragg, does the government agree that

21   those two phrases specifically, quote, you have to find

22   someone, close quote, and, quote, I don't care what you tell

23   them, whatever it takes, generate something, close quote, were

24   used by the agent in the presence of this witness on the

25   occasion on which that tape recording was made?

345

19f4dat3                          Ankur Gupta - cross

1           MR. BRAGG:  I don't know if those precise words were,

2      I would have to listen to the recording, I certainly know

3      something very close to that was said.  I think counsel has

4      ably made the point, so this would be cumulative.  I do believe

5      something very close to those words were said.

6           THE COURT:  Which counsel made the point it was

7      cumulative?

8           MR. BRAGG:  I believe the testimony as a general

9      matter has already reflected the tenor and substance of the

10     conversation, that these two specific points would be

11     cumulative.  That is point one.  The second point is, yes, I do

12     believe as I stand here that these remarks were made.  I would

13     have to confirm by listening to the tape at those two time

14     stamps, but the substance of it certainly was something that

15     was conveyed.

16           (Pause)

17           THE COURT:  As to the first, I am looking at the draft

18     transcript at page 68, starting at 67, the substance of that

19     quote, Mr. Ross, you have already got.  The witness said, he

20     said I recall that he said that if I recall him saying the

21     attorney needs to speak, but that nothing to do with the

22     bearing what we can provide further.

23     "Q.  Did he tell you that in these words you have to find

24     someone?

25     "A.  I don't recall.

19f4dat3                          Ankur Gupta - cross

1    "Q.  Let me go through all of these.  Do you recall being told

2    if you guys don't come up with something the lawyers will have

3    to speak?

4    "A.  Yes.

5    "Q.  Do you recall that he told you that we are going to have

6    to be more -- something?"

7             I don't know what the something was.

8             MR. ROSS:  It's aggressive.

9             THE COURT:  -- aggressive.  OK.

10   "A.  Yes.

11   "Q.  And to tell you you need to be more aggressive?

12   "A.  Yes.

13   "Q.  Did he tell you I don't care what you tell him?

14   "A.  I don't recall.

15   "Q.  Do you recall him telling you whatever it takes, generate

16   something?

17   "A.  Something to that effect."

18            I think you've got it.  Next.  I guess that is it

19   actually; that covers both of them, doesn't it?

20            MR. ROSS:  It does.

21            THE COURT:  It seems to me that it's cumulative and we

22   are not going to take the time.  Let's bring the jury back.

23            MR. ROSS:  Very well.

24            (Continued on next page)

25

19f4dat3                        Ankur Gupta - cross

1              (Jury entersleaves courtroom)

2              THE COURT:  The record will reflect the presence of

3     jurors and the defendant as they have been here throughout.

4              Any further questions?

5              MR. ROSS:  No, your Honor, thank you.

6              THE COURT:  Any redirect?

7              MR. BRAGG:  No, your Honor.

8              THE COURT:  Thank you.  You are excused.

9              (Witness excused)

10             THE COURT:  Next witness.

11             MR. BRAGG:  The government calls Roxana Beltran.

12     ROXANA BELTRAN,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15    DIRECT EXAMINATION

16    BY MR. BRAGG:

17    Q.  How old are you?

18    A.  31.

19    Q.  How far did you go in school?

20    A.  12th grade.

21    Q.  Where do you work?

22    A.  La Versailles perfume store.

23    Q.  What does La Versailles do?

24    A.  We sell perfume.

25    Q.  Where specifically do you work for La Versailles?

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

19f4dat3                          Beltran - direct

1    A.   In San Ysidro, California.

2    Q.   What type of facility do you work in?

3    A.   In the perfume area.

4    Q.   Do you work in a retail store?

5    A.   Yes.

6    Q.   How long have you worked at La Versailles?

7    A.   For about a year and three months.

8    Q.   You started in about May 2010?

9    A.   Correct.

10   Q.   Have you worked at the same store the entire time?

11   A.   Yes.

12   Q.   Where is the store located?

13   A.   4440 San Ysidro Boulevard.

14   Q.   When you first started what was your position?

15   A.   Sales representative.

16   Q.   Did your position change over time?

17   A.   Yes.

18   Q.   What were the various roles you held?

19   A.   Currently, I am a store manager.

20   Q.   Did you do anything between sales and being a store

21   manager?

22   A.   Repeat that.

23   Q.   Did you hold any other positions besides sales and now

24   being a store manager?

25   A.   Yes.

1   Q.   What position?

2   A.   Just those two positions I held for that time.

3   Q.   When did you become a store manager?

4   A.   Three months after, 3 or 4 months after I got hired.

5   Q.   What was your position in late August 2010?

6   A.   Manager.

7   Q.   The store manager position?

8   A.   Yes.

9   Q.   What are your responsibilities as store manager?

10  A.   Open, close the store, audit registers, report sales to

11  bookkeeper, order merchandise.

12  Q.   Is the San Ysidro store located close to the United

13  States-Mexico border?

14  A.   Yes.

15  Q.   How close?

16  A.   About a mile and a half.

17  Q.   Are most of your customers from Mexico?

18  A.   50/50 I believe.

19  Q.   When you say 50/50?

20  A.   50 from Mexico and 50 from the U.S.

21  Q.   At your store the time you have been there, many purchases

22  for over $10,000 did you get involved in?

23  A.   Just one.

24  Q.   When was that purchase?

25  A.   When?

19f4dat3                           Beltran - direct

1   Q.   Yes.  Not a specific date, the general time period.

2   A.   In August.

3   Q.   August 2010?

4   A.   Yes.

5   Q.   Do you know an employee at La Versailles named Cynthia?

6   A.   Yes.

7   Q.   Do you know her last name?

8   A.   No.

9   Q.   Have you ever met her in person?

10  A.   No.

11  Q.   How do you know her?

12  A.   I know her by phone.

13  Q.   What's your understanding what her job is at La Versailles?

14  A.   She is in charge of the warehouse and she is the person we

15  contact to order merchandise or let her know what perfume we

16  don't have in the store at the moment.

17  Q.   Do you know where the warehouse is located?

18  A.   No.

19  Q.   How frequently in connection with your job duties are you

20  in contact with Cynthia?

21  A.   One to three times a week.

22  Q.   Did you have a conversation with Cynthia in late August

23  2010 about the order over $10,000 you just testified about?

24  A.   Yes.

25  Q.   Was that conversation on the phone?

1   A.   Yes.

2   Q.   Did you call her or did she call you?

3   A.   I called her.

4   Q.   What did you talk with her about on that phone

5   conversation?

6   A.   That there was a customer that sent an email.

7   Q.   What was the email about?

8   A.   About us filling an order for the customer.

9   Q.   Did you talk to Cynthia on that call about your store at

10  San Ysidro filling the order?

11  A.   Yes.

12  Q.   What did you say to her and what did she say to you?

13  A.   I told her a customer had sent an email and had called

14  wanting a few perfumes and she said to go ahead and help him

15  out with the order.  And then I told her that the customer

16  wanted just certain perfumes, the full amount, and I told her

17  that he didn't want any different perfumes, just the ones he

18  wanted, the ones he had listed on the list he sent through

19  email.

20  Q.   Did you have the ones wanted in your store?

21  A.   Not that amount.

22  Q.   Did you relay that to Cynthia?

23  A.   Yes.

24  Q.   What did she say in response if anything?

25  A.   For us to sell other stuff that we had at the store besides

1    the ones he was asking for.

2    Q.  After that phone call did he speak with Cynthia again about

3    this customer?

4    A.  Yes.

5    Q.  When was that?

6    A.  It was the same day.

7    Q.  Also on the phone, correct?

8    A.  Yes, over the phone.

9    Q.  What did you talk about with Cynthia on that phone

10   conversation?

11   A.  That I had talked to the customer and let him know that, I

12   had asked the customer if he wanted other stuff besides the

13   ones on list which he said no.  That's when I called Cynthia

14   back letting are her know that.  I told her she would have to

15   take the customer, for her, like, for her to deal with the

16   customer.

17   Q.  What was Cynthia's response if anything?

18   A.  She, that she would talk to him.

19   Q.  Did you, did she say anything else on that phone call?

20   A.  No.

21   Q.  Did you at any point in the future interact with the

22   customer again?

23   A.  Yes.

24   Q.  When was that in relation to when you spoke with Cynthia on

25   the phone the second time?

19f4dat3                          Beltran - direct

1   A.  The same time; right after I spoke to Cynthia I called him

2   back and let him know that Cynthia was going to help him out

3   with the order.

4   Q.  Do you know if Cynthia was able to help him out with the

5   order?

6   A.  Yes.

7   Q.  How so?

8   A.  She talked to him over the phone I believe and she talked

9   to him over the phone and let him know that we were going to

10  fill his order from the warehouse.

11  Q.  Did you receive perfumes from the warehouse in connection

12  with his order?

13  A.  Yes.

14  Q.  How long after your phone conversation, the second one with

15  Cynthia, did you receive perfume from the warehouse?

16  A.  3 or 4 days after.

17  Q.  What did you do after you received the perfume in your

18  store if anything?

19  A.  I actually called the customer to let him know the

20  merchandise was there and that he was able to pick it up.

21  Q.  Did the customer come to the store and pick it up?

22  A.  Yes.

23  Q.  How did the customer pay?

24  A.  In cash.

25  Q.  Approximately how much was the order for?

19f4dat3                          Beltran - direct

1   A.  38,000.

2   Q.  Did he pay you the total amount at that time?

3   A.  No.

4   Q.  Had he paid some portion previously to the store?

5   A.  Yes.

6           THE COURT:  Was what he paid you the difference

7   between the 38,000 and what he had paid previously?

8           THE WITNESS:  He had paid 20 when he first visited the

9   store and then the rest he paid after.

10           THE COURT:  So on the occasion he came back to pick up

11   the merchandise, he gave you 18,000 in cash; is that what you

12   are telling us?

13           THE WITNESS:  Yes.

14   BY MR. BRAGG:

15   Q.  While the customer was in the store, did anyone call the

16   store?

17   A.  Did what?

18   Q.  Did anyone call the store while the customer was there?

19   A.  Mr. Datta.

20   Q.  Did you speak to Mr. Datta?

21   A.  Yes.

22   Q.  What did he say to you?

23   A.  He wanted me to get the customer on the phone.

24   Q.  Did you know how Mr. Datta knew the customer was there?

25   A.  I believe in the cameras that we have at the store.

1   Q.   Surveillance cameras?

2   A.   Yes.

3   Q.   Did Mr. Datta and the customer -- did you hand the phone to

4   the customer?

5   A.   I said to him Mr. Datta was on the phone, he would like to

6   speak to you.   The customer said, tell him I don't have any

7   time right now, I will call him later.   Then I said, I told

8   Mr. Delta the answer of the customer and Mr. Data said to get

9   him on the phone.   So, the customer got on the phone and after

10  that I don't know, they just spoke.

11  Q.   Did you speak back to Mr. Datta after the customer spoke to

12  him?

13  A.   No.

14  Q.   When you were on the phone with Mr. Datta did he ask you to

15  get identification from the customer?

16  A.   No.

17  Q.   Did you provide this customer with a receipt of any sort?

18  A.   Yes.

19          MR. BRAGG:   If I have could have on the monitor for

20  the witness Exhibit 704 for identification.

21  Q.   Do you recognize what has been marked Exhibit 704?

22  A.   Yes.

23  Q.   How do you recognize it?

24  A.   My writing is on the receipt.

25  Q.   What is it?

19f4dat3                          Beltran - direct

1    A.   It says *recivi el resto*, which means I received the rest.

2    Q.   Is this the receipt you are referring to that you handed to

3    the customer that day?

4    A.   Yes.

5              MR. BRAGG:   The government offers 704.

6              MR. ROSS:   No objection.

7              THE COURT:   Received.

8              (Government Exhibit 704 received in evidence)

9    Q.   On the right-hand corner it says --

10             THE COURT:   We can all read it.

11             MR. BRAGG:   You can take 704 down.

12   Q.   The money you received, the cash you received from the

13   customer that day, what did you do with it?

14   A.   I received it, I counted it when the customer gave it to

15   me, I gave him change back, and I put it in the safe.

16   Q.   After you put it in the safe what did you do?

17   A.   Deposit in the bank account.

18   Q.   701 and 702, do you recognize 701?

19   A.   Yes.

20   Q.   How do you recognize it?

21   A.   The amount.

22   Q.   What is it?

23   A.   $20,000.

24   Q.   What is the exhibit as a general matter?

25   A.   What is what?

1   Q.   What is it that you are looking at?

2   A.   That's the amount.

3          THE COURT:   The deposit slip for the bank.

4          THE WITNESS:   Yes, Bank of America.

5   Q.   Look at 702.   Is that also a deposit slip?

6   A.   Yes.

7   Q.   Do you know what these deposit slips relate to?

8   A.   To the 40,000.

9   Q.   How do you know that?

10  A.   Because this one, the previous one was deposited before,

11  the 20.

12  Q.   How do you know that?

13  A.   Because another employee deposited this receipt and then I

14  deposited the $20,000 one.

15         MR. BRAGG:   The government offers 701 and 702.

16         MR. ROSS:   No objection.

17         THE COURT:   Received.

18         (Government Exhibits 701, 702 received in evidence)

19  Q.   Exhibit 702 which is on the screen, there is some writing

20  at the top.   Is that your handwriting?

21  A.   Yes.

22  Q.   What does it say?

23  A.   Attention Yolanda from San Ysidro store.

24  Q.   Who is Yolanda?

25  A.   She is the bookkeeper.

1    Q.   Do you know where she is located?

2    A.   No, not exactly the store, no.

3    Q.   Did you send this deposit slip to Yolanda?

4    A.   Yes.

5    Q.   Was it the store's practice to send bank deposits like this

6    to Yolanda?

7    A.   Yes.

8    Q.   Did Yolanda ask you to fill out any paperwork in connection

9    with this deposit slip?

10   A.   No.

11   Q.   Did Cynthia ever ask you to fill out any paperwork in

12   connection with the order that the customer placed?

13   A.   No.

14   Q.   Did Mr. Datta ask you at any time to fill out any paperwork

15   in connection with that purchase?

16   A.   No.

17            MR. BRAGG:   No further questions.

18            THE COURT:   Thank you.

19            Members of the jury, 2:00.

20            (Lunch recess)

21            (Continued on next page)

22

23

24

25

19fddat4                       Beltran - cross

1                    A F T E R N O O N   S E S S I O N

2                              2 p.m.

3    ROXANA BELTRAN,

4         Resumed, and testified further as follows:

5              (Jury present)

6              THE CLERK:  Please be seated.

7              THE COURT:  All right.  The defendant and the jurors

8    all are present.

9              Let's continue.

10   CROSS-EXAMINATION

11   BY MR. WHITE:

12   Q.  Good afternoon, Ms. Beltran.

13              You testified that in August of 2010 you received an

14   e-mail from a customer ordering a large quantity of perfumes,

15   correct?

16   A.  Correct.

17   Q.  OK.  I'd like to show you what's marked as Defendant's

18   Exhibit A, for identification, and ask you if you recognize

19   that?

20   A.  Correct.

21   Q.  What is that?

22   A.  It's an e-mail that we received from the customer of the

23   perfumes he wanted.

24              MR. WHITE:  Your Honor, I offer Defendant's Exhibit A

25   in evidence.

19fddat4                           Beltran - cross

1          MR. BRAGG:  No objection, your Honor.

2          THE COURT:  Received.

3          (Defendant's Exhibit A received in evidence)

4    BY MR. WHITE:

5    Q.  And the e-mail is from is it Jose Correa?

6    A.  Correct.

7    Q.  And the e-mail is addressed as Correa Perfumera at

8    Gmail.com?

9          THE COURT:  I'm assuming literacy on the part of all

10   involved in the trial.  We don't have to have responsive

11   readings.

12         MR. WHITE:  I understand, your Honor.

13         THE COURT:  Thank you.

14   Q.  Now, this order, was it different from the type of business

15   you usually conducted at the San Ysidro store?

16   A.  No.

17   Q.  In size, in the volume of business that it was seeking to

18   conduct?

19   A.  Yes.

20   Q.  What was the usual sale in the San Ysidro store?

21   A.  Usual wholesales are 15, 20 hundred, 500, 600.

22   Q.  That would be the usual wholesale order, you say?

23   A.  Yes.

24   Q.  And did you also do retail sales?

25   A.  Correct.

19fddat4                          Beltran - cross

1   Q.  What would the average retail sale be or the range of

2   retail sales?

3   A.  Depending on how many perfumes a customer took,

4   100-something, 120, 130, 140.

5   Q.  And this I think you testified this order was for almost

6   $40,000 worth of perfume?

7   A.  Correct.

8   Q.  And up until this time, what was the largest transaction

9   you had done?

10  A.  16, 1600 maybe.

11  Q.  So this was an unusual transaction in size, wasn't it?

12  A.  Correct.

13  Q.  And did the San Ysidro store have this kind of inventory,

14  sufficient inventory to fill an order like this?

15          THE COURT:  Mr. White, I hate to interrupt but this is

16  very repetitious.

17          MR. WHITE:  Of the direct, your Honor?

18          THE COURT:  Yes.  We just heard this whole thing about

19  calling back to Laredo because they didn't have the inventory.

20  So why go over it all again?

21          MR. WHITE:  Just the unusual nature of the

22  transaction, your Honor.

23          THE COURT:  I mean, if there is some other purpose, by

24  all means, but I'm not seeing it.

25  BY MR. WHITE:

19fddat4                          Beltran - cross

1   Q.  You testified that you did not ask the customer at any

2   stage for identification, correct?

3   A.  Correct.

4   Q.  And you didn't prepare, or you neither prepared nor were

5   told to prepare any special paperwork regarding this sale,

6   correct?

7   A.  Correct.

8   Q.  You weren't told to prepare any forms to submit to a bank

9   or forms to submit to the government, nothing like that?

10  A.  Correct.

11  Q.  Had you ever had a transaction where you had to fill out

12  such forms?

13  A.  No.

14  Q.  Had you had transactions where you had to ask for

15  identification?

16              MR. BRAGG:  Objection.

17              THE COURT:  Ground?

18              MR. BRAGG:  "Had to."

19              THE COURT:  Sustained.

20  Q.  Did you ever have transactions where you asked for

21  identification?

22  A.  Yes.

23  Q.  And under what circumstances would you ask for

24  identification?

25  A.  When a customer's paying with an international credit card,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19fddat4                          Beltran - cross

1    we asked for identification.

2    Q.   You asked for what?   Identification?

3    A.   Identification, yes.

4    Q.   And why is that?

5    A.   Because we charge 3 percent more from the total charge of

6    the sale.   So when it is international we charge 3 percent more

7    and we ask for an ID.

8    Q.   Showing you Government Exhibit 704 in -- well, if we could

9    put up 704, please?

10            Do you see on Exhibit 704, Ms. Beltran, there is some

11   handwriting going across the page, from the lower left to the

12   upper right?

13   A.   Yes.

14   Q.   What is that?

15   A.   That's the customer's signature.

16   Q.   That was the customer's signature?

17   A.   Yes.

18   Q.   So the customer -- and what's the signature on?   What is

19   this document?

20   A.   It's an invoice -- it's a receipt, a receipt of the items

21   that were purchased.

22   Q.   And did you keep a copy of this receipt at the store?

23   A.   Yes.

24   Q.   And where was it kept?

25   A.   In a file.

1   Q.  How was -- is your filing system set up by customer, by day

2   of the week, or by how?

3   A.  By customer.

4   Q.  So you set up a file for this customer in your store?

5   A.  Yes.

6           MR. WHITE:  No further questions, your Honor.

7           THE COURT:  Thank you.  Any redirect?

8           (Pause)

9           MR. BRAGG:  No questions, your Honor.

10          THE COURT:  All right.  Thank you.  You are excused,

11  Ms. Beltran.

12          Next witness.

13          MR. BRAGG:  The government calls Jose Correa.

14          (Witness excused)

15          THE CLERK:  Sir, if you can please remain standing and

16  raise your right hand for a moment.

17   JOSE CORREA,

18      called as a witness by the government,

19      having been duly sworn, testified as follows:

20          THE CLERK:  Please be seated.  Please state your name

21  and spell your last name.

22          THE WITNESS:  Yes.  My name is Jose Correa, last name

23  is C-o-r-r-e-a.

24          THE COURT:  Counsel.

25  DIRECT EXAMINATION

19fddat4                          Correa - direct

1    BY MR. BRAGG:

2    Q.  Are you working currently, sir?

3    A.  No.  I'm retired.

4    Q.  Do you do any sort of work right now?

5    A.  Yes.  I do consulting for an attorney out of Florida.

6    Q.  What did you do prior to retiring?

7    A.  I was a detective assigned to the DEA Task Force.

8    Q.  Where were you assigned there from?  What was your home

9    office?

10   A.  The Passaic County Sheriff's Department in New Jersey.

11   Q.  How long did you work for the Passaic County Sheriff's

12   Department?

13   A.  I worked for a total of 22 years.  16 of those years was

14   with the DEA.

15   Q.  What was the assignment when you were with the DEA?

16   A.  I was assigned to a narcotics money laundering task force

17   group.

18   Q.  What did the Task Force do?

19   A.  We investigated narcotics and money laundering cases.

20   Q.  Which agencies were members of the Task Force?

21   A.  There was quite a few of them.  There was the Passaic

22   County Sheriff's Department, the Hudson County Sheriff's

23   Department, the Bayonne Police, Paterson Police, Elizabeth

24   Police, a few others, along with agents from the DEA.

25   Q.  OK.  Who was in charge of the Task Force?

19fddat4                          Correa - direct

1    A.   Special Agent Chris Urban.

2    Q.   Is he a special agent with the Drug Enforcement

3    Administration?

4    A.   Yes, he is.

5    Q.   Did he have the authority, to your knowledge, to

6    investigate money laundering crimes?

7    A.   Yes.

8    Q.   And your work on the Task Force, was it under his

9    direction?

10   A.   Yes, it was.

11   Q.   Did there come a point when you became involved in your

12   work at the Task Force in an investigation of a person named

13   Vikram Datta?

14   A.   Yes, sir.

15   Q.   What was your role in the investigation?

16   A.   I worked as an undercover in the case.

17   Q.   Do you see Mr. Datta in the courtroom today?

18        MR. ROSS:   Your Honor, we would stipulate to the

19   identity of Mr. Datta, if the government wishes.

20        THE COURT:   So stipulated.

21   Q.   When was your first interaction with Mr. Datta?

22   A.   I believe it was August of 2010.

23   Q.   Let me ask you this.  Did you meet Mr. Datta one time or

24   more than one time?

25   A.   No, just once.

19fddat4                          Correa - direct

1    Q.   And did you -- did there come a point in time when you went

2    to one of his stores?

3    A.   Yes.

4    Q.   When was the time when you actually met Mr. Datta?

5    A.   I met Mr. Datta -- I can't recall the exact date, but I'm

6    assuming it was in the summer of 2010.  I don't remember.

7    Q.   OK.  Where was it?  Do you remember where it was?

8    A.   Yes.  It was in Las Vegas.  It was at a convention center

9    in one of the hotels there.

10   Q.   And what were the circumstances under which you met

11   Mr. Datta?

12   A.   The purpose was for us to go out and see if we can generate

13   some business with him.

14   Q.   Well, how did it come to be that you met him?

15   A.   I was introduced to Mr. Datta by Ankur Gupta.

16   Q.   Who is Ankur Gupta?

17   A.   Ankur Gupta is one of the cooperating witnesses in the

18   case.

19   Q.   And when you were introduced by Mr. Gupta, who else was

20   present, if anyone?

21   A.   His father.

22   Q.   Do you know his father's name?

23   A.   I think it was Ajay Gupta.  I can't remember.

24   Q.   And were you accompanied by anyone?

25   A.   I was accompanied about a confident informant, Roberto.

19fddat4                          Correa - direct

1   Q.   And when Mr. Gupta introduced you -- withdrawn.  Did he

2   also introduce Roberto?

3   A.   Yes.

4   Q.   When Mr. Gupta introduced you and Roberto, who did he

5   represent that you were?

6   A.   He told the defendant that we were customers from Mexico

7   and that we were there to see if we can generate some business

8   and that we purchased perfume on a cash basis.

9   Q.   During this conversation, did you tell Mr. Datta how much

10  perfume you wanted to purchase?

11  A.   Yes.  During the conversation we decided that it would be

12  between 50 and 70,000 or $60,000 in cash every time we decided

13  to do so.

14  Q.   What, if anything, was Mr. Datta's response to the amount?

15  A.   He laughed it off and said it was -- that was peanuts,

16  pennies for him.

17  Q.   During that conversation, did Mr. Datta say anything to you

18  about how his customers pay?

19  A.   Yes.  He mentioned that all his customers or the majority

20  of his customers pay in cash.

21  Q.   While you were with Mr. Datta, did he call anyone?

22  A.   Yes.  He made a phone call to one of his workers in the

23  Laredo office, Cynthia.

24  Q.   Did he ask you to speak to Cynthia?

25  A.   Yes.

19fddat4                    Correa - direct

1   Q.  Did you?

2   A.  Yes, I did.

3   Q.  And what did you speak about?

4   A.  The purpose of the call was just for him to exchange some

5   information.  She wanted my fax number so they can send me a

6   copy or a list of the prices on the perfumes that Mr. Gupta was

7   selling.

8   Q.  You don't -- do you recall the date of this meeting, sir?

9   A.  No, I don't.

10          MR. BRAGG:  OK.  Ms. Quinones, could you call up

11  101-T.  I believe it is actually already in evidence.

12  A.  Am I looking on this screen here?

13  Q.  It should come up on your screen, sir.

14          What is -- are you familiar with 101-T?

15  A.  Yes.

16  Q.  And I know you just have the first page in front of you,

17  but is this the first page of a transcript of the introduction

18  you just testified about?

19  A.  Yes.

20  Q.  Is this your signature, the first one on the upper

21  right-hand corner?

22  A.  Yes, it is.

23  Q.  Does seeing the date here refresh your recollection as to

24  on what date this conversation occurred?

25  A.  Yes.  September 9, 2011.

370

19fddat4                        Correa - direct

1    Q.   Is that the date you signed, September 9, 2011?

2    A.   Yes.

3    Q.   What was the date of this introduction meeting?

4    A.   I'm assuming it might have been August of 2011.

5    Q.   Do you see the date field, sir?

6    A.   Oh, I'm sorry.  March 2nd.

7    Q.   So after this initial introduction, did there come a point

8    in time where you actually purchased perfume from one of

9    Mr. Datta's stores?

10   A.   Yes.

11   Q.   Approximately how long after this first meeting was that?

12   A.   Four months later, I would assume, if I can remember

13   correctly.

14   Q.   And what did you do to go about placing the order?

15   A.   We went to the store, which was in the San Ysidro area of

16   California.  And I spoke with a young lady behind the counter,

17   her name was Laura.  And I told her that I was there on behalf

18   of -- I was there to purchase some perfume and that I had

19   spoken to Mr. Datta in reference to it and he had told me to

20   come down to the store to do so.

21   Q.   And were you able to fill that order that day?

22   A.   No.  I wasn't able to fill the order because I had $40,000

23   in cash, and the young lady told me that she couldn't fill the

24   order because she didn't have enough perfume in that sore to

25   fill that order.  She told me that if I wanted to, I could fill

1   the order through the Laredo store and have it shipped over to

2   San Ysidro at which point I would pick it up.

3   Q.   Did you leave any money at the store that day?

4   A.   Yes.   On that particular day I went to the store, and while

5   I was speaking with Laura, I told her that I had $40,000 in

6   cash and I didn't want to hold on to it, would she take at

7   least half of the money so that I can hold on to the rest.   And

8   she didn't have a problem with that.

9   Q.   And after that interaction, did you speak again to Cynthia?

10  A.   Yes.   After that transaction I did speak with Cynthia,

11  because Cynthia was one who was filling the order for us out of

12  the Laredo, Texas store.

13  Q.   And what did you say to Cynthia and what did she say to

14  you?

15  A.   Basically the conversations that I had with Cynthia was

16  basically placing the order and her shipping it to me, but that

17  was pretty much the extent of the conversations that I had with

18  her throughout that time.

19  Q.   OK.   How long did it take before you were able to actually

20  physically take possession of the perfume?

21  A.   Approximately ten days.

22  Q.   And did you go back to the San Ysidro store to get the

23  perfume?

24  A.   Yes.   There was a date where I went back, which was

25  approximately ten days later we went back.   I received a phone

19fddat4                        Correa - direct

1   call that the perfume had arrived at the San Ysidro store.  At

2   that point I went back and paid the remainder of the money and

3   took the perfume and shipped it out to -- took it to FedEx and

4   shipped it out.

5   Q.  Let me just show you 704, already in evidence, your Honor.

6         Is this a receipt you received on that second day?

7   A.  Yes.

8   Q.  And is that in the middle, is that your signature?

9   A.  That is correct.

10  Q.  Actually, I should say that's the signature that you used

11  as an undercover, correct?

12  A.  Correct.

13        MR. BRAGG:  Now, if we could just show 705, just to

14  the witness, Ms. Quinones.

15  Q.  Do you recognize what's been marked for identification as

16  Government Exhibit 705?

17  A.  Yes, sir.  That's the actual handwritten receipt that was

18  given to me by Lara the first time I went to the store, and the

19  amount was for $20,000.

20        MR. BRAGG:  The government offers Exhibit 705.

21        MR. ROSS:  Without objection, your Honor.

22        THE COURT:  Received.

23        (Government's Exhibit 705 received in evidence)

24        MR. BRAGG:  You can take the exhibit down.  Thank you.

25  Q.  While you were at the store picking up the perfume, did you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19fddat4                         Correa - direct

1    speak with Mr. Datta?

2    A.   Yes, I did.

3    Q.   Did he call you or did you call him?

4    A.   No.  He called the store and told one of the girls that he

5    wanted to speak to me.

6    Q.   Did you actually -- well, then you actually spoke to him,

7    right?

8    A.   Yes, I did speak with him.

9    Q.   During that call, what did he say to you and what did you

10   say to him?

11   A.   Basically, the conversation was he was apologizing to me

12   because of what had happened.  I couldn't fill the order there

13   so I had to stay in San Diego for quite some time to have that

14   order filled.  And I told him that wasn't a problem and he said

15   that it wouldn't happen again.

16          At that moment he asked me if I was going to be around

17   the following week because he wanted to know -- because he was

18   under the assumption that I traveled to San Diego a lot.  So I

19   told him that I may be, and that he wanted to talk to myself

20   and to Mario.

21          At that point I said to him, listen, would it be a

22   problem if the next time around I give you -- I bring the money

23   to the store, I give the cash to the store, and then place the

24   order through Laredo, Texas, at which point he said there was

25   no problem with that.

19fddat4                        Correa - direct

1    Q.  Which store are you talking about?

2    A.  I'm talking about I would bring the money to the San Ysidro

3    store and then give the money to the people at the San Ysidro

4    store and then place the order from Laredo and then Laredo

5    would ship the perfume over to San Ysidro and I would receive

6    it there.

7    Q.  Did you tell Mr. Datta why you wanted to proceed that way?

8    A.  Yes.  The reason why was because I was receiving a lot of

9    money in San Diego and I didn't want to move through other

10   states with a large amount of currency on me.

11          MR. BRAGG:  One moment, your Honor.

12          No further questions, your Honor.

13          THE COURT:  Thank you.  Cross-examination.

14          MR. ROSS:  Thank you, your Honor.

15   CROSS-EXAMINATION

16   BY MR. ROSS:

17   Q.  Mr. Correa, good afternoon, sir.

18   A.  Good afternoon, sir.

19   Q.  Mr. Correa, the exhibit that was put in front of you,

20   101-T, is a transcript that purports to be a meeting that you

21   had at the Las Vegas show with Mr. Datta, correct?

22   A.  Correct, sir.

23   Q.  That is the first time you ever met him?

24   A.  Yes, sir.

25   Q.  You were introduced, as I understand it, by these fellows

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19fddat4                          Correa - cross

1    Ankur and Ajay Gupta along with Roberto?

2    A.   Correct, sir.

3    Q.   Roberto is a CI?

4    A.   He is a confidential informant.

5    Q.   OK.  And you two were wholesalers from Mexico?

6    A.   Yes.

7    Q.   I mean, that was the role you were playing?

8    A.   Correct.

9    Q.   That's the way you were introduced?

10   A.   Correct.

11   Q.   OK.  So you met with him.  We haven't heard this tape,

12   which is why I'm asking you.  Did you ever tell him that,

13   during the course of this March 2nd meeting, that you worked

14   for the Sinaloa Cartel?

15            THE COURT:  I'm sorry.  Did he ever tell who?

16            MR. ROSS:  Mr. Datta, your Honor.

17            THE COURT:  Are you asking whether he told him during

18   the meeting which is on the tape?

19            MR. ROSS:  Yes, sir.

20            THE COURT:  Go ahead and answer.

21   A.   No, sir.

22   Q.   Now, that is dated March 2nd.  You arrived in Las Vegas

23   prior to that day, did you not?

24   A.   Yes.

25   Q.   And you met with Roberto, the confidential informant, and

19fddat4                    Correa - cross

1   the two cooperating witnesses, Ankur and Ajay Gupta?

2   A.   That's correct.

3   Q.   Did you have a conversation with Ankur and Ajay Gupta and

4   Roberto about the level of aggressiveness with which they were

5   assisting in your investigation of Mr. Datta.

6   A.   No, sir.

7   Q.   OK.  You did not on March 1st say to Ankur and Ajay Gupta

8   that --

9           "I want to see if I can drive this home to you.  We

10  think you don't think it's a big problem.  The problem that you

11  guys have, you may not think it's a big deal."

12          -- do you recall that?

13  A.   Yes, sir, I do recall that but Roberto wasn't present.

14  Q.   OK.  Ankur and Ajay Gupta?

15  A.   Yes, sir.

16  Q.   So you told them that.  And you told them that it is in

17  fact a big deal and that you did not believe that they were

18  being as aggressive as you thought they should be?

19  A.   Yes, sir, that is correct.

20  Q.   And did you tell them that you're trying to be as nice as

21  you could possibly be but what I am trying to say is that we

22  need to start getting some results?

23  A.   Yes, sir, that is correct.

24  Q.   Did you tell them that you need to start being a little

25  more aggressive, you need to reach out, you have to find

1    someone?

2    A.  Yes, sir, I did.

3    Q.  Did you tell them that doing what we ask of you is not

4    enough; did you tell him that?

5    A.  Yes, sir, I did.

6    Q.  And did you go on to tell them that we need to start

7    getting involved and getting into some of these people?

8    A.  Yes, sir, I did.

9    Q.  And this is at a perfume show and you are referring to a

10   group of perfume dealers?

11   A.  Correct.

12   Q.  OK.  Did you tell them that I don't care what you tell

13   them?

14   A.  Yes, sir, I did.

15   Q.  You have to be more aggressive?

16   A.  That's correct.

17   Q.  I don't care what you tell them, generate something?

18   A.  That's correct.

19   Q.  Do whatever it takes?

20   A.  Yes, sir.

21   Q.  These are your instructions to two cooperating witnesses

22   who are acting in an undercover capacity?

23   A.  Correct.

24   Q.  OK.  Specifically regarding Vikram Datta, did you say, make

25   sure you make him want to work with us?

19fddat4                           Correa - cross

1    A.   If I can remember correctly, yes.

2    Q.   Did you say to him that we -- meaning your group -- we know

3    how to angle them?

4    A.   Probably so, yes, sir.

5    Q.   And did you say, you need to be more proactive, you've got

6    to set it up?

7    A.   That's correct.

8    Q.   At the end of the day, this is for your benefit, we need to

9    get some results.

10   A.   That is correct.

11   Q.   In response to that, was it true that Ankur Gupta said to

12   you, on the last set of phone calls, we did everything we were

13   supposed to do, we did everything we were supposed to do, and

14   he wouldn't take our money?

15   A.   If that's on the recording, the answer would be yes, sir.

16            THE COURT:  Do you remember?

17            THE WITNESS:  I don't recall at this moment.

18            THE COURT:  Thank you.

19   Q.   And then, finally, do you recall, So let's start with

20   Vikram, let's really try to get aggressive and get these guys

21   on board?

22   A.   That is correct, sir.  I did say that.

23            MR. ROSS:  Thank you.  I have nothing else, your

24   Honor.

25            THE COURT:  Thank you.  Redirect.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19fddat4                          Correa - cross

1              MR. BRAGG:  No redirect, your Honor.

2              THE COURT:  The witness is excused.  Thank you.

3              (Witness excused)

4              THE COURT:  Next witness.

5              MR. SKINNER:  Your Honor, the government calls Special

6    Agent Brian Duffy.

7              THE CLERK:  Special Agent Duffy, please remain

8    standing and raise your right hand for a moment.

9     BRIAN P. DUFFY,

10         called as a witness by the government,

11         having been duly sworn, testified as follows:

12              THE CLERK:  Please be seated.

13         Would you please state your name and spell your last

14   name for the record.

15              THE WITNESS:  My name is Brian P. Duffy, D-u-f-f-y.

16              THE COURT:  Mr. Skinner.

17              MR. SKINNER:  Yes, your Honor.

18         Before we begin, I would like to read a stipulation,

19   if that's OK.

20              THE COURT:  Yes.

21              MR. SKINNER:  It is stipulated and agreed between the

22   parties that Government Exhibits 602 and 608 are printouts of

23   commercial checking account records for La Versailles

24   Fragrances, and Government Exhibit 602 and 608 were retrieved

25   from the computer archive system of Wells Fargo Bank.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19fddat4

1           The records reflect that Government Exhibit 602 and

2    608 were created by a person with knowledge of, or created from

3    information transmitted by a person with knowledge of the

4    information shown, were created at or near the time the

5    information became available to Wells Fargo Bank and were

6    create and maintained by Wells Fargo Bank as part of its

7    regularly conducted business activity.

8           It is further stipulated and agreed that Government

9    Exhibits 602 and 608 and this stipulation may be received in

10   evidence at trial.

11          The stipulation I just read is marked as Government

12   Exhibit 809.

13          The government would hereby offer Government Exhibits

14   809, 602 and 608.

15          THE COURT:   Received.

16          (Government's Exhibits 809, 602, 608 received in

17   evidence)

18   DIRECT EXAMINATION

19   BY MR. SKINNER:

20   Q.  Mr. Duffy, where do you work?

21   A.  I work for Homeland Security Investigations.

22   Q.  And what is Homeland Security investigations?

23   A.  Homeland Security Investigations is a law enforcement

24   agency that investigates transnational crime.

25   Q.  Is this a law enforcement agency that is part of the

1    federal government?

2    A.   Yes, it is.

3    Q.   What department within the federal government is Homeland

4    Security investigations part of?

5    A.   It is under the Department of Homeland Security.

6    Q.   What is your title there?

7    A.   Special Agent.

8    Q.   And how long have you worked as a special agent?

9    A.   Approximately four-and-a-half years.

10   Q.   Generally speaking, what are your duties and

11   responsibilities as a special agent?

12   A.   Generally, Homeland Security Investigations investigates

13   transnational crime and criminal organizations involved in

14   smuggling of contraband.  Specifically, I'm assigned to a group

15   that investigates the smuggling of narcotics and currency,

16   money laundering.

17   Q.   Now, as part of your training and experience, have you had

18   any training and experience analyzing financial account

19   statements like bank account statements?

20   A.   Yes.

21            MR. SKINNER:  Your Honor, I would like to publish

22   Government Exhibit 602.

23            THE COURT:  Yes.

24            MR. SKINNER:  Which was just received in evidence.

25            Please call up the first page of 602, please,

19fddat4                    Duffy - direct

1    Ms. Quinones.  And maybe blow up the top half of the page.

2    Q.  Can you see the top half of the first page of Government

3    Exhibit 602 in front of you, Mr. Duffy?

4    A.  Yes.

5    Q.  And did you review this exhibit prior to testifying today?

6    A.  I have.

7    Q.  And can you just tell us what this exhibit is?

8    A.  This is a Wells Fargo Bank statement for La Versailles

9    Fragrances, Laredo, Texas.

10   Q.  And is there information on the account statement

11   indicating the period of time covered by the statement?

12   A.  Yes.  The start date of March 1, 2010 and a statement end

13   date of March 31, 2010.

14          MR. SKINNER:  Ms. Quinones, can you now call up the

15   second page of the document, and blow up the postings relevant

16   to March 1st to the beginning of March 3rd.

17   Q.  And, Agent Duffy, just looking at the second page of the

18   account statement, we are now looking -- let me direct your

19   attention to the transactions noted on March 1st and

20   March 2nd -- can you just briefly describe for us what kind of

21   transactions are depicted here?

22   A.  From March 1st there are approximately four deposits under

23   the amount of $10,000 made at a branch location.

24   Q.  And then what about for March 2nd?

25   A.  March 2nd, there are also approximately -- approximately

19fddat4                    Duffy - direct

1    eight deposits all under 10,000, with the exception of one

2    which was for 35,000, all made at a branch location.

3    Q.   All right.   The ones that are under 10,000 the notation is

4    they were all made at a branch store?

5    A.   Correct.

6            MR. SKINNER:   We can take down Government Exhibit 602.

7    Q.   Agent Duffy, let me direct your attention to March 2nd of

8    2010.   Were you working on that day?

9    A.   Yes.

10   Q.   And did you participate in a search that was conducted on

11   that day?

12   A.   I did.

13   Q.   And where was the search conducted?

14   A.   The search was conducted in a hotel room in Best Western,

15   101 International Way in Newark, New Jersey.

16   Q.   Roughly, what time was the search conducted?

17   A.   It was approximately 7 p.m.

18   Q.   And were you working alone or were you with other people?

19   A.   With others.

20   Q.   And generally speaking, just describe what you found when

21   you searched this hotel room at the Best Western Hotel in north

22   New Jersey.

23   A.   When we searched the hotel room, we found various banking

24   documents and electronic items, parts of video games and other

25   electronics equipment.

19fddat4                          Duffy - direct

1   Q.  Did you find anybody in the room?

2   A.  Yes.

3   Q.  Did you ask that person what their name was?

4   A.  I did.

5   Q.  What did they tell you?

6   A.  Their name was Miguel Lara Ramirez.

7   Q.  Did you find any currency in the room?

8   A.  We did.

9   Q.  Where was the currency?

10  A.  The currency was located in a safe inside the hotel room.

11          MR. SKINNER:  Your Honor, may I approach?

12          THE COURT:  Yes.

13  Q.  Special Agent Duffy, I'm showing you what we've marked as

14  Government Exhibit 505.

15          Did you have an opportunity to review the documents

16  contained in that envelope prior to testifying today?

17  A.  I did.

18  Q.  Do you recognize them?

19  A.  I do.

20  Q.  What are they?

21  A.  There are several bank deposit receipts as well as a bank

22  counter deposit slip that's partially filled out.

23  Q.  Can we call up the first page of Government Exhibit 602

24  again, and just zoom in again at the top portion of the page.

25          On the deposit slips, is there any indication of the

19fddat4                        Duffy - direct

1    last four digits of the account number for the deposit slips?

2    A.   There is.  It ends in 0859.

3    Q.   And on the one slip that you said was partially filled out,

4    is there any full account number on that deposit slip?

5    A.   There is.

6    Q.   What is the account number on that deposit slip?

7    A.   8964660859.

8    Q.   Have you compared the deposit receipts to Government

9    Exhibit 602 prior to testifying today?

10   A.   I did.

11   Q.   Do the deposit receipts match those -- match to some degree

12   the deposits that we looked at a moment ago that occurred on

13   March 1st and March 2nd?

14   A.   They do.

15             MR. SKINNER:   Your Honor, the government offers

16   Exhibit 505.

17             MR. WHITE:   No objection, your Honor.

18             THE COURT:   Received.

19             (Government's Exhibit 505 received in evidence)

20             MR. SKINNER:   May I publish it to the jury?

21             THE COURT:   You may.

22             (Pause)

23   Q.   I'm putting up one of the slips of paper on the screen.

24             Can you see that, Agent Duffy?

25   A.   I can.

19fddat4                    Duffy - direct

1    Q.  And looking at the slip of paper, does it give any

2    indication as to where the deposit was made?

3    A.  It does.

4    Q.  Where was this deposit made?

5    A.  The deposit was made at the Down Neck branch in Newark, New

6    Jersey for Wachovia, Wells Fargo.

7    Q.  Have you looked at all the other deposit slips that were

8    contained in the envelope marked Exhibit 505?

9    A.  I have.

10   Q.  Where were these deposit receipts for, or where were the

11   deposits made, according to the receipts?

12   A.  They were made at various branch locations in Newark, New

13   Jersey.

14   Q.  If you look at the deposit slip, it indicates deposit on

15   March 1st of 2010, correct?

16   A.  Correct.

17   Q.  And have you reviewed the dates on all of the deposit slips

18   for the receipts that were contained within Government Exhibit

19   505?

20   A.  I have.

21   Q.  What were the dates for the deposits that were made on

22   those days?

23   A.  They were March 1st and March 2nd of 2010.

24   Q.  I'm now going to put up the last piece of paper from

25   Government Exhibit 505.  Let me ask if you recognize this?

19fddat4                    Duffy - direct

1   A.  I do.

2   Q.  And can you describe for us what this is?

3   A.  This is a bank counter deposit slip that's partially filled

4   out in the name of Versailles Fragrances, account number ending

5   0859.

6   Q.  When you say a counter deposit slip, what do you mean?

7   A.  These are typically blank deposit slips for a banking

8   institution that's usually at the counter of the bank.

9   Q.  All right.  So counter deposit slip just refers to where

10  you might find this slip?

11  A.  Yes.

12  Q.  And was it filled out in this manner with this handwriting

13  when you found it in the hotel room on March 2, 2010?

14  A.  It was.

15  Q.  It hasn't been altered in any way since then?

16  A.  It has not.

17              MR. SKINNER:  Your Honor, may I approach?

18              THE COURT:  Yes.

19  Q.  I am just going to ask you to pull some of these out and

20  identify them.

21  A.  OK.

22  Q.  Special Agent Duffy, I've just handed you a bunch of

23  folders that contain a number of government exhibits, and the

24  first thing I want to do is just go through -- let me ask you

25  first:  Have you reviewed all of these exhibits prior to

19fddat4                    Duffy - direct

1    testifying today?

2    A.   I have.

3    Q.   And when did you review them?

4    A.   Yesterday.

5    Q.   And I just want to ask you first to identify what these

6    different exhibits are.

7         Looking at Government Exhibit 501, can you tell me

8    what that is?

9    A.   Yes.  This is a copy I made on March 2, 2010 of a passport

10   and immigration documents and a credit card in the name of

11   Miguel Lara Ramirez.

12   Q.   Where did you receive those documents from?

13   A.   From the hotel room search.

14   Q.   And can you please look at the little plastic envelopes

15   that are marked Government Exhibits 502 and 503, and just tell

16   us for identification purposes what those are?

17   A.   Exhibit 502 are travel documents for Miguel Lara Ramirez.

18   Q.   Where were these fund?

19   A.   These were found in the hotel room also.

20   Q.   Do they relate to travel within any particular time period?

21   A.   Yeah.  The travel document are dated February 22, 2010.

22   Q.   Looking at 503, are those travel documents as well?

23   A.   They are.

24   Q.   And do they -- again, you reviewed these prior to

25   testifying today, correct?

19fddat4                    Duffy - direct

1   A.  Correct.

2   Q.  Do they relate to travel that was conducted within any

3   particular time period?

4   A.  They do.  For January 16th and the middle of February,

5   2010.

6   Q.  All right.  With regard to Government Exhibits 506 through

7   510, did you review those exhibits prior to testifying today?

8   A.  I did.

9   Q.  Generally speaking, can you tell us what each of those

10  exhibits is?

11  A.  Exhibit 506 are more bank deposit receipts.

12  Q.  Are all of these exhibits different bank deposit receipts?

13  A.  They are.

14  Q.  Do they all concern the rough time period from early March

15  of 2010?

16  A.  They do.

17  Q.  Where were they found?

18  A.  They were found in the hotel room.

19  Q.  All right.  With regard to Government Exhibits 511 through

20  513, can you just describe generally what each of those

21  exhibits is?

22  A.  Exhibit 511 are various blank counter deposit tickets from

23  different bank institutions.

24          Exhibit 512 are numerous currency envelopes for

25  Wachovia Bank.

1              Exhibit 513 are currency wrappings for a denomination

2    of $2,000.

3    Q.  Can you please look at Government Exhibit 514 and 515.

4    A.  Exhibit 514 are numerous bank deposit receipts for

5    different bank institutions dated March 1st or March 2nd, and

6    one in the amount of $10,000 and the other ones under the

7    amount of 10,000.

8    Q.  What about Exhibit 515?

9    A.  Exhibit 515 is handwritten notes.  On the top of it, it

10   shows dollar denomination amounts for different bank

11   institutions.  On the bottom are a list of expenses.

12   Q.  OK.  Now, again, Government Exhibits 502 to 515 are all

13   records that you found in the hotel room on March 2nd, is that

14   right?

15   A.  That's correct.

16   Q.  And Government Exhibit 501 are copies of identification

17   documents that were produced by the occupant of that hotel

18   room?

19   A.  Yes.

20           MR. SKINNER:   your Honor the government offers

21   Exhibits 501 through 515 inclusive.

22           MR. WHITE:  No objection, your Honor.

23           THE COURT:  Let me just check something.

24           (Pause)

25           MR. SKINNER:  Your Honor, my apologies.  There is

19fddat4                         Duffy - direct

1    actually no Exhibit 504.  So it would be 501 to 503 and then

2    505 to 515.

3              THE COURT:  That's what I was checking.  Received.

4              (Government's Exhibits 501-503 and 505-515 received in

5    evidence)

6              MR. SKINNER:  Thank you, your Honor.

7              With the Court's permission, I would like to publish

8    certain of these exhibits to the jury.

9              THE COURT:  Sure.

10   Q.  All right.  I'm first putting up Government Exhibit 501.

11             Can you just remind us what this is?

12   A.  These are copies of the identification documents for Miguel

13   Lara Ramirez seized from the hotel room.

14   Q.  This is the individual from the hotel room.

15   A.  It is.

16   Q.  One of these documents is a passport, correct?

17   A.  Correct.

18   Q.  Where is Mr. Ramirez according to this document a citizen,

19   a national of?

20   A.  Mexico.

21   Q.  Now, I'm going to put up some of the documents from the

22   envelope marked 502.

23             You indicated that these were all travel-related

24   records found in the hotel room, correct?

25   A.  Correct.

1   Q.   And was the travel related to a particular time period?

2   A.   I can't see the ones.

3   Q.   Let me put one up.  I'm putting up the first document in

4   the envelope.  Do you recognize that?

5   A.   Yes.  It is a travel document for Miguel Lara dated

6   February 22, 2010.

7   Q.   What kind of document does this appear to you to be?

8   A.   A portion of a boarding pass or a receipt.

9   Q.   All right.  The flight from where to where?

10  A.   It originated in Guadalajara, Mexico, and was destined for

11  Monterey, Mexico.

12  Q.   On February 22nd?

13  A.   Correct.

14  Q.   Putting up the next document contained in the envelope.

15  This another boarding pass?

16  A.   It is.

17  Q.   This is a boarding pass from where to where?

18  A.   It is from Monterey, Mexico, to New York JFK on

19  February 22, 2010.

20  Q.   I'm putting up another document from the envelope.  What is

21  this?

22  A.   This is a business card for the Best Western, Newark

23  Airport, 101 International Way, Newark, New Jersey.

24  Q.   This the Best Western that you conducted the search of?

25  A.   That's correct.

19fddat4                    Duffy - direct

1   Q.   And what does this document appear to be?

2   A.   It appears to be an ATM receipt.

3   Q.   Showing what kind of transaction, when and where?

4   A.   It appears to be a withdrawal at Best Western, 101

5   International Way, Newark, New Jersey, on February 22, 2010.

6   Q.   And the last document from this particular envelope, have

7   you seen this before testifying today?

8   A.   Yes.

9   Q.   What does it appear to you?

10  A.   It appears to be an envelope for a rental receipt from

11  Dollar Rental.

12  Q.   I'm now going to put up a few of the documents from the

13  envelope marked Government Exhibit 503.

14          You testified earlier that these are other documents,

15  travel-related document, related to a different trip, is that

16  right?

17  A.   Correct.

18  Q.   So the first one we are going to put up, what does that

19  document appear to you to be?

20  A.   It is a seat request for Miguel Lara traveling Delta

21  Airlines from Guadalajara, Mexico to Atlanta, Georgia, on

22  January 12, 2010.

23  Q.   And then putting this one up, what is this?

24  A.   This is a boarding pass for Miguel Lara for

25  January 16th originating in Atlanta; destination New York JFK.

394

1   Q.   What is the date of this one?

2   A.   January 16th.

3   Q.   And what does this document appear to be?

4   A.   It is a passenger receipt for Miguel Lara.

5   Q.   All right.   Is there any notation here as to the form of

6   payment?

7   A.   There are.   Cash.

8   Q.   Let me ask you what this document appears to you to be?

9   A.   It is a hotel receipt for Miguel Lara.

10   Q.   From a hotel located where, according to the receipt?

11   A.   Jamaica, New York.

12   Q.   Is there any indication on there as to how the room was

13   paid for?

14   A.   Cash.

15   Q.   And is there a time period for the room rental?

16   A.   There is.   February 1, 2010 -- or January 25, 2010 to

17   February 1, 2010.

18   Q.   Putting up another document.   Does this also appear to be a

19   Comfort Inn receipt?

20   A.   It does.

21   Q.   What is this a receipt for?

22   A.   For a safe rental on January 28, 2010.

23   Q.   And the last two documents from Government Exhibit 302.   I

24   will put them together.   What are these documents?

25   A.   This is again a hotel receipt from Red Roof Inn on

19fddat4                    Duffy - direct

1    February 11, 2010 for Miguel Lara.   The location is

2    Philadelphia, Pennsylvania.

3    Q.   And this down here, this is a business card from Red Roof

4    Inn?

5    A.   Yes, it is.

6    Q.   All right.   Now, you've testified earlier that Exhibits 506

7    to 510 were all deposit receipts that were found in the hotel

8    room; is that correct?

9    A.   Correct.

10   Q.   So just looking at two of the ones from Government Exhibit

11   506, what do these deposit receipts reflect, based on your

12   training and experience?

13   A.   These are bank deposit receipts, Wachovia, Wells Fargo, for

14   account ending 4679.

15   Q.   What were the deposit amounts?

16   A.   The amount on March 2, 2010, at 9:12 a.m., was 5,000.

17           The second one was March 2, 2010, at 1:55 p.m., in the

18   amount of $5,581.

19   Q.   Now, looking at Government Exhibit 512, what are these?

20   A.   These are currency envelopes for Wachovia Bank.

21   Q.   And there is a number of them; would that be fair to say?

22   A.   Yes.

23   Q.   And looking at 511, what are these?

24   A.   These are various counter deposit slips for different bank

25   institutions.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19fddat4                          Duffy - direct

1    Q.   Again, is it fair to say that there's a number of them in

2    that deposit envelope -- in that exhibit envelope?

3    A.   Yes.

4    Q.   Bear with me for one second.  I'm sorry.  I seem to have

5    misplaced one of the exhibits in the folder here.

6              (Pause)

7              Here it is.  I'm showing you the contents of

8    Government Exhibit 513.  Can you tell us what these are?

9    A.   These are currency wrappers for the denomination $2,000.

10   Q.   All right.  Now, I'll put up some of the records from

11   Exhibit 514.

12             What are these two documents that I've put up?

13   A.   These are bank deposit receipts for Bank of America dated

14   January 28, 2010, both in the amount of $4,000, account number

15   ending 9300.

16   Q.   Where is the bank located, if you can tell?

17   A.   It's a branch code.  I don't know from looking at it.

18             (Continued on next page)

19

20

21

22

23

24

25

19F4DAT5                    Duffy - direct

1    BY MR. SKINNER:

2    Q.   Look at these two documents; what do these appear to be?

3    A.   These are bank deposit receipts for Chase Bank account

4    number ending 6787, March 1, 2010 deposit for $3,000, made at a

5    Kew Gardens branch.

6    Q.   Now two of the other documents, what are these?

7    A.   These are also bank deposit receipts for Citibank for the

8    account Wholesale Warehouse, address of 1230 Arch Street,

9    Philadelphia, Pennsylvania.

10   Q.   What are the dates for those deposits?

11   A.   Dated February 2, 2010.

12   Q.   Looking at Government Exhibit 515, this is what you

13   described as a slip of paper that was found in the room?

14   A.   Yes.

15   Q.   Would it be fair to say it has handwritten notations on it.

16   Looking at the top, based on what you can tell from looking at

17   the document, does the top seem to reflect any particular type

18   of information?

19   A.   It reflects various amounts related to different bank

20   institutions.

21   Q.   Where I just drew a line, as far as you know, those are the

22   names of different banks?

23   A.   That's correct.

24   Q.   What do those notations down here appear to be?

25   A.   They appear to be a list of expenses.

1          MR. SKINNER:  Can we call up for the witness

2   Government Exhibit 517.

3   Q.  Do you recognize this exhibit?

4   A.  I do.

5   Q.  What is this?

6   A.  This is a photo of currency seized from the hotel room

7   occupied by Miguel Lara on March 2, 2010.

8          MR. SKINNER:  The government offers Exhibit 517.

9          MR. WHITE:  No objection.

10          THE COURT:  Received.

11          (Government Exhibit 517 received in evidence)

12   Q.  Where was the money found in the hotel room?

13   A.  The money was found in a safe in the hotel room.

14   Q.  Is this all the money that was found in the hotel room?

15   A.  Yes.

16   Q.  Was it counted after this photograph or before at some

17   point in time?

18   A.  After.

19   Q.  How much money is depicted in the photograph?

20   A.  Approximately 30,000 U.S. dollars.

21   Q.  You saw the money in the hotel room on that day?

22   A.  Yes.

23   Q.  Does this photograph truly and accurately depict the way

24   money looked at that time?

25   A.  It does.

19F4DAT5                        Duffy - direct

1    Q.   Did anybody alter the way the money was packaged or wrapped

2    in any way prior to taking the photograph?

3    A.   No.

4    Q.   Would it be fair to say this was basically how it was found

5    in the safe?

6    A.   Correct.

7    Q.   It appears to be in six different bundles?

8    A.   Yes.

9    Q.   Was each bundle a particular dollar amount?

10   A.   Yes, approximately.

11   Q.   How much?

12   A.   5,000.

13   Q.   Each one of these little bundles is $5,000?

14   A.   Correct.

15   Q.   What kind of denominations were the bills?

16   A.   There were various denominations.

17   Q.   Do you see little brown slips of paper on top of each

18   bundle?

19   A.   I do.

20   Q.   Were those pieces of paper there when the money was first

21   found?

22   A.   They were.

23   Q.   Is there anything noted on those pieces of paper?

24   A.   There is.  I can't make it out on the screen, if you could

25   blow it up.  There are numbers on each piece of paper.

400

1          MR. SKINNER:  One moment, your Honor.

2          (Pause)

3          MR. SKINNER:  No further questions.

4          THE COURT:  Thank you.

5          Let's take our break here for a few minutes.

6          (Recess)

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19F4DAT5                          Duffy - direct

1              (At the sidebar)

2              THE COURT:  Can't you pick this up and move.

3              MR. SKINNER:  We are moving.  I think we are going to

4      be done, at this rate we will be done on Wednesday.

5              THE COURT:  Then devoutly to be desired.  You are good

6      lawyers, all of you, all four of you.  When I was starting out,

7      the first thing a very wise lawyer said to me is you got to

8      understand that every trial is a dramatic performance.  It's

9      not a good thing to have the jury on the verge of sleep.  You

10     guys could have, instead of spending the last hour or plus with

11     these receipts and documents, man, you could have had them in

12     in 5 minutes.  Let's move.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

19F4DAT5                        Duffy - direct

1              (In open court; jury not present)

2              MR. SKINNER:  Your Honor before we bring the jury in,

3       we had a legal issue we wanted to front with the court.  The

4       government's next witness is going to be special agent Richard

5       Reinhardt.  Given the fact that the defense opened on an

6       entrapment defense and put the government's motives in

7       initiating a proactive investigation at issue, we intend to ask

8       special agent Reinhardt some questions about how the

9       investigation of Vikram Datta was initiated.

10             I expect him to testify essentially that there was a

11      search of another perfume business in the summer of 2009 in

12      Miami.  We actually have a stipulation as to the facts of that

13      search.  I will be starting, before agent Reinhardt testifies,

14      I will be reading that stipulation.  There were records found

15      in that search that raise questions in the investigators' eyes

16      with respect to a number of different companies including La

17      Versailles.  They then started doing a financial statement

18      analysis of those companies, searches for SARs, things like

19      that and were targeting La Versailles and a number of different

20      companies prior to the arrest of the Guptas in September 2009.

21             I fronted this issue for the defense.  I am not sure

22      if they intend to raise any objection.  I told them about it a

23      couple of minutes ago; I wanted to give them an opportunity to

24      respond.

25             THE COURT:  Mr. Ross.

1           MR. ROSS:  Your Honor, fair is fair.  I think

2     correctly stated, we raised the entrapment defense; the

3     government should be entitled to demonstrate through admissible

4     evidence predisposition.  Among the items, however, I think the

5     government may seek to put in are these SARs or suspicious

6     activity reports from various banking institutions.  I don't

7     think those are admissible.  I don't have law to give you at

8     this very moment.  I will be more than happy --

9           THE COURT:  Why is it not admissible not for the truth

10    of the matter stated but for what they say about the motives of

11    the agents and how it is the agents got focused on Mr. Datta.

12          MR. ROSS:  That is a good question.

13          THE COURT:  I try.

14          MR. ROSS:  I would like to have a look at that.  I

15    have had SARs come in in cases before.  They come in for the

16    issue of the bank, for example.  It shows their state of mind;

17    it doesn't show the defendant's state of mind.  The problem

18    here is that we are now going to translate the bank's filing a

19    suspicious activity report into the agent's view of things as

20    to why he was investigating Mr. data.  The truth of the matter

21    is that is not why they started an investigation of Mr. Datta

22    nor why they targeted him.

23          THE COURT:  That's an issue for the jury to decide

24    maybe; that's disputed.

25          MR. ROSS:  I think then we run into Rule 403, because

1    I think it is prejudicial to have a bunch of suspicious

2    activity reports coming into evidence which is a bank saying we

3    think there is something wrong in your, we are going to live

4    with the bank having thrown him out which we heard so much

5    about, we are going to live with that of course.  These are

6    other reports that we are talking about that they came upon

7    along the way in addition to that bank.  The 403 I am wondering

8    if they are not more prejudicial than probative.

9              That's not where the government's investigation at all

10   began.  The government's investigation began I think at ET

11   Perfumes.  There was a search there.  They found documents.

12   They then pursued those documents.  I think unfortunately all

13   that is going to come in to show why the government said we are

14   going to name him a target on October 12 which, yes, we made

15   much ado about.

16             MR. SKINNER:  For purposes of agent Reinhardt's

17   testimony today, I think it's going to be confined to not

18   admitting the SARs, testifying as to the existence of the SARs

19   that have been filed in early 2009 and how that factored into

20   the analysis to continue the investigation of Mr. Datta's

21   companies.  There is a possibility that we may seek next week

22   if we get there to introduce admissible SARs.  We are not there

23   yet.  We can share the issue of the admissibility of the SARs

24   for now if the defense doesn't have an objection to testimony

25   as to the existence of a SAR and the general substance of what

19F4DAT5                       Duffy - direct

1    that SAR said.

2           MR. ROSS:  That's what we were expecting.  We are not

3    going to have A problem with that.

4           THE COURT:  OK.  If you want to brief this, I would

5    like to have it by 1:00 on Monday because I am going to be out

6    of town on Tuesday, and we will take it from there.

7           MR. SKINNER:  Yes, your Honor.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19F4DAT5                          Duffy - direct

1              (Jury enters courtroom)

2              THE COURT:  The jurors and the defendant all are

3    present.  Let's go guys.

4              MR. SKINNER:  The government calls special agent

5    Richard Reinhardt.

6              I am sorry, your Honor, I'm jumping the gun.

7              THE COURT:  Any cross-examination?

8              MR. WHITE:  No, your Honor.

9              THE COURT:  Thank you.  You are excused.

10             (Witness excused)

11             THE COURT:  Now Mr. Skinner.

12             MR. SKINNER:  The government calls special agent

13   Richard Reinhardt.

14    RICHARD REINHARDT,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. SKINNER:

19   Q.  Good afternoon, Mr. Reinhardt.  Where do you work?

20   A.  I am a special agent for the Internal Revenue Service

21   criminal investigation division.

22   Q.  How long have you been a special agent for the Internal

23   Revenue Service?

24   A.  Since March 2003.

25   Q.  What did you do prior to that?

19F4DAT5                    Reinhardt - direct

1   A.   I was a conversion investigator for the Drug Enforcement

2   Administration.

3   Q.   How long did you do that?

4   A.   Approximately four years.

5   Q.   What did you do prior to that?

6   A.   I was a border patrol agent.

7   Q.   In connection with these areas of law enforcement positions

8   you have held, have you had any specialized training on

9   financial documents?

10  A.   Yes.

11  Q.   Have you had special training on potential forms that must

12  be completed in connection with cash transactions?

13  A.   Yes.

14  Q.   Are you familiar with the terms 8300s, CTRs, and CMIRs?

15  A.   I am.

16  Q.   Have you had special training on each of those different

17  types of forms I just referenced?

18  A.   Yes.

19  Q.   Special agent Reinhardt, have you participated in the

20  investigation of the defendant in this case Vikram Datta?

21  A.   Yes, sir.

22  Q.   When did you first become involved in the investigation?

23  A.   Approximately the summer of 2009, late summer 2009.

24  Q.   How did you become involved in the investigation at that

25  time?

19F4DAT5                          Reinhardt - direct

1   A.   The DEA group I worked with had executed search warrants at

2   a completely separate perfume wholesaler and then records

3   obtained from that search warrant led us to conduct numerous

4   record checks on other companies, one which was Mr. Datta came

5   up.

6           MR. SKINNER:  At this time the government would like

7   that read into evidence a stipulation.

8           THE COURT:  Yes.

9           MR. SKINNER:  Government Exhibit 804, the stipulation

10  provides:  On June 18, 2009, agents of the Drug Enforcement

11  Administration and other law enforcement officers executed a

12  search warrant at the business of ET Perfumes located at 15895

13  Northwest 15th Avenue, Miami, Florida.

14          On June 29, 2009, at 4:15 p.m., agents of the Drug

15  Enforcement Administration and other law enforcement officers

16  arrested Emanuel Efroni and Marcela Melgarejo at ET Perfumes

17  located at 15895 Northwest 15th Avenue, Miami, Florida.  Efroni

18  and Melgarejo were arrested pursuant to a criminal complaint

19  charging them with a money laundering offense.  Efroni was the

20  owner and operator of ET Perfumes and Melgarejo was an employee

21  of ET Perfumes.

22          Finally, the telephone number 305-627-9411 is

23  registered to the ET Perfumes.

24          It is further stipulated and agreed that this

25  stipulation may be received in evidence at trial.

19F4DAT5                          Reinhardt - direct

1          The government offers Exhibit 804.

2          THE COURT:  Received.

3          (Government Exhibit 804 received in evidence)

4          THE COURT:  Members of the jury, you must accept those

5     facts to be true.

6     BY MR. SKINNER:

7     Q.  Is that the search that you were referring to a moment ago?

8     A.  Yes, sir.

9     Q.  Was it a search that occurred at a perfume store in Miami

10    in the summer 2009?

11    A.  I wasn't on the search.  It was a perfume wholesaler not

12    like a retail store.

13    Q.  You indicated there were documents found in that store

14    relevant to the investigation of the defendant, is that right?

15    A.  Yes.

16    Q.  Describe for us in general terms what documents were found

17    during that search that were relevant to the investigation of

18    the defendant?

19          THE COURT:  Let's clarify something.  Are you able to

20    tell us one way or the other whether prior to this search ET

21    Perfumes there was any investigation of the defendant?

22          THE WITNESS:  Prior to the ET Perfumes search?

23          THE COURT:  Correct.

24          THE WITNESS:  No.

25          THE COURT:  You are not able to tell us or there was

19F4DAT5                         Reinhardt - direct

1    no investigation?

2            THE WITNESS:  There was an investigation ET Perfumes,

3    not Mr. Datta, sir.

4            THE COURT:  This search happans at ET Perfumes in June

5    2009, and at that time there was no investigation of Mr. Datta,

6    is that correct?

7            THE WITNESS:  Yes, your Honor.

8            THE COURT:  Thank you.  Go ahead.

9    BY MR. SKINNER:

10   Q.  Was an investigation of Mr. Datta initiated following this

11   search of ET Perfumes in June 2009?

12   A.  Not an official investigation; we did record searches on a

13   number of different perfume wholesalers.  One of those

14   wholesaler, distributor names that came up was Mr. Datta.  We

15   had a list of names that we became suspicious of.

16   Q.  How did you compile this list of names?

17   A.  Off of people that ET Perfumes was supplying perfumes to.

18   Q.  How did you identify these companies?

19   A.  Through records from the search warrants.

20   Q.  What was it on these records that caused you to begin

21   looking at the companies on this list?

22   A.  There are a lot of transactions in whole dollar amounts

23   40,000, 50,000, 80,000, and we just thought it was suspicious

24   people buying perfumes and it coming out to $80,000 round

25   instead of $84,561 and change.  Everything was rounded up and

19F4DAT5                    Reinhardt - direct

1    that's what led to our suspicions.

2    Q.   You said there were a number of different companies on this

3    list, is that right?

4    A.   Yes, sir.

5    Q.   One of which was the defendant's company?

6    A.   Yes.

7    Q.   Which of the defendant's companies?

8    A.   La Versailles Fragrances.

9    Q.   After identifying these companies, including La Versailles,

10   what if anything did you do?

11   A.   There were several companies where we subpoenaed bank

12   records.   Initially Mr. Datta's was not one of them.   We

13   followed up on information from ET Perfumes.   Nandansons, which

14   we spoke about, I think we subpoenaed their bank accounts for

15   records, and did internal database searches.

16   Q.   What did you do next in the investigation with regard to

17   focusing particularly on the defendant's company La Versailles?

18   A.   The next step was we went to Nandansons and executed search

19   warrants there.

20   Q.   When was that?

21   A.   October or November 2009.

22   Q.   Prior to executing those search warrants did you do any

23   financial records searches with regard to La Versailles?

24   A.   Yes.

25   Q.   Did those financial, did those searches turn up any

19F4DAT5                          Reinhardt - direct

1   documents related to La Versailles that were relevant to your

2   investigation?

3   A.   Numerous CTRs and CMIRs.

4           THE COURT:   Explain what this alphabet soup means.

5           THE WITNESS:   Yes.   A CTR is a currency transaction

6   form which is filed by the bank when a customer deposits more

7   than $10,000.   A CMIR is a form filed when somebody crosses

8   into the U.S. with currency.

9   Q.   How much currency?

10  A.   If they are declaring it, any amount?

11  Q.   Does it have to be more than a certain amount in order to

12  require the filing of a CMIR?

13  A.   That I am not sure.   I don't think so.

14  Q.   Are you familiar with the term suspicious activity reports?

15  A.   Yes, I am.

16  Q.   What is a suspicious activity report?

17  A.   It's a report filed by a banking institution when they

18  become suspicious of activity in an account or a group of

19  accounts.

20  Q.   Did your searches with regard to La Versailles back, when

21  were you conducting these initial financial document searches

22  with regard to La Versailles?

23  A.   Shortly after the ET Perfumes search warrants were

24  executed, it was, there were numerous searches on Mr. Datta's

25  businesses as well as a number of other businesses.

1   Q.  Did the searches that occurred shortly after those search

2   warrants were executed, did any of them turn up suspicious

3   activity reports with regard to Mr. Datta's business?

4   A.  Yes.

5   Q.  How many reports?

6   A.  One.

7   Q.  At that point in time, when was this report from?

8   A.  I believe January 2009.

9   Q.  In general terms what was the substance of this suspicious

10  activity report?

11  A.  Wire activity from companies located in Mexico.

12  Q.  When you say wire activity, can you explain what you mean?

13  A.  Individuals wiring money into the La Versailles bank

14  account from Mexico.

15  Q.  Who filed the suspicious activity report?

16  A.  I don't recall, I believe Wells Fargo, I am not 100 percent

17  sure.

18  Q.  Who typically files suspicious activity report?

19  A.  The bank.

20  Q.  In this instance you identified a suspicious activity

21  report filed by a bank from early 2009?

22  A.  Yes.

23  Q.  What happened in the course of the investigation after

24  these documents were gathered?

25  A.  Typically, I would put them in a spreadsheet and start

1    looking at his customers and come up with totals.

2    Q.   In the case of the investigation of La Versailles, you

3    mentioned a moment ago there were searches done of Nandansons

4    business, correct?

5    A.   Yes.

6    Q.   Those were conducted in October 2009?

7    A.   Yes.

8    Q.   Was anything found in those searches relevant to the

9    investigation of La Versailles?

10   A.   There were A number of checks post-dated from Mr. Datta's

11   business as well as other businesses.

12   Q.   Were these checks relevant in any way to the investigation

13   you were conducting?

14   A.   They were large dollar checks for perfumes bought from

15   Nandansons.

16   Q.   After the search of the documents from Nandansons, what was

17   the next step in the investigation?

18   A.   Shortly after we executed those search warrants, Mr. Datta

19   had reached out for the owners of Nandansons and said he was

20   coming up here, so with the information we then went into the

21   previously discussed undercover operation.

22   Q.   You have been here listening to the testimony offered thus

23   far?

24   A.   Yes.

25   Q.   That undercover operation, is that the initial recording

19F4DAT5                          Reinhardt - direct

1      that Ajay and Ankur Gupta did for the government in October

2      2009?

3      A.  Yes, sir.

4              MR. SKINNER:  At this point the government has a

5      couple of different stipulations and exhibits to offer.  I will

6      try to get through them quickly.

7              THE COURT:  Can I clarify one word that the agent

8      used.  Let me go back here.  If I heard you correctly, you said

9      that when the search warrant or search warrants were executed

10     with respect to Nandansons in October 2009, you found some

11     large checks and I believe the word you used was post-dated

12     from the defendant's company for purchases from Nandansons.

13     First of all, is your memory consistent with mine that you used

14     the word post-dated?

15             THE WITNESS:  Yes.

16             THE COURT:  What do you mean by that?

17             THE WITNESS:  I meant it was, we were there in

18     October, so the check was dated, say, January of the next year.

19             THE COURT:  OK.  Go ahead.

20     BY MR. SKINNER:

21     Q.  Was the fact that there were post-dated checks from the

22     defendant's company found in the records at Nandansons, was

23     that suspicious or relevant to you in any way?

24     A.  Relevant, because we had already seen his name before and

25     then it, like, corroborated what we were looking for.

1          MR. SKINNER:  Your Honor, I have four stipulations I

2     would like to read off concerning evidence we would like to

3     offer.  First, Government Exhibit 801, it is stipulated between

4     the parties that if called as a witness, a records custodian of

5     the U.S. Department of the Treasury would testify as follows:

6          The treasury department maintains a computer archive

7     database of reports of cash payments over $10,000 received by a

8     trader of business also known as form 8300s.

9          Government Exhibit 301 is a printout of forms 8300

10    signed by Vikram Datta, the defendant, the president of La

11    Versailles Fragrances Inc.

12         Government Exhibit 301 was retrieved from the computer

13    archive system of the treasury department.  The records

14    contained in Government Exhibit 301 reflect all the forms 8300

15    signed by Vikram Datta, the defendant, from June 1, 2009 until

16    February 1, 2011.

17         It is further stipulated and agreed that Government

18    Exhibit 301 and this stipulation may be received in evidence at

19    trial.  The government offers the stipulation marked 801 and

20    Government Exhibit 301.

21         THE COURT:  Both received.

22         (Government Exhibits 801, 301 received in evidence)

23         THE COURT:  Members of the jury, one further piece of

24    instruction.  This is a slightly different kind of stipulation

25    than the others where the parties stipulated, for example, that

1    a search warrant was executed on a certain date.  That you must

2    accept as a fact.  You have no latitude on that.

3           In this case, the stipulation is a little different in

4    that they are stipulating that if called as a witness from the

5    treasury department would testify to X whatever the X is you

6    just heard read.  In that case you must accept that if that

7    witness came here and took the oath and testified on the stand,

8    he would say what they agreed he would say.  Whether you accept

9    that, accept the truth of what he would have said, that's up to

10   you, and the significance of what he would have said of course

11   is up to you.  But let's proceed.

12          MR. SKINNER:  Government Exhibit 802, another

13   stipulation, it is stipulated between the parties that if

14   called as a witness, a records custodian of the U.S. Department

15   of the Treasury would testify as follows:

16          The treasury department maintains a computer archive

17   database of currency transaction reports also known as CTRs.

18          Government Exhibit 302 is a printout of CTRs filed by

19   financial institutions identifying cash deposits in excess of

20   $10,000 made by La Versailles Fragrances Inc., Valencia

21   Fragrances, Sanpriya Enterprises, Perfumeria Valencia, VMSP

22   Holdings, and La Versailles Cosmetics, businesses owned and

23   controlled by Vikram Datta, the defendant.

24          Government Exhibit 302 was retrieved from the computer

25   archive system of the treasury department.  The records

1    contained in Government Exhibit 302 reflect CTRs filed from

2    June 1, 2009 until February 1, 2011 in connection with La

3    Versailles Fragrances Inc., Valencia Fragrances, Sanpriya

4    Enterprises, Perfumeria Valencia, VMSP Holdings, and La

5    Versailles Cosmetics.

6           It is further stipulated and agreed that Government

7    Exhibit 302 and this stipulation may be received in evidence at

8    trial.

9           The government offers 802 and 302.

10          THE COURT:  Received.

11          (Government Exhibits 802, 302 received in evidence)

12          MR. SKINNER:  Government Exhibit 803, this stipulation

13   provides if called as a witness, a records custodian of the

14   U.S. Department of the Treasury would testify as follows:

15          The treasury department maintains a computer archive

16   database of reports of international transportation of currency

17   or monetary instruments which are also known as CMIRs.

18          Governments 303 is a printout of CMIRs completed by

19   Hilario Martinez-Garcia upon arriving in the United States at

20   Laredo, Texas.

21          Government Exhibit 303 was retrieved from the computer

22   archive system of the treasury department.  The records

23   contained in Government Exhibit 303 are electronic copies of

24   CMIRs completed by Hilario Martinez-Garcia upon arriving in the

25   United States at Laredo, Texas without date limitation.

19F4DAT5                        Reinhardt - direct

1          Hilario Martinez-Garcia signed paper versions of the

2     CMIRs upon arriving in the United States.  The information from

3     those paper versions of the CMIRs is reflected in the

4     electronic copies of the CMIRs contained in Government Exhibit

5     303.

6          It is further stipulated and agreed that Government

7     Exhibit 303 and this stipulation may be received in evidence at

8     trial.

9          The government offers 803 and 303.

10         THE COURT:  Received.

11         (Government Exhibits 803, 303 received in evidence)

12         MR. SKINNER:  Your Honor, I would like to take a brief

13    moment just to show Government Exhibits 301, 302 and 303 to the

14    jury.  They are big exhibits, I am not going to publish them

15    all, just to give them an idea of the size of the documents

16    contained in each exhibit.

17         (Pause)

18         MR. SKINNER:  I am holding up Government Exhibit 301,

19    all the 8300s, more 8300s than I thought.  I am now holding up

20    Government Exhibit 302, all the currency transaction reports,

21    in two large pieces.  Finally, Government Exhibit 303, which is

22    all of the CMIRs submitted by Hilario Martinez-Garcia.

23         Thank you, your Honor.  I have one final stipulation.

24    We will get to those documents a little later.  If this were in

25    the stipulations, I thought I would offer it now.

19F4DAT5                            Reinhardt - direct

1          Government Exhibit 808 provides that the parties

2     stipulate as follows:

3          If called as a witness a records custodian from Bank

4     of America would testify as follows.

5          Government Exhibits 603, 604, 605 and 606 are

6     printouts of commercial checking account records for La

7     Versailles Fragrances Inc.  Government Exhibits 603, 604, 605

8     and 606 were retrieved from the computer archive system of Bank

9     of America.  The records reflected on Government Exhibits 603,

10    604, 605 and 606 were created by a person with knowledge of or

11    created from information transmitted by a person with knowledge

12    of the information shown, were created at or near the time the

13    information became available to Bank of America, and were

14    created and maintained by Bank of America as part of its

15    regularly conducted business activity.

16          It is further stipulated and agreed that Government

17    Exhibits 603, 604, 605 and 606 and this stipulation may be

18    received in evidence at trial.

19          The government offers 808, 603, 604, 605 and 606.

20          THE COURT:  They are received.

21          (Government Exhibits 808, 603-606 received in

22    evidence)

23    BY MR. SKINNER:

24    Q.  Special agent have you reviewed the documents that are on

25    the table marked 301, 302, 303 prior to testifying today?

1    A.  Yes, sir.

2    Q.  Government Exhibit 301 concerns forms known as 8300s, is

3    that correct?

4    A.  Yes.

5    Q.  Tell us what is a form 8300.

6    A.  Form 8300 is filed by a business when they receive more

7    than $10,000 in currency for a transaction.

8    Q.  When is a form 8300 filed?

9    A.  When a customer brings more than $10,000 to a particular

10   business.

11            MR. SKINNER:  Can we call up on the screen the 8300

12   from set A.  This is a page, ladies and gentlemen, a sample

13   page from Government Exhibit 301.  Blow up the top portion of

14   Part I.

15   Q.  What information is required to be included in Part I of

16   this form?

17   A.  Part I asks for the identification for the individual who

18   the cash was received from.

19   Q.  The person carrying the money?

20   A.  Yes.

21   Q.  In this case somebody who is dropping it off at a business?

22   A.  Yes.

23   Q.  Part 2, if this part of the form was completed what kind of

24   information would be in this part of the form?

25   A.  The person on whose behalf the transaction was conducted.

1   Q.   This means if somebody was carrying money for somebody

2   else, the person who owned the money, that would go in there?

3   A.   Yes.

4   Q.   Part 3, generally speaking what kind of information can be

5   found in there?

6   A.   A description of the transaction, how much was received,

7   what types of bills sometimes are in there.

8   Q.   A date?

9   A.   Date, what the payment was for.

10  Q.   The document is signed at the bottom, is that right?

11  A.   That's correct.

12  Q.   These documents were actually printed off an electronic

13  database, correct?

14  A.   Yes.

15  Q.   Here there is a notation that a signature present, tell us

16  what that means?

17  A.   The person who signed the form.

18  Q.   Somebody signed this form, would it be fair to say?

19  A.   Yes.

20  Q.   It indicates that the title of the person who signed the

21  form is president?

22  A.   Correct.

23            MR. SKINNER:   Can we call up the CMIR from set A.

24            THE COURT:   Is this Government Exhibit 302?

25            MR. SKINNER:   Yes, your Honor, no, 303, sorry, your

1   Honor.

2   BY MR. SKINNER:

3   Q.   Do you recognize this document?

4   A.   Yes, sir.

5   Q.   It this one of the pages from the documents marked as

6   Government Exhibit 303?

7   A.   Yes.

8   Q.   Tell us what information is included in the top part of the

9   document.

10   A.   The name of the individual crossing the border, address,

11   address where they will be in the United States if they are

12   staying somewhere, country of citizenship, passport number,

13   visa date and place where visa was issued.

14   Q.   Did it indicate where the person comes into the country?

15   A.   Yes.

16   Q.   Is that where I circled right there?

17   A.   Yes.

18   Q.   In this particular instance does that indicate that Hilario

19   Martinez-Garcia came into Nuevo Laredo, Mexico -- came into

20   Laredo, Texas from Nuevo Laredo, Mexico?

21   A.   Yes.

22   Q.   Focusing on parts 2 and 3 of CMIR, what information would

23   be included in this part of the form?

24   A.   The person who was going to be in receipt of the currency.

25   Q.   Is there any information about how much money?

1   A.   Yes, and the amount of money.

2   Q.   In this case the money was going to La Versailles

3   Fragrances and Mr. Martinez-Garcia was declaring $120,000?

4   A.   Yes, sir.

5   Q.   Part 4, the original of the document would contain a

6   signature of the person who completed the form, Mr. Hilario

7   Martinez-Garcia, is that correct?

8   A.   Yes.

9   Q.   This is an electronic version printed out off the

10  computerized database, is that right?

11  A.   Yes.

12  Q.   There would be a signature on the original if we went back

13  to Laredo, Texas and pulled it out, is that right?

14  A.   Yes.

15           MR. SKINNER:   Lastly put up the CTR form from set A.

16  Q.   This is a document that's one of the CTR forms from the

17  thousands of pages of records marked Government Exhibit 302.

18  Is that right?

19  A.   Correct.

20  Q.   Who completes the CTR form?

21  A.   The bank.

22  Q.   If we look at section A, what information is the bank

23  required to put in that portion of the document?

24  A.   Who is the owner of the cash, business or the person.

25  Q.   In section B what goes in?

1   A.   Who deposited the cash; the teller would take ID from

2   whoever is depositing money.

3   Q.   Part 2, What information do we find in that portion of the

4   document?

5   A.   You can find out the amount, the account numbers the money

6   was deposited in, whether it was a deposit or withdrawal.

7   Q.   Where I am circling now, is that where they note the date

8   of the deposit itself?

9   A.   Yes.

10  Q.   In this case that's where the total cash deposited in this

11  particular instance was?

12  A.   That's correct.

13  Q.   We have $109,000 cash deposit on August 4, 2010, is that

14  right?

15  A.   That's correct.

16  Q.   Part 3, that is who is completing it, the financial

17  institution that's completing the form?

18  A.   That's correct.

19  Q.   This CTR report is not signed; is it a printout of

20  information that's contained in the electronic database

21  maintained by the treasury department?

22  A.   Yes.

23  Q.   Would there be an original signed document signed by the

24  person indicated here on record of treasury department?

25  A.   Yes.

19F4DAT5                        Reinhardt - direct

1    Q.  One other question, scroll up back to section B.  I want to

2    circle where it says multiple transactions.  Can you explain

3    what that term means?

4    A.  That indicates that there was more than one deposit that

5    day that aggregated over the $10,000 amount.

6    Q.  So in this case there could have been a number of

7    different, there were at least more than one deposit that

8    totaled up to $109,000?

9    A.  That's correct.

10   Q.  Based on your training and experience do you know why the

11   CTR form tracks whether it's multiple transactions or single

12   transactions?

13   A.  Because there is a lot of instances where people will try

14   to deposit money less than $10,000 in a number of different

15   transactions to avoid the report.

16   Q.  The bank, if the bank sees those transactions of less than

17   $10,000 all occurring on the same day totaling up to more than

18   10, is still going to file a CTR?

19   A.  Yes.

20   Q.  Have you analyzed the CMIRs, the CTRs, and the 8300s that

21   are marked in Government Exhibits 301, 302 and 303?

22   A.  Yes.

23   Q.  If we are talking about the CTRs, these are all for cash

24   deposits that were made by a company controlled by Vikram

25   Datta?

19F4DAT5                        Reinhardt - direct

1    A.   That's correct.

2    Q.   These are all cash deposits that are more than $10,000,

3    correct?

4    A.   Correct.

5    Q.   So, if one of his employees made a deposit of less than

6    $10,000, unless it was in multiple transactions, it would not

7    have been captured by the CTRs, correct?

8    A.   That's correct.

9    Q.   Are you familiar more or less with the aggregate figures of

10   the CTRs from 2009 and 2010?

11   A.   I believe 2009 was approximately $13 million and 2010 was

12   approximately $18 million.

13   Q.   Those are cash deposits made by a company controlled by Mr.

14   Datta?

15   A.   In excess of $10,000.

16   Q.   It could have been more but it wouldn't have been reflected

17   in the CTRs?

18   A.   Correct.

19   Q.   What about the 8300s reflected in Government Exhibit, the

20   CMIRs reflected in Government Exhibit 303, these are records

21   filed by someone coming into the country?

22   A.   Correct.

23   Q.   In this case these were all filed by Hilario

24   Martinez-Garcia?

25   A.   Yes.

1   Q.  Do you know more or less how many times according to this,

2   how many CMIRs were filed by Hilario Martinez-Garcia during the

3   period from June 2009 until January 2011?

4   A.  Approximately 105.

5   Q.  Do you know more or less how much money was declared by

6   Hilario Martinez-Garcia during that period?

7   A.  Approximately $5.6 million.

8   Q.  Where was all of that money going?

9   A.  To perfume companies in Laredo, Texas.

10  Q.  Was it all going to La Versailles?

11  A.  No.

12  Q.  Directing your attention to January 18, 2011, were you

13  working on than day?

14  A.  Yes, I was.

15  Q.  Where?

16  A.  In Laredo, Texas.

17  Q.  What were you doing in Laredo, Texas on January 18, 2011?

18  A.  We were executing a number of search warrants at the

19  businesses of La Versailles, retail stores and Mr. Datta's

20  home.

21  Q.  How many retails stores were there?

22  A.  Three or four.

23  Q.  Could you describe in general terms what types of things

24  you found when you executed search warrants in Laredo, Texas on

25  January 18, 2011?

1    A.   Financial records, in the business, financial records,

2    invoices, receipt books; then in the home, just personal

3    financial documents, bank accounts.

4    Q.   While you were down there executing the searches, did

5    anyone take any photographs?

6    A.   Yes.

7           MR. SKINNER:  Your Honor, may I approach, your Honor.

8           THE COURT:  You may.

9           MR. SKINNER:  I am showing the witness exhibits marked

10   Government Exhibits 901 through 914 and I will ask him to take

11   one minute to review those exhibits.

12          (Pause)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

19F4DAT5                          Reinhardt - direct

1    19fddat6                          Reinhardt - direct

2    Q.  Do you recognize them?

3    A.  Yes.

4    Q.  And what are they?

5    A.  Pictures of Mr. Data's businesses, the retail stores and

6    the warehouse, and the office, I believe that is in the

7    warehouse, and a computer.

8    Q.  All right.  And were these all taken on January 18th during

9    the searches that were conducted at the business?

10   A.  Yes, sir.

11            MR. SKINNER:  Your Honor, the government offers

12   Government Exhibits 901 to 914.

13            MR. WHITE:  No objection.

14            THE COURT:  Received.

15            (Government's Exhibits 901 to 914 received in

16   evidence)

17            MR. SKINNER:  Your Honor, I would like to just quickly

18   publish those.  I guess we can just put them up on the screen

19   momentarily one by one.

20            THE COURT:  Fine.

21            MR. SKINNER:  Ms. Quinones, could you just put up each

22   picture for a brief moment, please.

23            (Pause)

24   Q.  Let me stop you right there.

25            Agent Reinhardt, do you recognize this space?

1    A.  I believe that's one of the retail stores.

2    Q.  Can you keep it on the screen.

3         We're now on 906.  Is this another retail store, Agent

4    Reinhardt?

5    A.  Yes.

6    Q.  You can keep going, Ms. Quinones.

7         908, what is this?

8    A.  Warehouse.

9    Q.  All right.  Where is this warehouse located?

10   A.  On Lincoln Avenue or Boulevard in Laredo, Texas.

11         MR. SKINNER:  Keep going, Ms. Quinones.

12         (Pause)

13         Ms. Quinones, can I now ask you to please put up

14   Government Exhibit 1101.

15         Just for Agent Reinhardt.  I'm sorry.

16   Q.  Agent Reinhardt, do you recognize this document?

17   A.  Yes.

18   Q.  What is it?

19   A.  It's a map of Laredo, Texas and part of Nueva Laredo,

20   Mexico.

21   Q.  And there are notations on the map, correct?

22   A.  Yes.

23   Q.  And are these addresses in Laredo, Texas, that are noted on

24   the map?

25   A.  Yes, they are.

1           MR. SKINNER:   Can we now put 1102 up just for Agent

2     Reinhardt.

3     Q.   And can I ask you what this is?

4     A.   That's a zoomed-in version of Laredo, Texas.

5     Q.   Again, there are addresses noted on the map?

6     A.   Yes, sir.

7           MR. SKINNER:   Your Honor, the government offers 1101

8     and 1102.

9           MR. WHITE:   No objection.

10          THE COURT:   Received.

11          (Government's Exhibits 1101 and 1102 received in

12    evidence)

13          MR. SKINNER:   Can we please put 1101 up for the jury.

14    Q.   Now, Agent Reinhardt, do you see this area that I just drew

15    a red line across?

16    A.   Yes.

17    Q.   What is that?

18    A.   The Rio Grande.

19    Q.   All right.   And this area where I just put a red X, is that

20    Mexico?

21    A.   Yes.

22    Q.   Specifically, Nueva Laredo, Mexico?

23    A.   Yes.

24    Q.   And where I just put a red number 2, is that Laredo, Texas?

25    A.   That is.

19F4DAT5                          Reinhardt - direct

1    Q.   Where I just drew a line right there, what is that?

2    A.   The bridge from Mexico to the United States.

3    Q.   And do you know what that bridge is referred to as?

4    A.   I believe that's bridge number one.

5    Q.   And where I'm just putting little dots right now, those are

6    different addresses noted on the map, correct?

7    A.   Yes.

8    Q.   And with regard to the three in that circle, do you know

9    what those are?

10   A.   They are Mr. Datta's retail stores.

11   Q.   And then the one up here, 1401 Lincoln Street, what is

12   that?

13   A.   The warehouse.

14          MR. SKINNER:   OK.   And can we just put up 1102 for the

15   jury.

16   Q.   This is, as you mentioned, just a zoomed-in picture of the

17   streets in Laredo, Texas, correct?

18   A.   That's correct.

19   Q.   And where I just circled, that is the retail stores?

20   A.   Yes.

21   Q.   And where I circled there, that is the warehouse, is that

22   right?

23   A.   Yes.

24          MR. SKINNER:   Your Honor, may I approach?

25          THE COURT:   You may.

19F4DAT5                          Reinhardt - direct

1    Q.  Special Agent Reinhardt, I'm showing you four books that

2    have been marked as Government Exhibits 201, 202, 203 and 204.

3    Can I ask you if you recognize those documents?

4    A.  Yes, I do.

5    Q.  What are those documents?

6    A.  They're journals of Mr. Datta's customers that were found

7    in the warehouse.

8    Q.  And when you say "the warehouse," the one that is located

9    in Laredo, Texas?

10   A.  That's correct.

11   Q.  And when were they found?

12   A.  On January 18, 2010.

13         MR. SKINNER:  Your Honor, the government offers --

14         THE COURT:  I am sorry.  2010?

15         THE WITNESS:  2011.  I'm sorry, sir.

16         MR. SKINNER:  The government offers Exhibits 201, 202,

17   203 and 204.

18         MR. WHITE:  No objection.

19         THE COURT:  Received.

20         (Government's Exhibits 201, 202, 203, 204 received in

21   evidence)

22   Q.  Now, Agent Reinhardt, have you reviewed these documents

23   prior to testifying today?

24   A.  Yes, I have.

25   Q.  Can you describe for us what they are?

1    A.  Each page has a number corresponding to a customer, and

2    then it's basically a ledger of that customer's buy and

3    payments.  So it would be an invoice number, or several invoice

4    numbers, then a payment or several payments, another invoice or

5    several invoices, payment, and then the form of payment --

6    wire, cash, check.

7    Q.  OK.  I'm just going to put up on the screen the very first

8    page of Government Exhibit 201.

9            If you can just describe for us what information

10   appears to be included on this page to you?

11   A.  These are the list of customers and then the corresponding

12   number for their page.

13   Q.  So if you wanted to find the page for Alma Piedra, you

14   would go to page 30 in the book?

15   A.  Yes.

16   Q.  And have you reviewed this entire book?

17   A.  Yes.

18   Q.  And the page we're just looking at is handwritten, correct?

19   A.  That's correct.

20   Q.  Is the entire book handwritten?

21   A.  Yes.

22   Q.  I'm going to go to page 6 of the ledger, and let's zoom in

23   on the top portion of the document.

24            And can you tell us, having analyzed this document,

25   what it appears to you to indicate?

1   A.  It's the ledger for Jose Luis Contreras:  The invoice

2   numbers, the balances on his account, the payments from his

3   account, the form of the payment, if there was a credit to the

4   account, the date of the purchase, or the date of the payment.

5   Q.  OK.  So if we're looking in this column, this would be the

6   date of the transaction, is that right?

7   A.  That's correct.

8   Q.  And that would be the invoice, is that right?

9   A.  Or payment, form of payment.

10  Q.  So it indicates different forms of payment here?

11  A.  That's correct.

12  Q.  So, for example, here it says wire transfer?

13  A.  Correct.

14  Q.  What is in this column that I just highlighted?

15  A.  Debit amounts, which are his invoice amounts.

16  Q.  And then what's here?

17  A.  Credit amounts, which are payments to the account.

18  Q.  And then what's here?

19  A.  Balance.

20  Q.  So this is essentially a record of Jose Luis Contreras'

21  account with La Versailles; is that fair to say?

22  A.  Yes.

23  Q.  And is there a particular notation that is included when it

24  depicts a cash transaction?

25  A.  Yes.  It will say "cash."

1    Q.   So if I turn the page -- and we're looking now at one on

2    page 8 and focusing in on where I just circled -- that's a

3    notation that you have seen throughout these ledgers reflecting

4    a cash transaction?

5    A.   Yes.

6    Q.   And would it be fair to say that Government Exhibit 202 and

7    203, which concern the year 2010, are they basically set up the

8    same way as the one we just looked at?

9    A.   Correct.

10   Q.   And Government Exhibit 204, which is from 2011, is that

11   again, are the notations generally similar in that one?

12   A.   Yes.

13   Q.   And I'm just going to put up one more page from Government

14   Exhibit 202.

15        This is for a customer named Jose Antonio Franco,

16   correct?

17   A.   Yes.

18   Q.   And if I understood what you were indicating earlier,

19   wherever we see "cash," the ones that I am noting here, those

20   would be cash transactions, is that correct?

21   A.   Correct.

22   Q.   Special Agent Reinhardt -- your Honor, may I approach?

23        THE COURT:   Yes.   Sure.

24   Q.   Special Agent Reinhardt, I am now going to show you

25   Government Exhibits what have been marked as 205 and 206.   Let

19F4DAT5                         Reinhardt - direct

1    me ask you if you recognize those?

2    A.   Yes, I do.

3    Q.   What are those?

4    A.   They are letters from the Internal Revenue Service to

5    Mr. Datta's business.

6    Q.   And where were those records found, if you know?

7    A.   During the search.

8    Q.   During what search?

9    A.   Of the warehouse.

10              MR. SKINNER:   Your Honor, the government offers

11   Government Exhibits 205 and 206.

12              MR. WHITE:   No objection.

13              THE COURT:   Received.

14              (Government's Exhibits 205 and 206 received in

15   evidence)

16   Q.   Have you reviewed these letters, Agent Reinhardt?

17   A.   I did.

18   Q.   Can you just describe for us generally content of these

19   letters?

20   A.   With each letter there was a Form 8300 attached to it; the

21   dates were illegible.  So the letter from the IRS is basically

22   saying you need to fill out the forms correctly, the

23   information is important to help the government track down

24   illicit proceeds.  It doesn't say it like that.  It says the

25   importance of the form is to provide accurate information,

1        subject to civil and criminal penalties.

2               MR. SKINNER:  Now, Ms. Quinones, can I have Government

3        Exhibits 607 and 608?

4               (Pause)

5               Your Honor, I'm sorry.  I'm just trying to do some

6        housekeeping.  I'm trying to determine if 607 and 608 had been

7        admitted already.  Would you bear with me for one moment?

8               THE COURT:  Yes.

9               (Pause)

10              THE COURT:  608 is in.

11              MR. SKINNER:  OK.

12              THE COURT:  607 appears not to be.

13              MR. SKINNER:  All right.  I am just going to read a

14       stipulation addressing a document.

15              Your Honor, the government has one other -- one of the

16       final stipulations that it would like to read at this time.

17              THE COURT:  Yes.

18              MR. SKINNER:  It is stipulated between the parties

19       that if called as a witness, a records custodian from BBVA

20       Compass Bank would testify as follows:

21              Government Exhibit 607 contains printouts of

22       commercial checking account records for La Versailles

23       Fragrances, Inc.

24              And Government Exhibit 607 was retrieved from the

25       computer archive system of BBVA Compass Bank.  The records

1    reflected on Government Exhibit 607 were created by a person

2    with knowledge of, or created from information transmitted by a

3    person with knowledge of, the information shown; were created

4    at or near the time the information became available to BBVA

5    Compass Bank; and were created and maintained by BBVA Compass

6    Bank as part of its regularly conducted business activity.

7              It is further stipulated and agreed that Government

8    Exhibit 607 and this stipulation may be received in evidence at

9    trial.

10             The government offers 807 and 607.

11             THE COURT:  807 and 607 are received.

12             (Government's Exhibits 807 and 607 received in

13   evidence)

14             MR. SKINNER:  Can I now have Government Exhibit 1004

15   on the screen for Mr. Reinhardt, or Agent Reinhardt?

16   Q.  Special Agent Reinhardt, we have put up on the screen a

17   document marked Government Exhibit 1004.  Can I ask you if you

18   recognize that document?

19   A.  Yes, I do.

20   Q.  And what is it?

21   A.  It's a spreadsheet that I created matching Hilario

22   Martinez-Garcia border crossings with deposits into Mr. Datta's

23   bank account.

24             MR. SKINNER:  And, your Honor, if I may approach and

25   show Special Agent Reinhardt Government Exhibit 607 and 608?

19F4DAT5                              Reinhardt - direct

1              THE COURT:  Yes.

2     Q.  Special Agent Reinhardt, let me ask you, in compiling that

3     spreadsheet, did you in part rely upon information from the

4     Form 8300 -- from the CMIRs filed by Hilario Martinez-Garcia

5     that are in evidence as Government Exhibit 303?

6     A.  Yes, sir.

7     Q.  Did you also rely upon the documents that we've marked as

8     607 and 608?

9     A.  Yes, as well as the cash book.

10    Q.  And those would be the cash books that we were just looking

11    at that are already in evidence?

12    A.  Correct.

13    Q.  What are the documents that I just referred to, 607 and

14    608?

15    A.  Bank deposit slips from Compass Bank and Wells Fargo Bank.

16              MR. SKINNER:  Your Honor, the government would offer

17    Exhibit 1004 as a summary of the evidence contained in the

18    exhibits that we just described.

19              MR. WHITE:  No objection, your Honor.

20              THE COURT:  Received.

21              (Government's Exhibit 1004 received in evidence)

22              MR. SKINNER:  Can we please publish Exhibit 1004 to

23    the jury?

24              THE COURT:  You may.

25              Is it just the one page, counselor?

1          MR. SKINNER:  It is, your Honor.

2          All right.  Can we just zoom in on the top half so it

3     is a little bit easier for us to read?

4     Q.  Now, Special Agent Reinhardt, I would like to just walk

5     across the columns and have you describe the kind of

6     information contained in each of these columns to us.

7          In column one, that's just -- just tell us what is in

8     column one, please.

9     A.  Column one is just simply numbering each entry.

10    Q.  And column two?

11    A.  Is the crossing date as per the CMIR.

12    Q.  All right.  Whose crossing date would this be?

13    A.  Hilario Martinez-Garcia.

14    Q.  And the third column?

15    A.  Is the cash book date.  So I went to the cash book and

16    tried to find a corresponding date to that border crossing.

17    Q.  All right.  And then the fourth one that says "deposit

18    date"?

19    A.  Based on the bank records, the deposit that either matched

20    or was very close to the amount.

21    Q.  And the next column where it says "crossing amount"?

22    A.  The amount declared on the form, the CMIR.

23    Q.  OK.  And the next column that stays "deposit amount"?

24    A.  The amount deposited into the bank account.

25    Q.  And then "bank," that is obviously the bank where the

1    deposit was made?

2    A.   Correct.

3    Q.   And the column next to that that says "account"?

4    A.   The ending numbers of the account.

5    Q.   And the final document that says customer per bank -- I

6    mean, the final column where it says "Customer per bank deps,"

7    what information is contained in that column?

8    A.   The deposit slips have names indicated on them.  So if they

9    had names indicated on them, they were in that column.

10   Q.   OK.  And so then can you just maybe walk us through the

11   first line, number one, that I've just underlined and tell us

12   what you were able to determine by looking at these various

13   documents?

14   A.   On 12/23/2009, Mr. Martinez-Garcia crossed the border with

15   approximately -- with $34,735.  There was an entry in the

16   handwritten cash ledger on 12/3/2009 indicating that Jose

17   Antonio Franco, abbreviated as J. Franco, made a payment of

18   $34,735.

19              THE COURT:  To whom?

20              THE WITNESS:  To La Versailles Fragrances.  Sorry.

21   A.   (Continuing) On 12/4/2009, there was a bank deposit for

22   $34,735.

23   Q.   And just so everybody understands it, we will walk through

24   just one of these as some examples from the documents

25   themselves, not for all of them.

1          MR. SKINNER:  But, your Honor, I would like to publish

2     again Government Exhibit 201.  I'm going to turn to a page

3     within the document, and I would ask that you put the Elmo back

4     up for the jury.

5          THE COURT:  All right.

6     Q.   This is a page from the cash book for 2009, correct?

7     A.   That's correct.

8     Q.   This is for Jose Antonio Franco?

9     A.   Correct.

10    Q.   So if I understood you, if we go to December 3rd of 2009,

11    that is the cash transaction in the cash book for $34,735?

12    A.   Correct.

13    Q.   All right.  Then you also found a CMIR from Hilario

14    Martinez-Garcia on the same day?

15    A.   Correct.

16    Q.   And then you also found within the account deposit slips

17    that you have in front of you a deposit on 12/3 of '09 in the

18    name of Mr. Franco?

19    A.   Correct.

20    Q.   And if I can just take the one for BBVA?  I will put it up

21    just to show the jury what it looks like.

22          (Pause)

23          Is that the first one on this slip here?

24    A.   Yes.

25    Q.   So this is the deposit slip that accompanied the cash

1   deposit at the bank?

2   A.   That's correct.

3   Q.   And this is the amount, the same as on the CMIR and the

4   same as in the cash book?

5   A.   Yes, sir.

6   Q.   When you said the deposit slip indicated a name, are you

7   referring to the area that I just circled?

8   A.   Yes.

9   Q.   With your review of the bank documents from BBVA Compass

10  and from Wells Fargo, did you find names on all of these

11  deposit slips?

12  A.   Not on every single deposit slip, no.

13  Q.   But on a number of the deposit slips there is a name

14  indicated similar to this?

15  A.   Yes.

16  Q.   These were names that matched the names in the account

17  book?

18  A.   Correct.

19  Q.   Excuse me.   In the cash book?

20  A.   Yes.

21        MR. SKINNER:   Can we just call up 1004 again?

22  Q.   So this particular spreadsheet summarizes border crossings,

23  deposits and cash book entries with regard to, I guess, 24

24  different border crossings, is that correct?

25  A.   Yes.

19F4DAT5                          Reinhardt - direct

1  Q.  And they are all from Hilario Martinez-Garcia?

2  A.  Correct.

3           MR. SKINNER:  You can take down 1004.

4  Q.  Special Agent Reinhardt, let me direct your attention to

5  January 15th of 2011.  Were you working on that day?

6  A.  Yes.

7  Q.  And what were you doing?

8  A.  Surveillance in Manhattan.

9  Q.  Why were you conducting surveillance in Manhattan?

10 A.  We were surveilling the meeting between Mr. Datta and Mario

11 Recinos.

12 Q.  Where did that meeting take place?

13 A.  I don't remember the name of the restaurant.

14 Q.  But it was a restaurant here in Manhattan?

15 A.  It was a restaurant in Manhattan.

16 Q.  And was this the meeting for the recording that we listened

17 to earlier?  I think we listened to only a few portions of it,

18 but is that the same meeting from that recording?

19 A.  Yes.

20 Q.  All right.  And following Mr. Recinos' meeting with

21 Mr. Datta, what happened?

22 A.  Mr. Datta was arrested outside the restaurant.

23 Q.  Were you present for Mr. Datta's arrest?

24 A.  Yes.

25 Q.  And what happened -- what was done with Mr. Datta following

19F4DAT5                        Reinhardt - direct

1    his arrest?

2    A.  He was taken back to the DEA office in north New Jersey.

3    Q.  And what happened once you got to the DEA office in north

4    New Jersey?

5    A.  He was interviewed.

6    Q.  And prior to being interviewed, was he advised of his

7    rights?

8    A.  Yes.

9    Q.  And what did he do after being advised of his rights?

10   A.  We asked him questions about the allegations that we had,

11   about the cash deposits, about his meeting with Mr. Recinos.

12   Q.  Let me ask you, what time did this interview take place?

13   A.  It was in the evening.  It had --

14   Q.  About how long following the time of his arrest?

15   A.  Oh, shortly after his arrest; the drive time from here to

16   Newark.

17   Q.  OK.  And in his post-arrest interview, were you present for

18   that interview?

19   A.  Yes.

20   Q.  Were you taking notes during that interview?

21   A.  Yes, sir.

22   Q.  And did you write a report following that interview?

23   A.  Yes, sir.

24   Q.  And did you review that report prior to testifying today?

25   A.  Yes.

1   Q.   And did that review help refresh your recollection as to

2   what was said during the post-arrest interview?

3   A.   Yes.

4   Q.   And was Mr. Datta in his post-arrest interview asked who he

5   was meeting with at the restaurant?

6   A.   Yes.

7   Q.   And what did Mr. Datta indicate with regard to who he was

8   meeting with?

9   A.   Mr. Mario.

10  Q.   Did he provide any other information on Mr. Mario?

11  A.   No.

12  Q.   Was he asked any questions about who Mr. Mario was?

13  A.   I believe so.

14  Q.   And what was he asked?

15  A.   A customer, I think he had described him as a potential

16  customer that he could do a lot of business with.

17  Q.   Are you having trouble remembering now what was asked?

18  A.   If I could see the memo, it would help me.

19  Q.   Yes.  One moment, Special Agent.

20           (Pause)

21           Special Agent Reinhardt, I'm showing you a document

22  that's been marked as 3508-D for purposes of identification.

23  A.   Thank you.

24  Q.   Do you recognize that?

25  A.   Yes.

1    Q.   What is it?

2    A.   It's my memorandum.

3    Q.   Is this a memorandum of your interview with Mr. Datta?

4    A.   Yes.

5    Q.   Can you just take a second to look at it, and let me know

6    if it helps refresh your recollection as to whether Mr. Datta

7    was asked who Mario was.

8                (Pause)

9    A.   He thought Mr. Datta was somebody who he could do a lot of

10   business with -- I mean, Mr. Mario, I'm sorry.

11   Q.   Did he indicate whether he had been discussing money

12   laundering with Mr. Mario?

13   A.   Yes.

14   Q.   What did he say?

15   A.   That they didn't discuss percentages that Mr. Datta would

16   charge Mr. Mario.

17   Q.   Did he indicate whether he had been -- did he indicate

18   whether he had actually been discussing money laundering with

19   Mr. Mario at the time of the meeting prior to the arrest?

20   A.   He stated that he didn't do anything wrong and he would

21   be -- he wouldn't be in trouble if he didn't have a

22   conversation with Mr. Mario.

23   Q.   Was he asked whether he had cash paying customers?

24   A.   Yes.

25   Q.   And what, in sum and substance, did he indicate about

19F4DAT5                         Reinhardt - direct

1    whether he had cash-paying customers?

2    A.   He said, yeah, he had cash-paying customers.

3    Q.   Where were those cash paying customers located?

4    A.   Mexico.

5    Q.   How many cash paying customers did he indicate he had

6    initially?

7    A.   Several.   I believe he wrote a list.

8    Q.   What did he say with regard to his knowledge of where the

9    cash came from?

10   A.   He didn't need to know that; it wasn't his responsibility.

11   Q.   Did he indicate how many of his customers -- after saying

12   that he had a few customers, did he later in the interview

13   indicate how many of his customers were paying with cash?

14   A.   I remember him saying the majority of customers paid with

15   cash.

16   Q.   Was he asked about Form 8300s?

17   A.   Yes.

18   Q.   Did he indicate who -- whether -- did he indicate who was

19   the one who filled out the Form 8300s that were filed by his

20   business?

21   A.   I'm sorry.   Say that again.

22   Q.   Did Mr. Datta say anything in his post-arrest interview

23   about who from his business filled out Form 8300s?

24   A.   Yes.   Yolanda.

25   Q.   Did he indicate that anybody else filled out Form 8300s?

1    A.   No.

2    Q.   Let me direct your attention to paragraph 2.

3    A.   Mm-hmm.

4    Q.   And ask you if reading that paragraph helps refresh your

5    recollection as to whether anybody else was filling out Form

6    8300s?

7    A.   I believe in this sentence, in this paragraph, what he's

8    saying is --

9              MR. WHITE:   Objection, your Honor.

10             THE COURT:   Sustained.

11   Q.   Let me just ask you:   Having read that paragraph, does that

12   give you a better recollection of what Mr. Datta said in the

13   post-arrest with regard to 8300s?

14   A.   Yes.

15   Q.   And what did he say?

16   A.   He said that he fills out a Form 8300 for any customer who

17   gives him more than $10,000 and that his accountant Yolanda

18   would know the form.

19   Q.   Did Mr. Datta identify any of his Mexican customers during

20   the post-arrest interview?

21   A.   Yes, he did.

22   Q.   Do you recall any of the names that he gave you?

23   A.   Octavio, Jose Luis Contreras, Jose de la Cruz, Alma Piedra,

24   Diablo Perfumes.

25   Q.   All right.   Now, you said a moment ago that Mr. Datta --

19F4DAT5                           Reinhardt - direct

1            THE COURT:  Excuse me, counselor.  We are going to

2   break here.

3            Members of the jury, enjoy the long weekend.  We'll

4   see you again at 9:30 on Wednesday morning, September 21.

5            Thank you.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  You can step down for now.  Thanks.

3           THE WITNESS:  Thank you, your Honor.

4           (Witness excused)

5           THE COURT:  Be seated, folks.

6           OK.  Mr. Skinner, progress report?

7           MR. SKINNER:  Your Honor, we are almost finished.  I'm

8   nearly finished with Agent Reinhardt.  I have a few other

9   questions about the post-arrest and one or two other minor

10  exhibits to admit that will not require extensive discussion.

11          On our return on Wednesday, it is our intention to

12  call Fausto Garza, another cooperating witness; Gabriel de la

13  Garza, who is a manager from a bank that closed one of

14  Mr. Datta's accounts; and an agent from the DEA, identity still

15  not yet determined, to introduce a number of phone calls that

16  were intercepted pursuant to wiretaps.

17          At this point in time, I think we have 10 or 12

18  foreign language calls that have already been transcribed, and

19  we've already stipulated to the admissibility of those.  We

20  will review them over the weekend, and we'll try -- we may

21  publish some very focused portions of a few of them, but we'll

22  try not to belabor that in front of the jury.  And we have I

23  think presently transcribed about five English-language phone

24  calls, and we've highlighted I think roughly another ten

25  more -- Is that fair to say? -- where we've just got the

19fddat6

1     transcriptions in today.  So we'll get those out to defense

2     counsel, and we'll work with defense counsel to try and not

3     have to play the bulk of those calls.  In any event, most of

4     them are very short, so I don't expect the wiretap recordings

5     to take nearly as long as the consensual recordings did.

6            There may be one or two other custodian record type

7     witnesses.  We'll try and work out some stips with defense

8     counsel over the weekend to address that evidence.  But the

9     long and short of it is that we have a handful of witnesses

10    left on Wednesday, and barring unexpectedly long

11    cross-examination, I think the government will rest on

12    Wednesday.

13            THE COURT:  OK.  Time for you, Mr. Ross.  What's going

14    to happen?

15            MR. ROSS:  I yield to Mr. White, your Honor.

16            MR. WHITE:  Well, we anticipate putting on a defense

17    case, your Honor, that would take us through Thursday and then

18    Friday afternoon, I believe, your Honor.  Next week is --

19    Friday is a half a day next week?

20            THE COURT:  Yeah.

21            MR. WHITE:  The decision on whether Mr. Datta will

22    testify has not been made yet, your Honor.  If he testifies, it

23    would likely be on the following Monday, possibly that Friday

24    afternoon.

25            THE COURT:  All right.  So we're going to have -- it

19fddat6

1     is going to be tight getting this in before the beginning of

2     October, it seems to me.

3               OK.  I thank you.  I don't know what else we can do.

4               Have you folks resolved your subpoena problem?

5               MR. SKINNER:  Yes, we have, your Honor.

6               I will note that there may be some motion practice --

7     oh, your Honor, I think I was referring to the wrong subpoena

8     problem.  The motion to quash the government's subpoena has not

9     been resolved.  We'll submit briefing on that issue on Monday.

10              MR. WHITE:  If we haven't resolved it by then, your

11    Honor.

12              MR. SKINNER:  We'll talk to defense counsel over the

13    weekend.  Thus far we have been able to resolve virtually

14    everything, so we'll see if we can resolve that over the

15    weekend.

16              THE COURT:  OK.

17              MR. SKINNER:  And we may be filing motions with regard

18    to additional subpoenas that the government has accepted on

19    behalf of other cooperating witnesses that the government does

20    not intend to call in its case in chief.  We talked to defense

21    counsel about that.  If it does become an issue, we will tee it

22    up with briefing by 1 p.m. on Monday.

23              THE COURT:  OK.

24              MR. SKINNER:  Thank you, Judge.

25              THE COURT:  All right.  Thank you very much.

19fddat6

1                MR. ROSS:  Thank you, your Honor.

2            (Adjourned to 9:30 a.m., Wednesday, September 21,

3     2011)

INDEX OF EXAMINATION

Examination of:                                          Page

HILARIO MARTINEZ-GARCIA                                    266

Cross By Mr. White . . . . . . . . . . . . 266

Redirect By Mr. Skinner  . . . . . . . . . 280

ANKUR GUPTA

Direct By Mr. Bragg  . . . . . . . . . . . 281

Cross By Mr. Ross  . . . . . . . . . . . . 299

ROXANA BELTRAN

Direct By Mr. Bragg  . . . . . . . . . . . 347

Cross By Mr. White . . . . . . . . . . . . 359

JOSE CORREA

Direct By Mr. Bragg  . . . . . . . . . . . 365

Cross By Mr. Ross  . . . . . . . . . . . . 374

BRIAN P. DUFFY

Direct By Mr. Skinner  . . . . . . . . . . 380

RICHARD REINHARDT

Direct By Mr. Skinner  . . . . . . . . . . 406

GOVERNMENT EXHIBITS

Exhibit No.                                                    Received

704   . . . . . . . . . . . . . . . . . . 356

701, 702   . . . . . . . . . . . . . . . 357

705   . . . . . . . . . . . . . . . . . . 372

809, 602, 608   . . . . . . . . . . . . . 380

505   . . . . . . . . . . . . . . . . . . 385

501-503 and 505-515   . . . . . . . . . . 391

517   . . . . . . . . . . . . . . . . . . 398

804   . . . . . . . . . . . . . . . . . . 409

801, 301   . . . . . . . . . . . . . . . . 416

802, 302   . . . . . . . . . . . . . . . . 418

803, 303   . . . . . . . . . . . . . . . . 419

808, 603-606   . . . . . . . . . . . . . . 420

901 to 914   . . . . . . . . . . . . . . . 430

1101 and 1102   . . . . . . . . . . . . . 432

201, 202, 203, 204   . . . . . . . . . . . 434

205 and 206   . . . . . . . . . . . . . . 438

807 and 607   . . . . . . . . . . . . . . 440

1004   . . . . . . . . . . . . . . . . . . 441

DEFENDANT EXHIBITS

Exhibit No.                                                    Received

A   . . . . . . . . . . . . . . . . . . . 360

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

459

19lddat1                         Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           (S1) 11 Cr. 102 (LAK)

5    VIKRAM DATTA,

6              Defendant.

7    ------------------------------x

8
                                           September 21, 2011
9                                          9:39 a.m.

10
     Before:
11
                         HON. LEWIS A. KAPLAN,
12
                                           District Judge
13

14                       APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  PETER M. SKINNER
17        ALVIN L. BRAGG, JR.
          Assistant United States Attorneys
18

19   ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN PA
          Attorneys for Defendant
20   BY:  ALAN S. ROSS

21   WHITE & WHITE
          Attorneys for Defendant
22   BY:  DIARMUID WHITE

23        - also present -

24   Vanessa Quinones, Government paralegal
     SA Richard Reinhardt, IRS
25

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everybody.

3          ALL COUNSEL:  Good morning, your Honor.

4          THE COURT:  So there is a rumor you folks have

5     something for me.  Is that right?

6          MR. SKINNER:  I believe the defense had an issue to

7     raise with your Honor.  We have one housekeeping matter but we

8     can table that for the moment.

9          MR. ROSS:  Good morning, your Honor.

10         THE COURT:  Good morning.

11         MR. ROSS:  Your Honor, over this break, we shared with

12    the government, as they did with us, our lineup of witnesses

13    that we intend to call, and yesterday Mr. White advised the

14    government of our intention to call Yolanda Carrillo and

15    Cynthia Garza as two defense witnesses in this case.

16         The response, as I understood it because I was not

17    privy to phone call, was that that is problematic because they

18    are alleged to be unindicted co-conspirators in the case, and

19    that it was the government's view that the Court should make

20    some inquiry and some suggestion about appointment of counsel,

21    independent counsel, to advise Ms. Carrillo and Ms. Garcia

22    before they testify.

23         I'm not sure if Mr. Skinner thinks my summary of the

24    discussion is accurate, but that's what I was advised was the

25    government's position.

19lddat1                         Trial

1          I took a quick look last night, your Honor -- and I

2    unfortunately don't have the benefit of having a printer in my

3    hotel room -- to see what the law on this particular subject

4    is.  And the case that I found that directed me to other

5    authority is a Second Circuit case, United States v. Pinto, at

6    850 F.2d 927, and that was a 1988 case.  Ultimately, while that

7    defendant's conviction I believe was affirmed, the Second

8    Circuit directed itself to discussion of the subject generally

9    of witness intimidation when this situation comes up.  That is,

10   there was a United States Supreme Court case, Webb v. Texas at

11   409 U.S. 95, in 1972, and that was the judge in that case

12   admonished before he testified the sole defense witness in a

13   case.  And the Court ultimately determined that the Court's

14   admonition, singling out the defense witness for the

15   admonition, scared the witness off the witness stand and

16   reversed the conviction based upon the Sixth Amendment

17   violation and Fifth Amendment violation, denying due process to

18   the defendant.

19         That case then is cited subsequently by the D.C.

20   Circuit in United States v. Smith at 478 F.2d 976, in 1973.

21   There convictions were reversed where it was the action not of

22   the Court but of the government prosecutor.  And in that case

23   the prosecutor stated to a defense witness, who was an

24   eyewitness to the crime at trial, that the witness should seek

25   independent counsel and then if the witness testified as

1    indicated by other testimony in the case, then he would be

2    prosecuted.

3         We have a situation somewhat like that now.  The

4    prosecutor is suggesting the appointment of independent

5    counsel.  It looks to me a lot like the situation in Smith.

6    And then --

7         THE COURT:  There is a vast difference between

8    proposing that the witness be told, if the witness is not aware

9    of it, the witness has already been named as an unindicted

10   co-conspirator and made aware of the witness' right to counsel

11   and in the second case, your summary of Smith, being told all

12   that and told if you testify you will be prosecuted.  Don't you

13   think there is a difference?

14        MR. ROSS:  Oh, I do.  I was seeking cases to give us

15   some guidance on how to handle this situation without

16   inappropriately intimidating two critical witnesses in the

17   case.

18        And then, your Honor, there was another case, which is

19   United States v. Morrison, at 535 F.2d 223.  That was from the

20   Third Circuit in 1976.  That was also a conviction reversed

21   case where the actions of the prosecutor who repeatedly warned

22   a prospective defense witness about the possibility of a

23   federal perjury charge if she testified falsely, and then there

24   was an interview that was described as intimidating.  The Court

25   held that that was completely unnecessary, and to use the

191ddat1                    Trial

1      verbiage of the Third Circuit, "Since a warning by the Court

2      prior to her testimony would have been adequate protection

3      against an unknowing waiver of the witness' right against

4      self-incrimination."

5              So the concern that --

6              THE COURT:  So, in other words, that case at least

7      suggests that a warning to the witness by the Court that

8      testifying might result in a waiver of the witness' privilege

9      against self-incrimination would have been appropriate?

10             MR. ROSS:  Actually, the case, as I read the body of

11     it -- again, I apologize I couldn't copy it, but as I read the

12     body of it said that it is certainly within the discretion of

13     the Court to make that kind of statement to a witness.

14             THE COURT:  So do you have a proposal about what ought

15     to be done?

16             MR. ROSS:  Your Honor, frankly, my view is nothing

17     need be done and let me tell you why.  I think we should be

18     able to call these witnesses directly to the witness stand and

19     have them testify.  I don't think they need to be advised of

20     anything.

21             And my position for that is supported by the

22     government's own actions in this case.  The government -- you

23     can harken back to the complaint.  The complaint was filed in

24     this case I believe the day before the arrest of the defendant

25     on the 14th; at least it was dated the 14th of January.  It was

19lddat1                          Trial

1    certainly filed with the defendant's arrest on January 15th.

2            These two women are identified as co-conspirator two

3    and co-conspirator three, respectively, in the complaint.

4    After that complaint was filed, the agents in this case -- I

5    think it may have been Agent Reinhardt, as a matter of fact,

6    went and interviewed both of these women and didn't advise

7    either of them of their need to get counsel, didn't advise

8    either of them about their Fifth Amendment right, and didn't

9    advise either of them that what they say might incriminate

10   themselves.  It was just simply an interview as though they

11   were witnesses.

12           So here we are months later in a trial and suddenly

13   the government finds it necessary, where they didn't

14   previously, to advise the same co-conspirators -- and, your

15   Honor, nothing new has come up.  The Court has heard how this

16   case developed.  They had wiretaps --

17           THE COURT:  So if I understand your position

18   correctly, the government would restate it something like this:

19   Maybe we made a mistake in the first place interviewing them in

20   that fashion a long time ago but because we did the Court

21   should now implicate itself in repeating the statement?

22           MR. ROSS:  No, your Honor.  I don't think that is a

23   fair statement.  I think it is this.  The government has made

24   no -- until yesterday, until they raised this issue of them in

25   the government's view needing to have independent counsel and

19lddat1                          Trial

1    need to be advised before they testify, the government has made

2    no overture that would have suggested that they had any

3    intention to charge either of these women in all of this time.

4    Nothing.  So I don't know that restating it exactly that way is

5    correct.

6              I don't know that in the real world, in the honest

7    world -- never mind how parties to this litigation may want to

8    spin their positions early or late in the game, but the reality

9    is neither one of these women did anything.  You heard the

10   various recordings.  And I note for the Court, for example,

11   105-T, pages 6 and 7.  At 6 Mr. Datta is advising the

12   undercover that he doesn't want anybody, any of his employees,

13   to know anything about it --

14             THE COURT:  I can't try the case for this purpose.

15             What I know -- the one fact I know is that the grand

16   jury found probable cause to believe that these two women were

17   culpable participants in criminal conspiracies.  That's the

18   given that I have before me.

19             MR. ROSS:  I don't know how the Court reaches that

20   conclusion --

21             THE COURT:  Are they not named as unindicted

22   co-conspirators in the Indictment?

23             MR. ROSS:  Your Honor, when the Grand Jury returns an

24   indictment against a defendant, I don't know that they

25   necessarily approve of and subscribe to all of the allegations

19lddat1                        Trial

1     that the government makes in the Indictment.  It's not

2     necessary to the Indictment to indict Mr. Datta; it wasn't

3     necessary that either of these two women be found to be

4     co-conspirators.  But I hear the Court.

5              THE COURT:  Let me hear from the government.

6              MR. SKINNER:  Well, your Honor, first of all, just to

7     be clear, the recitation of the facts with regard to what

8     happened yesterday is correct.  We were informed late yesterday

9     afternoon of the defendant's intention to call these two women

10    as witnesses, and we informed the defendant that we viewed them

11    as unindicted co-conspirators in this case.

12             THE COURT:  I see.  Are they named in the Indictment

13    as such?

14             MR. SKINNER:  I am just looking right now to see what

15    unindicted -- we have -- CC-1 would not be one of these two

16    women.  CC-2 is one of these two women.  I, frankly, off the

17    top of my head am not sure if it is Ms. Garcia or Ms. --

18             THE COURT:  You are telling me CC-2 is named as an

19    unindicted co-conspirator?

20             MR. SKINNER:  Yes.  A co-conspirator not named as a

21    defendant herein used a telephone located in Nueva Laredo,

22    Texas.

23             I think the defendant is right; they certainly were

24    named as co-conspirators in the complaint.  They were

25    interviewed during the search of the premises in a noncustodial

191ddat1                        Trial

1    interview.  Whether they if they were charged would have issues

2    with regard to the suppression of that interview I think is

3    another issue for another day.

4           They have -- you know, we have not yet indicted either

5    of these women.  We feel there is sufficient probable cause to

6    indict them.  We very well may indict them in the future.

7    Mr. Ross emphasizes that there has been no overture suggesting

8    an intention to charge these women.  Your Honor, frankly, that

9    was quite intentional.  You know, when we reached the stage of

10   the case that we had against the defendant and we started

11   saying to ourselves do we want to charge either of these women

12   at this point, we didn't want it to appear that we were

13   meddling.

14          You know, we are also -- we have the ability to

15   exercise prosecutorial discretion with regard to who we are

16   going to charge and when or why, and, frankly, we have not made

17   a decision at this point to charge either of them.  But I can

18   say in good faith that we believe there is adequate evidence to

19   support a charge against them, and the possibility of charging

20   them in the future remains open.

21          THE COURT:  All right.

22          MR. SKINNER:  What we would suggest -- what we

23   suggested to the defense yesterday was that independent counsel

24   be appointed for these women so that they can receive

25   independent advice as to whether they should be testifying

191ddat1                         Trial

1    and/or exercising their Fifth Amendment right against

2    self-incrimination when testifying.  I believe they are here in

3    the city.  I believe, from defense counsel's representations,

4    that they can be in the courthouse midday today for the

5    appointment of counsel.

6              So that would be our recommendation, that they get

7    their own attorneys and they get their own advice as to whether

8    or not they should testify.  If they do testify, what they are

9    going to say.

10             THE COURT:  Do you have any authority for me?

11             MR. SKINNER:  Your Honor, I frankly do not.  We did

12   not do the research on this.  It was just our -- when we

13   learned about this late yesterday, we told them what we thought

14   should happen.  I would be happy to try and get some authority

15   for you over the lunch break, if you want to chair this until

16   the end of the day.

17             THE COURT:  All right.  Let's do that.

18             OK.  Anything else before we begin?

19             MR. SKINNER:  One other housekeeping matter I

20   mentioned before.  Mr. White pointed out to us that we marked

21   the wrong set of CMIRs as Government Exhibit 303.  We

22   stipulated that it was CMIRs filed by Hilario Martinez-Garcia.

23   We in fact stamped the set of CMIRs that was all of the CMIRs

24   related to La Versailles.

25             I just wanted to bring to the Court's attention that

191ddat1                        Trial

1    we have substituted the correct exhibit in place of 303.  I

2    don't think it changes anything with regard to the presentation

3    of the evidence to the jury, because all we did was cite back

4    to that exhibit generally without going through it in any

5    detail.

6              THE COURT:  Any problem with that, Mr. Ross?

7              MR. ROSS:  No, sir.

8              THE COURT:  All right.  Now, just refresh my

9    recollection, had we finished with the last witness?

10             MR. SKINNER:  Special Agent Reinhardt has probably

11   another 10 or 15 minutes of testimony, and then we are prepared

12   to proceed with three other witnesses today.

13             THE COURT:  OK.  Let's get the jury.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

19lddat1                        Reinhardt - direct

1              THE CLERK:  Jury entering.

2              (Jury present)

3              THE CLERK:  Please be seated, everyone.

4              THE COURT:  Good morning, folks.  I hope everybody had

5    a good break.

6              The jurors and the defendant all are present.

7              The witness is reminded he is still under oath.

8              You may continue, counsel.

9    RICHARD REINHARDT,

10        Resumed, and testified further as follows:

11             MR. SKINNER:  Thank you, your Honor.

12   DIRECT EXAMINATION

13   Q.  Good morning, Special Agent Reinhardt.

14   A.  Good morning, sir.

15   Q.  At the conclusion of your testimony last week on

16   September 15th, you were answering some questions about the

17   defendant's post-arrest statement, is that correct?

18   A.  Yes.

19   Q.  Now, were you present for the defendant's entire

20   post-arrest statement?

21   A.  No.

22   Q.  And what portion of the post-arrest statement were you

23   present for?

24   A.  After he arrived at the Newark field office of the Drug

25   Enforcement Administration.

1    Q.   So what did you miss?

2    A.   The drive from Manhattan to Newark and then like the first

3    five or ten minutes of the interview.

4    Q.   Now, during the portion that you were present, was

5    Mr. Datta questioned about cash payments for perfume that his

6    business had received?

7    A.   Yes.

8    Q.   And did Mr. Datta acknowledge receiving cash payments for

9    perfume?

10   A.   Yes.

11   Q.   And what, if anything, did he tell you about where that

12   cash came from?

13   A.   From customers in Mexico.

14   Q.   What, if anything, did he tell you about where his

15   customers in Mexico got the cash?

16   A.   He said that wasn't his responsibility.

17   Q.   Now, how many times during the course of your interview of

18   the defendant did he say that it wasn't his business to know

19   where the cash came from?

20   A.   It came up several times.

21   Q.   Now, during the interview, was the defendant asked about

22   form 8300s that were filed by his business?

23   A.   Yes.

24   Q.   And just to remind the jury since it has been a couple of

25   days, what is a Form 8300?

19lddat1                    Reinhardt - direct

1    A.  It is a form filled out by a business when they receive

2    more than $10,000 in U.S. currency.

3    Q.  All right.  Now, what, if anything, did Mr. Datta tell you

4    about Form 8300s?

5    A.  That his business filed forms 8300 for his cash-paying

6    customers.

7    Q.  Now, what was Mr. Datta doing immediately prior to his

8    arrest?

9    A.  Having dinner with an undercover agent.

10   Q.  Was he asked during the post-arrest interview about

11   offering to assist that undercover agent in setting up a

12   business to launder money?

13   A.  Yes.

14   Q.  And what did he say in response to questions about offering

15   to help the undercover set up a business to launder money?

16   A.  He denied that he had those conversations.

17   Q.  Now, was he asked whether he had discussed with the

18   undercover a fee for laundering the undercover's money?

19   A.  Yes.

20   Q.  And what did he say when asked about whether he discussed

21   this fee with the undercover?

22   A.  They didn't have those conversations.

23   Q.  In the course of your investigation of this matter, did you

24   search CTRs for identifying information for the people, the

25   individuals, who deposited more than $10,000 at La Versailles

19lddat1                         Reinhardt - direct

1    bank accounts?

2    A.   Yes.

3    Q.   And were you able to find identifying information for those

4    people on the CTRs?

5    A.   Yes.

6    Q.   What kind of identifying information for the people who

7    deposited the cash could be found on the CTRs?

8    A.   The name, address, Social Security number, date of birth.

9    Q.   In your review of the CTRs, did you identify any

10   individuals with the first name of Cynthia?

11   A.   Yes.

12   Q.   And what was Cynthia's last name on the CTR forms?

13   A.   Garcia.

14   Q.   Now, have you conducted any public records searches that

15   indicated that Cynthia Garcia is also associated with another

16   surname?

17   A.   Yes.

18   Q.   And what surname is that?

19   A.   Garza.

20   Q.   All right.   In these public record searches, were you able

21   to determine Cynthia Garcia's date of birth?

22   A.   Yes.

23   Q.   And based on your review of her date of birth, how old

24   would Cynthia Garcia be today?

25   A.   27 years old.

19lddat1                          Reinhardt - direct

1    Q.  During the course of your investigation, did you review

2    account documents related to the defendant's business that were

3    produced by a bank called BBVA Compass Bank?

4    A.  Yes.

5    Q.  Did any of those documents indicate whether BBVA Compass

6    was previously known by another name?

7    A.  Yes.

8    Q.  What was the previous name of that bank?

9    A.  Laredo National Bank.  I actually think BBVA took over

10   Laredo National Bank.  It wasn't BBVA changed its name from

11   Laredo to Compass.

12   Q.  But at a previous point in time, some portion of that bank

13   was known as Laredo National Bank.

14   A.  That's correct.

15              MR. SKINNER:  Your Honor, at this point the government

16   would like to read in a stipulation with regard to some bank

17   records.

18              THE COURT:  Yes.  Go ahead.

19              MR. SKINNER:  The parties agree that if called as a

20   witness, a records custodian from Falcon Bank would testify as

21   follows:

22              Government Exhibit 609 is a printout from checking

23   account records for an account in the name of Hilario

24   Martinez-Garcia.  Government Exhibit 609 was retrieved from the

25   computer archive system of Falcon Bank.  The records reflected

1    on Government Exhibit 609 were created by a person with

2    knowledge of or created from information transmitted by a

3    person with knowledge of the information shown were created at

4    or near the time the information became available to Falcon

5    Bank and were created and maintained by Falcon Bank as part of

6    its regularly conducted business activities.

7             It is further stipulated and agreed that Government

8    Exhibit 609 and this stipulation may be received in evidence at

9    trial.

10            The stipulation is marked as Government Exhibit 813.

11            The government offers 813 and 609.

12            MR. WHITE:   No objection.

13            THE COURT:   They are received.

14            (Government's Exhibits 609 and 813 received in

15   evidence)

16            MR. SKINNER:   Can we call up, Ms. Quinones, the first

17   page of -- is the system not working?

18            (Pause)

19            MR. SKINNER:   Your Honor, may I approach?

20            THE COURT:   Let's just see where we are with the

21   system.

22            (Pause)

23            What is it you want to place before the witness?

24            MR. SKINNER:   I am going to place a hard copy of 609,

25   but I think we have it up on the screen now.

19lddat1                        Reinhardt - direct

1           THE COURT:  Yes.

2    BY MR. SKINNER:

3    Q.  Are you looking at the first page of what has been marked

4    as Government Exhibit 609 --

5    A.  Yes.

6    Q.  -- Special Agent Reinhardt?

7           Can you tell us what kind of documents are in

8    Government Exhibit 609?

9    A.  They are checks written from the Falcon Bank account in the

10   name of Hilario Martinez-Garcia.

11   Q.  If I focus your attention on that one that I just put the

12   circle around, where is that a check written to?

13   A.  La Versailles Fragrances.

14          MR. SKINNER:  We can take down 609.

15          May I approach, your Honor?

16          THE COURT:  Yes.

17   Q.  Special Agent Reinhardt, I am showing you five photographs

18   that have been marked as Government Exhibits 916 to 920.  I ask

19   you to take a look at them and let me know if you recognize

20   them.

21   A.  Yes, I do.

22   Q.  What are these?

23   A.  They are Mr. Datta's stores in Laredo, Texas and his

24   warehouse in Laredo, Texas.

25   Q.  So they are photographs of the different locations?

19lddat1                    Reinhardt - direct

1    A.   Yes.

2    Q.   When were these photographs taken?

3    A.   I didn't take the photographs.

4    Q.   All right.  Have you been to these locations?

5    A.   Yes -- not all of them, no.

6    Q.   Do you recognize the photographs?

7    A.   Yes.

8              MR. SKINNER:  Your Honor, we offer Government Exhibits

9    916 to 920.

10             MR. WHITE:  No objection.

11             THE COURT:  Received.

12             (Government's Exhibits 916 to 920 received in

13   evidence)

14             MR. SKINNER:  Can we just publish these exhibits one

15   by one?

16             THE COURT:  Yes, you may.

17             MR. SKINNER:  Can we call up 916 first?

18   Q.   Special Agent Reinhardt, can I ask you what we are looking

19   at here?

20   A.   The store on 1213 Zaragoza.

21   Q.   Is this one of the La Versailles retail stores?

22   A.   Yes.

23   Q.   Is this in Laredo, Texas?

24   A.   Correct.

25   Q.   Can we call up 917, please?

1       What are we looking at here?

2   A.  Another one of the stores in Laredo.

3   Q.  Is this another one of the La Versailles retail stores?

4   A.  Correct.

5   Q.  Can we call up 918?

6       What is this a photograph of?

7   A.  The warehouse.

8   Q.  And again where is this located?

9   A.  1401 Lincoln.

10  Q.  Is that in Laredo, Texas?

11  A.  Yes.

12  Q.  And can we now call up 919?

13      What is this?

14  A.  The store on 407 Convent.

15  Q.  This is a Valencia store, correct?

16  A.  Yes.

17  Q.  Valencia was also owned by the defendant, Vikram Datta?

18  A.  Correct.

19  Q.  And, last, can we call up 920?

20      What is this?

21  A.  Another store located on Zaragoza Street.

22  Q.  Is this another Valencia retail store?

23  A.  Yes.

24  Q.  How far is this Valencia retail store from the La

25  Versailles retail store that is located on Zaragoza Street?

1    A.   They are pretty much right next to each other.

2    Q.   We can take down 920.   Thank you.

3         Special Agent Reinhardt, last week on

4    September 15th you testified about Government Exhibit 302,

5    which is a compilation of CTRs from 2009 and 2010, correct?

6    A.   Yes.

7    Q.   And you also testified about the total figures for the cash

8    reported on the CTRs for those two years, is that right?

9    A.   Yes.

10   Q.   You testified that the CTRs for 2009 totaled roughly 13

11   million and the CTRs for 2010 total roughly 18 million, is that

12   right?

13   A.   Yes.

14   Q.   Did you have an opportunity to further review those figures

15   since testifying last week?

16   A.   Yes, I did.

17   Q.   Did you have any corrections to make to those figures?

18   A.   Yes, the numbers for 2009.

19   Q.   What is the accurate figure for total amount of cash

20   reported on the CTRs for 2009?

21   A.   I don't remember off the top of my head.

22         MR. SKINNER:   Your Honor, may I approach?

23         THE COURT:   Yes.

24   Q.   Let me just ask you if looking at that helps refresh your

25   recollection as to what the total figure for the CTRs in 2009

```
       19lddat1                      Reinhardt - direct
```

1    is?

2    A.   Yes.

3    Q.   And what is it?

4    A.   Approximately $14.3 million.

5    Q.   All right.  So 1.3 million more than what you testified to

6    previously?

7    A.   Roughly, yes.

8    Q.   Just to remind the jury, what kind of information is

9    included on a CTR?

10   A.   The name of the business, the name of the employer

11   individual that puts the money in the bank --

12   Q.   When are CTRs filed?

13   A.   Once the deposit goes over $10,000.

14   Q.   Special Agent Reinhardt, I want to show you a document that

15   we marked --

16          THE COURT:  Just to be clear, these are reports of

17   cash deposits on behalf of La Versailles where more than 10,000

18   in cash was put in at a time?

19          THE WITNESS:  It is aggregated.  Like if he has a

20   5,000, a 5,000 and a $2,000 deposit, a CTR will be triggered.

21          THE COURT:  On the same day?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Thank you.  Go ahead.

24   BY MR. SKINNER:

25   Q.   Just to be clear, these figures are for La Versailles as

19lddat1                          Reinhardt - direct

1    well as a handful of other corporate entities that are

2    controlled by the defendant, correct?

3    A.   Yes.

4    Q.   Special Agent Reinhardt, I would like to show you an

5    exhibit that we've marked as Government Exhibit 304, and ask

6    you if you recognize that exhibit?

7    A.   Yes.

8    Q.   Could you tell us what that exhibit is?

9    A.   These are the CTRs for La Versailles and the other

10   businesses for '07 and '08.

11   Q.   Did you compile that exhibit?

12   A.   Yes.

13   Q.   How did you compile that exhibit?

14   A.   Through the Detroit database which is the system used by

15   IRS to track records from FINCEN.

16   Q.   What's FINCEN?

17   A.   The Financial Crimes Enforcement Network.

18   Q.   Is this a centralized database that is maintained by

19   Department of Treasury?

20   A.   Yes.

21             MR. SKINNER:  Your Honor, the government offers

22   Government Exhibit 304.

23             MR. WHITE:  No objection.

24             THE COURT:  Received.

25             (Government's Exhibit 304 received in evidence)

191ddat1                    Reinhardt - direct

1   Q.   Special Agent Reinhardt, were you able to review those

2   documents and determine similar total cash figures that you had

3   for '09 and '10 but for the years 2007 and 2008?

4   A.   Yes.

5   Q.   What was the total cash figure for 2007?

6   A.   Approximately $5.9 million.

7   Q.   What was the total cash figure for 2008?

8   A.   Approximately $7.8 million.

9   Q.   Now, I show you a document that's been marked as Government

10  Exhibit 211.  Have you reviewed that exhibit prior to

11  testifying today?

12  A.   Yes.

13  Q.   Do you recognize that exhibit?

14  A.   Yes, I do.

15  Q.   Can you please tell us what that exhibit is?

16  A.   They are the Forms 8300 that were found in Mr. Datta's

17  business.

18  Q.   So when were these found?

19  A.   During the search of Mr. Datta's business.

20            MR. SKINNER:   Your Honor, the government offers

21  Exhibit 211.

22            MR. WHITE:   No objection.

23            THE COURT:   Received.

24            (Government's Exhibit 211 received in evidence)

25            MR. SKINNER:   Can we, Ms. Quinones, possibly put up

1    the first page?

2            I'm just going to put the first page of this exhibit

3    up on the projector.  Oh, it is not working?

4            MR. BRAGG:  No.

5    Q.  Agent Reinhardt, let me ask you, have you reviewed all the

6    documents in Government Exhibit 211?

7    A.  Yes.

8    Q.  All right.  And I don't know if you can see from there, but

9    looking at the first page, there is a signature on the bottom?

10   A.  Yes.

11   Q.  Whose signature is that?

12   A.  Mr. Datta.

13   Q.  Is Mr. Datta -- is there anybody else's signature on any

14   8300s other than Mr. Datta's?

15   A.  Not that I recall.

16   Q.  You also testified on September 15th about Government

17   Exhibit 303, correct?

18   A.  Yes.

19   Q.  And 303 is the CMIRs that were filed by Hilario

20   Martinez-Garcia?

21   A.  That's correct.

22   Q.  Can you just remind us what a CMIR is?

23   A.  It is a form filed by an individual crossing the U.S.

24   border with currency to declare.

25   Q.  You testified on September 15th that Mr. Garcia's total

1    declarations on the CMIRs was 5.6 million; is that what you

2    said last week?

3    A.   Yes.

4    Q.   All right.  And have you reviewed that figure again since

5    testifying on September 15th?

6    A.   Yes.

7    Q.   And is it accurate?

8    A.   No.

9    Q.   What is the total figure from the CMIRs for declarations by

10   Hilario Martinez-Garcia at customs?

11   A.   $11.4 million.

12   Q.   And that $5.6 million figure, did that -- withdrawn.

13          Have you also reviewed the same exhibit to determine

14   the total CMIR figure for Mr. Martinez-Garcia's declarations

15   about money that was being delivered to La Versailles?

16   A.   Yes.

17   Q.   And how much money did Mr. Martinez-Garcia declare as being

18   delivered to La Versailles?

19   A.   $6.7 million.

20   Q.   All right.  Now, again last week you testified about

21   Government Exhibit 301, correct?

22   A.   Yes.

23   Q.   And that's the compilation of 8300s that was maintained by

24   the Treasury Department, correct?

25   A.   Correct.

1    Q.   And that's information from the 8300s that is stored

2    electronically on a Treasury Department database, is that

3    right?

4    A.   Yes.

5    Q.   Now, are you able to search that database to try and

6    identify the individuals who are reported as having delivered

7    cash to a business?

8    A.   Yes.

9    Q.   And did you search that database to determine whether La

10   Versailles had filed any 8300s purporting to have received

11   money from Hilario Martinez-Garcia?

12   A.   Yes, I did.

13   Q.   What did you find when you ran that search?

14   A.   There were none in 2009 and 2010.

15   Q.   Did you search the database to determine whether there were

16   8300s filed by any other company controlled by Vikram Datta

17   that disclosed money received from Hilario Martinez-Garcia?

18   A.   Yes, I did.

19   Q.   And what did you find when you ran that search?

20   A.   There were none.

21   Q.   Now, were there any 8300s filed in the name of Hilario

22   Martinez-Garcia at some point in 2011?

23   A.   Yes.

24   Q.   All right.  How many?

25   A.   I believe two or three.

191ddat1                    Reinhardt - direct

1   Q.  All right.  And were those filed before or after

2   January 15th of 2011?

3   A.  They are dated after January 2011.

4   Q.  Meaning the filing date is after?

5   A.  Yes.

6   Q.  When you say "dated," what do you mean?

7   A.  On the bottom of the form it was dated I think June 15,

8   2011.

9   Q.  Were any of those forms signed by the defendant?

10  A.  No.

11  Q.  Have you searched the same database of 8300s to determine

12  whether any of the companies controlled by Vikram Datta filed

13  8300s reporting cash delivered by Faustino Garza?

14  A.  Yes, I did.

15  Q.  What did you find when you ran that search?

16  A.  There were none filed.

17  Q.  Were you able to search to see whether any Form 8300s were

18  filed by a company controlled by Vikram Datta for money

19  delivered by Fausto Garza?

20  A.  Yes, I did.

21  Q.  What did you find when you ran that search?

22  A.  There were none.

23  Q.  What was the name of the undercover agent who delivered the

24  money to the La Versailles store in San Ysidro in August of

25  2010?

19lddat1                         Reinhardt - direct

1    A.   Jose Correa.

2    Q.   Is that the name that the agent provided to the employees

3    at the store, to the best of your knowledge?

4    A.   Yes.

5    Q.   Have you searched the database for La Versailles or any

6    other Vikram Datta store to determine whether any 8300s were

7    filed in the name of Jose Correa?

8    A.   Yes.

9    Q.   What did you find?

10   A.   There was none.

11          MR. SKINNER:   One moment, your Honor.

12          (Pause)

13          MR. SKINNER:   No further questions, your Honor.

14          THE COURT:   Thank you.   Cross-examination.

15   CROSS-EXAMINATION

16   BY MR. WHITE:

17   Q.   Good morning, Agent Reinhardt.

18   A.   Good morning, sir.

19   Q.   You testified on direct that you and other law enforcement

20   officers executed search warrants at the La Versailles

21   warehouse and stores and Mr. Datta's home, correct?

22   A.   Yes, sir.

23   Q.   And did you participate in those searches yourself?

24   A.   Yes, sir.

25   Q.   And you found financial records?

191ddat1                    Reinhardt - cross

1   A.   I was at Mr. Datta's house; I was not at the business.

2   Q.   You didn't participate in the search of the business?

3   A.   I got there after they had already had everything boxed up.

4   Q.   Had you reviewed the documents that were seized from the

5   warehouse?

6   A.   Yes, I did.

7   Q.   And they consist of extensive financial records?

8   A.   There was a lot, yes.

9   Q.   And invoices?

10  A.   Yes.

11  Q.   Receipt books?

12  A.   Yes.

13  Q.   And you participated in the search of his home, too,

14  correct?

15  A.   Yes, sir.

16  Q.   And you seized information regarding bank accounts?

17  A.   Yes, sir.

18  Q.   In searching the warehouse, to your knowledge, were

19  computers also seized?

20  A.   Yes, they were.

21  Q.   And the hard drives from those computers were imaged by law

22  enforcement?

23  A.   Yes, by the Drug Enforcement Administration.

24  Q.   What does that mean, to image the hard drive?

25  A.   They basically take a copy of the contents of the computer

1    and they provide us a copy of it.

2    Q.   So you had -- the government, the law enforcement who

3    seized these had the ability to review anything that was on

4    those computers' hard drives at his business?

5    A.   Yes and no.  We didn't get back the information from DEA

6    until like shortly before this trial began.  So the computers

7    weren't really reviewed that much.

8    Q.   Did you learn anything about the contents of those

9    computers?

10   A.   From what I saw, it was limited information.

11   Q.   Do you know whether it had financial records?

12   A.   I didn't see much.  No, sir.

13   Q.   Did you see Excel spreadsheets for every single transaction

14   that has been conducted since 2005?

15   A.   No.  I saw some Excel spreadsheets but not all.

16   Q.   Did you see Excel spreadsheets for every single wholesale

17   client of La Versailles?

18               MR. SKINNER:  Objection.

19               THE COURT:  Ground?

20               MR. SKINNER:  Beyond the scope of direct examination.

21               THE COURT:  Sustained.

22   BY MR. WHITE:

23   Q.   So when you testified on direct that you found financial

24   records and you reviewed the financial records, you only

25   reviewed essentially the hard copies of the financial records;

19lddat1                          Reinhardt - cross

1   is that true?

2   A.  What was available to me.

3   Q.  Is it true that you only reviewed the hard copy of the

4   records, nothing from the computer?

5   A.  Yes.

6   Q.  And as you sit here now, you are aware they had Excel

7   spreadsheets on the computer, aren't you?

8   A.  I am aware there were some Excel spreadsheets, yes.

9   Q.  And that there were QuickBooks entries on the computer

10  also?

11              MR. SKINNER:  Objection, your Honor.

12  Q.  Are you aware of that?

13              THE COURT:  Sustained.

14  Q.  Did you review any QuickBooks entries?

15              MR. SKINNER:  Objection.

16              THE COURT:  Sustained.

17              Go on to another subject, counselor.

18              MR. WHITE:  Ms. Quinones, could you put up Government

19  Exhibit 1004.

20              (Pause)

21  Q.  I would just like to make clear what it is that this

22  exhibit -- you prepared this exhibit, correct, Agent Reinhardt?

23  A.  Yes, I did.

24  Q.  I would like to make clear what this exhibit consists of

25  and what the sources for the information on it are.

19lddat1                     Reinhardt - cross

1   A.   OK.

2   Q.   Let's start with the first column -- that's column 1 -- the

3   second column, "Crossing date," what does that column

4   represent?

5   A.   The crossing date as per the CMIR.

6   Q.   And what CMIR?

7   A.   The CMIR that was filed.

8   Q.   By whom?

9   A.   By Mr. Martinez-Garcia.

10  Q.   OK.  And the second entry, "Cash book date," what does that

11  mean?

12  A.   The date that is indicated in the cash book.

13  Q.   And when you say "cash book," do you mean a book like this,

14  Government Exhibit 201, in evidence?

15  A.   Yes, sir.

16  Q.   So if I understand you correctly, you took these books and

17  you reviewed them and you took information from here and you

18  entered it onto this chart?

19  A.   Yes, sir.

20  Q.   And the "deposit date," what does that represent?

21  A.   The deposit date per the bank records.

22  Q.   The deposit date derived from bank records?

23  A.   Yes.

24  Q.   And these are records you obtained from banks?

25  A.   Yes.

1    Q.   The "crossing amount"?

2    A.   Is the amount that was listed on the CMIR filed by

3    Mr. Hilario Martinez-Garcia.

4    Q.   Agent Reinhardt, does this chart assume -- withdrawn.

5          The crossing amount on the CMIRs filed for Hilario

6    Martinez with relation only to La Versailles?

7    A.   Yes.

8    Q.   And does this column assume that --

9          THE COURT:   I'm sorry.   Which column, Mr. White?

10         MR. WHITE:   We are on crossing amount.   The column,

11   "Crossing Amount."

12   Q.   Does that column assume that the information that Hilario

13   Martinez provided at the border crossing was truthful and

14   accurate?

15   A.   Yes.

16   Q.   And the next column, "Deposit Amount," where is that

17   information derived from?

18   A.   From the bank records.

19   Q.   From the bank records.   This shows on a particular date --

20   how does this match up?   How did you do this?   The dates of the

21   cash book and the crossing and the deposit aren't always the

22   same, correct?

23   A.   Yes.

24   Q.   So how did you match up the deposit with the crossing date

25   and the crossing amount?

1   A.  I looked at the amount of deposits and then like, for

2   instance, if you go to line 1, the crossing amount per the CMIR

3   was $34,735.  Then I went to the bank accounts to see if there

4   was a corresponding deposit for that amount or near that

5   amount.  And then on the deposit ticket was written J. Franco,

6   so that's where the J. Franco comes from.  And then the cash

7   book, there is also the same entry for 34,735 as an example.

8   Q.  If I can just stop you for a minute?

9           The deposit slips you retrieved from the banks

10  themselves?

11  A.  Yes.

12  Q.  And the deposit slips had been filled out by

13  representatives of La Versailles?

14  A.  Yes -- I assume, yes.

15  Q.  And written on the deposit slips was the names of the

16  particular customer?

17  A.  First initial, last name or, yeah.

18  Q.  Now, in matching this information up, the deposit date, the

19  crossing amount, you see, you pointed out in line number 1 that

20  there is a match between a deposit amount and a crossing

21  amount.  But as you go down both of those columns, there's

22  frequently no match at all; they are quite different in some

23  instances.  True?

24  A.  Yes.

25  Q.  But how did you match those ones up, then?

1    A.  Well, like there would be -- let me find a no match.

2            On February 16th, where there is $103,000 declared by

3    Mr. Martinez-Garcia, from what Martinez-Garcia told us, Jose

4    Contreras and Jose Franco were customers.  So I just used those

5    two deposits that were found on that date.

6    Q.  OK.  And if we pick another -- let's pick the date on line

7    number 5, a crossing date of January 19th, that would be

8    similar?  You cumulated the two deposits on that day and

9    matched it up against the crossing amount that Hilario Martinez

10   provided?

11   A.  Yes, and then to customers that we were told were customers

12   of Mr. Martinez and Mr. Garza.

13   Q.  Now, there's dates -- if we just look at line 7 for one

14   moment, the same two columns, $100,000 crossing amount?

15   A.  Mm-hmm.

16   Q.  That means the CMI -- Hilario Martinez, when he filled out

17   the CMI statement, said he was crossing $100,000 for La

18   Versailles, correct?

19   A.  That's correct.

20   Q.  But you only found a deposit of 70,000 for that day?

21   A.  There could have been other deposits, but that's the only

22   one I could match to a known customer.

23   Q.  OK.  You have been here throughout trial and have heard all

24   the testimony, correct?

25   A.  Yes, sir.

1    Q.  Do you recall Hilario Martinez' testimony that when he got

2    across the border, sometimes he would divide up his money among

3    some of his colleagues from the casa de cambio and they would

4    distribute it to different stores?  Do you recall that

5    testimony?

6            MR. SKINNER:  Your Honor, I object.

7            THE COURT:  Sustained.

8    Q.  Continuing along, the column that says "Bank" is obviously

9    the bank where the deposit was made, correct?

10   A.  Yes, sir.

11   Q.  And the "Account Number"?

12   A.  Account ending numbers.

13   Q.  Account ending numbers.

14           And the "Customer Per Bank Docs," what does that mean?

15   A.  Like I described before, some of the bank deposit tickets

16   would have like the first initial last name or first two

17   initials last name.

18   Q.  OK.  And so all the information in this column come from

19   the bank deposit slips filled out by La Versailles people?

20   A.  Yes, sir.

21   Q.  If I could call your attention to line 3, the third column

22   over, "Cash Book Date."  There's an entry on your chart of

23   none.  No cash book date.  You could find nothing to match up

24   with that $200,000 that Hilario Martinez told the border

25   officials that he was crossing for La Versailles and a $200,000

19lddat1                    Reinhardt - cross

1   deposit into Wells Fargo for the customer Jose Franco, is that

2   correct?

3   A.  Correct.

4              (Continued on next page)

1          MR. WHITE:  May I approach, your Honor.

2          THE COURT:  Yes.

3   BY MR. WHITE:

4   Q.  Showing you Government Exhibit 201, the cash book, a cash

5   book, page 167 of that cash book, does it identify the name of

6   the customer there?

7   A.  Yes.

8   Q.  Do you see an entry for $200,000?

9   A.  Yes, I do.

10  Q.  What date was that?

11  A.  12/31/2009.

12  Q.  Actually there is an entry on the cash book for $200,000 on

13  that date?

14  A.  Yes.

15  Q.  Whereas your chart says none, correct?

16  A.  Correct.

17  Q.  Can you explain why that is?

18  A.  I must have missed it.

19  Q.  Do you see below line 4, it's also none for the date of

20  January 11, 2010?

21  A.  Yes.

22  Q.  Can you find that entry there for such a deposit?

23  A.  Yes, on January 12.

24  Q.  The amount?

25  A.  $70,000.

1    Q.  Line number 5 on your chart, you have no deposit made on

2    January 19, 2010?

3              THE COURT:  I am sorry, I think you are misstating

4    that.

5    Q.  On your chart on line 5 under the cash book date, you have

6    none?

7    A.  For the $47,000.

8    Q.  For the $100,000.

9    A.  OK.

10   Q.  Excuse me, for the $47,000, do you find an entry for that?

11   A.  Under the same customer?

12   Q.  Yes.

13   A.  Yes.

14   Q.  Thank you.  So this chart is inaccurate to that extent?

15   A.  Yes, it is.

16   Q.  If you look at line 6 it shows a crossing amount --

17   withdrawn.

18              Looking at line 5 again, it shows a crossing amount of

19   $100,000, correct?

20   A.  Yes, sir.

21   Q.  And a deposit amount of $47,000, correct?

22   A.  And 50.

23   Q.  And 50 on the same day.  You combined those two?

24   A.  Correct.

25   Q.  You combined those two under that date and under that

1   crossing you attributed those two amounts to that crossing,

2   correct?

3   A.   That's correct.

4   Q.   The customer for the $50,000 was Juan Rubio?

5   A.   On line 5, yes, Juan Rubio.

6   Q.   The second customer was Juan Rubio?

7   A.   Correct.

8   Q.   You have spoken to Faustino Garza?

9   A.   Correct.

10  Q.   He has identified who his customers were, who his clients

11  were, has he not?

12          MR. SKINNER:   Objection.

13          THE COURT:   Objection stained.

14  Q.   To your knowledge was Juan Rubio a client?

15          MR. SKINNER:   Objection.

16          THE COURT:   Sustained.  Please Mr. White.

17  Q.   During the course of your investigation have you done any

18  investigation regarding Juan Rubio?

19  A.   No.

20  Q.   This morning the government offered into evidence

21  Government Exhibit 609 I believe which were checks drawn on

22  Charlton Bank from the account of Hilario Martinez-Garcia.

23          You saw those checks, did you not?

24  A.   Yes.

25  Q.   Did you see a check on that same date, January 19, 2010, to

1    La Versailles for $23,000 from Hilario Martinez's Charlton

2    account?

3    A.   I don't see what you are referring to.

4            MR. WHITE:   Let me show you what I have marked for

5    identification as Defendant Exhibit B.   If I may approach the

6    witness.   May I approach, your Honor?

7            THE COURT:   Do you have a copy for me, Mr. White?

8            MR. WHITE:   It's in evidence as Government Exhibit

9    609.

10           THE COURT:   Let's use Government Exhibit 609.

11           MR. WHITE:   OK.

12           THE COURT:   Put it on the screen.   This is in

13   evidence.

14           MR. SKINNER:   Yes, your Honor, it's in evidence.

15           THE COURT:   It looks like page 4.

16           MR. SKINNER:   The pages are not numbered.   If you

17   count in six pages into the record, that is the page defense

18   counsel wants to question about.

19           THE COURT:   OK.

20   BY MR. WHITE:

21   Q.   I am calling your attention to the second check on the

22   left; that is dated January 19, 2010, correct?

23   A.   Yes, sir.

24   Q.   And that was a check from Hilario Martinez-Garcia to La

25   Versailles?

1   A.   For $23,000.

2   Q.   That is not reflected in your chart, is it?

3   A.   No.

4   Q.   For that date.  Just one more question about the chart.

5           THE COURT:  Let me clarify something in my mind.

6           The chart you are referring to in answering that

7   question was Government Exhibit 1004, is that right?  It was

8   the chart at the beginning of your cross-examination.

9           THE WITNESS:  Yes.

10          THE COURT:  That counsel just took you through in

11  length, is that right?

12          THE WITNESS:  Yes, your Honor.

13          THE COURT:  Am I correct in remembering that that

14  chart is indicating instances where reports were filed by

15  Martinez-Garcia for cash carried across the border, right?

16          THE WITNESS:  Correct.

17          THE COURT:  In many cases, if not all, entered in the

18  La Versailles cash book on or about the date the money crossed

19  the border, is that right?

20          THE WITNESS:  That's correct.

21          THE COURT:  Then a corresponding bank deposit was made

22  in many cases, right?

23          THE WITNESS:  Yes.

24          THE COURT:  Did you make any such entries on that

25  chart with respect to checks?

1             THE WITNESS:  No.

2             THE COURT:  So that's apples and oranges, is that it?

3             THE WITNESS:  Yes.

4             THE COURT:  Let's go on.

5    BY MR. WHITE:

6    Q.  This chart does not reflect other payments that Hilario

7    Martinez-Garcia made to La Versailles that was not in the form

8    of cash, is that correct?

9    A.  Correct.

10   Q.  Just one last question on this chart.  If you to the very

11   last column, line 9, the customer per bank document says

12   Armando Ruiz?

13   A.  Rodriguez?

14   Q.  On line 9?

15   A.  Yes.

16   Q.  Maybe it's a Freudian slip; that was actually Armando

17   Rodriguez, wasn't it?

18   A.  I don't have, it could be, I don't have bank documents in

19   front of me.

20             MR. WHITE:  If I could approach the witness.  It's

21   Government Exhibit 607 in evidence.  It's fairly voluminous.  I

22   have one page; I think it would be more convenient to mark it

23   as a defense exhibit.

24   Q.  Showing you Defendant Exhibit B, looking at this document,

25   do you recognize what that is?

1    A.   Yes, it's a deposit ticket.

2    Q.   That's the type of deposit ticket you reviewed in putting

3    together your chart?

4    A.   Yes.

5    Q.   Do you see how the customer's identified on that?

6    A.   Yes.

7    Q.   How?

8    A.   Armando either I or L and RDZ.

9    Q.   Do you interpret that as being short for Rodriguez?

10   A.   Yes.

11   Q.   And the I for Israel?

12   A.   I don't know.

13   Q.   I would like to ask you some questions about form 8300.

14   You testified on direct examination that you have had special

15   training in form 8300s and CTRs and CMIRs, is that correct?

16   A.   Correct.

17   Q.   In your review of the records obtained from either banks or

18   from the search of La Versailles or from other sources, from

19   your review of all those records, La Versailles kept records of

20   the names of customers, correct?

21   A.   Yes.

22   Q.   And the dates of transactions?

23   A.   Yes.

24   Q.   The amounts of the transactions?

25   A.   Yes.

19L4DAT2                    Reinhardt - cross

1    Q.   The method of payment?

2    A.   Yes.

3    Q.   Whether it was cash, wire, check?

4    A.   Yes.

5    Q.   In some cases, perhaps in every case, the denomination of

6    the bills?

7    A.   Yes.

8    Q.   Yes?

9    A.   Yes.

10   Q.   Showing you Government Exhibits 209 and 210 in evidence,

11   you know what these are?

12   A.   Yes.

13   Q.   These are receipt books maintained by La Versailles?

14            MR. SKINNER:  Objection, your Honor.

15            THE COURT:  What's the objection?

16            MR. SKINNER:  Beyond the scope of direct examination;

17   the witness has not testified as to these receipt books.

18            THE COURT:  Sustained.

19   Q.   In your review of the records, did La Versailles maintain a

20   record of who conducted the transaction, in other words, who

21   paid them the money, who delivered the cash?

22            MR. SKINNER:  Objection.

23            THE COURT:  Grounds?

24            MR. SKINNER:  Same objection; beyond the scope.

25            MR. WHITE:  Your Honor, may I.

1          THE COURT:  Briefly.

2          MR. WHITE:  8300, that's my line of examination, about

3    the information on 8300.

4          THE COURT:  Then ask about it.

5          MR. SKINNER:  If that's where we are going, I don't

6    have an objection.

7          THE COURT:  Then ask about that.

8    BY MR. WHITE:

9    Q.   Form 8300 is required to be filed by any business that

10   receives over $10,000 in cash, correct?

11   A.   Correct.

12   Q.   Form 8300 is available, easily available on the IRS

13   website, is that correct?

14   A.   Yes.

15   Q.   When you download a copy of the form you get with it 4-page

16   instructions on how to fill it out, correct?

17   A.   I believe so.

18          MR. WHITE:  If I may show the witness what has been

19   marked Defendant Exhibit C for identification.

20          THE COURT:  Yes.

21   Q.   Take a minute and look through that and tell me if you

22   recognize it, agent Reinhardt.

23   A.   It's a form 8300 with instructions attached.

24          MR. WHITE:  I offer that in evidence, your Honor.

25          MR. SKINNER:  No objection.

1              THE COURT:   Received.

2              (Defendant Exhibit C received in evidence)

3              THE COURT:   Just a blank form?

4              MR. WHITE:   Yes, your Honor.

5              THE COURT:   How many hundred completed forms do we

6    have in the record.

7              MR. WHITE:   We have none with instructions, your

8    Honor.

9              THE COURT:   OK.  Another tree lost its life.

10             MR. WHITE:   Let me keep the exhibit in front of the

11   within if I may; I will ask him some questions about it.

12   BY MR. WHITE:

13   Q.  Part I of that form 8300 requires the identity of the

14   individual from whom the cash was received, correct?

15   A.  Correct.

16   Q.  So if a customer walks into a merchant and gives him

17   $15,000 in cash, that customer would be the individual from

18   whom the cash was received, correct?

19   A.  Correct.

20   Q.  The second part, the person on whose behalf this

21   transaction was conducted, in the example I just gave you of

22   the customer walking in to the merchant and paying $15,000, who

23   would be the person on whose behalf this transaction was

24   conducted?

25   A.  It would be the person who dropped the cash.  You said the

1   customer brings the cash to the store.

2   Q.  The customer brings it himself?

3   A.  That's on whose behalf it's being conducted, if they say

4   it's for them.

5   Q.  So in the hypothetical I gave you of the customer bringing

6   $15,000 to the merchant, he would have to fill out part 1 and

7   part 2 because he is the one bringing it and it's also on his

8   behalf?

9   A.  I would assume, yes.

10  Q.  Suppose the customer is sick on the day the payment is due

11  so he sends the money over by messenger; now who is the

12  individual from whom the cash was received?

13  A.  The messenger.

14  Q.  So the merchant would have to get all this information from

15  the messenger?

16  A.  Yes.

17  Q.  His driver license and country he is from, all of this

18  information?

19  A.  What identifying information is available, yes.

20  Q.  Look at the instructions; do you see anywhere where they

21  instruct you how to fill out part 1 and part 2?

22  A.  On page 4, part 1.

23  Q.  Do any of those instructions explain exactly what is meant

24  by the person on whose behalf this transaction was conducted in

25  part 2 or the identity of the individual from whom the cash was

1    received?

2              THE COURT:  Sustained; the document speaks for itself.

3              MR. WHITE:  Again, your Honor, I would like to show

4    the witness just one exhibit from Government Exhibit 302 which

5    is all the CTRs.  I would like to mark this just as Defendant

6    Exhibit C and show it to the witness.

7              THE COURT:  Try D.

8              MR. WHITE:  Defendant Exhibit D.

9              THE COURT:  From which exhibit?

10             MR. WHITE:  From Government Exhibit 302.

11             THE COURT:  Thank you.

12   BY MR. WHITE:

13   Q.  You have reviewed all the CTRs in this case you said?

14   A.  Yes.

15             MR. WHITE:  Look at Defendant Exhibit D.

16             it's Deemed in evidence, your Honor as under

17   Government Exhibit 302?

18             THE COURT:  Yes.

19             (Defendant Exhibit D received in evidence)

20   BY MR. WHITE:

21   Q.  Do you recognize that CTR?

22   A.  It's a CTR from La Versailles Fragrances.

23   Q.  The CTR unlike the 8300 is filed by the bank itself when it

24   receives a transaction exceeding $10,000, is that correct?

25   A.  Yes.

 1   Q.  The CTR form, in part 1 of that form, it says person

 2   involved in the transaction, correct?

 3   A.  Part 1 --

 4              MR. SKINNER:  Objection.

 5              THE COURT:  Sustained.  The form speaks for itself.

 6   Q.  The particular form you have before you, the currency

 7   transaction report you have before you was completed by Wells

 8   Fargo Bank, is that correct?

 9   A.  Yes.

10   Q.  It describes a transaction that was made in Newark, New

11   Jersey?

12   A.  That's correct.

13   Q.  You recall the testimony from agent Duffy about finding all

14   these deposit slips and miscellaneous other items in a hotel

15   room in Newark, New Jersey?

16   A.  I do.

17   Q.  Those documents were associated with Miguel Lara Ramirez?

18   A.  Yes.

19   Q.  They reflect deposits made in Newark, New Jersey, is that

20   correct?

21   A.  Yes.

22   Q.  On this particular form, the person involved in the

23   transaction is La Versailles Fragrances?

24   A.  That's correct.

25   Q.  That's what's entered on here.  Now there is a section B

1   that covers the individual conducting the transaction, correct?

2   A.   Yes, sir.

3   Q.   And does this say Miguel Lara Ramirez or any other

4   individual?

5   A.   No, because it's at an ATM machine, and several smaller

6   deposits are made at one time, the bank will just trigger the

7   CTR on the business because there was a series of deposits

8   under $10,000.

9   Q.   The answer is no, it does not show any individual --

10           THE COURT:   Mr. White, the document is in evidence.

11   You can make whatever argument you want.   What we are doing now

12   is a responsive reading by the witness.   I am confident he is

13   able to read it.   Let's move on.

14   Q.   Do you have any evidence that the money deposited into the

15   Wells Fargo Bank in Newark, New Jersey was deposited by ATM?

16   A.   Yes.

17   Q.   What is the evidence of that, that it was ATM and not over

18   the counter?

19           MR. SKINNER:   Objection.

20           THE COURT:   Grounds?

21           MR. SKINNER:   The defendant didn't testify to these

22   documents, the documents are not in front of him, beyond the

23   scope of his direct testimony.

24           THE COURT:   Sustained.

25   BY MR. WHITE:

19L4DAT2                         Reinhardt - cross

1   Q.  What you are telling us is that not all CTRs will reflect

2   the individual conducting the transaction even if the

3   transaction is over $10,000?

4   A.  If it's over $10,000 at one time; if I walk into the bank

5   with $12,000, the CTR is going to be filed right there.  If I

6   make a $5,000 in the morning and then an ATM deposit in the

7   afternoon $6,000, it will be triggered by the bank itself.

8   They are not going to ask me for ID at the ATM machine.  It's

9   triggered automatically on my business.

10  Q.  Here, what is the amount of the transaction in the exhibit

11  before you?

12  A.  $28,000 in multiple transactions.

13  Q.  Why was there no record of who made that transaction?

14  A.  Because it would have been made at ATM machines and you

15  don't have, there is no teller.

16  Q.  That's an exception to the CTR rules; you don't have to do

17  it if the deposits are in the ATM machines?

18          MR. SKINNER:  Objection.

19          THE COURT:  Sustained.

20  BY MR. WHITE:

21  Q.  To your knowledge, to make a deposit in an ATM machine, you

22  would have a PIN number, correct, to your knowledge?

23          MR. SKINNER:  Objection.

24          THE COURT:  Sustained.  Look, let's move on please.

25          MR. WHITE:  Can I challenge his testimony that these

1   deposits were made by ATM.

2              THE COURT:  Just move on, counsel.

3   BY MR. WHITE:

4   Q.  Did you in reviewing the cash books, did you seek to find

5   entries in the cash books for those deposits that were made

6   directly into the accounts in places like Newark or other areas

7   remote from Laredo; did you attempt to do that?

8   A.  No.

9   Q.  As you sit there now you don't know if those transactions

10  were entered into La Versailles' books?

11  A.  No, I do not.

12  Q.  Did you attempt to locate 8300s reflecting those deposits?

13  A.  No.

14  Q.  As you sit here now you don't know if 8300s were filed for

15  those deposits or were not, is that true?

16  A.  For those deposits in Newark, no.

17  Q.  Government Exhibit 1102 is now on the screen.  You

18  testified about this exhibit on direct examination; do you

19  recall?

20  A.  Yes, I do.

21  Q.  On direct examination this morning you identified

22  photographs of business associated with Mr. Datta in Laredo?

23  A.  Correct.

24  Q.  How many stores in total does he have or did he have in

25  Laredo?

1   A.   I am not sure of the exact number.

2   Q.   You have three here.  Did you show more than three this

3   morning?

4   A.   There are four here.

5   Q.   Do you know if he had a total of five?

6   A.   Four including, are you including the warehouse or no?

7            MR. SKINNER:   Objection to the relevance of the line

8   of questioning; I am not sure what the point is.

9            THE COURT:   What is the point, counselor?

10           MR. WHITE:   That this exhibit is in error; it's only

11  three stores here and there were five.

12           MR. SKINNER:   I believe the testimony is the exhibit

13  reflected the stores from the defendant.  We will stipulate one

14  of the stores is missing if that's what he is getting at.

15           THE COURT:   When you say missing, it's in the location

16  covered by this map or not?

17           MR. SKINNER:   I don't think the address is noted with

18  a little white box.

19           THE COURT:   Is there an understanding as to whether or

20  not this aerial photograph covers geographical area in which

21  this fourth store was.

22           MR. SKINNER:   We would have to ask the witness.

23           THE COURT:   Ask the witness.

24  BY MR. WHITE:

25  Q.   How many stores, as you sit here now, how many stores do

1    you recall there being affiliated with Mr. Datta on Convent

2    Avenue?

3    A.   There are at least two; one is not on the photo.

4    Q.   At least two; there may be more?

5    A.   Yes.

6              THE COURT:  Was the second store that was located on

7    Convent Avenue.

8              THE WITNESS:  I would assume it was 2 block up.

9              THE COURT:  I am not asking what you assume; I am

10   trying to find out of what you know.  Do you know where on

11   Convent Avenue the second store was; do you know its address?

12             THE WITNESS:  From the picture, it's 407 Convent.

13             THE COURT:  How can you tell from the picture that

14   it's number 407; are you referring to a different exhibit?

15             THE WITNESS:  Yes.

16             THE COURT:  What exhibit are you referring to?

17             THE WITNESS:  919.

18             THE COURT:  Are you able to tell us one way or another

19   whether 407 Convent Avenue appears within this aerial

20   photograph or is beyond the boundaries of it?

21             THE WITNESS:  It does not appear on this overhead

22   photo and I am not sure where it would be on this map.

23             THE COURT:  OK.  Just so we are clear, if somebody has

24   five stores in New York, one in each borough, and you take an

25   aerial photograph of Manhattan, four of them are not going to

1    be on the photo because the photo doesn't have Staten Island,

2    Brooklyn, Queens and the Bronx.  That's what we are talking

3    about.  Do we know whether that's what we are talking about?

4              THE WITNESS:  I do not.

5              THE COURT:  Let's move on.

6    BY MR. WHITE:

7    Q.  You know that the fourth store was near the store they can

8    show on Convent Avenue?

9              THE COURT:  What does near mean?

10   Q.  Within 100 feet.

11   A.  I didn't go to every location.

12   Q.  You went to the warehouse, correct?

13   A.  Yes.

14   Q.  The warehouse is laid out on one floor, correct?

15   A.  From what I recall, yes.

16   Q.  It has a stockroom in the back?

17   A.  I did not go in the back back.

18   Q.  The yellow dot on Government Exhibit 1102, that identifies

19   the warehouse?

20   A.  On 1401 Lincoln?

21             MR. SKINNER:  Objection to form.

22             THE COURT:  Sustained as to form.

23             MR. SKINNER:  There are four yellow dots.

24   Q.  I am sorry, the yellow dot at 1401.

25   A.  Yes.

1  Q.  Are you the witness or the person who identified that

2  building as the warehouse?

3  A.  I am not sure what you mean by that.

4  Q.  You were in that building, correct?

5  A.  Yes.

6  Q.  Is this, identifying this building as the warehouse, is

7  that based on your knowledge?

8  A.  It looked like a warehouse.

9          THE COURT:  I don't know what these questions mean;

10  maybe we can get it this way.  Did you prepare this photograph,

11  Government Exhibit 1102, by which I mean putting the labels on

12  the photograph?

13          THE WITNESS:  No, I did not.

14          THE COURT:  Somebody else did that?

15          THE WITNESS:  Yes.

16          THE COURT:  Are you able to tell us where that other

17  person got the information that indicated that a relevant

18  location was 1401 Lincoln Street?

19          THE WITNESS:  No.

20          THE COURT:  Could we go on to something.

21          MR. WHITE:  Yes, your Honor.

22  BY MR. WHITE:

23  Q.  Would it be fair to say, agent Reinhardt, that you reviewed

24  the documents that were seized from Mr. Datta and his business

25  since his arrest?

1    A.   Yes.

2    BY MR. WHITE:

3    Q.   I would like to show you what I am marking Defendant

4    Exhibit E for identification; it's Bates-stamped 055130.   Do

5    you recognize this document, agent Reinhardt; can I ask you if

6    you have even it before?

7    A.   Looking at it immediately I don't remember seeing it.   I am

8    reading it.

9    Q.   Review it and see if you recall it.

10          THE COURT:  Do you have a copy for me, counselor.

11          MR. WHITE:  I am sorry, I thought we would be

12   displaying them on the screen; I did not make copies for all

13   the parties.

14          MR. SKINNER:  You can take my copy.

15          (Pause)

16   A.   OK.

17   Q.   Having looked at it do you recognize that as a document you

18   reviewed from the documents seized from Mr. Datta's business?

19   A.   I remember reading a letter similar to this; however, I

20   don't recall seeing what's on the back page here.   I don't

21   recall saying that in the letter that I saw.   I don't know if

22   there were two copies.

23          THE COURT:  Don't say anything about its contents.

24          THE WITNESS:  OK.

25          MR. WHITE:  I would offer this in evidence minus the

1    scribbles on the back page.

2              MR. SKINNER:  Objection.

3              THE COURT:  Sustained.

4              MR. WHITE:  I have no further questions, your Honor.

5              THE COURT:  Thank you.  We will take a break.

6              (Recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2              MR. SKINNER:  Your Honor, we have a brief issue.  The

3     parties have signed a stipulation with regard to the

4     admissibility of a number of foreign language calls.  The

5     government had intended to introduce that stipulation of the

6     foreign language calls before calling Fausto Garza who is the

7     cooperating witness slated to call after the next witness who

8     is going to be called.  We may get to him before the lunch

9     break.  The issue is that Mr. White just told me that he thinks

10    a handful of these calls that relate to a particular subject

11    matter are not relevant and shouldn't come in.  There is no

12    objection as to the accuracy of the phone calls; it's purely a

13    legal ruling as to whether they are relevant or not.

14             THE COURT:  What's the subject matter?

15             MR. SKINNER:  These are phone calls between Vikram

16    Datta's employee Cynthia and two large perfume customers in

17    Laredo named Octavio and Polo.  There is considerable

18    discussion on the phone calls about the collection of debts

19    from another perfume customer named Namour and somebody I

20    believe who goes by Polo.  There is discussion about the fact

21    that Namour has people, that Octavio has people.  I am now

22    telling you why I think it's relevant.  The fact that they have

23    people which we view and intend to argue is a reference to

24    being connected to organized crime and criminals in Mexico.

25             There is also, the defendant says, that he can't

 1    collect his debt, he is going to kill the motherfuckers, which

 2    we would argue is indicative of the state of mind not of an

 3    ordinary perfume merchant but somebody who is conversant with

 4    the use of violence, with criminals, with using nonlegal

 5    methods to collect debt, all of which we feel is relevant to

 6    the case because we are trying to show that the defendant knew

 7    that the money that he was getting was drug money.   If

 8          we can show defendant has ties to people who appear to

 9    be criminals and engage in criminal acts to collect debts, that

10    it's relevant to this case.   What we would be asking for is a

11    legal ruling as to that at this point so we know whether to

12    take these things out of the stipulation or not.

13          MR. WHITE:   Your Honor, I believe that the relevancy

14    proffered by Mr. Skinner is very tenuous.

15          THE COURT:   One preliminary question, do you have any

16    disagreement with his description of what's on the tapes first

17    of all?

18          MR. WHITE:   Not what's on the tapes, just these were

19    not perfume merchants in Nuevo Laredo, they were in Mexico

20    City, large, two very big customers and Octavio who had been

21    one of Mr. Datta's biggest customers if not his biggest.

22          THE COURT:   I understand but there is no, you are not

23    quarreling with his description of what was said by whom on the

24    tapes, is that right?

25          MR. WHITE:   That's right.   The tapes are all about

1    efforts to collect from a shipment Mr. Datta had made a long

2    time ago to Namour and he is trying to get paid for the

3    shipment or get the inventory returned to him.

4          THE COURT:  But you don't dispute his description as

5    far as it goes about what was said in the conversation.

6          MR. WHITE:  As I supplemented it.

7          THE COURT:  Why shouldn't it come in.

8          MR. WHITE:  I think any probative value of it to the

9    charges in the indictment, the money laundering charge, is

10   remote, and in the sense it has any, injecting violence into

11   this case and a vulgar statement that Mr. Datta would himself

12   would resort to violence to get paid for perfume he sold is

13   unduly prejudicial when balanced against the probative value.

14         MR. SKINNER:  With respect to prejudice, referring to

15   the one statement with regard to Mr. Datta's own personal use

16   of violence, we think it's highly probative because this is not

17   the language of an ordinary merchant.  It's the language of

18   somebody who is himself willing to use criminal acts to collect

19   a debt, is familiar with people who can do that.

20         There are repeat references to him sending men, people

21   will be there, they will be there in two days, I want my money.

22   First of all it's directly relevant to the charges.  I think

23   defendant's opening on entrapment has given a little bit wider

24   latitude to show the defendant's prior course of conduct and

25   how he may have been engaged in conduct similar to that's

1     alleged in the sting part of the count.

2              THE COURT:  That's alleged in --

3              MR. SKINNER:  Alleged in Count 1 which is the sting.

4     We should be able to show other things this defendant was doing

5     that indicate that he was, I keep wanting to say

6     predispositioned, I am forgetting the term implied in

7     entrapment.  It shows he was predisposed to commit the crimes

8     charged.  This is the kind of thing that shows this was a

9     criminal who was predisposed to commit the crimes charged and

10    not an innocent perfume merchant entrapped by the big bad

11    government into doing something he wouldn't have otherwise

12    done.

13             THE COURT:  Mr. White, you have at least two problems

14    here.  The first is, as I understand it, the evidence at the

15    opening.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

191ddat3

1          MR. WHITE:  May I give you an additional fact, your

2     Honor, before you crystallize your reasoning?

3          THE COURT:  Yes.

4          MR. WHITE:  This conversation takes place in September

5     of 2010, about six months after the undercover operation began.

6     So it's pertinence to predisposition is I think nonexistent.

7          THE COURT:  OK.  It seems to me that there are two

8     things that give me very substantial pause about your argument.

9     The first is that, as I understand the evidence and the

10    opening, you're making an entrapment argument and I think it

11    goes to predisposition.  Notwithstanding your point about

12    timing, the jury would be entitled to infer that if he was

13    willing to use violence in September, there is no reason in the

14    world why they shouldn't conclude that he was willing to do

15    that earlier.

16         The second problem is that I gather your defense in

17    major part is that he didn't know that what he was dealing with

18    was drug money, right?

19         MR. WHITE:  I will reserve that for our closing, your

20    Honor.

21         THE COURT:  Well, look.  If you want me to exclude

22    this evidence on the ground that knowledge is not an issue, now

23    is the time you are going to have to tell me.

24         MR. WHITE:  I think it's based on the conscious

25    avoidance instructions, your Honor, knowledge is going to be an

524

19lddat3

```
 1    issue.
 2            THE COURT:  OK.  So since knowledge and predisposition
 3    are going to be issues, I am not persuaded that the probative
 4    value of the evidence is substantially outweighed by any unfair
 5    prejudicial effect.
 6            I would entertain and consider whether some limiting
 7    instruction should be given.  If you have anything to propose
 8    along those lines, I'll certainly think about it.  But its
 9    going to come in.
10            OK.  Let's get the jury.
11            (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

191ddat3

1          THE CLERK:  Jury entering.

2          Please be seated.

3          (Jury present)

4          THE COURT:  All right.  The defendant and the jurors

5    all are present.

6          Any redirect?

7          MR. SKINNER:  No, your Honor.  Thank you.

8          THE COURT:  All right.  The witness is excused.  Thank

9    you.

10          (Witness excused)

11          THE COURT:  Next witness.

12          MR. SKINNER:  The government calls Gabriella de la

13   Garza.

14    GABRIELLA DE LA GARZA,

15       called as a witness by the government,

16       having been duly sworn, testified as follows:

17          THE CLERK:  Thank you.  Please be seated.

18          If you can please state your name and spell your last

19   name for the record.

20          THE WITNESS:  Yes.  Gabriella de la Garza, d-e l-a

21   G-a-r-z-a.

22          THE COURT:  You may proceed, Mr. Bragg, please.

23   DIRECT EXAMINATION

24   BY MR. BRAGG:

25   Q.  What is your educational background?

191ddat3                              G. de la Garza - direct

1    A.   I am an accountant.

2    Q.   Do you have a degree?

3    A.   I have a bachelor's degree in Mexico.

4    Q.   Where do you work now?

5    A.   I work at International Bank of Commerce in Laredo, Texas.

6    Q.   How long have you worked at the International Bank of

7    Commerce in Laredo, Texas.

8    A.   Eleven years and two months.

9    Q.   What is your current position?

10   A.   I'm in charge of the teller operations area.

11   Q.   I'm sorry.  I just couldn't hear the end.

12   A.   Teller operations area.

13   Q.   What are your responsibilities as being in charge of the

14   teller operations area?

15   A.   I oversee all the teller area -- the schedules, the boxes,

16   anything related to the tellers.

17   Q.   And when did you start that particular position?

18   A.   March 2011.

19   Q.   What position were you in at the bank in 2006?

20   A.   I was a branch manager --

21   Q.   What were you --

22   A.   -- in the retail branches.

23   Q.   What were your responsibilities as a branch manager?

24   A.   As a branch manager on the retail, you are basically in

25   charge of the customer service, anything related to customer

G. de la Garza - direct

1    service, and bringing the accounts into the branch, growing the

2    deposits.

3    Q.  How many branches were under your supervision as a branch

4    manager?

5    A.  Two branches.

6    Q.  What was the dollar value of the portfolio of accounts that

7    you were responsible for?

8    A.  Between the two branches, it was about 90 million

9    portfolio.

10   Q.  I'm sorry.  I couldn't hear you.

11   A.  90 million portfolio.

12   Q.  At that time in 2006, did you become responsible for an

13   account held for a company named La Versailles Fragrances?

14   A.  Correct.

15   Q.  How did it come to be that you became responsible for that

16   account?

17   A.  I inherited that account from another bank officer that was

18   leaving the bank, and so that account was transferred to me and

19   she was the one who introduced me to this customer.

20   Q.  When you say introduced you to this customer, who are you

21   referring to?

22   A.  Mr. Vikram Datta.

23   Q.  When you first inherited the account, did you speak to

24   Mr. Datta?

25   A.  Yes.  As I mentioned, the previous officer introduced me to

1  him.

2  Q.  In addition to that introduction, what, if anything, did

3  you do when you first inherited this account?

4  A.  I don't understand the question.

5  Q.  When you first inherited this account, did you do anything

6  to familiarize yourself with the account in addition to

7  speaking with Mr. Datta?

8  A.  Well, basically that's what we do.  We look at the history

9  of the account.  We call the owners of the account, introduce

10  myself, letting them know that I was going to be taking care of

11  the account.  We look at the type of transactions that they

12  have and we go from there.

13  Q.  Is that what you did with this account?

14  A.  Correct.

15  Q.  In or about May 2009, did any issues arise with this

16  account?

17  A.  Well, yes.  I mean, the discussions that -- the

18  conversations that I had with Mr. Datta, it was about him

19  wanting to receive immediate credit on his checks.

20  Q.  If you can just talk a little more slowly, I think it might

21  be helpful.

22  A.  I apologize.  He wanted to receive immediate credit on his

23  checks drawn on a different bank.

24  Q.  What do you mean by "immediate credit"?

25  A.  He wanted to receive immediate credit, which I'm about to

1  explain which immediate credit means that he would bring

2  another check from another financial institution wanting to

3  receive credit for those funds that same day to wire money to a

4  vendor.

5  Q.  On what type of accounts would that check be drawn?

6  A.  They were drawn on La Versailles to La Versailles.

7  Q.  And these were conversations that you had with Mr. Datta

8  himself?

9  A.  Yes.  I mean, he will bring that check coming from La

10 Versailles to deposit into La Versailles' account in IBC to

11 further send a wire transfer to one of his vendors.  And so I

12 wouldn't comply with that request.

13 Q.  Why did you not comply with that request?

14 A.  Normally, when a customer deposits a check, it takes --

15 when it is a local bank that the check is drawn on, it takes

16 from two to three days to collect those funds to give the

17 ability of the funds to the customer.

18 Q.  And what, if anything, was Mr. Datta's response when you

19 told him you would not comply with his request?

20 A.  I mean, he would get upset of not getting that immediate

21 credit on those checks.

22 Q.  Did you ask Mr. Datta why he wanted to deposit a check from

23 one of La Versailles' other accounts into the IBC account held

24 under La Versailles' name?

25 A.  Well, yes.  He mentioned that he was just tracking

191ddat3                          G. de la Garza - direct

1   because --

2           THE COURT:  Ma'am, you are going to have to slow down.

3           THE WITNESS:  OK.

4           THE COURT:  I can't understand you; I know Vinny can't

5   understand you.

6           THE WITNESS:  OK.

7           THE COURT:  Please start again.  Start your answer

8   again.

9   A.  OK.  What he wanted, he wanted to receive immediate credit

10  and take the wire transfer from IBC.  He would mention that it

11  was for tracking purposes, because I would recommend for him to

12  send the wire from the other financial institution instead.

13  Q.  When you say send a wire from the other financial

14  institution, do you mean send it not through IBC?

15  A.  Correct.  Because he wanted, again, to receive the

16  immediate credit on those checks.  And so I said and

17  recommended instead of doing that, because I'm not going to be

18  giving you that immediate credit on the check, what you can do

19  is send a wire from your other financial institution instead.

20  And he would have said that he wanted it from IBC.

21  Q.  And what, if anything, was -- withdrawn.

22          In connection with -- well, withdrawn.

23          How many conversations of this nature did you have

24  with Mr. Datta in or around May 2009?

25  A.  Many occasions.

19lddat3                          G. de la Garza - direct

Q.   In connection with those conversations, did Mr. Datta tell

you that he would close his account?

A.   Well, at times he would get upset because I wouldn't

comply, the bank wouldn't comply with his requests, and he

would have said that he would close the accounts.

Q.   Did he in fact close the account?

A.   No.

Q.   Now, moving forward to in or about September 2009, were

there any issues with the accounts in or about that time?

A.   Well, again, just a matter of they immediate credit on

these checks.

Q.   And in addition to the immediate credit, was there any

issues brought to your attention concerning the amount of cash?

          MR. WHITE:   Objection to the leading, your Honor.

          THE COURT:   Yes.   Rephrase.

Q.   What, if any, issues were raised in or about September 2009

in addition to the immediate credit issue?

A.   Well, we have an internal department, a fraud department,

that alerts the account officers whenever there is an

inconsistency or any type of transactions on the customers'

accounts.   So I was alerted by the fraud department that this

customer was making some cash deposits and I needed to find out

if it was inconsistency with his business or what type of

transactions he was doing to be depositing this cash into his

account.

1   Q.  What, if anything, did you do to follow up on that?

2   A.  Well, when we received those alerts from the fraud

3   department, we have certain time to go ahead and get back to

4   them.  So I proceeded to contact Mr. Vikram Datta to better

5   understand the cash deposits.

6   Q.  Were you able to speak with Mr. Datta?

7   A.  No.  He was traveling at the time that I contacted him.

8   Q.  Were you able to speak with anyone at the company?

9   A.  Yes.  I spoke to Yolanda, one of his assistants.

10  Q.  Do you know Yolanda's last name?

11  A.  I really don't recall.

12  Q.  What did you talk to Yolanda about?

13  A.  I wanted -- I wanted to -- I asked her that I wanted to

14  understand what type of transactions he was conducting and

15  what -- better understand where the money and the cash was

16  coming from.  As a banker, we want to know your customer and

17  where the money is coming from.

18  Q.  Did you ask Yolanda for any particular information?

19  A.  Well, she mentioned that those monies --

20           MR. WHITE:  Objection, your Honor.

21           THE COURT:  The question, Ms. de la Garza, was did you

22  ask her for any particular information?

23           THE WITNESS:  Yes.

24           THE COURT:  OK.  Next question, please.

25  BY MR. BRAGG:

1   Q.  What type of information did you ask her for?

2   A.  I asked for invoices to validate the sale of merchandise

3   that will sustain the amount of cash that he was depositing

4   into the bank account.

5   Q.  What, if anything, was Yolanda's response?

6   A.  Well, she said that she was --

7           MR. WHITE:  Objection, your Honor.

8           THE COURT:  What is the objection?

9           MR. WHITE:  Hearsay.

10          MR. BRAGG:  I have a response, your Honor.  It may be

11  best at the sidebar.

12          THE COURT:  Sidebar.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. BRAGG:  The government has two response.

3          The obvious one, which was teed up this morning, was

4    this is a statement of a co-conspirator in furtherance of a

5    conspiracy.  In addition, the government argues that this is a

6    statement of a servant or agent of the defendant within the

7    scope of that servant or agent's responsibilities.  She was his

8    employee and she was acting at his direction.  And that falls

9    as an exception to the --

10          THE COURT:  She was the bookkeeper, right?

11          MR. SKINNER:  Correct.

12          MR. WHITE:  Yes.

13          THE COURT:  What is wrong with that?

14          MR. WHITE:  What is the answer going to be?  What is

15    the witness going to say?

16          MR. BRAGG:  I would proffer that the witness is going

17    to say that she said she will talk to Mr. Datta and get back to

18    her.  And then, in fact, I will ask a follow-up question that

19    Yolanda never got back to her.  The witness had followed up

20    with Yolanda again, and Yolanda told her that Mr. Datta was not

21    going to give her the invoices.  So she is acting as a conduit

22    for Mr. Datta.

23          MR. WHITE:  I have no rejoinder.

24          THE COURT:  OK.  Overruled.

25          (Continued on next page)

1          (Open court)

2          THE COURT:  OK.  The objection is overruled.

3          The witness will answer the question, please.

4          THE WITNESS:  Can you repeat the question, please?

5          MR. BRAGG:  Sure.

6   BY MR. BRAGG:

7   Q.  What, if anything, was Yolanda's response?

8   A.  Well, she said that she was going to deal with Mr. Datta

9   and she was going to get back to me.

10  Q.  Did Yolanda get back to you?

11  A.  I followed up with a phone call a couple of days after.

12  Q.  And when you followed up on that phone call, what did you

13  and Yolanda talk about?

14  A.  She mentioned that Mr. Datta wasn't going to comply with

15  those invoices and that because we weren't the only ones

16  asking, the only institution asking for those invoices, and

17  that he was going to close the accounts.

18  Q.  What, if anything, did you do in response to this

19  conversation with Yolanda?

20  A.  Well, I reported to the fraud department the response that

21  I got from the customer, and the bank decision was to close the

22  accounts.

23  Q.  All right.  About when was the account closed?

24  A.  It should be around November, if I'm not mistaken.

25  Q.  Of 2009?

19lddat3                                    G. de la Garza - direct

1    A.  Of 2009, correct.

2              MR. BRAGG:  May I have one moment, your Honor?

3              THE COURT:  Yes.

4              (Pause)

5              MR. BRAGG:  No further questions, your Honor.

6              THE COURT:  Thank you.

7              Cross-examination.

8    CROSS-EXAMINATION

9    BY MR. WHITE:

10   Q.  Good morning, Ms. de la Garza.

11             You testified that when you took over Mr. Datta's

12   account -- was it one account or was it more than one account?

13   A.  It was more than one account.

14   Q.  And were the accounts with different entities?

15   A.  Yes.

16   Q.  How many do you recall?

17   A.  Well, the ones that I was managing, it was La Versailles

18   Perfumes, and if I'm not mistaken, the name of the other one

19   was La Valencia Perfumes.

20   Q.  I'm not sure I followed you on your direct testimony.

21             The checks that Mr. Datta was asking for immediate

22   credit on were checks from one of his entities to another

23   entity?

24   A.  No.  Well, the ones that I was referring to, it was from La

25   Versailles payable to La Versailles, and he wanted to deposit

1    it into La Versailles account in IBC.

2    Q.  I'm not sure I understand.  Forgive me, Ms. de la Garza.

3         Who was the check drawn on?

4    A.  He had an account under La Versailles Perfume in a

5    different institution, say, Chase Manhattan or Wells Fargo, and

6    those were payable to La Versailles, and those were the checks

7    that he wanted to deposit into IBC to immediate send a wire

8    transfer out to a vendor, per se.

9    Q.  So it was a check on another institution --

10   A.  Right.

11   Q.  -- drawn to La Versailles from La Versailles?

12   A.  Correct.

13   Q.  He wanted to deposit it into your bank?

14   A.  Correct, into La Versailles' account.

15   Q.  And he said it was for tracking purposes?

16   A.  Correct.

17   Q.  And what did you understand -- what are tracking purposes,

18   as you understood it?

19        THE COURT:  Sustained.

20   Q.  When you took over the account in 2006, you testified that

21   you reviewed a history of the account?

22   A.  Correct.

23   Q.  And how long had that account been at IBC?

24   A.  I don't recall the exact opening date.

25   Q.  Did it have a substantial prior history that you were

1    reviewing or had it just been opened?

2    A.  Well, I didn't review the whole since the opening.

3    Normally, what we look at is a couple of months and watch out

4    for transactions the previous officer would have reviewed with

5    me and said this is what this customer does.

6              THE COURT:  Slower.  Slower, please.

7    Q.  Any unusual transactions would have been something that you

8    would review?

9    A.  Well, yes, but at that point I wasn't alerted of any.

10   Q.  Did you ever see a deposit made into the -- in your review

11   of the account and its history, a deposit made into this

12   account for $1.3 million in cash?

13   A.  I don't recall.

14   Q.  Did you ever see -- in the time that you were working on

15   his account, did you ever see a deposit -- a single deposit of

16   that volume, $1.3 million in cash?

17   A.  No, not that I recall.

18   Q.  What was the largest deposit you recall?  Approximately,

19   what would you say the largest deposit you recall would be?

20   A.  Well, as I mentioned, I was alerted -- I mean, we're not I

21   mean looking at the accounts on a daily basis and the

22   transactions; we have a lot of customers.  So at that

23   particular time, when I was reviewing that in 2009, I was

24   alerted.  We have a system that monitors the cash activity on

25   the accounts, and I was alerted.

1    Q.   OK.   But you --

2    A.   And it was about 100-and-some thousand.

3    Q.   OK.   And Mr. Datta, he was asking you to credit the deposit

4    immediately because he had to pay his vendors?

5    A.   Correct.

6    Q.   OK.   And was he -- I think you said he got impatient and

7    got annoyed that you wouldn't do this?

8    A.   Correct.

9    Q.   Because he couldn't pay his vendors, was that why?

10           MR. BRAGG:   Objection.

11           THE COURT:   Sustained.

12   Q.   And there came a point in time that you asked him for his

13   invoices, correct?

14   A.   Correct.

15   Q.   Did IBC Bank, during this period of time, did it have

16   clients who were other perfume merchants in Laredo?

17   A.   Yes.

18   Q.   Like Sunny Perfumes, that was a client of IBC, wasn't it.

19   A.   Well, I'm not allowed to disclose my --

20           MR. BRAGG:   Objection.

21           THE COURT:   Sustained.

22   Q.   The invoices -- what information did you want from the

23   invoices?

24   A.   Well, we wanted to validate the source of funds and where

25   he sold that merchandise and he got paid in cash for those --

1   for the merchandise.

2   Q.   You wanted to get the names of the customers from the

3   invoices?

4   A.   Well, yes.

5   Q.   And what was sold --

6   A.   Correct.

7   Q.   -- to those customers?

8   A.   Correct.

9   Q.   And what he charged those customers for the product?

10  A.   Well, yes, to validate and to match it up to the amount of

11  cash he was depositing into the account.

12  Q.   He didn't want to give you, as far as you understood --

13  A.   Correct.

14  Q.   -- he didn't want to give you that information about his

15  business, correct?

16  A.   Correct.

17            THE COURT:   Sustained.

18  Q.   He declined to give you those invoices, correct?

19  A.   Correct.

20  Q.   You mentioned that you would see deposits of maybe

21  $150,000?

22  A.   At that particular time when we were researching the

23  account, was about 150,000, -30,000.

24  Q.   And would other perfume clients you had in Laredo make

25  large cash deposits like that also?

1          MR. BRAGG:  Objection.

2          THE COURT:  Sustained.

3          MR. WHITE:  Nothing further, your Honor.

4          THE COURT:  Thank you.

5          Any redirect?

6          MR. BRAGG:  No, your Honor.

7          THE COURT:  Thank you, Ms. de la Garza.  You are

8   excused.

9          (Witness excused)

10          Next witness.

11          MR. BRAGG:  Your Honor, the government calls Faustino

12   Garza.

13          (Pause)

14          MR. SKINNER:  Your Honor, while we are waiting, we

15   have a stipulation with some stipulated facts we could read to

16   use our time.

17          THE COURT:  Sure.

18          MR. SKINNER:  One moment.

19          (Pause)

20          MR. SKINNER:  Now he is here.

21          (Present were two Spanish language interpreters for

22   the witness)

23   FAUSTINO GARZA,

24        called as a witness by the government,

25        having been duly sworn (through an interpreter),

1        testified as follows:

2                THE CLERK:  Please be seated.

3                And if you could please state your name for the

4    record.

5                THE COURT:  You may proceed, counsel.

6                THE WITNESS:  Faustino Garza.

7    DIRECT EXAMINATION (through an interpreter)

8    BY MR. SKINNER:

9    Q.  Mr. Garza, where are you from?

10   A.  Detroit, Michigan.

11   Q.  And where did you grow up?

12   A.  In Nueva Laredo, Mexico.

13   Q.  Are you a citizen of the United States?

14   A.  Yes.

15   Q.  How old were you when you moved from Nueva Laredo, Mexico?

16   A.  Approximately three years old.

17   Q.  Where is Nueva Laredo, Mexico?

18   A.  It's at the border with Laredo, Texas.

19   Q.  How old are you, Mr. Garza?

20   A.  I'm 49 years old.

21   Q.  How far did you go in school?

22   A.  I continued -- I finished high school.

23   Q.  How old were you when you started working?

24   A.  Around 15 years old.

25   Q.  I would like to talk briefly about your employment history.

1      Q.  What industry did you first start working in?

2      A.  My first job was at a store where they sold fabric.

3      Q.  What did you do after that?

4      A.  After that I was employed at a store where they sold

5      menswear.

6      Q.  How long did you work at this menswear store?

7      A.  Almost ten years.

8      Q.  Where was the menswear store located?

9      A.  In Laredo, Texas.

10     Q.  Where were you living at that point in time?

11     A.  Well, when I first began working there, I was living in

12     Nueva Laredo, Mexico.

13     Q.  So would you cross the border every day in order to go to

14     work and then come home?

15     A.  Yes.

16     Q.  Now, after you went to -- after you worked at this retail

17     store, did you move to a new job?

18     A.  Yes.

19     Q.  Where did you go?

20     A.  To Santos & Santos International.

21     Q.  What kind of business was Santos & Santos International?

22     A.  It's an import/export firm.

23     Q.  Where was it located?

24     A.  In Laredo, Texas.

25     Q.  And, more or less, when was it that you left the retail

1   store and went to Santos & Santos?

2   A.   In around '91.

3   Q.   And why did you go work for this business at that time?

4   A.   Well, I went to work at that business because I was invited

5   to work there.

6   Q.   Who invited you?

7   A.   At that time, the gentleman was my father-in-law.

8   Q.   Is he no longer your father-in-law?

9   A.   No, he isn't.

10   Q.   And how long did you work at Santos & Santos?

11   A.   Between six and seven years.

12   Q.   And did you go to a new job after that?

13   A.   Yes.

14   Q.   Where did you go?

15   A.   To Alpha Money Exchange.

16   Q.   What kind of business is Alpha Money Exchange?

17   A.   It's a money exchange house.

18   Q.   And when did you go to Alpha Money Exchange?

19   A.   Approximately in '97, 1997.

20   Q.   Where was this business located?

21   A.   In Laredo, Texas.

22   Q.   How did you get a job there?

23   A.   I was also invited to work there.

24   Q.   Did you know someone at the business?

25   A.   Yes.   The owner.

191ddat3                              F. Garza - direct

1    Q.   How did you know the owner?

2    A.   Well, I met him actually when I was a child.   When we were

3    children we used to play soccer together.

4    Q.   So he was a friend of yours?

5    A.   Yes, a friend of mine.

6    Q.   What was your position at Alpha Money Exchange?

7    A.   Well, you could say I was a trusted employee.

8    Q.   Did you have any supervisory responsibilities?

9    A.   Yes.

10   Q.   And how long did you work at Alpha Money Exchange?

11   A.   Until 2000.

12   Q.   Why did you stop working for Alpha Money Exchange?

13   A.   I was arrested.

14   Q.   Where were you arrested?

15   A.   In Laredo, Texas.

16   Q.   For what were you arrested?

17   A.   For money laundering.

18   Q.   Following your arrest, were you convicted of a money

19   laundering crime?

20   A.   Yes.

21   Q.   Was there a trial?

22   A.   No.

23   Q.   How were you convicted?

24   A.   18 months.

25   Q.   No.  How did it come to be that you were convicted of this

19lddat3                          F. Garza - direct

1   crime if there was no trial?

2   A.   I pled guilty.

3   Q.   And what had you done that made you guilty of the money

4   laundering crime that you pled guilty to?

5   A.   I filled out a form called a CTR with a false name on it.

6   Q.   And why did you fill out this form with a false name on it?

7   A.   Because a person asked me to do it.  He didn't have

8   identification.  And it was just easy for me to do.

9   Q.   All right.  And can you tell us, when do you have to file

10  CTR forms?

11  A.   It's whenever you're doing a transaction for $10,000 or

12  more in cash.

13  Q.   All right.  So had this person who wanted you to put false

14  information on the CTR given $10,000 to Alpha Money Exchange,

15  or more than $10,000?

16  A.   Yes.

17  Q.   How much money was involved?

18  A.   It was over $25,000.

19  Q.   Where did you think that money had come from?

20  A.   From drug dealing.

21  Q.   All right.  Were you sentenced to any time in jail as a

22  result of your conviction for this offense?

23  A.   Yes, sir.

24  Q.   And when did you get out of jail?

25  A.   In 2001.

191ddat3                    F. Garza - direct

1   Q.  After you got out of jail, what did you do for work?

2   A.  I went back to working for Santos & Santos International.

3   Q.  All right.  For how long -- did there come a time when you

4   stopped working at Santos & Santos after that?

5   A.  Yes.

6   Q.  And when was that?

7   A.  Around the year 2007.

8   Q.  And why did you leave Santos & Santos in the year 2007?

9   A.  I went to open up my own business.

10  Q.  Did you in fact open up your own business?

11  A.  Yes, sir.

12  Q.  What kind of business did you open?

13  A.  A money exchange house.

14  Q.  Where was this money exchange -- withdrawn.

15          Are you still running this money exchange business?

16  A.  No, sir.

17  Q.  Why not?

18  A.  Because I was arrested.

19  Q.  So this is a second arrest?

20  A.  Yes, sir.

21  Q.  When was this arrest?

22  A.  August 23, 2011.

23  Q.  Where were you arrested?

24  A.  In Laredo, Texas.

25  Q.  For what were you arrested?

1    A.   For money laundering.

2    Q.   Have you been in jail ever since your arrest on

3    August 23rd of 2011?

4    A.   Yes, sir.

5    Q.   After your August 2011 arrest, did there come a point in

6    time you decided you would cooperate with the government?

7    A.   Yes, sir.

8    Q.   When did you first begin trying to cooperate?

9    A.   The first day -- the first day of my arrest.

10   Q.   And what did you do the first day of your arrest in an

11   attempt to cooperate?

12   A.   Well, I told the truth about what they were asking me.

13   Q.   All right.  So did you give a statement to some law

14   enforcement officers?

15   A.   Yes, sir.

16   Q.   In general terms, what did you tell the law enforcement

17   officers in that statement?

18           MR. WHITE:  Objection, your Honor.

19           THE COURT:  Just one moment, please.

20           What is the objection?

21           MR. WHITE:  Prior consistent statement.

22           THE COURT:  All right.  We'll hold it.

23   BY MR. SKINNER:

24   Q.   Where did this interview take place?

25   A.   In Laredo, Texas.

1    Q.  And after this interview with law enforcement officers on

2    the day of your arrest, did there come a time when you were

3    transported to New York City?

4    A.  Yes.

5    Q.  And when was that?

6    A.  August 26th.

7    Q.  And once you got to New York City, were you then housed in

8    another jail here in New York?

9    A.  Yes.

10   Q.  After coming up to New York, did there come a time when you

11   signed a contract known as a cooperation agreement with the

12   government?

13   A.  Yes, sir.

14   Q.  And on what date did you sign this cooperation agreement?

15   A.  September 8, 2011.

16   Q.  Now, prior to September 8th of 2011, but following your

17   arrest on August 23rd, did you meet additional times with

18   federal prosecutors and agents?

19   A.  Yes.

20   Q.  So from the time you were arrested up until the time you

21   signed this cooperation agreement, about how many times did you

22   meet with prosecutors and agents from the government?

23   A.  Four times.

24   Q.  All right.  What types of things did you tell the

25   government about during those meetings?

1           MR. WHITE:  The same objection, your Honor.

2           THE COURT:  Sustained.

3   Q.  Prior to signing this cooperation agreement, did you admit

4   to the government the money laundering crimes that you had

5   committed?

6   A.  Yes.

7   Q.  Did you tell the government about other people you

8   committed these crimes with?

9   A.  Yes.

10  Q.  Did you provide information about other crimes in addition

11  to money laundering that you had committed?

12  A.  Yes, sir.

13  Q.  Now, as part of that cooperation agreement you signed on

14  September 8th, did you agree to plead guilty to any crimes?

15  A.  Yes.

16  Q.  What crimes did you agree to plead guilty to?

17  A.  Money laundering and illegal transportation of the same

18  thing, of money.

19  Q.  All right.  Did you in fact plead guilty to those two

20  crimes?

21  A.  Yes, sir.

22  Q.  On what date did you plead guilty to those two crimes?

23  A.  The same day that I signed my cooperation.

24  Q.  What is the highest possible sentence you face as a result

25  of pleading guilty to these two crimes?

1    A.   25 years.

2    Q.   Have you been sentenced yet?

3    A.   No.

4    Q.   When will you be sentenced?

5    A.   I still don't know.

6    Q.   In addition to pleading guilty, did you agree to do

7    anything else when you entered into this cooperation agreement

8    with the government?

9    A.   Yes.

10   Q.   What other things did you agree to do on top of pleading

11   guilty to two crimes?

12   A.   To tell the truth and cooperate.

13   Q.   Did you make any agreements about further criminal conduct?

14   A.   Yes.

15   Q.   What did you agree to do with regard to further criminal

16   conduct?

17   A.   Not to do them anymore.

18   Q.   Now, if you do what you're obligated to do under the

19   agreement, what is your understanding of what the government

20   will do?

21   A.   Well, a lower sentence.

22   Q.   All right.  What is your understanding of what the United

23   States Attorney's office might do in connection with your

24   sentence if you satisfy your obligations under the agreement?

25   A.   Give a letter to His Honor, the Judge, about the good and

191ddat3                          F. Garza - direct

1   the bad that I've done.

2   Q.  Are you referring to the judge who is going to sentence

3   you?

4   A.  Yes, sir.

5   Q.  All right.  And you say this letter is going to include the

6   good and the bad; is that right?

7   A.  Yes, sir.

8   Q.  When you say "the bad," what do you mean?

9   A.  My behavior and the crimes that I committed.

10  Q.  And when you say "the good," what do you mean?

11  A.  Well, that would be about my cooperation.

12  Q.  Do you know for sure whether the prosecutor's office is

13  going to send this letter?

14  A.  No.

15  Q.  What, if anything, do you expect to happen if this letter

16  is sent?

17  A.  I'm hoping for a lower sentence.

18  Q.  Do you know for certain whether your sentence will be

19  reduced if this letter is sent to your sentencing judge?

20  A.  No.

21  Q.  Have you gotten any promises from anybody in the government

22  as to what your sentence will be?

23  A.  No.

24  Q.  What about, has your attorney given you any promises about

25  what your sentence might be?

1   A.   No.

2   Q.   Has anyone at all made any promises to you about what your

3   sentence will be?

4   A.   No.

5   Q.   Is it possible that even if this letter from the government

6   is sent, you still might get up to 25 years in prison as a

7   sentence?

8   A.   Yes.

9   Q.   Does your sentence in any way depend on the outcome of this

10  trial against Vikram Datta?

11  A.   No.

12  Q.   Other than the possibility of this letter from the

13  government, have you received any other benefit as a result of

14  entering into the cooperation agreement with the government?

15  A.   Yes.

16  Q.   What other benefit have you received?

17  A.   Immunity.

18  Q.   All right.  And immunity for what?

19  A.   Immunity for some violations that I committed.

20  Q.   So has the government agreed not to prosecute you for

21  certain crimes?

22  A.   Yes.

23  Q.   For what crimes has the government agreed not to prosecute

24  you?

25  A.   Well, I used cocaine and I filled out some false income tax

1    forms.

2    Q.  So the government has agreed not to prosecute you for your

3    use of cocaine, is that correct?

4    A.  Yes.

5    Q.  And when did you first start using cocaine?

6    A.  Around 1991.

7    Q.  And for how long did you use cocaine?

8    A.  Oh, well, until 2011.

9    Q.  Now, has the government made any agreements with regard to

10   your distribution of cocaine, as opposed to your use of

11   cocaine?

12   A.  No.

13   Q.  And have you distributed cocaine in the past?

14   A.  Never.

15   Q.  Now, you said you also received an agreement from the

16   government that they wouldn't prosecute you for filing false

17   tax returns, correct?

18   A.  That's correct.

19   Q.  Can you please describe what you did that could have

20   resulted in a false tax charge?

21   A.  I asked someone to include me on his work payroll.

22   Q.  All right.  Who did you ask to include you on their work

23   payroll?

24   A.  That person is my brother-in-law.

25   Q.  And had you actually done any work for your brother-in-law?

1   A.  No.

2   Q.  Did you file a tax return indicating that you earned income

3   as a result of working for your brother-in-law?

4   A.  Yes.

5   Q.  When did you file these tax returns?

6   A.  Around 2009.

7   Q.  And why did you file false tax returns indicating that you

8   had earned income at your brother-in-law's business?

9   A.  Well, to show to the government that I was working in

10  something legal.

11  Q.  So it would be fair to say that you were trying to cover up

12  illegal money that you had been earning?

13  A.  Yes, sir.

14  Q.  And by filing these false tax returns, did you also hope to

15  get some --

16          MR. WHITE:  Objection to the leading, your Honor.

17          THE COURT:  Excuse me.

18          MR. WHITE:  I object to the leading.

19          THE COURT:  Overruled.

20  Q.  By filing these false tax returns, did you also hope to get

21  any kind of Social Security benefit?

22  A.  Yes.

23  Q.  Now, did you pay taxes on the income that you earned as a

24  result of your money exchange business?

25  A.  No.

1   Q.  What, if anything, have you agreed to do in the cooperation

2   agreement with regard to income that you earned from your money

3   exchange business?

4   A.  To pay the appropriate taxes.

5   Q.  When do you have to make payment or reach an agreement to

6   make payment?

7   A.  Before my sentencing.

8   Q.  Now, what will happen if you do not live up to your

9   obligations under the cooperation agreement?

10  A.  There is no deal; there is no immunity.

11  Q.  All right.  And what will happen with regard to the letter

12  that you're hoping the government sends to your sentencing

13  judge?

14  A.  Well, they wouldn't send it.

15  Q.  And if that letter isn't sent, what's your understanding

16  about what will happen at your sentencing?

17  A.  Well, they can sentence me with the full weight of the law.

18  Q.  Will you be sentenced as if you had never cooperated with

19  the government?

20  A.  Yes.

21  Q.  Since you signed the cooperation agreement, have you met

22  additional times with prosecutors and agents?

23  A.  Yes.

24  Q.  About how many times?

25  A.  Three or four times.

191ddat3                        F. Garza - direct

1          MR. SKINNER:  Your Honor, I was going to start a new

2    topic.  If this is a good place to break?

3          THE COURT:  All right.  Members of the jury, I'll see

4    you at 2.

5          And, counsel, I've got a couple of things to do with

6    you before we break.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1914dat4a

1          (Jury not present)

2          THE COURT:  First of all, I had a note earlier in the

3     morning from Ms. Simmons who I think is alternate 3 if my

4     memory is accurate, that's right, saying she has been called

5     for a portion of her civil service exam for police

6     administrative aid at 3:30 on October 3 and she wants to be

7     excused on that day.  If we are still in session, I propose we

8     will break early and let her take her test.  Anybody have a

9     problem?  It's in the neighborhood.

10         MR. SKINNER:  No objection.

11         MR. ROSS:  No objection.

12         THE COURT:  We will mark that a court exhibit next in

13    order whatever it is.  Mr. Ross, I quickly took a look at the

14    cases you cited to me this morning.  At least my present

15    impression is that they don't really read on this situation.

16    Indeed, there is language in some of them that tends to cut

17    against you although not dispositively.

18         I am at least in the moment inclined to the view I

19    would bring these two witnesses in to say to them in words or

20    in substance that if they testify in this case there may be

21    some reason to believe that it could implicate their personal

22    interests, that they would be well-advised to consult with

23    counsel before getting on the witness stand, to inquire as to

24    whether they have counsel and have consulted and if not to

25    offer to appoint counsel for them for that purpose.

1914dat4a

1      Do you have an objection to that?

2      MR. ROSS:  Yes, sir.

3      THE COURT:  Explain why.

4      MR. ROSS:  I think it intimidates the witness.  It

5  chills the right of this defendant to call these essential

6  witnesses.  There could not be two more people more important

7  to his defense.  They are alleged to be co-conspirators.  They

8  would testify not.  They have traveled across the country.

9  They are here.  They presented themselves. your Honor.

10      THE COURT:  Whether they traveled, whether they are

11  here or whether they are on the moon or whether they didn't

12  move out of bed this morning has nothing to do with this issue.

13      MR. ROSS:  It has to do with my objection.  My

14  objection is that, notwithstanding the fact, these women have

15  been told from day one that they were alleged to be

16  co-conspirators.

17      THE COURT:  Told by whom?

18      MR. ROSS:  By myself, by Mr. White, in our interviews

19  with them.

20      THE COURT:  Are you representing them, either of you.

21      MR. ROSS:  Absolutely not, your Honor.  We interviewed

22  them as witnesses in Mr. Datta's case and have been very

23  forthcoming.  We were very forthcoming with them yesterday

24  after Mr. Skinner's conversation with Mr. White.

25      THE COURT:  Did you tell them that they had a

1    privilege against self-incrimination which they could invoke

2    not to testify?

3         MR. ROSS:  Yes, sir, in those words, not the words

4    that your Honor suggested a moment ago.  I didn't tell them if

5    you get on the witness stand there is a possibility something

6    is going to happen against your personal interests, as close to

7    a quote I can get from memory, which is different than saying

8    you have a Fifth Amendment right not to testify given the fact

9    that you have been identified by the government alleged to be

10   co-conspirators.

11        THE COURT:  Did you tell them that they have a right

12   to consult counsel before deciding whether to invoke that

13   privilege?

14        MR. ROSS:  Yes, sir.

15        THE COURT:  Did you offer to provide independent

16   counsel to them?

17        MR. ROSS:  No, actually, no, actually I did not.  The

18   issue did come up and I said that I thought that if the Datta

19   family provided counsel, that that would cause more problems

20   than it would solve.

21        THE COURT:  I understand the argument.  I am only

22   trying to find out what happened.

23        MR. ROSS:  We told them exactly what the conversation

24   was very straightforwardly.

25        THE COURT:  Do you have any problem with my saying I

1914dat4a

1    have been informed that you have been advised by Mr. Datta's

2    lawyers that you have a privilege against self-incrimination

3    that you could invoke in the circumstances of this case so as

4    not to testify.  How about if I say in words and substance,

5    Mr. White, I mean I am trying to accommodate you as best I can,

6    but --

7            MR. WHITE:  Your Honor, we represent Mr. Datta.  We

8    made that clear to them, that we represent him.  We did not

9    give them legal advice, your Honor.  We told them that --

10           THE COURT:  Mr. Ross just got finished telling me that

11   he told them or you told them, one or both of you told them

12   that they have a privilege against self-incrimination that

13   could be invoked in the circumstances of this case; isn't that

14   what I was just told?

15           MR. ROSS:  Yes, your Honor, I said that to Yolanda

16   Carillo.

17           THE COURT:  But not to both.

18           MR. ROSS:  We had a joint discussion.  I am not sure

19   exactly.  Your Honor, I am putting on Ms. Carillo.  Mr. White

20   is putting on Ms. Garcia.  In our separate interviews we

21   apparently discussed this issue because I was in the middle of

22   my preparation with her when Mr. White shared with me his

23   conversation with Mr. Skinner.

24           THE COURT:  Look, I have strong doubt that I need to

25   attempt to accommodate you in this way to say the least.  I am

19l4dat4a

1    trying to do this in terms where pretty much the essence of the

2    inquiry is about what you have told them.

3          MR. ROSS:  Your Honor, speaks on Ms. Carillo and

4    myself, I am good with everything your Honor said.

5          THE COURT:  I would then, but of course I have to know

6    what you say was said, and you told me as to one of them and

7    Mr. White has not told me as to the other one.

8          MR. WHITE:  That's correct, your Honor.  I told

9    Ms. Garcia, Cynthia Garcia that I represent Vikram Datta and

10   represent his interests, that because she was named in the

11   complaint and in the indictment as a co-conspirator, she may

12   need independent counsel to advise her on the risks of

13   testifying for Mr. Datta.  That's in essence what I told her,

14   your Honor.

15         THE COURT:  Did you ask her whether she wanted

16   independent counsel?

17         MR. WHITE:  Not at that point, then we met jointly and

18   we told them about that.  What Mr. Ross represented to you,

19   that they said, well, I said you could get appointed counsel,

20   they said could we get retained counsel, then as Mr. Ross told

21   you, that could be a conflict if you would expect the Datta

22   family to pay for the lawyer, you would not be really getting

23   completely independent judgment.

24         THE COURT:  I appreciate the attempt to skate down

25   that line but essentially where we are is that these two women

1914dat4a

1    have agreed on the basis of the advice you gave them, or what

2    you said to them if you prefer that formulation of words

3    better, and I am not trying to be pejorative, I understand the

4    spot you are in, and that that's OK.  But it's not OK if you

5    were to say that the Datta family would pay for them to get

6    somebody who is really independent; I understand that too.

7              Why isn't the better course for me just to say to

8    them, look, you have various rights here of which you should be

9    fully and fairly informed.  I understand you have had some

10   discussion with counsel for defendant but they represent the

11   defendant, they don't represent you.  Their job is to protect

12   him not you.  My advice to you is that you consult with counsel

13   who are totally independent.  I will either give you time to go

14   out hire one at your own expense if that's what you want or

15   alternatively I am prepared to appoint at public expense

16   counsel for you to consult with, public defender counsel to

17   advise you on this and I strongly represent that you take

18   advantage of that offer.

19             Anybody have any problem with that?

20             MR. SKINNER:  No, your Honor.

21             MR. WHITE:  In the interests of efficiency, your

22   Honor --

23             MR. ROSS:  Your Honor, to be as straightforward as a

24   human being never mind a lawyer can possibly be --

25             THE COURT:  I always used to think those were

1914dat4a

1    coextensive categories.

2            MR. ROSS:   They are not; I have learned they are not.

3    Your Honor, I don't wish to see this potential issue waived.   I

4    have read *Pinto*.   The Second Circuit is one of the perhaps only

5    circuits that still recognizes a right of a court to order

6    immunity of a defense witness under extraordinary or

7    exceptional circumstances albeit.   And to say that we don't

8    have a problem on behalf of Mr. Datta with the court saying to

9    this witness all that the court just proposed would in my

10   estimation be a waiver of the first element of the three

11   factors in *Pinto* that might compel immunity, because I think it

12   is intimidating.

13           I recognize this situation.   I recognize the wisdom of

14   the court giving these ladies this information.   But I am not

15   going to say to the court that all of this is fine.   I just

16   won't say that to the court and agree with it.   The fact of the

17   matter is that we have told these women what they have been

18   told.   They do know they are targets, not targets, alleged

19   co-conspirators.   They do know they have a right to counsel.

20   And that's as much as I would like to posture.

21           I don't think there is any way, frankly, that the

22   court can deal with this that is not going to result in some

23   level of witness intimidation, albeit, the contrary is

24   intended.   I recognize the court is certainly not intending to

25   intimidate these women and I also recognize I don't think it

1914dat4a

 1    was Mr. Skinner's intention to cause that to happen.

 2            THE COURT:  We can go down another path.  We could

 3    have a hearing and take testimony on the subject of what

 4    transpired between you and Mr. White and these women and see

 5    what exactly they have been told and what they understand.  And

 6    I am sure, if we go down that path, you will say that's even

 7    more intimidating.  I am supposed to rely on you who have a

 8    red-hot conflict on this point to ensure that they know what

 9    their rights are.  But there we are.  I don't contest anybody's

10    veracity, please understand that, but we are where we are.

11            MR. ROSS:  As between the two choices, the least

12    intimidating is to give them the fact they have a Fifth

13    Amendment right, that the court would make available counsel,

14    they have a right to counsel; that's the admonition they should

15    be given.

16            THE COURT:  Any problem with that, Mr. Skinner?

17            MR. SKINNER:  Something to that effect is fine with

18    the government.  What the court articulated a moment ago, I

19    don't have total recall, was something basically the same

20    thing, which is fine by us.  I think these women should be

21    advised of their right to talk to an independent attorney so

22    they fully understand the right they may invoke in connection

23    with this proceeding.  As to the exact words, as long as we get

24    the substance of that, we are fine.

25            THE COURT:  So, let's have them here, and let's make

1914dat4a

1    sure Andy gets whoever is on CJA up here at 4:30.

2              MR. WHITE:  In the interests of efficiency, if you are

3    still going to advise them they have a right to hire counsel, I

4    would delete that because I think they would be prepared to

5    accept appointed counsel.  That would be logistically --

6              THE COURT:  I will do that.  There is no thought they

7    are going to testify today.

8              MR. WHITE:  No.

9              THE COURT:  When it is possible they will be called.

10             MR. WHITE:  Tomorrow.

11             THE COURT:  OK.  Have them here at 4:30.

12             The government ought to have the indictment and any

13   other documents you think are relevant to show counsel

14             See you at 2:00.

15             (Lunch recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                          (2:00 p.m.)

3           (In open court, jury not present)

4           THE COURT:  My office has had at least two calls today

5    from somebody who identifies himself, and it could well be, as

6    a law clerk or staff member for a district judge in the

7    Southern District of Texas, who is seeking information about

8    this case and who claims that Mr. Datta is to be on trial

9    before him shortly in the Southern District of Texas.  Does

10   anybody know anything about this?

11          MR. SKINNER:  I am aware of a Rule 41 proceeding filed

12   in the Southern District of Texas with regard to some seized

13   property from Mr. Datta; that's the only pending matter I am

14   aware of in the Southern District of Texas.

15          THE COURT:  Do you know who the judge is?

16          MR. SKINNER:  I don't.  I can find out.

17          MR. WHITE:  Mr. Datta is not a party to that Rule 41

18   motion; it's the corporate entities and family members.

19          THE COURT:  OK.  It's always better to be careful than

20   not.

21          (Continued on next page)

22

23

24

25

19L4DAT4B                           F. Garza - direct

1          (Jury enters courtroom)

2          THE COURT:   The jurors and the defendant all are

3    present.   Let us proceed.

4          MR. SKINNER:   Thank you, your Honor.

5     FAUSTO GARZA, resumed.

6          (Through interpreter)

7    BY MR. SKINNER:

8    Q.   Mr. Garza, you testified before our break that you had

9    started your money exchange business in or around 2007, is that

10   right?

11   A.   Yes.

12   Q.   Can you describe for us what this business did?

13   A.   Yes, of course.   My business consisted of the sale and

14   purchase of dollars.

15   Q.   Who did you sell dollars to?

16   A.   I regularly sold them to some clients I had in Mexico City.

17   Q.   What did these clients do?

18   A.   Most of them are clients who purchase perfume in the stores

19   in Laredo, Texas.

20   Q.   What did you do with the dollars you sold to these clients

21   who purchased perfume?

22   A.   OK.   I would receive instructions from my clients and they

23   would tell me which stores to go to to pay or which stores to

24   go to in order to pay off any bills that they had in Laredo,

25   Texas.

19L4DAT4B                          F. Garza - direct

1   Q.   So, what would you actually do with the dollars that you

2   sold to them?

3   A.   I would transport them in Laredo, Texas, and I would go

4   into the perfume shops and turn the money over to them.

5   Q.   After you turned the money over to the perfume shops did

6   you take possession of the perfume back in return?

7   A.   No.

8   Q.   What happened to the perfume?

9   A.   The shop owners would send them to the clients in Mexico.

10  Q.   You said you sometimes hand-delivered the dollars to the

11  stores in Laredo, Texas, is that right?

12  A.   Yes, sir.

13  Q.   This was to pay invoices for your clients who were the

14  purchasers of the perfume, is that right?

15  A.   Yes, sir.

16  Q.   Were there other ways that you would get dollars to the

17  perfume stores in Laredo, Texas other than hand-delivering the

18  money?

19  A.   Yes, sir.

20  Q.   What other ways would you get dollars to perfume stores in

21  Texas?

22  A.   We would send them bank transfers and occasionally a bill

23  would be paid with a check in Laredo, Texas.

24  Q.   In 2007 and in 2008, who were you buying dollars from?

25  A.   I would buy them at certain money exchange businesses or

1   with banks, through banks, excuse me.

2   Q.  In 2007 and 2008 when you were hand-delivering money, how

3   much would you typically deliver to the businesses in Laredo,

4   Texas?

5   A.  Well, it would be less than $10,000.

6   Q.  Did you work with anyone else at the money exchange

7   business that you started?

8   A.  Yes.

9   Q.  Who else did you work with?

10  A.  I worked with three other people.

11  Q.  What were their names?

12  A.  Jesus Garza-Rodriguez, Jose Trinidad de la Rosa-Micsume,

13  and Mr. Hilario Martinez-Garcia.

14  Q.  Was Mr. Jesus Garza a relative of yours?

15  A.  No, sir.

16  Q.  How did you know Mr. Jesus Garza?

17  A.  From my childhood.

18  Q.  What was Mr. Jesus Garza's job at the money exchange

19  business?

20  A.  Well, he would deposit checks at certain banks or he would

21  cash them.

22  Q.  How did you know Jose Trinidad de la Rosa-Micsume?

23  A.  Also from my childhood.

24  Q.  What was Mr. de la Rosa's job at the money exchange

25  business?

1  A.  He was my accountant; he was the one who took care of all

2  the data there.

3  Q.  How did you know Mr. Hilario Martinez-Garcia?

4  A.  Well, I met Mr. Garcia when we were working at Santos &

5  Santos International.

6  Q.  What was Mr. Martinez's job at the money exchange business?

7  A.  He was also in charge of transporting the money to Laredo,

8  Texas.

9  Q.  In 2007 and in 2008, how much did you make at the end of

10  each year after you paid all your expenses?

11  A.  Around, well, between 15 and $20,000.

12  Q.  How much did you pay your employees in 2007 and in 2008?

13  A.  Between 200 and $300 per week.

14  Q.  In the timeframe 2007 and 2008 where was your business

15  located?

16  A.  In Nuevo Laredo, Mexico.

17  Q.  What type of building was it in?

18  A.  It was a commercial building.

19  Q.  Did you have signs outside advertising that there was a

20  money exchange business inside?

21  A.  Yes.

22  Q.  Did you ever have people walk in off the street to exchange

23  currency?

24  A.  Yes.

25  Q.  During this period of time 2007, 2008, how far was your

1   business from the border crossing with Laredo, Texas?

2   A.   Around 10 to 15 meters away.

3   Q.   10 to 15 meters?

4   A.   You are asking me how far away my business was from the

5   bridge?

6   Q.   Yes.

7   A.   Well, excuse me, well, 100 meters, like a block away to the

8   other side.

9   Q.   You testified that during this period of time when you

10  moved money over the border, if you hand-delivered it, it was

11  always under $10,000, is that right?

12  A.   Yes, sir.

13  Q.   Did there come a time when you began moving larger amounts

14  of money to businesses in Laredo, Texas?

15  A.   Yes, sir.

16  Q.   When was that?

17  A.   It was like in the middle of 2009 or in the beginning of

18  2009.

19  Q.   At this point did you make any changes with respect to

20  where you were buying your dollars?

21  A.   Yes.

22  Q.   What change did you make?

23  A.   Well, I would buy them from two people instead of going to

24  a money exchange business or a bank.

25  Q.   What were the names of these two people?

1   A.   Carlos Martinez Amador and a Mr. Alberto.

2   Q.   Do you know Mr. Alberto's last name?

3   A.   I don't recall what it is.

4   Q.   Where were these two men located?

5   A.   Mr. Carlos Martinez Amador is from Rio Verde San Luis

6   Portosi, Mexico.

7   Q.   How far away is that from Nuevo Laredo?

8   A.   It's approximately 500 kilometers away.

9   Q.   How long would that take to drive?

10  A.   Between 6 and 7 hours.

11  Q.   Mr. Alberto, where was he located?

12  A.   In Mexico City.

13  Q.   How did the price that you got for the dollars you were

14  buying from these two men relate to the price you were getting

15  previously from banks and casas de cambio in Nuevo Laredo?

16  A.   It was much cheaper.

17  Q.   When you say much cheaper, can you give us an idea how much

18  cheaper?

19  A.   Around 8 to 10 cents less.

20  Q.   Where was the money coming from that Carlos Martinez and

21  Sr. Alberto were selling to you?

22           MR. WHITE:   Objection; basis of knowledge.

23           THE COURT:   Lay a foundation.

24  Q.   Mr. Garza, do you have any understanding as to where

25  Mr. Martinez and Mr. Alberto were getting their money?

19L4DAT4B                          F. Garza - direct

1              MR. WHITE:   Same objection.

2              THE COURT:   Answer yes or no.

3    A.   Yes, sir.

4    Q.   What's your understanding based on?

5    A.   What is my understanding based on?

6    Q.   Yes, what is the basis for your understanding that the

7    money was coming from a particular place?

8    A.   Because of the rates of exchange, because of the price.

9    Q.   What did the rate of exchange or the price indicate to you

10   about where the money was coming from?

11             MR. WHITE:   Objection; speculation.

12             THE COURT:   Sidebar.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

19L4DAT4B                    F. Garza - direct

1                    (At the sidebar)

2               THE COURT:  That's it; that's the foundation?

3               MR. SKINNER:  I think this witness is not going to

4     testify that either of these two men ever told him were they

5     were getting the money from.  What he can testify to is that

6     the rate of exchange, the way it was packaged, the way it was

7     transported, and the fact that he was buying it on consignment,

8     that all of this were facts that led him to believe this was

9     drug money, all circumstantial evidence of the fact that it's

10    drug money.

11              THE COURT:  Why don't you develop the rest of the

12    foundation and then we will see what I think.

13              MR. WHITE:  If it doesn't develop any further, I think

14    he could elicit those facts and he can argue to they jury

15    that's circumstantial evidence.

16              THE COURT:  Let's see where we get.

17                    (Continued on next page)

18

19

20

21

22

23

24

25

1                    (In open court)

2      BY MR. SKINNER:

3      Q.  How was the money that you purchased from Carlos Martinez

4      and Mr. Alberto delivered to you?

5      A.  He would bring it to me personally or it would be his

6      employees.

7      Q.  When you say he, who are you referring to?

8      A.  Mr. Carlos Martinez.

9      Q.  Employees when they brought this money to you, how were

10     they dressed?

11     A.  Casual.

12     Q.  How did they transport the money?

13     A.  They would drive it over.

14     Q.  They would take the bus?

15     A.  Occasionally.

16     Q.  You indicated that the money was coming from cities located

17     hours away from Nuevo Laredo, is that right?

18     A.  Yes, sir.

19     Q.  If one was driving this trip like yourself, would this be a

20     dangerous trip to make in Mexico?

21     A.  Yes, sir.

22     Q.  Why do you say that?

23     A.  It's a route where there are drug dealers and a lot of

24     cities, I am sorry, there was a lot of drug dealers and

25     violence, so you need to go through these cities without

1   getting bothered.

2   Q.  Did Mr. Carlos Martinez or Mr. Alberto or any employees

3   ever have any difficulty in making the trip when transporting

4   cash?

5              MR. WHITE:  Objection; basis of knowledge.

6   Q.  Did you talk to Mr. Martinez, Mr. Alberto and their

7   employees at the times they delivered money to you?

8   A.  Yes, sir.

9   Q.  Did they ever tell you that they had any trouble making the

10  trip?

11             MR. WHITE:  Objection.

12             THE COURT:  Overruled.  801(d)(2)(E).

13  A.  No, sir.

14  Q.  Did they ever indicate to you they were robbed?

15  A.  No, sir.

16  Q.  Did they ever indicate they lost any of the money they were

17  transporting?

18  A.  No, sir.

19  Q.  Were they ever dressed in any kind of official clothing

20  like a bank uniform or a uniform for an armed guard?

21  A.  No, sir.

22  Q.  Did they ever transport the money in an armored car?

23  A.  No, sir.

24  Q.  How would they physically carry the money?

25  A.  Well, they would be shrink-wrapped or vacuum-packed in

19L4DAT4B                          F. Garza - direct

1   plastic wrappers, and it would be bundled with rubberbands.

2   Q.   Was the money they delivered to you new or old?

3   A.   Used.

4   Q.   How much money would they typically transport to you at a

5   time?

6   A.   Around $80,000.

7   Q.   Were you able to buy money from Carlos Martinez and

8   Mr. Alberto on consignment?

9   A.   Yes, sir.

10  Q.   Could you explain what it means to buy money on

11  consignment?

12  A.   Yes, of course.  When you say that the money is bought on

13  consignment, it's obvious that the money had been ill-gotten or

14  gotten through drug dealing, and later I would be given time to

15  pay it back off.

16  Q.   On consignment means that you would be provided with the

17  money up front and then you would pay for it later?

18  A.   Yes, sir.

19            THE COURT:  The jury will disregard what the witness

20  said was obvious.

21  Q.   Were you able to buy dollars on consignment from banks or

22  casas de cambio that you dealt with in 2007 and 2008?

23  A.   No.

24  Q.   Can you tell us to the best of your knowledge how many

25  other money exchange businesses were there in Nuevo Laredo?

19L4DAT4B                       F. Garza - direct

1    A.   Approximately about 40.

2    Q.   Would you talk to the other owners of other money exchange

3    businesses?

4    A.   Yes.

5    Q.   Would you talk to them about buying dollars from other

6    people?

7    A.   Yes.

8    Q.   Did you talk to them --

9               MR. WHITE:   Objection.

10              THE COURT:   Overruled.

11   Q.   Did you talk to them about where these other dollars were

12   coming from?

13              THE COURT:   Just answer yes or no.

14   A.   Yes.

15   Q.   Did you use code when talking to these other money exchange

16   owners about dollars they were purchasing?

17   A.   Yes.

18   Q.   What code did you use?

19              MR. WHITE:   Objection.

20              THE COURT:   Sidebar.

21              (Continued on next page)

22

23

24

25

1           (At the sidebar)

2           THE COURT:  OK.  Why does this come in?

3           MR. SKINNER:  First of all, I don't expect him to say

4      he called them drug dealers or anything like that.  He's going

5      to say he would refer, we would refer to money coming from los

6      senores, the gentlemen.  He is going to say we would use code

7      because it's our understanding that money was coming from drug

8      dealers and we didn't want to use their name, we were afraid of

9      saying the name of a cartel.

10          THE COURT:  I don't think so.

11          MR. SKINNER:  Your Honor, I do proffer at this point

12     that I have elicited most of the facts that are the basis for

13     his understanding where the money comes from.  I would intend

14     to ask now based on all the facts, what is your understanding

15     of the providence of this money.

16          MR. WHITE:  His understanding is irrelevant; his

17     understanding where the money comes from is irrelevant.

18          THE COURT:  Why is his understanding relevant?

19          MR. SKINNER:  He has been in the money exchange

20     business on the border for a number of years.  He has had quite

21     a bit of experience in both the legitimate and illegitimate

22     sides of this.  He has a basis for his opinion as to where the

23     money came from.  I think it's relevant to the case that he

24     thinks it was coming from drug dealers.

25          THE COURT:  Are you offering him as an expert witness?

1          MR. SKINNER:  No.  The fact is what his thought is of

2     the origin of the money.  They are welcome to cross him as to

3     the fact it's just what he thinks and he doesn't know for

4     certain.  But the fact that he believes the money was coming

5     from narcotics traffickers is relevant to the charge here.  He

6     is part of a conspiracy.  Part of the basis of the conspiracy

7     is the belief of the participants in the conspiracy as to the

8     origin of the funds.  It's one of the elements of the crime.

9          THE COURT:  What you have to prove is that the

10    defendant thought that it was drug money, at least on some of

11    your claims, and whether this guy thought that it was drug

12    money or not is beside the point.  Now, you've got this giant

13    coloring book of Bugs Bunny.  The fact you have not colored in

14    the ears is not going to prevent the jury from realizing that

15    it's Bugs Bunny.

16         MR. SKINNER:  Fair enough.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2     Q.  Mr. Garza, let me ask you, how did you know Carlos

3     Martinez?

4     A.  He was recommended to me.

5     Q.  When did you first meet him?

6     A.  Approximately three years ago.

7     Q.  Now, when you started buying dollars from Carlos Martinez

8     and Senor Alberto, it was at this point in time that you

9     started increasing the amount of money that you would deliver

10    to businesses in Laredo, Texas?

11    A.  Yes.

12    Q.  And the money that you received from Carlos Martinez and

13    Senor Alberto, did you typically receive that money in cash?

14    A.  Yes.

15    Q.  In what currency?

16    A.  Dollars.

17    Q.  So starting in the middle of 2009, when you started

18    getting -- was it United States dollars?

19    A.  Yes, sir.

20    Q.  So starting in the middle of 2009, when you started buying

21    U.S. dollars from these men, how would you then get the dollars

22    to the businesses in Laredo?

23    A.  We would transport them to Laredo, Texas, and we would

24    declare the money at the American customs.

25    Q.  All right.  Did you ever just deposit the money in a bank

191ddat5                    F. Garza - direct

1   in Mexico and use a wire transfer or a check?

2   A.   No.

3   Q.   Why not?

4   A.   It's not permitted to deposit American dollars in Mexican

5   banks in cash.

6   Q.   And starting in mid-2009, how much money would you

7   typically have carried over the border at any one time?

8   A.   Between 80 and $100,000.

9   Q.   And what was the most you ever had delivered at any one

10  time?

11  A.   Around $220,000.

12  Q.   Now, who actually carried the money over the border to

13  deliver it to Laredo, Texas?

14  A.   Mr. Hilario Martinez-Garcia.

15  Q.   Did you ever carry these large sums of money over the

16  border yourself?

17  A.   No.

18  Q.   Could you have carried these larger sums of money over the

19  border if you wanted to?

20  A.   Yes.

21  Q.   So why didn't you just carry the money yourself?

22  A.   Because I didn't want to have the responsibility.

23  Q.   All right.  Now, at this point in mid-2009, where was your

24  business located?

25  A.   In Nueva Laredo at Donato Guerra 1313.

19lddat5                          F. Garza - direct

1    Q.   Is this a different address than the one you gave us a

2    little while ago for your business?

3    A.   Yes.

4    Q.   All right.  And where relative to the border was this

5    address?

6    A.   It was approximately 10 minutes away by car.

7    Q.   And previously your business was in a commercial building,

8    is that right?

9    A.   Yes.

10   Q.   Was this also a commercial building, this new location?

11   A.   No.

12   Q.   What kind of building was it?

13   A.   A house.

14   Q.   Did you have any signs advertising your business on the

15   house?

16   A.   No.

17   Q.   Starting in June 2009, did you ever have any people walk in

18   off the street to exchange money with you?

19   A.   No.

20            MR. SKINNER:  I would like to show the witness

21   Government Exhibit 915, the witness only, on the screen.

22            (Pause)

23            THE COURT:  Go ahead.  I'm sorry.  Is there a pending

24   objection?

25            MR. SKINNER:  No, your Honor.  We are actually just

1    waiting for approval to put Government Exhibit 915 on the

2    screen for the witness.

3             THE COURT:  All right.

4             (Pause)

5             MR. SKINNER:  Ms. Quinones, could you put the picture

6    up.

7    Q.  All right.  Let me ask, Mr. Garza, do you see the document

8    that's been marked as Government Exhibit 915 that is on the

9    screen right now?

10   A.  Yes.

11   Q.  Do you recognize it?

12   A.  Yes.

13   Q.  What is it?

14   A.  That's the house from which I operated my business.

15   Q.  It is a photograph of the house, is that right?

16   A.  Yes.

17            MR. SKINNER:  Your Honor, the government offers 915.

18            MR. WHITE:  No objection.

19            THE COURT:  Received.

20            (Government's Exhibit 915 received in evidence)

21            MR. SKINNER:  Could you please publish 915 to the

22   jury.

23   Q.  So, Mr. Garza, this is the house that you were just

24   describing that your business moved to sometime around

25   mid-2009?

1    A.  Yes.

2    Q.  Would you store money in this house?

3    A.  Yes.

4    Q.  And how much money would you store in this house at a given

5    time?

6    A.  Around $150,000.  It varied.

7              MR. SKINNER:  We can take down 915.  Thank you.

8    Q.  Mr. Garza, you said that after you moved, you were, you

9    said, about 20 blocks from the border?

10   A.  Yes.

11   Q.  All right.  And when you had cash to deliver to Laredo,

12   Hilario Martinez would physically carry it over the border; is

13   that right?

14   A.  Yes.

15   Q.  How would Hilario get from the house where your business

16   was to the border crossing 20 blocks away?

17   A.  He would go in a pickup truck.

18   Q.  And how would he actually carry the money?

19   A.  He would put it in his pants pocket, in his jacket pocket,

20   and even on some occasions in his socks.

21   Q.  Why did Mr. Martinez carry the money in his clothing?

22             MR. WHITE:  Objection.

23             THE COURT:  Sustained.

24   Q.  Did you take any security measures to try and protect the

25   money as you were transporting it?

19lddat5                           F. Garza - direct

1    A.   No.

2    Q.   Did anybody ever carry weapons?

3    A.   No, never.

4    Q.   Did you pay any protection money?

5    A.   No.

6    Q.   Did Mr. Martinez ever tell you what he did when he went

7    through customs?

8    A.   Yes.

9    Q.   And what did he tell you that he did when he went through

10   customs?

11   A.   That he was a Mexican businessman and that he filled out a

12   form to declare the money on the American side with his

13   personal information.

14   Q.   Do you know whether Mr. Martinez ever got a copy of the

15   declaration that he filed with U.S. Customs?

16             MR. WHITE:   Objection, your Honor.

17             THE COURT:   Overruled.

18   A.   No, he didn't.

19   Q.   Can you tell us, what were the names of some of the perfume

20   customers to whom you sold dollars?

21   A.   Mr. Gerardo Rangel, Mr. Jose Antonio Franco, Mr. Jose Luis

22   Contreras, Mr. Jose Luis Martinez, Mr. Luis Flores, Mr. Jose

23   Luis Torres, Mr. Jose Antonio Moreno, and Mrs. Catalina Franco,

24   just to remember a few.

25   Q.   The name Jose Luis Contreras, is that one of the people

19lddat5                        F. Garza - direct

1    that you just mentioned?

2    A.   Yes, sir.

3    Q.   And when do you think you first started selling dollars to

4    Jose Luis Contreras?

5    A.   Approximately in the middle of 2009.

6    Q.   What were the names of the businesses in Laredo to which

7    you delivered dollars?

8    A.   La Versailles Perfumes, Broadway Perfumes, Sunny Perfumes,

9    Tio Perfumes, Nysa Perfumes, TM Perfumes, and Ueta Perfumes.

10   Q.   Did you deliver more dollars to any particular store than

11   others?

12   A.   Yes.

13   Q.   Which store did you deliver the most dollars to?

14   A.   La Versailles.

15   Q.   Now, how much did you earn in 2009 and in 2010 after you

16   paid your expenses?

17   A.   Around $50,000.

18   Q.   How much did you pay your employees in 2009 and 2010?

19   A.   Between 400 and $500 a week.

20   Q.   Was this more than you were paying them back in 2007, in

21   2008?

22   A.   Yes.

23   Q.   Let me direct your attention to your dealings with La

24   Versailles.

25            How did you come to start dealing with La Versailles?

1    A.   One of my customers gave me instructions to do that.

2    Q.   Which customer?

3    A.   Gerardo Rangel.

4    Q.   When you say he gave you instructions, what did he tell you

5    to do?

6    A.   To go and deliver money to La Versailles.

7    Q.   Was there anybody at La Versailles that you usually dealt

8    with?

9    A.   Yes.

10   Q.   Who was that?

11   A.   Cynthia.

12   Q.   Did you ever meet Cynthia?

13   A.   Yes.

14   Q.   How did you meet her?

15   A.   At La Versailles.

16   Q.   Did anybody introduce you?

17   A.   One of my customers sent me to meet her.

18   Q.   And to the best of your recollection, when you first met

19   Cynthia, what did you say to her and she say to you?

20   A.   Well, after we introduced ourselves to each other, I

21   mentioned that I was the one who was going to be bringing

22   dollars to her from certain customers of hers.

23   Q.   What, if anything, did she say to you?

24   A.   Fine.

25   Q.   What was Cynthia's job at La Versailles?

191ddat5                    F. Garza - direct

1   A.  She received the money.  She counted it.

2   Q.  Do you know if she owned the business?

3   A.  She was not the owner.

4   Q.  Do you know the owner of La Versailles?

5   A.  Yes, sir.

6   Q.  Who is the owner of La Versailles?

7   A.  Mr. Datta.

8   Q.  Did you ever meet Mr. Datta?

9   A.  Yes, sir.

10  Q.  How did you come to meet Mr. Datta?

11  A.  Cynthia introduced him to me.

12  Q.  All right.  Do you see Mr. Datta in the courtroom here

13  today?

14  A.  Yes, sir.

15  Q.  Can you please describe where Mr. Datta is by where he is

16  sitting or an article of clothing he's wearing?

17  A.  Yes, of course.  Yes.  He's seated to the right of you and

18  I believe he's wearing a gray suit with a red tie.

19          MR. SKINNER:  Can the record reflect the witness has

20  identified the defendant?

21          THE COURT:  Yes.

22  Q.  When you met with the defendant, what did you say to him

23  and did he say to you?

24  A.  Well, I introduced myself to the gentleman and I mentioned

25  to him that I was the one who was going to be bringing the

1    money.  And he said that was fine, no problem, and that when I

2    needed to get in touch with them, that I should deal with

3    Miss Cynthia.

4              MR. SKINNER:  All right.  At this point, your Honor,

5    the government would like to read a stipulation and offer some

6    exhibits into evidence.

7              THE COURT:  Yes.

8              MR. SKINNER:  810, the foreign language stip.

9              The parties have agreed that Government Exhibits 401

10   and 402 are recordings of telephone conversations that occurred

11   either entirely or predominantly in Hindi and/or Punjabi and

12   that were incepted pursuant to court-authorized wiretaps.

13             Government Exhibits 401-T and 402-T are transcripts

14   that contain fair and accurate English translations of the

15   Hindi/Punjabi language conversations contained on Government

16   Exhibits 401 and 402 respectively.  The telephone conversations

17   reflected in Government Exhibits 401-T and 402-T occurred on

18   the dates and at the times indicated on the transcripts.

19             Government Exhibits 403, 404, 405, 406, 407, 408, 409,

20   410, 411, 412, 413, 414, 415, 416, 417, 418, 419 and 425 are

21   recordings of telephone conversations that occurred either

22   entirely or predominantly in Spanish and that were intercepted

23   pursuant to court-authorized wiretaps.  Government Exhibits

24   403-T, 404-T, 405-T, 406-T, 407-T, 408-T, 409-T, 410-T, 411-T,

25   412-T, 413-T, 414-T, 415-T, 416-T, 417-T, 418-T, 419-T and

 1    425-T are transcripts that contain fair and accurate English

 2    translations of the Spanish language conversations contained on

 3    Government Exhibits and then it lists out all of the exhibits

 4    403 through 419 and 425, respectively.

 5            The telephone conversations reflected in Government

 6    Exhibits 403-T through 419-T and 425-T occurred on the dates

 7    and at the times indicated on the transcripts.

 8            Vikram Datta, the defendant -- well, that's not part

 9    of the stipulation.

10            It is further stipulated and agreed that this

11    stipulation, Government Exhibits 401, 402, 403, 404, 405, 406,

12    407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419

13    and 425 and Government Exhibits 401-T, 402-T, 403-T --

14            THE COURT:  The word "through" would serve nicely

15    somewhere about here.

16            MR. SKINNER:  "Through" is not written, but all of the

17    exhibits 401-T through 419-T and 425-T are listed, and it is

18    stipulated and agreed that those exhibits may be received in

19    evidence at trial and that this stipulation may be received in

20    evidence.

21            The government offers Exhibit 810 as well as all of

22    the exhibits listed within the stipulation.

23            THE COURT:  Received.

24            (Government's Exhibit 810 received in evidence)

25            (Government's Exhibits 401-419, 425 and 401-T through

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19lddat5                    F. Garza - direct

1     419-T, 425-T received in evidence)

2              MR. SKINNER:   Thank you, your Honor.

3              At this point we have a few portions of some of the

4     Spanish language calls that we just introduced that we wanted

5     to ask the witness about.

6              Could I ask permission to pass the transcript binders

7     back out to the jury?

8              (Pause)

9              Before we get to the calls themselves, I note that

10    I've given original transcripts exhibits to Mr. Garza.   There

11    is nine exhibits.   They are not all consecutive so I will just

12    list them for the record:   406-T, 410-T, 411-T, 412-T, 413-T,

13    414-T, 417-T, 418-T and 419-T.

14    Q.   Let me ask you, Mr. Garza, have you reviewed these

15    transcripts prior to testifying today?

16    A.   Yes.

17    Q.   All right.   And are these transcripts of recorded telephone

18    calls?

19    A.   Yes.

20    Q.   Did the telephone calls occur in Spanish?

21    A.   Yes.

22    Q.   Did you listen to the telephone calls prior to testifying

23    today?

24    A.   Yes.

25    Q.   Who were the participants in these nine phone calls?

594

1   A.  Miss Cynthia and myself.

2   Q.  All right.  And the transcripts, do they contain a Spanish

3   transcription of what was said?

4   A.  Yes.

5   Q.  And did you review those transcripts prior to testifying

6   today, the Spanish portions?

7   A.  Yes.

8   Q.  At the time that these recordings were made, did you know

9   that you were being recorded?

10  A.  No.

11  Q.  Let me direct your attention to 406-T.

12          MR. SKINNER:  I would ask the jury to turn to the

13  first page of 406-T in their binders.

14  Q.  Do you see midway through the page where it says, "Very

15  well.  Listen, uh, well, Mr. Gerardo Rangel has just reported

16  to me -- I talked to Jorge Gomez:  27419, 27, 4, 19."

17          Do you see that?

18  A.  Yes, sir.

19  Q.  All right.  Did you say that to Cynthia?

20  A.  Yes.

21  Q.  OK.  Who is Gerardo Rangel?

22  A.  He is a client who buys perfume.

23  Q.  And who is Jorge Gomez?

24  A.  He works for Mr. Rangel.

25  Q.  What did you mean when you said this to Cynthia, the

1     portion that we just reviewed?

2     A.   I was reporting to her that I had spoken to Mr. Jorge Gomez

3     to turn over $27,419 to him on behalf of Mr. Gerardo Rangel.

4     Q.   To turn that over, that money over to who?

5     A.   To Miss Cynthia.

6     Q.   Can you now turn to 410-T, and I would ask the jury to turn

7     to that page as well.

8             Have you reviewed this transcript prior to testifying

9     today?

10    A.   Yes.

11    Q.   And what were you -- was this also with Cynthia?

12    A.   Yes, sir.

13    Q.   And what were you discussing in this phone call?

14    A.   I was talking to her to report to her about some money from

15    Mr. Jose Luis Contreras.

16    Q.   How much money were you talking about?

17    A.   $38,681.

18    Q.   Could you now please turn to 412-T.

19            Do you see where Cynthia says, toward I guess the

20    second time she speaks, "Listen, just here, uh, hasn't anyone

21    closed for me?"  Do you see that?

22    A.   Yes, sir.

23    Q.   The word "closed," is that a term that you and Cynthia

24    would use with each other when you spoke to each other about

25    business?

1   A.   Yes.

2   Q.   And when you used that term, what did you mean?

3   A.   If we had made -- if we had closed a deal for Cynthia.

4   Q.   What kind of deal?

5   A.   For the purchase of dollars so that they could be paid to

6   Cynthia.

7   Q.   Do you see where you're speaking at the bottom of the

8   page -- withdrawn.

9            Do you see where Cynthia says, toward the bottom of

10  the page, she refers to Kaliman?

11  A.   Yes, sir.

12  Q.   Do you know a man named Kaliman?

13  A.   Yes, sir.

14  Q.   Who is Kaliman?

15  A.   That's Mr. Jose Luis Contreras.

16  Q.   And do you see next to that she refers to Guero?

17  A.   Yes, sir.

18  Q.   Do you know a man who uses the name Guero?

19  A.   Yes, sir.

20  Q.   And who uses the name Guero?

21  A.   Jose Antonio Franco.

22  Q.   Is that another one of your customers?

23  A.   Yes, sir.

24  Q.   Now, can you turn to 413-T, please.

25           Do you see the second time you speak where you refer

1    to sending a little envelope?

2    A.   Yes, sir.

3    Q.   To what were you referring when you said you sent a little

4    envelope?

5    A.   That a little envelope was sent to Miss Cynthia.

6    Q.   OK.  We can put the transcripts aside for the time being.

7              MR. SKINNER:  Ms. Quinones, can I ask you to please

8    put up the first page of Government's Exhibit 609, which is

9    already in evidence.

10             Can you blow up the bottom half of the page, the

11   checks that are written down there.

12   Q.   We're looking at Government Exhibit 609 right now, the

13   first page, Mr. Garza.  We've blown up some checks that were

14   written from this account.  Do you recognize these checks?

15   A.   Yes, sir.

16   Q.   All right.  And are these checks from a bank account at

17   Falcon Bank in the name of Hilario Martinez-Garcia?

18             THE INTERPRETER:  What is the name of the bank?  I'm

19   sorry.

20             MR. SKINNER:  Falcon Bank.

21   A.   Yes.

22   Q.   Did you know that Hilario Martinez-Garcia had a checking

23   account at Falcon Bank?

24   A.   Yes, sir.

25   Q.   How did you know that he had a checking account at Falcon

19lddat5                              F. Garza - direct

1    Bank?

2    A.   I gave him the instructions.

3    Q.   So was this account used in connection with your business?

4    A.   Yes, sir.

5    Q.   Why didn't you open the account up in your own name, or the

6    name of your business?

7    A.   To avoid responsibility.

8    Q.   All right.  How was this checking account used in

9    connection with your business?

10   A.   Well, at times I would give out the checks for the stores.

11   Q.   Who would you give these checks to?

12   A.   To the perfume shops.

13   Q.   And so just to be clear, at times you gave checks from this

14   bank account to perfume shops in Laredo, Texas; is that right?

15   A.   That's right.

16   Q.   All right.  And was this to pay the invoices of your

17   clients, the perfume purchasers in Mexico?

18   A.   Yes, sir.

19   Q.   Now, where did the money come from that was deposited into

20   this checking account?

21   A.   At times I would send transfers from Nueva Laredo to

22   Laredo, Texas, and on other occasions we would deposit cash

23   into the account.

24   Q.   The cash that you deposited, did any of that cash come from

25   purchases you made from Carlos Martinez or Senor Alberto?

1    A.   Yes, sir.

2    Q.   And why didn't you always just write checks to the perfume

3    businesses rather than delivering cash to them directly?

4    A.   It was easier.   It was easier for us to bring it across --

5    to bring it over, to just give them the check, as opposed to

6    giving them cash.

7    Q.   All right.   If it was easier to give them a check, why

8    didn't you do it every time?   Why did you ever deliver cash?

9    A.   Well, we weren't always allowed to deposit large amounts

10   and at times we didn't have the checks to make transfers.

11   Q.   When you say you weren't always allowed to deposit large

12   amounts, who would limit the deposits that you could make into

13   this bank account?

14   A.   The banks, the banks themselves.

15   Q.   Where was this bank located?

16   A.   In Laredo, Texas.

17   Q.   Let me draw your attention back to the first page of 609.

18          Do you see the check that I've just circled, marked

19   number 505?

20   A.   Yes, sir.

21   Q.   Do you recognize the handwriting to the left of the red

22   line I just made on the screen?

23   A.   Yes.

24   Q.   Whose handwriting is that?

25   A.   It's Mr. Jose Veta de la Rosa's.

1   Q.  Whose signature is that that I just circled?

2   A.  It's Mr. Hilario Martinez-Garcia's.

3   Q.  And is that how things would typically work, the accountant

4   would write out the check and Hilario would sign it?

5   A.  Yes, sir.

6           MR. SKINNER:  We can take down 609.

7           THE COURT:  All right.  Let's take our break here.

8           MR. SKINNER:  Your Honor, I only have one more

9   question.

10          THE COURT:  One more question?

11          MR. SKINNER:  One more.  Now you are going to hold me

12  to that.

13  Q.  Directing your attention back to your dealings with La

14  Versailles.

15          Did anyone at La Versailles, during the entire time

16  that you dealt with them, ever ask you where you were buying

17  the dollars that you were delivering to La Versailles?

18          THE INTERPRETER:  Where did you buy -- I'm sorry?

19  Q.  Did anybody from La Versailles ever ask you where you were

20  buying the dollars that you were delivering to La Versailles?

21  A.  No, sir.

22          MR. SKINNER:  Your Honor, we have no further

23  questions.

24          THE COURT:  OK.  Recess.

25          (Recess)

1           (Jury not present)

2           THE COURT:  How are we doing on time?

3           MR. SKINNER:  We have one more witness then we rest.

4    I hope we will get him on today depending on cross.  I think we

5    will definitely be done tomorrow morning at the earliest.  Then

6    we have those two women.  I am not sure, I will defer to the

7    defense as to whether we get to them or not.

8           THE COURT:  What else would the defense have?

9           MR. WHITE:  We would have an expert witness, two short

10   witnesses, then we would call the two women.

11          THE COURT:  That would be it.

12          MR. WHITE:  It depends on what happens with the two

13   women, your Honor.

14          THE COURT:  OK.  We may be finished tomorrow.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F. Garza - cross

```
 1              (Jury enters courtroom)

 2              THE COURT:  The defendant and jurors are all present.

 3              Cross-examination.

 4              MR. WHITE:  I wonder if I can get Government Exhibit

 5    411T.  I don't think that's one of the transcripts before

 6    Mr. Garza.

 7              MR. SKINNER:  The original exhibit.

 8              MR. WHITE:  Yes.

 9              MR. SKINNER:  It's in front of the witness.

10              MR. WHITE:  I am not sure it is.

11    CROSS EXAMINATION

12    BY MR. WHITE:

13    Q.   Good afternoon, Mr. Garza.

14    A.   Good afternoon.

15    Q.   Look at the transcript before you, Government Exhibit 411T,

16    and I ask the jurors to turn to that transcript in their books.

17    Do you see where you say, listen, excuse me, it's a question of

18    our crossing the bridge and we declare; do you see that,

19    Mr. Garza?

20    A.   Yes, sir.

21    Q.   What did you mean when you were telling Cynthia that you

22    declare?

23    A.   I was talking about how long it would take me for me to

24    cross the bridge and declare the amount of money that I had

25    reported on previously.
```

F. Garza - cross

1    Q.   You always declared, you and the people that worked with

2    you always declared when you came across the border, correct?

3    A.   Yes, sir.

4    Q.   Here you are telling Cynthia that you are declaring on this

5    particular delivery?

6    A.   Yes, sir.

7    Q.   When you were first introduced to Cynthia as the person who

8    would be bringing her U.S. dollars, did you tell her that you

9    declare when you bring the money across from Nuevo Laredo?

10   A.   No, sir.

11   Q.   This is the only time you ever told her that you declare

12   money?

13   A.   Well, as far as I can recall there might have been similar

14   ones in terms of my responses, I mean, in terms of when I used

15   to cross over and head over there and I declare.

16            THE INTERPRETER:   Correction.

17   Q.   Did you let La Versailles, Cynthia, did you let them know

18   that you declare when you take money across the border?

19   A.   Not every time I wouldn't say that, I wouldn't say that

20   when I returned.   I would just tell them that I was turning the

21   money, making a delivery of money.

22            THE INTERPRETER:   Correction.

23   Q.   You didn't say it every time because you had told them on

24   previous occasions that you declare when you come across the

25   border, correct?

F. Garza - cross

1    A.   Correct.

2    Q.   You described, Mr. Garza, how after, in 2009 and 2010,

3    money would come to you in Nuevo Laredo from distant cities, is

4    that correct?

5    A.   Yes, sir.

6    Q.   And you described how that money would be delivered and

7    what it looked like and what were the circumstances under which

8    you received that money; do you remember testifying to that?

9    A.   Yes, sir.

10   Q.   Did you ever tell Cynthia or Mr. Datta, did you ever tell

11   them that's how you got the money?

12   A.   No, sir.

13   Q.   Mr. Skinner asked you had anybody at La Versailles ever

14   asked you where you got the U.S. dollars from; do you remember

15   that?

16   A.   Yes, sir.

17   Q.   You testified, no, nobody ever asked you?

18   A.   Yes, sir.

19   Q.   Did you ever tell anybody at La Versailles the

20   circumstances under which you got that money?

21   A.   No, sir.

22   Q.   If someone at La Versailles had asked you as Mr. Skinner

23   asked you where does those U.S. dollars come from, what would

24   you have said?

25            MR. SKINNER:   Objection.

```
 1              THE COURT:  Sustained.

 2              MR. WHITE:  Can I have sidebar on that one?

 3              THE COURT:  No.

 4              MR. WHITE:   I want to make a record later.

 5    BY MR. WHITE:

 6    Q.   You identified some of the customers for whom you paid the

 7    invoices, Gerardo Rangel, Jose Franco and others; do you recall

 8    that, testifying to that?

 9    A.   Yes.

10    Q.   Those were perfume businesses in Mexico City, correct?

11    A.   Yes.

12    Q.   Were all of those perfume businesses that you served, that

13    you delivered money for?

14    A.   Yes, sir.

15    Q.   Not all of them were customers of La Versailles though,

16    were they?

17    A.   The vast majority were.

18    Q.   But not all of them?

19    A.   No.

20    Q.   You testified that one of those customers was Jose

21    Martinez, correct?

22    A.   One of my clients, yes.

23    Q.   Jose Martinez was not a customer of La Versailles, was he?

24    A.   Correct.

25    Q.   You testified on direct that somebody had recommended you
```

F. Garza - cross

1    to Carlos Martinez; do you remember that you testified to that

2    on direct?

3    A.   Yes.

4    Q.   Carlos Martinez was one of the people from whom you

5    received U.S. dollars, right?

6    A.   Yes, sir.

7    Q.   And the person who recommended you to Carlos Martinez was

8    Jose Martinez, correct?

9    A.   No, sir.

10   Q.   Who was it who recommended you to Carlos Martinez?

11   A.   Someone else.

12   Q.   Name?

13   A.   Juan Urtiago.

14   Q.   How did you know this gentleman?

15   A.   He has a currency exchange business in Nuevo Laredo.

16   Q.   How did you come to get these customers in Mexico City?

17              THE COURT:   Which customers are you talking about,

18   sir?

19   Q.   Your own customers in Mexico City for whom you delivered

20   money, how did you come to get these customers?

21   A.   When I worked for Alpha money exchange.

22   Q.   That was like 10 years earlier, correct?

23   A.   Yes, approximately it was.

24   Q.   So did it come about that in 2009, these people all of a

25   sudden became your clients?

1   A.   Well, for most of them I had the telephone numbers, I had

2   portfolio, a customer portfolio from Alpha, so I got in touch

3   with some of them and they referred me on to other people, so

4   successively I got to them.

5   Q.   What did you tell these people when you called them?

6   A.   That I had begun my own casa de cambio business and I was

7   calling them to offer them my services.

8   Q.   What did you tell them about your services; why should they

9   use you?

10          MR. SKINNER:   Objection; relevance.

11          THE COURT:   Sustained.

12   Q.   Did you talk to them about exchange rates?

13          MR. SKINNER:   Objection; relevance.

14          THE COURT:   Why is it relevant, counsel?   If you need

15   to come to the sidebar, come.

16          MR. WHITE:   I would like to, your Honor.

17          (Continued on next page)

18

19

20

21

22

23

24

25

F. Garza - cross

1           (At the sidebar)

2           MR. WHITE:  According to the 3500 material, he told

3    Jose Luis Contreras, a customer of my client, that he could

4    give him better service than Alpha gave him or EMAX.  So he is

5    offering them better service as opposed to cheaper dollars.   In

6    fact, if these women testify, they would testify that he could

7    provide a faster service than the money exchanges they were

8    using.  So that was the appeal.  He had not cheap dollars but

9    better service that he offered to the customers.

10          THE COURT:  So what?

11          MR. WHITE:  It diminishes the likelihood that he was

12   being used because the customers or La Versailles knew these

13   were narco dollars, that he was giving cheap dollars.  We just

14   keep hearing cheap dollars.  But he is offering them better

15   service, faster service then they were getting.

16          MR. SKINNER:  I fail to see the relevance of the speed

17   of the service he was providing.

18          MR. WHITE:  It's the reason he is being used.

19          MR. SKINNER:  By whom?

20          MR. WHITE:  It's the reason that La Versailles agrees

21   to deal with him because he could do faster service.

22          MR. SKINNER:  That's a different question than why his

23   customers agree to deal with him.  I don't see the relevance of

24   his customers.

25          MR. WHITE:  The idea here is this is the black market

F. Garza - cross

1    peso exchange, they are going around getting cheaper dollars.

2    If they can get narco dollars, they will use narco dollars.

3    This is in conflict with that theory.

4            THE COURT:  I don't get it.  I don't understand your

5    argument.

6            MR. WHITE:  Their expert, testified all this cash is

7    drug money.

8            THE COURT:  That's your theory.

9            MR. WHITE:  And that the importers in Mexico, that's

10   what they want, they want cheap dollars, and this argument goes

11   to the fact that Fausto is offering them better service, faster

12   service, not cheap dollars, faster service.

13           MR. SKINNER:  I think the testimony from the expert is

14   that it's cheap dollars.  It's also the desire to avoid taxes

15   and tariffs, all sorts of other things, which is why they are

16   using cash with this guy.  I still don't see why where he said

17   to a customer, first of all he got customers from 2007 rather

18   than 2009, it's unclear on that point, we will have to clarify

19   that on redirect, but I don't see the relevance.  I am trying

20   struggling with it myself, but I still don't see the relevance

21   of it.

22           THE COURT:  I don't either.

23           MR. WHITE:  Can I make the little record I wanted to

24   make.  I know when I was cross-examining Hilario Martinez, I

25   asked the same question, what would you have said if they asked

F. Garza - cross

1    you if it was drug money, and the objection was sustained.

2    This is going to be a conscious avoidance instruction given to

3    this jury undoubtedly in which your Honor will instruct the

4    jury, I anticipate, that the defendant avoided confirming the

5    fact, avoided confirming the fact.  If the fact is impossible

6    of confirmation or it would have been futile to attempt to

7    confirm the fact, I think that's relevant under the conscious

8    avoidance issue.  That's why I think that's a proper question.

9            THE COURT:  I adhere to the ruling.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2              THE COURT:  Let's proceed.

 3   BY MR. WHITE:

 4   Q.  The clients that you had in Mexico City, the perfume

 5   dealers in Mexico City, when is it that you, what year was it

 6   that you reached out to them from your Alpha file and told them

 7   you had a casa de cambio?

 8   A.  In 2007 and then up to 2008 I continued to get them.

 9   Q.  In 2007 when you first reach out to them, what did you ask

10   them to do; what did you tell them you could do for them?

11   A.  That I was beginning a money exchange house of my own and I

12   was offering them my services.

13   Q.  Why should they use you; why were you telling them they

14   should use you?

15              THE COURT:  He wanted the business, don't you think.

16              MR. WHITE:  That's why.

17              THE COURT:  There might be a better question.

18   Q.  What were you telling them were the advantages of using

19   your casa de cambio?

20   A.  Just to offer them the best price.

21   Q.  What do you mean by the best price?

22   A.  Cheaper than the competition.

23   Q.  You mean cheaper on the exchange rate?

24   A.  Yes, sir.

25   Q.  This was in 2007, correct?
```

F. Garza - cross

1  A.  Yes, sir.

2  Q.  Were all your clients in Mexico City?

3  A.  Yes, sir.

4  Q.  You had none in Guadalajara?

5  A.  Yes, I did have them but I did not get in touch with them.

6  Q.  Did you have a client named Juan Rubio?

7  A.  No.

8  Q.  Jose Luis Rodriguez?

9  A.  No.

10  Q.  Did you know a person named Octavio?

11       MR. SKINNER:  Objection, your Honor, beyond the scope

12  of direct examination.

13       THE COURT:  Sustained.

14  Q.  When you were at Alpha, did you have a client named

15  Octavio?

16       MR. SKINNER:  Objection.

17       THE COURT:  Sustained.

18  Q.  In 2007 when you reached out to former clients from Alpha,

19  was Octavio one of the people you reached out to?

20       MR. SKINNER:  Objection, your Honor.

21       THE COURT:  Sustained.

22  Q.  You have a prior conviction in 2001 for money laundering,

23  correct?

24  A.  Yes, sir.

25  Q.  What you did then is you were working for Alpha, correct?

F. Garza - cross

1  A.  That's true.

2  Q.  What you did is you exchanged pesos for $25,000 --

3  withdrawn.  You exchanged $25,000 in U.S. money for pesos,

4  correct?

5  A.  That's true.

6  Q.  You were dealing, were you not, with an undercover agent,

7  weren't you?

8  A.  Yes, sir.

9  Q.  When you made this exchange you put in false information on

10  the CTR, correct?

11  A.  Yes, sir.

12  Q.  Prior to doing that you met with the undercover in La

13  Posada, did you not?

14  A.  Yes, sir.

15  Q.  La Posada is a hotel in Laredo?

16  A.  Yes, sir.

17  Q.  Where did you meet him, in the bar?

18  A.  In the restaurant.

19  Q.  Prior to your doing this transaction he told you, did he

20  not, that this was money he had from cocaine trafficking,

21  correct?

22  A.  Yes, he did mention it.

23  Q.  So you knew when you made that exchange at Alpha with the

24  $25,000, you knew because he had told you that that was money

25  from cocaine, correct?

1   A.   Yes, sir.

2   Q.   You testified on direct that you filled out false United

3   States tax forms, correct?

4   A.   Yes, sir.

5   Q.   These forms indicated that you were an employee of a United

6   States company in Laredo, correct?

7   A.   Yes.

8   Q.   You did that so you would be entitled to Social Security

9   payments, correct?

10   A.   Yes, sir.

11   Q.   You knew at the time that you did that that you were

12   defrauding the United States government, didn't you?

13   A.   Yes.

14   Q.   Going back to your conviction, when you were having that

15   meeting at La Posada with the undercover, you were a regular

16   cocaine user yourself, right?

17   A.   Yes, sir.

18   Q.   And you continued to be a regular cocaine user up until the

19   time of your arrest in your present case?

20   A.   Yes, sir.

21   Q.   How much cocaine did you use on a daily basis?

22   A.   I didn't use it daily; I would use it every 10 days to two

23   weeks.

24   Q.   For 20 years?

25   A.   Approximately, sir.

1    MR. WHITE:  Nothing further, your Honor.

2    THE COURT:  Thank you.  Any redirect?

3    MR. SKINNER:  No, your Honor.  Thank you.

4    THE COURT:  Thank you.  The witness is excused.

5    Next witness.

6    (Witness excused)

7    MR. SKINNER:  The government calls special agent

8    Miguel Carrera.  We have two stipulations we want to read into

9    the record prior to the witness's testimony.

10    The first stipulation is marked Government Exhibit

11    805.  It provides that the parties agree that Samez Worldwide

12    is perfume supplier located at 609 Columbus Avenue, New York,

13    New York, during the period from June 1, 2009 until February 1,

14    2011.  Samez Worldwide shipped perfume from New York, New York

15    to perfume businesses located in Laredo, Texas that were owned

16    and operated by Vikram Datta, the defendant.

17    Second, Edgemont Trading Company is a perfume supplier

18    located at 609, Columbus Avenue, New York, New York.  During

19    the period from June 1, 2009 until February 1, 2011, Edgemont

20    Trading shipped perfume from New York, New York to perfume

21    businesses located in Laredo, Texas that were owned and

22    operated by Vikram Datta, the defendant.

23    Perfume Unlimited Inc. is a perfume supplier located

24    at 31 West 31st Street, New York, New York during the period

25    from June 1, 2009 until February 1, 2011.  Perfume Unlimited

F. Garza - cross

1    shipped perfume from New York, New York to perfume businesses

2    location in Laredo, Texas that were owned and operated by

3    Vikram Datta, the defendant.

4         Park Fragrance is a perfume supplier located at 261

5    West 25th Street, New York, New York.  During the period from

6    June 1, 2009 until February 1, 2011, Park Fragrance shipped

7    perfume from New York, New York to perfume businesses located

8    in Laredo, Texas that were owned and operated by Vikram Datta,

9    the defendant.

10        Vermani Perfumes is a perfume supplier located at 37

11   West 30th Street, New York, New York.  During the period from

12   June 1, 2009 until February 1, 2011, Vermani Perfumes shipped

13   perfume from New York, New York to perfume businesses located

14   in Laredo, Texas that were owned and operated by Vikram Datta,

15   the defendant.

16        Mod Textile & Perfumes is a perfume supplier located

17   at 609 Columbus Avenue, New York, New York.  During the period

18   from June 1, 2009 until February 1, 2011 Mod Textile & Perfumes

19   shipped perfume from New York, New York to perfume businesses

20   located in Laredo, Texas that were owned and operated by Vikram

21   Datta, the defendant.

22        It is further stipulated and agreed this stipulation

23   may be received in evidence at trial.  The government offers

24   Exhibit 805.

25        THE COURT:  Received.

F. Garza - cross

1              (Government Exhibit 805 received in evidence)

2              MR. SKINNER:   The second stipulation provides that the

3      parties agree that if called as a witness, a manager from the

4      Best Western Hotel located at 101 International Way, Newark,

5      New Jersey would testify as follows.   The Best Western Hotel

6      located at 101 International Way, Newark, New Jersey maintains

7      records relating to guests who rent rooms at the hotel.

8              I have reviewed those records and have determined that

9      on February 22, 2010, Miguel Lara Ramirez, a citizen and

10     national of Mexico checked into the hotel.   Lara Ramirez paid

11     in cash in advance for his room.   Lara Ramirez stayed at the

12     Best Western Hotel until March 2, 2010.

13             It is further stipulated and agreed this stipulation

14     may be received in evidence at trial.   The government offers,

15     Government Exhibit 815.

16             THE COURT:   Received.

17             (Government Exhibit 815 received in evidence)

18             MR. SKINNER:   Your Honor, may I proceed with questions

19     of the witness.

20             THE COURT:   You may.

21     MIGUEL CARRERA,

22         called as a witness by the Government,

23         having been duly sworn, testified as follows:

24     DIRECT EXAMINATION

25     BY MR. SKINNER:

1   Q.  Where do you work?

2   A.  Excuse me?

3   Q.  Where do you work?

4   A.  Drug Enforcement Administration, DEA.

5   Q.  Where is your title?

6   A.  Special agent.

7   Q.  How long have you been a special agent with the DEA?

8   A.  About 7-1/2 years now.

9   Q.  Generally speaking what are your duties and

10  responsibilities as a special agent with DEA?

11  A.  Conduct criminal investigations as they have to do with

12  drug trafficking, money laundering, etc.

13  Q.  Directing your attention to to January 15, 2011, were you

14  working on that day?

15  A.  Yes.

16  Q.  Did you participate in an arrest on that day?

17  A.  Yes, I did.

18  Q.  Where did the arrest take place?

19  A.  Right here in midtown on the east side.

20  Q.  What was your role?

21  A.  Right before the arrest I was sitting next to the

22  defendant, a table over, having lunch.  When they got ready to

23  move or to leave, I went out, got my car, and came across the

24  street, got my car and parked right in front of the restaurant.

25  Q.  Just to back up, when you say the defendant, are you

19L4DAT6                        Carrera - direct

1    referring to Vikram Datta?

2    A.   Yes, sir, the defendant.

3    Q.   Was there some type of undercover operation that was going

4    on prior to the defendant's arrest?

5    A.   Yes, sir.  He was having lunch with detective Recinos,

6    Mario Recinos.

7    Q.   You say that you pulled your car around to the front, is

8    that correct?

9    A.   That's correct.

10   Q.   What happened after that?

11   A.   Basically the defendant came out of the restaurant with the

12   undercover.  Several agents came behind them, separated the

13   undercover, arrested Mr. Datta, and put him in the back of my

14   car.

15   Q.   What did you do after that?

16   A.   Another agent got in the car with me; we drove to the New

17   Jersey office.

18   Q.   Where is the New Jersey office?

19   A.   In Newark, Newark, New Jersey.

20   Q.   After the defendant was put in the car and you pulled away

21   and headed towards Newark, was the defendant advised of his

22   right to remain silent?

23   A.   Yes, sir, his Miranda rights were read to him.

24   Q.   Did he waive his Miranda rights?

25   A.   Yes, sir.

19L4DAT6                    Carrera - direct

1    Q.   After he waived his Miranda rights, was he asked any

2    questions?

3    A.   Yes, sir; we spoke to him all the way.

4    Q.   Did you participate in the questioning of the defendant?

5    A.   Yes, sir.

6    Q.   Did you ask the defendant any questions about the

7    undercover he had been meeting with at the meeting prior to his

8    arrest?

9    A.   Yes, sir.  We basically asked him who the person he was

10   having lunch with was; he said that the guy's name was Mario.

11   Q.   Did you ask any questions about what Mario did?

12   A.   Yes.  We asked if he knew actually that Mario was a drug

13   trafficker and a money launderer; he indicated he did not know

14   that.

15   Q.   Did you ask the defendant anything about large amounts of

16   cash that he received in his business from Mexico?

17   A.   Yes, sir.  We basically questioned him about the amount of

18   cash that was coming into his stores.  He indicated basically

19   that's how business was done at the border, that it came from

20   perfume.  When we asked him where did he think that money was

21   coming from, he basically indicated that wasn't his business,

22   that wasn't his concern.

23   Q.   Did you ask the defendant anything about a man named

24   Octavio?

25   A.   Yes, sir, we did.

1    Q.   What did you ask him about Octavio?

2    A.   Basically, we asked him if he knew a person named Octavio.

3    He said yes, he did.  He said that it was a prior business

4    associate of his.

5    Q.   Did you ask him anything about Octavio's kidnapping?

6    A.   Yes, sir.  We asked him about Octavio's kidnapping.  He

7    said he knew about it.  We asked him also if he had made any

8    arrangements to send money to Octavio's kidnappers.  He said

9    that he did not.

10   Q.   Was the defendant asked anything about an organization

11   known as the Zetas?

12   A.   Yes, sir.  We asked him if he knew who had kidnapped

13   Octavio and he said he didn't know.  We asked him if he knew if

14   the Zetas had kidnapped him.  He said he did not know.

15   Q.   Did you ask the defendant anything whether he was there to

16   receive money from the undercover Mario?

17   A.   Yes, that's one of the other things we approached him with.

18   He said he wasn't there to receive money; he was just there to

19   meet with an acquaintance.

20   Q.   Was the defendant asked at any time in your presence about

21   an organization known as the Sinaloa drug cartel?

22   A.   Yes, sir.

23   Q.   What did he say in response to questions about the Sinaloa

24   drug cartel?

25   A.   Specifically we asked him if he had ever done any business

1    with them, and he didn't, he denied doing any business with

2    them.  We asked him if he had heard of them or he had mentioned

3    them.  He said he hadn't mentioned them.  We confronted him

4    again, telling him that later on that he had mentioned him on

5    recordings, the Sinaloa cartel, and he denied having mentioned

6    them.

7    Q.  Was the defendant asked anything about how much cash his

8    business took in?

9    A.  Yes, sir.

10   Q.  What did he tell you?

11   A.  He wasn't exactly sure; he said approximately $12 million.

12   Q.  Was the defendant asked anything about how Mexican perfume

13   businesses could generate so much money?

14   A.  Yes, sir.  Actually we asked him on several occasions the

15   same thing.  He basically said that was not his concern.  At

16   one point he told us that if we had any problems with money

17   coming across Mexico, we should arrest the people that are

18   delivering it, that he had nothing to do with that.

19   Q.  Are you familiar with the term wiretap?

20   A.  Yes, sir.

21   Q.  What is a wiretap?

22   A.  Wiretap is basically a term used in law enforcement.

23   Basically when we listen to phones or emails or basically

24   interception of the communication device.

25   Q.  Have you had training on the use of wiretaps?

1    A.   Yes, sir.

2    Q.   Have you used wiretaps in previous investigations?

3    A.   Yes, sir, I have.

4    Q.   How many investigations do you think you worked on that

5    involved wiretaps?

6    A.   I would say about 20, 20, 40, something like that.

7    Q.   Aside from what you told us about the arrest of the

8    defendant, were you involved in the investigation of the

9    defendant?

10   A.   Yes, sir.

11   Q.   Did that investigation involve the use of wiretaps?

12   A.   Yes, sir.

13   Q.   What was wiretapped in the investigation?

14   A.   Basically cellphones, the defendant's personal cell,

15   another three phones used in the business, and I believe we

16   also intercepted a landline at the time for the business; about

17   five cellphones in total.

18   Q.   Did DEA or someone else in the government have to get

19   permission from anyone to wiretap these phones?

20   A.   Yes, it's actually a very involved process.  Basically

21   after an application is done, it goes to headquarters.  It goes

22   in front of a federal judge; they approve or disapprove it.

23   Q.   For how long was DEA authorized to wiretap these five

24   phones you mentioned?

25   A.   Each order only authorizes us to listen in if you will for

1     30 days.

2     Q.   During the wiretaps in this investigation, how many 30-day

3     periods was the DEA authorized to wiretap one or more of the

4     phones that were involved in the investigation?

5     A.   We had four applications, so four times.

6     Q.   Four 30-day periods?

7     A.   That's correct.

8     Q.   Roughly speaking during what time period did the DEA

9     intercept phone calls during the four 30-day periods?

10    A.   If I remember correctly, around March and May, and toward

11    the end of the year, October, November, or August October,

12    October and November, I believe around that time.

13    Q.   Of what year?

14    A.   2010.

15    Q.   Once the wiretaps were in place, were recordings made of

16    the intercepted phone calls?

17    A.   Yes, recorded calls.

18    Q.   Describe for us how the calls are recorded.

19    A.   Basically there is a computer system we have that

20    interfaces with a particular phone company.  Once that phone

21    company reviews the court order, we tap into the phone.  So if

22    the person makes a phone call, the system will automatically

23    kick in and make a recording of the session if you will or the

24    details.

25    Q.   It's a recording of voices once the phone is activated?

1    A.   Yes and no.   In addition to the voices, if somebody calls

2    and hangs up, it will record an incident and give it a number,

3    a session number we call it.   It will have the time, the date,

4    if there was an audio recording made of it.

5    Q.   In addition to capturing voices, does the computer

6    equipment capture any another information about completed phone

7    calls?

8    A.   Yes, sir.   There is a couple of different types of

9    safeguards in place for that.   There is a monitor, somebody

10   monitoring the system, let's say, and the system also has

11   different safety nets in place.

12   Q.   Does the computer have the ability to record the phone

13   numbers for the telephones that participated in the captured

14   call?

15   A.   Yes, sir.

16   Q.   Does it indicate which phone was doing the dialing and

17   which phone was receiving the call?

18   A.   Yes, sir.

19   Q.   Does it indicate what time phone calls were made?

20   A.   Yes, sir.

21   Q.   You said that there is a monitor involved in the process,

22   is that right?

23   A.   Yes, sir.

24   Q.   So if the recordings are being captured on that, what role

25   does a monitor play?

1  A.  That is one of the safeguards.  Basically we can only

2  record what we are listening to.  If we are listening to

3  something, it automatically will be recorded.  Someone has to

4  make a determination whether that particular phone call has to

5  do with the crime at hand, does it have to do with money

6  laundering as in this case.  If it does not have to do with

7  money laundering, then the person behind manning the terminal

8  has to what we call minimize it, stop listening, then it stops

9  recording.  That's one of the safeguards the monitor plays.

10 Q.  Does the monitor monitor every phone call that's recorded?

11 A.  During their shift they are there manning the machine, if

12 that's your question.

13 Q.  If the monitor minimized a phone call, is it still recorded

14 whether or not they are listening or does it just stop

15 recording?

16 A.  Once the person deems the call doesn't have anything to do

17 with the crime, they will hit a minimize button and they cannot

18 listen or record.  The system will record that event.  The

19 system will record the fact that the call was not being

20 listened to.

21 Q.  Are calls monitored 24 hours a day?

22 A.  No, sir.

23 Q.  Are calls intercepted 24 hours a day?

24 A.  No, sir.

25 Q.  During what period of time in this investigation were calls

 1    being intercepted and monitored?

 2    A.   We were listening to his phones in two shifts, 8 to 4 and 4

 3    to midnight.

 4    Q.   There was nobody listening from midnight to 8, no

 5    recordings were made during that period of time?

 6    A.   That's correct.

 7    Q.   How do you determine what period of time to intercept phone

 8    calls?

 9    A.   We basically looked at the amount of phone calls he

10    normally has on his phone and determine when he had the most

11    phone calls or the business will be open.  In this case we

12    listened to his phone around business time.

13    Q.   What information did you have at your disposal that let you

14    know when the phones were most active?

15    A.   Basically toll records.

16    Q.   Were any of the phone calls that were intercepted in this

17    investigation in foreign languages?

18    A.   Yes, sir.

19    Q.   What languages?

20    A.   The phones, we had conversation in Spanish, full Spanish, a

21    lot of conversations were in Spanish and English, and a lot of

22    them were in Hindi.

23    Q.   Did DEA take any steps to monitor foreign language phone

24    calls?

25    A.   Yes, sir.

1    Q.   What did the agency do?

2    A.   For the foreign language ones, we had monitors, specialized

3    companies that have contracts with the government and the

4    monitors come in, they are basically experts on this, and they

5    translate the phone call and make a quick summary of what's

6    going on in the phone call.

7    Q.   The english language calls, were they also being summarized

8    in realtime as calls were being made?

9    A.   Yes, sir.

10   Q.   During any one of the 30-day periods the DEA was authorized

11   to intercept phone calls, was it required to engage in any kind

12   of reporting of what was happening during that 30-day period?

13   A.   Yes, sir.  Every 10 days or so we have to generate a report

14   to the federal judge and basically the report has data, says

15   how many calls came in, how many were pertinent, how many were

16   minimized, how many were not pertinent, how many were recorded,

17   how many were minimized; yes, a report gets generated.

18            MR. SKINNER:  May I approach, your Honor.

19            THE COURT:  Yes.

20   Q.   I have given you a Redweld that contains a number of

21   different government exhibits.  I ask you to turn to Government

22   Exhibit 427 and 427T.  There should be a folder with those

23   numbers on top, probably a few in from the front.

24   A.   427?

25   Q.   Yes.  Do you have 427 and 427T in front of you?

1    A.   Yes.

2    Q.   What is 427?

3    A.   427 is a CD that contains a recording made during the

4    intercept period.

5    Q.   This is recording that was intercepted pursuant to one of

6    the wiretaps you were just telling us about?

7    A.   That's correct.

8    Q.   What's 427t?

9    A.   It's a transcript of the same thing that's on the CD.

10   Q.   Have you reviewed the recording of the transcript prior to

11   testifying today?

12   A.   Yes, I did.

13   Q.   Can you tell us who the participants are in this particular

14   intercepted phone call?

15   A.   It was the defendant, Mr. Datta, and a female named Liz,

16   and another unknown female.

17   Q.   What day and time did this phone call take place?

18   A.   It was April 14, 2010.

19   Q.   Generally can you describe the subject matter of this

20   phone?

21   A.   This is actually an overhear.

22   Q.   Explain what you mean by an overhear?

23   A.   We were basically listening to the phone that he was

24   talking to.  At that point he received a different phone call

25   on another phone so he starts talking on the other phone.  With

Case 1:11-cr-00102-LAK   Document 61   Filed 10/27/11   Page 633 of 652
630
19L4DAT6                     carrera - direct

1    this phone we could still hear his part of the conversation.

2    So he is talking in Hindi then basically switches to English.

3    So we can hear on this phone what he is saying on this phone,

4    just his side of the conversation.

5    Q.   In this overhear, the one side of the conversation, tell us

6    in general terms what the defendant was talking about.

7    A.   He speaks to this person named Liz, he's getting an update

8    of what was sold in one of the stores, and later during the

9    conversation, he starts making reference to Sinaloa in Mexico,

10   and he acknowledges from the person that of course he

11   understood that there is a big Sinaloa drug cartel in that

12   area.

13              MR. SKINNER:   The government offers 427 and 427T.

14              THE COURT:   Received.

15              (Government Exhibits 427 427T received in evidence)

16              MR. SKINNER:   We like to play a brief portion of this

17   phone call.   We will turn to 427T in the transcript binders and

18   we will start the recording from 25 minutes and 30 seconds.

19              (Audiotape played)

20              (Continued on next page)

21

22

23

24

25

1    Q.   Stop it there.

2         And Special Agent Carrera, can I now ask you to turn

3    to what we've marked as Government Exhibit 421?

4         Do you have it in front of you?

5    A.   Yes, sir.

6    Q.   Is this another -- are 421 and 421-T in front of you?

7    A.   Yes, sir.

8    Q.   Is 421 another audio CD with a recording on it; 421-T is a

9    transcript of that CD?

10   A.   Yes, sir.

11   Q.   Did you review these prior to testifying today?

12   A.   Yes, sir.

13   Q.   Can you give us the date and time of the call captured on

14   421?

15   A.   Yes.  This happened on September 13, 2010 at 1:55 p.m.

16   Q.   Who are the participants in the phone call?

17   A.   It was the defendant Vikram Datta and a person identified

18   as Jaime Goldstein.

19   Q.   What is the general subject matter of the phone call?

20   A.   Buying perfume, and Jaime basically wants assurances that

21   the perfume he sells to the defendant will not come back into

22   the U.S. but will go into Mexico.

23        MR. SKINNER:  Your Honor, the government offers 421

24   and 421-T as a transcript of 421.

25        MR. ROSS:  Without objection, your Honor.

1            THE COURT:  Received.

2            (Government's Exhibits 421, 421-T received in

3    evidence)

4            MR. SKINNER:  And I would like to publish a portion of

5    the call.

6            Can I ask everyone to turn to 421 and turn to page 2.

7    There are no line numbers on this transcript.  We are going to

8    start a little bit midway through the page where Jaime

9    Goldstein is saying, "But the stores, it's for the stores in

10   Laredo."

11           And, Ms. Quinones, can I ask you to start it at 1:11.

12           (Tape played)

13           MR. SKINNER:  You can stop it there.

14   Q.  Agent Carrera, can I ask you to turn to Government Exhibits

15   430 and 432.

16   A.  Yes, sir.

17   Q.  And while you are getting there, your Honor, we have a

18   stipulation that we would like to read into the record right

19   now.

20           THE COURT:  Yes.

21           MR. SKINNER:  I think this is the last one.

22           The parties agree that if called as a witness, the

23   witness from Verizon would testify as follows:

24           Verizon is a service provider for the telephone

25   numbers 956.764.2818, 956.794.8046 and 956.794.8047.

1          The telephone numbers 956.764.2818, 956.794.8046 --

2          THE COURT:  You've lost everybody.

3          MR. SKINNER:  I've loss the reporter.

4          THE COURT:  We have no record.

5          MR. SKINNER:  I'm sorry.  I'm trying to go quickly but

6     too fast.  Let me start back over.

7          Verizon is a service provider for the telephone

8     numbers 956.764.2818, 956.794.8046 and 956.794.8047.  The

9     telephone numbers 956.764.2818, 956.794.8046 and 956.794.8047

10    are registered to BBVA Compass Bank in Laredo, Texas.

11          It is further stipulated and agreed that this

12    stipulation may be received in evidence at trial.

13          The government offers Exhibit 814.

14          THE COURT:  Received.

15          (Government's Exhibit 814 received in evidence)

16    BY MR. SKINNER:

17    Q.  I apologize, Agent Carrera.  I intended to have you turn to

18    Exhibits 428, 429, 431 and 434.  Can you pull those folders,

19    please?

20    A.  So 428, 429, and what else?

21    Q.  Then 431 and 434.  They should all be in a group.

22          Do you have them in front of you now?

23    A.  Yes, sir.

24    Q.  And can I ask you, are these four different CDs with the

25    government numbers that I just indicated?

1    A.   Yes, sir.

2    Q.   Do they all contain recorded telephone calls captured

3    pursuant to the wiretaps?

4    A.   Yes, sir, they do.

5    Q.   And are the corresponding T exhibits transcripts of those

6    recorded phone calls?

7    A.   Yes, sir.

8    Q.   Have you reviewed those phone calls and transcripts prior

9    to testifying today?

10   A.   Yes, sir, I did.

11   Q.   Can I ask you, just generally speaking, what is the time

12   period for these four phone calls?

13   A.   That was September 10th through the end of September 10th,

14   14th through the 30th.

15   Q.   Generally speaking, what is the subject matter of these

16   phone calls?

17   A.   It's basically conversations between the defendant and bank

18   officials or the defendant's workers and bank officials.

19          MR. SKINNER:   Your Honor, the government offers 428,

20   429, 431 and 434 and the corresponding transcripts.

21          MR. ROSS:   No objection, your Honor.

22          THE COURT:   Received.

23          (Government's Exhibits 428, 429, 431, 434 received in

24   evidence)

25          (Government's Exhibits 428-T, 429-T, 431-T 434-T

1   received in evidence)

2   BY MR. SKINNER:

3   Q.   Can you turn first to 428?

4   A.   Yes, sir.

5   Q.   When was this phone call placed?

6           THE COURT:   Mr. Skinner, are you absolutely on the

7   verge of finishing here?

8           MR. SKINNER:   No, your Honor.   We have some more.

9           THE COURT:   All right.   So let's have this come over

10  until tomorrow.

11          Members of the jury, we'll see you at 10:15 tomorrow.

12  And I have pretty much cleared my schedule for Friday.   I know

13  everybody would like to finish as soon as possible.   So Friday

14  will be a full day or as much of a full day as we have work to

15  do except that I will have to take about 30 minutes out

16  mid-morning to take care of what I couldn't get postponed.

17          So thank you very much, and we'll see you tomorrow

18  morning.

19          THE CLERK:   Will the jurors please come this way.

20          (Continued on next page)

21

22

23

24

25

```
1                (Jury not present)

2                THE COURT:  You can stand down for now.

3                (Witness excused)

4                THE COURT:  Be seated, folks.

5                So, first of all, Mr. Skinner, how much longer with

6    this witness?

7                MR. SKINNER:  Probably about another 20 minutes or

8    half hour, your Honor.

9                THE COURT:  OK.  And what do you think on cross?

10               MR. ROSS:  Half of that at most.

11               THE COURT:  All right.  So that gets us to 11 o'clock.

12               Then the government rests, right?

13               MR. SKINNER:  That is our intention, yes, your Honor.

14               THE COURT:  OK.  And then you have two short

15   witnesses?

16               MR. WHITE:  We have the expert and then two short

17   witnesses.

18               THE COURT:  What has the expert got to say?

19               MR. WHITE:  The expert is on border commerce, cross

20   border commerce and banking.

21               THE COURT:  What's he got to say?

22               MR. WHITE:  Well, he is going to describe the cross

23   border commerce.  He's written books on the history of cross

24   border commerce between Laredo and Mexico.  He has worked for a

25   bank in Laredo for 15 years.  He's intimately familiar with the
```

1    currency practices between Laredo and Mexico.  And he's going
2    to testify about the history of cross border commerce, that
3    it's been a cash economy, the effect of the change in the laws
4    in 2009 regarding U.S. dollars, and related subjects, your
5    Honor.  The government got an expert notice a couple of weeks
6    ago.

7              THE COURT:  Is there going to be an objection to this,
8    or not?

9              MR. BRAGG:  Your Honor, we believe that the first
10   half, or much of it, the border commerce, is not particularly
11   relevant here.  The government doesn't contest that there is
12   legitimate, you know, Mexico/U.S. commerce activity.

13             As to the second part about the change of laws in
14   2009, the government certainly has no objection.  If the first
15   part is offered sort of by way of background, then I think the
16   government would have no objection.  If it became unduly long,
17   then we might object at that point, your Honor.

18             THE COURT:  Is there a report that's been exchanged,
19   or a summary of his testimony?

20             MR. WHITE:  A summary of his testimony, your Honor.

21             THE COURT:  Maybe you can before you leave tonight
22   give me one so I am prepared.

23             MR. WHITE:  I will, your Honor.

24             THE COURT:  Thank you.

25             OK.  Now, we've lost Andy again.

1          (Pause)

2          Are these two witnesses here that we've got to deal

3    with?

4          MR. ROSS:  Shall I step out and look, your Honor?

5          THE COURT:  Yes.  Let's take a look.

6          (Pause)

7          THE COURT:  Andy, do we have both counsel here?

8          THE CLERK:  Yes, Judge.

9          (Pause)

10         MR. WHITE:  I could hand that up, your Honor, if you

11   would like it.

12         THE COURT:  Thanks very much.  You can give it to my

13   law clerk.

14         MR. ROSS:  Your Honor, this is Ms. Carrillo and

15   Ms. Garcia, who I have asked to sit in the back of the

16   courtroom until your Honor directs otherwise.

17         THE COURT:  That's fine.

18         OK.  Now, Mr. Skinner, which of the witnesses is named

19   indirectly as -- which is CC-2?

20         MR. SKINNER:  Your Honor, I believe it's Cynthia

21   Garcia.

22         THE COURT:  Andy.

23         THE CLERK:  Yes.

24         (Present were counsel Gregory Cooper and Kafahni

25   Nkrumah)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1          THE COURT:  First of all, let me say to Mr. Cooper and

 2     Mr. Nkrumah, we're very grateful for your being able to respond

 3     on no notice at all.  It's very important and we appreciate it.

 4          Now, Ms. Garcia and Ms. Carrillo, I understand that

 5     the defense -- Ms. Garcia needs an interpreter.  All right.

 6     Let's get going.

 7          Do we need to swear the interpreter?

 8          THE CLERK:  No.

 9          THE COURT:  He is a house interpreter.

10          (Pause)

11          All right.  Ms. Carrillo, Ms. Garcia, do you both hear

12     me all right and understand me?

13          (Ms. Carrillo and Ms. Garcia nodded)

14          THE COURT:  OK.  I have been informed by the lawyers

15     that Mr. Datta wishes to call each of you as a witness in this

16     case.

17          Are you aware of that, Ms. Carrillo?

18          MS. CARRILLO:  Yes.

19          THE COURT:  And, Ms. Garcia, you are aware of that?

20          You need to speak

21          MS. GARCIA:  Yes.

22          THE COURT:  Yes.  OK.  Now, taking the witness stand

23     sometimes has personal implications for people, legal

24     implications.

25          Do you understand that, Ms. Carrillo?

1        MS. CARRILLO:  Yes.

2        THE COURT:  Do you understand that, Ms. Garcia?

3        MS. GARCIA:  Yes.

4        THE COURT:  And you both have various legal rights in

5   relation to the possibility of being called as a witness.  It

6   seems to me that it would be useful for each of you to have

7   those rights explained to you by a qualified attorney before

8   you make any decision about what you wish to do about

9   testifying.

10        Do you understand, Ms. Carrillo?

11        MS. CARRILLO:  Yes.

12        THE COURT:  Ms. Garcia?

13        MS. GARCIA:  Yes.

14        THE COURT:  Now, it's also relevant and important that

15   any attorney that you consult on that subject be somebody who

16   is not a lawyer for someone involved in the case, either for

17   Mr. Datta or for the government, because it should be somebody

18   who is loyal and responsible only to each of you.

19        Do you understand what I'm saying, Ms. Carrillo?

20        MS. CARRILLO:  Yes.

21        THE COURT:  And Ms. Garcia?

22        MS. GARCIA:  Yes.

23        THE COURT:  Now, time is short, but would either of

24   you like the advice of an independent lawyer before you decide

25   whether to testify and, if need be, to be here to represent you

1   when you testify, if you decide to testify?

2          Ms. Carrillo, would you like that?

3          MS. CARRILLO:  Yes.

4          THE COURT:  Ms. Garcia?

5          MS. GARCIA:  Yes.

6          THE COURT:  All right.  Now, you each have the right

7   to select your own lawyer and go out and hire somebody.  And if

8   you want to do that, I would grant a short postponement of your

9   testimony to enable you to go find somebody and hire them.

10          I am also willing to appoint at government expense

11   independent lawyers who are on the panel of lawyers that the

12   court appoints to represent people who don't have enough money

13   to hire private lawyers and who have been screened by the court

14   and selected by the court to do this kind of work, and I've

15   arranged to have two such lawyers be present here this

16   afternoon.

17          Ms. Carrillo, would you like to have me appoint a

18   lawyer for you with whom you could consult and who would

19   represent you with regard to this business about testifying in

20   this case, or would you like to go via your own lawyer?

21          MS. CARRILLO:  I would like to have a court-appointed

22   lawyer.

23          THE COURT:  And, Ms. Garcia, what do you say?

24          MS. GARCIA:  A court-appointed lawyer.

25          THE COURT:  Then, Ms. Carrillo, I am going to appoint

642

Mr. Nkrumah, who is sitting back here in the rusty colored
shirt, as your counsel.  And, Mr. Cooper, I appoint you as
counsel to Ms. Garcia.

Both of these lawyers have had cases before me
recently.  You can meet with them and consult them in
confidence.  You have a lawyer/client privilege with them.
That means that what you say to them and what they say to you
is secret unless you decide otherwise.  So whatever questions
you have, whatever advice you need, they are the people to talk
to about it.

And now, Mr. Cooper, Mr. Nkrumah, what else can I do
to make life simpler for you fellows?

MR. COOPER:  Two things as far as I'm concerned,
Judge.  You can verify whether -- as I understand that
Ms. Garcia is being called as a witness by the defense, I would
like to know if the defense has made any application to the
government with respect to immunity for Ms. Garcia, so that I
would know that, and whether or not the government has agreed
or refused to grant Ms. Garcia immunity for her testimony.

THE COURT:  I assume you would have the same question,
Mr. Nkrumah?

MR. NKRUMAH:  That is correct, your Honor.

THE COURT:  Mr. Skinner.

MR. SKINNER:  There has been no application, your
Honor.

1          THE COURT:  No application.

2          MR. COOPER:  Then I would assume that since no

3    application has been made, then I need to discuss with the

4    government whether or not they would be willing to give

5    Ms. Garcia immunity for her testimony, although I am pretty

6    sure I know what the answer would be, but just to clarify in

7    terms of advising Ms. Garcia.

8          Second, if the interpreter is available, I will meet

9    with Ms. Garcia right now, because my question to your Honor

10   is, having looked very quickly at the complaint, understanding

11   that Ms. Garcia is identified as an unindicted co-conspirator

12   in this matter, I have a very strong sense of what my advice to

13   her would be, and I don't know what the Court's position would

14   be if I informed the Court that Ms. Garcia wishes to invoke her

15   Fifth Amendment privilege against self-incrimination, how your

16   Honor would understand that.

17         THE COURT:  Let's not get the cart before the horse.

18   We'll deal with that after you have consulted your client.

19         MR. COOPER:  That is fine, your Honor.

20         THE COURT:  OK.

21         MR. COOPER:  Can I personally talk with the government

22   with respect to the question of immunity for Ms. Garcia?

23         THE COURT:  Yes.

24         All right.  Then do I correctly sense that what each

25   of you would like to do, Mr. Nkrumah and Mr. Cooper, is take

1   five minutes to meet your respective clients and then sort of

2   take a time out and meet with Mr. Skinner separately or

3   together, however you all work it out, and then get back with

4   Ms. Carrillo and Ms. Garcia?

5           MR. COOPER:  Yes.

6           MR. NKRUMAH:  Certainly, your Honor.

7           THE COURT:  Well, the jury room -- I want to check to

8   make sure it is clear.

9           MR. COOPER:  The witness room.  We met -- Mr. Nkrumah

10   and I just went over the documents very quickly.  So the

11   witness room is available.  If the conference room could be

12   opened, then I think we could use those.  In that way, if the

13   jury has any notes or anything else back there --

14           THE COURT:  You say the conference room?

15           MR. COOPER:  Well, there are two rooms back there.

16   One is a conference room and the other is a witness room.

17           THE COURT:  It probably has been 15 years since I came

18   into the courtroom through that door.  So we'll do what we can

19   about the rooms immediately in the rear of the courtroom.

20           And I think that's about as far as we can take it

21   tonight.

22           So, Ms. Carrillo and Ms. Garcia, it is very important

23   that you stay in touch with Mr. Nicaragua and Mr. Cooper this

24   evening.  They are going to need to talk to you.  You are going

25   to need to talk to them.  They are going to have to talk to the

```
 1     government.  They may want to talk to the defense, I don't
 2     know.  So there is going to be some investment of time on the
 3     part of everybody.
 4              Do you understand that, Ms. Carrillo?
 5              MS. CARRILLO:  Yes.
 6              THE COURT:  And Ms. Garcia?
 7              MS. GARCIA:  Yes.
 8              THE COURT:  OK.  This is all intended to make sure
 9     that you make an informed decision, whichever way it is, and
10     that your personal rights are protected.  That's what we are
11     trying to do here.
12              OK.  Anything else?
13              MR. COOPER:  Judge, with respect to scheduling.
14              THE COURT:  Yes.
15              MR. COOPER:  With respect to whatever decision --
16     well, let me -- if the decision is reached on behalf of my
17     client that she will invoke the Fifth Amendment privilege,
18     would you like me to notify chambers tonight or tomorrow?  I
19     don't know what your Honor's scheduling situation is in terms
20     of how you want me to deal with that.
21              THE COURT:  Well --
22              MR. COOPER:  Only because I am assuming that it is not
23     something your Honor would want to do in the presence of the
24     jury.
25              THE COURT:  That would be right.  Let my chambers know
```

 1   at 9:30 tomorrow morning if that's the case.  We're starting at

 2   10:15 tomorrow.  I gather we have about three-quarters of an

 3   hour left with the government's last witness.  The government

 4   then will rest.  The defense tell me they have an expert first;

 5   is that right?

 6              MR. WHITE:  Yes, your Honor.

 7              THE COURT:  And then are we going into these witnesses

 8   after that?

 9              MR. WHITE:  Two short witnesses.

10              THE COURT:  Two short witnesses.  So I'm not sure

11   whether we will get to these two ladies, assuming they are

12   going to testify, if that is the decision, before or after

13   lunch but we are going to get to them tomorrow, it looks like.

14              MR. COOPER:  Your Honor, I just may need the

15   assistance of chambers, because I have matters scheduled

16   tomorrow morning before Judge White in State Supreme Court, and

17   I was planning to call her tomorrow morning and tell her that I

18   will be delayed.  But I might go over there first, tell her the

19   situation, and delay that proceeding until after --

20              THE COURT:  You know Andy's number and he will be

21   helpful.

22              MR. COOPER:  I know how to get in touch with Andy.  I

23   do, Judge.

24              THE COURT:  OK.  Anything else, folks?

25              MR. SKINNER:  No, your Honor.  Thank you.

1          MR. COOPER:  If I could just have David's assistance

2     to confer with her for a while, I would appreciate it.

3          THE COURT:  Great.

4          OK.  David, are you free to do that?

5          (David Mintz, the Spanish Language Interpreter,

6     indicated affirmatively)

7          THE COURT:  Thank you.

8          All right.  Thanks, folks.

9          (Adjourned to 10:15 a.m., Thursday, September 22,

10    2011)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

RICHARD REINHARDT

Direct By Mr. Skinner . . . . . . . . . . . 470

Cross By Mr. White . . . . . . . . . . . . . 487

GABRIELLA DE LA GARZA

Direct By Mr. Bragg . . . . . . . . . . . 525

Cross By Mr. White . . . . . . . . . . . . 536

FAUSTINO GARZA

Direct By Mr. Skinner . . . . . . . . . 542

FAUSTO GARZA                                       568

Cross By Mr. White . . . . . . . . . . . . 602

MIGUEL CARRERA

Direct By Mr. Skinner . . . . . . . . . . 617

```
1                      GOVERNMENT EXHIBITS

2     Exhibit No.                                      Received

3       609 and 813   . . . . . . . . . . . . . . . 475

4       916 to 920    . . . . . . . . . . . . . . . 477

5       304   . . . . . . . . . . . . . . . . . . . 481

6       211   . . . . . . . . . . . . . . . . . . . 482

7       915   . . . . . . . . . . . . . . . . . . . 585

8       810   . . . . . . . . . . . . . . . . . . . 592

9     401-419, 425 and 401-T through 419-T, 425-T   592

10      805   . . . . . . . . . . . . . . . . . . . 617

11      815   . . . . . . . . . . . . . . . . . . . 617

12      427 427T   . . . . . . . . . . . . . . . . . 630

13      421, 421-T   . . . . . . . . . . . . . . . . 632

14      814   . . . . . . . . . . . . . . . . . . . 633

15      428, 429, 431, 434   . . . . . . . . . . . . 634

16      428-T, 429-T, 431-T 434-T   . . . . . . . . 634

17                      DEFENDANT EXHIBITS

18    Exhibit No.                                      Received

19      C   . . . . . . . . . . . . . . . . . . . . 506

20      D   . . . . . . . . . . . . . . . . . . . . 508

21

22

23

24

25
```