6/28/12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
UNITED STATES OF AMERICA,      \*
                                      \*
                                      \*
                                      \*
                                      \*
                                      \*
                                      \*
            V                         \*
                                      \*
  VIKRAM DATTA,                       \*     11 CR 102
                                      \*
                                      \*
                  DEFENDANT,          \*
                                      \*
                                      \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



DOC # 62

BEFORE:   HON. LEWIS A. KAPLAN,
          District Judge

DATES:    SEPTEMBER 22,23,26,27          2011

SOUTHERN DISTRICT COURT REPORTERS (212) 805-0300

650

19M4DAT1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                           (S1) 11 Cr. 102 (LAK)

 5    VIKRAM DATTA,

 6                   Defendant.

 7    ------------------------------x

 8
                                            September 22, 2011
 9                                          10:20 a.m.

10
      Before:
11
                        HON. LEWIS A. KAPLAN,
12
                                            District Judge
13

14                         APPEARANCES

15    PREET BHARARA
           United States Attorney for the
16         Southern District of New York
      BY:  PETER M. SKINNER
17         ALVIN L. BRAGG, JR.
           Assistant United States Attorneys
18

19    ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN PA
           Attorneys for Defendant
20    BY:  ALAN S. ROSS

21    WHITE & WHITE
           Attorneys for Defendant
22    BY:  DIARMUID WHITE

23            - also present -

24    Vanessa Quinones, Government paralegal
      SA Richard Reinhardt, IRS
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19M4DAT1

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  Good afternoon everybody.
 3              Before I bring the jury in I am informed, first of
 4    all, that both Mr. Nkrumah who I was told was here, I don't see
 5    him, he is in the hallway, and Mr. Cooper have advised that
 6    their clients are going to take the Fifth.  The question, first
 7    of all, is does anybody feel that has to be done on the record
 8    in open court or is defense prepared to accept the statement of
 9    counsel.
10              MR. ROSS:  Your Honor, I would accept the statement of
11    counsel if the government is also willing to stipulate that's
12    their position; I want it clear that's exactly what happened.
13              THE COURT:  I don't understand what that meant.
14              MR. ROSS:  You are asking one of the parties whether
15    it's OK.  The answer is yes on behalf of --
16              THE COURT:  The government doesn't get to appeal and
17    they are not trying to call the witnesses, so I didn't think
18    they had --
19              MR. ROSS:  If there were an appeal and the government
20    challenged whether that occurred.
21              THE COURT:  Fair point.  Are counsel on sides prepared
22    to accept the representation of Mr. Cooper and Mr. Nkrumah?
23    Mr. Cooper is not here yet, he will be here shortly.
24              MR. SKINNER:  The alternative being bringing in the
25    witness in, putting her on the stand.
```

19M4DAT1

1          THE COURT:  Out of the presence of the jury.

2          MR. SKINNER:  We are willing to accept counsel's

3    representation they are invoking their Fifth Amendment rights

4    in response to any questions that would be asked of them.

5          THE COURT:  Defense also?

6          MR. ROSS:  Yes, your Honor.  With respect to this

7    issue, at some point when the court feels it convenient, I

8    would like to make a proffer of the testimony I would have

9    elicited from Yolanda Carillo.  I believe Mr. White would make

10   a proffer of testimony he would have anticipated from Cynthia,

11   his witness.

12         THE COURT:  Mr. Nkrumah, I am informed that your

13   client will invoke the privilege against self-incrimination.

14   That's Ms. Carillo in response to any questions put to her if

15   she were called as a witness in this case, is that right?

16         MR. NKRUMAH:  That's correct.

17         THE COURT:  Any reason to detain either Mr. Nkrumah or

18   Ms. Carillo any further?

19         MR. SKINNER:  No, your Honor.

20         MR. ROSS:  No, your Honor.

21         THE COURT:  Thank you very much.  You are excused.  I

22   appreciate your answering the fire bell.

23         MR. NKRUMAH:  Thank you, your Honor; have a good day.

24         THE COURT:  You too.

25         As soon as Mr. Cooper comes we will deal with that.

653

19M4DAT1

1    How long will these proffers take.

2            MR. ROSS:  Little bit of a while, your Honor.

3            THE COURT:  Then we will do it later.

4            MR. ROSS:  Very well.

5            THE COURT:  Mr. White, I read over this summary of

6    what Dr. Adams would say.  I think most of it is completely

7    irrelevant, and that to the extent there is anything relevant,

8    I rather expect the government would stipulate to it.  Why

9    should we take the time?

10           MR. WHITE:  Your Honor, when we argued the motion to

11   transfer the case to Laredo, I said there is a lot about the

12   market that people in Laredo would know and you said we will

13   get an expert to come in here and describe it.  That's what I

14   set out to do.

15           THE COURT:  Among the facts that would fall under that

16   heading is what the predominant preference for luncheon food is

17   in Laredo.  It's true that people in Laredo would know that and

18   that if it were a relevant issue here, you could call a witness

19   to testify to it, but that doesn't mean that anything anybody

20   could possibly say about Laredo is relevant.

21           MR. WHITE:  That's true, your Honor, but this jury

22   heard from the government's expert on the BMPE, if I can call

23   it that, which suggested that any cash transaction nowadays is

24   drug money.  This witness among other things will testify to

25   alternate sources of cash, that it's a cash economy, that the

19M4DAT1

1    workers in Mexico get paid in cash, they prefer dollars because

2    of the stability, that there is a constant market of U.S.

3    dollars existing in Mexico along the border.

4         THE COURT:  I don't doubt that; I don't imagine

5    government doubts it either.  What's the problem with

6    stipulating?

7         MR. WHITE:  Because I want the jury to know.

8         THE COURT:  You know what happens to stipulations, you

9    read them to the jury and then the jury knows it, right?

10        MR. WHITE:  That's true, your Honor.  But it doesn't

11   have to be done through stipulation.  This is a witness who has

12   unique knowledge because of his background in both banking and

13   as an historian of Laredo's commerce.

14        THE COURT:  Look.  I am not going to prevent you from

15   calling him obviously, but I anticipate a flood of objections

16   and I anticipate a lot of them are going to be sustained.  You

17   do what you want.  You are going to call a witness to testify

18   that Laredo started as a river ford along the Rio Grande

19   centuries ago; I don't care.

20        MR. WHITE:  When I gave notice, with an abundance of

21   caution, I made the scope of the notice as broad as possible so

22   that if he goes into some area that's not within the notice, I

23   won't be precluded from going into it, so the notice is broader

24   than his testimony would be.  I want to add the government said

25   yesterday they really had no objection to this witness.  They

19M4DAT1

1    didn't move in limine to preclude it, your Honor.

2         THE COURT:  Look, we've got a jury with people on it

3    who have other commitments and I would like to get the trial

4    finished, not at the expense of the defendant's rights.  But we

5    will see how it goes; that's the best I can say.  You

6    understand my concern, I think.

7         MR. WHITE:  I do.

8         THE COURT:  Keep it to what is in fact relevant.  Keep

9    it to stuff that in fact he is an expert on.  When I read, for

10   example, that there has been a culture of smuggling in Mexico

11   for centuries, I have some reservations about whether this guy

12   knows what the cultures of Mexico in 1750 were.

13        MR. WHITE:  He does, he absolutely does.  He has a PhD

14   in history.  He has written a book on the history of

15   Mexican-United States trading since the 18th Century.  It's

16   well-documented.  I have seen the book.  It's well-researched.

17   He does, he knows this stuff.

18        THE COURT:  We will see.  Stick close to the last if

19   you repair a shoe.

20        MR. ROSS:  I want the court to know the attorneys have

21   spoken this morning.  We did do anticipate that this case will

22   conclude the evidentiary portion of it either later today, this

23   afternoon, or probably at worst tomorrow morning, and we would

24   be prepared to close the case.

25        THE COURT:  I appreciate that.

19M4DAT1

1          MR. ROSS:  Mr. Skinner suggested asking if this case

2    were to proceed to conclude, the testimony concluded at say

3    2:00 this afternoon and we had a charge conference after, would

4    the court be inclined to keep the jury, go right into closings

5    or go forward or want to think about it.

6          THE COURT:  Want to think about it.

7          Do we have Mr. Cooper yet or not?  Let's bring in the

8    jury.  When he gets here we will bring him to the sidebar.

9          MR. SKINNER:  We saw Mr. Cooper; he walked in with us.

10         THE COURT:  I gather he is in the state court right

11   now.

12         MR. SKINNER:  One other housekeeping issue.  We have a

13   couple of other phone calls we intend to publish to the jury,

14   the English-language portions of the phone calls.  We have one

15   Spanish-language call we wanted to publish, a page and a half,

16   two pages of this phone call to the jury.  It was our intention

17   to read it, have the agent read one part, I will read the

18   other.  I wanted to see if that's acceptable to the court.

19         THE COURT:  How long is it?

20         MR. SKINNER:  About two pages of a 5-page transcript.

21         THE COURT:  Any reason why we shouldn't do that.

22         MR. ROSS:  I don't know why we are not handling it the

23   same way we have handled every other transcript in the case and

24   allow the jury to read it.

25         THE COURT:  Do it that way.

657

1     MR. SKINNER:  We will read from this part to the end.

2     THE COURT:  Do it the old way.

3     MR. SKINNER:  We have not addressed this issue yet

4  because we have not published a portion of a foreign-language

5  call.  All we have done is ask very specific questions about

6  the meaning of specific words on foreign-language calls.  We

7  introduced 20 foreign-language calls most of which we will

8  address in closing.  I am asking to publish a small portion of

9  one phone call in a manner that is consistent with how we

10  ordinarily deal with this evidence in other trials.  I don't

11  think I am asking too much from defense counsel.

12     MR. ROSS:  My only concern, the court will of course

13  rule, my concern is it always seems to be problematic when you

14  have this reading because there is intonation, there is

15  influence on how words are characterized.  This is a

16  translation from a foreign language so counsel can add whatever

17  intonation it wants.

18     THE COURT:  All the other stuff thus far has been

19  English.

20     MR. SKINNER:  That's correct.

21     THE COURT:  They heard the tapes.

22     MR. SKINNER:  That's correct.  We can play the Spanish

23  tape they can read along.

24     THE COURT:  We are not playing the Spanish tape.  You

25  may do it the way you first proposed.

19M4DAT1

1          (Jury enters courtroom)

2          THE COURT:  Good morning.  The defendant and jurors

3     are present.  Mr. Cooper, come to the sidebar.  We would have

4     done this before you came back in but I didn't know when this

5     gentleman would arrive.

6          (At the sidebar)

7          THE COURT:  Mr. Cooper, I have been advised that your

8     client would invoke the privilege against self-incrimination if

9     called as a witness and asked anything relating to this case on

10    the stand.  Is that correct?

11         MR. COOPER:  While I have not spoken to her this

12    morning, last night she advised me, my following my advice,

13    that she would assert a Fifth Amendment privilege.  I notified

14    both Mr. Skinner and Mr. Ross last night by phone and emailed

15    your Honor chambers this morning to advise that fact.  Yes.

16         THE COURT:  In light of that representation, is there

17    any need to call the witness out of the presence of the jury to

18    make her invoke before me or are you satisfied that she would

19    invoke.

20         Mr. Skinner?

21         MR. SKINNER:  We are satisfied she would invoke.

22         MR. ROSS:  We are satisfied, your Honor.

23         THE COURT:  Thank you, Mr. Cooper.

24         MR. COOPER:  Can I tell her she is free to go?

25         THE COURT:  Yes.

19M4DAT1

1              (In open court)

2         THE COURT:  You are still under oath, agent.

3    Mr. Skinner.  As near as I can tell we are running ahead of

4    schedule and there is a good chance you will get the case not

5    later than Monday.

6     MIGUEL CARRERA, resumed.

7    DIRECT EXAMINATION (Continuing)

8    BY MR. SKINNER:

9    Q.  Agent Carrera, when we left off yesterday you were looking

10   at Government Exhibits 428, 429, 431, 434.  I ask you to pull

11   those four exhibits out.

12   A.  Repeat the exhibits.

13   Q.  428, 429, 431, 434.

14   A.  Yes, sir.

15   Q.  Can you to identify generally, are these all recordings and

16   transcripts of recordings of intercepted phone calls?

17   A.  Yes, sir.

18   Q.  Did you review them prior to testifying today?

19   A.  Yes, I did.

20   Q.  Identify for us generally speaking the time period in which

21   these phone calls were made?

22   A.  These calls took place at the beginning, September 10, the

23   middle around 14 September, and toward the end, September 30.

24   Q.  Who are the participants in the phone call?

25   A.  Participants of the phone calls are bank officials talking

19M4DAT1                         Carrera - direct

1    to either the defendant Mr. Datta or the defendant's employees,

2    Yolanda, I believe Cynthia is also intercepted in these calls.

3    Q.  What's the general subject matter of the phone calls?

4    A.  Basically the bank officials are trying to keep the

5    accounts open for the defendant's business, and they are having

6    conversations back and forth.  Efforts are being made for the

7    accounts to be closed, and they are trying to maintain them

8    open.

9            MR. SKINNER:  The government offers 428, 429, 431, 434

10   and the corresponding transcript exhibits.

11           MR. ROSS:  Without objection.

12           THE COURT:  Received.

13           (Government Exhibits 428, 429, 431, 434 received in

14   evidence)

15   Q.  Turning first to Exhibit 428, give us the date and time of

16   this phone call.

17   A.  The call took place on September 30, at 2:00 p.m.

18   approximately.

19   Q.  Who are the participants in the phone call?

20   A.  A person identified as Giampaolo, Yolanda and the

21   defendant.

22           THE COURT:  Excuse me.  The date of the call in

23   Exhibit 428 is what?

24           THE WITNESS:  September 10, 2010.

25   Q.  The time?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19M4DAT1                    Carrera - direct

1    A.   2:00 p.m., 1:50 to be exact.

2    Q.   What happens in the phone call?

3    A.   Basically the president of the bank calls the defendant and

4    sets up a meeting to take place on same the day at around 3:00;

5    they set up a meeting basically.

6    Q.   Turn to 429.  What is the date and time of this phone call?

7    A.   It was on the same day, September 10, 2010, a couple hours

8    after, 5:00 p.m.

9    Q.   Who are the participants in this phone call?

10   A.   A vice president of the bank David Puig, Yolanda Carillo,

11   and the defendant Vikram Datta.

12             MR. SKINNER:  I ask the jury to turn to 429T and the

13   second page of the transcript where the recorded conversation

14   starts.  We are going to start the recording right at the top.

15             (Audiotape played)

16             MR. SKINNER:  Turn to page 4 of the transcript and

17   pick up toward line 8, starting at 2:57.

18             (Audiotape played)

19   BY MR. SKINNER:

20   Q.   Turn to Government Exhibit 431.  What is the date and time

21   of this phone call?

22   A.   Four days later, September 14, 2:00 p.m.

23   Q.   Who are the participants?

24   A.   Another bank representative identified as Rita Richards,

25   speaking with Yolanda Carillo, one of the employees for

19M4DAT1                          Carrera - direct

1    Mr. Datta.

2    Q.  Are there any statements in this phone call from Yolanda to

3    the effect of who the account relationship manager is for La

4    Versailles at BBV?

5    A.  Yes, she identifies David Puig as the bank representative.

6    Q.  Turn to Government Exhibit 434.  Looking at 434T, what is

7    the date and time of this phone call?

8    A.  September 30 and the time was a little past noon, 12:23.

9    Q.  Who are the participants?

10   A.  Vice president David Puig and Yolanda Carillo.

11           MR. SKINNER:  Turn to page 2 of Government Exhibit

12   434T and start the recording at 55 seconds which is around line

13   11 on page 2.

14               (Audiotape played)

15   BY MR. SKINNER:

16   Q.  I would like to turn to Government Exhibits 439 and 440.

17   A.  Yes, sir.

18   Q.  Have you reviewed these exhibits prior to testifying today?

19   A.  Yes.

20   Q.  Describe what they are.

21   A.  These are consensually recorded calls between the

22   cooperator Ankur Gupta and the defendant Mr. Datta.

23   Q.  These were not intercepted pursuant to the wiretap

24   authorization but rather recorded with consent?

25   A.  Yes, the cooperator gave us permission to listen to his

19M4DAT1                         Carrera - direct

1   phone.

2   Q.  Mr. Gupta?

3   A.  Yes.

4   Q.  Look at 439, give us the date.

5   A.  This happened November 24, 2009.

6   Q.  440, what's the date of that phone call?

7   A.  January 1, 2011.

8           MR. SKINNER:  The government offers 439 and 440.

9           MR. ROSS:  Without objection.

10          THE COURT:  And you are offering the transcripts also.

11          MR. SKINNER:  Yes.

12          THE COURT:  439 and 440 and the corresponding T

13  exhibits are received.

14          (Government Exhibits 439, 440, 439T, 440T received in

15  evidence)

16          MR. SKINNER:  Turn to 439 to page 3 of the transcript,

17  in the neighborhood of line 24, starting at the

18  2-minute-30-second mark.

19          (Audiotape played)

20          MR. SKINNER:  Turn to 440T, page 58 of the transcript,

21  we are going to come in at the neighborhood of line 22,

22  starting at 1 hour 17 minutes 25 seconds.

23          (Audiotape played)

24          MR. SKINNER:  We are on page 58, line 23.  Back it up

25  to 1 hour 17 minutes 25 seconds.

664

19M4DAT1                        Carrera - direct

1                (Audiotape played)

2    BY MR. SKINNER:

3    Q.  Can I now ask you to turn to Exhibits 403, 426 and 401.

4    Turning first to 403T, do you have that?

5    A.  Yes, sir.

6    Q.  Turning to 403T already in evidence, directing your

7    attention to page 1 of that exhibit, do you see there, there is

8    a reference to IMEX by an unidentified female on the first

9    page.  Did the term IMEX come up in the course of the wiretaps

10   over the course of the investigation?

11   A.  Yes, sir.  IMEX is a business, another money exchange

12   business in Laredo.

13   Q.  Turn to 401.  Directing your attention to page 14 of this

14   exhibit --

15   A.  Yes, sir.

16   Q.  This exhibit is in evidence.  Can you identify the speakers

17   in this intercepted phone call.

18   A.  It's the defendant Mr. Datta, a person named Raman, and an

19   unidentified female.

20   Q.  The top of page 14, Raman says, do you know about Sahar's

21   theft, the guys are arrested now, Mr. Datta says uh uh, Raman

22   says they belong to the New York police, the thieves, Datta

23   says that's good.  In the course of the investigation did the

24   name Sahar surface?

25   A.  Yes, we know Sahar; Sahar is an associate of the defendant.

665

19M4DAT1                         Carrera - direct

1              MR. ROSS:  Objection; relevance and his basis of

2     knowledge, this is all --

3                   (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19M4DAT1                          Carrera - direct

 1          (At the sidebar)
 2          MR. SKINNER:  The basis of knowledge, the second
 3   objection, he testified to having participated in the wiretap
 4   investigation and heard the name Sahar coming up before.  The
 5   relevance is the expected testimony is that Sahar is another
 6   perfume company operating out of New Jersey owned by an
 7   individual named Rafat Khan.  There is a reference in another
 8   telephone call already in evidence that happened shortly after
 9   this one that we intend to reference in our closing argument,
10   something to the effect that Rafat is on vacation.  It's our
11   intent to argue when you couple that information with the fact
12   Rafat was a victim of a burglary with other information from
13   these phone calls --
14          THE COURT:  Very loud.
15          MR. SKINNER:  -- with other information from these
16   phone calls, that it's indicative that these individuals were
17   engaged in criminal activity, particularly money laundering,
18   and Rafat is taking a break from his money laundering activity.
19   It's difficult to put it all together right now.  A lot of the
20   phone calls are already in evidence.
21          THE COURT:  How does this agent know any of it.
22          MR. WHITE:  It's based on hearsay.
23          MR. SKINNER:  The only thing I am asking the agent to
24   do is tell me based on his review of thousands of intercepted
25   phone calls where the Sahar comes up repeatedly, his

1  understanding of what Sahar is and who owns it.  That evidence

2  is apparent to him just like the identification of one of the

3  speakers would be after a while; when you review these things

4  you start to identify players.  It's basically an

5  attribution-type testimony.  I am not going to ask him anything

6  else.  Everything else is leaps we will be asking the jury to

7  draw from what's said in the transcripts which are already in

8  evidence.

9           MR. ROSS:  Your Honor, Sahar is not alleged to be a

10 co-conspirator.  It's not an 801(d)(2)(E) statement.  I don't

11 understand why the government is playing it in terms of its

12 relevance.  Whether the fellow had some kind of burglary or

13 theft, there is discussion of people with stolen or counterfeit

14 perfume, stolen perfume, it's irrelevant to the case; it's a

15 diversion that's somehow prejudicial.

16          THE COURT:  Let's address this thing in no some

17 orderly way.  The first question is, I guests, you want to

18 elicit from this guy is Sahar or what is Sahar.

19          MR. SKINNER:  Precisely.

20          THE COURT:  Your argument is that he knows this from

21 having listened to a gazillion wiretaps.

22          MR. SKINNER:  That's correct, your Honor; he knows

23 that Sahar is a perfume company.

24          THE COURT:  Just so we don't waste a lot of time

25 unnecessarily, is there any dispute that Sahar is a perfume

19M4DAT1                        Carrera - direct

1   company or was at the time.

2          MR. ROSS:  He was in the perfume business.

3          THE COURT:  What else do you want.

4          MR. SKINNER:  Based on the intercepted phone calls, he

5   identified one of the owners of Sahar is a man named Rafat

6   Khan.

7          THE COURT:  Any dispute about that.

8          MR. WHITE:  We don't know.  I don't know.  I have no

9   idea.

10         THE COURT:  I want to know if there is any dispute

11  about it.

12         MR. WHITE:  That question is, we can neither dispute

13  nor confirm it.

14         MR. ROSS:  This is a wiretap where people talk about

15  all kinds of stuff.  I think the question we are missing here

16  is how is it relevant to proving my client is a participant in

17  the conspiracy to launder money.

18         MR. SKINNER:  With all due respect, I think your

19  relevance objection has passed.  You stipulated to the

20  admission of the phone calls and they are in evidence.  All I'm

21  asking him to do is to identify what a particular word means.

22         THE COURT:  If somewhere in the evidence that came in

23  there was a discussion of dietary habits in Laredo in 1955,

24  that means that anything related to that subject is relevant; I

25  think not.

19M4DAT1                              Carrera - direct

1          MR. WHITE:  The understanding on the stipulations.

2          THE COURT:  Please.

3          MR. WHITE:  We didn't stipulate to relevance.

4          MR. SKINNER:  Fair enough.  The relevance is related

5     to the entrapment charge, the entrapment defense.  The

6     defendant engages in two phone calls, one with this individual,

7     one with another individual, Exhibits 401 and 402.  In one he

8     engages in a coded conversation with Uzzy, a business that had

9     or had not been done.  In this other, we are going to argue

10    that the references, that those link back to the structured

11    deposits that were made in the bank in New Jersey which we

12    already heard about from agent Duffy.

13         In this one phone call we have Raman indicating that

14    Sahar was burglarized.  In the other phone call Uzzy is talking

15    about the business and we think we should photograph these

16    structured deposits, he says, of course you know Rafat is on

17    vacation.  We argue this is evidence of a predisposition to

18    commit crimes, evidence of the scope of the conspiracy, it

19    demonstrates money laundering activities in New Jersey.

20         THE COURT:  Let's come back to the first proposition.

21    What you want as a predicate to that whole argument is you

22    simply want that Sahar is a perfume company and that Rafat is

23    the owner or principal; is that the sum and substance of what

24    you want from this guy.

25         MR. SKINNER:  That's precisely what I want from this

19M4DAT1                        Carrera - direct

1    guy.  I will proffer there are numerous other intercepted

2    conversations on the wiretaps that he has described with an

3    individual named Rafat that from those conversations it is

4    obvious he worked at Sahar.  It's this kind of thing agents

5    testify to all the time as to how they identify participants in

6    a conversation.  How they identify somebody is based on what

7    they hear.

8            They are welcome to cross him on the fact he can't be

9    certain, that his knowledge is based on what he heard in the

10   phone calls, but I think he should be able to testify to this

11   limited fact.  I think the underlying link we are eventually

12   going to draw is highly relevant to the conspiracy as well as

13   the entrapment.

14          (Pause)

15          THE COURT:  In substance what you are doing, I take

16   it, is that you are offering the agent's conclusion as to what

17   Sahar is and who Rafat is based on his listening to a lot of

18   wiretaps; that's what you're doing.

19          MR. SKINNER:  Yes.

20          THE COURT:  So would it be fair to say you are

21   offering this as under Rule 701.  You are not offering it as

22   this witness's personal knowledge of any of this.  You are

23   offering it as a lay opinion based on materials to which he has

24   been exposed.

25          MR. SKINNER:  I am offering it as a summary of the

19M4DAT1                       Carrera - direct

1   remainder of the wiretap evidence, trying to shortcut

2   introducing all those phone calls with individuals with Rafat,

3   having to call a custodian of records from a phone company to

4   say the phone numbers are subscribed to by a company named

5   Sahar.  We can get there eventually; I don't think it's an

6   expert opinion on this.

7            THE COURT:  I didn't say anything about expert

8   opinion; I said lay opinion.

9            MR. SKINNER:  Yes, it's his conclusion.  I think they

10  can cross him on the fact his conclusion may be wrong.  But

11  it's based on the evidence in the case that he's reviewed.

12           THE COURT:  Why shouldn't I take it under Rule 701.  I

13  understand his relevance argument; I understand yours.  At the

14  moment he is ahead on points on relevance.

15           MR. ROSS:  If the court finds it's relevant, to me

16  this is all quite tenuous and somewhat desperate, just my view,

17  it is.  If you have evidence of a guy conspiring to do this

18  money laundering, you put it in.  You don't reach out to try to

19  connect all these dots to somehow show -- whatever, we will

20  argue it.  I would suggest that the government lead the witness

21  without objection to those two statements; Sahar is a perfume

22  business and this guy is associated with it based on your

23  knowledge of the wiretaps, so he is not up here talking about

24  all kinds of stuff he heard and his impressions of it.

25           Having said that I have one other problem, your Honor.

19M4DAT1                       Carrera - direct

1    We did announce no objection to these transcripts, but frankly,

2    I didn't look at them again, there are some very off-color

3    remarks made by the defendant.  I thought that from prior

4    discussion with the government, now what I am hearing I

5    misunderstood, that the government was going to redact out of

6    those conversations --

7         THE COURT:  We are not resolving that in sidebar.  You

8    can talk to the government and see what you can work out.  If

9    there is a problem I will deal with it.  I just want to deal

10   with this question right now.

11        MR. ROSS:  My problem is the jury is reading those

12   transcripts as we speak in the jury box.

13        THE COURT:  Talk about after it's out of the barn.

14   Those binders have been on your desk for a week.

15        MR. WHITE:  That's not fair.  We have been stipulating

16   very generously based on assumptions.  These things come in

17   wholesale.  We don't have an opportunity to --

18        THE COURT:  With all due respect you had the discovery

19   a million years ago.

20        MR. ROSS:  Not these, respectfully.

21        THE COURT:  When did you get the draft transcripts.

22        MR. WHITE:  Over the last couple of weeks.  We had

23   discussions with the government about redacting.

24        THE COURT:  I want to focus on what we came to the

25   sidebar to do.

19M4DAT1                        Carrera - direct

1           MR. WHITE:  We are concerned with the jury reading

2    them.

3           THE COURT:  They are in evidence.

4           MR. WHITE:  We are asking for the transcripts to be

5    redacted before the jury gets the books.

6           THE COURT:  It's a little late for that because they

7    are all sitting there with the books and they are all sitting

8    there with the books for a couple days.

9           MR. WHITE:  We were under the assumption the stuff had

10   been redacted.

11          THE COURT:  I can't unring the bell however the bell

12   happened to be rung.  If you can work something out, that's

13   fine; if there is something specific that you want me to rule

14   on, fine, but I can't just in the abstract unring the bell.

15   Come bank to this.  Is Mr. Ross's constructive suggestion about

16   how do deal with Sahar and the individual, whatever his name,

17   Rafat Khan, why not do that.

18          MR. SKINNER:  Fine with me, your Honor.

19          THE COURT:  That's easy.

20          (In open court)

21   BY MR. SKINNER:

22   Q.  Again, turning your attention to the top of page 14, is it

23   your understanding from your review of the wiretaps in this

24   investigation that Sahar is a perfume store located in New

25   Jersey?

19M4DAT1                        Carrera - direct

1    A.  Yes, sir.

2    Q.  I also ask you is it your understanding based on the review

3    of the wire tapes in the case that Sahar is owned and operated

4    by an individual named Rafat Khan?

5    A.  That's correct.

6    Q.  Turn to 426 and 426T.

7    A.  Yes, sir.

8    Q.  Can you identify the date and time of this phone call?

9    A.  Yes, sir.  It was March 2 -- March 29, 2010, 5:46 p.m.

10   Q.  Who are the participants in this phone call?

11   A.  It was employees Nina and Cynthia talking to the defendant

12   Mr. Datta.

13   Q.  What is the general subject matter of this phone call?

14   A.  Cynthia basically is updating the defendant Mr. Datta about

15   the money that was supposed to be received.  Mr. Datta tells

16   the employee that he spoke to the customer, did you receive the

17   money, she says I didn't receive it.  She calls a person by the

18   name of Federico and tells, the defendant again calls, I told

19   you the money has not been received.

20          MR. SKINNER:  The government offers 426 and 426T?

21          MR. ROSS:  Without objection.

22          THE COURT:  Received.

23          (Government Exhibits 426 426T received in evidence).

24          MR. SKINNER:  Turn to 426T, page 2, starting at the 14

25   second mark which is about line 9.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

19M4DAT1                      Carrera - direct

1              (Audiotape played)

2            MR. SKINNER:  Turn to Government Exhibits 430 and 432.

3    While you are turning, I would like to republish a portion of a

4    stipulation, 804 already in evidence.  In Government Exhibit

5    804, the parties agree that on June 18, 2009, agents of the

6    Drug Enforcement Administration and other law enforcement

7    officers executed a search warrant at the business of ET

8    Perfumes, located at 15895 Northwest 15th Avenue, Miami,

9    Florida.  The parties further stipulated, I am summarizing, the

10   stipulation is already in evidence, that the owner of ET

11   Perfumes was arrested.  It is first stipulated that the

12   telephone number 305-627-9411 is registered no ET Perfumes.

13   BY MR. SKINNER:

14   Q.  Look at Exhibits 430 and 432; tell us what those are.

15   A.  Basically calls taking place between the intercepted phone

16   line of the defendant and calling that 305-627-9411 phone.

17             (Continued on next page)

19mddat2                          Carrera - direct

1              MR. SKINNER:  Your Honor, the government offers 430,

2      432 and the corresponding transcripts.

3              THE COURT:  Received.

4              (Government's Exhibits 430, 432, 430-T, 432-T received

5      in evidence)

6      BY MR. SKINNER:

7      Q.  Agent Carrera, I now want to direct your attention to

8      Government Exhibits 424 and 420.

9              First, with regard to 424, can you give us the date

10     and time of the phone call and the participants in the phone

11     call?

12     A.  September 25, 2010, at 3:52 p.m.  And the participants are

13     the defendant, Mr. Datta, and one of the employees, Cynthia

14     Garza.

15     Q.  Agent, what is the general subject matter of the phone

16     call?

17     A.  The employee is basically updating the defendant as to how

18     much money was received, just updating him on all the money

19     that came in basically.

20             MR. SKINNER:  Your Honor, the government offers 424

21     and 424-T.

22             MR. ROSS:  Without objection.

23             THE COURT:  Received.

24             (Government's Exhibits 424 and 424-T received in

25     evidence)

19mddat2                          Carrera - direct

1   BY MR. SKINNER:

2   Q.  Agent Carrera, can we now turn to Government Exhibit 420?

3   A.  Yes, sir.

4   Q.  Can you tell us the date and time of this call and the

5   participants?

6   A.  This was September 3, 2010, at 8 p.m., and the participants

7   is again the defendant, Mr. Datta, and the other employee,

8   Yolanda Carrillo.

9   Q.  What is the general subject matter of this phone call.

10  A.  Again, the employee is updating Mr. Datta as to how much

11  money was received.

12           MR. SKINNER:  Your Honor, the government offers 420

13  and 422.

14           MR. ROSS:  Without objection, your Honor.

15           THE COURT:  Received.

16           (Government's Exhibits 420 and 422 received in

17  evidence)

18  BY MR. SKINNER:

19  Q.  Agent Carrera, can I now ask you to turn to Exhibit 423 and

20  423-T.

21           What is the date and time of this phone call?

22  A.  September 21, 2010, and the time is 3:53 p.m.

23  Q.  And who are the participants in this phone call?

24  A.  The defendant, Mr. Datta, and Cynthia Garza, the other

25  employee.

19mddat2                          Carrera - direct

1    Q.  What is the general subject matter of this phone call?

2    A.  Cynthia basically tells him that Miguel called and that he

3    wants -- he wants to -- he's updating -- she updates the

4    defendant that basically that I called, and I said we wanted to

5    hold a meeting in San Ysidro and we then wanted to pick up the

6    merchandise in San Ysidro also.

7              MR. SKINNER:  All right.  Your Honor, the government

8    offers 423 and 423-T.

9              MR. ROSS:  Without objection.

10             THE COURT:  Received.

11             (Government's Exhibits 423 and 423-T received in

12   evidence)

13   BY MR. SKINNER:

14   Q.  Now, Agent Carrera, to back up for a moment, you said

15   that -- you referred to yourself in the first person.  You said

16   "I called."  Is that right?

17   A.  That is correct, sir.

18   Q.  Now, did you have any role in the undercover investigation

19   in this case?

20   A.  Yes, sir.

21   Q.  What role did you play in the undercover investigation in

22   this case?

23   A.  I had several phone calls with Cynthia basically just

24   assuming that I was working alongside Mario and setting up a

25   meeting.

19mddat2                          Carrera - direct

1   Q.  And in this -- the call that is referenced here on

2   September 21st, had you spoken to Cynthia prior to this about

3   setting up a meeting with Mario?

4   A.  Yes, sir.

5   Q.  All right.  And just generally, what had you and Cynthia

6   discussed?

7   A.  I just informed her that Mario wanted to meet at the end of

8   the week, which is the 27th or 28th, in the San Diego area and

9   that we may want to pick up the perfume that we had ordered

10  over there also.

11  Q.  All right.  At this point in time, were there any plans to

12  give -- to wire money to La Versailles?

13  A.  Yes, sir.

14  Q.  What was the plan?

15  A.  For us to wire money and to purchase the perfume and to

16  have another meeting with the defendant.

17          MR. SKINNER:  OK.  Can I ask the jury to turn to

18  423-T, the first page of the transcript.

19          And I'll ask Ms. Quinones to start it at the 20 second

20  mark, which should bring us in around where Cynthia Garza says,

21  "Miguel said that" -- you know, we'll continue from there.

22          (Tape played)

23          MR. SKINNER:  You can stop it there.

24          Let's pick it up, then, again on the second page.

25  Ms. Quinones, can we pick up at the 1-minute 16-second mark.

680

19mddat2                    Carrera - direct

1    And we don't have the benefit of line numbers, but if you look

2    about a third of the way down the page, where Vikram Datta says

3    "Hello" and Cynthia Garza responds "Yes," we should come into

4    the call around there.

5                (Tape played)

6                MR. SKINNER:  You can stop it there.

7    Q.  Agent Carrera, can I now ask you to turn to Government

8    Exhibit 438 and 438-T?

9    A.  Yes, sir.

10   Q.  Do you have that there?

11   A.  I do.

12   Q.  Do you recognize this, these exhibits?

13   A.  Yes, sir.

14   Q.  Can you give us the date and time of this phone call?

15   A.  This happened on November 19, 2010, at 5:22 p.m.

16   Q.  And can you tell us the participants in this phone call?

17   A.  The defendant, Mr. Datta, and Cynthia again.

18   Q.  And what, generally speaking, are they discussing?

19   A.  They are discussing basically sending money to Mexico and

20   whether they should use wire transfers or not.

21   Q.  Can I ask you to turn to page 2 of the transcript.

22               MR. SKINNER:  And, Ms. Quinones, I will ask you to

23   start at about the 10-second mark, and ask you to bring us in

24   at the top of the phone call.

25               (Tape played)

19mddat2                        Carrera - direct

1              MR. SKINNER:  You can stop it there.

2              Your Honor, just so the record is clear, the

3    government offers 438 and 438-T after the fact.

4              THE COURT:  Received.

5              (Government's Exhibits 438 and 438-T received in

6    evidence)

7    Q.  Agent Carrera, could I now ask you to turn to 422 and 408.

8    A.  Yes, sir.

9    Q.  And have you reviewed 422 and 408 prior to testifying

10   today?

11   A.  Yes, sir, I did.

12   Q.  And what is the general time period of these -- again, are

13   these two intercepted phone calls that have been recorded?

14   A.  Both of these calls occurred on September 17, 2010, at

15   approximately 7 p.m.

16   Q.  All right.  And what is the general subject matter of these

17   phone calls?

18   A.  There is a discussion about collecting money in Mexico and

19   sending people to collect money over there.

20             MR. SKINNER:  Your Honor, the government offers 422

21   and the corresponding transcript for 422.

22             THE COURT:  Just 422, is that right?

23             MR. SKINNER:  Yes.  I was going to clarify.  408 is a

24   phone call that's half in Spanish, half in English.  The

25   Spanish portion has been covered by a stipulation and we were

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

19mddat2                         Carrera - direct

1    going to offer the English portion.

2              THE COURT:  All right.

3              MR. SKINNER:  Why don't I just offer 422 and 408.

4              THE COURT:  Any objection to 422 and 422-T?

5              MR. ROSS:  No objection, your Honor.

6              THE COURT:  Received.

7              (Government's Exhibits 422 and 422-T received in

8    evidence)

9              MR. SKINNER:  Turning to 422 first, I ask the jury to

10   turn to that transcript in their binders.

11             And, Ms. Quinones, if we can start at the 22-second

12   mark of the call, and that should bring us in at the top of the

13   phone call.

14             (Tape played)

15   BY MR. SKINNER:

16   Q.  And can you now, Agent Carrera, turn to 408-T.

17             MR. SKINNER:  I ask the jury to turn to 408-T in their

18   transcripts.

19   A.  Yes, sir.

20   Q.  And can we turn to the third page of the transcript?

21   A.  Yes, sir.

22   Q.  And do you see toward the bottom of the page, where it says

23   "Vikram," and he says, "What's up, handsome?"

24   A.  Yes, sir.

25   Q.  Now, prior to this portion of the call, can you tell us who

683

19mddat2                         Carrera - direct

1    had been intercepted speaking on this phone call?

2    A.  It was Cynthia and Polo.

3    Q.  And they were speaking in Spanish, correct?

4    A.  I believe so, yes, sir.

5            MR. SKINNER:  And then, Ms. Quinones, can I ask you to

6    start the recording at 1:24, and we are going to listen to

7    it --

8    Q.  Let me ask you, Agent Carrera, who speaks starting where

9    the attribution is to Vikram?

10   A.  The defendant, Mr. Datta.

11           MR. SKINNER:  And I would ask you to start at 1:24,

12   and we will now read on into the English portion of the phone

13   call.

14           (Tape played)

15           MR. SKINNER:  You can stop it there.

16           Can I now ask everyone to turn to page 9?

17           We are going to pick up the transcript at the bottom

18   of page 9 with the speaking that is attributed to Polo.

19           And, Ms. Quinones, can I ask you to start the

20   recording at the 5-minute mark.

21           (Tape played)

22           MR. SKINNER:  You can stop there.

23   Q.  Agent Carrera, can I now ask you to turn to Government

24   Exhibit 416 and 416-T.

25   A.  I'm sorry.  Just 416, you said, and 16-T?

19mddat2                      Carrera - direct

1    Q.  Yes.  416-T is what I am focusing on.

2         MR. SKINNER:  Your Honor, 416 and 416-T have been

3    stipulated into evidence, and we wanted to publish a short

4    portion of this phone call which was in Spanish by reading it

5    to the jury.

6    Q.  I ask, Agent Carrera, for you to turn to page 3 and read

7    the part that's attributed to Gerardo Lopez and I'll read the

8    part that's attributed to Cynthia.   OK?

9    A.  Starting from the top, sir?

10   Q.  Starting where Gerardo Lopez says "Listen."

11        "Gerardo Lopez:  Listen, but I wanted to ask you,

12   because Don Fer says that you no longer -- that you can't

13   receive money from him.

14        "Cynthia:  Oh, oh, oh, when have I said that, sir?  I

15   don't even -- I don't even talk to Don Fer?

16        "Gerardo Lopez:  What I'm getting at is that, like,

17   you wanted to ask him for identification and all those things.

18        "Cynthia:  Never.  Do you know what happened the last

19   time?  Oh, but I've already told you.  A lady came to bring her

20   money --

21        "Gerardo Lopez:  Mm.

22        "Cynthia:  And the moment Nina asks her, what is your

23   na...?  Because she signed, right, the lady signed.  We always

24   have them sign the -- the receipt.  What is your name?  Nina

25   asked her, to be able to write down there what the lady's name

19mddat2                         Carrera - direct

1   was.  She said, no, I can't give you my name; ask Don Fer.  And

2   I told Nina, no problem, Nina.  Put down Don Fer, Don Fernando.

3   That Don Fernando brought it to you, in other words...

4           "Gerardo Lopez:  Yes.

5           "Cynthia:  Don't write down the person.  I never asked

6   her for identification.  Let him come and say it to me.

7           "Gerardo Lopez:  Uh, exactly.  No, you know what he

8   told me?  He told me something that's OK, well, good.  So

9   there's no problem.

10          "Cynthia:  What?

11          "Gerardo Lopez:  He said, tell her that, uh, that

12  money that you will send with Versailles, I'd better leave it

13  for Rosi in the store.  What do you think?

14          "Cynthia:  No.

15          "Gerardo Lopez:  How come?

16          "Cynthia:  No, no, no.  He has to bring it to me.

17  Rosi is separate.  No, Rosi is not with me.  Rosi doesn't have

18  my account.  No.  He has to bring it to me.  I'm not -- I'm not

19  in, in the store; there's no -- in the store, and besides, Rosi

20  can't take my money.  I have to take it.  But what's Don

21  Fernando's problem, when I don't even ask for anything?  What's

22  the problem?

23          "Gerardo Lopez:  Well, I don't think he wants to sign

24  anything.  I think he doesn't even want to --

25          "Cynthia:  But the lady want upset because she signed.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19mddat2                          Carrera - direct

1   She m -- it seems she got annoyed when Nina asked her, may I

2   have your name, please?  And ma'am said, no, no, I can't give

3   you my name.  You all settle that with him.  I said -- I

4   said -- I answered, I said to her, no problem; I told Nina,

5   write down that Don Fernando brought it to you.  When have I

6   asked them for identification?  Never.

7          "Gerardo Lopez:  Yes.

8          "Cynthia:  Never, ever, ever.  Never.  He shouldn't

9   lie.  I'm telling you, because you're my customer.  I never ask

10  for identification."

11         MR. SKINNER:  And we'll stop there.

12         One moment, your Honor.

13         THE COURT:  Yes.

14         (Pause)

15         MR. SKINNER:  All right.  Your Honor, we have nothing

16  further for this witness.

17         THE COURT:  All right.  Let's take a break.

18         THE CLERK:  All rise.

19         (Recess)

20         THE CLERK:  Jury entering.

21         (Jury present)

22         THE COURT:  OK.  The jurors and the defendant all are

23  present, as they have been throughout.

24         Mr. Ross.

25         MR. ROSS:  Thank you, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19mddat2                    Carrera - direct

1    CROSS-EXAMINATION

2    BY MR. ROSS:

3    Q.  Good morning, Agent Carrera.

4    A.  Good morning, sir.

5    Q.  Agent Carrera, what I'd like to talk to you about is the

6    ride after Mr. Datta was arrested coming out of a restaurant

7    that you spoke about on January 15th of 2011.  OK?

8    A.  Yes, sir.

9    Q.  All right.  And you told us some of the things that he

10   said.  Did you take notes during that?

11   A.  No, I did not.

12   Q.  OK.  Among the things that he said -- and correct me if I

13   am wrong -- you said he waived his Miranda rights?

14   A.  That is correct.

15   Q.  So you gave him the right to remain silent and all of that

16   and he waived those rights?

17   A.  The other agent that was with me read the rights, and, yes,

18   he did, sir.

19   Q.  That would be Agent Post?

20   A.  Yes.

21   Q.  OK.  But you were present for that?

22   A.  Yes, sir.

23   Q.  And you witnessed all the conversation that we're talking

24   about?

25   A.  I took part in some of it, yes.

19mddat2                          Carrera - cross

1    Q.  And, in fact, what Mr. Datta said was that he felt that it

2    was his duty as an American to assist the government in any way

3    that he could?

4    A.  Yes, sir.

5    Q.  And he agreed to talk to the agents -- to you, to Agent

6    Post -- without an attorney being present?

7    A.  That's correct.

8    Q.  All right.  He had been told that he was under arrest for

9    money laundering?

10   A.  Yes, sir.

11   Q.  He told you and Agent Post that there must be some

12   misunderstanding because he --

13             MR. SKINNER:  Objection.

14             MR. ROSS:  Part of the same statement, your Honor.

15             THE COURT:  Sustained.

16   BY MR. ROSS:

17   Q.  OK.  Did he tell you that cash business is the way business

18   is conducted --

19             MR. SKINNER:  Objection.

20             THE COURT:  Sustained.

21   Q.  Did you tell us everything on your direct examination that

22   Mr. Datta told you and Agent Post in that ride, sir?

23   A.  I'm sure that there are things that he said additionally

24   that were not in the report.

25   Q.  And how long was the conversation -- how long was the ride?

19mddat2                          Carrera - cross

1   A.  About -- I would say about 20 minutes or so.

2   Q.  And did you start talking with him and Agent Post talk with

3   him even before you left on the ride, while you were in the

4   car?

5   A.  I'm sorry.  Can you rephrase the question?

6   Q.  Yes.  Did the discussion with Mr. Datta begin before you

7   actually pulled out, before you started to drive?

8   A.  We got him in the car.  The other agent jumped in front of

9   me.  I started driving.  And Agent Post started reading him his

10  rights.

11  Q.  OK.  You are saying it is about 20 minutes?

12  A.  Yes, sir.

13  Q.  All right.  So how many more things do you think Mr. Datta

14  told you in that ride that you haven't told us about here yet

15  today?

16          MR. SKINNER:  Objection.

17          THE COURT:  Sustained.

18  BY MR. ROSS:

19  Q.  Did Mr. Datta acknowledge knowing Mario as an acquaintance?

20  A.  Yes, sir.

21  Q.  Did Mr. Datta acknowledge that his friend Octavio had been

22  kidnapped?

23  A.  Yes, sir.

24  Q.  Did Mr. Datta acknowledge that he tried to help Octavio's

25  family after he was kidnapped?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

690

19mddat2                          Carrera - cross

1    A.  I believe so, yes.

2    Q.  Did Mr. Datta acknowledge that he did call Mario, the

3    undercover agent, regarding the kidnapping?

4    A.  Yes, sir.

5    Q.  Did he acknowledge that Octavio, who had been kidnapped,

6    used to be a perfume customer?

7              MR. SKINNER:  Objection.

8              THE COURT:  Sustained.

9    Q.  Did he acknowledge that -- well, strike that.

10             Did you ask him who some of his perfume customers were

11   in Mexico?

12             MR. SKINNER:  Objection.

13             THE COURT:  I'm sorry.

14             (Pause)

15             THE COURT:  Sustained.

16   Q.  Did Mr. Datta tell you who his perfume customers were in

17   Mexico?

18             MR. SKINNER:  Objection.

19             THE COURT:  I'll take it as a "yes" or a "no."

20   A.  Yes, sir.

21   Q.  Did Mr. Datta acknowledge filing 8300 forms?

22             MR. SKINNER:  Objection.

23             THE COURT:  Sustained.

24   Q.  Did you ask Mr. Datta why his customers deal in cash?

25   A.  Yes, sir.

19mddat2                    Carrera - cross

1   Q.  Did Mr. Datta acknowledge that they do so to avoid paying

2   taxes to the Mexican government?

3                MR. SKINNER:  Objection.

4                THE COURT:  Sustained.

5                MR. ROSS:  I have no further questions.  Thank you.

6                THE COURT:  Thank you.

7                Anything else, Mr. Skinner?

8                MR. SKINNER:  No, your Honor.  Thank you.

9                THE COURT:  The witness is excused.  Thank you.

10               (Witness excused)

11               MR. SKINNER:  Your Honor, the government rests.

12               THE COURT:  Let me just see counsel at the sidebar

13   briefly.

14               (At the sidebar)

15               THE COURT:  Is any motion by the defense going to be

16   short and sweet, or is it really going to be some significant

17   discussion?

18               MR. ROSS:  I can make it as short as the Court wishes.

19               THE COURT:  No.  If you feel you need time, we will

20   just arrange to do it in a way that you will get the time.  But

21   if it is going to be short and sweet, I can take it right now.

22               MR. ROSS:  I think a couple of minutes more than a

23   sidebar would allow for would be appropriate but not much more.

24               THE COURT:  OK.  Any objection to proceeding with any

25   defense case before I hear that motion, reserving the motion to

19mddat2

1    you when I get to it, and then we'll just let the jury go to

2    lunch a little early?  And then I'll hear your motion.

3            MR. WHITE:  Can you give us an idea of when you would

4    hear it?  How far would we be into the defense case?

5            THE COURT:  How long will it take you to deal with the

6    motion?  10 minutes?  20 minutes?

7            MR. ROSS:  At most.  At most.

8            THE COURT:  So we would go another 15 or 20, 25

9    minutes and then we would send the jury out for a slightly

10   longer lunch than usual and then I will take your motion.

11           MR. WHITE:  That's fine.

12           THE COURT:  Thank you.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

19mddat2

```
 1              (In open court)
 2              THE COURT:  OK.  Defense case.
 3              MR. WHITE:  Your Honor, the defense calls John Adams.
 4              THE COURT:  We're not starting with George Washington?
 5              (Pause)
 6              MR. WHITE:  Mr. Ross is getting Mr. Adams, your Honor.
 7              THE CLERK:  Mr. Adams, please take the stand.
 8              Sir, if you can please remain standing and raise your
 9     right hand for a moment.
10     JOHN ADAMS,
11         called as a witness by the defendant,
12         having been duly sworn, testified as follows:
13              THE CLERK:  Thank you.  Please be seated.
14              Please state your name and spell your last name for
15     the record.
16              THE WITNESS:  John Adams, A-d-a-m-s.
17              THE COURT:  You may proceed, Mr. White.
18     DIRECT EXAMINATION
19     BY MR. WHITE:
20     Q.  Good afternoon, Mr. Adams.
21              Where do you presently reside?
22     A.  I live in College Station, Texas, north of Houston.
23     Q.  Is College Station known for any particular institution?
24     A.  Texas A&M University.
25     Q.  Have you had associations during your life with Texas A&M
```

19mddat2                        Adams - direct

1    University?

2    A.   I have.  A great deal.

3    Q.   Could you tell us your educational background, Mr. Adams?

4    A.   I graduated from high school in Managua, Nicaragua, and

5    went to Texas A&M and received my BA, master's and Ph.D. at

6    Texas A&M.

7    Q.   What was your Ph.D. in?

8    A.   It was in history with a specialization in business in

9    Latin America.

10   Q.   In addition to receiving a Ph.D. in history from Texas A&M,

11   did you do any other graduate study?

12   A.   I did.  I went to SMU, Southern Methodist, in Dallas, the

13   banking school there.

14   Q.   Did you get any degrees from the banking school at SMU?

15   A.   I did.  It was the equivalent of a master's.

16   Q.   Have you served in the Military, sir?

17   A.   Yes.  I was commissioned out of the Corps., Texas A&M, into

18   the United States Air Force.

19   Q.   What rank did you hold?

20   A.   I entered as a captain.

21   Q.   Have you ever -- what is your current occupation, sir?

22   A.   I am currently living in College Station doing consulting

23   and working with Texas A&M on economic development projects as

24   well as doing research in areas that I have an interest in.

25   Q.   How do you define your field?

1   A.  I have been in business most of my life, whether it is in

2   banking or economic development, and so my degree was a

3   business history degree.  So I'm more in the business side and

4   dealing with trade and finance and the economic situations as

5   it involves with Mexico, Latin America and the United States.

6   Q.  You also have a Ph.D. in history also, correct?

7   A.  Correct.

8   Q.  Do you do anything based on that degree?

9   A.  Sure.  I do.  I continue to write and publish and do

10  articles.

11  Q.  Are you currently doing anything in your role as a

12  historian?

13  A.  Yes, I am.  I am working on a new monograph for Mexico and

14  I am doing a project for Texas A&M.

15  Q.  Have you ever resided in Laredo, Texas?

16  A.  I have.

17  Q.  When did you reside in Laredo, Texas?

18  A.  I was there from the late '80s, 1990 through a decade, the

19  entire decade through 2000.

20  Q.  And what did you do during that decade while you were in

21  Laredo?

22  A.  I went down there to do consulting initially with the banks

23  on handling the Mexican debt after the Brady bond meltdown,

24  after the radical devaluation of '86/'87, during that period.

25  As a result of that, I joined a local bank, Union National

19mddat2                          Adams - direct

1    Bank, in Laredo in their international department.

2    Q.   During that decade, were you involved in banking in Laredo?

3    A.   Yes, I was.

4    Q.   How many banks were you employed at?

5    A.   Well, I was with Union that was bought out by -- which

6    became Wells Fargo, and then later I worked with Bank One, but

7    all in Laredo, all in the international banking area.

8    Q.   And from that -- after that decade, from 2000 to 2005, did

9    you also work in and reside in Laredo?

10   A.   Yes.  After being in banking and since the bulk part of my

11   banking experience was in dealing with companies and

12   multinationals, I left the banking environment and went to the

13   Laredo Development Foundation as the president or executive

14   director and CEO, which was the economic development entity for

15   Laredo in south Texas to deal with industry and employment

16   expansion in that region.

17   Q.   In that role, and in your role in working with banks, did

18   you become familiar with the cross border trade between the

19   United States and Mexico?

20   A.   Oh, most definitely.  I daily -- almost daily dealt with

21   it; for sure weekly was dealing with all -- every aspect of

22   transportation, finance, shipping, locations, distribution.

23   Q.   Have you published any books, sir?

24   A.   I have.  Probably the three -- I've done 10 or 11, but the

25   three that might be most germane to this is I did a book on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19mddat2                          Adams - direct

1   Mexican banking in transition after the '95 devaluation.

2   Q.   Devaluation of what?

3   A.   The Mexican peso, the radical devaluation that really upset

4   the economy.

5              Then I later did a book called "Bordering the Future,"

6   the impact of Mexico with the United States and the role of the

7   border in that transition.

8              And then just a couple of years ago, I did a book on

9   Laredo called "Commerce and Conflict on the Rio Grande," a look

10  at Laredo's economic development over the last couple of

11  hundred years

12  Q.   From what years to what years?

13  A.   Laredo was founded officially in 1755, but it had been a

14  trading spot probably with Indians years before that.  So from

15  1755 to 1955 was this first volume.

16  Q.   You say "first volume."  Are you working on another volume?

17  A.   I am.  The idea is to go from -- the reason it ended in '55

18  is that there was a major flood that wiped out the entire

19  region, so that was the benchmark.  And to do the second half,

20  from '55 currently, to take in NAFTA, the trade, the changing

21  environment that's happened since 1955.

22  Q.   1955 to the present?

23  A.   Correct.

24  Q.   Do you have any teaching experience?

25  A.   I have.  I've taught at Texas A&M International, it is a

19mddat2                          Adams - direct

1    branch of A&M in Laredo, in banking and finance.  I've lectured

2    in Mexico, Costa Rica, Athens, Greece, Tokyo, Japan on trade

3    business relations and economic development and finance.

4    Q.  Have you ever testified before any Congressional or

5    legislative bodies?

6    A.  I have, both at the state and national level.

7    Q.  What was the general subject?

8    A.  The general subject was trade, finance, border commerce and

9    transportation at both in Texas and in Washington before House

10   subcommittees on trade and the impact of trade to the border.

11   Q.  Have you been to Mexico, sir?

12   A.  I have.

13   Q.  Have you traveled there?

14   A.  The entire -- just about the entire country.

15   Q.  How many times would you say you've been to Mexico?

16   A.  Oh, I guess hundreds.  I was -- you know, I was in and out

17   of it.  It was like driving to work.  I was -- Laredo is right

18   on the border; it's only feet from the border.  So I normally

19   crossed it.

20   Q.  Did you travel to the interior of Mexico?

21   A.  I did.  I believe I've been to almost -- I believe I've

22   been to every of state, all 30 states -- 30 or 31 states.

23          MR. WHITE:  Now, if I may show the witness what I've

24   marked for identification as Defendant's Exhibit F?

25   Q.  And do you recognize this, sir?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

19mddat2                        Adams - direct

1   A.  Sure.  It's Mexico.

2   Q.  And what is also on there in addition to Mexico?

3   A.  Well, you have Mexico and then straight across you have the

4   four border states of Texas, New Mexico, Arizona and

5   California.

6           MR. WHITE:  Your Honor, I offer Defendant's Exhibit F,

7   your Honor.

8           THE COURT:  Received.

9           (Defendant's Exhibit F received in evidence)

10  BY MR. WHITE:

11  Q.  Could you indicate on the map where Laredo, Texas is, sir?

12  A.  It's right here.

13  Q.  OK.  Now, indicating here?

14  A.  Correct.

15  Q.  OK.

16  A.  There you go.  I've got it.

17  Q.  Could you indicate where McAllen, Texas is?

18  A.  It's right down the border.  Right there.  It's south of

19  Laredo, towards the Gulf of Mexico.

20          (Pause)

21          MR. WHITE:  Do the jurors have the map now?

22          THE COURT:  They do.

23  Q.  So maybe we could start again and you could --

24          THE COURT:  I don't think the cities are going to

25  move.  They are right on the map.  Let's move on.

700

19mddat2                          Adams - direct

1              MR. WHITE:   OK.

2   Q.   Could you locate Nogales, Arizona on this map, sir?

3   A.   Nogales is on border in Arizona, right -- I made a mark.

4   Just to the left of that mark.

5   Q.   Do you know where San Ysidro, California is?

6   A.   Yes.   It's right east of -- it starts over here -- of San

7   Diego and Tijuana.   It's a land border crossing.

8   Q.   At Tijuana, is that what you are saying?

9   A.   Yes.   It is a little bit east of Tijuana.

10   Q.   Have you been there?

11   A.   I have.

12   Q.   Now, looking into Mexico, could you identify -- indicate

13   where Mexico City is?

14   A.   Mexico City is right there.   It is a federal district, like

15   Washington, with about 16 million people right in the heart of

16   Old Mexico.

17   Q.   And Guadalajara, could you indicate where that is?

18   A.   Guadalajara is over here towards the coast in the State of

19   Jalisco.

20   Q.   OK.   And Monterey?

21   A.   Monterey is right at the bottom of the red mark, below

22   Laredo.

23   Q.   How far from Laredo is Monterey?

24   A.   Oh, a hundred-and-30, 40 miles at most.

25   Q.   Now, in general terms, what is the economy of Laredo based

19mddat2                          Adams - direct

1   on?

2               MR. BRAGG:  Objection.

3               THE COURT:  Sustained.

4   Q.  Is there -- well --

5               THE COURT:  It is a little broad.

6               MR. WHITE:  OK.

7   Q.  What is the principal commerce in Mexico?

8   A.  In Mexico?

9   Q.  No.  In Laredo.

10  A.  In Laredo.  It's trade.  It's business.  It's cross border

11  trading goods and services.

12  Q.  How large is Laredo in terms of the country as a whole, the

13  United States as a whole, in cross border trade?  What role do

14  they play?

15  A.  Laredo, as a port of entry is -- ranks fourth or fifth

16  behind New York, Long Beach, San Francisco as an international

17  commerce center in the United States.

18  Q.  And with respect to Mexico specifically, how does Laredo

19  rank?

20  A.  It is the number one -- even though Mexico will tell you

21  it's Veracruz, it's the number one port of entry into Mexico

22  ahead of Veracruz, which is a coastal city in the south.

23  Q.  In Laredo itself, in Laredo itself, is there a

24  well-developed merchant -- well-developed merchant

25  establishments along the border with Mexico?

702

19mddat2                          Adams - direct

1   A.  Yes, there is.  They bump right up against the river and

2   the city is full of merchants --

3   Q.  And who shops in these stores?

4          MR. BRAGG:  Objection.

5          THE COURT:  Sustained.

6   Q.  Is the economy of Laredo based solely on purchases or

7   business from American citizens?

8   A.  No.  Only about 30 percent, I would say, 25 to 30 percent

9   is American.

10  Q.  And what is the other 70 percent?

11  A.  70 percent are Mexican citizens coming up to shop and buy

12  things on the border, in Laredo.

13  Q.  And based on your research and your experience, can you

14  tell us the reasons that shoppers from Mexico come over the

15  border to shop in Laredo?

16         MR. BRAGG:  Objection.

17         THE COURT:  Certainly sustained in that form.

18  Q.  What advantages does Laredo offer to people in Mexico that

19  they couldn't get in Mexico when they seek to shop?

20  A.  The Mexican customer traditionally over the years, for the

21  last hundred years, thinks there is a major advantage to coming

22  there for the quality of merchandise, the variety.  It is --

23  they feel they'll get better value for their money; it will

24  stretch farther.

25         They don't pay taxes there because they are able to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19mddat2                        Adams - direct

1    take it back across the border with them.   They bring their
2    families there.   They just see a tremendous value.   Say buying
3    a pair of Levi bluejeans are worth more buying them in Laredo
4    than they are buying them in the interior.
5    Q.  For how long has Mexicans comprised the majority of the
6    shoppers in Laredo, based on your research and experience?
7               MR. BRAGG:  Objection.
8               THE COURT:  Sustained.
9               (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

19M4DAT3                              Adams - direct

1    BY MR. WHITE:

2    Q.  Is this a recent phenomenon you just described of the

3    attraction that Laredo offers to people coming from Mexico?

4                MR. BRAGG:  Objection.

5                THE COURT:  Sustained.

6    Q.  When you were working in Laredo from 1990 to 2005 in the

7    banking and related business, did you see people coming from

8    Mexico to shop in the stores in Laredo?

9    A.  Yes, I did.

10   Q.  Where did you see them?

11   A.  In the downtown district, the banks, supermarkets, the big

12   box stores, and all levels of commerce in Laredo and all the

13   border cities I did business in.

14   Q.  Do any bridges cross from Mexico into Laredo?

15   A.  Yes, there are three.

16   Q.  What kind of bridges are the three?

17   A.  What kind of bridges, two primary, there's four, actually

18   four, first, a railroad bridge, technically, the other, the

19   first two, the oldest two in downtown and the primary bridge

20   empties right across the river since all these cities are twin

21   cities, empties right into the commercial district into the

22   foot of Laredo, then the fourth bridge is down the river which

23   is a commercial truck, international trade bridge.

24   Q.  The bridge that you described entering right into the

25   commercial part of Laredo, have you seen Mexican people coming

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

19M4DAT3                          Adams - direct

1    across the bridge?

2    A.  The line is usually about 7 -- 100 yards long, 150 people

3    all the time lined up coming into the country to shop, into

4    Laredo.

5    Q.  Based on your research and experience, is there part of the

6    Laredo commerce, is it also wholesale?

7    A.  Yes, it is.

8    Q.  What does the wholesale business, is it wholesale into

9    Laredo, excuse me into Mexico, or over wholesale all over the

10   country?

11   A.  It is wholesale from Laredo by entity or it could be a

12   retail entity or a standalone company that buys in volume and

13   sells wholesale into Mexico.

14   Q.  What kinds of wholesalers are there?

15   A.  They are in everything, medical equipment, in farma, in

16   cloth, bolts of cloth, I've never seen so much cloth in my

17   life, farm equipment, machinery, tools, electronics is very

18   big, any type of volume they can sell.

19   Q.  Are there any perfume stores at the entry point across the

20   bridge?

21   A.  There are a number of perfume stores there.

22   Q.  Among the wholesalers based on your research and

23   experience, is perfume also wholesale into Mexico?

24   A.  Yes, it is.

25   Q.  How do you know that?

19M4DAT3                        Adams - direct

1    A.   I know that because I have in the stores, I have seen it in

2    Mexico.   It's a high value item; they like to buy that type of

3    stuff in Mexico.   Probably the two most popular things in

4    Mexico are perfume and candy.   They have a tremendous sweet

5    tooth in Mexico.

6    Q.   Based on your experience in banking -- withdrawn.

7             When you were in the banking field in Laredo, did you

8    have customers of the bank who were retailers and wholesalers

9    in Laredo?

10   A.   Yes, I did.

11   Q.   Can you tell us based on your years in Laredo, your

12   research and experience whether the purchases, in what form of

13   payment was the retail sales made?

14   A.   Generally it was made in cash probably 95 percent of the

15   time.

16   Q.   How about wholesale?

17   A.   Wholesale is cash also.

18   Q.   Based on your experience and your research, can you

19   indicate why it was in cash?

20   A.   Well --

21             MR. BRAGG:   Objection.

22             THE COURT:   Sustained in that form.

23   Q.   Would it be accurate to describe the commerce between

24   Laredo and people in Mexico as a cash economy?

25   A.   Yes.

19M4DAT3                        Adams - direct

1    Q.  Do you know how, during the time you were in Laredo and

2    your experience, how Mexican workers in Mexico, how are they

3    paid?

4    A.  The majority are paid in cash.  I would say 70 to 80

5    percent are paid in cash.

6    Q.  Do they have credit cards anywhere near to the extent that

7    Americans have credit cards?

8             MR. BRAGG:  Objection.

9             THE COURT:  Sustained.

10   Q.  In your experience in banking while you were in Laredo, did

11   you witness substantial credit card accounts from people who

12   were in Mexico shopping in Laredo?

13            MR. BRAGG:  Objection.

14            THE COURT:  Sustained; no foundation at least.

15   Q.  What is the basis for your indicating that Mexicans pay

16   predominantly in cash in Laredo?

17   A.  The amount of deposits that we receive at the banks, at the

18   banks, my bank, all the banks received, were deposits in cash.

19   As you know there, credit cards produce a receipt, a slip that

20   you would deposit and somewhere between generally less than 10

21   percent were credit card receipts and the majority at all

22   levels, whether from hotels or retail, the distributors, the

23   wholesalers were in cash too, and the deposits.

24   Q.  Was the cash U.S. dollars?

25   A.  It was largely U.S. dollars but there were some pesos.

19M4DAT3                          Adams - direct

1    Q.  What time period are you talking about when you say there

2    were some pesos?

3    A.  Primarily prior to the radical devaluation in '95, pesos

4    and dollars were interchangeable in the stores in Laredo, but

5    after the radical devaluation, the dollar which is already very

6    important in trade, was generally the only thing that was

7    accepted.  The customer had to obtain dollars to give the

8    merchants.  Many merchants still dealt with pesos but they

9    would exchange pesos for them into the dollar equivalent at the

10   time of the purchase.

11   Q.  Merchants where, in Laredo?

12   A.  Merchants in Laredo.

13   Q.  What would they do?

14   A.  A customer could either, if a customer came in with pesos,

15   most of them had dollars because they already probably changed

16   the dollars when they came over, if they had pesos, there was

17   constantly interchange.  This is a border economy.  Wherever

18   you have two countries, if you have a dynamic economy where you

19   have a dual language, dual culture, dual everything, so you

20   have a dual use of the currency.  The dollar is the primary

21   store wealth, but the peso, the point is the peso is still used

22   and can be used in transactions.

23   Q.  You talk about the devaluation of the peso in 1995, what

24   effect did that have on the desirability of having pesos or

25   having U.S. dollars in Mexico?

19M4DAT3                        Adams - direct

1    A.  It was already desirable to have dollars but when the peso

2    devaluated it went from approximately 3 to 1 to about, well,

3    officially it was 7 to 1, but in the hyperness of inflation, it

4    went up to 12, in some places 12 to 1.  Obviously if you held a

5    dollar the day after, you would not get 3 pesos, you would get

6    12 or so in the right exchange market.  So the store value is

7    in the dollar.

8    Q.  What would be the sources, if Mexicans have U.S. dollars,

9    what would be the sources of those dollars?

10             MR. BRAGG:  Objection.

11             THE COURT:  Sustained.

12   Q.  Do you know the sources, from your research, from your

13   experience in banking, and from your general knowledge of

14   Mexico, do you have knowledge of the sources of U.S. dollars in

15   Mexico; do you have knowledge of that?

16   A.  Yes, direct knowledge.

17   Q.  What direct knowledge?

18   A.  Hotels we dealt with received dollars from tourists, even

19   European tourists pay dollars when they come to Mexico,

20   basically everywhere else in Latin America.  They are not to

21   going to take Bulgarian money in Mexico, they will only take

22   dollars.  Farm workers, we had a tremendous farming sector,

23   stretch all the way across Arizona and California, these farm

24   workers stretched across the border are paid in cash, dollars.

25   They would go home and send it.

19M4DAT3                          Adams - direct

1          Remittances, each year over $20 billion in dollars is

2    sent back from Mexican workers who work in the United States.

3    The United States paid Guadalajara alone sends, let me get the

4    number right, close to 900,000 Social Security checks just to

5    American retirees in Guadalajara.  The dollars are going in by

6    wire or cash.

7          MR. BRAGG:  Objection, your Honor.

8    A.   The merchants --

9          THE COURT:  Stop please.  There has been an objection.

10         MR. BRAGG:  Yes, your Honor.

11         THE COURT:  Just ask a new question; this is beginning

12   to become a thesis.

13   Q.   You mentioned a little earlier in your testimony that

14   Mexicans coming into Laredo could exchange pesos for dollars

15   before they come across the border; where would they do that?

16   A.   I will list them all; if they can go to a bank, they go to

17   a bank.

18   Q.   Take your time.

19   A.   They go to the bank, they go to a casa de cambio which is a

20   an exchange house, they could go to a hotel, do it in the

21   hotel, they could do it with the bell capital at a hotel.  I

22   have changed a lot of pesos with taxi drivers in Mexico cities

23   to where I had pesos left over, I was going to the airport,

24   handed them pesos, they gave me dollars.  Pharmacies for some

25   reason since they have a lot tourists who buy stuff, someone's

19M4DAT3                          Adams - direct

1   coming to the United States, they can go to a pharmacy and the

2   pharmacist says I will change it.   It's a rather fluid economy

3   to change the money.

4           MR. WHITE:   Nothing further.

5           THE COURT:   Cross-examination.

6           MR. BRAGG:   Thank you, your Honor.

7           THE COURT:   Let's break here.   We have some business

8   to do.   Members of the jury, see you back at 2:00.

9           (Jury leaves courtroom)

10          (Witness excused)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19M4DAT3

```
 1                THE COURT:  I will hear any motions.
 2                MR. ROSS:  Thank you, your Honor.  Defendant,
 3     Mr. Datta, pursuant to Rule 29, Federal Rules of Criminal
 4     Procedure, moves the court for a judgment of acquittal as to
 5     all three counts of the indictment.
 6                Count 1 is a conspiracy to violate Section 1956 and
 7     subsections specifically that the government has alleged and
 8     traveled on is that which provides that Mr. Datta would have to
 9     have conspired with another person, one or more persons, for
10     the purpose of receiving moneys that were represented by at
11     least an agent or law enforcement agent of the United States
12     who was authorized to make the representation that they were
13     drug proceeds.  I recognize the distinction between a
14     conspiracy and the substantive offense in making this argument
15     to the court.
16                THE COURT:  The argument is what exactly?
17                MR. ROSS:  First, who did he conspire with in the
18     sting operation.  The only people that the evidence shows had
19     any knowledge of any kind of suggestion of impropriety, a
20     person doesn't become an unwitting co-conspirator.  I expect
21     the government is going to argue that the conversations between
22     the defendant and Cynthia, who is back at his office, putting
23     her together with the undercover agent about handling this
24     transaction for $38,000 and change, is a co-conspirator.
25                I suggest to the court there is not an iota of
```

19M4DAT3

1    evidence with regard to the sting operation that there was any

2    other person other than law enforcement agents and arguably

3    Mr. Datta that had any knowledge whatsoever that would have

4    made them co-conspirators.

5         Somebody who is employed in the normal and ordinary

6    course of business for Mr. Datta, as was Cynthia, as an

7    example, as was Roxana who testified, as an example, who have

8    no reason to be suspicious of or have any knowledge of a

9    transaction that could arguably violate 1956 can't be

10   conspirators.

11        THE COURT:  Dr. Adams, would you please give you a

12   little privacy.  Thank you.  Point one is no evidence of any

13   conspirator other perhaps than Mr. Datta and government agents.

14        MR. ROSS:  And no knowledge by Mr. Datta.

15        THE COURT:  No knowledge of?

16        MR. ROSS:  That was represented to be drug proceeds.

17   The evidence, the transaction that we are talking about where

18   someone would have had to have conspired.  Interestingly that

19   count alleges that it begins on August 9 and goes through

20   January; that particular count is the undercover operation.  So

21   somebody had to have some knowledge that it was drug proceeds.

22   The uncontroverted evidence is that it was said to be drug

23   proceeds on September 27, which is a month or so after the

24   transaction.

25        There is no evidence that any co-conspirator other

19M4DAT3

1    than a federal agent knew that there had been any

2    representation, whether it be September 27 or at any time.    If

3    the government wanted to argue there was something said before

4    that time that should have put someone on notice, none of that

5    was ever communicated.    There is not an iota of evidence that

6    that's the case.

7              Independent of the lack of a co-conspirator and

8    certainly a lack of a co-conspirator with knowledge of its

9    unlawful matter, I suggest to the court this case, the sting

10   operation makes out a case of entrapment as a matter of law,

11   objective entrapment.    Your Honor, it is uncontroverted that

12   the information that the government had before the sting

13   operation and then what they learned from their investigation

14   afterwards does not in any way show that Mr. Datta was

15   predisposed in any way and had a predisposition.

16             The government has an obligation when entrapment is

17   raised to rebut the claim of entrapment, and within their own

18   case, the evidence is problematic I think.    It's clear that

19   Mr. Datta was targeted by law enforcement because he was in the

20   perfume business and took cash.    That's as much as they knew.

21   They started their operation.    Their operation resulted in, the

22   only inquiry about his knowledge about whether this was drug

23   money or not, he says I don't know.    Then you have those two

24   calls, November 24, the phone calls on November 24, and phone

25   calls on January 19, in which he is invited to participate in a

19M4DAT3

1   money drop kind of situation, money laundering situation, and

2   says no.

3        It is unusual that we have this kind of testimony

4   about the kind of intensity and aggressiveness that law

5   enforcement apparently viewed this target with, but we have

6   that in this case, March 1.  Then we have March 2, which the

7   government didn't even make a pitch on March 2 to get this

8   going.  There was nothing.  March 2 was a meeting with Jose.

9   Nothing happened.  He is a customer from Mexico.  That's all

10  that was represented and nothing happened.

11       It is not illegal to sell perfume for cash.  It is

12  only illegal to sell perfume for cash if you have knowledge

13  that it's derived from unlawful activity.  I suggest that the

14  uncontroverted evidence has not been disputed by the

15  government's case that shows, first, a lack of predesignation,

16  a desire not to participate in criminal activity, is lured and

17  lured by what.  In the few-minute conversation, there were two

18  conversations on August 9, I believe 103 and 104.

19       The 103 conversation takes just a few minutes.  The

20  agent Mario Recinos said that he and Roberto, who was some kind

21  of law enforcement related person, went outside of the perfume

22  venue and had this brief conversation.  In that brief

23  conversation, in just those few minutes, it went from we want

24  to do 40, $50,000 a week at the beginning to, just that

25  conversation went to a couple of million dollars a month.

19M4DAT3

```
 1              This makes the government's effort look like chump
 2      change.  This is a classic case of entrapment.  The guy says I
 3      don't want to do it.  We are going to offer you more money than
 4      you could possibly make in any way in your life and they get
 5      him then  to engage in a transaction that precedes by a month
 6      and three days their telling him it was drug proceeds.
 7              Count 2.
 8              THE COURT:  Let me deal with Count 1 so we keep them
 9      straight.  Let me hear from the government on Count 1.
10              MR. SKINNER:  The first argument I understand there to
11      be is there were no co-conspirators.  I proffer there is ample
12      evidence of multiple co-conspirators, both known and unknown.
13      Cynthia and Yolanda, Mr. Datta's two trusted employees in the
14      business, there is evidence both of them were knowing
15      participants in the conspiracy.
16              With regard to Yolanda, there is evidence that after
17      the money was received, $40,000 bulk cash deposited in San
18      Ysidro, that deposit information was sent to Yolanda, evidence
19      from the defendant stating to law enforcement that Yolanda was
20      responsible for filing 8300 forms.  There is evidence that no
21      8300 form was ever filed with respect to that bulk cash.
22              We feel it is a reasonable inference from that that
23      Yolanda was intentionally not filing 8300 forms in connection
24      with this cash deposit even though she was regularly filling
25      8300 forms in connection with other cash deposits at that
```

19M4DAT3

1    point.  That's indicative of her participation in the

2    conspiracy and her knowledge.

3              With regard to Cynthia, there are multiple recordings

4    independently establishing Cynthia's participation in the

5    conspiracy.  We have testimony from Roxana Beltran that when

6    she learned of this customer coming into their store to make a

7    purchase that exceeded anything they had ever done, when she

8    learned they were coming, when she realized they didn't have

9    sufficient stock of perfume in order to make the sale, she

10   contacts Cynthia.  Cynthia tells her give him whatever else you

11   have in the store, give him whatever you have.  Cynthia

12   ultimately has to step in and arrange for the perfume to be

13   sent from Laredo to San Ysidro.

14             There is a recorded telephone conversation, Government

15   Exhibit 23, which occurs after the San Ysidro meeting where

16   Cynthia and Datta are discussing what they anticipate to be the

17   next perfume sale to Mario.  As agent Carrera testified this

18   morning, he had been communicating with both Cynthia and Datta

19   to try to set up this meeting.  They were expecting to wire

20   $50,000 to store for the purchase of perfume.

21             In this conversation Cynthia and Datta discuss how

22   they are going to go about doing it.  Datta informs Cynthia,

23   what, we should use L & D rather than San Ysidro.  That relates

24   to the wire instruction into which stores.  He said we should

25   not have San Ysidro involved in this.  These are the folks who

19M4DAT3

1    are not knowledgeable about what's going on here, let's keep it

2    in house in Laredo.  He says we should do the pallet here, and

3    for Mr. Mario especially, we have no invoice, we don't have to

4    receive, we don't have to document this.  He asks Cynthia what

5    do you think, and her response is, well, I think we probably

6    should do an invoice.

7              There is evidence here of conversation between two

8    co-conspirators about how they should go about concealing this

9    transaction with Mr. Mario.  There is ample evidence that

10   Cynthia was regularly involved in the receipt of cash,

11   regularly involved in documenting how that cash came in.  The

12   fact that for this particular transaction with this particular

13   customer, she's having this recorded conversation with Vikram

14   Datta where they are discussing handling it differently than

15   they ordinarily would.

16             We would suggest that is evidence of Cynthia's state

17   of mind and the fact that, I will note for this conspiracy we

18   just have to show that she believed the proceeds were illegal.

19   We will be able to argue to the jury they can make a reasonable

20   inference from the fact that Cynthia knew what was going on and

21   that she was assisting Datta in covering up this purchase that

22   they were planning with the undercover.

23             THE COURT:  Is there any reference to any evidence of

24   a representation prior to September 27 that it was drug money?

25             MR. SKINNER:  Yes, ample evidence of that.  The phrase

19M4DAT3

1    drug money was never used but this was an undercover operation

2    where they had just met this man, Mario had just met this man

3    for the first time in August.  We are bleeding now into the

4    entrapment argument a little bit.

5            Before I get there, to put a marker on the other

6    co-conspirators, I would also argue that the government's

7    position is this was an ongoing conspiracy that run up until

8    the time of defendant's arrest in January.  There were

9    statements defendant made in the December meeting, as well as

10   in the January meeting to the effect that he was working with

11   others to try to set up a corporation to do the wire transfers

12   and other things that the undercovers had proposed to him, that

13   any of these individuals could be co-conspirators.

14           In particular, he mentions Octavio by name and says he

15   is in.  So there is sufficient evidence there to point to

16   Octavio as a member of this conspiracy, and I think there is

17   sufficient suggestion from the defendant's own words that he

18   was talking and working with other unnamed co-conspirators at

19   that point in time.

20           To move on to the entrapment argument, with regard to

21   the suggestion that it was drug proceeds, it's an undercover

22   operation.  We are going to be arguing in closing that

23   undercover officers for obvious reasons, the jurors can derive

24   from their own experience might not say the first time they

25   meet target, hey, we are running kilos for the Sinaloa cartel,

19M4DAT3

1  that criminals in actuality oftentimes speak in code.

2         We plan to reference back to Mr. Datta's own

3  conversations with Uzzy indicating that he would use code when

4  referring to people, that he would talk around subjects when

5  talking about criminal activity.  It was not unusual for the

6  undercovers not to come in first moment with a name tag on

7  their chests saying Sinaloa cartel, to maybe start with a

8  softer suggestion of what they were doing.

9         With regard to the actual undercover operation, the

10  idea that we went to this man repeatedly and he said no is

11  simply contradicted by the evidence.  The initial meeting in

12  October between the Guptas and the defendant was unplanned.  At

13  that point, we were looking at Mr. Datta.  We were not planning

14  an operation with respect to him.  We heard that he had come

15  up.  We were already suspicious of his company because of the

16  existence a SAR, because his company was popping up in

17  documents that had been seized in search warrants at ET

18  Perfumes in Miami as well as in the search warrant with regard

19  to Nandansons in New Jersey.

20         He was there.  He was on the radar.  We say he comes

21  up, let's see what we can find out about this guy, we will wire

22  you up.  No instruction about trying to engage in criminal

23  activity.  The instruction is to see what you can find out

24  about how he does his business, where the cash is coming from.

25  That's what they do, they talk to him and they get a lot of

19M4DAT3

1    information from him about the fact he is receiving huge cash

2    deliveries.  He boasts of a $1.3 million cash delivery from

3    Octavio.

4         They asked him point-blank, do you know where the

5    money is coming from.  He didn't say no.  He didn't say I am

6    certain it's clean.  His answer was I don't know.  That's

7    consistent with defendant's position throughout the entirety of

8    the operation.  The defendant's efforts to avoid knowing the

9    truth of what should have been plain on its face are

10   staggering.  That's what happened in the first meeting.

11        The next two recorded phone calls, we put them in so

12   everybody could see what exactly was said in the phone calls in

13   November and January with Ankur Gupta.  Defense counsel

14   suggested in opening that he said no.  I suggest if you look at

15   it, he didn't say no at all.  He said in the first phone call,

16   they said, can we have the money cash delivered, can you send

17   it up to us.  He said cash can be a problem because people are

18   coming in, I kicked some people out because of cash, but so

19   long as it's documented then I can do whatever you want.  If I

20   have this slip from customs, I'll put it in your name, a

21   reference to what he does in the general scheme here, which is

22   filed the 8300s incorrectly, then I can do whatever you want.

23        There is no no there.  In contrast, there was an

24   acceptance of the offer to do something.  The call in January,

25   I don't think really is criminal.  Here they are just talking

19M4DAT3

1    about the logistics, if we ship some product down to you for

2    our customers in California to pick up, can we do that, and

3    Mr. Datta says, quite understandably, sure, not my business, I

4    don't have a problem with that.  He certainly doesn't say no to

5    any kind of criminal activity that was suggested by the

6    undercovers.

7              Then March, we have a preliminary meeting between

8    Roberto and Jose.  There wasn't any criminal activity suggested

9    in this meeting.  They were trying to meet the guy, they were

10   trying to get in.  But it was suspicious.  They were introduced

11   to this man as people who move cash.  We went through in the

12   testimony, the court pointed out some of the instances where

13   these guys said to him they moved cash.  That's not the kind of

14   thing a normal merchant says.

15             Then we flash-forward to August; now we have the real

16   meat of the matter.  We have Mario get in.  We finally have the

17   defendant engage, talk to them.  Within moments of meeting

18   these guys at dinner, he starts talking dirty.  There were a

19   lot of suggestions, I have now wound up to answer your Honor's

20   question, a lot of suggestions in this meeting that it's drug

21   money.  I will concede the words drug money, narco dollars,

22   Sinaloa cartel, some of the more direct evidence of drug money

23   that arose in this case did not come up until later in the

24   course of the undercover operation, in the course of the

25   conspiracy.

19M4DAT3

1          But they did say quite a bit.  They talked about money

2     coming from down south, talked about, they referenced Colombia,

3     they referenced the fact that they need to move their money

4     down.  I don't have the outline in my closing with me.  There

5     is a lot there.

6          The response of this defendant is indicative of the

7     fact that he understood what was going on.  His immediate

8     response is to say things like, you know, send me a chilango

9     with a passport, that's one way we can do this, another thing

10    we can do, I open up my perfume boxes, you can shove the money

11    inside.

12         This is within moments of meeting these guys.  After

13    we get this all done, I don't want to see you people no more, I

14    don't even know where you get your money from, it's not my

15    business.

16         THE COURT:  Let's move on to Count 2.  Thank you.

17         MR. ROSS:  One thing to Count 1 in response.

18         THE COURT:  Briefly.

19         MR. ROSS:  What evidence is there on the planet that

20    any of that was shared with another person who could be a

21    co-conspirator.  None.

22         Count 2 charges the typical 1957, I say typical

23    because I think the earlier sting operation is somewhat

24    different, 1957 violation.  The government has to prove

25    differently in this count, again a conspiracy, however, that

19M4DAT3

1    the proceeds that are being conspired to launder are, in fact,

2    in fact, drug proceeds.

3         Your Honor, what we heard is, we had heard about an

4    economy in Mexico where people apparently don't pay taxes.  We

5    heard about an economy in Mexico where there is a 3 percent or

6    more fee, bank fee.  We heard about an economy in Mexico that

7    is a cash economy, that they cannot, perhaps we have not heard

8    from an expert on Mexican law, but what we have heard is in

9    Mexico there is a problem and the banks are not allowed to take

10   large volumes of cash or cash at all even apparently and that

11   all of these reasons contribute to cash being used across the

12   border to purchase retail and to purchase wholesale.

13        You have a situation where the defendant's business

14   does everything to comply, perhaps imperfectly, if the

15   government wants to criticize how the 8300 forms were filled

16   out, when they started filling them out, but again this

17   conspiracy is alleged to have occurred between June 2009 and

18   January 2011, not before that.

19        The question I think becomes, because the testimony is

20   that this fellow Fausto was in the business in 07 and 08 of

21   paying customers' bills in Mexico for perfume stores and that

22   there was no evidence that it was at all drug money.  So he

23   says that there were circumstances from which now the

24   government wants the jury and your Honor, I guests, to conclude

25   that there is a basis to conclude that it's in fact drug money.

19M4DAT3

1             The only other testimony came from Hilario.  All he
2    did was parrot what he heard from Fausto which was an opinion.
3    But there is no evidence that it is in fact drug money.  There
4    is no evidence that even had it been drug money, that it was
5    known by this defendant or anybody that he conspired with.  I
6    appreciate the argument that the government may make about
7    people who act in concert with one another don't have to have
8    an express agreement.  I am familiar with the jury instruction
9    on conspiracy.

10            But notwithstanding that fact, they have to be of like
11   minds.  You can't have a co-conspirator without like minds.  So
12   while it may be the case that Fausto had the mentality that he
13   thought he was bringing over drug money and had reason to think
14   it was because of the rate, how it was packaged, and all the
15   circumstances he described, the reverse argument is now true as
16   to Count 2 as I made to Count 1.  Where is any evidence that
17   Mr. Datta knew any of that.  He was rather specific about not
18   having told anybody.  Hilario bristled when he was asked, did
19   you tell anybody, no, no, I wouldn't tell anybody.  And then
20   Fausto, the same thing; did you ever share that with him or any
21   of his employees, absolutely not.

22            So the question becomes again in this conspiracy, who
23   is the conspirator other than anybody.  Who is a conspirator.
24   Where have they shown some understanding or agreement to
25   launder proceeds.  The mere act of people acting in a way that

726

19M4DAT3

1    may further some goal that may be consistent with one another

2    is not evidence of itself of a conspiracy.  I appreciate the

3    government does not have to put on an express agreement, but

4    they have to put on something.  I don't think there is

5    something in this case.

6          They have not in fact shown that it's drug money.

7    They have not shown that even if were in fact shown to be drug

8    money, or a sufficient showing that it was communicated to the

9    defendant or anybody that the government can show he conspired

10   with.  Your Honor, that's Count 2.  That's my argument.

11         THE COURT:  Thank you.

12         Briefly.

13         MR. SKINNER:  As a threshold point, I don't think we

14   need to prove it was in fact drug money.  It's a conspiracy.  I

15   just need to prove there was an agreement to launder actual

16   proceeds of narcotics as opposed to something that was

17   represented to me.  There is ample evidence here that actual

18   drug money was involved.  Two cooperating witnesses testified.

19   One testified expressly that he believed it was drug money and

20   one provided all the circumstantial evidence as to why it was

21   drug money, where it was coming from, the price he got for it,

22   etc., etc.

23         THE COURT:  Your case on this is conscious avoidance.

24         MR. SKINNER:  Yes.  I don't think we have to rely on

25   conscious avoidance.  In the December 7 phone call, the

19M4DAT3

1  defendant says it all.  I know for sure a lot of customers,

2  there is a lot of cash coming to me, I am reporting everything

3  under their name, I am pretty sure they are taking their

4  discount someplace, it's all Sinaloa money.  He's talking about

5  his business.  This is something that was said in the course of

6  the undercover operation.

7          THE COURT:  Which exhibit is that?

8          MR. SKINNER:  Exhibit 107T, bottom or page 32, top of

9  page 33, the defendant summarizes his conspiracy.

10         THE COURT:  32 on to 33.

11         MR. SKINNER:  The very bottom, we can do the right

12  number, then he continues, yeah, yeah I had to, then he

13  continues.

14          (Pause)

15         THE COURT:  OK.

16         MR. SKINNER:  There is ample evidence of the

17  conspiracy, acknowledgement of agreement between the defendant

18  and other co-conspirators acting in concert to launder the

19  actual proceeds of narcotics.  As a final point, it's all

20  buttressed by the expert's testimony how the black market peso

21  exchange works.  It's exactly in lockstep with how he explained

22  how the black market peso exchange worked in the Datta

23  mechanism for laundering narcotics proceeds.

24         THE COURT:  Thank you.  Count 3.

25         MR. ROSS:  Count 3, a conspiracy alleged also

19M4DAT3

1    beginning June 2009 through January 2011, a conspiracy to

2    transport across the border money that is supposed to be drug

3    money.  Again it's supposed to in fact be drug money.  Your

4    Honor, there is no evidence that Mr. Datta conspired with any

5    person to do that.  But I think, I don't understand.  There is

6    no conversation about transport.  Any transportation that was

7    ever discussed, people bringing money across the border.  I

8    take that back, there really is none.

9         We have conversations where Fausto calls Cynthia and

10   says I am sending you this, I am sending you that, whatever

11   inferences may be drawn from it, but there is no evidence that

12   there was an understanding or agreement that drug money, and

13   that has to be the state of mind.

14        THE COURT:  What about the portion of Exhibit 107 to

15   which Mr. Skinner just referred.

16        MR. ROSS:  Your Honor, it is clear what was said in

17   December 7 but, your Honor, I think the circumstances, this is

18   a difficult one for me to say to the court in a judgment of

19   acquittal as opposed to closing argument to a jury.  The fact

20   is that the government, look at the circumstances that

21   presented on December 7.  This man had already been frightened

22   away, I suggest, because he sent the money back on September 27

23   when it's the first overture where they say this is Sinaloa, I

24   work with Sinaloa was that reference.

25        On December 27, I am sorry, November 18, his dear

19M4DAT3

1    friend, we have all the tape recordings about Octavio gets

2    kidnapped and this man believes that he should be sucking up

3    to, pardon the expression, and doing whatever he can to engage

4    Mario who he now believes is somehow a Sinaloa cartel member to

5    assist in the safe return of his friend Octavio.  That's when

6    this occurs, December 7.  The transcript says, the only reason

7    I am here, that's why I am here, he says, is because of

8    Octavio.  Octavio was still kidnapped, was not released until 8

9    days later on December 15.

10                   There is ample reason why this man would say whatever

11   it is he is going to say, but I don't believe that by him

12   saying that he has some opinion that his customers, that's how

13   I take that conversation, he is referring to his customer

14   taking a discount somewhere, his speculation that it's Sinaloa,

15   90 percent of this Sinaloa, makes it in fact the case and makes

16   it in fact his state of mind given the circumstances of the

17   conversation.

18                   THE COURT:  Thank you.

19                   Motions denied as to Counts 2 and 3.

20                   I will reserve on Count 1.

21                   MR. SKINNER:  Thank you, your Honor.

22                   THE COURT:  See you at 2:00.

23                   (Lunch recess)

24                   (Continued on next page)

25

730

19mddat4                      Adams

```
1                    A F T E R N O O N   S E S S I O N

2                            2:07 p.m.

3    JOHN ADAMS,

4         Resumed, and testified further as follows:

5              THE CLERK:  Jury entering.

6              (Jury present)

7              THE COURT:  OK, folks.  The jurors and the defendant

8    all are present.  The witness is still under oath.

9              Cross-examination.

10             MR. BRAGG:  No, your Honor.

11             THE COURT:  OK.  Well, Dr. Adams, had I known that, I

12   would have sent you back to Texas before lunch, but thank you

13   very much.

14             THE WITNESS:  Thank you, Judge.

15             (Witness excused)

16             THE COURT:  OK.  Next.

17             MR. WHITE:  The defense calls Fred Chalmers,

18   C-h-a-l-m-e-r-s.

19             THE CLERK:  Sir, if you could please take the stand.

20             Please remain standing and raise your right hand.

21   FRED CHALMERS,

22        called as a witness by the defendant,

23        having been duly sworn, testified as follows:

24             THE CLERK:  Thank you.  Please be seated.

25             If you can please state your name and spell your last
```

731

19mddat4                          Adams

1    name for the record.

2              THE WITNESS:  Fred Chalmers, C-h-a-l-m-e-r-s.

3              THE COURT:  You may proceed, Mr. White.

4    DIRECT EXAMINATION

5    BY MR. WHITE:

6    Q.  Good afternoon, Mr. Chalmers.

7              How old are you, sir?

8    A.  55.

9    Q.  Where do you live?

10   A.  Middletown, New Jersey.

11   Q.  How long have you lived there?

12   A.  50 -- about 55 years.

13   Q.  Are you presently employed?

14   A.  No, sir.

15   Q.  What was your last employment?

16   A.  La Versailles.

17             THE COURT:  I'm sorry?

18             THE WITNESS:  La Versailles.

19   Q.  You were employed by La Versailles?

20   A.  Yes.

21   Q.  And where did you work out of?  Did you work out of

22   Middletown or someplace else?

23   A.  Yes.

24   Q.  What dates did you work at La Versailles?

25   A.  I started July 1.

732

19mddat4                          Chalmers - direct

1   Q.   Of what year?

2   A.   Of 2010.

3   Q.   OK.   Until when?

4   A.   January.

5   Q.   January 2011?

6   A.   Yes.

7   Q.   And your employment terminated at that point?

8   A.   Yes.

9   Q.   Why did it terminate?

10          MR. SKINNER:   Objection, your Honor.

11          THE COURT:   Sustained.

12   Q.   Were you a salaried employee?

13   A.   Yes.

14   Q.   Prior your employment at La Versailles, what had your

15   career consisted of?

16   A.   I had been in the fragrance industry basically all of my

17   life.   I spent 19 years at L'Oreal, two years at Puig, and

18   actually prior to L'Oreal, Halston for four years.

19   Q.   You said Puig.   How do you spell that?

20   A.   P-u-i-g -- Puig, Puig.

21   Q.   And what did your responsibilities entail, just generally,

22   at those companies?

23   A.   I was the AVP of operations at L'Oreal.   I was responsible

24   and directed customer service, distribution, warehousing,

25   returns, logistics, and very similar duties at Puig.

19mddat4                          Chalmers - direct

1    Q.   And who hired you to work at La Versailles?

2    A.   Pardon me?

3    Q.   Who hired you to work at La Versailles?

4    A.   Vikram.

5    Q.   Vikram Datta?

6    A.   Yes.

7    Q.   And what were the tasks that you were assigned to do?   What

8    were the principal tasks you were assigned to do when you were

9    hired?

10   A.   I was to bring more of a corporate feel, corporate attitude

11   to the retail stores, responsible for developing policies,

12   procedures, guidelines, training staff, developing staff --

13   Q.   All with respect to the retail stores?

14   A.   Exactly.

15   Q.   And what was their condition at that time that they needed

16   your services?

17   A.   A lot of manual type operation.   It was more of a mom/pop

18   operation and Vikram wanted to bring it up a level, develop, as

19   I mentioned, efficiencies, reports, information, communication,

20   things of that sort, and develop a personnel policy for all the

21   stores so everything was operating similarly.

22   Q.   And how many retail stores were there when you were

23   employed by La Versailles?

24   A.   I believe when I started there were nine and I think three

25   additional opened, for a total of eleven, if I'm not mistaken.

19mddat4                          Chalmers - direct

1    Q.  Were there plans to open up additional stores that you

2    would be involved in as managing --

3    A.  Yes.

4    Q.  Did you visit any of the stores?

5    A.  Yes.  I visited the stores in Laredo and California.  The

6    only stores I did not get to visit were Nogales and Eagle Pass.

7    Q.  What were the physical conditions of those stores?

8    A.  The stores were very well set up.  They were beautiful

9    stores, very well put together.

10   Q.  Did you see stores of competitors in those towns?

11   A.  Yes.

12   Q.  And how did the stores of the competitors compare

13   physically to the stores of Mr. Datta?

14   A.  Mr. Datta's stores were set up very, very well -- well lit,

15   very well organized, beautiful stores.

16   Q.  Did you have another task that you were assigned when you

17   went to work for Mr. Datta?

18   A.  Another -- what else I was responsible for is developing

19   direct relationships with some of the major manufacturers so

20   there would be direct distribution.  I was just starting that

21   process.

22   Q.  What do you mean by "direct distribution"?

23   A.  Setting up a direct relationship with a manufacturer would

24   be where we would buy direct from, say, a Coty or a L'Oreal,

25   for instance, things of that.

19mddat4                              Chalmers - direct

1    Q.   As opposed to what, buying from whom?

2    A.   Other distributors.

3              MR. WHITE:   I have nothing further, your Honor.

4              THE COURT:   Thank you.

5              Cross-examination.

6              MR. SKINNER:   Thank you, your Honor.

7    CROSS-EXAMINATION

8    BY MR. SKINNER:

9    Q.   Mr. Chalmers, you said that when you went to work for La

10   Versailles, your focus was on the retail operation, correct?

11   A.   Correct.

12   Q.   You didn't really have any knowledge of the wholesale

13   operation, do you?

14   A.   No.

15   Q.   You visited Texas but you spent most of your time in New

16   Jersey, correct?

17   A.   Correct.

18   Q.   When you were in Texas, did you ever see anybody depositing

19   large amounts of cash at the warehouse owned by La Versailles?

20   A.   No.

21   Q.   Do you have any knowledge of cash deposits at all?

22   A.   No.

23   Q.   You indicated that you were hired in part to bring a more

24   corporate feel or attitude to La Versailles; is that right?

25   A.   Correct.

19mddat4                              Chalmers - cross

1   Q.  How would you describe Mr. Datta's management style before

2   you took over?

3   A.  Well, my feeling is that he knew the employees very, very

4   well, and I think he wanted to distance himself from that and

5   have somebody direct -- direct them from a different source.

6   In other words, he -- it was a very close relationship and he

7   knew that he needed to have somebody else run those operations

8   for him.

9   Q.  Is it fair to say that he was a hands-on manager when you

10  came on?

11  A.  Yes.

12  Q.  He was intimately involved in the daily affairs of his

13  employees?

14  A.  Yes.

15  Q.  He knew what was going on in those retail stores?

16  A.  Yes.

17  Q.  If somebody was going to be absent, he was called?

18  A.  I'm sure.

19  Q.  If somebody had a dispute with another employees, he knew?

20  A.  Yes.

21  Q.  And part of the reason he wanted you to come in was he was

22  tired of having to deal with every little issue in these

23  stores; is that fair to say?

24  A.  Yes.

25  Q.  He wanted you to help him be a little bit less hands on

19mddat4                              Chalmers - cross

1    than he was previously?

2    A.   Exactly.

3                 MR. SKINNER:  No further questions.

4                 THE COURT:  Thank you.

5                 Mr. White.

6    REDIRECT EXAMINATION

7    BY MR. WHITE:

8    Q.   From your observations when you were working with Mr. Datta

9    in regard to the retail stores, was he involved in each

10   transaction that occurred in the stores?

11   A.   No.

12   Q.   When you say he was hands on, what do you mean by that --

13   and he was aware of the day-to-day activities, what do you mean

14   by that?

15   A.   Well, he kept in close contact with his stores and his

16   employees, and they would contact him, you know, on a daily

17   basis -- in the morning, in closing, things of that sort.

18   Q.   Were you present when that contact occurred?

19   A.   No.

20   Q.   No?

21   A.   Not usually, no.

22   Q.   So what do you base that on?

23   A.   Well, I knew the stores would all call him when they open

24   up in the morning and I knew they called him when they closed.

25   Q.   That's it?

738

Chalmers - redirect

1    A.   Yeah.   I mean, I -- yes.

2               MR. WHITE:   Nothing further, your Honor.

3               THE COURT:   Thank you.

4               Anything else?

5               MR. SKINNER:   No, your Honor.   Thank you.

6               THE COURT:   Thank you.   You are excused.

7               (Witness excused)

8               THE COURT:   Anything else?

9               MR. WHITE:   Your Honor, the defense calls Lalit,

10   LALIT, Abichandani, A-b-i-c-h-a-n-d-a-n-i.

11              THE CLERK:   Sir, if you would please take the stand.

12              Please remain standing and raise your right hand.

13    LALIT ABICHANDANI,

14        called as a witness by the defendant,

15        having been duly sworn, testified as follows:

16              THE CLERK:   Thank you.   Please be seated.

17              And could you please state your name for the record?

18              THE WITNESS:   Lalit Abichandani.

19   DIRECT EXAMINATION

20   BY MR. WHITE:

21   Q.   Good afternoon, Mr. Abichandani.

22              How are you employed, sir?

23   A.   I'm a CPA, self-employed.

24   Q.   You are a CPA?

25   A.   Yes.

19mddat4                          Abichandani - direct

```
 1    Q.   Self-employed.

 2              Where is your practice?

 3    A.   My practice is in 31st and Fifth Avenue in New York City.

 4    Q.   And what's the degree of your education, sir?

 5    A.   I have a CPA from New York State.  I have an accounting

 6    degree and a CPA from New York State.

 7    Q.   Where did you get the accounting degree?

 8    A.   My basic degree was from India, and then about 30 years ago

 9    I came over here in New York and got an equivalent degree from

10    NYU.

11    Q.   I guess you were born in India, sir?

12    A.   That's right.

13    Q.   Are you a U.S. citizen?

14    A.   Yes.

15    Q.   Do you know Vikram Datta?

16    A.   I have known him now since the end of 2006, 2007.

17    Q.   What happened in 2006 and 2007, generally?  Did he become a

18    client of yours?

19    A.   Yes.

20    Q.   And how is it that he became a client of yours?

21    A.   He called me through a common friend of ours.  He had heard

22    my name and he had called me.  He had a problem relating to a

23    New York State tax return, and I helped him out with that.

24    Q.   And where was he?

25    A.   At that time he was in Laredo.
```

19mddat4                         Abichandani - direct

1   Q.  But he had a problem with the New York State tax return,

2   did he?

3   A.   Yes, because he was originally a New York State resident

4   and his wife was also a New York State resident at that time

5   and they had some income from New York State and they had filed

6   New York State tax returns and there were some mistakes done in

7   the tax returns and the State had contacted them regarding

8   that.   And he contacted me to take care of that situation, and

9   we did.

10  Q.   And after that did your services for Mr. Datta increase?

11  A.   Yes, they did.

12  Q.   And in what respect?

13  A.   Toward the end of 2006, he asked me to take care of his

14  accounting and taxes.   Of course, he is in Laredo and I was in

15  New York.   In discussing about his business and what he does

16  and other things, we discussed about possibility of him

17  becoming a client.   And in that I asked him that he has to

18  have -- you know, because at that time he was growing his

19  business, growing out of retail and wholesale that he was

20  doing.   So we discussed that he has to have a full-time

21  bookkeeper.

22          At that time he didn't have a full-time bookkeeper.   I

23  insisted that he has to have a full-time bookkeeper.   I won't

24  be able to give too much time coming out of New York but I can

25  still take care of it.

1          And that's what he did.  He hired -- right thereafter

2    he hired a full-time bookkeeper, and we took care of all the

3    accounting records and he became my client late 2006, early

4    2007.

5    Q.  Do you know who the bookkeeper is, her name?

6    A.  Yes.  Yolanda Carrillo, who is the present bookkeeper.

7    Q.  Then you became his accountant, you said, when?

8    A.  Yes.  It has to be somewhere late 2006, early 2007.

9    Q.  What did your duties include as his accountant?  What

10   services did you provide to him?

11   A.  I basically did the accounting.  During the year, we would

12   monitor his payroll and his accounting records and whatever

13   difficulties Yolanda -- she is really knowledgeable in the

14   bookkeeping area.  She is a full-time bookkeeper.  So whatever

15   issues she had relating to filing of the sales taxes or filing

16   of the other taxes on a monthly basis or quarterly basis, they

17   would fax it to our office, we will review it, and, you know.

18   And also during the year we will take a look at their

19   accounting records and at the end of the year file the tax

20   returns.

21   Q.  Do you know when you -- did you file tax returns for his

22   entities?

23   A.  Yes.  Since 2007, every year I have been filing his

24   business as well as personal tax returns.

25   Q.  Did you spend any time in Laredo yourself?

19mddat4                         Abichandani - direct

1    A.  Yes, I did.  Almost every year I would go there two days to

2    look at his accounting records, issues that if we were not able

3    to resolve it during the year or on the phone, we would go

4    there and also meet his -- in the later years, I would also

5    meet his staff in the retail outlets to make sure that

6    everything from the cash registers ties in with the bookkeeping

7    and it comes -- because now the wholesale operation was

8    becoming like a head office for all these retail outlets.  So I

9    would meet his staff in the retail stores and also in the

10   wholesale stores to make sure that everything was followed

11   through in the books of accounts.

12   Q.  OK.  And when you first started working for Mr. Datta or

13   providing services to Mr. Datta, did you go to Laredo, meet

14   with Yolanda, and help set anything up?

15   A.  I think it was in 2007, if I'm not mistaken.  Yes, in 2007

16   I went, and then every year thereafter.

17   Q.  Do you know when you -- when you started providing services

18   for La Versailles' Fragrances, do you know whether they were

19   filing 8300 reports?

20   A.  When I started they were not.  When I started they were

21   not.  But I had a few meetings with Mr. Datta regarding that.

22   I also spoke to Yolanda.  And we told them the importance of

23   filing the 8300s, explained to them how the whole system works.

24           And later on we started filing -- when I took over, my

25   immediate steps were to make sure that all the accounting was

19mddat4                    Abichandani - direct

1   done right.  Because he was growing and he was opening up these

2   extra outlets, to make sure that -- and there was a lot of

3   retail transactions that was happening.  So my efforts were

4   more focused on making sure that every entity and every

5   location, the accounting comes correctly per Yolanda and then

6   Yolanda properly records that.  So initially that's what I did.

7            And then we took over the 8300 task as well.  I spent

8   an extra day there to explain to them what the importance of

9   the filing the 8300 was.  And then later on we had been

10  filing -- twice a month we had been filing 8300.

11  Q.  When you say "twice a month," did you recommend a plan on

12  the timing of the filing of Form 8300?

13  A.  Yes.  The large parts, we could do it every 15 days.  The

14  task that has come in every 15 days had to be recorded

15  properly, and then we needed to fill in those 8300s and the

16  filing was twice a month.

17  Q.  Did you ever monitor the actual 8300s that were filed after

18  they were filed?

19  A.  I actually did not monitor them because I was not there at

20  that location, but if they had any question relating to 8300, I

21  made sure that those questions were answered.  And even when I

22  went there, I questioned that the 8300 is being filed and they

23  said yes.

24  Q.  You were inquiring whether or not the 8300 has been filed?

25  A.  Well, I didn't really go through the detailed part of it.

19mddat4                        Abichandani - direct

1   I just made sure that she was doing it on a regular basis.

2   Q.  Did you provide any advice to Mr. Datta on the viability of

3   his wholesale business versus his retail business?

4   A.  Yeah.  During my visits there and even otherwise, we had

5   discussions about this business.  When I said "this business,"

6   meaning the wholesale business.  It was becoming more difficult

7   to collect the receivables coming out of Mexico.  A lot of it

8   was cash transactions, all of these transactions that was

9   coming in, and it was becoming difficult to collect the

10  receivables.  And it was difficult to go to Mexico to collect

11  money from these people, to chase after this money.

12          So Mr. Datta, he himself grew out of retail.  So it

13  was best for him, rather than focus more on wholesale, that he

14  focus more on retail end of it, where he didn't have to give

15  merchandise on credit.  All of the merchandise that was sold in

16  retail outlets, there was very little or no receivables in

17  there and it was easier operation.

18          And, also, he had experience in the retail area more

19  than anything.  So it was more -- that retail business was more

20  viable, more easier to handle than the wholesale business and

21  the collection of the receivables.

22          And that's what he did in 2008, in 2009.

23  Q.  You testified that you prepared the tax returns for his

24  businesses --

25  A.  I prepared tax returns for all of his businesses.

19mddat4                          Abichandani - direct

1    Q.  And through what year?  Through what year have you prepared

2    and filed tax returns?

3    A.  From 2007 through 2009, and 2010 is in process.

4    Q.  Let me show you what I've marked for identification as

5    Defendant's Exhibit G, and ask you if you recognize this

6    document?  It is up on your screen there, sir.

7    A.  Yes.  This tax return was prepared by me.

8    Q.  And could you say who -- what entity -- what client?

9    A.  This is for La Versailles Fragrances, Inc., which is his

10   wholesale entity in Laredo, Texas.

11   Q.  And for what year?

12   A.  This is for 2009, sir.

13   Q.  And is this copy of the return signed?

14   A.  Yes.  This was a copy signed by me and filed with the IRS.

15   Q.  Well, is the document before you signed that you are

16   looking at on the screen, is that signed?

17   A.  No, it's not signed.  Because it is just a copy, it is not

18   signed, but this was the return that was filed with the IRS.

19   Q.  So the original was signed and filed?

20   A.  The original is always signed by myself first, then

21   Mr. Datta, and then it is filed with the IRS.

22          MR. WHITE:  Your Honor, I offer Defendant's Exhibit G

23   in evidence.

24          MR. BRAGG:  Objection, your Honor.

25          THE COURT:  Ground?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19mddat4                          Abichandani - direct

1        MR. BRAGG:  Hearsay.

2        THE COURT:  Come to the sidebar.

3        (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19mddat4                        Abichandani - direct

1          (At the sidebar)

2          THE COURT:  So what is it being offered to prove?

3          MR. WHITE:  It is being offered to prove, number one,

4    that he filed tax returns for all of his receipts, to show that

5    he -- to show that the $30 million in gross proceeds, there

6    were 28,600,000 for the cost of the goods because these large

7    numbers have been floated around.

8          THE COURT:  So it is offered for the truth and,

9    indeed, beyond the truth, right?

10         MR. WHITE:  Yes.  I don't know about "beyond the

11   truth," Judge.

12         THE COURT:  Beyond the truth in that --

13         MR. WHITE:  Yes.

14         THE COURT:  -- you are seeking to offer a tax return

15   as proof that the tax return reflects all receipts and

16   accurately reflects the costs.  So it is at least an implied

17   representation that there is nothing else that's not on the

18   return.

19         MR. WHITE:  It's -- yes, but it's based on the

20   business records of La Versailles.

21         THE COURT:  We don't know that.

22         MR. WHITE:  I could ask him that.

23         THE COURT:  You could.

24         MR. BRAGG:  As far as the government knows, it is

25   unsourced information that was provided to this accountant by

19mddat4                          Abichandani - direct

1   employees, and there is no way to check the accuracy of it.  So

2   I presume it is what he is told on -- he already testified and

3   he could probably testify to the accuracy of some of these and

4   from other people in La Versailles, not through this witness.

5             THE COURT:  So your objection is hearsay?

6             MR. BRAGG:  Yes, your Honor.

7             MR. SKINNER:  The objection is hearsay, your Honor,

8   because he is offering the document for the truth of the matter

9   asserted.  If he wants to question him about the contents of

10  the document, he can.  If he wants to ask him if the returns

11  were filed, he can.  If he wants to ask him figures, if the guy

12  doesn't remember, then he can refresh recollection.  The

13  document itself is pure hearsay.

14            MR. WHITE:  I can do that, your Honor.

15            MR. ROSS:  Judge, excuse me.  Before we part.

16            Immediately after this witness is the defendant

17  testifying and the marshals have asked --

18            THE COURT:  I'm sorry.  I can't hear you.

19            MR. ROSS:  The defendant testifies next.  The marshals

20  have asked us to take a break so that they can station a

21  marshal up here rather than walk him across the room.

22            THE COURT:  OK.  Thank you.

23            (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

749

19mddat4                          Abichandani - direct

1                (In open court)

2      BY MR. WHITE:

3      Q.  You testified that you prepared the tax returns for La

4      Versailles Fragrances, Inc. for the last several years.

5                What did you -- where did you get the information from

6      which you compiled the income tax returns?

7      A.  In my visit to Laredo, that was my role, to go and look at

8      the books, look at the system that Yolanda was following, look

9      at the invoices, purchase invoices as well as sales invoices,

10     tie-ins of the receivables, payables, issues relating to that

11     and the classification thereof, whatever Yolanda had done.  And

12     if there were any mistakes, those mistakes were then corrected

13     there.

14               I would typically go somewhere around November or so

15     and spend a couple of days in going over the accounting records

16     there.  Subsequently, we would get a backup from Yolanda of

17     those tax returns again during the tax season, make sure that

18     everything tied in, and if there were any issues, we would get

19     the copies of the invoices or other documents that were

20     necessary to review before preparation of the tax return.

21     Q.  What kind of accounting system was in existence at La

22     Versailles during these years?

23     A.  It's generally accepted accounting principles and we used

24     QuickBooks as the software regarding these transactions.

25     Q.  Who maintained the QuickBooks?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19mddat4                    Abichandani - direct

1   A.  Basically, Yolanda maintained the QuickBooks at the entry

2   level.  And at the end of the year, like I said, we received a

3   backup of that, which I would then load it onto my computer and

4   review that, review everything up until December to make sure

5   that everything ties in.  If there were any loose ends or if

6   there were issues that she had not done it properly, to make

7   sure that we took care of that.  And, again, send the corrected

8   backup back to her so that that was taken care of at her end as

9   well.

10  Q.  Would you reconcile it with the underlying documents?

11  A.  Every month there would be a reconciliation of bank

12  accounts.  Every month there would be -- every quarter there

13  would be a reconciliation of account receivables, accounts

14  payable to make sure those two numbers were correctly reflected

15  in the closing of financial statements.

16  Q.  For the tax year 2009 for La Versailles Fragrances, Inc.,

17  do you recall what the gross receipts or sales was that was

18  reported to the IRS?

19  A.  I just saw the figure, and I know that it was generally

20  $30 million.  He's in that range of sales that is around $30

21  million.  Some years there is 31; some years there is 29, but

22  generally he's in that 30 million range.

23  Q.  OK.  Do you recall what the cost of the goods were, the

24  cost of the goods sold that were reported to the IRS?

25  A.  I don't remember the exact cost of goods, but I know that

19mddat4                    Abichandani - direct

1   the profit margin on these is somewhere between 5 to 6 percent

2   at the wholesale level.  So that would be somewhere 28,

3   28-and-a-half million, or 29 million; somewhere in that range

4   would be the cost of goods sold.

5   Q.  Would a document refresh your recollection as to what the

6   actual cost of the goods reported to the IRS --

7   A.  Yeah.  It will be page 2 of the tax return.

8   Q.  Let me show you again what is marked as Defendant's Exhibit

9   G.

10          Without getting to page 2, if you look at line number

11  2, does that indicate the cost of the goods sold?

12  A.  Yes.  28.6 million, that is a derived number.  There is a

13  schedule to back up, which is page 2 of the tax return, which

14  lists down the components of this $28.6 million, how we arrive

15  at that number.

16  Q.  This refreshes your recollection as to --

17  A.  Yes.

18  Q.  -- as to the cost of the goods in 2009?

19  A.  Right.

20  Q.  And for 2008, do you recall the cost of the -- well, you

21  filed a return for La Versailles Fragrances in 2008 as well,

22  correct?

23  A.  Correct.

24  Q.  And do you recall the gross receipts of sales for that

25  year?

19mddat4                           Abichandani - direct

1    A.  Like I said, I don't recall, but they were in that --

2    somewhere in that range, between 31 and 31-and-a-half or 29.

3    You know, his sales were in that range always.  So --

4    Q.  Would a document refresh your recollection?

5    A.  It would, yes.  Definitely.

6              THE COURT:  Does the precise number matter?

7              MR. WHITE:  Yes.  It does in this case, your Honor.

8              THE COURT:  Go ahead.

9    BY MR. WHITE:

10   Q.  Showing you Defendant's Exhibit H, in evidence,

11   Mr. Abichandani, does that refresh your recollection of what

12   the gross receipts of sales for La Versailles Fragrances was

13   for the tax year 2008?

14   A.  For 2008, it is $31.5 million.

15   Q.  And do you recall what the cost of the goods was that year?

16   A.  The cost of goods is $29.7 million.

17             MR. BRAGG:  Well, your Honor, it is not an objection.

18   Just to clarify, I don't believe that document is in evidence.

19             THE COURT:  That is correct.  It's not.

20             MR. BRAGG:  Counsel said it is in evidence.  I just

21   wanted to clarify.

22             MR. WHITE:  It is not in evidence.  It was offered to

23   refresh his recollection, your Honor.

24   BY MR. WHITE:

25   Q.  In addition to filing returns for La Versailles Fragrances,

19mddat4                          Abichandani - direct

1    did you file returns for La Versailles Cosmetics, Inc.

2    A.   Yes, I did.

3    Q.   And Valencia Fragrances, Inc.?

4    A.   Yes, I did.

5    Q.   And La Versailles Fragrances California LLC?

6    A.   Yes, I did.

7    Q.   And VMSP Holdings, LLC?

8    A.   Yes, I did.

9    Q.   And what were these entities?

10   A.   These are basically retail entities at different locations.

11   Mr. Datta has retail locations in -- some original locations in

12   Laredo, one in California, one in McAllen, Texas, and there

13   were different entities for each of these different locations.

14   Sometimes two locations were under one entity.  Sometimes just

15   he would like start out with one entity and then if he was

16   opening up a second location, that will go under that entity as

17   well.

18   Q.   What process did you follow in order to prepare the tax

19   returns for those entities?

20   A.   The same process.  Like I said, when I went over there to

21   these locations, I made sure that the daily transactions were

22   summarized and brought into Yolanda at La Versailles

23   Fragrances, which was like their head office.  Every day the

24   system managers, the store managers, would make sure that the

25   registers tied in and the money tied in and came to La

19mddat4                          Abichandani - direct

1   Versailles, and that money was then deposited the following day

2   in the bank accounts.   And that summary of transactions that

3   was received from these retail locations was then entered in

4   QuickBooks.

5                And then when I went over there, I made sure that we

6   had all of those documents.   There was a reconciliation every

7   month.   The proper sales taxes were filed.   Payroll taxes were

8   filed.   And at the end of the year when we received the backup,

9   we prepared the final tax returns for the year.

10  Q.  Did you also prepare the personal income tax return for

11  Mr. Datta?

12  A.  Yes, sir.

13  Q.  Was that an individual tax return?

14  A.  It was a married, filing joint tax return with his wife.

15  Q.  For how many years did you file those returns?

16  A.  I think I did it for 2007.   I'm not sure that I did it for

17  2006.   I believe there was a mistake in the 2006 tax return

18  when he came to me and I had pointed out it to him.   So I know

19  that I did it from 2007, '8, '9.   2006 also I probably may have

20  done it, yes.   Or I filed a corrected one, I'm sorry, for 2006.

21  Q.  Did you participate or represent Mr. Datta in an IRS audit?

22  A.  Yes, I did.

23  Q.  When was that, sir?

24  A.  This was for the year 2009.

25  Q.  Where was the audit conducted?

19mddat4                          Abichandani - direct

1   A.  The audit was out of Laredo, Texas, but we handled it over

2   the phone.  I did it from my office.  We faxed them and mailed

3   them our documents, bank statements that they had asked for the

4   entire year.

5   Q.  What was nature of the inquiry in the audit?

6   A.  The nature of the inquiry was there were a lot of deposits

7   in Mr. Datta's bank account in that year, and they were

8   concerned that --

9               THE COURT:  Stop right there.  The witness cannot

10  testify to what they were concerned about.

11  Q.  What was the result of the audit, sir?

12  A.  The result of the audit was that all of the income that was

13  deposited in these bank accounts was properly accounted for.

14              MR. WHITE:  No further questions, your Honor.

15              THE COURT:  Thank you.

16              Any cross-examination?

17              MR. SKINNER:  One minute, your Honor.

18              (Pause)

19              MR. BRAGG:  No questions, your Honor.

20              THE COURT:  All right.  Thank you.  You are excused.

21              (Witness excused)

22              THE COURT:  We will take a short break.

23              THE CLERK:  All rise.

24              (Recess)

25              THE CLERK:  Jury entering.

19mddat4

1                    (Jury present)

2                    THE COURT:  The next witness.

3                    MR. WHITE:  The defense calls Vikram Datta, your

4     Honor.

5                    THE COURT:  And I'll note that the jury and, of

6     course, Mr. Datta all are present.

7      VIKRAM DATTA,

8          the defendant herein,

9          having been duly sworn, testified as follows:

10                   THE COURT:  Proceed, counselor.

11    DIRECT EXAMINATION

12    BY MR. WHITE:

13    Q.  Good afternoon, Mr. Datta.

14    A.  Good afternoon, sir.

15    Q.  Mr. Datta, is English your first language?

16    A.  Hindi is my first language and I also speak and understand

17    English.

18    Q.  And do you speak Spanish?

19    A.  Very little, sir.

20    Q.  Where were you born, sir?

21    A.  I was born in India.

22    Q.  And when was that?

23    A.  October 22, 1960.

24    Q.  I see you're wearing earphones.  What is the reason for

25    that, sir?

19mddat4                        Datta - direct

1    A.  I have low hearing.  I have a hearing problem in my both

2    ears.

3    Q.  Could I ask you to raise your voice a little when you

4    answer my questions, please?

5    A.  I will do that.

6    Q.  What was your education in India?

7    A.  Bachelor's in commerce.

8    Q.  And how old were you when you finished your education in

9    India?

10   A.  19 years or 20 years.

11   Q.  And you obviously came to the United States, correct?

12   A.  Yes, sir.

13   Q.  And when was that?

14   A.  August 2, 1983.

15   Q.  And are you a United States citizen, sir?

16   A.  Yes, sir.

17   Q.  When did you become a citizen?

18   A.  I believe in 1994.

19   Q.  When you came to the United States, did you immediately get

20   into the perfume business?

21   A.  No, sir.

22   Q.  What was some of the types of jobs you had when you first

23   came to the United States?

24   A.  I worked at grocery stores.  I worked at newsstands.  I

25   drove car service in New York.  I did flea markets.  I sold

758

1    insurance, and I sold perfumes.  I had -- I sold clothes.  I

2    had a factory manufacturing clothing, and then I got into

3    perfume.

4    Q.  Well, in your answer, then, that you said you sold

5    perfumes, what did that consist of?

6    A.  Retail store in Jamaica, New York.

7    Q.  And whose store was that?

8    A.  That was my store.

9    Q.  And when was that?  What year did you have that retail

10   store in Jamaica, New York?

11   A.  1989.

12   Q.  So six years after you came to this country?

13   A.  Yes, sir.

14   Q.  During those six years -- you were single when you came to

15   this country?

16   A.  Yes, sir, I was.

17   Q.  During those six years, did you remain single?

18   A.  No.  I got married in 1986.

19   Q.  Are you still married to the same woman?

20   A.  Yes, sir.

21   Q.  Do you have any children?

22   A.  Two girls.

23   Q.  Your perfume store in Jamaica, Queens, in 1989, was that a

24   success?

25   A.  I lost that business.

19mddat4                          Datta - direct

1    Q.  Why did you lose the business?

2    A.  Because I overexpended myself.

3             Can I get some tissues, please?

4    Q.  Excuse me?

5    A.  I overexpended myself.

6    Q.  Is there something you need, sir?

7    A.  Some tissue.

8             (Pause)

9             Sorry about that.

10   Q.  What do you mean by you overextended yourself?

11   A.  I opened up a factory stitching garments, and that was too

12   much expenses -- more expenses, less income, so I lost that

13   business.

14   Q.  Then what did you -- in 1989, what did -- did you return to

15   the perfume business in the next ten years?

16   A.  No, sir.  After that I drove a corporate car and community

17   car, a car service in New York and I did flea markets in the

18   Tri-State area.

19   Q.  When did you work in the flea markets?

20   A.  I had been working in the flea markets from 1985 onwards,

21   off and on.

22   Q.  How many days a week?

23   A.  On the weekends, Saturdays, Sundays, and when I had nothing

24   else to do so I will go do during the weekdays also.

25   Q.  What did you sell -- you sold products at the flea markets?

19mddat4                          Datta - direct

1   A.   Yes, sir, I did.

2   Q.   What kind of products?

3   A.   In 1985 through 1987, I was selling audio cassettes, radio

4   cassettes, cameras, films, batteries, stuff like that.  And in

5   '90 I was selling clothing in the flea markets.

6   Q.   Where were you living at this time, sir?

7   A.   In Corona, Queens.  In Queens, New York, most of the time.

8   Q.   Did there come a time that you returned to perfume?

9   A.   Yes, sir, I did.

10  Q.   When was that?

11  A.   I believe 1997 or 1998, somewhere around that time.

12  Q.   And what did you do in the perfume business?

13  A.   I worked for one of my friends selling his perfumes.

14  Q.   Where did you work?

15  A.   At Victory International.  That is the name of the company

16  now.  At that time the company was Dream & Beauty.

17  Q.   And where was it located?

18  A.   In Edison, New Jersey.

19  Q.   And you were still living in Corona, Queens?

20  A.   Yes, sir.

21  Q.   What did your job for this company consist of?

22  A.   I was living in Flushing at that point, sir.  Flushing, New

23  York.

24  Q.   What did your job consist of?

25  A.   I would sell perfumes, the line of my -- for the company to

19mddat4                          Datta - direct

1   all the stores on Broadway, New York.

2   Q.  So you would get the perfumes from the warehouse in Edison;

3   is that what you are saying?

4   A.  I would bring the samples, and then I will go with it to

5   other stores and then I will call people all over the country

6   and see if anybody could buy.

7   Q.  How long did you work for Victory?

8   A.  For three months.

9   Q.  Did you stay in the perfume business after that?

10  A.  Yes, sir, I did.

11  Q.  What did you do next?

12  A.  I started to sell perfumes on my own on Broadway in New

13  York and wherever else I could sell in the United States of

14  America.

15  Q.  You were selling to the stores on Broadway in New York?

16  A.  Yes, sir.

17  Q.  Did you have an office or anything?

18  A.  The first two years I operated the business from my house,

19  and then I had an office in Broadway, New York.

20  Q.  And where would you get the perfume that you sold?

21  A.  I will get the perfumes from Dream & Beauty, the company

22  that I used to work for, and also from other people, other

23  wholesalers throughout the United States, mostly in Florida.

24  Q.  How did you develop clients in Florida?

25  A.  One of my friends, we used to do flea markets together, he

19mddat4                    Datta - direct

1    moved to Florida and he had started his own company and he

2    helped me a lot.

3    Q.   And what was his name?

4    A.   Mr. Tony Bajad, B-a-j-a-d.

5                    (Continued on next page)

19M4DAT5                          Datta - direct

1    BY MR. WHITE:

2    Q.  You said you told sold perfume to stores in New York, and

3    where else did you sell to?

4    A.  In United States, in LA, in Dallas.

5    Q.  How would you get clients in LA and Dallas?

6    A.  Because when I was selling perfumes on Broadway, New York,

7    all my customers from United States, different parts of the

8    company, will come to Broadway and I will meet them, see them,

9    talk to them, then I exchange cards, take the information, and

10   they will take my information and we started business.

11   Q.  How long did this, you said you worked out of your home for

12   the first two years, then after that what?

13   A.  Then I opened up office in Broadway, 1201 Broadway on the

14   6th floor.

15   Q.  How long did you have that office?

16   A.  Approximately three years.

17   Q.  Among the sales you made to businesses outside of New York,

18   did you make any to businesses in Laredo, Texas?

19   A.  Yes, sir, I did.

20   Q.  Did you ever travel to Laredo, Texas while you had the

21   business in New York?

22   A.  Yes, sir, I did.

23   Q.  When was that?

24   A.  That was in 19, I am sorry, in 2000.

25   Q.  Why do you go Laredo?

19M4DAT5                    Datta - direct

1   A.  I sold perfumes to one of the store owners in Laredo; he

2   didn't pay for six months, so I went to collect my money.

3   Q.  You had never been to Laredo before?

4   A.  No, sir.

5   Q.  Why did you go there personally to collect your money?

6   A.  The people lived there didn't send me the money, so I went

7   there to collect my money.

8   Q.  Were you able to collect the money?

9   A.  I did.

10  Q.  How did you go about collecting it?

11  A.  When I went there I said you have the money, one guy owed

12  me like $3,200 some change, that he gave me right away, the

13  other person he owed me $32,778, he gave me $10,000, and he

14  said he would send the rest of the money in two, three weeks.

15  I decided to stay there because I could not stay without the

16  money.

17  Q.  You decided to stay until you got paid the balance?

18  A.  Wait until I got paid, yes.

19  Q.  How long were you in Laredo?

20  A.  During that time I was there almost one week.

21  Q.  What did you do during that week?

22  A.  I used to walk around, used to observe how people are

23  selling, what kind of business is happening, how is the town.

24  From my observation I saw a lot of business taking place, and I

25  look at empty Perfume Mania store, then I got the store.

765

19M4DAT5                           Datta - direct

1   Q.   You looked at an empty Perfume Mania store?

2   A.   Yes, sir.

3   Q.   Where was that located?

4   A.   That was on 219 Convent Avenue, Laredo, Texas.

5   Q.   It was vacant?

6   A.   Yes, sir.

7   Q.   You made a decision regarding that store?

8   A.   Yes, sir.

9   Q.   What was your decision?

10  A.   To rent out the store and because wholesale business was

11  very challenging in New York, the whole perfumes there, and I

12  saw amount of perfumes being sold in the stores in Laredo made

13  me make a decision to take a store in Laredo.

14  Q.   When you say take a store in Laredo, did you remain in

15  business in New York?

16  A.   Yes, sir.

17  Q.   For how long?

18  A.   After that, another two years.

19  Q.   Who operated the store in Laredo?

20  A.   I did.

21  Q.   Did you rent it?

22  A.   Yes, sir.

23  Q.   Did you live in Laredo those two years?

24  A.   Yes, sir.

25  Q.   Have you lived in Laredo continuously since then?

19M4DAT5                         Datta - direct

1    A.   Since then I am in Laredo.

2    Q.   You maintained an office in New York?

3    A.   Yes, sir.

4    Q.   Why did you do that?

5    A.   Because I had a partner and he was taking care of the New

6    York office and I was in Laredo.

7    Q.   Did you devote all your time to the Laredo store?

8    A.   Yes, sir.

9    Q.   What about your wife and kids, did they come to Laredo with

10   you?

11   A.   They will come to visit me during summer vacations, during

12   the vacation and holidays, they will come.

13   Q.   Did they eventually come to live with you in Laredo?

14   A.   Yes.

15   Q.   Yes or no?

16   A.   Yes.

17            THE WITNESS:   Can I make a request.   Can I ask my

18   daughter to leave so I can testify properly.

19            THE COURT:   The jury will disregard that.   Go ahead.

20   Q.   Were the sales, the store now that you opened at 219

21   Convent Avenue, was that successful?

22   A.   It was like immediate success.

23   Q.   Why was it, what did you mean by a major success?

24   A.   Immediate, right away, because a lot of customers were

25   coming to buy from Mexico, and they will buy big quantities and

767

1   lot of perfumes, so.

2   Q.  Had you seen anything like that volume of business in New

3   York?

4   A.  Never in my life.

5   Q.  Did they pay in cash?

6   A.  Yes, sir.

7   Q.  Was it all cash or mostly cash or what?

8   A.  It was 90 percent cash and maybe 5 to 10 percent credit

9   cards.

10  Q.  You would take credit cards?

11  A.  Yes.

12  Q.  Did you have customers from the United States too?

13  A.  Yes, sir.

14  Q.  Did the customers from Mexico use credit cards?

15  A.  Customers from Mexico used credit cards; customers from the

16  United States used credit cards.

17  Q.  That store at 219 Convent Avenue, was it still operating in

18  January 2011 when you were arrested?

19  A.  Yes, sir.

20  Q.  Was it still a profitable store?

21  A.  Yes, sir.

22  Q.  Did there come a time you added other retail stores in

23  Laredo?

24  A.  Yes, sir, I did.

25  Q.  What was the first one that you added?

768

Datta - direct

1   A.  It was on Zaragoza Street, the address I believe was 1209

2   Zaragoza Street.

3   Q.  How long after you opened the store on Convent Avenue, 219,

4   did you open the store on Zaragoza?

5   A.  I believe the next year in 2001 or 2002.

6   Q.  How far away from 219 Convent Avenue was this new store?

7   A.  Approximately 150 yards.

8   Q.  Why would you open two stores in the same town?

9   A.  Because my first store, the store started to sell good, the

10  combination, they started to offer more rent to the landlord.

11  Q.  More rent for the premises at 219 Convent Avenue?

12  A.  Yes, sir, and then the landlord wanted more rent so I was

13  scared so I took another store and in case I have to move, I

14  cannot meet his demands, I move to that store.

15  Q.  What kind of business did the perfume store on Zaragoza do?

16  A.  They were mostly wholesale customers come to Zaragoza.

17  Q.  When opened it was mostly wholesale?

18  A.  Zaragoza Street is only for wholesale business.

19  Q.  The store you opened when you thought you might get thrown

20  out of 219 Convent was on Zaragoza and it was going to be

21  wholesale?

22  A.  It was going to be a store, retail and semi wholesale, but

23  on Zaragoza Street bigger wholesale customers used to come and

24  buy.

25  Q.  Can shoppers come off the street and go there in and buy a

19M4DAT5                        Datta - direct

1   couple bottles of perfume if they want.

2   A.   Yes.

3   Q.   What do you mean by semi wholesale, what is that?

4   A.   Semi wholesale is customers from, they will come, they will

5   buy more than $200, $300, $400 of perfume, and they will go

6   back to their towns, they will sell there and come back again.

7   That means semi wholesale.

8   Q.   That's in contrast to wholesale like La Versailles

9   Fragrances would do in later years selling very large

10  quantities to distributors?

11  A.   Yes, sir.

12  Q.   At this point in time you had been in Laredo for two years?

13  A.   Yes, sir.

14  Q.   The store at 219 Convent Avenue, that was a retail store?

15  A.   Retail and semi wholesale.

16  Q.   Did you have occasion in that store to develop a wholesale

17  business while you were still in that store?

18  A.   Yes, I did.

19  Q.   What year was that?

20  A.   That was in 2000, September or maybe August.

21  Q.   A few months after you had opened the store?

22  A.   Yes, sir.

23  Q.   Where did the wholesale customers come from?

24  A.   They all will come from Mexico.

25  Q.   Where in Mexico?

1   A.  Mexico City, Guadalajara, Monterrey.

2   Q.  How was it that you were only there for -- withdrawn.

3         Did wholesale customers that, you had wholesale

4   customers in 219 Convent Avenue?

5   A.  Yes, sir.

6   Q.  And did they come from Monterrey, Guadalajara, and Mexico

7   City?

8   A.  Yes, sir.

9   Q.  Wholesalers would come to your store on 219 Convent Avenue?

10  A.  My customers will come to look for products.  If any store

11  did not have it, and I had it, they will come.  If I did not

12  have it and the other store have it, they will go look for

13  those perfumes and they will buy.

14  Q.  They came to your store on 219 Convent Avenue?

15  A.  Yes.

16  Q.  To look for products to buy wholesale?

17  A.  To look for products they could not find or just to check

18  the price and compare the prices with the competition.

19  Q.  Since you opened that store as a retail store, did you have

20  any inventory to sell them wholesale?

21  A.  When I went I went with around $180,000 of inventory, but

22  as I started to sell more, I started to order more perfumes.

23  Q.  Is there any particular perfume that you had on stock in

24  that year 2000 that none of the stores in Laredo had?

25  A.  I got lucky in October because for Christmas in Mexico,

19M4DAT5                          Datta - direct

1   customers will buy bigger quantities in October right after

2   October 15.  So there was no Benetton, it's a cheap line like

3   in the market, and one of my suppliers in Florida had it.  So

4   all my customers from Mexico were asking for Benetton line

5   continuously.  I started to make a phone call, like who has it,

6   and I made a phone call to one my suppliers and he said you are

7   lucky, I am stuck with around 70 to 80,000 pieces of Benetton,

8   can you take them all.  I said yes, I can take them all, what

9   kind of price.  He said my cost was 25 cents and all the

10  testers I will give to you for one dollar.  So, I check the

11  market and I bought everything.

12  Q.  Were you able to sell it?

13  A.  Yes, sir.

14  Q.  How was it you were able to sell so much of that inventory?

15  A.  Once the first customer bought it, all the customers knew

16  we had the merchandise, so everybody started to keep on coming

17  and they bought it.

18  Q.  Those customers who bought perfumes from you wholesale in

19  2000, did they continue to be your wholesale customers?

20  A.  Up to now I have the same customers, most of them.

21  Q.  Did you open any further retail stores in Laredo?

22  A.  Yes, sir.

23  Q.  When did you open the next one?

24  A.  I believe in Laredo the next store I opened in 2006, then I

25  opened one --

19M4DAT5                         Datta - direct

1   Q.   Did you open any stores outside of Laredo before that?

2   A.   Yes, sir.

3   Q.   Where?

4   A.   In Nogales, Arizona.

5   Q.   How is it that you came to open a store in Nogales,

6   Arizona?

7   A.   I have a friend who was in New York, one day he called me.

8   He said, Vikram, the border towns are very busy.  I said why,

9   where are you.  He said I am in Nogales.  I said where is

10  Nogales.  He said in Arizona.  OK.  I said how big is that

11  town.  It's a very small town but there is thousands of people

12  on the streets of Nogales in downtown by the border and we went

13  into Mexico.  I asked him how did you to Nogales.  That's how I

14  end up in Nogales.

15  Q.   You made a decision to open a store there?

16  A.   I went to see Nogales.  I look at the place.  There was

17  only one store available, and immediately I made a decision, I

18  took the store.

19  Q.   Who operated the store?

20  A.   I had an employee from Laredo.  I asked her if she wanted

21  to move.  She was willing to move.  She moved to Nogales.  Then

22  I opened the store.

23  Q.   You still have that store in Nogales?

24  A.   Yes, sir.

25  Q.   I think you said in 2006 you opened another store in

1   Laredo?

2   A.   Yes, sir.

3   Q.   Where was that located?

4   A.   That was on Convent Avenue, I think 2006 or 2007, I might

5   be a little off, it was on 407 Convent Avenue.

6   Q.   A second store on Convent?

7   A.   Yes.

8   Q.   Was that retail?

9   A.   Retail and semi wholesale, same kind of store.

10   Q.   How far away from 219 Convent Avenue was it?

11   A.   One and a half block, like maybe 200 yards.

12   Q.   Why would you open another store in competition with

13   yourself?

14   A.   There were so many customers, we could not prevent they

15   will go to other stores, so to take those customers, I opened

16   another store.

17   Q.   Over the next few years did you continue to open further

18   retail stores?

19   A.   Yes, sir.

20   Q.   Did you open any more in Laredo?

21   A.   After that I opened two more stores in Laredo.

22   Q.   Where were those?

23   A.   One is very next door to Zaragoza Street, right next door,

24   and the other one in front of 219 Convent Avenue, 301 Convent

25   Avenue I believe or 219 Convent Avenue, right just between the

19M4DAT5                    Datta - direct

1   both corners.

2   Q.  You had five retail stores in Laredo?

3   A.  Yes, sir.

4   Q.  As of the time of your arrest did you still have five

5   retail stores, retail and semi wholesale?

6   A.  Yes, sir.

7   Q.  Did you open your retail stores in any other border towns?

8   A.  Yes, sir, I opened up a store in San Ysidro, California, I

9   opened up a store in Calexico, California, and I opened two

10  stores in McAllen and one in Eagle Pass, Texas.  McAllen is

11  also in Texas.

12  Q.  While you were expanding your retail stores did your

13  wholesale business expand also?

14  A.  Yes, sir.

15  Q.  Did you open a warehouse?  How did it expand?

16  A.  I took a warehouse in 2000 from my landlord who was my

17  landlord for 219 Convent Avenue, small, maybe 1,000 square feet

18  warehouse, then in 2005, 2006, I took an 8 to 10,000 square

19  feet warehouse.

20  Q.  Where was that warehouse located?

21  A.  1401 Lincoln Street.

22  Q.  When you opened up the store on 219 Convent in 2000, how

23  did you do your bookkeeping?

24  A.  I wrote everything myself in a ledger.

25  Q.  You wrote it into a ledger?

19M4DAT5                          Datta - direct

1   A.   Yes, sir.

2   Q.   Showing you what I have marked as Defendant Exhibit H for

3   identification.   I will hold it up in my hand.   Can you

4   recognize from where you are sitting what this is?

5   A.   Yes, sir.

6   Q.   What is this?

7   A.   My first holy book of the business.

8             THE COURT:   Counsel, that is at least the second

9   Defendant Exhibit H you used today.

10            MR. WHITE:   I, your Honor.   I offer this in evidence,

11  your Honor, as a business record.

12            MR. SKINNER:   Can he lay a foundation.

13            THE COURT:   Objection sustained for now.

14  BY MR. WHITE:

15  Q.   Did you keep this book in the ordinary course of your

16  business on Convent Avenue?

17  A.   Yes, sir.

18  Q.   Was it in the ordinary course of business to maintain

19  ledgers for retail sales?

20  A.   This book is for my wholesale sales.

21  Q.   Was it the regular course of business to maintain these

22  types of records for your wholesale business?

23  A.   Yes.

24  Q.   Did you make entries in the ledger, you said you made them

25  yourself?

19M4DAT5                        Datta - direct

1    A.  Yes, sir.

2    Q.  Did you make them at or near the time of the transaction?

3    A.  I made the entries as the transactions were happening.

4           MR. WHITE:  I offer Defendant Exhibit I.

5           MR. SKINNER:  No objection.

6           THE COURT:  Received.

7           (Defendant Exhibit I received in evidence)

8    Q.  You reviewed this book in the last week or so?

9    A.  Yes.

10   Q.  Does it have the names of the customers at the top and

11   entries along the side?

12   A.  Yes, sir.

13   Q.  Did you attempt to recognize which of the customers from

14   2001 were still your customers in 2010?

15   A.  I know which customers I had.

16   Q.  Did you attempt to do that; did you look through the ledger

17   attempting to do that?

18   A.  I did.

19   Q.  Roughly how many customers who were you your customers in

20   2000 were still your wholesale customers in 2010?

21   A.  I believe 6 or 7 of them.

22          MR. WHITE:  May I approach, your Honor, show him the

23   ledger.

24          THE COURT:  Yes.

25          MR. WHITE:  A couple of questions from here?

19M4DAT5                        Datta - direct

1            THE COURT:  Go to the podium.

2    Q.  When you reviewed that book, Mr. Datta, did you mark the

3    pages where you recognize the customers that were still

4    customers in 2010?

5    A.  Yes, sir.

6    Q.  If you would quickly count the places you marked, I will

7    ask you again, how many did you recognize as customers in 2010

8    that were customers in 2000.

9            THE COURT:  Before you answer that, maybe you can

10   clear something up, Mr. Datta.  This book in your hand,

11   Defendant Exhibit I, does it cover a particular time period?

12           THE WITNESS:  It started, your Honor, in 2001 and

13   customers and I kept it all the time.

14           THE COURT:  It's a list of your wholesale customers,

15   is that what it is?

16           THE WITNESS:  Yes, sir.

17           THE COURT:  Go ahead.

18   BY MR. WHITE:

19   Q.  When does that particular ledger, when does it end, what

20   year does it end?

21   A.  I believe I used this ledger for two, three years.

22   Q.  Have you been able to count up from those tabs how many

23   customers you recognize?  Let me ask you this; was it more like

24   a dozen customers than six?

25   A.  Yes, sir, around 10 to 12 customers.

1           MR. WHITE:  If I may retrieve the exhibit.

2   Q.  You said those wholesale customers were located in Mexico?

3   A.  Yes, sir.

4   Q.  Mexico City, Monterrey?

5   A.  And Guadalajara.

6   Q.  Did you ever visit their businesses?

7   A.  Many times.

8   Q.  Why did you visit their businesses?

9   A.  To see how does their store look, how do they do their

10  business, their habits, their lifestyle.

11  Q.  What kinds of businesses did you see that they operated in

12  these places that you went to?

13  A.  They were selling perfumes; they were busy as we were busy

14  in Laredo, all those stores were very busy.

15  Q.  When you say they were selling perfumes, were they selling

16  it retail to people shopping or selling it wholesale to other

17  customers?

18  A.  They were selling both retail and semi wholesale.

19  Q.  When you say semi wholesale, who were they selling to?

20  A.  To customers from different towns of Mexico.

21  Q.  Not in Mexico City, Guadalajara or Monterrey?

22  A.  No, sir, from different towns of Mexico.

23  Q.  Were there particular markets for perfume in Mexico City?

24  A.  There were wholesale markets called Tepito.

25  Q.  Were there any other markets?

779

19M4DAT5                        Datta - direct

1   A.   Another market called Apartado mall.

2   Q.   What kind of business was conducted in Apartado mall.

3   A.   Same business, retail and semi wholesale or even bigger

4   wholesale than Tepito mall.

5   Q.   I was asking about Apartado mall, what kind of business?

6   A.   Perfumes, they would be selling perfumes, so many different

7   products within that mall.

8   Q.   Showing you what I have marked Defendant Exhibits J through

9   Q, before testifying today have you previously reviewed

10  photographs?

11  A.   Yes, sir.

12  Q.   I will show you some photographs and ask you if you

13  recognize them.

14  A.   Yes, sir.

15  Q.   Do you recognize where this is?

16           THE COURT:   What exhibit?

17  Q.   Defendant Exhibit J.

18  A.   This is Apartado mall in Mexico City.

19  Q.   How many times have you been there?

20  A.   More than three times.

21  Q.   Have you visited stores in that mall?

22  A.   Yes, sir.

23  Q.   Do you recognize Defendant Exhibit K?

24  A.   Yes, sir, the store belongs to Mr. Jose Luis Contreras.

25  Q.   Do you recognize this as a store in Apartado mall?

19M4DAT5                    Datta - direct

1   A.  Yes, sir.

2           MR. WHITE:  I offer Defendant Exhibit K.

3           MR. SKINNER:  No objection.

4           THE COURT:  K is received.

5           (Defendant Exhibit K received in evidence)

6           THE COURT:  I don't think I offered J.  I offer J.

7           MR. SKINNER:  No objection.

8           THE COURT:  Received.

9           (Defendant Exhibit J received in evidence)

10  Q.  Whose store, Defendant Exhibit K, whose store is that?

11  A.  This belongs to Mr. Jose Luis Contreras.

12  Q.  Who was he?

13  A.  A customer of mine.

14  Q.  He was a big customer of yours?

15  A.  One of the biggest customers.

16  Q.  Have you been to that store?

17  A.  Yes, sir.

18  Q.  Showing you Defendant Exhibit L, do you recognize this,

19  sir?

20  A.  Yes, sir.

21  Q.  Is this one of the stores you saw in that mall?

22  A.  Yes, sir.

23          MR. WHITE:  I offer Defendant Exhibit L in evidence.

24          MR. SKINNER:  No objection.

25          THE COURT:  Received.

1          (Defendant Exhibit L received in evidence)

2    Q.   Is that a perfume store?

3    A.   Yes, sir.

4    Q.   Whose is it?

5    A.   It belongs to Jose Antonio Franco, Guero.

6    Q.   When you say Guero, is that a nickname?

7    A.   Yes, sir.

8    Q.   Did Jose Luis Contreras have a nickname?

9    A.   We call him Panama.

10   Q.   That was the name of his store in Defendant Exhibit K?

11   A.   Yes, sir.

12   Q.   Showing you Defendant Exhibit M, do you recognize this

13   picture?

14   A.   Yes, sir.

15   Q.   Have you visited this store?

16   A.   Yes, sir.

17          MR. WHITE:   I offer M in evidence.

18          MR. SKINNER:   No objection.

19          THE COURT:   Received.

20          (Defendant Exhibit M received in evidence)

21   Q.   Whose store is that?

22   A.   It belongs to Guero, Jose Antonio Franco.

23   Q.   He had more than one store in Apartado mall?

24   A.   He had four stores in the Apartado mall.

25   Q.   Showing you Defendant Exhibit N, do you recognize that

19M4DAT5                         Datta - direct

1   photograph?

2   A.  Yes, sir.

3   Q.  Have you been there?

4   A.  Yes, sir.

5           MR. WHITE:  I offer Defendant Exhibit N.

6           MR. SKINNER:  No objection.

7           THE COURT:  Received.

8           (Defendant Exhibit N received in evidence)

9   Q.  Whose store is that in N?

10  A.  This store belongs to Jorge Estrada.

11  Q.  Showing you Defendant Exhibit O for identification, are you

12  able to recognize that store?

13  A.  Yes, sir.

14  Q.  Have you been in that store?

15  A.  Yes, sir.

16          MR. WHITE:  I offer Defendant Exhibit O in evidence.

17          MR. SKINNER:  No objection.

18          THE COURT:  Received.

19          (Government Exhibits O received in evidence)

20  Q.  Whose store is that?

21  A.  Jose Antonio Franco, Guero.

22  Q.  Showing you Defendant Exhibit P for identification, do you

23  recognize that?

24  A.  Yes, sir.

25  Q.  Is it another store in the Apartado mall?

783

19M4DAT5                        Datta - direct

1    A.   Yes.

2              MR. WHITE:  I offer P.

3              MR. SKINNER:  No objection.

4              THE COURT:  Received.

5              (Defendant Exhibits P received in evidence)

6    Q.   You have been to that store?

7    A.   Yes.

8    Q.   Whose store is that?

9    A.   Jose Antonio Franco.

10   Q.   Showing you Defendant Exhibit Q, do you recognize that?

11   A.   Yes, sir.

12   Q.   Is that a store you visited?

13   A.   I visited this store, yes, sir.

14             MR. WHITE:  I offer Defendant Exhibit Q.

15             MR. SKINNER:  No objection.

16             THE COURT:  Received.

17             (Defendant Exhibit Q received in evidence)

18   Q.   Is Defendant Exhibit Q a customer of yours?

19   A.   It was my customer; not anymore.

20   Q.   What was the name of that customer?

21   A.   We used to call him Pedron; if it comes to my mind, I will

22   let you know.

23   Q.   You mentioned another market called Tepito market?

24   A.   Yes, sir.

25   Q.   How is Tepito market different than the Apartado mall?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

19M4DAT5                    Datta - direct

1   A.  Apartado mall is a modern construction, it's a very new

2   construction.  Tepito is a very old construction and it is very

3   small, the stores are very small, but it is the first wholesale

4   perfume sales in Mexico.

5   Q.  Showing you Defendant Exhibit R for identification, are you

6   able to recognize that store?

7   A.  Yes.

8   Q.  Where is it?

9   A.  It is in Tepito mall.

10  Q.  Have you visited it?

11  A.  Yes, sir.

12  Q.  How many times have you visited Tepito mall?

13  A.  More than 7 or 8 times.

14  Q.  Is this a customer of yours, do you know?

15  A.  This store belongs to Gabe Cisenero; she was my customer

16  two years back.

17           MR. WHITE:  I offer Defendant Exhibit R.

18           MR. SKINNER:  No objection.

19           THE COURT:  Received.

20           (Defendant Exhibit R received in evidence)

21  Q.  How many perfume stores do you recall being in Tepito

22  market?

23  A.  In Tepito market more than 100 stores in different

24  locations, maybe 150.

25           THE COURT:  All perfume stores?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19M4DAT5                         Datta - direct

1          THE WITNESS:  Yes, sir.

2    Q.  How was that market set up?

3          THE WITNESS:  I want to make a correction, your Honor.

4    In Tepito market, in that section there were 150 stores.

5    Tepito mall is very big mall, like, Tepito market is a very big

6    market, I would say there are thousands of different stores.

7          THE COURT:  All selling perfume?

8          THE WITNESS:  No, sir, perfumes and all other

9    merchandise.

10   BY MR. WHITE:

11   Q.  The perfume stores numbered about 150?

12   A.  In that section of Tepito mall, yes.

13   Q.  Showing you one more for identification, Defendant Exhibit

14   S, do you recognize that?

15   A.  Yes.  This store is I believe in Tepito again.

16         MR. WHITE:  I offer Defendant Exhibit S.

17         MR. SKINNER:  No objection.

18         THE COURT:  Received.

19         (Defendant Exhibit S received in evidence)

20   Q.  These two stores, Defendant Exhibit S and Defendant Exhibit

21   R, are they typical of the type of smaller perfume stores

22   numbering up to 150 that exist in Tepito?

23   A.  In Tepito mall, yes, in Tepito market or Tepito mall.

24         MR. WHITE:  Your Honor, I was falsely under the

25   assumption that these were published to the jury.  Could I take

786

19M4DAT5                          Datta - direct

1    a minute to publish them on the screen.

2              THE COURT:  I don't believe you were mistaken.

3              MR. WHITE:  Very good.

4    BY MR. WHITE:

5    Q.  Back in 2000, 2001, 2002 when you were developing your

6    wholesale business, did you have a client named Octavio?

7    A.  Yes, sir.

8    Q.  Was he a customer of yours?

9    A.  Yes, sir.

10   Q.  Was he a wholesale customer or retail?

11   A.  Wholesale customer.

12   Q.  Where was his business located?

13   A.  Mexico City.

14   Q.  Was he in Tepito market?

15   A.  Yes, sir.

16   Q.  How many stores did he have in Tepito market?

17   A.  He will wholesale to the stores, even sell to the stores in

18   Tepito.

19   Q.  Did he have any business in Apartado mall?

20   A.  He had one store in Apartado mall.

21   Q.  Have you ever visited Octavio in Mexico City?

22   A.  Yes, sir.

23   Q.  Did he have a store or building where you could visit him?

24   A.  Yes, sir, in his warehouse.

25   Q.  Where was the warehouse located?

19M4DAT5                        Datta - direct

1    A.  Right next to Tepito, like, maybe 10 yards.

2    Q.  Across the street from Tepito?

3    A.  Yes, sir.

4    Q.  He had a warehouse there?

5    A.  Yes, sir.

6    Q.  And to your knowledge who would he sell to?

7    A.  To the small stores in Tepito and all over Mexico.

8    Q.  Was he a big client of yours?

9    A.  He was the biggest client.

10   Q.  For how many years was he the biggest client?

11   A.  Of the perfume business, he was not my biggest customer; he

12   was the biggest client for perfumes in Mexico City.

13   Q.  Was he a big client to you?

14   A.  He was a big client for me.

15   Q.  Did he become a friend as well as a client?

16   A.  Yes, sir.

17   Q.  How did he become a friend?

18   A.  One time as we sold merchandise to Mexico and that

19   merchandise was stolen.

20   Q.  When was this approximately?

21   A.  Approximately 2002 or 2003.

22   Q.  You said you sold?

23   A.  I sold merchandise to different perfume customers in Mexico

24   and the wholesaler was robbed in Mexico City so we will sell

25   the merchandise on credit so I was not strong at that time

1   financially so I asked Octavio for help.

2   Q.  What do you mean you asked him for help?

3   A.  If I could borrow some money for him and if we will sell

4   them goods on credit to all the customers and I told him if he

5   could pay me cash instead of credit.

6   Q.  Why did you need him to lend you money; what did you need

7   that money for?

8   A.  Because the merchandise which was stolen was $600,000, and

9   all the goods were sold on credit.  So, the customers in order

10  to pay me, I had to sell them again to collect the money.  So

11  if they were not in business, I was not going to collect my

12  money.

13  Q.  You basically had to replace the shipment that had been

14  stolen?

15  A.  Yes.

16  Q.  Octavio, what did he do?

17  A.  I borrowed $200,000 from him, and whatever merchandise I

18  was selling him, instead of taking 30 days credit, he will pay

19  me cash and I would give him back the goods.

20  Q.  Why was it important for you to get quickly?

21  A.  So I could maintain my cash flow.

22  Q.  What do you mean by that, so you could maintain your cash

23  flow?

24  A.  Because I will buy the merchandise, my perfumes also on

25  credit, so as I will get the terms, the same terms I will

19M4DAT5                        Datta - direct

1    extend to my customers.

2    Q.   You had a $600,000 shipment stolen?

3    A.   Yes.

4    Q.   Had you paid your suppliers for that shipment yet?

5    A.   I have paid for that shipment, yes.

6    Q.   As of the time it was stolen, had you paid your suppliers

7    for it?

8    A.   No, sir.

9    Q.   Is that why you needed to get money immediately?

10   A.   Yes, sir.

11   Q.   Did you pay Octavio back?

12   A.   Yes, sir.

13   Q.   Do you know a customer named Polo?

14   A.   Yes, sir.

15   Q.   Do you know Polo's full name?

16   A.   Apolonio Nunio.

17   Q.   Where was this customer located?

18   A.   In Tepito mall.

19   Q.   Was he a big customer?

20   A.   Yes, sir.

21   Q.   When did he become a customer of you?

22   A.   I believe 2004, 2005, somewhere around there.

23   Q.   Did you have a customer named Namour?

24   A.   Yes, sir.

25   Q.   Where was he located?

19M4DAT5                        Datta - direct

1    A.   In Tepito mall and in Apartado mall.

2    Q.   You heard recorded telephone conversations I believe

3    earlier today regarding a dispute with Polo regarding Namour?

4    A.   Yes, sir.

5    Q.   Explain what that dispute was about, how it was resolved?

6    A.   I had sold merchandise to Namour and did he not pay for six

7    months.   I had been calling him to pay me and one day he told

8    me send somebody to pick up the merchandise, because he knew I

9    could not go to Mexico.   So at that point I asked Octavio if he

10   could send some people to pick that merchandise from Namour so

11   I did could settle my accounts.

12   Q.   How did Polo get involved?

13   A.   Polo's location is right in front of Namour and Polo was

14   selling to Namour merchandise.

15   Q.   So according to the telephone conversation that we heard,

16   what was the issue, what was Polo's concern?

17   A.   If Namour gave all the merchandise then he would not have

18   merchandise to sell and pay to Polo, so Polo was trying to

19   mediate so that the situation can be resolved.

20   Q.   By the time of 2010, how many retail stores did you have?

21   A.   11.

22   Q.   Did you have plans for expanding along the border the

23   retail stores?

24   A.   Yes, sir.

25   Q.   Is that when you hired Fred Chalmers?

19M4DAT5                          Datta - direct

1    A.   Yes.

2    Q.   How much had your wholesale business grown in the previous

3    10 years from when you first started, had it expanded?

4    A.   The wholesale business in last 10 years, from no sale event

5    to $31 million.

6    Q.   When did you go to wholesale of about $30 million?

7    A.   From 3 years back I was in that vicinity, 3 to 4 years

8    back.

9    Q.   You are saying approximately 2007, 2008, 2009?

10   A.   2007, 2008, in 2007 I got around 25 million and then I kept

11   on making small growth.

12   Q.   For the wholesale business who were your suppliers?

13   A.   I have more than 25 suppliers in the country.

14   Q.   Where are they located?

15   A.   In New York, Miami, California, New Jersey.

16   Q.   I believe you said they sell to you on credit?

17   A.   Yes, sir.

18   Q.   On what term?

19   A.   60 to 90 days.

20   Q.   What does that mean?

21   A.   That means I have to pay them in 60 days from the date I

22   receive the shipment, I have to pay them in 90 days from the

23   time I get the shipment.

24   Q.   When you sell to your customers what are the terms?

25   A.   I will give them 30 to 45 days to pay me.

19M4DAT5                          Datta - direct

1              THE COURT:  We are going to take a break here.

2              (Recess)

3              (Jury not present)

4              THE COURT:  What's your forecast, Mr. White; I am

5     afraid to hear.

6              MR. WHITE:  I won't be completed today; maybe an hour

7     in the morning, your Honor.

8                   (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                THE CLERK:  Jury entering.

2                (Jury present)

3                THE COURT:  OK.  The jurors and the defendant are

4     present.

5                Let's continue.

6     BY MR. WHITE:

7     Q.  Mr. Datta, I want to ask you one more question about this

8     journal, Defendant's Exhibit I, in evidence, and I'm going to

9     show you one of the inside pages and ask you to explain what

10    this is.

11    A.  What, sir?

12    Q.  Can you see on the screen, on the left?  There.

13    A.  OK.  This is a sign or logo for Lord Ganesha.  Whenever we

14    start a business and we write the books, so this is the first

15    thing we do when we open.  We put this sign.

16               (Discussion off the record)

17               THE COURT:  You referred to a god.  I think what Vinny

18    wants to know is the name of the god.

19               THE WITNESS:  Lord Ganesha, G-a-n-e-s-h-a.

20    BY MR. WHITE:

21    Q.  Mr. Datta, you testified that the terms that your suppliers

22    extended to you was 60 to 90 days and the terms you extended to

23    your customers was 30 to 45 days.

24    A.  Yes, sir.

25    Q.  And why did you extend to your customers shorter terms than

19mddat6                          Datta - direct

1   your suppliers gave you?

2   A.  Because it will take five to seven days to get that

3   merchandise from the suppliers into my warehouse by the time we

4   got done counting and putting them on the shelves and stored

5   them properly, and we will take another 15 to 20 days to sell

6   or finish that shipment and then the customers will take

7   another -- sometimes they will extend 15 days, 20 days, one

8   month.

9   Q.  Were you always able to pay your suppliers on time for the

10  perfume they had sold to you?

11  A.  Actually, I never paid my suppliers on time; I was always

12  late.

13  Q.  Why?

14  A.  Because customers will always take advantage and I will not

15  get that much, and competition will also try to sell their

16  goods.  So there will be a price war in selling the

17  merchandise.  So sometimes I will take longer time.  And I was

18  expanding, so the money was always tight.

19  Q.  The money was always tight, you said?

20  A.  Yes, sir.

21  Q.  You've heard testimony that you gave postdated checks to a

22  supplier, Nandansons; do you recall that?

23  A.  Yes, sir.

24  Q.  Why were you giving Nandansons postdated checks?

25  A.  Because whenever I will make the order with them, they will

19mddat6                          Datta - direct

1    send me a pro forma invoice so that everything is fine, the

2    quantity and the pricing is fine, and then I will postdate the

3    check for 60 days and I will send it to them.

4    Q.  You would call Yolanda -- you would call Yolanda every

5    morning to ask if there were any deposits?

6    A.  I will call Yolanda more than one time a day or

7    continuously to check if she got any money, the money has gone

8    to the bank, if we can pay to some suppliers.

9    Q.  And what was the purpose of that?

10   A.  So that I can make the payments to my vendors or my

11   suppliers for the perfumes.

12   Q.  So were your accounts receivable greater than your accounts

13   payable?

14   A.  Accounts receivable?

15   Q.  Well, let me withdraw that lousy question and ask you a

16   different one.

17          Was it always a tight squeeze for you to pay your

18   suppliers, to get paid from your customers and pay your

19   suppliers?

20   A.  Yes, sir.

21   Q.  For how long as you were operating La Versailles was that a

22   problem for you?

23   A.  Since I start the business.

24   Q.  I would like to ask you fairly briefly some questions about

25   the wholesale operation, how that worked at La Versailles

19mddat6                              Datta - direct

1    Fragrances, what the process was.

2              And the suppliers, they shipped the perfume to you?

3    A.   Yes, sir.

4    Q.   Right to the warehouse?

5    A.   Yes, sir.

6    Q.   OK.  And that became your inventory, I assume?

7    A.   Yes, sir.

8    Q.   OK.  And how did you go about selling this perfume to your

9    wholesale customers?

10   A.   We will send our customers and my stores every week a list

11   with the new arrivals in the perfume, and the perfumes which we

12   have been -- we are out, we will take them out of the list.

13   Q.   And how would the customer order the perfume?

14   A.   They will check the list, whatever perfumes they need, they

15   will place an order, and we will get the order.

16   Q.   When you sent your price list to a customer, did he always

17   order it from you?

18   A.   No.  My price has to be the best for them to buy from me.

19   Q.   Well, if you didn't -- who would your customer buy the

20   perfume from if not you?

21   A.   From the other store owners in Laredo and also they will

22   buy from New York, from L.A., from duty-free stores.

23   Q.   So once La Versailles received an order, how was that

24   processed?  Very briefly.

25   A.   When the order will come, Cynthia will make a copy of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19mddat6                              Datta - direct

1    order and give it to the warehouse manager and then they will

2    pack the order.

3    Q.   They packed the order?  You mean put it in the cartons and

4    tape it and that type of thing?

5    A.   Yes, sir.

6    Q.   Then what would happen to that perfume?

7    A.   Once when that invoice is created, we will let the customer

8    know the goods are ready, and they will send their freight

9    forwarders to pick up the merchandise.

10   Q.   When the merchandise was picked up by the freight

11   forwarders, was there any kind of receipt or paperwork?

12   A.   Whatever boxes and how the merchandise is packed, they have

13   to sign a receipt with the warehouse manager and we will keep a

14   record of that.

15   Q.   Did La Versailles Fragrances do any shipping of perfumes

16   itself?

17   A.   We -- very rarely we shipped to others -- very rarely we

18   shipped to New York.  I will sell the perfumes to the New York

19   area.  But to my stores, we will ship the merchandise two times

20   a week.

21   Q.   La Versailles Fragrances, operating out of the warehouse,

22   also sold wholesale to your other -- to your retail stores,

23   correct?

24   A.   Yes, sir.

25   Q.   OK.  And that you would ship?

19mddat6                        Datta - direct

A.  That I will ship.  Or we will deliver it to them in Laredo,
only after Laredo we will ship.

Q.  You would ship if you were selling it to, let's say,
Nandansons?

A.  Yes, sir.  I will ship it to Nandansons.

Q.  And how about into Mexico?  Did you ship into Mexico?

A.  No, sir.

Q.  How was their perfume received?  The Mexican customers, how
did they get their perfume?

A.  All the customers in Mexico have their own freight
forwarders.  They will come and they will pick up the perfumes
from us, the boxes, and then they will deliver it to them,
wherever they are in Mexico.

Q.  How did you bill for the perfume that you sold?

A.  In U.S. dollars.

Q.  What was the mechanism -- how do you go about -- what was
the paperwork involved in obtaining payment from one of your
wholesalers?  Would there be invoice bills?  How did you do
that?

A.  We will create the invoices and we will fax them the
invoice, and they will check that everything is fine.  And they
will sent their freight forwarder.

Q.  When was the -- how long after the goods were picked up at
your warehouse would you invoice the customer?

A.  Very -- the same day or next day, the latest.

1   Q.   OK.   And the customer had 30 to 45 days to pay, is that it?

2   A.   Yes, sir.

3   Q.   Now, did you have to charge sales tax on the sales of the

4   perfumes?

5   A.   No, sir.

6   Q.   And why not?

7   A.   Because these are sales into Mexico.

8   Q.   And no sales taxes are required for that?

9   A.   No, sir.

10  Q.   And this is a sales tax imposed by the State of Texas, is

11  it?

12  A.   Yes, sir.

13  Q.   Now, when you were running your wholesale business selling

14  to wholesale customers in 2001, 2002 and 2003, in what form

15  would the payment come to you?

16  A.   The payment will come in checks from casa de cambios or

17  cash.

18  Q.   That was the only two ways?

19  A.   And the wire transfers also, and the customers will come

20  and bring with them the money; they will pay also.

21  Q.   So it would come in cash?

22  A.   Yes, sir.

23  Q.   OK.   And did you say checks from casas de cambio?

24  A.   Yes, sir.

25  Q.   And the wire transfers, where would they be from?

19mddat6                         Datta - direct

1    A.   From the casa de cambios.

2    Q.   And were these casa de cambios located in Mexico, or are

3    they located in the United States?

4    A.   In Mexico.

5    Q.   I'm talking now 2001, 2002, 2003.

6              And did you ever get checks from casas de cambio that

7    were located in the United States?

8    A.   Yes, sir.

9    Q.   What were some of those casas de cambio, the names of them,

10   if you recall?

11   A.   It was only one that we were dealing with.  It was Alpha

12   Casa De Cambio, Alpha Money Exchange in Laredo, Texas.

13   Q.   You said you were dealing with only one.  Who chose the

14   casa de cambio?  Did you choose the casa de cambio?

15   A.   No, sir.

16   Q.   Who chose the casa de cambio?

17   A.   The customers.

18   Q.   What was your understanding -- what was your understanding,

19   then, of why you were paid in different methods?  You were paid

20   by check from a casa de cambio in the United States.  You could

21   get cash from a casa de cambio in Mexico, wire transfers from a

22   casa de cambio.

23   A.   Yes, sir.

24   Q.   And cash.  What was your understanding of why you were paid

25   those different ways?

19mddat6                         Datta - direct

1    A.   The customers will call and they will try to get the best

2    price from different casa de cambios.   From wherever they will

3    get the best price, I believe they will send the money from

4    that place.

5    Q.   When you say "price," what do you mean?

6    A.   They have to change their pesos into dollars for the price

7    for the U.S. currency, for the dollars.

8    Q.   And is the price the same thing as the exchange rate?

9    A.   Yes, sir.

10   Q.   All right.   So it is your understanding that the customers

11   would determine which one has the best exchange rate and that's

12   how you would get the payment?

13              MR. SKINNER:   Objection.

14              THE COURT:   Sustained.

15   Q.   In 2008, 2009, 2010, in what form was La Versailles paid?

16   A.   By checks, by cash, the wire transfers.

17   Q.   The same forms as in earlier in the decade?

18   A.   No.   The cash, we started to see more cash I believe in

19   2009.

20   Q.   But it was the same -- did you also get wire transfers?

21   A.   Yes, sir.

22   Q.   Did you get checks from casa de cambios?

23   A.   Yes, sir.

24   Q.   And did you get cash delivered to you from casas de cambio?

25   A.   Yes, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19mddat6                          Datta - direct

1    Q.   And that was earlier in 2001, 2002, 2003 also?

2    A.   No, sir.

3    Q.   Who would you get cash from then?

4    A.   At that time, we will send to Alpha; they will give us the

5    checks.  Or sometimes I will take the cash, because for the

6    checks to get the immediate credit from the bank, it will take

7    me two or three days.  So if I put the cash, I will have the

8    availability of the funds the same day.

9    Q.   Did you ever get cash paid to you by your customers in

10   2001, 2002, 2003; did they ever pay you in cash?

11   A.   Yes, sir.

12   Q.   And who would bring that -- would that payment be made at

13   the warehouse?

14   A.   I did not have the warehouse at that time.  They will come

15   to the store.  So they will come or they will send one of their

16   relatives or their friends or somebody else is coming from the

17   same market.  They will send the money to the other person.

18   Q.   Now, you said that in 2008, 2009, 2010, you began to

19   receive more cash than you had in earlier years?

20   A.   Yes, because my sales were more.  I was getting

21   proportionately more cash.

22   Q.   But you were getting more cash than you had been getting?

23   A.   Yes, sir.

24   Q.   Now, in 2009, 2010, those years, where was the cash coming

25   from that you were getting in those years?

19mddat6                          Datta - direct

1    A.  They were coming from casa de cambios, and the customers

2    will pick up the casa de cambio, and the casa de cambio people

3    will deliver it to us in the warehouse.

4    Q.  Did you ever give a thought during any of those ten years

5    to where the casas de cambio were getting their U.S. dollars?

6    A.  No, sir.

7    Q.  Why not?

8    A.  Because customers have to get the money to me so they were

9    sending me the money.  So I never gave a thought about it at

10   all.

11   Q.  What was your understanding of whether cash coming across

12   the bridge, the Mexican/United States border from Nueva Laredo

13   into Laredo, what was your understanding of whether it had to

14   be declared at the border?

15   A.  Because when you come to the country or when you go out of

16   the United States of America, if you are carrying more than

17   $10,000, you have to declare with the U.S. Customs.  So that

18   was my understanding, that they have to declare.

19            And when they declare, I believe they gave them some

20   paper or something that they have to --

21            MR. SKINNER:  Objection, your Honor.

22            THE COURT:  What is the objection?

23            MR. SKINNER:  No basis for the defendant's knowledge.

24            THE COURT:  Well, that is a subject -- state of mind

25   here is relevant and you can cross him on it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19mddat6                          Datta - direct

1    BY MR. WHITE:

2    Q.  My question was, though -- let me ask this question.

3            You understood that cash coming across the border in

4    excess of $10,000 had to be declared, correct?

5    A.  Yes, sir.

6    Q.  Was it your understanding --

7            THE COURT:  Don't lead, counselor.

8            MR. WHITE:  OK.

9    Q.  What was your understanding about whether a receipt or a

10   piece of paper or some document was given to the person

11   bringing the dollars across the border?

12   A.  My understanding was if they declared the cash on the U.S.

13   Customs, they will take the name of the person and they will

14   give them some kind of paperwork.

15   Q.  What was that understanding based on?  What made you think

16   that?

17   A.  Because when you declare something, they have to give you

18   something in writing.  That was my understanding.

19   Q.  When you received the -- when La Versailles received the

20   payments at the warehouse -- now I'm talking about after you've

21   been operating the warehouse -- if it was cash, how would that

22   cash be taken in and processed?

23   A.  The cash -- we will receive the cash.  We will count the

24   cash.  We will make up a receipt of which customer sent us the

25   cash.  And the person who was delivering the cash, they will

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

19mddat6                          Datta - direct

1   have their receipt so that we had to sign we received the cash

2   from that person on behalf of which customer.  And then all

3   that then was recorded in the books.

4   Q.  The receipt that -- you gave a receipt to the person who

5   brought you the money?

6   A.  Yes, sir.

7   Q.  Did that person have to sign that receipt or do anything

8   with the receipt?

9   A.  We gave the receipt under the name of the customer who sent

10  the money.

11  Q.  But did the person bringing it have to sign the receipt?

12  A.  It was handled by Yolanda, my accountant.  I never saw

13  that.

14  Q.  You don't know?

15  A.  No, I don't know.

16  Q.  And the person bringing the cash would have a receipt of

17  his own that he would ask La Versailles to sign?

18  A.  Yes, sir.

19  Q.  OK.  And who would do that?

20  A.  Again, Yolanda, the person, she was in charge of the

21  bookkeeping.  It can be Cynthia or it can be Nina.  There were

22  like three people working in the warehouse.

23  Q.  Cynthia and Nina?

24  A.  Yes, sir.

25  Q.  Who else?

19mddat6                    Datta - direct

1   A.  And Yolanda.

2   Q.  And Yolanda.

3           And then you said the payment was entered on the

4   books?

5   A.  In the books in Cynthia's computer, in her --

6   Q.  What was in Cynthia's computer?

7   A.  In Cynthia's computer was the whole inventory from where

8   she will sell, and we will have a separate account of each

9   customer, because each customer had a credit limit and we had

10  to pay and credit it if their payments were good or then we

11  will give them the credit.  If not, then we have to count on

12  their credit.  So Cynthia had to keep her accounts and then

13  Ms. Yolanda will keep in the QuickBooks.

14  Q.  What will she enter in the QuickBooks with respect to the

15  cash payment that came in?

16  A.  Because she had to enter the amount in the QuickBooks, so

17  each entry was done two times in the computer and one time in

18  the ledger.

19  Q.  You say "one time in the ledger."  What are you referring

20  to?

21  A.  We had the ledger like you showed me, we had a ledger like

22  that so there were three entries for the one transaction.

23  Q.  Why did you do three entries?

24  A.  So this way Cynthia did not have to disturb them to see how

25  much of the balance, open balance of the customers.  So she was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19mddat6                          Datta - direct

1    on top of everything.

2                And in the ledger, because in case something goes

3    wrong with the computers, I have my own accounts.

4    Q.   Now, did La Versailles -- had La Versailles, since you

5    started the wholesale business -- when you started the

6    wholesale business in 2000, 2001, did you receive payments in

7    cash of over $10,000?

8    A.   Yes, sir.

9    Q.   Did you complete Form 8300s for the IRS when you received

10   those payments?

11   A.   In the beginning, no, sir.

12   Q.   And when did you start -- when did you start -- well, when

13   did you start filling out Form 8300s?

14   A.   I believe it was in 2009 or 2010 -- in 2009, I believe.

15   Q.   And in all those years prior to it, you had not filed Form

16   8300s?

17   A.   No, sir.

18   Q.   Why?

19   A.   Because my accountant in Arizona had given me a form like

20   we had to keep our information of the customers.  And when we

21   will make the deposit in the bank, on the deposit slip we will

22   name -- put the name of the customer.  So I was thinking that's

23   what I was supposed to do tell it to the bank from where I'm

24   getting the money.  So the deposit was made under the name of

25   the customer in the bank.

19mddat6                          Datta - direct

Q.  Were all your records -- were all your records -- the
invoices, the Excel entries, the QuickBooks, the receipts --
was everything always put in the name of the customer?

A.  Yes, sir.

Q.  When did you start doing Form 8300s?

A.  I believe in 2009.

Q.  And what caused you to start doing it?

A.  One of my friends in duty-free business, he had an audit
and he asked me, Vikram, are you filing Form 8300?  I said,
What is that?  He said, it's some form when you get more than
$10,000, you have to fill out.  I said, No, I'm filling out the
other form.  He said, Which form?  I said, Why don't you speak
to Yolanda.  I have no knowledge of it.  So she will tell you
the form.

        And then he called me back.  He said, That form is not
the right form.  You have to fill out the Form 8300.

        And that's when we started to file the Form 8300.

Q.  Who is this person who told you this?

A.  His name is Mr. Stuart.

Q.  And why did this subject come up?

A.  Because he had an audit from IRS.

Q.  The form that you were using prior to doing Form 8300s, do
you know what it was called?

A.  It was -- I believe it was some border -- border form.  It
was used in California, Arizona and Texas and New Mexico and

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

19mddat6                              Datta - direct

1   all the bordering states with Mexico.

2   Q.   And do you know who issued that form, where that form came

3   from?

4   A.   That has to be from some department of the government.

5   Q.   And did you have a form like that for all your customers?

6   A.   Yes, sir.

7   Q.   And what information was on that form?

8   A.   The customers, all their information -- their passports,

9   their identification, their addresses and everything.

10  Q.   You say their passport.  Did it have a copy of their

11  passport?

12  A.   Yes, sir.

13  Q.   And did you maintain a file -- what did you do with these

14  forms?

15  A.   I maintained the file of all the customers, and with the

16  addition of any new customers, we added double forms and then

17  we kept a record of all the customers.

18  Q.   Did you say the deposit slips would have the name of the

19  customer when you deposited it into the bank?

20  A.   Yes, sir.

21  Q.   Now, when you started doing 8300s, Form 8300s, filing them

22  with the IRS, who did that?

23  A.   Yolanda.

24  Q.   And when she completed -- how often did she do it, do you

25  know?

19mddat6                          Datta - direct

1    A.   She did two times a month.

2    Q.   OK.   And would you sign those forms after she completed it?

3    A.   Yes, sir.

4    Q.   How did you know they were accurate when you signed them?

5    A.   I would just try to match the figures, whatever they

6    received, and I will just sign it.

7    Q.   Did you say you would match the figures to what was

8    received?

9    A.   In the Form 8300s, they have to put the figure two times,

10   and so I will just see these four figures that match and I will

11   sign.

12   Q.   What was your understanding of whether those Form 8300s

13   were properly filled out or not?

14   A.   I think we had to tell from where we are getting the money.

15   We were getting the money from the customers.   So we put the

16   customers' information and we sent the forms.

17            MR. WHITE:   Your Honor, I'm going to move over to a

18   complete new subject now.

19            THE COURT:   All right.   We are going to break here,

20   members of the jury.   We'll see you at 9:30 tomorrow morning.

21            (Continued on next page)

22

23

24

25

19mddat6                            Datta - direct

1            (Jury not present)

2            THE COURT:  You can step down right now, Mr. Datta.

3            (Witness excused)

4            THE COURT:  Be seated.

5            All right.  What's left?  Just Mr. Datta?

6            MR. WHITE:  Yes.

7            THE COURT:  And you have about an hour left?

8            MR. WHITE:  Yes.

9            THE COURT:  Do you have any idea on cross?

10           MR. SKINNER:  Your Honor, I think maybe about an hour.

11   I will try not to go overboard on this.

12           THE COURT:  All right.  Does any of this testimony

13   provoke any further request for instructions?

14           MR. SKINNER:  Thus far, no.

15           THE COURT:  OK.  All right.  Anything else we can

16   usefully accomplish tonight?

17           MR. ROSS:  One thing, just for overnight thought

18   perhaps.  I read the instructions, and I know your Honor

19   earlier made some mention of what I later observed to be

20   absolutely true, that is, the redundancy, the repetition of the

21   instructions, because somebody -- you know, all the different

22   objects of the statute, money laundering statute, have been

23   elected by the government.  I haven't been able come up -- and

24   I tried to give some thought to some way to streamline that.  I

25   haven't been able to do so, and I don't believe the government

19mddat6

1    has either.

2            So it dawns on me, your Honor, that I would perhaps

3    ask at least that the Court consider as part of the Rule 29

4    motion previously made that -- as a subargument, that some of

5    the objects there has been no evidence of -- you know, I'm not

6    really sure that it is a Rule 29 issue, but I don't know of any

7    other way to streamline what this jury is going to hear.  It is

8    just this volume of repetition.

9            THE COURT:  The Rule 29 ship, as of the end of the

10   government's case, has sailed.

11           MR. ROSS:  It has.

12           THE COURT:  So I'm not retroactively amending your

13   motion, particularly --

14           MR. ROSS:  I can renew later.

15           THE COURT:  -- given the vagueness of what you say.

16   We can deal with whatever the situation may be at the close of

17   all the proof -- at the close of all the proof.

18           Is there likely to be a rebuttal case?

19           MR. SKINNER:  I would say very unlikely, your Honor.

20   We have the possibility of one or two witnesses, but at this

21   point we don't have anybody subpoenaed or any plans to call

22   anybody.  We are going to talk about it after the break today.

23   But I think it would be very unlikely.

24           THE COURT:  OK.  Well, then, you should be prepared to

25   get the charge, the draft charge, right at the end of the proof

19mddat6

1   tomorrow to read it quickly and to move right into the charge

2   conference and to sum up Monday morning.

3          OK.  Thanks.

4          MR. SKINNER:  Thank you, your Honor.

5          THE COURT:  I hasten to add that the charge conference

6   will be over when it is over tomorrow.  It is not an invitation

7   for a whole bunch of new objections and requests to charge on

8   Monday morning.

9          MR. ROSS:  Very well.

10         (Adjourned to 9:30 a.m., Friday, September 23, 2011)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2      Examination of:                        Page

3      MIGUEL CARRERA                          659

4      Direct By Mr. Skinner . . . . . . . . . 659

5      Cross By Mr. Ross . . . . . . . . . . . 687

6      JOHN ADAMS

7      Direct By Mr. White . . . . . . . . . . 693

8      FRED CHALMERS

9      Direct By Mr. White . . . . . . . . . . 731

10     Cross By Mr. Skinner . . . . . . . . . . 735

11     Redirect By Mr. White . . . . . . . . . 737

12     LALIT ABICHANDANI

13     Direct By Mr. White . . . . . . . . . . 738

14     VIKRAM DATTA

15     Direct By Mr. White . . . . . . . . . . 756

16

17

18

19

20

21

22

23

24

25

```
1                        GOVERNMENT EXHIBITS

2    Exhibit No.                              Received

3    428, 429, 431, 434  . . . . . . . . . 660

4    439, 440, 439T, 440T  . . . . . . . . 663

5    426 426T  . . . . . . . . . . . . . . 674

6    430, 432, 430-T, 432-T  . . . . . . . 676

7    424 and 424-T  . . . . . . . . . . . . 676

8    420 and 422  . . . . . . . . . . . . . 677

9    423 and 423-T  . . . . . . . . . . . . 678

10   438 and 438-T  . . . . . . . . . . . . 681

11   422 and 422-T  . . . . . . . . . . . . 682

12   O  . . . . . . . . . . . . . . . . . . 782

13                        DEFENDANT EXHIBITS

14   Exhibit No.                              Received

15   F  . . . . . . . . . . . . . . . . . . 699

16   I  . . . . . . . . . . . . . . . . . . 776

17   K  . . . . . . . . . . . . . . . . . . 780

18   J  . . . . . . . . . . . . . . . . . . 780

19   L  . . . . . . . . . . . . . . . . . . 781

20   M  . . . . . . . . . . . . . . . . . . 781

21   N  . . . . . . . . . . . . . . . . . . 782

22   P  . . . . . . . . . . . . . . . . . . 783

23   Q  . . . . . . . . . . . . . . . . . . 783

24   R  . . . . . . . . . . . . . . . . . . 784

25   S  . . . . . . . . . . . . . . . . . . 785
```

19nddat1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                    New York, N.Y.

4              v.                                 (S1) 11 Cr. 102 (LAK)

5    VIKRAM DATTA,

6              Defendant.

7    ------------------------------x

8                                                 September 23, 2011
9                                                 9:50 a.m.

10

11   Before:

12                      HON. LEWIS A. KAPLAN,

13                                                District Judge

14                            APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  PETER M. SKINNER
17        ALVIN L. BRAGG, JR.
          Assistant United States Attorneys

18

19   ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN PA
          Attorneys for Defendant
20   BY:  ALAN S. ROSS

21   WHITE & WHITE
          Attorneys for Defendant
22   BY:  DIARMUID WHITE

23             - also present -

24   Vanessa Quinones, Government paralegal
     SA Richard Reinhardt, IRS
25

19nddat1                              Trial

1              (Trial resumed; jury not present)

2              MR. ROSS:  Your Honor, just a side housekeeping matter

3       while Andy is on his way to get the jury.

4              Exhibit C, Defendant's Exhibit C that was admitted

5       into evidence was an 8300 form with instructions, and the

6       government pointed out this morning that the form that we

7       marked and had admitted is the new form that's going to be

8       effective in 2011.  The government provided us the form that

9       was in effect at the time of the offense conduct.  We've agreed

10      to substitute it.  We have done so.

11             THE COURT:  OK.  I assume that's OK with you, right?

12             MR. SKINNER:  Yes, your Honor.

13             THE COURT:  OK.

14             MR. ROSS:  Thank you.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

19nddat1                          Trial

1          THE CLERK:  Jury entering.

2          (Jury present)

3          THE COURT:  All right.  The jurors are present.  Good

4     morning, everybody.

5          The defendant is present.  He is still under oath.

6     Let's continue, counsel.

7      VIKRAM DATTA,

8          Resumed, and testified further as follows:

9     DIRECT EXAMINATION (Resumed)

10    BY MR. WHITE:

11    Q.  Good morning, Mr. Datta.

12    A.  Good morning, sir.

13    Q.  Did there come a time in 2010 where you learned that some

14    customers had had money deposited directly into your -- into La

15    Versailles' account?

16    A.  Yes, sir.

17    Q.  How did that come to your attention?

18    A.  I believe I was traveling, checking onto my other stores,

19    when I came back to Laredo --

20    Q.  Could you speak up a little bit, Mr. Datta?

21    A.  I was traveling, checking my other stores in McAllen or

22    someplace else.  When I came back, my accountant, she told me

23    that there are people that have been depositing money into bank

24    accounts into different states.  And I asked her, who are those

25    customers.  She told me.  I said, send a letter to all the

19nddat1                        Datta - direct

1    customers they cannot do that anymore and if they do it, I will

2    personally report it to the authorities.  And that's how this

3    thing was handled, this situation was handled.

4    Q.  Was a letter prepared?

5    A.  Yes, sir.  I wrote a letter in English and then Yolanda or

6    Cynthia, they changed the letter into Spanish and they sent to

7    the customers, to all the customers with their accounts and

8    with the list which we send every Friday or Thursday to the

9    customers.

10   Q.  The letter that you wrote out in English, was it a

11   handwritten letter?

12   A.  Yes, sir.

13   Q.  Showing Mr. Datta what was previously marked as Defendant's

14   Exhibit E; do you recognize that, Mr. Datta?

15   A.  Yes, sir.

16   Q.  Is that the letter that you wrote out in English?

17   A.  Yes, sir.

18            MR. WHITE:  I offer this letter, your Honor.

19            MR. SKINNER:  Your Honor, we object to the letter as

20   hearsay.

21            MR. WHITE:  It is not being offered for the truth,

22   your Honor.

23            THE COURT:  Let me read it.

24            (Pause)

25            THE COURT:  Come to the sidebar, folks, and I don't

1    think I've seen the whole thing.  I think I've seen only part

2    of it on the screen.

3              (At the sidebar)

4              THE COURT:  OK.  What is it being offered for?

5              MR. WHITE:  It is being offered to show that he took

6    action and directed his clients not to deposit money into his

7    account.

8              THE COURT:  Suppose what it said is let's all go to

9    the World Series together.  I don't get the relevance.

10             MR. WHITE:  The relevance is when he learned that

11   money was being deposited directly into his account, he took

12   action to stop it.  That's why the --

13             THE COURT:  What he says:  I had a meeting with bank

14   officers, and law enforcement officers were present also.  I

15   can't allow anybody to deposit cash in the bank account.  They

16   won't be credited unless you come to Laredo and meet with the

17   law enforcement officers.

18             MR. WHITE:  Yes.

19             THE COURT:  Boy, is that probative.

20             MR. WHITE:  Your Honor, you can give a limiting

21   instruction that it is only being offered to show that

22   Mr. Datta took action when he learned of this, that it is not

23   being offered for the truth of the contents.

24             MR. ROSS:  And, your Honor, I might suggest it also

25   shows his state of mind that he is not approving, which is

19nddat1                          Datta - direct

1      going to be the government's argument at the end of this case,

2      that those deposits up in New Jersey direct from Mr. Ramirez

3      Lara were done somehow with his approval.  He found out about

4      it afterwards.  He disapproved of it.  And this letter was the

5      result to every one of his customers.

6              MR. SKINNER:  I don't have a problem with the

7      testimony itself about what he did.  But I think the document

8      itself is being offered for the truth of the content in the

9      document and it is hearsay.

10             MR. WHITE:  It is not, and it corroborates what he is

11     saying.  He can just say it but this corroborates it.

12             THE COURT:  So then you are bolstering.

13             MR. ROSS:  And, your Honor, the testimony was this was

14     identified first by Agent Reinhardt, that it was there when he

15     searched the premises, the Bates stamped numbers --

16             MR. SKINNER:  He testified he didn't recall seeing

17     this.

18             THE COURT:  OK.  If it is not offered for the truth,

19     what does it prove?

20             MR. WHITE:  It proves that he took action when he

21     learned of this and advised, instructed his clients not to

22     deposit cash directly into his account.  And an instruction or

23     a command is not hearsay, your Honor, because it is not an

24     assertion of fact, it is a verbal act or what is called a

25     verbal act.

19nddat1                          Datta - direct

1              THE COURT:  What do you say to that?

2              MR. SKINNER:  That this handwritten piece of paper

3      proves that he sent the letter?  We don't even have a typed

4      form letter, we don't have an envelope.  We don't have

5      anything.

6              MR. WHITE:  It is evidence that he took action.  You

7      can cross-examine on whether it was sent or not.

8              MR. SKINNER:  I think the evidence that he took action

9      was his testimony that he asked for a letter to be sent.  I

10     think this is simply --

11             MR. WHITE:  He wrote out the letter.

12             MR. SKINNER:  I think this is simply bolstering what

13     he says, and I think you are asking it for is to back-door a

14     document that states the truth of what you are trying to prove,

15     which is that he had a meeting with bank officers, he doesn't

16     allow his customers to deposit cash in the bank.

17             MR. WHITE:  As I said, the Judge can instruct the

18     jury --

19             THE COURT:  I'll take it but I will give a limiting

20     instruction.

21             Now, can I hold on to this for a minute, or do you

22     need it?

23             MR. WHITE:  You can hold on to it.  It is the same

24     thing, your Honor.

25             MR. ROSS:  Yes.

1          THE COURT:  I just don't have one.

2          MR. WHITE:  OK.

3          MR. ROSS:  Take the one that is the exhibit.

4          (Continued on next page)

19nddat1                          Datta - direct

1              (In open court)

2              THE COURT:  All right.  Defendant's Exhibit E is

3    received for a limited purpose, members of the jury.

4              It is not to be considered by you for the truth of

5    anything it says.  The witness has testified he wrote out this

6    letter and you may receive it for, assuming you accept his

7    testimony, that he made this statement in writing at or about

8    the time he says he made it, but you may not consider it for

9    the truth of what he says in it.

10             OK.  Let's go ahead.

11             (Defendant's Exhibit E received in evidence)

12   BY MR. WHITE:

13   Q.  So Defendant's Exhibit E, that's on the screen before you,

14   Mr. Datta, is that the letter you wrote out?

15   A.  Yes, sir.

16   Q.  And was a two-page letter?

17   A.  Yes, sir.

18   Q.  And what did you do with this after you wrote it out?

19   A.  I gave it to Yolanda to write it in Spanish and then send

20   it to all the customers.

21   Q.  Do you know if she did send it -- did write it in Spanish?

22   A.  Yes, sir.

23             MR. SKINNER:  Objection, your Honor.

24             THE COURT:  I'm sorry.  Say that again.

25             MR. SKINNER:  Objection.  How would he know?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  You know, I do have a small role to play

2     here, if counsel would permit me to do so.

3          The answer to the last question, namely, "Yes, sir,"

4     is stricken.

5          Go ahead.  You have no foundation for it.

6          MR. WHITE:  OK.

7     BY MR. WHITE:

8     Q.  Did you see a copy of your letter translated into Spanish?

9     Did you ever see it?

10    A.  Yes, sir.

11    Q.  How did you see it?  When did you see it?  Where did you

12    see it?

13    A.  I was in my office and they're in their office.  I called

14    Yolanda.  I gave her the letter.  They translated the letter.

15    Towards the end of the day, they came back to me with the

16    letter and it was Cynthia and Yolanda.  They confirmed what is

17    in the letter.

18          And at that time we were sending our weekly list with

19    the accounts to the customers, and the letter went with that.

20    And the fax machine is in my office where I see everything,

21    what's happening.  I saw everything happen.

22    Q.  Showing you Defendant's Exhibit T, for identification,

23    Mr. Datta, do you recognize that document?

24    A.  Yes, sir.  This is the letter in Spanish.

25          MR. WHITE:  I offer Defendant's Exhibit T, your Honor.

19nddat1                          Datta - direct

1              THE COURT:  Excuse me.  How do you know that, sir?

2              THE WITNESS:  What, sir?

3              THE COURT:  How do you know that it is the letter in

4    Spanish?

5              THE WITNESS:  Because I saw this letter and I read the

6    letter a little bit in Spanish, it's written.

7              (The witness read in Spanish from Exhibit T)

8              THE WITNESS:  That from there, I know the problem with

9    the bank, they were depositing the money in the bank, and that

10   was the letter, sir.

11             THE COURT:  Could you translate this letter for the

12   jury?

13             THE WITNESS:  In Spanish?  My Spanish is not good,

14   sir.  But they wrote this letter in front of me and I saw that

15   letter, sir.

16             THE COURT:  Received.

17             (Defendant's Exhibit T received in evidence)

18   BY MR. WHITE:

19   Q.  Are you aware, Mr. Datta, of any of your customers having a

20   copy of a credit card or a debit card for La Versailles

21   Fragrances?

22   A.  No, sir.

23   Q.  Are you aware of any of your customers having a PIN number

24   for any bank account for La Versailles Fragrances?

25   A.  No, sir.

1    Q.  You've heard testimony here concerning disputes you had

2    with Ms. De la Garza at the IBC Bank.  Do you recall that

3    testimony?

4    A.  Yes, sir.

5    Q.  And one was in May of 2009 regarding what?

6    A.  With Ms. Garza, I always needed immediate credit for my

7    checks deposited in the bank.

8    Q.  Why?

9    A.  Because I needed to send the money to my vendors.  So

10   that's where there was always a problem with her.

11   Q.  And what is it that you proposed to do?

12   A.  I told her I'm going to -- you know, if you do not give me

13   the immediate credit, I will move my bank accounts to the

14   other -- all my accounts to another bank.

15   Q.  What kind of check did you want immediate credit on?

16   A.  The checks which were returned from my retail stores to the

17   wholesale.

18   Q.  Checks from the retail stores to La Versailles Fragrances?

19   A.  To my wholesale account, and, also, I always maintained two

20   accounts for La Versailles Fragrances, one that with the IBC

21   Bank and the other at that time at the Falcon Bank.

22   Q.  And what did you do with the checks from the retail stores

23   that were made out to La Versailles?

24   A.  I deposited in the banks.

25   Q.  Which bank?

19nddat1                          Datta - direct

1    A.  With IBC Bank, and the retail accounts were I believe in

2    LNB bank, Laredo National Bank, at that time.

3    Q.  So the check that you were depositing into IBC was made out

4    to La Versailles Fragrances?

5    A.  Yes, sir.

6    Q.  And who were those checks drawn on?

7    A.  To my retail stores.  They are separate operations.  There

8    were separate accounts.

9    Q.  And they paid La Versailles Fragrances by check?

10   A.  Yes, sir.

11              THE COURT:  I think what I understood counsel to be

12   asking, but in any case I'll ask it myself:  Were they drawn on

13   different banks?

14              THE WITNESS:  Yes, sir.

15              THE COURT:  OK.  So it is as if you had one store with

16   an account at Chase Manhattan writing a check to La Versailles

17   and depositing it in a different bank than Chase Manhattan?

18              THE WITNESS:  Yes, sir.  Exactly like that.  Thank

19   you, sir.

20   BY MR. WHITE:

21   Q.  And was there another reason?  Did it have anything to do

22   with tracking -- tracking transactions?

23   A.  Yes, sir, because --

24              MR. SKINNER:  Objection, your Honor.

25              THE COURT:  Sustained.  The answer is stricken.

19nddat1                        Datta - direct

1   Q.  Do you recall Ms. De la Garza's testimony, that you told

2   her this was so you could track --

3              MR. SKINNER:  Objection, your Honor.

4              THE COURT:  Sustained.  You are just leading.  You are

5   just putting the words in his mouth.

6              MR. WHITE:  I am just trying to call it to his

7   attention, your Honor.

8   BY MR. WHITE:

9   Q.  What does tracking mean to you, Mr. Datta?

10  A.  I wanted to keep the accounts clear between my retail

11  stores and in my wholesale company.  So I didn't want them to

12  be mixed up, because there were invoices generated from La

13  Versailles Fragrances to the retail stores so at the end of the

14  year those accounts had to be matched.

15  Q.  Approximately a year later, did you have another dispute

16  with IBC Bank?

17  A.  With them, more or less, you know, like I wanted on

18  every -- toward the end of every month, I was under the

19  pressure to send the payment to my vendors.  So I always tried

20  to get the immediate credit for the checks deposited.

21             THE COURT:  So is the answer yes or is the answer no

22  that a year later there was another dispute?

23             THE WITNESS:  Yes, sir, there was another dispute.

24  Q.  Did there come a point in time where IBC Bank wanted to see

25  La Versailles Fragrances' invoices?

19nddat1                         Datta - direct

1   A.  Yes, sir.

2   Q.  And what was your position with regard to that request?

3   A.  I wanted to protect the information of my wholesale

4   business so I didn't give it to her.

5   Q.  What do you mean, you wanted to protect it?

6   A.  My customers and at what prices I'm selling to my

7   customers.

8   Q.  And why were you concerned that giving it to a bank might

9   compromise that information?

10   A.  In the bank there was an employee who was very close with

11   one of the competition.

12   Q.  Which competitor?

13   A.  Sunny Perfumes.

14   Q.  Did you keep your account at IBC open?

15   A.  I had the account open, but I had opened accounts in Wells

16   Fargo and LNB and I moved all the retail accounts into LNB

17   Bank.

18   Q.  Did you open any accounts at BBVA?

19   A.  LNB Bank and BBVA is the same bank; they merged or

20   something happened.

21   Q.  Did you have any issues with BBVA Bank in 2010?

22   A.  Yes, sir.

23   Q.  And what was the issue?

24   A.  They sent me a letter.  They wanted to close all my

25   accounts.

19nddat1                          Datta - direct

Q.   And what did you do?

A.   I tried to speak to the people in the bank.  Mr. David Puig
was the accounts manager.  I spoke to him.  He said it is not
in my hand.  You know, I said, then whom should I speak to?  He
said, The president of the bank.  It was Mr. John Paulo.  So I
reached and I called Mr. John Paulo and I met him.

Q.   Was it important to you to keep that account open?

A.   It was very important, sir, to keep all my accounts open.

Q.   To keep all your accounts open?

A.   Yes, sir.

Q.   And what did you do in an effort to keep the account open
with BBVA?

A.   I requested Mr. John Paulo to give me one hour, and I was
pushing him, pushing for the meeting because I had to travel on
that day to San Diego.  And then when he met me, finally he
agreed.  So I went with a lot of documents to Mr. John Paulo.

Q.   Just very generally, what kind of documents?

A.   I took the tax returns of all the retail corporations.  I
took the tax returns of La Versailles Fragrances, Inc. from the
day they are opened, they are in business, and I took my
personal income tax returns for ten years.  I took all the
sales tax returns to the bank for all the corporations.  And I
also asked him, I have 1.7 million point of sales cash register
tickets which I sell, I can bring him that also for all the
years I have separate.  I have the whole account of everything

19nddat1                    Datta - direct

1    which came in to one corporation and all the corporations and

2    everything which went out.

3    Q.   Did you say anything to him about the future of La

4    Versailles Fragrances?

5    A.   Yes, sir.

6    Q.   What did you say?

7    A.   Because he had --

8    Q.   My question is, what did you say?

9            What did you tell him about the future of your

10   business?

11   A.   I told him, I'm planning to expand, I'm planning to open

12   more stores, I'm planning to open a duty-free company, so it

13   will be much more business.

14   Q.   What you told him, was that your actual expectation, or was

15   it an exaggeration?

16   A.   It was an exaggeration.

17   Q.   Did you have a telephone conversation with a woman named

18   Liz while you were involved in another conversation with Mario?

19   A.   Yes, sir.

20   Q.   Or with a third person, with somebody else?

21   A.   Yes, sir.

22   Q.   You received a phone call from Liz, did you?

23   A.   Yes, sir.

24   Q.   Who is Liz?

25   A.   Liz was the manager at the Nogales retail store, Nogales,

19nddat1                          Datta - direct

1    Arizona.

2    Q.   Nogales is where?

3    A.   Nogales is in Arizona.

4    Q.   Do you have a safe in the La Versailles warehouse?

5    A.   Yes, sir.

6    Q.   Did you ever permit one of your customers to put money into

7    your safe in the warehouse?

8    A.   Actually more than one customer.  Whenever they had money,

9    they will keep the money in the safe.

10   Q.   What do you mean, "whenever they had money"?

11   A.   Whenever the exchange rate was favorable to the customers,

12   they will change all their pesos and they will bring the

13   dollars and they will leave in my -- in the safe.

14   Q.   How many times did that occur?

15   A.   More than ten times.

16   Q.   And these customers, were these customers from the United

17   States or customers from Mexico?

18   A.   These are the customers from Mexico.

19   Q.   And why did you permit them to put the money into your

20   safe?

21   A.   It is a great confidence of the customers in me, they

22   trusted me with their money that --

23         MR. SKINNER:  Objection, your Honor.

24         THE COURT:  Sustained.  It is stricken.

25         Answer the question directly, sir.

19nddat1                          Datta - direct

1    Q.   Why did you permit them to do that?

2    A.   To honor their confidence in me.

3    Q.   And what would happen to that money that was in the safe?

4    A.   They will leave the money in the safe and they will go back

5    to Mexico.  So whenever they will come back, they will take the

6    money whenever they needed the money to make the payment to

7    other store owners.

8    Q.   So the money wasn't for payments to La Versailles; is that

9    what you are saying?

10   A.   From there they were paying to me and to the other stores

11   in Laredo.

12   Q.   "Other stores" meaning actually your competitors?

13   A.   Yes, sir.

14   Q.   Did you ever take cash from your retail stores and put it

15   aside for future use?

16   A.   Yes, sir.

17   Q.   What time of the year would you do that?

18   A.   In December, when the sales were very heavy for the holiday

19   season.

20   Q.   Is December your biggest month?

21   A.   Yes, sir.

22   Q.   What percent of the year's sales, roughly, would you say

23   occur in December?

24   A.   Between Thanksgiving and Christmas, I will say around

25   35 percent sales of the whole year will happen.

19nddat1                          Datta - direct

1    Q.   Is there a period of the year that is particularly slow?

2    A.   Yes, sir.  In the holy month of Easter, in March/April,

3    it's very slow.

4    Q.   Do you mean the month preceding Easter?

5    A.   During the Easter, when they go to church with it is called

6    with the ash or the lent for one month, it is very slow,

7    absolutely no business.

8    Q.   Now, getting back to cash that you would take and hold for

9    future use, what did you do?

10   A.   I will keep in the safe at the IBC Bank.

11   Q.   And what would happen with that cash?

12   A.   In those months I will bring that money back into the

13   warehouse, and then as I need the money to make the payments to

14   my vendors, I will deposit them back in the bank accounts.

15   Q.   What bank accounts?

16   A.   In the retail stores' bank account.

17   Q.   And you say you would deposit it back in that month.  Are

18   you talking about the month before Easter?

19   A.   During that month and after the month of Easter, like in

20   May/June; it was slow during that time.

21   Q.   Do you have any bank accounts overseas?

22   A.   No, sir.

23   Q.   Do you have any secret bank accounts?

24   A.   No, sir.

25   Q.   From your years working in the perfume business, were you

1   aware of ways to launder money?

2   A.   Yes, sir.

3   Q.   How did you become aware of ways to launder money?

4   A.   There were a couple of people arrested in New York and in

5   the perfume industry, and in the conversations -- during the

6   conversations with other people in the perfume industry, I came

7   to know.

8   Q.   What were some of the ways you heard or that you were aware

9   of that money could be laundered in the perfume business?

10   A.   I heard they were putting the money in the boxes and they

11   were sending it overseas.

12   Q.   Any other ways?

13   A.   And they were buying perfumes, they were selling perfumes,

14   I believe.

15   Q.   Were you aware of any use of invoices to launder money?

16          MR. SKINNER:   Objection.

17          THE COURT:   Sustained.

18   Q.   Do any other -- aside from putting cash into the perfume

19   boxes, were you aware of any other way that money could be

20   laundered through the perfume business?

21   A.   No, sir.

22   Q.   I would like to call your attention to October 13th of

23   2009.   Were you in the New York area at that time?

24   October 13th of 2009.

25   A.   I'm not sure.

19nddat1                         Datta - direct

1   Q.   OK.

2                   THE COURT:   Counselor, do you mean on that day, is

3   that what you are asking?

4                   MR. WHITE:   Yes.

5                   THE COURT:   When you say were you in New York, is the

6   question designed to elicit whether he was physically present

7   on an occasion at or about that time, or was he doing business

8   here, or was he living here?

9   BY MR. WHITE:

10  Q.   Were you doing -- have you ever visited Nandansons?

11  A.   Yes, sir.

12  Q.   Where were they located when you visited them?

13  A.   In Edison, New Jersey.

14  Q.   Did you visit them in October of 2009?

15  A.   Yes, sir.

16  Q.   And what was the purpose of that visit?

17  A.   Mr. Gupta had a granddaughter that is Ankur's daughter.   I

18  went to visit them and give the blessings to the child.

19  Q.   Did you conduct any business during that visit?

20  A.   Yes, sir.   In -- yes, sir.

21  Q.   How long were you at Nandansons?

22  A.   Approximately two hours.

23  Q.   And what did you do during those two hours?

24  A.   I gave the -- first of all, I gave the gift to the newly

25  born baby and then we sat down.   We started to talk, have

19nddat1                    Datta - direct

1  conversation.  We had some tea.  And then we were just talking.

2  Q.  Did you order any perfume that day?

3  A.  Yes, sir.

4  Q.  Did you discuss your own business with the -- who were the

5  people at Nandansons that you met with?

6  A.  It was Ankur Gupta, Mr. Ajay Gupta, his father, and another

7  gentleman, Mr. Roberto, I believe.

8  Q.  Did you actually speak to Mr. Roberto?

9  A.  I believe we shook hands and that's all.

10  Q.  When did you shake hands with him?

11  A.  When I first went into the -- in the conference room.

12  Q.  What makes you think that that was Mr. Roberto?

13  A.  Because I had met him in the March show.

14  Q.  You mean several months earlier you had met him?

15  A.  I believe I -- I believe I met him -- I met Mr. Roberto, I

16  remembered him somehow from the shows, from somewhere.

17  Q.  Were you to meet him again after you visited Nandansons?

18  Did you meet him again after you visited Nandansons?

19  A.  Mr. Roberto?

20  Q.  Yes.

21  A.  Yes, at the show.

22  Q.  And when was that show?

23  A.  August show -- it was I believe in the March show.

24  Q.  When you saw him in March, did he look like the person you

25  had seen in Nandansons back in October?

19nddat1                          Datta - direct

1    A.  Yes, sir, I believe.

2    Q.  Are you sure of that?

3    A.  I'm not a hundred percent sure, sir.

4    Q.  Other than greeting Roberto, did you have any conversation

5    with him?

6    A.  No, sir.

7    Q.  Was he in the meeting with you and Ajay Gupta and Ankur

8    Gupta?

9    A.  No, sir.

10   Q.  In that meeting, did you tell the Guptas -- did you provide

11   a lot of information to them about your business?

12   A.  Yes, sir.

13   Q.  Is everything you told them about your business true?

14   A.  No, sir.

15   Q.  Why did you tell them things that weren't true?

16   A.  In our business, we -- it's very, very confidential and

17   secretive business.  We try to hide from the competition or the

18   people in the same business the real information about our

19   business.

20   Q.  Was some of the information you gave them true?

21   A.  Some.

22   Q.  Was any exaggerated?

23   A.  There were exaggerations, sir.

24   Q.  Did you tell them of an occasion where you received on one

25   day $1.3 million cash from Octavio?

19nddat1                          Datta - direct

1   A.  I said --

2   Q.  Did you tell them that?

3   A.  Yes, sir.

4   Q.  Was that true?

5   A.  No, sir.

6   Q.  You told them that you put that in the backpack of Cynthia

7   to take to the bank, correct?

8   A.  Yes, sir.

9   Q.  Was that true?

10  A.  No, sir.

11  Q.  Why did you tell them that?

12  A.  I'm sorry?

13  Q.  Why did you tell them that?

14  A.  Because when I was in New York, Nandansons were a very big

15  company and I was a very small guy.  So their behavior was not

16  respectable to me at that time.  So when I went back, I just

17  tried to impress them with those numbers.

18  Q.  Did you have phone calls with Ankur Gupta between that

19  meeting in October and March of 2009?

20  A.  I will talk with Ankur Gupta because I was buying from

21  them, they were my suppliers, and I will sell to them also.

22  Q.  Well, about a month after your meeting, did you have a

23  telephone call with Ankur Gupta in which he proposed a

24  particular transaction to you?  Yes or no?

25  A.  Yes.

19nddat1                           Datta - direct

1    Q.   What was he proposing to do?

2    A.   I do not remember the whole conversation 100 percent, but I

3    think he wanted to get some money from Mexico and send it to

4    them, or something like that.   I am not sure.

5    Q.   Sell it to them -- sell what to them?

6    A.   Send the money to them in New Jersey.

7    Q.   And what would the money be for?

8    A.   It was from one of their customers in Mexico.

9    Q.   And for what?

10   A.   For the merchandise they sold to that customer.   The

11   customer wanted to buy from them in New Jersey and pay the

12   money in Laredo.

13   Q.   And did you agree to do that?

14   A.   No, sir.

15   Q.   Why did you not agree to do that?

16   A.   Because I am not the buyer and I am not the seller.   Why

17   should I get the money?

18   Q.   A couple of months later, in January of 2010, did you have

19   another telephone conversation with Ankur Gupta in which he

20   made another proposal to you?

21   A.   I do not remember that conversation, sir.

22   Q.   You don't remember the conversation?

23   A.   I don't remember the conversation.

24   Q.   Do you remember him ever proposing that again to you, to

25   accept payment in Laredo for goods that he was selling in New

1   York --

2   A.   That conversation took place more than one time, I

3   remember.

4   Q.   Did you ever agree to do that?

5   A.   No, sir.

6   Q.   Now, in March of 2010, did you meet the Guptas again?

7   A.   In the show, yes.

8   Q.   And when you say "show," do you mean the perfume

9   exhibition?

10  A.   Perfume exhibition at Las Vegas.

11  Q.   And who attends that exhibition?

12  A.   All the perfume wholesalers and retailers from America and

13  the world.

14  Q.   You spoke to the Guptas at that convention or show?

15  A.   I saw them at the show, yes.

16  Q.   Did you speak to them?

17  A.   Yes.

18  Q.   Did they introduce you to anybody?

19  A.   They were calling me continuously to introduce to a

20  customer from Mexico.

21  Q.   And is that what they said, a customer from Mexico?

22  A.   Yes, sir.

23  Q.   And did they introduce you to somebody?

24  A.   Yes, sir.

25  Q.   And who did they introduce you to?

1    A.   To Roberto.

2    Q.   Was anybody else with Roberto?

3    A.   With Mr. Roberto it was his son Jose.

4    Q.   OK.  And did you and Mr. Roberto and Jose agree on

5    anything?

6    A.   We spoke.  They asked me that, you know, the Guptas told me

7    that they are very good cash customers.  We are doing business

8    with them for a long time so, but they want to buy from

9    California because it is easier for them.  So just, you know,

10   we went there, we take their guarantee, we are responsible, and

11   they took the responsible -- responsibility to both of us, to

12   me and to Mr. Roberto that we are fine.

13   Q.   But did you -- how did you leave it with Roberto and Jose?

14   How were things left with them?  We are talking about at the

15   March show now.

16   A.   They said that we -- we want to buy, cash.  I said, that's

17   good, that's the only way I sell, cash.  And he said, How do

18   you want to buy?  What do you want to buy?  I said, We sell all

19   over Mexico.  And we will buy a lot -- we need a lot of

20   merchandise and we pay cash.  I said, OK, that's very good.

21   Q.   What did you mean when you said that's the only way you

22   sell is cash?

23   A.   Because all the sales are in cash.  We have to -- when we

24   say cash, we will get paid immediately.

25   Q.   So when you say -- when you just said cash, you are talking

1    about cash as opposed to credit?

2    A.   Yes.   The sales are cash and credit.   So the cash sales are

3    where we get paid immediately as we deliver the goods.   So that

4    is a cash sales for me.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. WHITE:

2    Q.  After the March show did you ever speak to, did you ever

3    have any phone conversations with either Roberto or Jose after

4    that show?

5    A.  No, sir.

6    Q.  Did you call them?

7    A.  No, sir.

8    Q.  Did you ever call the Guptas and ask them what happened to

9    though guys, you never heard from them?

10   A.  No, sir.

11   Q.  Did you ever meet Roberto again?

12   A.  In the August show of the same year.

13   Q.  Again in Las Vegas?

14   A.  Again in Las Vegas.

15   Q.  Before meeting Roberto at that show did you meet either of

16   the Guptas?

17   A.  They were calling me.

18   Q.  Did you meet?

19   A.  Yes.

20   Q.  How did you come to meet the Guptas at that meeting, at

21   that show?

22   A.  At that show, I went to say hello and I spoke to them and I

23   left.

24   Q.  Did there come a time when you spoke to them again?

25   A.  Yes.

1    Q.  When was that?

2              THE COURT:  I am sorry, Roberto and Jose are you

3    speaking of, I am asking the witness, or are you speaking of

4    the Guptas?

5              THE WITNESS:  The Guptas, your Honor.

6              THE COURT:  Thank you.

7    Q.  When did you speak to them again?

8    A.  During the show first or second day, the show starts from

9    Sunday, I was texting them on Sunday, I was texting them on

10   Monday.  I don't remember how many times I met, but they were

11   calling me, so whenever I would go by the booth with other

12   vendors, I said them hello and I go have a conversation.

13   Q.  You said they were calling you; what do you mean they were

14   calling you?

15   A.  They were calling me on the cellphone.  Ankur was

16   constantly calling me to meet Roberto and his partner who was

17   going to put some money into his business.

18   Q.  Did there come a time that you met Roberto?

19   A.  Yes, sir.

20   Q.  Where did you meet him?

21   A.  I met him at the booth of Nandansons of Guptas.

22   Q.  Did you met Roberto at the booth of Nandansons?

23   A.  Yes, sir.

24   Q.  Did you meet anybody else?

25   A.  Mr. Roberto's partner Mario.

1    Q.   Prior to meeting Mario at that moment, did you know you

2    were going to meet somebody else with Roberto?

3    A.   Yes, sir.

4    Q.   How did you know?

5    A.   From Guptas, I knew that they, I have to meet somebody else

6    because Roberto has come with his partner or maybe even with

7    Roberto there also, I am not sure.

8    Q.   What did you understand was reason that you were meeting

9    Mario?

10   A.   Mario -- I am sorry, repeat the question please.

11   Q.   What did you understand was the reason you were meeting

12   Mario and on what basis did you come to that understanding?

13   A.   Mario was going to invest money into Roberto's business,

14   and he wanted to meet me before he put the money into Roberto's

15   business.

16   Q.   What was the basis of your understanding; how did you know

17   that?

18   A.   I was told by Guptas, by Roberto's, I believe.

19   Q.   Who it was who told you; was it the Guptas or was it

20   Roberto?

21   A.   It was Guptas because I knew Guptas or last 12 years I know

22   them.

23   Q.   Do you remember that clearly who it was?

24   A.   Clearly, I don't remember, sir.

25   Q.   Do you know if it was Ajay Gupta or Ankur Gupta?

1    A.   I don't remember.

2    Q.   Could it have been Roberto himself?

3    A.   It can be either of those three.

4    Q.   Your understanding about Mario was what?

5    A.   Mr. Roberto did not have money, he had lost money or he had

6    lost a shipment into Mexico and Mr. Mario was supposed to give

7    him the money to do business, and Mr. Mario had an office in

8    Mexico City and in New York.

9    Q.   This was based on something you had heard from either Ajay

10   Gupta or Ankur Gupta or possibly Roberto prior to your actually

11   being introduced?

12   A.   Yes, sir.

13   Q.   Were you introduced to Mario?

14   A.   Yes, sir.

15   Q.   Where?

16   A.   At the booth of Mr. Gupta.

17   Q.   Did you have a conversation with Mr. Mario?

18   A.   Yes, sir.

19   Q.   Where was that?

20   A.   We met at the booth.  One minute Mr. Gupta introduced, he

21   said he take responsibility for them, we both are good people,

22   do business with them, and they will be buying and then I left

23   with them.

24   Q.   Did you just speak to them at the booth or did you go away

25   from the booth?

19N4DAT2                          Datta - direct

1    A.   We went outside the hall, outside the exhibition hall.

2    Q.   Did Mr. Mario tell you what he had in mind?

3    A.   Mr. Mario had said in one of the conversations that, you

4    know, we just make our life, he make my life easy, he has some

5    questions, answer them and give him the right answers, and then

6    we will be doing a lot of business.

7    Q.   Did he tell you how much business he thought he could do

8    with you?

9           THE COURT:   Why don't we just elicit the conversation

10   instead of leading.

11   Q.   What did he propose, what kind of business did he propose,

12   what volume of business did he propose?

13          THE COURT:   Counselor, what's wrong with what did he

14   say to you and what did you say to him.

15   Q.   What did you say to you and what did you say to him about

16   the business you would do?

17   A.   I asked them how much, how much they are planning to buy

18   and where do they have their stores, where do they sell,

19   because I wanted to protect my existing customers in Mexico.

20   They said we will be buying, you know, a lot of merchandise, at

21   least $15,000, and I said where do you need to buy the stores

22   because I have 10 stores.  And he said maybe we need them

23   merchandise all over Mexico, we can probably buy from other

24   stores around 10, $15,000 a week.

25   Q.   How much did you figure that would be a year?

1   A.   $15,000 a week becomes $150,000 a week multiplied by 52,

2   close to $7 million, $7.5 million business.

3   Q.   Were you excited about that prospect?

4   A.   Yes, sir, it was all cash business, I was very excited and

5   I was very interested.

6   Q.   When you spoke to Mario you spoke to him in the hallway,

7   away from the Guptas booth?

8              THE COURT:   Could we please stop the leading.

9   Q.   Where did you speak to him?

10  A.   After the introduction we walked outside the exhibition

11  hall and outside the hall, that's where we spoke, me, Roberto

12  and Mario.

13  Q.   Did you speak to them again that day?

14  A.   Yes, sir, in the night.

15  Q.   Did you form an opinion about whether Mario was a criminal?

16  A.   In the night meeting I felt that.   Yes.

17  Q.   What about him made you feel that?

18  A.   Because he was talking bigger numbers, because numbers had

19  increased from $15,000 a week to $40,000 to $60,000, a week so

20  I am like multiplying 60,000 into 10, $600,000, $60,000 into

21  10, $600,000 into 52 is like $25 million, $22 million.   It's a

22  huge business.   So that's not, why Mr. Gupta will give me such

23  a big customer and, you know, the figure did not sound right.

24  Q.   Did you discuss with him ways to launder money?

25  A.   On that day because --

1  Q.  Did you?

2  A.  Yes.

3  Q.  At that point in time, did you figure in your own mind that

4  he was involved in criminal activity?

5  A.  Yes, sir.

6  Q.  Why did you proceed to talk to him if you formed that

7  conclusion?

8  A.  It is a combination of greed and intoxication.

9  Q.  Explain the greed part of it.

10  A.  Big business, 7 million to $22 million, on a 8 percent

11  margin, that was very tempting.

12  Q.  Did you form an opinion as to what type of criminal

13  activity Mario might be engaged in?

14  A.  No, sir.

15  Q.  Did you talk to him about putting his cash in perfume

16  boxes?

17  A.  I spoke to him in one of the meetings; which meeting I

18  don't remember.

19  Q.  Were you proposing to do that yourself, to put dollars in

20  perfume boxes?

21  A.  No.

22  Q.  What were you discussing with him?

23  A.  I told him I will give you the boxes and then you can put

24  your money, if you have to put by yourself in the boxes and you

25  know which boxes did you put your money in.

19N4DAT2                          Datta - direct

1  Q.  After the August 9 meeting, did you conduct any business

2  with Mr. Mario?

3  A.  Yes, sir.

4  Q.  What business did you conduct?

5  A.  They bought 38,600 and some dollars from my San Ysidro

6  store.

7  Q.  How did that sale come about?

8  A.  Like how?

9  Q.  Did he telephone you, did you telephone him; how was that

10 sale set up?

11 A.  He called me that he wanted to buy from the San Ysidro

12 store.

13 Q.  At this time in your mind he is a criminal, correct?

14 A.  Yes, sir.

15 Q.  So what was in your mind; did you agree to do that sale?

16 A.  I wanted, yes, I agreed to do that sale.

17 Q.  Why did you agree to do it if you believed he was a

18 criminal?

19 A.  I said let me try one time maybe to find out more, if

20 everything is fine, or maybe I am mistaken because maybe I did

21 not understand him 100 percent, so I went with the sale and I

22 wanted to sell.

23 Q.  Did that sale take place?

24 A.  Yes, sir.

25 Q.  Was that a wholesale sale?

1    A.   That was a wholesale sale.

2    Q.   Where was the sale conducted?

3    A.   In San Ysidro, California.

4    Q.   In your store in San Ysidro?

5    A.   Yes, sir.

6    Q.   Was that a wholesale store?

7    A.   That is my retail store.

8    Q.   Has that store ever done a sale of over $10,000?

9    A.   No, sir.

10   Q.   Were you satisfied with him doing the sale in San Ysidro?

11   A.   I did the sale but I was not comfortable but that sale was

12   not like the sales which we do into Mexico with our other

13   customers.

14   Q.   Where are those sales done from?

15   A.   From Laredo, Texas.

16   Q.   Did you know -- that sale then was completed, correct?

17   A.   Yes, sir.

18   Q.   Did you know -- you were arrested in January of 2011,

19   correct?

20   A.   January 15, 2011.

21   Q.   Did you know prior to your arrest whether a form 8300 was

22   ever filed for that particular sale in San Ysidro?

23   A.   Form 83 -- no, it was not filed for that sale.

24   Q.   Did you know that prior to your arrest?

25   A.   Prior to my arrest I had no idea if it had been filed or it

19N4DAT2                      Datta - direct

1    had not been filed.

2    Q.  Did Mr. Mario propose another sale subsequent to the one we

3    have just been discussing in San Ysidro?

4    A.  Yes, sir.

5    Q.  Did you -- was that sale ever executed?

6    A.  No, sir.

7    Q.  Was it ever begun?

8    A.  No, sir.

9    Q.  Was any order placed to your knowledge?

10   A.  I don't know.

11   Q.  Did you meet Mr. Mario and Roberto again?

12   A.  In San Diego.

13   Q.  What was the occasion of your meeting them in San Diego?

14   A.  I want to meet them and they had wired $50,000 into my

15   account and just see, like, if we can do any more business or

16   we cannot do any more business.

17   Q.  At the time you went to San Diego to meet them did you know

18   before you met them that they had wired $50,000 into your

19   account?

20   A.  There was a discussion but I was not aware of that money

21   has come in or not.

22   Q.  Did you say you also wanted to discuss more business with

23   them?

24   A.  I wanted to go and, yes, to see if there is any possibility

25   to do more business.

1    Q.  You were still open to doing more business with Mr. Mario

2    and Roberto at that point?

3    A.  Yes, sir.

4    Q.  After that meeting -- how long was the meeting in San

5    Diego?

6    A.  Around one hour, an hour and a half.

7    Q.  After that meeting, were you still open to doing business

8    with Mr. Mario and Roberto?

9    A.  No.

10   Q.  Why?

11   A.  Because they said they do not want to buy that perfumes,

12   they wanted me to send money into different accounts in Panama

13   or someplace, and because I told them I cannot take, you know,

14   the best thing for me to do is I need the wire transfer to

15   sell, you know, in order to sell them, and they said they do

16   not want to buy the perfumes, if I could send the money to

17   different accounts and I can take out the commission.  I said

18   no.

19   Q.  You said that with respect to -- at the August show you

20   formed the conclusion that Mr. Mario was a criminal but you

21   doesn't know what type of criminal activity he was in.  At the

22   meeting in San Diego in September, did you form an opinion as

23   to what kind of criminal activity he was involved in?

24   A.  I was 100 percent sure he is money launderer.

25   Q.  Money launderer laundering what kind of money?

19N4DAT2                      Datta - direct

1   A.   Money coming from the drugs or the cartel money, it was the

2   cartel money because he mentioned the Sinaloa cartel at that

3   meeting.

4   Q.   Did Mr. Mario or Roberto propose providing any other

5   services to you if you worked with them?

6   A.   They asked me if I have to collect any money from Mexico

7   and I told them yes and they said they can help me in

8   collecting money and at that point I said how.   They told me

9   they were with the Sinaloa cartel, and that's all.

10  Q.   Did you agree to take the $50,000 wire transfer?

11  A.   No, sir.

12  Q.   What happened to the $50,000 wire transfer?

13  A.   I send the $50,000 back into the account I received the

14  money from.

15  Q.   Were they -- did they appear to be happy when you told them

16  that you would not, you could not accept the $50,000 wire

17  transfer?

18  A.   Their attitude was a little bit more aggressive, especially

19  Roberto.

20  Q.   What do you mean by a little bit more aggressive?

21  A.   Because they were saying the $50,000 you have and I was

22  saying I do not have the $50,000.   Then they said what you will

23  do with the money, you will run to India, you can go to India,

24  you can go to any other country, this is not a problem, this is

25  nothing for me, take our $50,000.   I was telling them I do not

1   have the money.  Then I said please wait, let me call Yolanda

2   to confirm.  At that point I made a call to Yolanda, and she

3   said she had the $50,000.

4   Q.  My question was in what way did Roberto appear aggressive

5   when you told him you would return the $50,000?

6   A.  I felt I was going to be hurt by Roberto.  He took off his

7   glasses.  He was very angry.  He stood up and Mario told him,

8   please wait, he is our friend, just take it easy, he is our

9   friend.

10  Q.  After that meeting -- you just testified a few minutes ago

11  that prior to the meeting you were open to doing business with

12  Mr. Mario and Roberto.  After that meeting, were you open to

13  doing business with Mr. Mario and Roberto?

14  A.  No, sir.

15  Q.  Why not?

16  A.  I had clearly realized they were dangerous people, I can be

17  hurt, and I do not want to get involved in that kind of

18  business, I don't need to.

19  Q.  Did you ever -- that meeting was in September 2010 in San

20  Diego?

21  A.  Yes, sir.

22  Q.  In November 2010 did you learn someone had been kidnapped

23  in Mexico?

24  A.  Yes, sir.

25  Q.  Who was that?

1    A.   It was Octavio.

2    Q.   Who was Octavio again?

3    A.   Octavio is my customer and my friend.

4    Q.   Was he your customer at that time?

5    A.   No, sir.

6    Q.   Do you know why he was not your customer anymore?

7    A.   I am sorry?

8    Q.   Do you know why he was no longer your customer?

9    A.   He is not selling perfumes no more, he was not in perfume

10   business, he is not doing any perfume business for last 3, 4

11   years now.

12   Q.   Do you know why?

13   A.   His business was closed down.

14   Q.   By who?

15   A.   I believe by Mexican government.

16   Q.   Do you know why?

17   A.   No, sir.

18   Q.   Do you remember the date on which you learned he was

19   kidnapped approximately?

20   A.   Approximately it is in the middle of November I believe.

21   Q.   Did you, what did you do when you -- how did you learn that

22   he had been kidnapped?

23   A.   Cynthia called me from the warehouse on my cell because I

24   was at one of my stores, that Vikram there is very bad news.   I

25   said what happened; she said Octavio has been kidnapped.

19N4DAT2                        Datta - direct

1   Q.  What did you do?

2   A.  I told her I call her back.

3   Q.  Did you call her back?

4   A.  Yes.

5   Q.  What did you decide, without going through every

6   conversation, what did you decide you would do with respect to

7   Octavio?

8   A.  Octavio's family had already called to Cynthia looking for

9   help if --

10  Q.  What do you mean by looking for help?

11  A.  Financial help, how much they can count on me to help the

12  family.

13  Q.  For what?

14  A.  To get the money for Octavio's release.  They wanted to

15  borrow the money from me.

16  Q.  So what did you do?

17  A.  I said yes, I will, whatever they need.

18  Q.  Did you do anything with respect to Mr. Mario?

19  A.  I called Mr. Mario looking for help.

20  Q.  When you called him in the middle of November 2010, had you

21  called him anytime prior to that following the San Diego

22  meeting; had you ever called him between the San Diego meeting

23  and mid November?

24  A.  No, sir.

25  Q.  You had decided after the --

1          THE COURT:  Counsel, would you stop leading.

2     Q.  Why did you call him in November when you just testified

3     that you were afraid of him and you didn't want to do any more

4     business with him and Roberto?

5     A.  Because I knew he is working with Sinaloa cartel and he has

6     to have connections so I thought he might be of some help so I

7     called him.

8     Q.  Did you in fact help provide some of the money to obtain

9     Octavio's release?

10    A.  Yes, sir.

11    Q.  How did you do that?

12    A.  Customers who owed me money from Mexico, I told them

13    instead of paying me, if they can help the family and I will

14    give the credit into their accounts, so that's how.

15    Q.  What customer was that?

16    A.  Mr. Paco Dialba from Guadalajara.

17    Q.  You said customers used to put money in your safe

18    sometimes?

19    A.  Yes, sir.

20    Q.  Did Paco Dialba ever do that?

21    A.  He did what?

22    Q.  Put money in your safe?

23    A.  Yes, sir.

24    Q.  Did you meet Mr. Mario again?

25    A.  Yes, sir.

1  Q.  When did you meet him?

2  A.  In December 7 in Las Vegas.

3  Q.  Was that at a perfume show?

4  A.  No, sir.

5  Q.  Why did you meet Mr. Mario that day?

6  A.  Because after my call to Mr. Mario for help, we were

7  talking on the telephone and he had information which I did not

8  have.

9  Q.  Information about what?

10  A.  About Octavio's kidnapping, and he said he is trying to

11  help and he told me that there is a female also kidnapped with

12  a lot of people, and when it was confirmed to me, I wanted to

13  meet him to see if I can get Octavio's release a little bit

14  faster.

15  Q.  Octavio had not been released as of the time you met with

16  him in Las Vegas?

17  A.  No, sir.

18  Q.  At that meeting, did you discuss Octavio and the release of

19  Octavio?

20  A.  Yes, sir.

21  Q.  Did you also discuss doing future business with Mr. Mario?

22  A.  At that time I was --

23  Q.  Did you discuss it?

24  A.  Yes, sir.

25  Q.  Was it your intention do future business with Mr. Mario?

19N4DAT2                        Datta - direct

 1   A.   No, sir.

 2   Q.   Why did you talk to him about doing future business at that

 3   meeting in December 2010?

 4   A.   I needed help for Octavio's release.

 5   Q.   Did you meet with Mr. Mario again?

 6   A.   Yes, sir.

 7   Q.   When was that?

 8   A.   January 15.

 9   Q.   2011?

10   A.   2011.

11   Q.   Where did you meet with him?

12   A.   At Smith & Wollensky in Manhattan.

13   Q.   At this time was Octavio still being held by the

14   kidnappers?

15   A.   He was already released in December.

16   Q.   Why did you meet Mr. Mario in New York in January 2011?

17   A.   I wanted to personally thank him and Octavio also.  I had

18   told Octavio somebody from New York helped me, if he wants to

19   meet him.  He said ask the person; if he wants I will come to

20   say thank you also.

21   Q.   Is that the only reason you met Mr. Mario in New York when

22   you came?

23   A.   Yes, sir.

24   Q.   At that meeting did you discuss again doing future business

25   with Mr. Mario?

1   A.  He will ask about the business, yes, we talk.

2   Q.  Why did you continue to talk to him about doing business in

3   the future with him?

4   A.  Because I knew very well it's not going to happen; that was

5   my last meeting with Mr. Mario.

6   Q.  You were arrested that same day, were you not?

7   A.  Yes, sir.

8   Q.  You were interviewed by various law enforcement officers?

9   A.  Yes, sir.

10  Q.  That included agent Reinhardt here?

11  A.  Yes, sir.

12  Q.  When you were interviewed by him, you said to him the

13  following, which is already in evidence at page 449 of the

14  transcript, that you didn't do anything wrong and wouldn't be

15  in trouble if you hadn't spoken to Mario.  Did you say that to

16  him, you didn't do anything wrong and you wouldn't be in

17  trouble if you hadn't spoken to Mario?

18  A.  Yes, sir.

19  Q.  What did you mean when you said that?

20  A.  Because at that time of my arrest I had a very strong

21  feeling that this all was a setup to trap me, it started from

22  Mr. Gupta because I met, and that's why I said that.

23  Q.  In your mind at that point, aside from your involvement

24  with Mr. Mario, in your mind, had you ever laundered money?

25  A.  No, sir.

19N4DAT2                         Datta - direct

1            MR. WHITE:  Nothing further, your Honor.

2            THE COURT:  Thank you.

3            We are going to take a recess here.  I am going to

4    take care of another piece of business.  This will probably be

5    a little longer than usual.  We hope to be back to you within

6    20 minutes or half an hour.

7            (Jury leaves courtroom)

8            (Recess)

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  OK.  Let us proceed.

3           Mr. Skinner, your time estimate is what?

4           MR. SKINNER:  20 minutes to a half hour.

5           THE CLERK:  Jury entering.

6           (Jury present)

7           THE COURT:  OK.  The defendant and the jurors all are

8    present, as throughout.

9           Cross-examination.  You may proceed, Mr. Skinner.

10          MR. SKINNER:  Thank, your Honor.

11   CROSS-EXAMINATION

12   BY MR. SKINNER:

13   Q.  Good morning, Mr. Datta.

14   A.  Good morning, sir.

15   Q.  Now, in the testimony that you offered this morning, you

16   said that in September 2010 you spoke with David Puig, the bank

17   officer from BBVA Compass, correct?

18   A.  Yes, sir.

19   Q.  During that conversation you told Mr. Puig about your

20   business, right?

21   A.  Yes, sir.

22   Q.  You told him, I'm going to gross over 40 million, right?

23   A.  Can you repeat it, please?

24   Q.  You told him, I'm going to gross over 40 million, correct?

25   A.  Yes, sir.

19nddat3                     Datta - cross

1   Q.  You told him that you had already taken a growth of

2   15 percent, right?

3   A.  Yes, sir.

4   Q.  You said your competition couldn't do any better than you,

5   right?

6   A.  Yes, sir.

7   Q.  You said, I'm going to capture the whole market of Mexico,

8   correct?

9   A.  Yes, sir.

10  Q.  On all of the borders, right?

11  A.  Yes, sir.

12  Q.  You were looking to do 300 million in the next year?

13  A.  Yes, sir.

14  Q.  Now, this morning you said that these were exaggerations,

15  is that correct?

16  A.  Yes, sir.

17  Q.  So you said this to Mr. Puig because you were hoping to

18  impress him, correct?

19  A.  Yes, sir.

20  Q.  He was reviewing your business account because he wanted --

21  he might close it; is that fair to say?

22  A.  Yes, sir.

23  Q.  The bank was concerned about massive amounts of cash that

24  you were depositing into your accounts, right?

25  A.  Yes, sir.

19nddat3                      Datta - cross

1    Q.  And you didn't want him to close your account, did you?

2    A.  Yes, sir.

3    Q.  You needed that account to stay open, didn't you?

4    A.  Yes, sir.

5    Q.  So you exaggerated to Mr. Puig to try and convince him that

6    you were such a worthy customer he wouldn't want to lose that

7    account; wasn't that what you were trying to do?

8    A.  Yes, sir.  And I --

9    Q.  You also testified that you met in October of 2009 with

10   Ajay and Ankur Gupta, correct?

11   A.  Yes, sir.

12   Q.  These were important people in your industry, were they

13   not?

14   A.  They are one of the suppliers in the perfume industries.

15   Q.  One of your biggest suppliers, right?

16   A.  No.

17   Q.  Well, they were big suppliers in the industry, weren't

18   they?

19   A.  Yes.

20   Q.  And you said this morning that you wanted to impress them,

21   did you not?

22   A.  Yes.

23   Q.  You wanted them to think that you had a big business,

24   correct?

25   A.  Yes.

19nddat3                          Datta - cross

1  Q.  You wanted them to think that you were getting in a lot of

2  money, correct?

3  A.  Can you repeat the question, please?

4  Q.  You wanted the Guptas to think your business was generating

5  a lot of money; isn't that fair to say?

6  A.  Yes.

7  Q.  You told them about this one transaction you'd had with

8  Octavio, didn't you?

9  A.  Yes.

10  Q.  You told them that you got in $1.3 million in cash, right?

11  A.  Yes.

12  Q.  And that got their attention, didn't it?

13  A.  That got their attention, I think so.

14  Q.  They asked you some follow-up questions about that, right?

15  A.  Yes.

16  Q.  They asked you how could you get that much money from your

17  business to the bank; they asked you about that, right?

18  A.  Yes.

19  Q.  And you told them how you put the money in Cynthia's

20  backpack, correct?

21  A.  Yes.

22  Q.  You told them how you put stacks of hundred-dollar bills

23  into the backpack of a woman who worked for you, and you told

24  her to walk it to the bank, right?

25  A.  Yes.

19nddat3                          Datta - cross

1   Q.  You told them that she was a 16-year-old girl, right?

2   A.  When Cynthia started to work for me, I believe that's how

3   old she was.

4   Q.  And that's what you told the Guptas back in October, right?

5   A.  Yes, sir.

6   Q.  Now, none of this was true, was it?

7   A.  None of that ever happened.

8   Q.  It was an exaggeration?

9   A.  Yes, sir.

10  Q.  You were inventing these facts because you wanted to

11  impress this supplier, correct?

12  A.  At that point I did not have to impress Mr. Guptas.

13  Q.  But you were lying to them because you wanted them to

14  believe you were bigger than you were; isn't that fair to say?

15  A.  I told them the figures to tell them that I have a big

16  business.

17  Q.  Figures that were exaggerations?

18  A.  Yes, sir.

19  Q.  Figures that were not true?

20  A.  You can say that.

21  Q.  And you were saying this in the hope of helping yourself;

22  is that fair to say?

23  A.  Helping myself how?

24  Q.  By impressing them.  Why else invent all of these -- this

25  incredible story about putting money into the backpack of a

19nddat3                          Datta - cross

1   16-year-old girl?  Why else say that to them?  You wanted to

2   impress them, didn't you?

3   A.   Yes.

4   Q.   Now, you were arrested in January of this year, right?

5   A.   Yes, sir.

6   Q.   Prior to your arrest you had been eating at a restaurant,

7   is that right?

8   A.   Yes, sir.

9   Q.   You had been eating with the undercover named Mario, right?

10  A.   I didn't know at that point he was an undercover.  With

11  Mario, yes.

12  Q.   But you know that now, right?

13  A.   Yes, sir.

14  Q.   That you were eating with Mario, the undercover who

15  testified earlier in the trial, is that right?

16  A.   Yes, sir.

17  Q.   Now, immediately after the meal you were arrested, correct?

18  A.   Yes, sir.

19  Q.   You were put into a car, right?

20  A.   In a SUV.

21  Q.   SUV.  You were put into a SUV, is that correct?

22  A.   Yes, sir.

23  Q.   There were two DEA agents in the vehicle, correct?

24  A.   Yes, sir.

25  Q.   And they started asking you some questions, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19nddat3                        Datta - cross

1    A.   There were three agents in the beginning and one left,

2    therefore two.

3    Q.   When you started driving when you left the restaurant,

4    there were two, right?

5    A.   Yes, sir.

6    Q.   And they started asking you some questions, right?

7    A.   Yes, sir.

8    Q.   And you provided some answers, correct?

9    A.   Yes, sir.

10   Q.   They asked you -- one of the first things they asked you

11   was who's that guy you were having dinner with; didn't they ask

12   you about that?

13   A.   Yes, sir.

14   Q.   They asked you, you know, how do you know him?  And you

15   said, oh, he's an acquaintance of mine.  Isn't that what you

16   said?

17   A.   Yes, sir.

18   Q.   And then they said to you, did you know that he's a drug

19   dealer?  Didn't they ask you that?

20   A.   Yes, sir.

21   Q.   And you responded, No, I didn't know that; that's what you

22   said, right?

23   A.   I believe so.

24   Q.   All right.  So the first question out of the box, you lied;

25   is that fair to say?

19nddat3                    Datta - cross

1   A.  I'm sorry?

2   Q.  The first question the agents asked you, you lied in

3   response to; is that fair to say?

4   A.  I was shocked with what happened.  And I saw Mario walking

5   away and I called Mario.  And it took me five to ten minutes to

6   calm down myself.

7   Q.  Be that as it may, the first thing they asked you, you told

8   them a lie, that's correct?  It is a fact, correct?

9   A.  You can say so.

10  Q.  I don't want to say so.  I'm asking for your response,

11  Mr. Gupta.

12          Do you agree with me that the first answer you gave in

13  response to a question from a law enforcement officer was a

14  lie?

15  A.  My name is not Mr. Gupta.  I'm Vikram Datta.

16  Q.  My apologies.  We are both a little nervous.

17          You agree with me, Mr. Datta, that the first

18  question -- the first answer you gave in response to a question

19  from law enforcement was a lie?

20  A.  Yes.

21  Q.  Now, after that they kept asking you questions, did they

22  not?

23  A.  Yes, sir.

24  Q.  They also asked you about Octavio, correct?

25  A.  Yes, sir.

19nddat3                        Datta - cross

1   Q.  And you told them that Octavio had been kidnapped, right?

2   A.  Yes, sir.

3   Q.  And they asked you whether or not you had made any payments

4   to try and help Octavio get released, is that right?

5   A.  Yes, sir.

6   Q.  You told them that you hadn't made any payments; isn't that

7   what you said?

8   A.  I told them I helped Octavio's family.

9   Q.  But they asked you specifically about payments.  And you

10  explained -- you said to them, I haven't made any payments; you

11  denied making payments?

12  A.  I do not remember that.

13  Q.  You don't recall that?

14  A.  No.

15  Q.  Do you recall when Agent Carrera testified earlier that he

16  asked you that question; do you remember that?

17  A.  Who asked me?

18  Q.  Agent Carrera, he testified --

19          THE COURT:  Sustained in that form.

20  Q.  Do you recall Agent Carrera testifying earlier in this

21  trial?

22  A.  He testified, yes, I remember.

23  Q.  And Agent -- do you recall Agent Carrera testifying that he

24  had asked you a question about whether or not you paid money to

25  Octavio?

19nddat3                          Datta - cross

1   A.   It was the other agent who was sitting with me in the back.

2   Q.   So the other agent asked you about Octavio?

3   A.   Who was talking to me.

4   Q.   Do you remember telling that agent that you never made any

5   payments to Octavio?

6   A.   I don't remember saying that.

7   Q.   Now, you also told the agents that you actually didn't know

8   that Octavio had been kidnapped; isn't that true -- or, excuse

9   me, you told the agents you didn't know who had kidnapped

10  Octavio, isn't that true?

11  A.   Yes.

12  Q.   But in fact you knew that Octavio had been kidnapped by the

13  Mexican drug cartel called the Zetas, did you not?

14  A.   No, sir.  I did not know who kidnapped Octavio.

15  Q.   Didn't you tell the undercover, in a phone call on

16  October 18th of 2010, that he had been kidnapped by the Zetas?

17  A.   I said I believe but I'm not sure who kidnapped Octavio.

18  Q.   But it was your belief that he had been kidnapped by the

19  Zetas, was it not?

20  A.   When I made a phone call to Mr. Mario?

21  Q.   Yes.

22  A.   I thought so.

23  Q.   And you were telling Mr. Mario the truth at that point,

24  correct?

25  A.   I was telling him what did I think -- what did I know about

19nddat3                      Datta - cross

1    the kidnapping and what did I think about the kidnapping.

2    Q.  You said the kidnapping happened in Veracruz, right?

3    A.  Yes, sir.

4    Q.  You said the family members had mentioned the Zetas, right?

5    A.  Family members might have -- family members mentioned it

6    might be the Zetas, yes.

7    Q.  You told him this because you were hoping that he would

8    help you; that's why you told him that, right?

9    A.  Yes, sir.

10   Q.  But when you were arrested in January and law enforcement

11   officers asked you about who had kidnapped Octavio, you didn't

12   provide them with the same information, did you?

13   A.  Because at that time I was not sure who actually kidnapped

14   Octavio.

15   Q.  Did you or did you not tell them your belief as to who had

16   kidnapped Octavio?

17   A.  I don't remember.  I might have.

18   Q.  You were also asked by the undercovers -- excuse me, asked

19   by the law enforcement agents after your arrest whether there

20   had been any discussion with Mario about receiving money.  They

21   asked you about that, right?

22   A.  Yes.

23   Q.  They asked you whether there had been a discussion about a

24   fee for money laundering services that you were going to

25   provide to Mario.  They asked you about that, did they not?

19nddat3                          Datta - cross

1    A.  Can you repeat that question, please.

2    Q.  Didn't the law enforcement officers ask you about a fee

3    that you and Mario had discussed?

4    A.  No.

5    Q.  You don't recall that?

6    A.  No.

7    Q.  Do you recall the law enforcement officers asking you about

8    money that Mario had said he might be able to get you from the

9    ransom payment?

10   A.  Mr. Mario was saying that all the time that he will try to

11   get the money back from the people who kidnapped Octavio, but I

12   was not expecting any money from Mario.

13   Q.  All right.  But they asked you whether there was any

14   discussion of it, and you denied having any discussion of it;

15   isn't that fair to say?

16   A.  I don't remember that discussion.

17   Q.  Well, they asked you one very specific question.  They

18   asked you whether you had ever heard of the Sinaloa drug

19   cartel.  Do you remember them asking you that?

20   A.  They asked me if I do business with Sinaloa Cartel.

21   Q.  They asked you, and you said, no, I don't do business with

22   them, right?

23   A.  Yes.

24   Q.  Then they asked you have you ever talked about the Sinaloa

25   drug cartel, have you ever used the word Sinaloa, and you said

1    I never even mentioned Sinaloa before; isn't that what you

2    said?

3    A.   The form of the question is not right.

4    Q.   Didn't they ask you -- you told the undercover agents in a

5    post-arrest interview that you had never used the word Sinaloa;

6    that's what you told them, isn't that true?

7    A.   Yes.

8    Q.   And we all know from the phone call with Liz that we

9    listened to, which was from April of 2010, that at that point

10   in time you were well aware of what the Sinaloa Cartel was and

11   you had used the word yourself, isn't that true?

12   A.   Yes.

13   Q.   Now, we're in agreement, are we not, that your business in

14   Laredo received large amounts of United States currency as

15   payment for perfume?

16   A.   Yes.

17   Q.   The money came in in amounts larger than $10,000 on a

18   regular basis, correct?

19   A.   Yes, sir.

20   Q.   It is fair to say it was coming in almost daily in the

21   second half of 2009 and through 2010; is that fair to say?

22   A.   Every day I would say, yes.

23   Q.   And you would call and you would check with Cynthia and

24   Yolanda, if you weren't there yourself, to get a sense of how

25   much cash was coming in, correct?

19nddat3                    Datta - cross

1   A.  Every day I checked how much payment has been received.

2   Q.  And, in particular, they would tell you how much United

3   States currency in cash had been received for payment; they

4   would tell you that, right?

5   A.  Yes, sir.

6   Q.  So you were constantly apprised of the inflows of currency

7   into your business, correct?

8   A.  I will constantly -- can you repeat the question, please?

9   Q.  You were constantly updated on the U.S. currency that was

10  coming into your business, is that correct?

11  A.  I was constantly updated how much payments I was receiving

12  on daily basis.

13  Q.  Right.  And you were constantly updated on payments in

14  cash, correct?

15  A.  In all payments, cash or checks or wire transfers, I

16  constantly checked every day.

17  Q.  So you would agree with me that you were updated on various

18  forms of payment, one of which was cash?

19  A.  One of which was cash, of course, all payments; cash was

20  one sort of payment.

21  Q.  And you understood that this was cash that was coming to

22  you from your perfume customers in Mexico, right?

23  A.  I know that money was coming to me from my customers who

24  were buying perfumes from me in Mexico.

25  Q.  And you understood that some of the cash in United States

19nddat3                        Datta - cross

1   dollars was coming to your business from these perfume

2   customers, right?

3   A.  From the perfume customers, yes.

4   Q.  And you understood that some of these customers bought

5   their dollars from casas de cambio; you understood that, right?

6   A.  I knew that, yes.

7   Q.  You knew that there were people like Fausto who were casa

8   de cambio owners, correct?

9   A.  Yes.

10  Q.  And you knew that Fausto's business was delivering cash to

11  your business, right?

12  A.  Fausto's business was to bring me the payments made by my

13  customers to me, yes.

14  Q.  You knew that Fausto, who was over in Nueva Laredo, that

15  your customers were buying dollars from him and that Fausto and

16  his employees were then walking the dollars over the bridge and

17  they would deliver it to your store; you understood that that's

18  how it worked, right?

19  A.  Yes.

20  Q.  You also understood that Cynthia spoke frequently with your

21  customers in Mexico about the money that they owed as payment

22  for product that you had shipped, correct?

23  A.  It was Cynthia's job to sell to the customers and to

24  receive the payments and keep the accounts balanced.  So that

25  was her job.

19nddat3                          Datta - cross

1   Q.  Yes.  And as part of that job, she would talk to the

2   customers in Mexico about the balances and the payments, right?

3   A.  That is Cynthia's job to sell to the customers and to

4   collect the money from the customers, to ask for the payment

5   from the customers.

6   Q.  She would use the phone to talk to these customers,

7   correct?

8   A.  Yes.

9   Q.  She actually -- you guys had specific what you call

10  radiophones that you used to talk to your Mexican customers,

11  right?

12  A.  Nextel.  It is a Nextel radio and telephone which we will

13  use to talk with our customers and with all of our stores.

14  Q.  That's the push-to-talk feature on the Nextel phone; is

15  that what you are referring to?

16  A.  Yes.  That's what you are calling push-to-talk, we call it

17  Nextel.

18  Q.  That's what you told Cynthia and your employees to use when

19  they talked to your Mexican customers, right?

20  A.  I didn't tell them it was easier to use Nextel.  They will

21  use the regular telephone and they will use the Nextel as it

22  was available for them.

23  Q.  But you understood that's how they were communicating with

24  your customers, correct?

25  A.  They were communicating with customers by telephone and by

19nddat3                    Datta - cross

1   Nextel.

2   Q.  Now, the cash that was coming into your business daily, as

3   we just discussed, you were then depositing it into various

4   bank accounts, correct?

5   A.  Into the one bank account.

6   Q.  BBVA Compass?

7   A.  Yes, sir.

8   Q.  So you directed your employees to take that cash from your

9   business, walk it over to the local BBVA branch, and deposit

10  it?

11  A.  I told my employees to make the deposit.  If they walk or

12  they drive, I didn't know that because I was not there.

13  Q.  Fair enough.  It's your understanding that they deposited

14  the cash, right?

15  A.  They had to deposit the payments which we received from the

16  customers into the banks, yes.

17  Q.  You never learned from the bank that hundreds of thousands

18  of dollars in cash were not making it from your store to the

19  bank, did you?

20  A.  I'm sorry?

21  Q.  You never learned that you were losing money en route to

22  the bank, did you?

23  A.  In Laredo there is no crime and I have very good employees.

24  Q.  And you reviewed your bank account statements, right?

25  A.  I did, yes.

19nddat3                          Datta - cross

1    Q.  And you confirmed, reviewing those statements, that the

2    cash deposits you directed your employees to make were in fact

3    made; is that fair to say?

4    A.  The money which we received as the payments have to be

5    deposited in the bank so it was deposited in the banks.

6    Q.  And you knew this.  It is something that was in your mind.

7    You understood it was being deposited in the banks.   Right?

8    A.  Yes.

9    Q.  You also understood that some of the cash that was being

10   deposited in the bank was the cash that was being delivered to

11   you from Mexico; is that fair to say?

12   A.  My -- all the payments came from Mexico.

13   Q.  So then it was all from Mexico; is that fair to say?

14   A.  All the payments from my other wholesaler customers from

15   Mexico and so as I received the payments from my customers in

16   U.S.A.

17   Q.  Now, some of the cash that you received from Mario in

18   October of 2010 in those two payments in San Ysidro, that was

19   also deposited in your bank account, correct?

20   A.  Yes, sir.

21   Q.  Now, you had a number of perfume suppliers located in New

22   York City, correct?

23   A.  Yes, sir, in New York City, in Florida, in California, yes.

24   Q.  Some of those perfume suppliers were located here in

25   Manhattan, is that right?

19nddat3                          Datta - cross

1   A.   Yes, sir.

2   Q.   We went through in that stipulation we read earlier the

3   five or six of the different perfume suppliers located here in

4   Manhattan, is that right?

5   A.   Yes, sir.

6   Q.   And you were the one -- withdrawn.

7        Am I correct that you would call these perfume

8   suppliers in Manhattan in order to arrange delivery of perfume

9   from here to your business in Laredo?

10  A.   I will buy perfumes for my business from all over the

11  country --

12  Q.   And that included perfume suppliers located in New York,

13  right?

14  A.   Yes.

15  Q.   And you would either speak with them or e-mail them here in

16  order to order your perfume, right?

17  A.   Yes.

18  Q.   You testified yesterday that you had some small growth in

19  your wholesale business from 2007 through 2009; is that right?

20  A.   Can you repeat that question, please.

21  Q.   I believe you testified yesterday that there was small

22  growth in your wholesale business from '07 through '09, is that

23  right.

24  A.   Yes, sir.

25  Q.   And you gave some figures, in response to questions from

19nddat3                              Datta - cross

1    your attorney, indicating that in 2008 your total gross sales

2    were about 31.5 million, is that right?

3    A.   In 2008 or 2009?

4    Q.   2008.

5    A.   Around -- it was around $30 million.   I have to see it in

6    the tax returns.   I do not remember.

7    Q.   It was about the same in '09, right?

8    A.   I believe so.

9    Q.   It was about the same even before that, in '07, right?

10   A.   I do not know.

11   Q.   Would it help refresh your recollection to look at a tax

12   filing?

13   A.   I'm sorry, sir.

14   Q.   Would it help refresh your recollection to look at a tax

15   filing --

16   A.   You mean my tax return?   Yes, sir.

17            MR. SKINNER:   One minute, please.

18            (Pause)

19            MR. SKINNER:   Your Honor, may I approach?

20   Q.   Mr. Gupta -- I mean, Mr. Datta, let me ask you to take a

21   look at those two documents, one tax filing for 2008 and one

22   for 2009.

23            THE COURT:   What are the exhibit numbers?

24            MR. SKINNER:   One is marked Defendant's Exhibit H, for

25   identification, and one we'll mark as Government Exhibit 1005,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19nddat3                        Datta - cross

1    for identification.

2    Q.  So let me ask you first to look at the one marked

3    Defendant's Exhibit H.

4    A.  Yes, sir.

5    Q.  Does that indicate the total sales for La Versailles in

6    2008?

7                THE COURT:  I'm sorry.  You are asking him for the

8    contents of a document that's not in evidence?

9                MR. SKINNER:  No, your Honor.  I wouldn't do that.

10   Q.  Let me ask you:  Does that refresh your recollection as to

11   the total sales --

12               THE COURT:  I didn't think you would.

13   Q.  -- in 2008?

14               Mr. Datta, does that remember your recollection as to

15   the total sales of La Versailles in 2008?

16   A.  Yes, sir.

17   Q.  What were the total sales of La Versailles in 2008?

18   A.  $31,594,456.

19   Q.  I'm now showing you a document that we've marked as

20   Government Exhibit 1005, for purposes of identification.

21               Let me ask you if that refreshes your recollection as

22   to the total sales for La Versailles in 2009?

23   A.  Yes, sir.

24   Q.  And what were the total sales for La Versailles in 2009?

25   A.  $30,038,818.

19nddat3                        Datta - cross

1   Q.   And the La Versailles business, that's one that included

2   your wholesale, is that right?

3   A.   The wholesale and all the sales to my -- all the retail

4   stores.

5   Q.   All right.  So in 2008, in 2009, it's fair to say that your

6   growth was actually pretty flat, correct?

7   A.   I sold less in 2009 as compared to 2008.

8   Q.   They were close in number; they were both around 31 or

9   $30 million, right?

10  A.   Yes, sir.

11  Q.   Yesterday you also testified that you started getting more

12  cash in 2007, 2008, in 2009, right?

13  A.   Yes, sir.

14  Q.   You said this was because your sales had increased, right?

15  A.   My retail sales of my other stores -- my retail store

16  sales, which I was opening and they were increasing -- my

17  retail stores in 2007, 2008 and 2009 and 2010, so I was

18  receiving more cash, yes.

19  Q.   So this was -- if I understand you right, you are saying

20  the reason you started getting more cash in those years is

21  because of your retail business?

22  A.   Because my retail business was growing.  And my -- I

23  believe in 2010, I sold $12 million to my own retail stores,

24  whereas in 2009 I might have sold around 8 or $9 million to my

25  retail stores.  So when the retail stores sell under the

19nddat3                          Datta - cross

1      margins so it was more money coming in from the retail stores.

2      Q.  And you're confident in those figures?

3      A.  I'm confident, yes.

4      Q.  All right.  And is it your testimony that the reason your

5      cash increased in '08 and '09 was not due to increase in your

6      wholesale business but, rather, was due to an increase in your

7      retail business?

8      A.  Increase in the retail business, and in the wholesale

9      business the customers started to send more cash in 2009, I

10     believe.

11     Q.  All right.  So more cash was also coming from the wholesale

12     customers?

13     A.  Yes, sir, in 2009, instead of checks and the wire

14     transfers.

15     Q.  OK.  And so that -- but there was no increase in total

16     wholesale sales, was there?

17     A.  No.  Actually, it went down my sales -- my real sales into

18     Mexico went down in 2010 as compared to 2009.

19     Q.  All right.  So the total figure of sales was going down but

20     the amount of cash for those sales was going up?

21     A.  I started to receive the cash payment -- payments in cash

22     from customers in Mexico.

23     Q.  OK.  I just want to make sure I understand you.

24          You were saying a moment ago that your cash intake on

25     the wholesale side was increasing at the same time that your

19nddat3                           Datta - cross

1   cash intake on the retail side was increasing; is that what

2   your testimony is?

3   A.   Yes.   The cash sales -- the retail sales of the stores were

4   increasing, and the customers from Mexico, instead of sending

5   the wire transfers or checks, they were sending more cash, the

6   same customers.

7   Q.   So cash was going up on the wholesale side at the same time

8   that your total sales were going down?

9   A.   Yes, sir.

10   Q.   Now, overall in your business in 2010, total sales were in

11   the neighborhood of what?

12   A.   In 2010?

13   Q.   Yes.

14   A.   It should be around 31.

15   Q.   $31 million?

16   A.   Yes, sir.

17   Q.   This is a business that you started about ten years ago, in

18   2000, 2001?

19   A.   Yes, sir.

20   Q.   So you grew your business from nothing to $31 million in

21   about a decade?

22   A.   In ten years.

23   Q.   Is that fair to say?

24   A.   Yes, sir.

25   Q.   All right.   And it is fair to say you are a businessman,

19nddat3                        Datta - cross

1   you wanted to keep growing; is that fair to say?

2   A.  Yes, sir.

3   Q.  You wanted to do well?

4   A.  I wanted to grow, yes, sir.

5   Q.  You wanted to expand your business, add more stores,

6   correct?

7   A.  Yes, sir.

8   Q.  You were considering adding a duty-free store in 2010, were

9   you not?

10  A.  Yes, sir.

11  Q.  All right.  And nearly all of your sales turned on sales to

12  Mexican customers, correct?

13  A.  Yes, sir.

14  Q.  That's what you told Mr. Goldstein in that telephone call

15  we listened to, right?

16  A.  Mr. Goldstein was trying to sell -- I bought the line of

17  Christian Dior from Mr. Goldstein and he wanted me to sell them

18  not in the U.S. market but rather into Mexico.

19  Q.  You confirmed for him, don't worry, all of my customers are

20  Mexican, it's not going to end up in the U.S. market.  That's

21  what you said, right?

22  A.  Yes, sir.

23  Q.  That was true because all your customers were actually from

24  Mexico, correct?

25  A.  My 95 percent of business is with Mexican people.

19nddat3                        Datta - cross

1   Q.  All right.  And if you want your business to grow, then it

2   makes sense that if your customers in Mexico are doing better,

3   you end up doing better?

4   A.  Of course.  My customers have to do better than me for me

5   to do better.

6   Q.  So they end up buying more from you; you end up growing?

7   A.  Yes, sir.

8   Q.  Now, is it also fair to say that the retail side of your

9   operation is smaller than the wholesale side?

10  A.  It is smaller than the wholesale; the retail sales is

11  around $12 million and the wholesale is around 17, $18 million.

12  Q.  So significantly smaller, then, by a factor of a few

13  million dollars?

14  A.  $6 million.

15  Q.  All right.  Now, I want to turn to the Form 8300s for a

16  minute.

17             Yesterday you testified that there was a period of

18  time you were not filing the forms at all; is that fair to say?

19  A.  Yes, sir.

20  Q.  And you learned at a certain point in time that you needed

21  to file the 8300s, correct?

22  A.  Yes, sir.

23  Q.  And your testimony yesterday was that you learned you

24  needed to file the 8300s from a man named Mr. Stuart?

25  A.  Mr. Stuart Kimbell.  I didn't tell the last name yesterday.

19nddat3                        Datta - cross

1   Q.  What was the last name?

2   A.  Mr. Stuart Kimbell; K-i-m-b-e-l-l, I believe.

3   Q.  This is somebody who was involved in the duty-free

4   business?

5   A.  In the duty-free business of watches and sunglasses.

6   Q.  And after you learned from Mr. Stuart Kimbell that you

7   needed to file 8300s, you started doing it, right?

8   A.  Yes, sir.

9   Q.  And if I understood you right, Yolanda was filling out the

10  8300 but you would then sign it, correct?

11  A.  Yes, sir.

12  Q.  I'm putting up the first page of Government Exhibit 211,

13  which is already in evidence.

14          And that's what an 8300 form looked like, correct?

15  A.  Yes, sir.

16  Q.  And that's your signature on the bottom that I just

17  circled, right?

18  A.  Yes, sir.

19  Q.  And you were the only one in your business who signed the

20  8300 forms, is that right?

21  A.  Yes, sir.

22  Q.  Yolanda didn't sign them, did she?

23  A.  No.

24  Q.  Cynthia didn't sign them, did she?

25  A.  No.

19nddat3                          Datta - cross

1   Q.  And you understood that this was an important document; is

2   that fair to say?

3   A.  Yes.  We have to report all the payments received in cash

4   to the U.S. government, so it is a very important document.

5   Q.  You understood that if you wanted to avoid problems with

6   the U.S. government, you needed to include accurate information

7   on the form, right?

8   A.  Can you repeat the question, please?

9   Q.  You understood you needed to put true and accurate

10  information into these forms, correct?

11  A.  What I believe to be correct, we filled that information,

12  and Ms. Yolanda was filling out the form; she is an accountant.

13  Q.  But Ms. Yolanda didn't sign it, did she?

14  A.  No.

15  Q.  You signed it, right?

16  A.  Yes, sir.

17  Q.  You signed it -- it says right here -- "Under penalties of

18  perjury, I declare that, to the best of my knowledge, the

19  information I have furnished above is true, correct and

20  complete."  That's what you said when you signed this document,

21  correct?

22  A.  Yes, sir.

23  Q.  And you understand, don't you, that penalties of perjury

24  means it could be a crime to put false information in this

25  document?

19nddat3                         Datta - cross

1    A.  Yes, sir.

2    Q.  Now, you testified a little earlier about the review that

3    BBVA Compass did of your accounts, right?

4    A.  Yes, sir.

5    Q.  And you listed a lot of different types of documents that

6    you gave BBVA in connection with that review, correct?

7    A.  Yes, sir.

8    Q.  And that included these 8300s, right?

9    A.  Whatever we had ready 'til that day, yes, sir.

10   Q.  Let me direct your attention to that August 2010 meeting

11   with Mario and Roberto in Las Vegas, OK?

12   A.  Yes, sir.

13   Q.  Now, if I understood you before, you testified on direct

14   examination that you realized as early as this meeting that

15   these men were criminals, correct?

16   A.  Yes, sir.

17   Q.  It was clear to you, right?

18   A.  Yes, sir.

19   Q.  And in response to their questions about what you might be

20   able to do to help them, you proposed to them different means

21   of laundering money; that is fair to say, right?

22   A.  Yes, sir.

23   Q.  You proposed to them that they could send you a chilango

24   and you would then sell perfume and file information under that

25   person's name, right; that's what you said?

19nddat3                              Datta - cross

1    A.  They asked me how to do it.  They were asking me my
2    suggestions.  So I was just giving them the suggestions.
3    Q.  And that's what your suggestion was, send me a chilango
4    with a different passport every time.  I'll sell you perfume.
5    We'll file the forms in that person's name.  That's what you
6    suggested?
7    A.  Yes, sir.
8    Q.  You also suggested that they could open up the boxes and
9    hide cash in it, boxes that are being shipped to Latin America,
10   right?
11   A.  When Mario asked what to do, I said if that's what you want
12   to do, you can do that.
13   Q.  You're the one who first suggested opening up boxes and
14   putting money into them, right; they didn't come up with that
15   idea themselves?
16   A.  As to how to send the money, I told them.
17   Q.  That was one of your ideas about how to do it, right?
18   A.  Yes, sir.
19   Q.  When you were having this conversation with them, with men
20   that you understood to be criminals, but it is your testimony
21   that you didn't know what kind of criminals they were?
22   A.  Yes, sir.
23   Q.  Now, you're from -- well not "from," but you've lived for
24   some period of time in Laredo, Texas, correct?
25   A.  Yes, sir.

19nddat3                    Datta - cross

1   Q.   That is right on the border with Mexico, right?

2   A.   Yes, sir.

3   Q.   You read the newspapers down there?

4   A.   Yes, sir.

5   Q.   You watch the news?

6   A.   Yes, sir.

7   Q.   You are familiar with what's happening in the border?

8   A.   Yes, sir.

9   Q.   You're familiar with significant increase in violence in

10  Mexico on the border region in the last few years?

11  A.   Yes, sir.

12  Q.   You're familiar with the prevalence of the narcotics trade

13  in that area?

14  A.   There is violence between the cartels fighting with each

15  other.

16  Q.   And these are cartels that are engaged not in gambling or

17  something but in drug trafficking, right?

18  A.   I do not know that.  There might be other parts that they

19  want to control the overall business in Mexico; that's what is

20  my understanding.

21  Q.   You don't know what the cartels in Mexico do?

22  A.   The cartels, they control the business, the marine

23  transport, all the shipments which go and all the people who

24  work, and the drugs is one part of their business, yes.

25  Q.   All right.  Drugs are -- I think it is fair to say, tell me

19nddat3                            Datta - cross

1   if you agree -- drugs are a pretty big part of their business?

2   A.  Correct, sir.

3   Q.  Is that accurate?

4   A.  You say; I believe you.  Yes.

5   Q.  It is not what I say.  I want to know what your

6   understanding is.

7   A.  They deal in different types of illegal activity and drugs

8   is one of them, yes.

9   Q.  But drugs is a significant one, is it not?

10  A.  I have no experience with the drug business.  So I cannot

11  say that; but, yes, drugs is one of their business they deal

12  in.

13  Q.  Fair enough.  But you said a minute ago that you have lived

14  in the area, you've read the news reports, you've watched the

15  news, you talked to people daily in Mexico.  Are you telling me

16  that you really don't have an understanding of the fact that

17  the Mexican cartels are engaged primarily in drug trafficking?

18  Is that your testimony?

19  A.  There is -- they are engaged in drug activity and other

20  activities.

21  Q.  Fair enough.  The agents told you in this initial meeting

22  that they had called down south about you, correct?

23  A.  Yes, sir.

24  Q.  That the reason they were there was because the people down

25  south weren't happy with the existing operation that they had

19nddat3                           Datta - cross

1    in place, right?

2    A.   Yes, sir.

3    Q.   And they told you that they wanted your help in getting

4    their money back home, correct?

5    A.   In which meeting, sir?

6    Q.   In the meeting at dinner in the evening in Las Vegas.

7    A.   Yes, sir.

8    Q.   And they told you that in the future when they talk to you,

9    you should have a code to use when you spoke to them, right?

10   A.   Mr. Mario said we should use the code.

11   Q.   All right.  And you were pretty clear with them that you

12   didn't want -- you recommended to their friends from down

13   south, right?

14   A.   I'm sorry?

15   Q.   You said, Do not recommend me to none of your friends;

16   isn't that what you said?

17   A.   I said do not recommend me to any of your friends.

18   Q.   You understood that their friends were from down south,

19   right?

20   A.   The "down south" can be anything.  Down south, I did not

21   understand clearly what the down south means.  For me, down

22   south is Texas, South Carolina, Atlanta, Alabama, Mississippi;

23   that's down south.

24   Q.   So you thought that -- you thought that when they referred

25   to down south, they might have been referring to criminal

19nddat3                          Datta - cross

1    activity in the greater southern region of the United States?

2    A.  Down south, I did not understand what it meant.  They said

3    down south.  They used the word down south and that's it.

4    Q.  You just said down south to me means Texas, Florida, the

5    south of the United States.

6              When these men met with you in Las Vegas and said we

7    talked to the guys down south.

8    A.  Yes.

9    Q.  They're having a problem --

10   A.  Yes.  I talked to the guys down south.

11   Q.  You thought they were talking the southern U.S.?

12   A.  I understood down south.  Down south can be anywhere.  They

13   didn't tell me clearly what is down south.

14   Q.  Mario told you he is from Guatemala, didn't he?

15   A.  Yes.

16   Q.  That is one of the first things he said, right?

17   A.  It is a South American country.

18   Q.  When he said, "My connection is down south, I'm a

19   Guatemalan," you thought he might have been referring to

20   Mississippi?

21   A.  I said, down south, what does it mean?  That down south

22   is -- if he said South America, it's very clear.  But down

23   south, if you want to say it is South America, yes.

24   Q.  All right.  So let's turn to September 27, 2010.  You met

25   with them again that day, correct?

19nddat3                         Datta - cross

1    A.   Yes, sir.

2    Q.   Now, since this meeting, you'd accepted a little more than

3    $38,000 in cash as payment for perfume, right?

4    A.   In October, sir?

5    Q.   Between the meeting that you first had in Las Vegas in

6    early August and the meeting that you had in San Diego at the

7    end of September, you had accepted roughly $38,000 in cash from

8    people working for Mario, is that right?

9    A.   Yes.

10   Q.   And when you took this money from them, at that point in

11   time you weren't drunk, were you?

12   A.   No.

13   Q.   All right.  And you understood at that point in time that

14   they were criminals, correct?

15   A.   I was in Laredo when that sale took place.

16   Q.   But you knew the sale was happening, right?

17   A.   Yes, sir.

18   Q.   You saw Jose over that video system that you had, right?

19   A.   Yes, sir.

20   Q.   You talked to him on the phone, right?

21   A.   Yes, sir.

22   Q.   There was no confusion about what was going on, was there?

23   A.   There was no confusion, yes.

24   Q.   And you knew they were criminals?

25   A.   I knew I am making a sale.

19nddat3                         Datta - cross

1   Q.  And you then met with them again in September, correct?

2   A.  Yes, sir.

3   Q.  Now, at this point you were planning to sell them more

4   perfume, right?

5   A.  Yes, sir.

6   Q.  Another $50,000 worth, right?

7   A.  Around $50,000, because they had sent a $50,000 wire

8   transfer in.

9   Q.  And there were discussions ahead of time about that wire

10  transfer right?

11  A.  Yes, sir.

12  Q.  That was that telephone conversation we listened to with

13  Cynthia where you told her tell him to send it to LNB, not San

14  Ysidro; those were wire instructions, right?

15  A.  Yes, sir.

16  Q.  You were saying let's get the money in the Laredo part of

17  the business, not in the San Ysidro part of the business for

18  the next perfume sale, correct?

19  A.  Can you repeat it, please?

20  Q.  You wanted the money wired to Laredo, Texas and not San

21  Ysidro, California, right?

22  A.  Yes, sir.

23  Q.  That is what you told Cynthia?

24  A.  Yes, sir.

25  Q.  Now, when you got to the meeting, the agents didn't want

19nddat3                          Datta - cross

1    perfume anymore, right?

2    A.   Yes, sir.

3    Q.   They said, we don't know what to do with perfume, right?

4    A.   Yes, sir.

5    Q.   Our bosses think it's too expensive, right?

6    A.   Yes, sir.

7    Q.   So they started proposing other things to you, correct?

8    A.   Yes, sir.

9    Q.   They started proposing, hey, you've got this 50 grand, why

10   don't you just wire it someplace else for us, right?

11   A.   Yes, sir.

12   Q.   And you during that meeting kept saying, no, I'm not going

13   to do the wire transfer, right?

14   A.   Yes, sir.

15   Q.   But you were OK still during that meeting selling them

16   perfume, correct?

17   A.   In that meeting, when I came to know that Mr. Mario is

18   working with Sinaloa, I just could not offend him.  Yet my

19   whole idea has changed, so I have to get away from him in a

20   smooth manner, in a nice manner.

21   Q.   You guys had a pretty lengthy conversation before the word

22   Sinaloa ever got mentioned, didn't you?

23   A.   I do not remember how long before he mentioned the Sinaloa.

24   Q.   And I guess we can just check the recording for that,

25   right?

19nddat3                     Datta - cross

1   A.  Just how many minutes it should be the conversation took

2   place and the Sinaloa came.

3   Q.  Well, would it surprise you, as you sit here right now, to

4   learn that they said to you, "So you're telling me the only way

5   you can help us is with perfumes," and you responded, "Just the

6   perfumes, I don't have no other way."

7   A.  Yes, sir.

8   Q.  Would it surprise you that you said that before he ever

9   mentioned Sinaloa to you?

10  A.  I do not know at what time this conversation took place.

11  Q.  But if it occurred before he mentioned Sinaloa to you, you

12  would agree with me, would you not, that at that point in time,

13  at least, you were willing to sell perfume to him even before

14  you understood he was part of the Sinaloa Cartel?

15          MR. WHITE:  Objection, your Honor.

16          THE COURT:  Overruled.

17  A.  I wanted to sell them perfumes.  Yes.

18  Q.  You wanted to sell them perfumes even before you knew they

19  were from the Sinaloa cartel?

20  A.  Yes, sir.

21  Q.  And then after they told you they were from the Sinaloa

22  Cartel, you continued to say I'll sell you perfume?

23  A.  Yes.

24  Q.  Now, Mr. Datta, you testified earlier on direct that the

25  reason you were willing to work with these men was because of

19nddat3                         Datta - cross

1    drunkenness and greed, right?

2    A.  Yes.

3    Q.  And by the time -- you know, while you may have had a few

4    drinks in Las Vegas, we can agree that your continued dealings

5    with them were not driven by intoxication; is that fair to say?

6    A.  Can you repeat the question, please?

7    Q.  Well, you said, "I dealt with them in August because I was

8    greedy and I was drunk;" you said that, right?

9    A.  Yes, sir.

10   Q.  And the question is you continued dealing with them

11   afterwards not because you were drunk but because you were

12   greedy?

13   A.  Yes.

14   Q.  The same greed that caused you to want to increase your

15   business, to expand into duty-free, to develop to $300 million

16   is the same greed, right?

17   A.  Yes, sir.

18   Q.  The same greed that caused you to accept tens of millions

19   of dollars in cash from your Mexican perfume customers in

20   Mexico?

21   A.  It's not the greed, it's the business.  I was getting the

22   payment from my sales into Mexico from my customers.

23              (Continued on next page)

24

25

19N4DAT4A                    Datta - cross

1   BY MR. SKINNER:

2   Q.  But you will concede, will you not, that greed motivated

3   your interactions with the undercover agents?

4   A.  I was introduced to them by Mr. Gupta, and he took the

5   responsibility of the paying customers that they are good

6   customers and that's why I started to deal with them; that's

7   how I met them.  I didn't look for anybody on the street.  I

8   was introduced to them by a person with whom I know for 12

9   years.

10  Q.  The question was, you would agree with me greed motivated

11  your dealings with the undercovers, right?

12  A.  Yes.

13  Q.  Are you trying to draw a distinction now that your desire

14  to stay in your business and take cash from Mexico was driven

15  by something different than the same greed?

16  A.  I don't understand the question, this question; can you

17  repeat please.

18  Q.  Let me ask you point-blank.  Did your greed also motivate

19  you to accept tens of millions of dollars in cash from Mexican

20  perfume customers?

21  A.  Whatever I sold to my Mexican customers, I got paid them in

22  the form of cash and the wire transfers and the checks.

23  Q.  So to go back very briefly to make sure we are clear on

24  this, in August of 2010, when you met with the undercovers,

25  told you they were from down south, you understood they were

19N4DAT4A                      Datta - cross

1    criminals but you were not sure what kind of criminals they

2    were; that's your testimony, right?

3    A.   Yes, sir.

4    Q.   It's your testimony that you specifically didn't understand

5    that they were connected to the drug trade, right?

6    A.   Yes.

7    Q.   But long before that people had said things to you about

8    whether or not you were accepting cash from narcotics

9    traffickers; would it be fair to say?

10   A.   Long before that --

11   Q.   Long before August 2010, way back as early as October 2009,

12   people were asking you, is that drug money you are bringing in?

13   A.   It was Ajay Gupta who asked me if it was drug money.

14   Q.   At that point in time it was in your mind, some of this

15   cash I am bringing in from Mexico could be drug money?

16   A.   My answer was I do not know.

17   Q.   Your answer was not no?

18   A.   My answer was I do not know.

19   Q.   You didn't tell them no, you didn't tell them absolutely

20   not, it's not drug money, it's legitimate money from my perfume

21   customers; you didn't say that, did you?

22   A.   It was a normal conversation.  He asked me a normal

23   question.  I gave him a normal answer.  I do not know.

24   Q.   I am asking you a normal question now and I would like a

25   normal answer.  Did you say no when they asked you if it was

19N4DAT4A                    Datta - cross

1   drug money?

2   A.  My answer was I do not know.

3   Q.  If you knew it wasn't drug money, wouldn't you have said of

4   course not, it's not drug money?

5   A.  How do I know --

6           THE COURT:  Just please answer the question; don't ask

7   another question.

8   Q.  I am saying if in ordinary conversation --

9           THE COURT:  Mr. Skinner, there is a question pending.

10  Are you withdrawing it?

11          MR. SKINNER:  No, your Honor.

12          THE COURT:  Please read the pending question back to

13  the witness.

14          (Record read)

15  A.  It was a normal conversation.  I didn't think of that.

16  Q.  It didn't occur to your when somebody asked you, are you

17  taking in millions of dollars in drug money that you didn't

18  think was drug money to say no?

19  A.  It was a normal conversation.  I did not think what is he

20  asking.  I didn't know his intentions, what he is doing or what

21  he is asking.  I gave him the honest answer at that time.

22  Q.  The honest answer was you were not sure at that time

23  whether it was drug money or not?

24  A.  I said I do not know.

25  Q.  Exactly, you didn't know, because if you knew it wasn't

19N4DAT4A                    Datta - cross

1    drug money, you would have told him?

2    A.   This is how you want to put it.

3    Q.   You would agree, would you not, that at least as early

4    October 2009, someone had expressly asked you whether or not

5    this cash was drug money, right?

6    A.   Yes.

7    Q.   And after that, you never went back to Fausto Garza and

8    asked him where he was getting his dollars, did you?

9    A.   It was just a conversation in New York; what it had to do

10   with my business in Laredo.

11   Q.   After Ajay Gupta asked you was all this money drug money,

12   did you ever go back to Fausto Garza and ask him, where are you

13   getting the dollars?

14   A.   I do not have to speak to Fausto Garza.

15   Q.   It's a yes-or-no question.  Did you ever go to Mr. Garza

16   and ask him whether any of his money was drug money?

17   A.   No.

18            MR. SKINNER:  No further questions.

19            THE COURT:  Redirect.

20   REDIRECT EXAMINATION

21   BY MR. WHITE:

22   Q.   Mr. Datta, you were asked on direct about statements that

23   you had made in your meeting with the Guptas at Nandansons in

24   October 2009.  Do you recall being asked those questions by

25   Mr. Skinner?

19N4DAT4A                    Datta - redirect

1    A.   Yes, sir.

2    Q.   Not everything you told the Guptas was true, correct?

3    A.   Yes, sir.

4    Q.   You exaggerated things to them?

5    A.   Yes, sir.

6    Q.   You were also asked about statements you made to arresting

7    officers immediately after you were arrested, correct?

8    A.   Yes, sir.

9    Q.   Not everything you said to them was true?

10   A.   Yes, sir.

11   Q.   Is that correct?

12   A.   Yes, sir.

13   Q.   You want to be found not guilty in this case, do you not?

14   A.   Yes, sir.

15   Q.   Do you believe that the way for you to be found not guilty

16   is to lie to this jury?

17   A.   No.

18   Q.   What do you believe?

19   A.   I believe I have to be truthful and tell them everything,

20   the truth, nothing else but the truth.

21   Q.   Why do you believe that?

22   A.   Because that is my duty.

23              MR. WHITE:   Nothing further.

24              THE COURT:   Thank you.

25              Recross.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19N4DAT4A                    Datta - redirect

1          MR. SKINNER:  No, your Honor, thank you.

2          THE COURT:  You are excused, Mr. Datta, thank you.

3          (Witness excused)

4          THE COURT:  Anything else, Mr. Ross, Mr. White?

5          MR. WHITE:  No, your Honor.

6          MR. ROSS:  The defense rests.

7          THE COURT:  I would like to see counsel at the

8     sidebar.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19N4DAT4A                    Datta - redirect

 1          (At the sidebar)

 2          THE COURT:  Obviously, the defendant has the right to

 3    a verdict.  I would just like to know whether there is any

 4    meaningful prospect that we would have to contact the jury over

 5    the weekend or later today to tell them not to come back.  You

 6    know what I mean I trust.

 7          MR. WHITE:  No.

 8          THE COURT:  Is there any prospect of a plea?

 9          MR. WHITE:  No.

10          MR. ROSS:  No, sir.

11          THE COURT:  Thank you.

12          (Continued on next page)

19N4DAT4A                    Datta - redirect

1          (In open court)

2          THE COURT:  Members of the jury, that concludes the

3   presentation of evidence in this case.  The lawyers and I now

4   have some work to do to get ready to have closing argument.  We

5   are going to do it this afternoon.  So you are done for the

6   day.  We will see you at 9:30 on Monday.  You will get closing

7   arguments and get the case on Monday.

8          Have a good weekend.  Don't get too wet.

9          (Jury leaves courtroom)

10         THE COURT:  I will take the motions now and when we

11  are done with the motions, I will give you the draft charge and

12  we will set a time for the charge conference.

13         MR. ROSS:  Your Honor, the defendant at close of all

14  the evidence renews its previously made Rule 29 motions on all

15  the grounds previously discussed with the court and add thereto

16  the specific and additional objects of the alleged conspiracies

17  in all three of the counts, including promotion, concealment,

18  etc.

19         We don't think, your Honor, that a reasonable juror

20  could find the defendant guilty beyond a reasonable doubt as to

21  any three of the, any one of the three counts, and more

22  specifically, and in addition more specifically, any of the

23  many objects which the government apparently alleged in a bit

24  of a scattergun type of allegation.  What they did was

25  apparently allege all of the objects under 1956 and 1957.

19N4DAT4A                    Datta - redirect

1          A good example is promotion.  There has not been --

2          THE COURT:  Promotion, I am not sure what you are

3     referring to.

4          MR. ROSS:  The objects of the alleged conspiracy, one

5     is to promote the unlawful activity, there is no evidence of

6     that, unlawful activity being drug trafficking, to conceal, to

7     disguise.  For example, your Honor --

8          THE COURT:  We are not going to do this by example; if

9     we are going to do it, you are going to state the grounds.

10         MR. ROSS:  I stated the grounds.

11         THE COURT:  OK.

12         MR. ROSS:  Thank you.

13         THE COURT:  I am sorry, you stated the grounds?

14         MR. ROSS:  I adopted, reincorporated the arguments

15    that I made at the close of all the evidence.  If the court

16    wishes me to restate them, I will.

17         THE COURT:  You do not have to restate what you said

18    already.  I am asking whether you have anything more specific

19    or anything else to say.

20         MR. ROSS:  Your Honor, we do not believe that a jury

21    could find beyond a reasonable doubt, based on the evidence in

22    this case, the defendant guilty of any of the three counts.  In

23    addition, we believe that the of objects the alleged

24    conspiracies, which include promotion, for example, of drug

25    trafficking, have not been, there is not a scintilla of

19N4DAT4A                    Datta - redirect

1    evidence from which the court or the jury could draw the

2    conclusion that the defendant is guilty beyond a reasonable

3    doubt.

4           I also, in renewing the motions previously made and

5    the government now having had its opportunity after the

6    defendant testified to offer rebuttal to the entrapment

7    defense, state to the court that as a matter of law, the

8    defendant as to Count 1 of the indictment should receive a

9    judgment of acquittal on the entrapment basis in addition to

10   the insufficiency of any evidence showing that there is another

11   human being who is not a law enforcement officer who was shared

12   the information that the money was coming from drug

13   trafficking.

14          Thank you.

15          THE COURT:  Thank you.

16          Anything the government wants to say?

17          MR. SKINNER:  Your Honor, I really don't have anything

18   to add to what we said yesterday.

19          THE COURT:  Is the government disposed to withdraw

20   from the jury's consideration any of the objects that are

21   alleged in this?

22          MR. SKINNER:  I will say, given that consideration, we

23   did not file a scattershot indictment charging every object

24   under the money laundering statute.  To the contrary, we

25   charged objects that are supported by the evidence.

19N4DAT4A                    Datta - redirect

1           At this point in time, particularly given the

2    entrapment defense raised, we are not inclined to take any

3    arrows out of our quiver.  No, we are not going to back off

4    from any of the objects.

5           THE COURT:  The motion is denied.

6           I will see you for the charge conference at a quarter

7    after 2.  We will give you copies of the draft charge.

8           See you later folks.

9           (Lunch recess)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19N4DAT4B

AFTERNOON SESSION

(2:20 p.m.)

1

2

3          (In open court, jury not present)

4          THE COURT:  We will market the verdict form Court

5     Exhibit B and the proposed charge Court Exhibit C.  I guess the

6     verdict form is uncontroversial.

7          MR. BRAGG:  On the verdict form, your Honor, there is

8     an issue I talked about with defense counsel which is that one

9     of the objects for Count 2, the statutory maximum for the

10    Section 1957 object is lower than the other objects.  So I

11    wanted to call that to the court's attention.

12         THE COURT:  So you are going to enlighten me now.

13         MR. BRAGG:  Section 1957 has a 10-year maximum.  I

14    think the verdict form can remain as is; defense counsel

15    suggested that when the jury returns, a special question can be

16    put to them.

17         MR. ROSS:  That's correct, your Honor, rather than

18    take what is otherwise a clean straightforward verdict form and

19    complicate it with subissues.

20         THE COURT:  You would rather have the complication

21    after the verdict.

22         MR. ROSS:  It's not that complicated.  If he is

23    convicted on Count 2, to send a special question, which of the

24    objects alleged do you find beyond a reasonable doubt.

25         THE COURT:  I don't want to do it that way; I want to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    charge this jury and get a verdict.  And they are going to be

2    expecting to be leaving here once they return a verdict not to

3    come back for a new closing and all of that.  If indeed it's

4    something we need to do --

5            MR. ROSS:  It is Count 2, your Honor.

6            THE COURT:  -- then we are going to do it.

7            So, Mr. Bragg, which is which?

8            MR. BRAGG:  Section 1957(b) states a 10-year penalty;

9    the other objects have a 20-year statutory maximum.

10           THE COURT:  1957(b) is a 10-year max.

11           MR. BRAGG:  Yes, your Honor.

12           THE COURT:  OK.

13           (Pause)

14           THE COURT:  Would it be satisfactory if I enter the

15   part of the verdict form that calls for guilty or not guilty on

16   Count 2, there was this subquestion:  Did the government prove

17   by a preponderance of the evidence that at least, and we will

18   say assuming if you find guilt.  Did the government prove by a

19   preponderance of the evidence that at least one of the objects

20   of any conspiracy of which you find the defendant to have been

21   a member was an object described in paragraph 6, 7, 8 or 9 of

22   the indictment.  Does that solve the problem?

23           MR. WHITE:  I didn't follow that, your Honor; I don't

24   understand the preponderance of the evidence.

25           THE COURT:  Because the phrase wasn't even used, that

19N4DAT4B

1    may be why you didn't -- did I say preponderance?

2            MR. WHITE:  You did.

3            THE COURT:  You are right; I even wrote it.  I take it

4    back.   That's because you write verdict forms like this only in

5    civil cases.  If you have found the defendant guilty on Count

6    2, did the government prove beyond a reasonable doubt that at

7    least one of the objects of the conspiracy of which you have

8    found the defendant guilty was an object described in paragraph

9    6, 7, 8 or 9 of the indictment.

10           I think it's paragraph 10, the 1957 count.

11           Is that satisfactory?

12           MR. BRAGG:  It is to the government, your Honor.

13           MR. WHITE:  Are the paragraphs of the indictment, is

14   the jury going to get the indictment?

15           THE COURT:  Yes.  We could do it just as easily by

16   referring to the first, second, third, or fourth object that I

17   described to you.  I am indifferent as to which way.  Any

18   objection to doing it either way?

19           MR. WHITE:  This is only marginally related, but one

20   of the things I was going to ask the court is, I didn't know if

21   the jurors were going to get the indictment, that the

22   forfeiture allegations in the indictment be removed from the

23   copy submitted to them during their deliberations.

24           THE COURT:  Any reason that shouldn't be done?

25           MR. BRAGG:  We can redact that.

19N4DAT4B

1          THE COURT:  OK.

2          Can we come back to the question I asked.

3          MR. WHITE:  Either way.

4          THE COURT:  There will be a corresponding change or

5      addition really to the charge.  We will do that.

6          Turning to the charge, is there anything from the

7      defense from the beginning to the bottom of page 4?

8          MR. WHITE:  No, your Honor.

9          THE COURT:  Government?

10         MR. BRAGG:  No, your Honor.

11         THE COURT:  Top of page 5 through page 7 line 19.

12         Defense, any objection?

13         MR. WHITE:  No, your Honor.

14         MR. BRAGG:  No, your Honor.

15         THE COURT:  Page 7 line 21 through page 11 line 2.

16         Defense?

17         MR. WHITE:  No, your Honor.

18         THE COURT:  Government?

19         MR. BRAGG:  No, your Honor.

20         THE COURT:  Page 11 line 4 through page 13 line 20.

21         Defense?

22         MR. WHITE:  The defense objects to the charge of no

23     overt act requirement.  I know it's the law no over act is

24     required in a money laundering charge.  But the jury being told

25     what's not an element I think is superfluous.

19N4DAT4B

1          MR. BRAGG:  Your Honor, the jury is going to get the

2     indictment.  They will have it before them.  They need to know

3     they do not find it.

4          THE COURT:  Obviously correct.  Overruled.  But of

5     course the government created the problem; there was no reason

6     for it to be in the indictment.  We have now resolved it.

7          Anything on the entrapment defense page 12 line 21

8     through page 16 line 3?

9          MR. WHITE:  Yes, your Honor.  On page 15, line 3, the

10    first contact with the government agent in the singular; I

11    think it should be with a government agent.

12         THE COURT:  Any objection?

13         MR. BRAGG:  No objection.

14         THE COURT:  OK.  Fine.

15         MR. WHITE:  Line 16, agents or informants, earlier in

16    the charge your Honor adds the language or other person acting

17    on behalf of law enforcement, and I think that should be in

18    there at this point also.

19         THE COURT:  Mr. Bragg.

20         MR. BRAGG:  No objection, your Honor.

21         MR. WHITE:  That's it on the entrapment.

22         THE COURT:  OK.

23         Page 16 line 5 through page 17.  Defense?

24         MR. WHITE:  No, your Honor.

25         THE COURT:  Government?

19N4DAT4B

```
1              MR. BRAGG:   Nothing, your Honor.

2         THE COURT:   Page 18 line 1 through page 19 line 1.

3              MR. WHITE:   Nothing, your Honor.

4              MR. BRAGG:   No, your Honor.

5         THE COURT:   Page 19 line 13 through page 21 line 12.

6              MR. WHITE:   Nothing, your Honor.

7              MR. BRAGG:   Nothing, your Honor.

8         THE COURT:   Page 21 line 14 through page 23 line 19.

9              MR. WHITE:   Nothing, your Honor.

10             MR. BRAGG:   Nothing, your Honor.

11        THE COURT:   Page 23 line 21 through page 25 line 9.

12             MR. WHITE:   Nothing for defense.

13             MR. BRAGG:   Nothing, your Honor.

14        THE COURT:   Page 25 line 1 through page 31 line 16.

15             MR. WHITE:   Nothing, your Honor.

16             MR. BRAGG:   No issues for the government, your Honor.

17        THE COURT:   Page 31 line 18 through page 34 line 12.

18             MR. WHITE:   Yes, your Honor.  On page 32 line 7, the
```
19  defendant objects to the last phrase on that line, by
20  intentionally failing to investigate it.  We don't believe
21  there is an affirmative duty to investigate.  We don't think
22  that's consistent with the *Global Tech* case.
```
23        THE COURT:   Mr. Bragg.

24             MR. BRAGG:   Your Honor, I am pulling *Global Tech* out.
```
25  As I recall, I believe, your Honor, *Global Tech* --

19N4DAT4B

1      THE COURT:  It comes right out of *Global Tech*.

2      MR. BRAGG:  Right.  Footnote 9 says, yes, she

3  intentionally failed to investigate those facts.

4      THE COURT:  It comes right out of footnote 9 in *Global*

5  *Tech*.

6      MR. WHITE:  OK, your Honor.  We would request --

7      THE COURT:  That one is overruled just for clarity of

8  the record.

9      MR. WHITE:  We request that there be added to the

10  charge that it is not sufficient that the defendant

11  deliberately remained indifferent to the possibility of

12  wrongdoing.  In *Global Tech*, the trial court had instructed the

13  jury that deliberate indifference to the risk of wrongdoing was

14  sufficient for knowledge, and the Supreme Court said that that

15  was not true.  So we would like the jury to be instructed that

16  it is not sufficient that the defendant deliberately remained

17  indifferent to the possibility of wrongdoing.

18      MR. BRAGG:  Your Honor, I think the charge as it's

19  written mirrors *Global Tech*, the case cited by the defense.  To

20  take a line from Mr. White, it seems here to add in something

21  that the jury need not consider would seem to complicate what

22  is a streamlined and accurate charge.

23      THE COURT:  I am not going to charge as you would

24  suggest.  I think the charge as it stands accurately states the

25  law.  What you suggest would be needlessly confusing.

19N4DAT4B

```
1                Anything else up to page 34 line 12?

2           MR. WHITE:  No, your Honor.

3           MR. BRAGG:  No, your Honor.

4           THE COURT:  Page 34 line 14 --

5           MR. WHITE:  No, your Honor.  Sorry.

6           THE COURT:  -- through page 42 line 2?

7           MR. WHITE:  No, your Honor.

8           MR. BRAGG:  No, your Honor.

9           THE COURT:  It seems to me that the uncalled witnesses

10   instruction on page 42 is not necessary.  Anybody disagree.

11          MR. BRAGG:  I guess in part, they made mention --

12   that's fine, your Honor.

13          THE COURT:  What's fine?

14          MR. BRAGG:  To omit it.

15          THE COURT:  Mr. White.

16          MR. WHITE:  I agree.

17          THE COURT:  Gone.

18          Page 42 line 13 through page 44 line 20

19          MR. WHITE:  Nothing, your Honor.

20          THE COURT:  Mr. Bragg?

21          MR. BRAGG:  Nothing, your Honor.

22          THE COURT:  Page 44 line 22 to the end?

23          MR. WHITE:  Nothing, your Honor.

24          MR. BRAGG:  Nothing, your Honor.

25          THE COURT:  Well, pleasure doing business with you
```

19N4DAT4B

 1    gentlemen, I must say, it has been whatever happens and we are

 2    all set.  Anything else to be done?

 3                MR. BRAGG:  I did want to note for the record,

 4    Mr. Skinner is not here because he had a pressing family

 5    emergency.

 6                THE COURT:  I hope everything is all right.

 7                MR. BRAGG:  I think it will be; he needed to run out.

 8                THE COURT:  I had understood that.

 9                I thank you and wish you all a good weekend.

10                MR. WHITE:  One second, your Honor.  Mr. Ross will be

11    submitting that proffer on Monday morning that we spoke about,

12    put it in in written form.

13                MR. ROSS:  Regarding Ms. Carillo and Ms. Garza's

14    testimony.

15                THE COURT:  I am not going to stop you from handing in

16    something for whatever value it has at this stage of the

17    proceeding or any other stage.

18                MR. ROSS:  Yes.

19                THE COURT:  But OK, you will do what you think is

20    appropriate.  Anything else?

21                MR. ROSS:  No, sir.

22                THE COURT:  OK.  See you on Monday.

23                (Trial adjourned to September 26, 2011, 9:30 a.m.)

24                            -   -   -

25

924

```
1                      INDEX OF EXAMINATION

2    Examination of:                      Page

3    VIKRAM DATTA

4    Direct By Mr. White  . . . . . . . . . . . . 818

5    Cross By Mr. Skinner . . . . . . . . . . . . 865

6    Redirect By Mr. White  . . . . . . . . . . . 907

7                     DEFENDANT EXHIBITS

8    Exhibit No.                          Received

9     E   . . . . . . . . . . . . . . . . . . . 824

10    T   . . . . . . . . . . . . . . . . . . . 826

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

925

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,                New York, N.Y.

 4              v.                             (S1) 11 Cr. 102  (LAK)

 5   VIKRAM DATTA,

 6              Defendant.

 7   ------------------------------x

 8
                                              September 26, 2011
 9                                            9:30 a.m.

10
     Before:
11
                        HON. LEWIS A. KAPLAN,
12
                                              District Judge
13

14                         APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  PETER M. SKINNER
17        ALVIN L. BRAGG, JR.
          Assistant United States Attorneys
18

19   ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN PA
          Attorneys for Defendant
20   BY:  ALAN S. ROSS

21   WHITE & WHITE
          Attorneys for Defendant
22   BY:  DIARMUID WHITE

23        - also present -

24   Vanessa Quinones, Government paralegal
     SA Richard Reinhardt, IRS
25
```

1                    (Trial resumed; jury not present)

2                    THE COURT:  Just give me an idea of the length of

3      closing.

4                    MR. SKINNER:  Your Honor, I expect to be about an

5      hour.

6                    MR. ROSS:  I am trying for an hour and a half.  The

7      jury instructions take a bit to talk about and incorporate.  I

8      have gone through it; I have come down from 2 hours to an hour

9      and a half.  I would ask the court to tolerate that.

10                   THE COURT:  We will see.

11                   (Jury enters courtroom)

12                   THE COURT:  Good morning everybody.  I hope you all

13     had a good weekend.  The jurors and the defendant all are

14     present.  We are going to hear closing argument.

15                   Mr. Skinner.

16                   MR. SKINNER:  Thank you, your Honor.

17                   Good morning, ladies and gentlemen.  This man, Vikram

18     Datta, accepted millions of dollars in drug money as payment

19     for perfume.  He knew the money was drug money but he didn't

20     care.  By taking this money, by accepting it, by depositing it,

21     by running it through his business he legitimatized it, he

22     cleaned it.  Ladies and gentlemen, this man, Vikram Datta, was

23     a money launderer and he was a careful money launderer.  He

24     tried the best he could to protect himself.  He tried to make

25     sure that if law enforcement came looking at his business, came

19Q4DAT1                    Closing - Mr. Skinner

1    scrutinizing his records, they would pass muster, they wouldn't

2    arouse suspicion.  He mixed the drug money he took in with the

3    legitimate cash he took in as part of his business.  He

4    reported everything.  He had a story for everything.

5              In his own words, from Government Exhibit 107, one of

6    the recordings, I have a perfect plan.  But as careful as

7    Vikram Datta was, he wasn't careful enough.  He let his guard

8    down.  He let his guard down when he was talking to people that

9    he thought were criminals like himself.  He let his guard down

10   when he was talking to people he believed to be drug

11   traffickers.  He told them how he laundered money.  He advised

12   them on how they could launder money.  As you know, those drug

13   dealers were not really drug dealers.  In reality they were

14   undercover agents from the DEA, and they were recording his

15   every word.

16             As careful as Vikram Datta was, he did not anticipate

17   somewhere down the road his co-conspirators, men like Fausto

18   Garza and Hilario Martinez-Garcia, would be up here, testifying

19   before you, offering you an inside picture of how they

20   delivered drug money to his business.  As careful as he was, he

21   managed to leave a paper trail.  He thought that by documenting

22   everything he was protecting himself.  He thought that by

23   following all the procedures he would have a defense if he was

24   ever accused of money laundering.

25             But when you have an inside view of what he is doing,

1    when you have his own recorded explanation, when you have the

2    testimony from other co-conspirators like the cooperating

3    witnesses who testified, the documents he intended to cover up

4    his crime, they actually revealed, when, where and how much he

5    was laundering.  The CTRs from the bank, the CMIRs filed when

6    people were crossing the border, the 8300s he signed himself,

7    all those documents offer you a complete picture of the scope

8    of the money laundering operation.  It was big.  The numbers

9    were big tens of millions of dollars of cash going into his

10   business day after day after day.

11           So, let's talk about how the government has proven all

12   of this.  Let's talk about what the evidence in this case has

13   shown.  First, let's look at the big picture.  Vikram Datta

14   participated in the black market peso exchange.  Let's put up

15   Government Exhibit 1002.  This was a demonstrative chart

16   detective DiGregorio used in explaining the black market peso

17   exchange.  Just to refresh your recollection on how it works,

18   in the lower left-hand corner you have the drug dealers.  They

19   send the drugs up north to the United States.  They are sold.

20   They generate a lot of U.S. currency as cash.  That money is

21   smuggled back down to Mexico where it is aggregated and stored

22   in safe places where the cartels know it's not going to be

23   subjected to some kind of law enforcement.

24           Eventually those dollars are sold to a  peso broker.

25   The dollars going to the peso broker.  Pesos go back to the

1    drug dealer.  The drug dealer is now happy.  He has received

2    payment for his drugs in the form of currency that they use in

3    Mexico and he no longer has to worry about these large amounts

4    of U.S. dollars that are sitting in his stash house

5    aggregating.  Now the peso broker needs to do something with

6    those dollars.  He sends the dollars back north over the border

7    into Laredo, Texas where he heard about this amazing border

8    trade economy, a border trade economy fueled in part by drug

9    money, ladies and gentlemen.

10           But he sends it up here to the U.S. businessmen, to a

11   businessman who exports goods back down to Latin America.  That

12   business man accepts the drug money as payment for a product.

13   The product is sent back down to Mexico or elsewhere in Latin

14   America where it's sold to generate pesos that are used to pay

15   the peso broker for the dollars.  Then the pesos go back to the

16   drug dealer to buy more cash.  It's a big cycle; drugs going

17   north, product eventually coming south, money being exchanged

18   in between.

19           So where did defendant Vikram Datta fit in?  He was a

20   perfume exporter.  He is right here, the U.S. exporter side of

21   this chart.  He accepted drug money as payment for perfume and

22   what was the benefit to him, sales, ladies and gentlemen, to

23   put it simply, more sales than he would have had without drug

24   money.  So, how do you know this is what Vikram Datta was

25   doing?  How do you know he was participating in the black

19Q4DAT1                    Closing - Mr. Skinner

1     market peso exchange?  Well, we are going to go through this,

2     through the evidence.  Before we do that I just want to ask you

3     to keep something in mind about the evidence in the case.

4           There are basically two classes of evidence, evidence

5     concerning Mr. Datta's business and how he used that business

6     to launder drug money, then there is evidence that was gathered

7     by the undercovers, the evidence about how he laundered money

8     that was represented to be drug money.  So you have actual drug

9     money evidence and evidence concerning money that we told him

10    was drug money.  The evidence concerning Datta's business

11    focuses on, we have a three-count indictment, the evidence

12    concerning Datta's business focuses on Counts 2 and 3 of that

13    indictment.  I am going to talk about that evidence first.  The

14    evidence concerning the undercover operation, that focuses on

15    Count 1, that the conspiracy focused purely on the laundering

16    of the money represented to be drug money.  We will talk about

17    that second.

18          What I want you to keep in mind is that these two

19    classes of evidence, they don't exist completely independently

20    of each other.  It's not you have all the undercover evidence

21    and all of the evidence concerning his business, because what

22    he said to the undercovers about his business explains what he

23    was doing in Laredo in that business where he was accepting

24    money as payment for perfume.  What we learned, what you

25    learned, I will tell you about it now, about his business, the

1    evidence about his business, that offers you some insight into

2    what he was saying to the undercovers and what he was doing

3    when he was agreeing to launder money for the undercovers.

4          So keep in mind the two kinds of evidence are

5    interrelated.  I am going to do the best I can to segregate

6    them, talk about one set then the other, but you will hear

7    about the undercover operation while I am talking about the

8    business and vice versa, so keep that in mind; they inform each

9    other.  With that qualification, let's talk about Datta's

10   business and how you know he operated it as part of the black

11   market peso exchange.

12         I have put the screen 5 points I want to walk through.

13   You know he was operating as part of the black market peso

14   exchange because he took cash for payment for perfume.  Some of

15   that cash, not all of it because he was mixing the money

16   together, some of that cash was drug money.  He knew it was

17   drug money or he should have confirmed that it was drug money.

18   He profited from receiving that drug money and he took steps to

19   hide where the money was coming from.  Let's talk about each

20   one of those.

21         First, Datta took cash as payment.  This is really

22   beyond dispute.  He took in millions of dollars of cash in

23   payment for perfume.  When you look at the photographs of his

24   store and you hear these numbers, it's staggering to think how

25   much business was going through these little stores right down

19Q4DAT1                         Closing - Mr. Skinner

1    on the border if a little warehouse where they just had creaky

2    shelves holding everything up.  Millions of dollars is going

3    through this business on an annual basis.  A lot of it is cash,

4    no dispute.

5            Mr. Datta admitted that he was accepting cash as

6    payment during cross-examination.  He admitted that tens of

7    thousands of dollars were coming in every day.  The reports you

8    saw, they conform this for you, the currency transaction

9    reports, you heard about a lot of reports, those are the ones

10   the bank files when they get more than $10,000 in a deposit.

11   You have seen in Government Exhibit 302 all of the CTRs for his

12   business.  You know the numbers.  They show massive cash

13   deposits, $7.8 million in 2008, $14.3 million in 2009, $18

14   million in 2010.  And you know about these figures from the

15   testimony agent Reinhardt gave you.

16           That brings us to what kind of money was this.  Some

17   of the cash that Vikram Datta was getting was drug money.  The

18   evidence has established this beyond a reasonable doubt.  So,

19   as the CTRs establish in the figures we were just going

20   through, there was big jump in the amount of cash he was

21   getting as part of his business.  It went up nearly 100 percent

22   from 7.8 million in cash in 2002 to 14.3 million in 2009.  It's

23   pretty clear from the objective documents he started bringing

24   in a lot more cash in 2009.

25           The timing of that is significant.  Both the

19Q4DAT1                        Closing - Mr. Skinner

1  cooperating witnesses, Mr. Garza and Mr. Martinez, testified to
2  you they started delivering more cash to his business in the
3  middle of 2009.  They started delivering more cash in the
4  middle of 2009 because they all of a sudden were able to start
5  buying cheaper dollars.  They could buy cheaper dollars.  They
6  could sell the dollars cheaper to their clients, the perfume
7  customers down in Mexico.  And all of a sudden everybody is
8  excited to be paying with cash.  It's cheaper for them.  If you
9  can buy more dollars you can buy more perfume.
10            The cooperating witnesses were entirely consistent on
11  the timing of this operation.  They both testified there came a
12  time when they started buying cheap dollars and they both
13  testified when it was, the middle of 2009.  That testimony from
14  the cooperating witnesses is consistent with the timing you
15  learned about from detective DiGregorio.  He explained that
16  since September 11, cash drug proceeds in the United States, as
17  opposed to being stored in New York City and other places where
18  there was an increase in law enforcement attention, they
19  started seeing this money starting about 10 years ago just
20  reverse the smuggling.  The drugs come up, reverse smuggle it
21  back down to Mexico where it's stored and aggregated.
22            For a long time the Mexican drug traffickers were able
23  to just deposit the U.S. dollars in Mexico right into the banks
24  down there.  Then they could wire it to wherever they wanted.
25  Money laundering was pretty easy for them at that point.  But

1   starting in the beginning of 2009, as detective DiGregorio told

2   you, the banks started cracking down.  They stopped accepting

3   all these U.S. dollar deposits.  All of a sudden there is a lot

4   of money sitting down there with no place to go.

5            At that point it starts flowing back up over the

6   border.  Law enforcement starts noticing increased cash flows

7   coming from Mexico back to the United States.  At that point

8   it's being used as part of the black market peso exchange to

9   buy products.  The timing here makes sense.  When the banks in

10  Mexico start to clamp down, there is no place for the money to

11  go, all of a sudden there are more drug dealers, more drug

12  dollars to be sold to folks like Fausto Garza.  All of a sudden

13  folks like Fausto Garza start sending more money up to people

14  like Vikram Datta.

15           That's all borne out by the documents you have seen,

16  the CTRs, etc.  It's clear that those dollars that he was

17  buying was drug money.  Hilario Martinez-Garcia told you how he

18  and Fausto Garza referred to it as narco dollars.  You heard

19  about the money itself.  You heard testimony from the

20  cooperators about how they were able to buy this money cheaper

21  than they could buy it any other place on the legitimate

22  market.  You heard Fausto Garza testify about how he was able

23  to buy it buy the money on consignment, on credit.  That means

24  somebody was willing to sell this man at a pop hundreds of

25  thousands of dollars in cash and he would give it to them and

19Q4DAT1                        Closing - Mr. Skinner

1     he would say come back to me later and pay me for that cash.

2               He told you that's not something he could do in the

3     legitimate market.  A bank is not going to give you cash up

4     front and let you pay for it later.  A casa de cambio is not

5     going to do that, not for someone like Fausto Garza who is

6     running this little fly-by-night operation in Nuevo Laredo.

7     But somebody who is buying drug dollars, they are willing to do

8     that kind of thing.  So you know that he could buy it cheap,

9     you know he could buy it on consignment, and you heard how the

10    money was coming to him.  It was driven or taken by bus from

11    places far away across Mexico traveling across dangerous

12    territory in Mexico, territory controlled by cartels.

13              They never had any trouble getting millions of dollars

14    in cash through this area.  They would drop it off as business.

15    You heard how it looked.  It was old, not new, it was bundled

16    in rubberbands, not in some kind of bank wrapper.  When you put

17    all this together, ladies and gentlemen, I submit it

18    establishes beyond a any reasonable doubt that the money was

19    drug money.  On top of that, you should keep in mind that you

20    also know it's drug money because what the cooperating

21    witnesses told you is entirely consistent with how detective

22    DiGregorio told you drug launders launder their money.

23              Look at 1002, this was how detective DiGregorio

24    explained the black market peso exchange.  I would like to put

25    up now a chart we prepared for closing today.  This focuses on

1    what we know about this business.  We know there were Mexican

2    drug dealers who were selling dollars for pesos to Fausto and

3    Hilario.  We know they were bringing dollars back up over the

4    bridge to La Versailles.  We know La Versailles was shipping

5    the perfume back to the customers of Fausto Garza, the perfume

6    customers in Mexico City.  We know they were paying Fausto

7    Garza in pesos.

8            This is essentially the exact same operation described

9    by detective DiGregorio.  You know from detective DiGregorio

10   that the people who used this sophisticated money laundering

11   operation, the black market peso exchange, they are drug

12   dealers.  So on top of all the testimony about how they got the

13   money, you put it up next to this, it's pretty clear that it

14   was drug money.

15           Also keep in money when you think about the

16   cooperators' testimony that their testimony is confirmed by

17   independent evidence.  They told you how it works.  They

18   described it just like the chart on the screen.  You don't have

19   to take them exclusively at their word.  There is other

20   evidence in the case that confirms what they told you.  There

21   are nine recorded phone calls in evidence between Fausto Garza

22   and Cynthia, Datta's co-conspirator, where Garza says, he is

23   doing just what he said he did; he's setting up perfume

24   deliveries to La Versailles.  There are scores of CMIRs filed

25   by Hilario Martinez-Garcia, Government Exhibit 303.  They

19Q4DAT1                           Closing - Mr. Skinner

1    confirm that he did just what he said he did, that he crossed

2    the border regularly, that he declared the cash he was bringing

3    across the border, that he declared how much he was bringing to

4    La Versailles.

5            You have the cash books from La Versailles, Government

6    Exhibits 201, 202, 202, 203, 204.  This is just one of those

7    cash books.  If you look through this you will see that they

8    confirm the receipt of cash payments from people that Fausto

9    Garza identified as his customers.  For example, Garza

10   testified that one of the his clients was a man name Jose Luis

11   Contreras.  You heard recorded phone calls confirming he was

12   delivering cash for Contreras, Governments Exhibit 410, 410T

13           The cash books, they show large amounts of cash from

14   Jose Luis Contreras, Government Exhibit 203.  If you look, it

15   shows large amounts of cash: November 23, $90,000 cash

16   received; November 26, $10,000; November 29, $23,000; and on

17   down the line, tens of thousands of dollars coming in from Jose

18   Luis Contreras just like the cooperators told you.

19           So, just to summarize how do we know it was drug

20   money, we have testimony from cooperating witnesses, testimony

21   from detective DiGregorio, and there is another thing, another

22   piece to this puzzle that's important.  You have the evidence

23   that you got from special agent Brian Duffy, the evidence about

24   the search of the Best Western hotel in Newark, New Jersey,

25   Government Exhibits 501 to 517, all of the evidence about

1    Miguel Lara, the guy they found in the room of an airport hotel

2    with $30,000 in cash.

3         This evidence shows that Miguel Lara, a Mexican

4    national, made two separate trips in early 2010 to the United

5    States.  Each trip he stayed in hotels, he paid cash, each trip

6    he visited a lot of banks.  When he visited those banks he made

7    deposits of under $10,000 into a lot of different bank

8    accounts.  One of those bank accounts was a La Versailles bank

9    account.  Government Exhibit 609, page 2 of the record, page 2

10   of that account statement, these were transactions recorded on

11   that account statement.  All of these deposits made in branch

12   stores, all for under $10,000.

13        You saw Government Exhibit 505.  These were receipts

14   from the deposits that were found in Miguel Lara's room.  They

15   match the deposits indicated on the La Versailles account.

16   They have the last 4 digits of the La Versailles account number

17   on them.  They are from the same bank.  There's also a counter

18   deposit ticket made out in the name of La Versailles Fragrances

19   with the same account number you are going to find on

20   Government Exhibit 609.

21        What does this is establish, that money was being

22   deposited someplace else in the country in what we call the

23   structured manner, calculating, you are trying to avoid the

24   bank filing a CTR about this cash deposit by coming in under

25   $10,000 each time.  It shows that Mr. Datta was collecting cash

19Q4DAT1                          Closing - Mr. Skinner

1    in other places aside from his business on the border.  It's

2    obvious this money was drug money.  It's entirely consistent

3    with what detective DiGregorio told you about how the black

4    market peso exchange works.

5            He told you about how drug proceeds in the United

6    States get put into the banking still via structured deposits

7    of less than $10,000 and then they are transferred to exporters

8    like Mr. Datta who send product to Latin America.  It's

9    precisely what happened here.  You know from this evidence that

10   drug dealers in the New York City area were depositing

11   narcotics proceeds directly into Datta's bank account.  You

12   know from Mr. Datta himself that was not the only time this

13   happened.  He told you in his own testimony that he had other

14   instances like this elsewhere around the country.

15           When Mr. Datta testified he tried to distance himself

16   from those deposits.  He claimed that he wrote a letter to his

17   customers telling his customers you are not allowed to deposit

18   money directly into my bank accounts anymore.  It's kind of a

19   ridiculous letter.  If you don't want your customers depositing

20   money into your bank accounts, how did they get your account

21   information.  Miguel Lara flies up from Mexico, has cash in his

22   pocket, he somehow ends up without Mr. Datta's knowledge with

23   Mr. Datta's bank account information in his pocket and he just

24   starts making deposits.  He's doing this out of the goodness of

25   his heart, it's something he looks to do, find other people's

1   bank information, fly around the country and make structured

2   deposits into their accounts.  Come on, ladies and gentlemen.

3              He gave him, he gave him that information.  He wanted

4   the money to be deposited in his account.  Then he wrote this

5   letter later when he started to realize he might get in trouble

6   for it.  I have to ask, if it was such a problem, why did he

7   wait so long to send this letter.  If this is something that

8   truly surprises him that he did not intend to have happen, the

9   cash deposits occur in the beginning of March.  The letter,

10  Defendant Exhibit T, is dated 17 agosto 2010.  They did not

11  provide us with a Spanish translation, but I think we can agree

12  that means this was sent in August.

13             If he really cares about what is happening, if it's a

14  problem, it's a surprise, why wait 5 months to take some kind

15  of action.  Ladies and gentlemen, the reason is this does not

16  add up, it doesn't make sense.  Because this had nothing do

17  with those deposits in New Jersey.  At around the same time

18  this was happening, BBVA Compass Bank is separately reviewing

19  his accounts, he is trying to figure out how he could keep

20  those accounts, and he sends the letter out at that point.  He

21  only sends it because he has to, not because he never intended

22  to get that money in New Jersey.  I submit that you can just

23  discount, put aside this rather ridiculous explanation that he

24  gave you in this attempt after the fact to try to explain away

25  these deposits in New Jersey that otherwise is pretty

19Q4DAT1                    Closing - Mr. Skinner

1    compelling evidence this man was involved in taking drug money.

2              In sum, there is considerable evidence that Vikram

3    Datta received drug money.  Fausto Garza and Hilario

4    Martinez-Garcia credibly testified to how about how they

5    brought drug money to him.  You have all this evidence from New

6    Jersey indicating the drug money was coming to him from

7    elsewhere in the country.  You have the testimony from

8    detective DiGregorio explaining to you how this evidence is

9    consistent with the operation of the black market peso

10   exchange.

11             So that brings us to the third point on that little

12   list; how do we know that Datta Vikram's business took place on

13   the black market peso exchange, in part because he knew what he

14   was getting drug money.  The evidence has shown that he knew in

15   his own mind, he actually explained to the undercovers he knows

16   it's drug money.  On top of that, there is ample evidence right

17   in front of him that if he just confirmed in any manner

18   whatsoever he would have known it was drug money.

19             Let's look at his own words.  On December 7, 2010,

20   Vikram Datta met in Las Vegas in a casino with Mario Recinos,

21   one of the undercover officers.  During that meeting he

22   discussed a detailed plan for future money laundering

23   operations.  You heard this recording, it went on a long time,

24   the level of detail and discussion about how he was going to

25   launder hundreds of millions of dollars for Mr. Recinos is

19Q4DAT1                    Closing - Mr. Skinner

1    staggering.  We are going to focus on one little piece of that

2    meeting.  He tells Mario, in addition to how he was going to

3    launder money, he tells him about how his own business is

4    working.

5            From 107T, transcript, pages 32 to 37, he says, there

6    is a lot of cash coming in, I am reporting everything under

7    their names, I am pretty sure they are taking their discount

8    someplace, it's all Sinaloa money.  Agent Recinos, you think

9    so.  Yeah, people send me, I am 90 percent sure, really, they

10   are dropping it off to you, yeah, I am 90 percent sure.  This

11   man says he told the undercovers in his own words, it's all

12   Sinaloa money.  He knew exactly what he was doing.  He knew

13   exactly where this cash was coming from.

14           Of course, you know that he knows exactly what Sinaloa

15   is because months before this, in April, you had that

16   intercepted phone call.  You overhear that conversation he had

17   with Liz.  During that conversation, despite the fact he later

18   denied knowing what Sinaloa was, during that conversation he

19   said to Liz, of course, I know that Sinaloa is a big drug

20   cartel.  You have from this defendant's own mouth, from his own

21   mouth, an admission that he knew what he was getting was drug

22   money.

23           In addition to this plain evidence of what he in fact

24   knew, there is a lot of evidence that he was on notice that he

25   was receiving drug money, that he took steps to avoid

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    confirming what was otherwise obvious.  You are going to get

2    instruction on the law after we all finish with our closing

3    arguments.  Judge Kaplan is going to instruct you I expect on

4    the legal concept known as conscious avoidance.  I am not going

5    to explain in detail what it means now.  Judge Kaplan is the

6    only one who can explain the law to you.  It's his explanation

7    that controls, not anything I can say.

8         But suffice it to say for purposes of discussing the

9    evidence right now, the defendant cannot claim he didn't know

10   something if it's clear he took active steps to avoid

11   confirming what was otherwise obvious as the nose on his face.

12   Here, there is plenty of evidence that Datta actively avoided

13   confirming what was otherwise obvious, that he was accepting

14   millions of dollars in drug money as payment for perfume.  For

15   example, he was repeatedly challenged as to the source of the

16   cash was bringing in.  In September 2009, IBC Bank started

17   asking questions.  You heard about that from Gabriela de la

18   Garza.  They specifically want to know where all this cash you

19   are depositing in our bank, where is that coming from.

20        What does Mr. Datta do, does he answer their

21   questions, does he provide an explanation.  No.  He closes the

22   account.  I don't want to provide that information to IBC Bank.

23   Why, because, we will get to the timing of that in a minute,

24   but suffice it to say for purposes of what we are talking about

25   right now, in September 2009, one of the banks is asking where

1   money is coming from and he doesn't want to tell them, he

2   doesn't want to figure it out himself.

3           A year later, another bank, BBVA Compass Bank, starts

4   asking the same questions.  They start saying where is your

5   money coming from.  You heard this in one of the telephone

6   conversations, Government Exhibit 429.  At the top, David Puig

7   was saying, you guys are pretty legit.  Look by the way, I

8   think it's fair to say pretty legit is not how bankers usually

9   talk about their aboveboard clients.  Anyway, you guys are

10  pretty legit but, you know, it's really the cash that, that you

11  guys receive from the others.  BBVA Compass Bank is saying to

12  him, Yolanda Carillo who is an employee, he gets on the call a

13  minute later, BBVA Compass Bank is making clear that Datta to

14  his co-conspirators, we are concerned about where that money is

15  coming from.

16          Now two banks have told Vikram Datta told him they are

17  concerned about where the money is coming.  Shortly after that

18  October 2010, he had a meeting with two cooperating witnesses,

19  the Guptas.  They told you about how during this meeting they

20  asked him about how he was running this business.  You heard

21  recordings from that meeting and he was bragging to them about

22  how much cash he was receiving.  At one point Ajay Gupta, the

23  father, says to him, he's flabbergasted how much money is

24  coming in, he says do you think it's drug money.  If he didn't

25  have any reason to question where it's coming from up to that

1    point, by now red lights should be flashing in front of him.

2    Holy cow, is it drug money.  What was his answer, not no, of

3    course not, not I know it's not because I confirmed where it's

4    coming from.  He says I don't know.  I don't know, ladies and

5    gentlemen.

6          What does he do that after that.  Does he ask any

7    questions about where the money is coming from.  No.  Fausto

8    Garza testified that no one from La Versailles ever asked him

9    about where he was getting all this cash.  Datta himself

10   testified that he knew Fausto Garza was delivering cash from

11   Mexico, but he never asked him where he was getting all of this

12   cash.  Following his arrest Datta repeatedly told DEA, it's not

13   my business, it's not my problem.  That's his party line.

14   That's his mantra.  That's what Datta thought would get him off

15   the hook eventually.  I don't need to go out and confirm what

16   otherwise is painfully obvious which is I am accepting millions

17   of dollars in cash.

18         So it's clear as day from his own statements that he

19   knew what he was doing.  He said as much.  He told the

20   undercovers, I know it's all Sinaloa money.  It's also clear as

21   day there was a lot of evidence right in front of him telling

22   him you should really ask some hard questions about what's

23   going on in your business and that he made a conscious decision

24   not to ask those questions.  Why didn't he ask those questions.

25   He thought if he ended up here, ladies and gentlemen, it might

19Q4DAT1                          Closing - Mr. Skinner

1    help him, he might be able to say I didn't really know.

2              This brings us to the fourth point.  We know he got

3    cash.  We know it's drug money.  We know he knew it was drug

4    money.  You also know he participated in the black market peso

5    exchange because he profited from getting that drug money.  He

6    was a willing and active participant in a money-making venture.

7    You know that he profited because, as detective DiGregorio told

8    you, that's why he lets exporters participate in this, that's

9    why they take cash in.  They make more sales.  Their business

10   goes up.  Here is a guy who is willing to take in tens of

11   millions of dollars in cash.  Let's buy perfume from him rather

12   than from the guy down the street who might ask some hard

13   questions about where that money is coming from.

14             If you are willing to take this suspicious money in,

15   if you are willing to take in this tainted dirty money, then

16   all of a sudden you are going to have some people who are

17   excited to do business with you, other participants in the

18   black market peso exchange.  You also know from Datta's own

19   testimony that the cash he was bringing in was crucial to his

20   business.  He told you how his business had stopped growing in

21   2009, 2010; it was flat, it actually decreased.  And at the

22   same time business is stopping growing, you know that cash is

23   going through the roof.  It goes from 7.8 million in 2008.  It

24   doubled to over 14 million 2009, up to 18 million in 2010.

25             While his overall sales are remaining flat, the cash

19Q4DAT1                    Closing - Mr. Skinner

1    sales are going way up.  Of those cash sales, a lot of that

2    money was coming from Fausto Garza.  As agent Reinhardt

3    testified, you can tell from the CMIRs that Fausto Garza

4    declared delivery of $6.7 million in cash to La Versailles

5    during the period charged in the indictment.  That is one/third

6    of La Versailles' cash deposits in 2010 from a guy who carries

7    tens of thousands of dollars over the border in his socks.

8            It's fair to say that this cash, Fausto Garza's cash

9    in particular was important to Vikram Datta's business.  It's

10   fair to say without it his business would have suffered without

11   Fausto's cheap dollars, that his customers would have bought

12   less perfume and might have bought it from somebody less

13   willing to take that cash.  He therefore profited and was part

14   of the system and he made money from it.

15           That brings us to the fifth point.  You know Datta

16   participated in the black market peso exchange because he also

17   not only did he profit from it, he tried to hide where the

18   money was coming from.  As agent Reinhardt told you, whenever

19   he took these cash deposits in he was required to file an 8300

20   form.  They are an important deterrent to money laundering

21   because they require business owners to flag when they are

22   getting a large amount of cash and where it's coming from.

23           The first page of 211, this is one of the 8300 forms

24   found during the search of Vikram Datta's business.  Look at

25   the form, it's straightforward.  At the top, part 1, right

19Q4DAT1                        Closing - Mr. Skinner

1    there, that's where you fill in the identity of the person

2    delivering the cash, in the words of the form, the person from

3    whom the cash was received.  If that person is delivering cash

4    for someone else, then you fill in the owner of the cash, part

5    2, the person on whose behalf this transaction was conducted.

6    There is not much to it, ladies and gentlemen.

7          You know from Datta's own testimony, for a long time,

8    he wasn't filing these forms at all.  He was completely

9    ignoring his obligation to report this stuff to the government.

10   He didn't file a form for any of that cash he got in 07, any in

11   08, really for any of it in the first half of 09, not one 8300.

12   You know from his accountant who told you and from Vikram Datta

13   himself how admitted he didn't file a form.  Something happened

14   in June 2009 that got Vikram Datta filing the forms.  In June

15   2009, ET Perfumes located in Miami got in trouble for money

16   laundering.  The owner of the business got arrested.  The

17   business was searched.  No dispute this happened.  The parties

18   have agreed to it.  You can find the agreement in a stipulation

19   marked 804.

20         Vikram Datta knew about ET Perfumes.  He knew that ET

21   Perfumes had gotten in trouble.  You know he knew about ET

22   Perfumes because we agreed there is a particular phone number

23   associated with that company.  You know Vikram Datta spoke to

24   people at that company on his cell.  Two of the phone calls are

25   in evidence, Government Exhibits 430 and 432.  You know he did

19Q4DAT1                          Closing - Mr. Skinner

1    business with the company because agent Reinhardt testified

2    when they were going through the records they noticed a lot of

3    large round dollar transactions with Vikram Datta's business.

4    They got their attention way back in the summer of 2009.

5              You also know that Datta's knew ET Perfumes had gotten

6    in trouble because he told the undercovers about this.   In the

7    August 9 meeting, Government Exhibit 103 we will put up now, he

8    said to the undercovers in the green part, I am being audited

9    by an IRS officer, everything started in Miami.   Later in

10   September 2010 when he is talking to the undercovers, he makes

11   another comment about this.   He tells them, the IRS has, this

12   whole thing, has started in Miami.   Then he continues, one guy

13   had a problem in Miami, from there people, people, people,

14   that's it.

15             What he is doing is saying to the undercovers, this is

16   why I need to be reporting everything, I need to be reporting

17   everything because somebody else in Miami had a problem.

18   Coincidentally we know that just before Vikram Datta decided it

19   was time to start filing 8300 forms, that's in August 09, you

20   can tell that from the 8300 forms in evidence, just before that

21   happens, another perfume company that he does business with

22   that he is talks to get busted for money laundering.

23             So, as of the time he learns about ET Perfumes he has

24   a problem, he is taking in millions of dollars in cash.   He

25   knows at least some of the money is drug money.   Now he knows

19Q4DAT1                     Closing - Mr. Skinner

1    the government is looking at money laundering at perfume stores

2    and he has a reporting issue.  He can get in trouble if he

3    keeps not reporting the cash.  Eventually somebody might figure

4    out he is not filing 8300 forms.  He can also get in trouble if

5    he accurately says where the cash is coming from on the form.

6            What does he do, he decides to hide, hide in plain

7    sight, you might say.  He decides he is going to report the

8    cash, but he is going to report the cash as coming from his

9    perfume customers in Mexico.  He is going to leave out that he

10   was getting cash physically delivered from Fausto Garza and

11   Fausto's co-conspirators.  He is going to ignore that little

12   part.  He begins filing false 8300 forms in August 2009.  How

13   do you know they are false.  You know, Hilario Martinez-Garcia

14   testified, he delivered millions and millions of dollars in

15   drug money to La Versailles.  You know from the CMIR forms that

16   he crossed 105 times during the course of the indictment, that

17   he delivered $6.7 million in cash to La Versailles.

18           From June of 2009 until the time of Datta's arrest in

19   January 2011, how many times did Vikram Datta disclose the name

20   Hilario Martinez-Garcia on one of those forms to the

21   government.  Zero.  Never.  Not one.  How many times does he

22   report the name of Fausto Garza, the peso broker who is

23   actually selling these dollars to his customers.  Zero, not

24   one.  Rather than identifying Hilario Martinez-Garcia, the

25   person who is delivering the money, the 8300s indicate the

19Q4DAT1                        Closing - Mr. Skinner

1    money is coming directly from the perfume customers.  These are

2    the people getting put in part 1 of the form.

3              Let's look at one of the 8300 forms taken out of

4    Vikram's Datta business.  This is one that shows a customer

5    Jose Luis Contreras that Fausto Garza told you was one of his

6    customers and Vikram Datta told you was one of his biggest

7    customers.  We have a cash delivery being reported, the amount

8    about $300,000, cash delivery being reported in the name of

9    Jose Luis Contreras.  And you know that if the government sees

10   this and says, I have some questions about this, I want to know

11   where your cash is coming from, what is the government going to

12   do.

13             They are going to go back to the person identified on

14   the form as the one who delivered the money and talk to that

15   person and ask that person where the cash came from.  So if we

16   want to follow the trail, we are sent towards Jose Luis

17   Contreras.  We find this, Defendant Exhibit K, Kaliman, the

18   store in Mexico City at the market that Vikram Datta testified

19   is the business of Jose Luis Contreras.  Putting aside the fact

20   it's hard to believe this business is selling that much

21   perfume, if you are a government investigator, this might

22   appear legitimate.  You have a perfume wholesaler who reported

23   getting cash payment for perfume and he is identifying the

24   person delivering the cash as a perfume store in Mexico.

25             If you are following this paper trail, you probably

19Q4DAT1                          Closing - Mr. Skinner

1    stop asking questions right about there because it looks

2    legitimate.  But if Vikram Datta had correctly filled out the

3    8300 form, he would have identified that money as having been

4    delivered by Hilario Martinez-Garcia.  If he correctly

5    identified that information on the form, you would have popped

6    up with this, Government Exhibit 915, a house in Mexico.  No

7    signs, no indication at all they are doing any kind of

8    business.

9            If you start crunching the numbers, you see millions

10   of dollars coming out of this house, you find this, you might

11   start asking some hard questions.  You might start wondering

12   where is Vikram Datta's money coming from.  He didn't want you

13   to start asking those hard questions so he filled out the form

14   incorrectly.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

19qddat2                    Summation - Mr. Skinner

1           MR. SKINNER:  Now, you also know, ladies and

2    gentlemen, what he was doing, because he told you what he was

3    doing, with the undercovers.

4           Can we put up transcript 107, page 32.

5           He told you -- he told the undercovers, I'm getting a

6    lot of cash, a lot of cash is coming to me.  I'm reporting

7    everything under their names.  I'm pretty sure they're taking

8    their discount someplace.  It's all Sinaloa money.

9           What's he saying when he says this?  He's saying that

10   he is putting the paperwork in the names of his customers, not

11   in the names of the people who were actually giving him the

12   money.  So he is admitting exactly what he is doing as part of

13   his scheme.

14          And you also know that his co-conspirators -- Datta

15   and his co-conspirators took a lot of steps to make sure that

16   they never got the actual information for the people who were

17   delivering the money.  This is at Government Exhibit 416.

18          This is a recorded phone call with Cynthia, and you

19   heard the translation from Spanish but the transcript is in

20   evidence.  You heard Cynthia say, When have I asked them for

21   identification?  She's talking to Gerardo Lopez about the

22   dispute they are having, because apparently somebody who

23   dropped off cash was asked for ID.  She said when have I ever

24   asked them for identification, the people coming in with money?

25   Never.  Ever.  Ever.  Never.  I never ask for identification.

1          Ladies and gentlemen, it's pretty hard to fill out the

2     8300 form without identification.  If you look right here, on

3     the very top of the form, it asks you, what kind of

4     identification is being provided by the person dropping off the

5     cash.  And the person in Vikram Datta's business who is

6     routinely accepting the cash says, in a recorded phone call,

7     she's never asking for that information.  They didn't want that

8     information.  They didn't want that identifying information

9     that the government might somehow, someday later be able to

10    unravel and find where the cash was actually coming from.

11         So for all of these reasons, you know that Vikram

12    Datta was a knowing participant in the black market peso

13    exchange, and since he was participating in the black market

14    peso exchange, he's guilty of the crimes charged in Counts Two

15    and Three of the Indictment.

16         Now, Judge Kaplan is going to instruct you on the law.

17    He'll go through the Indictment.  I am not going to get into it

18    now.  But I want you to keep in mind a few different things

19    when he is talking about the charge and when you go into your

20    deliberations.  You are going to hear about different kinds of

21    money laundering.  And you are going to hear about -- one thing

22    you should be paying attention to, I should say, is where the

23    money is coming from.  So you are going to hear about what's

24    called transaction money laundering and transportation money

25    laundering.

1           Now, I submit, when you look at all of this evidence,

2   Datta engaged in transaction money laundering when he took cash

3   payment for perfume, and he engaged in transportation money

4   laundering when his co-conspirators Fausto Garza and Hilario

5   Martinez carried that money from Mexico to his store.

6           You should also pay attention in your deliberations to

7   the purpose behind the transaction or the transportation of the

8   money.  I expect that you are going to hear that to find Vikram

9   Data guilty, you are going to have to find that he acted with a

10  particular purpose, and those purposes will include an intent

11  to promote drug trafficking or an intent to conceal where the

12  money was coming from.

13          Well, Vikram Datta acted with an intent to conceal

14  where the money was coming from when he filed these false 8300s

15  that we were just talking about, indicating that the money was

16  coming from his perfume customers rather than from Hilario

17  Martinez-Garcia.

18          In addition, the evidence has established that since

19  he was a knowing participant in the black market peso exchange,

20  he was promoting drug trafficking.  Detective DiGregorio

21  testified every participant in the black market peso exchange

22  benefited.  And since Datta knew that he was receiving Sinaloa

23  money and he knew that his customers that were provided Sinaloa

24  money were, in his own words, taking their discount someplace,

25  he understood that they were buying cheap dollars.  For his

19qddat2                    Summation - Mr. Skinner

1    customers to do well and continue to buy his perfume, they

2    needed these cheap dollars, and to have a continual source of

3    cheap dollars, the drug dealers needed to keep selling drugs.

4         It's all part of one big loop, one big system, ladies

5    and gentlemen.  And since the success of the drug dealers is

6    necessary to the continued operation of the black market peso

7    exchange, Datta acted with the intent to promote drug

8    trafficking.

9         One final thing with regard your consideration of

10   Count Two.  You are going to hear about a conspiracy to violate

11   a statute called 1957.  Again, I'm not going to talk in detail

12   about what that statute requires now.  But when you are

13   considering the evidence of that statute, I would like you to

14   take a look at Government Exhibit 1004.  This was the summary

15   of evidence prepared by Agent Reinhardt.  All of the evidence

16   that he is summarizing was gathered elsewhere.  All of that

17   other evidence is here if you want to go back and look at it

18   yourself.

19        And, ladies and gentlemen, I submit to you that this

20   chart establishes beyond any reasonable doubt that Vikram Datta

21   was depositing the drug money that he got from Hilario

22   Martinez-Garcia in his bank accounts.  And if he was knowingly

23   depositing that drug money into his bank accounts, then he is

24   guilty of a conspiracy to violate 1957.  So when you are

25   considering that part of the case, go back and look at this

19qddat2                        Summation - Mr. Skinner

1    chart that I asked you to.

2          So that brings me to the end of the discussion on

3    Counts Two and Three.  Now, before I sit down, let me talk

4    briefly about Count One.

5          Count One is the conspiracy that concerns an agreement

6    to launder money that was represented to be drug money by

7    undercover officers.  The conspiracy addresses Vikram Datta's

8    conduct from August of 2011 -- excuse me, August 2010 to

9    January 2011.  And there's four main meetings that occurred

10   during that period of time -- there is the meeting in Vegas in

11   August, the meeting in San Diego in September, another meeting

12   in Vegas in December, and the final meeting in New York City at

13   Smith & Wollensky in January, and in between that you have the

14   delivery of the $38,000 and change as payment for perfume by

15   some of the undercover agents.

16         Now, I want to talk for a moment about each of these

17   meetings.  I'm not going to go into any detail.  You've heard

18   all of the recordings of the undercover meetings.  I'm not

19   going to go through them all again.  They speak for themselves,

20   ladies and gentlemen.  As you heard, Vikram Datta did not

21   hesitate in any way to conduct money laundering with these

22   undercover agents.  But let's just focus first on August of

23   2010.  Let me point out a couple of things I want you to try

24   and focus on from that meeting.

25         So in August 2010, he is introduced to Mario Recinos.

19qddat2                    Summation - Mr. Skinner

1    And in their first meeting, minutes after being introduced --

2    minutes, ladies and gentlemen, after being introduced on the

3    floor of the convention hall -- he is proposing a money

4    laundering scheme to Mario.  This is at 103, page 8.

5              What he's saying, it is kind of a slight twist on what

6    he is doing in Laredo, Texas.  He's saying that he can take

7    cash from these guys but that he needs to report it.  Now, he's

8    already reporting things in the name of his customers in

9    Mexico.  What he is saying to the undercovers is bring me

10   somebody else with a passport that I can use when I report to

11   the IRS and we could be doing business forever.

12             So it's a slightly different scheme than what he had

13   before.  The reason he is doing this is because the undercovers

14   are not themselves perfume merchants; they represented

15   themselves to be middlemen.  They told him when they first met

16   him -- this at 103 -- we have a lot of cash customers.  So he

17   has to flip the scheme around.  He has to propose that they

18   send couriers, in his own words, chilangos with a passport, and

19   that they will use that passport to report the cash and

20   nobody's going to know where the cash is coming from.

21             But it's really consistent with his overall mode of

22   operation, which is follow the procedures, file the paperwork,

23   tweak the paperwork so that nobody is ever the wiser about what

24   has really happened.

25             Later that night he meets with them again.  He

19qddat2                          Summation - Mr. Skinner

1   immediately launches into detailed and varied money laundering

2   discussions.  We can pull up 104 at page 6.  Basically goes

3   back into the same discussion he had before about accepting

4   cash as payment for perfume and hiding where the money is

5   coming from.  He says it again, if you turn to page 33.

6               (Pause)

7               Give me a passport, Mexican.  I take the numbers.  I

8   fill out the form, I report to the IRS.  Your money is gone,

9   and that guy is gone.

10              Nobody's the wiser, the money's cleaned.

11              Again, he's talking about how he's going to do this

12  for the undercover.  In essence, what he's saying is I sell

13  perfume for drug money.  He says this at page 39 of the same

14  undercover meeting.

15              I buy perfume.  I sell perfume.  How you pay is cash.

16  How the cash comes is not my business.

17              That's really -- that's really an excellent synopsis

18  of what he was doing down on the border:  I sell perfume.  I

19  take the cash.  I know its drug money, but it's really not my

20  business.  I don't need to know what's happening.  I don't need

21  to know where that money is coming from.

22              He also says in that same meeting, he starts spinning

23  out other sort of amazing ways of laundering money.  He

24  proposes stuffing cash into perfume boxes that are going to be

25  shipped to Latin America.  He talks about wiring money from

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19qddat2                    Summation - Mr. Skinner

1   companies and countries that don't have reporting requirements.

2   It's kind of an amazing conversation for somebody who had just

3   met this undercover Officer, Mario Recinos.

4            Perhaps recognizing that these recordings are damning,

5   that they speak for themselves and that there is no way -- no

6   way to talk his way out of them, he's admitted that he believed

7   the undercovers were criminals.  He has admitted that he knew

8   they were discussing money laundering schemes.  He did this in

9   his testimony here in this trial.  But he has a little tweak on

10  that, ladies and gentlemen.  He says, I knew they were

11  criminals but I didn't really know what kind of criminals they

12  were.  I didn't appreciate that they were giving me drug money.

13           The undercovers said plenty to indicate that they were

14  narcotics traffickers, and they said it as early as their

15  initial meetings with him in August of 2010.  They talk about

16  calling down south.  They talk about their bosses down south

17  not being happy with how fast the money was moving with the

18  existing apparatus they had.  And despite his reluctance on

19  cross-examination to acknowledge that he understood what the

20  undercovers were signaling, Datta's statements during that

21  meeting demonstrate that he knew exactly what they were saying.

22           He says it.  And if you look at page 10 of 104-T,

23  Datta says to them, in trying to say what they're doing -- I

24  have to interrupt for one second.

25           Before we get there, Datta says to them -- and I don't

1   have this up on a slide -- Datta says to them:  So you want to

2   get your merchandise to either Guatemala or Colombia -- he is

3   the first person to mention the word "Colombia."  And after he

4   says that, now they have this conversation.

5            And Mario tells him the ultimate goal is to send it

6   back home to Colombia, to Bogota, to Medellin.  You want to

7   send the perfumes there, right?  And most likely, that's what

8   we're gonna -- OK.  Well, if you want to do that, here's how

9   you do it so that nobody knows nothing.  You do it in two

10  transactions.  You send it from here to Mexico and then from

11  Mexico to Colombia.

12           So he's indicating that he understands where the

13  money -- where they need to get the money.  He's indicating

14  that he understands that it needs to get there let's say in a

15  discrete manner.

16           And after he says this to them in August of 2010, he

17  does nothing to try and confirm where they're getting their

18  money.  To the contrary, he tries to actively avoid it, at --

19  he says -- he says to them, initially, you can pick up your

20  merchandise, it is not my problem.  At another point he says

21  once we set up the whole thing, I don't want to see you people

22  no more because we don't have to make our marriage public.  He

23  says I don't want to know nobody.

24           And then, probably most succinctly here on page 26 of

25  104-T, he says, I don't need to know where you get your money

19qddat2                          Summation - Mr. Skinner

1    from; it's not my business.

2              So it's clear that he either knew the agents were

3    connected to drugs or there was evidence right in front of his

4    face indicating they were connected to drugs and he chose to

5    just not ask the hard question about where that money was

6    coming from.

7              So following this meeting in August of 2010, there is

8    the $38,000 perfume exchange in San Ysidro.  At this point

9    there is no dispute that he knew he was dealing with criminals.

10   He has admitted as much.  And the delivery goes forward

11   nevertheless.  You heard testimony about that from Jose Correa.

12   You heard testimony from Roxana Beltran, the La Versailles

13   employee who participated in the transaction.  You heard how

14   she didn't ever have cash transactions of this size.  You heard

15   how she needed to get in touch with Yolanda to try and get the

16   perfume, because she didn't have enough perfume.  She told you

17   that she faxed the confirmations of the sale to Yolanda

18   confirming that they've gotten more than $10,000 in at a time.

19             Any 8300 filed in connection this transaction, ladies

20   and gentlemen?  No.  Actively hiding what is going on in this

21   transaction, they don't file an 8300.

22             And you also saw this -- after that transaction there

23   was a phone call on September 21st of 2010, and during this

24   phone call Datta is talking to Cynthia.  And they're talking

25   about the next transaction with Mario.  And they're talking

19qddat2                    Summation - Mr. Skinner

1   about how they spoke to Miguel.  You heard from Miguel, another

2   undercover who was posing as Mario's assistant.

3          And he tells you how they were setting up a meeting on

4   September 27th and they were planning how they were going to

5   conduct the next perfume transaction.

6          Can we put up 423-T at 2?

7          At the end of the call, Datta says to Cynthia, What

8   information are you going to send now?  She says, You tell me.

9   I'm going to send it to LNB.  And he cuts her off and he says,

10  look, it's better to send it to LNB.  Let's pack that order

11  because there is no confusion and send it, and we just send

12  them, especially from Mario, the hold out, that they can pick

13  it up and then they -- we don't have to make the invoice.  We

14  don't have to receive.  We don't have to do nothing.

15         It's better that way.  He says it's majore, but it's

16  better that way.  What do you think?  And she says, Oh, so LNB,

17  not San Ysidro?  He says, no, no, no, don't send it to San

18  Ysidro.

19         Well, what's going on here, ladies and gentlemen?  If

20  this call is about a planned wire transfer from the agents.

21  Datta told you had on cross-examination, LNB equals Laredo

22  National Bank.  He's discussing with Cynthia where to have the

23  money wired.  And they agree to have the money wired to Laredo

24  in advance of the next deal with Mario.  At this point they are

25  expected to sell perfume to Mario.  And he says it's better to

19qddat2                    Summation - Mr. Skinner

1   do the deal in Laredo, where you and I are, so that we don't

2   have to make an invoice, we don't have to receive, we don't

3   have to do nothing.  In other words, they don't have to create

4   any paper trail for this transaction with regards to the

5   undercovers.  It's better to do it in Laredo than in San

6   Ysidro, where he will be dealing with employees like Roxana

7   Beltran who are not part of the scheme.

8        So what does this call show?  It shows that as of this

9   point in time the conspiracy continues, and it shows that he

10  was planning with Cynthia how they were going to conceal what

11  they were doing.  And it shows that Cynthia was an active

12  participant in that conspiracy involving the undercover

13  officers.  It shows that she knew what was going on.  She was

14  being asked for advice, and she was a willing and active

15  participant in the conspiracy.

16       That brings us to September 27th.  This is another

17  meeting with the undercovers.  In this meeting, the undercovers

18  make clear they don't actually want perfume.  They tell him

19  it's too hard.  We don't want to deal with that.  It is not

20  our -- we would prefer to have some other easier operation than

21  the black market peso exchange as a means for laundering our

22  money.  They want to branch out into new areas.  And Datta's

23  response, in a nutshell:  I'll do what I've always done but I'm

24  not going to branch out into new areas.  Basically, he'll

25  continue to sell perfume for drug money but he won't engage in

19qddat2                    Summation - Mr. Skinner

1     wire transfers of something else that might attract attention.

2          When it comes to perfume, he is basically back to the

3     same scheme he was proposing in August of 2010.  He wasn't

4     exactly happy with the way things worked when they actually

5     transferred the money in San Ysidro, and he's saying send me

6     somebody with a passport and we'll do things the way I always

7     do things.  And it's clear that the reason he's not willing to

8     branch into a new area at this point is because at this point

9     in time he's under the gun at BBVA Compass.  You know from

10    Government Exhibits 428, 429, 431 and 434, those intercepted

11    phone calls, that they are actively reviewing the account.  In

12    the words of the account manager, we should be closing their

13    account.  So he's worried about bank scrutiny.  The last thing

14    he wants are his wire transfers that he has got no experience

15    with.  He doesn't know how to tweak that operation.  So he's

16    saying let's stick with what we're doing.  Let's stick with how

17    I know how to do it.

18         And that brings us, ladies and gentlemen, to December

19    of 2010.  By December he's become more aggressive and now he's

20    actually agreeing to go out and engage in other kinds of money

21    laundering.  You have -- can we put up page 5 of 107-T?

22         Mario says to him, you know what really interests me

23    is when you're talking about Panama, because I thought maybe

24    you were ready to do the wire transfers, that's what I really

25    need.  Datta says flat out, I will do the wire transfers but I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19qddat2                          Summation - Mr. Skinner

1   need to set things up in a way -- I need like another two to

2   three weeks.  He's saying I'll do it.  I just need to set

3   things up my way.

4            So -- and in addition to this, he talks quite a bit

5   about how -- he gives advice to Mario about how Mario can

6   launder his own money.  He talks to Mario about mixing dirty

7   money with clean money.  He talks about mixing dirty money with

8   his legitimate business.  And you know this is consistent with

9   what he was doing in Laredo.

10           We've already gone through the evidence with regard to

11  Count Two and Three.  You know that he had a legitimate perfume

12  business and that he was concealing what he was doing.  And so

13  he's basically telling them I'm willing to -- he's saying to

14  Mario this is kind of how you can do it.  This is what my

15  experience is.  He's really offering him a course in money

16  laundering during the course of this December call.

17           So it's clear that he knew what he was doing, and it's

18  clear that as of December he's willing to branch out, which

19  leads to the question, Why was he doing this?  A few months

20  before in September he's saying to them I will not do a wire

21  transfer.  Why is he getting more aggressive?

22           Ladies and gentlemen, the reason he was getting more

23  aggressive as of December is because Mario had delivered the

24  goods in the meantime.  Using information intercepted over the

25  wiretaps, Mario had made it appear that he was privy to

1    information that only somebody connected with the drug cartel

2    in Mexico could have known.  He was providing realtime

3    information about Octavio's kidnapping back to Vikram Datta.

4    So in Vikram Datta's mind, Mario was proven.  He was the real

5    deal.

6                And you know about this man's greed.  He admitted to

7    you, he told you, I'm a man motivated by greed.  He's motivated

8    by a desire to have more, to grow, to corner the market in

9    Mexico.  And in Mario he now sees a direct conduit to the

10   Mexican drug cartels.  He no longer has to depend on getting

11   money from a peso broker like Fausto Garza.  He no longer has

12   to depend on the black market peso exchange.  He can just start

13   wiring money through these guys, who are the real deal, and

14   charging percentages.  He can set up dummy corporations.  He

15   can go to the next level.

16               So to borrow the poker metaphor, at this point Vikram

17   Datta goes all in.  He starts using his considerable

18   experience, his considerable business acumen to propose a lot

19   of different ways to launder Mario's money.  That's what was

20   happening in this December meeting in Las Vegas.

21               Now, to be sure, Vikram Datta got up here and told you

22   a different story.  He told you that he was saying this because

23   he was concerned about Octavio's safety because Octavio was

24   still in the custody of the kidnappers.  He was saying I felt I

25   needed to pump Mario, earn his trust in order to protect my

19qddat2                    Summation - Mr. Skinner

1   friend.  Basically, he wants you to believe that everything he
2   said to Mario starting in December 2010 was a ruse, a lie, a
3   lie to try and help his friend.
4          Ladies and gentlemen, don't be persuaded by this.
5   This is just -- it is a desperate attempt to explain away
6   recorded statements that are otherwise incredibly damning,
7   because when you go through what happened in December 2010,
8   it's virtually impossible not to find that he was agreeing to
9   launder money for these criminals, Mario, unless you think
10  there is some other reason why he is saying this.
11         So I think you should reject his story.  I think you
12  should reject it for three reasons.
13         First, it just doesn't make sense.  There is no
14  evidence at all that Mario hesitated to help Datta in any way
15  with regard to Octavio.  To the contrary, Mario saw this as an
16  opportunity to prove himself to Vikram Datta and provide him
17  information about Octavio.  So he immediately agreed to do
18  whatever he could do to help Octavio.
19         So why do you need to pump Mario?  Why do you need to
20  entice him with these crazy stories of what you're going to do
21  for him on the money laundering front in order to get him to
22  help you?  He's already helping you before you even get there
23  and meet with him in Vegas in December.
24         If he's truly motivated by his concern for Octavio, if
25  that's really what he's up to, well, he's acting pretty

19qddat2                    Summation - Mr. Skinner

1    recklessly.  Why is he promising anything to Mario at all?
2    It's dangerous to meet with somebody who runs kilos for the
3    Sinaloa drug cartel and promise that person that you're going
4    to wire money for him if what you're really doing is acting in
5    Octavio's interest.  You don't go that far, ladies and
6    gentlemen.  You travel back a little bit.  Maybe you tell him
7    I'll think about it.  Before I say no, now I'm considering it.
8    But he goes all in.  He says, I will do the wire transfers.
9    I'll do it.  Just give me a little bit of time to set it up.
10   His story makes no sense.

11          The second reason you should reject it, the man is not
12   reliable.  You can't rely on what Vikram Datta tells you
13   because he says whatever suits his purposes at any given time.
14   There are a lot of examples of this.  You know that when he was
15   talking to David Puig, the bank manager, he told Puig about how
16   he was going to have a $300 million a year business.  He wants
17   to keep his account open.  He's trying get Puig's help.  He's
18   trying to convince him that it's worth Puig's while to go to
19   bat for him.  So he exaggerates, he lies about the size of his
20   business, about where he's going.

21          He lied to the Guptas to impress them.  He told them
22   this crazy story about receiving 1.3 million in cash and having
23   Cynthia -- who, by the way, she is not a teenager, like he said
24   in that conversation; she is a 27-year-old woman.  But, anyway,
25   he concocts this story about having a teenager deliver that

19qddat2                      Summation - Mr. Skinner

money to the bank.  He seems to think that this is going to

impress about the Guptas somehow.  He said this on

cross-examination.

So he's lying to his major suppliers.  He's trying to

earn their trust, their admiration to increase his business.

He lied repeatedly to the DEA officers after his

arrest.  We went through those.  We're not talking about one

little lie; he was lying about everything.  He was lying about

the obvious, like who Mario was.  He says, no, I didn't know

the guy was a drug dealer.  He lies about simple things like

using the word "Sinaloa."  Why does he lie to the DEA at that

point?  It was obvious.  He knew Mario.  He believed Mario was

a drug trafficker.  He doesn't want to get in trouble.  He

thought he could talk his way out of it.  That's what Vikram

Datta does.  He tries to talk his way out of the trouble that

he's in.  He exaggerates the truth, he shades the truth when it

suits his purposes.

So it's clear, he'll say whatever he needs to suit his

purposes, and for that reason I think you should discount what

he told you.  And there is a third reason, and this may be the

most obvious reason to discount what he told you about his

motives in meeting the undercovers in December, and that is

that by the time he goes to meet with Mario again in January,

Octavio is freed, Octavio is out; he's no longer being held

prisoner by the kidnappers.

1           So if he's really dealing with Mario in order to

2   protect Octavio, he no longer has that motivation in January.

3   But what does he do in January?  He goes to New York to meet

4   with Mario, and he continues to talk about laundering money for

5   Mario.  He continues to tell him, I will do it.  Here's an

6   example, just one, from that transcript.  Again, for the

7   80th time, Mario is telling him what his problem is, that his

8   product is coming up north and he's getting the money down

9   south, where he came from, Colombia.

10          What does Datta say?  Of course.  That's what we're

11  going to set up.  That's what I've agreed to do.  That's what

12  we're -- working with other people, not alone -- that's what

13  we're going to set up.

14          Why on earth -- why on earth would he say this if by

15  this point his only motivation to lie is gone?  Think about it.

16  If you're an innocent businessman and you're trying to protect

17  your client from Mexico, your friend, you're rolling the dice,

18  you're playing with fire, you're talking with somebody that you

19  know to be a major drug trafficker for a violent cartel but you

20  are willing to do it in order to help your friend?  OK.  Maybe.

21  But once your friend is freed, why on earth would you fly

22  halfway across country to sit down at dinner with this man and

23  keep talking about money laundering?  It doesn't make any sense

24  at all.

25          The reason he went to that meeting in January was

19qddat2                    Summation - Mr. Skinner

1   because he fully intended to keep laundering money for Mario.

2   He fully intended to set up his operation that was going to go

3   to the next level.  It had nothing to do with his concern for

4   Octavio.  He was happy Octavio was released because he mentions

5   elsewhere in the transcript that he views Octavio as somebody

6   who could help them.  But this excuse that Octavio was his real

7   motivation, the excuse he offered for coming up to New York,

8   that he wanted to thank Mario in person for what he did, I

9   mean, come on, it's ridiculous.

10       You do not walk into the lion's den with a known

11  narcotics trafficker if you are just -- if the reason that you

12  had to deal with this guy is now gone.  The reason he wanted to

13  deal with Mario was because he wanted to launder money for

14  Mario and that's why he was there.  So you should just put

15  aside this crazy explanation, these crazy excuses he has to try

16  and explain away all of this damning stuff he says during those

17  meetings with Mario.

18       So where does this leave us on Count One?  We've got a

19  continuing conspiracy that started in August 2010, runs until

20  the time of his arrest.  He's clearly acting to promote

21  narcotics trafficking because he knows that that's what these

22  guys are, he knows what he's doing is going to help their

23  business.  He's clearly also trying to conceal where the money

24  is coming from, because he tells them how we're going to hide

25  it, and he doesn't file the 8300 when he actually takes money

19qddat2                          Summation - Mr. Skinner

1    from them.  So for all of these reasons, he's guilty on Count

2    One.

3            Now, before I sit down, and we're very close, I just

4    want to say a brief word, a brief word, about a defense that

5    Mr. Ross raised in his opening statement.

6            He says that Vikram Datta was entrapped.  I mean,

7    given the statements on the recordings, what other choice does

8    he really have?  So let me say a few words about entrapment.

9            You are going to hear from Judge Kaplan what

10   entrapment means under the law.  I think you will see it really

11   only applies in special circumstances, circumstances that

12   clearly don't apply here.

13           So keep that in mind.  Just keep in mind the actual

14   legal definition of entrapment when you are considering this

15   defense.

16           And keep in mind, as well, that Counts Two and Three

17   don't turn at all on Datta's criminal conduct with regard to

18   the undercovers.  It turns on what he was doing with people

19   like Fausto Garza and Hilario Martinez.  This conduct

20   establishes that he was already engaged in money laundering

21   before the undercover operation even started.  Since he was

22   already a money launderer, he wasn't entrapped by this

23   investigation, he was exposed by this investigation.  He was

24   exposed for what he was -- a criminal, a money launderer -- not

25   an innocent man who was otherwise tricked into doing something

19qddat2                     Summation - Mr. Skinner

1    illegal.

2              And, finally, keep in mind his willingness to engage

3    with the undercovers when reviewing the evidence.  He did not,

4    as was suggested to you in the openings, repeatedly say no.

5    Mr. Ross walks through a bunch of different meetings or phone

6    calls with Ankur Gupta in the meeting in March.  And he says if

7    you look at this, there is a lot of no's -- no, no, no, no, no.

8    He kept saying no and the government kept coming back.  Ladies

9    and gentlemen, if you look at the actual evidence, that's not

10   what happened.  You have the evidence.  We put it in.  We're

11   not afraid of these phone calls.

12             If you look at what he says to Ankur Gupta in

13   November 2009, Gupta says I got a customer that wants to pay

14   cash in Laredo for goods that they bought from us up here in

15   New York.  Datta doesn't saw, no, I don't do that.  Datta says,

16   look, if they declare the money with Customs and they give it

17   to me, I will put it under your name because then I can -- you

18   know, we can do anything.  We can do whatever you want.

19             It is Government Exhibit 439.  This is entirely

20   consistent with his existing money laundering operation.  So

21   long as I got a name to report, I don't care where the money

22   comes from.  And I don't care whether I accurately fill out

23   where the money comes from, I'll put it in your name, Ankur

24   Gupta's name.  So far from saying no, he agrees in

25   November 2009 to help Ankur.

19qddat2                     Summation - Mr. Skinner

1        In January 19th, he doesn't say no to Ankur Gupta.

2   Again, there is another phone call.  You heard the relevant

3   portion of the call.  It is at Government Exhibit 440.  He

4   didn't refuse to do anything in that call.

5        And in March of 2010, when he is introduced to Roberto

6   and Jose, again he doesn't refuse to do anything for them.

7   Rather, he says, fine, I can pick up the $5 million in cash.  I

8   just need a name to use in reporting to the IRS.  Again,

9   entirely consistent with his existing money laundering

10  operation.

11       So the bottom line:  His attorney has suggested to you

12  in his opening that the government twisted his arm, held it

13  behind his back, and he kept saying no and we kept coming back

14  until eventually he was somehow beaten down into submission and

15  he said, OK, OK, I'm willing to launder money with you guys.

16  That's not what happened.  He never refused us.  He was always

17  willing to do something -- always.  And as a result, he was not

18  entrapped.  Rather than being entrapped, he jumped at the

19  opportunity to launder money for these undercover agents, and

20  this makes him guilty of Count One.

21       So in conclusion, I submit to you, ladies and

22  gentlemen, that when you look at the evidence in this case,

23  when you look at all of the evidence -- the recorded meetings,

24  the testimony from the cooperators, the records seized during

25  the search, the CMIRs, the CTRs, the 8300s, the bank records,

19qddat2                    Summation - Mr. Skinner

1    the recorded phone calls -- when you put all of that evidence

2    together, it establishes beyond a reasonable doubt that Vikram

3    Datta was a money launderer.  To use his own words, he was just

4    "washing the whole money."  "Washing the whole money."

5            And that, ladies and gentlemen, makes Vikram Datta

6    guilty as charged.

7            Thank you.

8            THE COURT:  Thank you, Mr. Skinner.

9            Members of the jury, we are going to take a break here

10   for 10 or 15 minutes.  We are going to then hear closing

11   argument from the defense.

12           And just so you know how the day is going to go, when

13   the defense is finished, we are going to have a short lunch

14   break.  We have ordered lunch; I guess you know that.  And then

15   the government has the opportunity for a brief rebuttal

16   argument, and then I will instruct you and you will begin

17   deliberations.  And I ask you to stay, if you need to, past

18   4:30 today, and that's the plan.

19           OK.  So break now.

20           Counsel, remain for a minute, please.

21           THE CLERK:  Jurors, please come this way and bring

22   your notes and your binders.

23               (Continued on next page)

24

25

19qddat2

1           (Jury not present)

2           THE COURT:  Be seated, folks.

3           I have a letter from Juror No. 7.  It will be marked

4   the court exhibit next in order and you are welcome to look at

5   it.  But the substance of it is that, as he told us during the

6   voir dire, he is leaving on a vacation/business trip on Friday.

7   He has got a very substantial prepaid investment in it.  He

8   says it's reasonable to assume that they will be done before

9   then, but he would be guided by my counsel with respect to his

10  further participation.

11          Now, it seems to me we ought to settle what we are

12  going to do about this gentleman before deliberation.  I do

13  think it likely there will be a verdict before Wednesday night

14  but, of course, nobody ever knows.  And if everybody agreed to

15  proceeding with 11, if we have to excuse him at the end of the

16  day Wednesday, that makes it easy.  But I am open to thoughts.

17          (Pause)

18          MR. WHITE:  Can we consider this during the recess,

19  your Honor?

20          THE COURT:  Sure.

21          Now, the other thing I wanted to raise, because I

22  discovered when I came in this morning that, flatly

23  inconsistent with the defense's position on Friday and what I

24  said on Thursday, I now have something called a request for

25  jury determination regarding forfeiture in which the defense

19qddat2

1   says they want me to submit to the jury the question of whether

2   the government has established the requisite nexus between the

3   property and the offense committed by the defendant, assuming

4   there is a guilty verdict on any count.

5          What is going on here, Mr. White?

6          MR. WHITE:   That language is the language of the rule,

7   and, you know, the rule provides for a jury determination, your

8   Honor --

9          THE COURT:   Mr. White, on September 22nd, at page 812

10  and 813 of the transcript, I. said we were going to have a

11  charge conference on last Friday and that when the charge

12  conference was over, it was over.   Finished.   No new ideas over

13  the weekend.

14         You had the verdict form.   The verdict form did not

15  call for a verdict on this subject.   You accepted the verdict

16  form without it.

17         That's the first reason why the subject ought to be

18  closed.

19         And the second reason why the subject ought to be

20  closed is that on Friday, at page -- I believe it is 913,

21  but -- 917, you asked that all the forfeiture allegations be

22  removed from the Indictment that go to the jury.   So it is

23  abundantly clear that the defense made a conscious decision

24  that it did not wish any forfeiture allegations before the

25  jury, and I have trouble seeing why I should relieve you of

19qddat2

1   that and have to start redrafting part of the charge here at

2   this late hour.

3           MR. WHITE:  Well, your Honor --

4           THE COURT:  Particularly after the government has

5   already summed up.

6           MR. WHITE:  Your Honor, what I contemplated was a

7   bifurcated proceeding, that this would only occur if the jury

8   returned a guilty verdict.

9           THE COURT:  We had a discussion of that, too, and I

10  rejected that earlier, didn't I?

11          MR. WHITE:  On another issue, a special verdict as to

12  the different objects of the conspiracy.

13          But this is something that the defense rethought over

14  the weekend and made a decision that we would want to have the

15  jury determine what property is forfeitable rather than the

16  Court, your Honor.  I think the defendant has a right to that

17  and the rule provides for it.  I think we are in compliance

18  with the rule --

19          THE COURT:  Well, I'm not going to comment on whether

20  he has a right to it, but assuming for the sake of argument

21  that he had a right to it, the question is whether he has

22  waived it.

23          Let me hear from the government now, please.

24          MR. SKINNER:  Your Honor, we learned of this late

25  yesterday, when it was filed on ECF.  We, you know, caucused

19qddat2

1    with our asset forfeiture people to determine what it was, to

2    be honest with you.  We hadn't been considering this particular

3    jury instruction.  You know, we've learned that, you know, as

4    Mr. White explains, typically if the defendant wants a jury

5    determination on this, it is part of a bifurcated proceeding

6    that arises after there is a verdict of guilty.  With regard to

7    whether he waived it --

8         THE COURT:  You spoke so quickly, I didn't quite get

9    the whole sense.

10        MR. SKINNER:  Sorry.  What I understand about how the

11   procedure works is consistent with what Mr. White represented,

12   which is that typically if the defendant files the required

13   notice indicating that he wants a jury determination on this

14   point, then it is a bifurcated proceeding.  The jury first

15   makes a finding as to guilt, and then if there is guilt, they

16   come back and we put in additional evidence, if necessary, to

17   establish how we know that the money, you know -- I'm not going

18   to say the perfectly correct standard right now, but we put in

19   relevant evidence as to the forfeiture question.

20        Whether or not he's waived it, you know, frankly, we

21   were surprised, given what he said on Friday.  I wasn't here

22   myself, but having looked back through what was said, it seemed

23   like this was closed.  But as a legal matter, I mean, I don't

24   know if what was said on Friday would rise to the level of

25   waiver.  I guess what I would ask the Court's permission to do

19qddat2

1    would be to think about this and maybe come back when we rebut

2    and let us let you know whether we think what he said would

3    rise to the level of waiver or not.

4              THE COURT:  OK.  Mr. White, do you have something

5    else?

6              MR. WHITE:  No.  No, your Honor.

7              THE COURT:  OK.  Thanks.  See you in a few minutes.

8              (Recess)

9              THE COURT:  Be seated, folks.

10             So what is your pleasure with respect, first of all,

11   to the juror?

12             MR. SKINNER:  Your Honor, we are fine with the Court's

13   proposal of keeping him on -- if we understood it, of keeping

14   him on the jury.  In the event that he then needs to leave, if

15   we don't have a verdict by Wednesday night, proceeding with 11.

16             MR. WHITE:  Your Honor, we would prefer a jury of 12,

17   and an alternate could be substituted for this juror either now

18   or Wednesday, if there is no verdict by Wednesday.

19             THE COURT:  What is your pleasure?  You understand

20   that if an alternate is substituted, deliberations have to

21   begin all over again.

22             MR. WHITE:  Yes, I am aware of that, your Honor.

23             (Pause)

24             I would hold an alternate, your Honor, or hold the

25   alternates until Wednesday, and if this juror can't serve after

19qddat2

1   Wednesday, I would ask that you substitute an alternate at that

2   point.

3            MR. SKINNER:  That is fine, your Honor.

4            THE COURT:  OK, that's what we will do.

5            Now, what about the other issue?

6            MR. SKINNER:  Oh, the waiver point, your Honor?

7            THE COURT:  Mm-hmm.

8            MR. SKINNER:  I'm sorry.  I thought I had more time.

9   I thought I had until we came back from lunch.

10           THE COURT:  I see.  OK.  I will give you until after

11  lunch.

12           MR. SKINNER:  I appreciate that.  Thank you.

13           THE COURT:  OK.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

19qddat2                      Summation - Mr. Ross

1           THE CLERK:  Jury entering.

2           (Jury present)

3           THE COURT:  OK.  The jury is present, as is the

4    defendant.

5           Mr. Kennedy, I received your note earlier.  You will

6    make your trip one way or another.

7           JUROR NO. 7:  Thank you.

8           THE COURT:  Mr. Ross.

9           MR. ROSS:  Thank you, your Honor.

10          Good afternoon, ladies and gentlemen -- or good

11   morning, ladies and gentlemen, still.

12          I feel a bit like Paul Harvey standing up to tell you

13   the rest of the story.  I listened carefully to the government,

14   who is very ably represented by good lawyers and very

15   convincing, a very compelling argument we just heard.  Having

16   said that and not wanting to get derailed from what I think is

17   important to tell you in my argument today, I want to respond

18   to two things.

19          If I heard the government correctly, doing things

20   legitimately means you're not.  And if I heard the government

21   correctly, by showing the complete picture, you're concealing.

22   That summarizes what the government had to say about Vikram

23   Datta and his business.

24          Having said that, we met on the 12th, and I told you

25   on that day in the opening statement that Vikram Datta is not a

984

19qddat2                    Summation - Mr. Ross

1   money launderer.  You've listened to the evidence.  You've

2   watched carefully.  I thank you.  Mr. White, and more

3   importantly, our client thanks you.  You were attentive.  You

4   were taking notes.  You were paying attention now.  It hasn't

5   been easy.  Some of you have been taken away from a lot of

6   other important things.  We appreciate that.

7          So having said that, however, the one preliminary

8   instruction the Court gave you at the beginning of this trial

9   was that the government has to prove the defendant's guilt

10  beyond a reasonable doubt, and that the defendant was presumed

11  to be innocent.  So let me ask you to reflect for a moment two

12  weeks back to ask yourself whether or not you really afforded

13  the presumption of innocence.

14          When you walked into the courtroom and you were seated

15  in various places as jury selection occurred and you saw all of

16  this and you see deputy marshals in the courtroom, did it dawn

17  on you for a minute, wow, this guy must have done something

18  wrong to be here?  Where there's smoke, there's fire.  How did

19  he get this far?

20          First, I'm going to tell you, you're the first --

21  you're the only finders of fact, jurors, who are ever going to

22  determine -- no one has done it before -- whether the

23  government's case proves the defendant's guilt beyond a

24  reasonable doubt.  You're it.  Because nothing that happened

25  between the beginning of time and now, no one else, just you,

19qddat2                    Summation - Mr. Ross

1    for the first time.

2            So as you sat there and you thought, probably, God, he

3    must have done something to get here, then the government

4    started its case.  And where did the government start its case?

5    Did they start it at the beginning?  No.  They started it ten

6    months after an undercover operation had already been ongoing.

7    They put Mario Recinos up on the witness stand and he told you

8    about August 9th.  That's where the government's case started,

9    as though the ten months that preceded it never existed.

10           You are supposed to keep an open mind.  You are

11   supposed to presume the defendant guilty -- innocent of any

12   wrongdoing, any wrongdoing.  And could you honestly say to

13   yourself when you've heard that testimony, not only were you

14   thinking as you sat here as prospective jurors he probably did

15   something, you're hearing about really what's the worst

16   conversation in this whole case, August 9th, right off the bat.

17   Certainly smart lawyers, they know, let's put our best piece of

18   evidence out there first.

19           Did you find yourself tinting your views, jading your

20   view slightly?  Did you find yourself as you look -- look back

21   and be honest with yourselves.  Do you find yourself now

22   looking back and saying, you know what, once that happened,

23   once I heard Mario up there on the witness stand and heard that

24   bad conversation start right off the bat, August 9th, I started

25   writing down in my notepad "Things that made the defendant look

986

19qddat2                          Summation - Mr. Ross

1    guilty."

2            I think if you're honest, you are going to say --

3    because it is human nature, it is not a criticism of anybody,

4    it is human nature.  But that's not where we are.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19q4dat3                         Closing - Mr. Ross

1          MR. ROSS:  We are in a courtroom of law.  This man is

2    charged with a serious crime.  He is presumed innocent.  So if

3    you are wearing any color glasses as you are listening to the

4    evidence, as you are considering making notes in your notepads

5    as you are reading these transcripts, trying to interpret

6    really what's going on in the case, the color of the glasses

7    you have to look through is not, hey, he must have done

8    something wrong.  It's he is innocent and I am presuming he is

9    innocent.  Now is the time to reflect, go back, look at the

10   evidence, now that you have heard it all, and see it in that

11   light.  I ask you to do that.

12         It's said, a lot of people believe as a general

13   principle that if the government can't prove that you committed

14   a crime, they charge you with conspiracy.  That's what happened

15   here.  He is not charged with money laundering.  No, absolutely

16   not.  Not Count 1, not Count 2, not Count 3.  He is charged

17   with a different crime.  He is charged with conspiracy, three

18   different conspiracies.  In that regard, ultimately the court

19   is going to instruct you.

20         Among the things the court is going to tell you is you

21   need to look into his mind.  You need to be a mind reader.  I

22   remember during jury selection nobody asked anybody if they had

23   any experience in mind reading.  Maybe you do, maybe you don't.

24   That's what the court is going to tell you.  You have to look

25   into his mind, into other people's minds to see, did they have

Closing - Mr. Ross

1    an agreement.  It's not enough that two people act in a way

2    that looks like they are moving towards the same goal.  You

3    have to look inside someone's mind.  In that regard the court's

4    going to tell you something we have all heard our whole lives;

5    actions speak louder than words.  If I get across one message

6    in the time I have it's actions speak louder than words.

7         So revisiting and reviewing the evidence now, let's

8    look at how the evidence in this case played out, not the way

9    the government presented it, it started at chapter 13.  Let's

10   start at chapter 1.  Let's take it in the order it really

11   occurred.  You know that Vikram Datta moved down to Laredo,

12   Texas in a fortuitous set of circumstances where he opened a

13   store when he was down there collect a debt from a guy that

14   owed him money while he was still working here in New York.

15        Let's put this in context.  As Dr. Adams explained,

16   Laredo is the number 1 port of entry from Mexico into the

17   United States.  Number 1.  20 billion United States dollars go

18   from the United States into Mexico every year.  900,000 Social

19   Security checks are sent apparently to expatriated U.S.

20   citizens living in Guadalajara.  Candy and perfumes are the

21   biggest sellers to Mexicans.  The majority of Mexican workers

22   are paid in cash.  Hotels receive money in cash.  Tourists

23   bring dollars in cash.  Farm workers come into the United

24   States to work carry back U.S. dollars.  Cash is completely

25   normal in Laredo.  It is in fact a cash economy.  It has been

19q4dat3                    Closing - Mr. Ross

1    for years.  You heard that from Dr. Adams.  I suggest you are

2    not going to find anyone more competent to tell you that than

3    this man.  He has written books on this very subject.

4              With that having been said, Vikram Datta goes down,

5    starts a business.  Defendant Exhibit I, this is his first

6    ledger.  It's in evidence.  This is 2001, 2002, beginning of

7    2003, his customers.  What happened.  Right here, that's

8    $100,000 in cash.  In cash.  Look at it.  That came from his

9    client Octavio.  Down further on the same page, $150,000, in

10   cash, from Octavio.  You can go through this book, all these

11   different pages, $5,000 in cash, $10,000 in cash, on and on.

12             From Alfa, from a casa de cambio, here it is, cash,

13   $33,000, payable Alfa, cash actually it's $35,000.  Just a

14   couple.  $30,000, January 23, 2001, $30,000, August 8, 2002.

15   These pink tabs that we have allowed to stand on here, these

16   mark the pages of the same customers that Vikram Datta had in

17   2009 and 2010 that he had in 2001, 2002.  What's the point.

18   The point is he goes down to Mexico, he starts to sell perfume.

19   It's commonplace, this is just wholesale that he receives cash

20   even in wholesale, even in wholesale, he receives dollars.

21             What did the dollar looked like in 2001, 2002, 2003.

22   It looked like that.  Just like that.  Looked like any other

23   dollar.  Then he continued.  He stayed there.  He started

24   working.  He started selling.  In the years that follow, 04,

25   05, 06, business grew.  He opened up other stores.  He bought

19q4dat3                        Closing - Mr. Ross

1    this Benetton product fortunately, it kicked off his wholesale,

2    because he had all this product that everybody was looking for.

3           He continued on to 2006.  In 2006 what significantly

4    happened, two people come into his life, Yolanda Carillo hired

5    as a full-time bookkeeper Lalit Abichandani was hired as his

6    CPA.  QuickBooks comes into his business.  Now everything is

7    being accounted for.  Now he doesn't need to do this anymore.

8    He doesn't need to keep a ledger anymore.  You know what,

9    folks, he did.  This is Government Exhibits 2001 through 206.

10   Same kind of journals, same kind of ledgers.  What kind of

11   information is in these.  Everything.  Everything.  Every

12   transaction is documented.  Didn't need to do that, but he did

13   it.

14          Now the accounting of the business is on QuickBooks,

15   cash registers in the stores are inputted into QuickBooks,

16   proper sales tax, payroll, each year corporate and individual

17   tax returns are prepared from information coming from the books

18   and records, QuickBooks Excel spreadsheets, all that.  He

19   painted a complete picture, the government says, so he has been

20   concealing, he is trying to hide these transactions, trying to

21   conceal these transactions.  This is to the contrary.

22          These books and records are all reconciled.  You heard

23   the accountant.  He reconciled them every month, all the

24   invoices, all the cash deposits, all of the deposit slips are

25   reconciled with one another.  He did that on a regular basis.

1    In other words, he goes to the invoices, sees how much was

2    sold, goes, checks it out, finds out everything synchronized.

3    In 2008 his gross receipts were $31,594,456 in 2008.  His costs

4    of goods sold was $29,700,000.  So let there be no mistake,

5    this not some front, this is the real deal, the real business.

6    He bought perfume for $29,700,000 that he sold for $31,594,456,

7    and of course paid his employees.

8         2009, gross receipts, over $30 million.  Costs of

9    goods sold $28,600,000.  That was the testimony from the CPA.

10   He also testified about an IRS audit in 2009 where he

11   represented Mr. Datta.  During the course of that audit, the

12   nature of the inquiry were the deposits being made in the bank.

13   The result of the inquiry, the audit was that all income

14   deposited in La Versailles accounts was properly accounted for.

15        Prior to 2009, it is true, that La Versailles was not

16   filing 8300 forms.  Contrary to the government's suggestion

17   that it is somehow related to the arrest of someone in

18   connection with ET Perfumes, I suggest what you heard from the

19   witness stand is true.  That is, you heard that in 2009, a

20   sunglass a fellow in the duty-free business, sunglass business

21   communicated with Mr. Datta and his staff that he had been

22   audited by IRS for not filing 8300 forms, that they then

23   immediately brought it up with Lalit, the CPA who then put them

24   on a plan to file 8300 forms, on the 15th and 1st of every

25   month.

19q4dat3                      Closing - Mr. Ross

1               Did they do that, did they file these.  This is
2       Exhibit 301.  These are 8300 forms filed, signed by Mr. Datta,
3       providing information to the Internal Revenue Service, saying
4       that this person, this is a customer who is paying me X number
5       of dollars.  Interestingly the government, I am getting a
6       little out of turn, I don't want to forget this.  This is from
7       Exhibit 302.  The government says, wait a minute, he is money
8       launderer because he didn't fill out section 2 and this is a
9       simple enough form the government said, simple.
10              The first part of the form, 8300 form is identity of
11      individual from whom the cash was received.  Part 2, the person
12      on whose behalf this transaction was conducted.  Well, it looks
13      a lot like currency transaction reports, this is Exhibit 302,
14      that banks file.  They have two parts.  The top part is person
15      involved in the transaction.  That would be the person who
16      brought the cash, like the flip side, that's number 2.  Then
17      the second is individual conducting the transaction if other
18      than above.  Actually it's exactly the same.
19              What happened, these are currency transaction reports,
20      these are filed by banks.  I culled out page 117 and 118 just
21      as an example.  These are the currency transaction reports
22      regarding this guy Lara in the hotel over at Newark Airport
23      going into various banks depositing money, couple of CTRs from
24      that.  Here is one.  The person, this in Newark, New Jersey,
25      this is Wells Fargo Bank.  Who else is going to know how to

19q4dat3                      Closing - Mr. Ross

1   fill out a CTR correctly, Wells Fargo Bank.

2          The person on whose behalf the transaction is

3   conducted is La Versailles.  They don't even know that.  They

4   don't even know that.  They just put that in there.  Why,

5   because somebody deposited money in the account.  The

6   government wants to make a big deal over the omission of part 2

7   of the 8300 forms, when in fact, all that information is

8   provided for in the books and records that I am showing you.

9   We will get to that.

10          Exhibit 301, the currency transaction reports, Exhibit

11   303 are the CMIRs.  So, what happens.  Hilario across the

12   bridge.  He declares.  Right away they get a record.  The

13   government wants information.  They know who it is who is

14   bringing the money, right on this form, CMIR.  The government

15   knows who is bringing the money.  Hilario is bringing the

16   money.  His name on every one of them.  He carries the money

17   across the bridge.  This goes to the Internal Revenue Service.

18   That's who this goose to.

19          So before he gets to La Versailles, they already know.

20   They already know he has brought money.  Then what happens, La

21   Versailles puts it in their ledger, puts it in their journal,

22   the receipt books.  These are receipt books.  Receipt books,

23   you saw some of them as we went through the evidence in the

24   case, the receipt books for these businesses contain every bit

25   of information.

1           They contain, remember what the story was from Hilario

2      he said when he delivered the money.  He had a receipt the

3      accountant from a casa de cambio gave him.  He came over with

4      the money.  He gave that receipt to either Yolanda, Cynthia or

5      Nina.  She would sign their receipt.  She would prepare a

6      receipt for him to sign, Hilario, you saw it in evidence.

7      Hilario would sign his name to the receipt as the person who

8      was bringing the money.  They would put the receipt in the name

9      of the client.  What's missing?  Yeah, were they perfect in

10     their filing of 8300 forms?  Apparently not.  Does that mean he

11     is a money launderer?  I suggest that it does not.

12          During the same years, 2007 and 8, that we were just

13     talking about, Fausto Garza came out of his retirement, I call

14     it retirement from being involved in a casa de cambio.  He said

15     he started his business back up and he became again a casa de

16     cambio in Nuevo Laredo, one of 40 if I recall correctly his

17     testimony.  So what did he do.  He went back to the customer

18     list that he had from Alfa.  If you remember his testimony, he

19     said that he left Alfa in 2001 because he got arrested.  He was

20     working at Alfa.  He got arrested.  He had not been there in

21     all these years.

22          He went back to his customers.  He contacts perfume

23     buyers.  He contacts clients.  Not him, he is not contacting

24     customers.  Fausto contacts these people and solicits them and

25     says I can sell you dollars.  Fausto says the money he is

1    buying them is all legitimate, he is buying it from banks,

2    casas de cambio, 2007, 2008 when he gets back into business.

3         So Fausto has his clients directing him on where to

4    deliver money.  He is selling U.S. dollars for pesos to his

5    clients some of whom happen to be Vikram Datta's clients who

6    were also customers of all the perfume stores.  Whoever has the

7    lowest price gets it.  There is not a shred of evidence as the

8    government suggests that he is getting business because he is

9    willing to turn a blind eye to dirty money.  No suggestion of

10   that at all.

11        This is the dollar we had up there from 2001, 2002.

12   Now we are moving into 2007, 2008, and Fausto's casa de cambio

13   is bringing money to among other places La Versailles.  What

14   did the dollars look like when they were brought over in 2007

15   and 2008.  They looked like that.  I know they looked alike.

16   That's really the point.  They looked exactly alike.  There is

17   no way to tell the difference between money that was brought in

18   01 and money that was brought in 07.  They are exactly alike.

19        Three people worked for Fausto at the time.  He had an

20   accountant, he had another guy Trinidad, Jose Trinidad, and he

21   Hilario Martinez-Garcia who walked across the bridge.  He

22   declares the money every time he walks across the bridge.

23   Those are the CMIRs, gives his visa number, how much money he

24   has, they counted it, all that information.

25        It all gets declared.  He tells that information,

19q4dat3                          Closing - Mr. Ross

1    Fausto testified that he told that to Cynthia at La Versailles
2    a long time ago when he first started, that he declares.  So
3    knowing that he declares means that he knows that the
4    government already has the information on who brought the
5    money.  The CMIRs are already filed.  They are already there.
6              Who were the clients that Fausto had in 2008; Jose
7    Antonio Frank, Jose Luis Gonzalez, Gerardo Gonzalez.  When you
8    look at the records, these ledgers, these journals, what the
9    government is referring to as the cash books, this is Exhibit
10   201, 202, 203, 204.  Just the fact he has cash books belies the
11   idea of money laundering.  I guess it's part of the
12   government's theory that the more legitimate you keep it, the
13   more Ts you cross, the more Is you dot, the more ways you
14   follow the law, the more ways you comply, the easier it is to
15   hide what you are really doing.
16             I guess the answer must be, if you want to conduct
17   business and you want to be a money launderer and you don't
18   want to give the government this argument, then you do what
19   Ankur did, no receipts, no nothing, money goes in the pocket.
20   But that's not what happened here.  That is not what happened
21   here.  He always declared the money.  He came across.  He filed
22   the CMIRs at the direction of Fausto's client.  He would go to
23   La Versailles warehouse.  He would deliver money with his
24   accountant receipt which would be signed by Yolanda, Nina.  He
25   would be given a receipt and required to sign it.

19q4dat3                     Closing - Mr. Ross

1          I don't think I asked, I apologize to the government,

2    209 and 210, these are the receipt books.  If you take those

3    two exhibits back to the jury room, you look at the information

4    in these two books, you are going to be satisfied that there

5    was no hiding anything.  It's actually quite remarkable when

6    you look at how they cross-indexed the one with Hilario that

7    the government used.

8          For example, you have one here, Mr. Contreras paid

9    $100,000, and underneath, you have Mr. Contreras' receipt for

10   $100,000, and for La Versailles, then you have the signature of

11   the person who brought the money over here, then you have the

12   copy of the receipt that he brought from their accountant

13   dovetailed here.  On here, look underneath, here is the number

14   485750 right here, 485750.

15         You know from looking at these records alone, just

16   from these records, you know the following.  You know how much

17   money was brought.  You know what denominations the money was

18   brought in for the most part.  You know who brought the money,

19   who the client was.  Then the money gets deposited in the bank.

20   What happens.  The bank files these.  Currency transaction

21   reports.  Hiding.  Concealing.

22         When you hear the instructions from the court, you

23   will find out that's what he is charged with.  Two ways, we

24   will get to that, he is either promoting drug dealing, you have

25   not heard a shred of evidence of that, or he is concealing or

998

19q4dat3                          Closing - Mr. Ross

1   hiding drug profits or drug money for them as part of the

2   conspiracy.  I suggest that everything that you see is contrary

3   to hiding.  Everything you see is contrary to concealing.   It

4   is straightforward.

5          But the government has turned the world upside down

6   and now makes the argument that by doing this he is just

7   building in a defense for if and when this day should come.

8   That's pretty smart, giving him little too much credit maybe.

9   He goes there, gets these receipts signed, receipts books, you

10  look in there, you are going to see there is no concealment.

11         What do you have now.  So far in any transaction

12  charged, this conspiracy count is charged from 09 through 11,

13  this is the period of time, what do you have so far.  You have

14  8300, albeit imperfect, shows client, amount, date, place.  You

15  have a currency transaction report showing that the money went

16  into the bank.  You have a CMIR, which I have already shown you

17  that shows Hilario's name carrying money across the border with

18  all his identification and his visa.  And you have these

19  records, receipts, you have these ledgers other here, details

20  every transaction with every customer ever in these.

21         Concealing.  Hiding.  I think not.  I think not.

22         THE COURT:  Counsel, we will have no expression of

23  personal views on issues of fact.

24         MR. ROSS:  Yes, your Honor.

25         Hilario never told anybody anything about drug money

19q4dat3                           Closing - Mr. Ross

1    ever.  Fausto never told anybody anything about drug money.

2    But in 2009, Fausto says that he started to purchase dollars

3    from Carlos Martinez Amador and Mr. Alberto instead of going to

4    a casa de cambio or a bank.  OK.  In 2009, he starts buying

5    dollars from Carlos Martinez Amador and Mr. Alberto.  If I

6    remember correctly, it's about the same time he moves from this

7    nice store he was describing for us with signage outside,

8    people coming in, exchanging money.  He was just yards from the

9    bridge was his testimony.

10           He exchanged that for this house, Exhibit 215, for

11   this house, this crummy house.  Is there any evidence anybody

12   told Vikram Datta that.  Is there any evidence at all that

13   Vikram Datta knew that Fausto had gotten rid of his shop and

14   moved into this little place.  More importantly, is there any

15   evidence from any source anywhere that Fausto, when he decided

16   in 2009, to start buying dollars from Carlos Martinez Amador

17   and Mr. Alberto shared that with Vikram Datta, shared that with

18   Cynthia, Yolanda or an employee of his who might have told him.

19   The answer is no.  They did not.

20           What happened.  He started, this guy now who he's

21   already sending money, been sending money for a while.  He pays

22   invoices for perfume customers, not just at his store but at

23   all the stores, that was his testimony.  Now, however, he is

24   getting dollars from another source.  He is not sharing that

25   with anybody.  What do the dollars look like that are now

19q4dat3                        Closing - Mr. Ross

coming from Mr. Amador and Mr. Alberto.  My goodness, it looks

the same.  How is Vikram Datta to know that, that the dollars

that have been coming since 2001, June 2000, the books start

2001, cash is coming 2001, comes from casa de cambio.

When you look through this Exhibit I, 01, 02, you are

going to see Alfa.  I showed you one of the transactions was in

Alfa cash, $35,000.  When you go back you are going to see this

continuum of activity.  How is Vikram Datta to know, how is he

he supposed to know that this guy is out buying from Carlos

Martinez Amador and Mr. Alberto.  When we asked Hilario on the

witness stand whether or not he had told anybody at La

Versailles anything about drug money or anything like that, he

thought about that.  Not only did he answer no, he just sort of

jumped, no, no.  Why?  It's the last thing on earth he would

tell anybody.  Ever.

They are keeping it a secret.  What's the government

asking you to do.  The government's asking you to convict a guy

because he did not know their secret.  He was not in on their

secret.  If they had evidence that he was, he would be guilty,

you know what, he would be guilty of those crimes.  But there

is no evidence that he was aware of it whatsoever.  Dollars

looked the same in 01, they looked the same in 07 and 08 and

they looked the same in 2009.  The same.

Garza testified he moved from a storefront operation

at this little house, no communication with him.  He said he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19q4dat3                         Closing - Mr. Ross

1    met Vikram Datta one time to say I am the guy from the casa de

2    cambio that's sending you the money.  That's fine he said.

3    Deal with Cynthia, that's it.  Nothing else.

4              Fausto Garza's customers included Gerardo Rangel, Jose

5    Antonio Franco, Jose Luis Contreras, Louis Flores, Jose Luis

6    Torres, Jose Antonio Moreno, and Catalina Franco.  If you go

7    back to these pages with the pink when you receive this

8    evidence, you can take all this back to the jury room.  Don't

9    talk my word for it.  Look at it.  These are those customers,

10   the same customers from 2001, 2002, 2003, who are doing

11   business the same way, nothing has changed.  Nothing has

12   change.

13             Fausto Garza did testify at times he would pay by

14   check.  We saw a couple checks on Hilario's account to pay for

15   his customers' invoices.  His customers, these people, while

16   they may be customers of La Versailles and they may be

17   customers of other perfume stores, are Fausto's customers,

18   Fausto's customers.  He doesn't have anything to do with how

19   those people do their business.  All he does is sell his

20   perfume on credit, sends an invoice, you owe me in 30 days to

21   45 days.  When it comes due he expects payment.  Payment

22   eventually comes.  It comes from casas de cambio.  It has been

23   coming through casas de cambio for years.  For years.  Look

24   through here.  That's how business has been done there for

25   years.

SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

Closing - Mr. Ross

1    There was absolutely nothing that made this dollar
2   look any different to Vikram Datta.  He was never told that
3   they were buying dollars in another place.  He was not privy to
4   this rubberband, stuff it in your socks, take a bus from
5   wherever conversation and description we are talking about.  He
6   knows none of that.  What he does know is that the law in
7   Mexico changed regarding the amounts of money that can be
8   deposited and 3 or 4 percent, I think it was 3 percent, the
9   bank fee that was being charged.  At that time that law was
10   enacted, more dollars started arriving.
11    Perfectly consistent, not with these guys, the
12   government says it's perfectly consistent with him knowing
13   these guys were out buying dollars at a bigger steeper discount
14   that somehow suggests it's narco dollars.  It's consistent with
15   the information that he and all the other business owners knew.
16   That was that Mexico was clamping down on cash deposits.  You
17   saw the pictures of businesses, cash business, perfume dealers,
18   this is a cash economy.  Always declared every time he comes
19   across.  Never told anybody.
20    This is one of these cases where this is unusual.  In
21   a trial, a lot of times you may expect a defense counsel to get
22   up and try to show that the government witnesses are lying, you
23   shouldn't believe them, that's why you should acquit the
24   defendant.  If you believe every word that every government
25   witness said in this case, you still have to find Vikram Datta

19q4dat3                          Closing - Mr. Ross

1   not guilty.  This is not about who is lying.  This is about

2   whether or not a crime was ever committed.  Ever.

3              I suggest to you it's certainly interesting that the

4   government starts its case from the sale of drugs.  They put up

5   this thing on the screen for you, the sale of drugs.  That's

6   where their case starts.  Our case, in our view, starts from

7   Vikram Datta selling perfume.  It doesn't start from a drug

8   sale.  It's Vikram Datta selling perfume.  He ships it, sends

9   an invoice, freight forward picks it up, sends an invoice, he

10  gets paid.  It's just that simple.  This case, I told you in my

11  opening statement, still true today, began on September 10,

12  2009, the day Ankur and Ajay get arrested.

13             $5,725,000 they received in bags and boxes in Rite Aid

14  parking lots, in Burger King parking lots.  They have no

15  receipts.  They have no names, no signatures, they have no idea

16  who has brought them the money.  They are receiving money from

17  Martin who is a Colombian drug dealer.  They know that.  They

18  negotiated with him.  When I say they, it's not really they.

19  It's Alonzo.  That's Ankur's a/k/a, his alias, Alonzo, because

20  he knew what he was doing is wrong.

21             Vikram Datta is so smart according to the government's

22  theory he is going to do everything legitimate to make himself

23  legitimate.  If he's going to money launder, if he knows he is

24  doing something wrong, he is going to do the opposite.  He is

25  going to use the name Vikram, Vikram Datta.  That is my name.

19q4dat3                          Closing - Mr. Ross

1    That's what the defendant says, his name, no use of an alias,

2    nothing.

3          All the money that was brought in to Nandansons this

4    way was off the books, no deposits were made, no 8300 forms, no

5    CTRs, no tax returns, no nothing.  Contrast that to the

6    business of Vikram Datta, the details of all of his business,

7    the 8300 forms, the ledgers, the CMIRs of people bringing it

8    across, the receipts are all, you go through the receipt books,

9    do so carefully, they are a wealth of information.

10         It starts September 10.  Then what happens on October

11   12.  October 12, a phone call comes in from Ankur Gupta for a

12   business trip, a buying trip.  Vikram is coming to New York.

13   They have a meeting at Nandansons.  He runs out, Ankur runs to

14   the agents and says, hey, one of those guys that's on the list

15   of people in Laredo that I gave you who I sell to is coming to

16   see me tomorrow.  They give him a recording device and they do

17   this wire on him.  The agents testify he was a target, that's

18   the word, folks, target of the government's undercover

19   operation from October 13, 2009.

20         All that, it is all perfume discussion, a little

21   discussion about the baby, you recall he bought a baby gift.

22   He testified he did a blessing, an Indian ritual on the baby.

23   The only significant thing other than that happened on that

24   day, he is making up a story about $1.3 million.  He didn't, he

25   was telling a story about years ago, when he just started.

19q4dat3                    Closing - Mr. Ross

1    That's why he says Cynthia was teenager then, to make the story

2    believable, that 1.3 million from Octavio came in.

3            How do you known that when Vikram Datta tells you that

4    that's a fairytale, how do you know it's a fairytale, because

5    this IRS agent, agent Reinhardt, pulled all the CTRs.  There

6    would have been you bet there was a CTR if somebody walks in

7    the bank with $1.3 million.  There wasn't one.  There never was

8    one.  With that bragging, that embellishment of $1.3 million

9    comes the question from Ajay Gupta, is it drug money, and the

10   answer is I don't know.  Hold on one second.  The government

11   says his answer really should have been no.  How would he know

12   that.  How could anyone know that, that it's not drug money.

13           How do you know that money in your pocket is not drug

14   money.  Do you think when the government took the $4.5 million

15   that they rounded up here in New York from Anjay and Ankur

16   Gupta's various locations, safe deposit boxes, do you think

17   they burned that money.  No.  No.  Deposited it in U.S.

18   treasury accounts.  It goes into the banks.  When it goes into

19   the banks, people like you, like me, like everybody else come

20   into the bank, they end up with these very same dollars.  So to

21   say no, no, I don't know.  Because he didn't know.  He didn't

22   know then.  He testified here he does not know then.

23           How does this go.  The government wants to play this

24   down.  I appreciate that.  But November 24, 2009, first,

25   playing the phone calls on the 23rd is Ankur trying to get

19q4dat3                              Closing - Mr. Ross

1   something going.  He couldn't reach him.  He finally reaches

2   him on November 24, 2009.  Says this was directed by the

3   agents.  Remember I asked him about his father's question.  I

4   said when your dad asked the question of Mr. Datta, is it drug

5   money, was that something the agents put you up to, he said no,

6   it was just the normal flow of conversation.

7            Contrast that to November 24.  He said this was agent

8   directed.  This was the agent telling him try this, try this.

9   And he did try this.  And when he tried it, the answers were,

10  what he was proposing was, what he testified to was a model of

11  what he had done.  A model.  Just a money drop and he was

12  proposing somebody come in, drop money on Laredo, that somehow,

13  someway he Vikram Datta was going to get that money to

14  Nandansons and Nandansons was going to supply the perfume.

15           You heard him on tape.  If he is the one doing the

16  deal, he is the one handling the money.  If he is not selling

17  perfume, he is not touching money.  Because he knows that's an

18  open door to money laundering.  What does he says.  Let me

19  quote some of what he said.  No, no, I don't want, I do not

20  need to make this money.  No, we don't need to do, I don't need

21  to get into this shit, because I have worked for 10 years to

22  make my company.  I don't want it.  November 24, 2009.  The

23  government says, he is already committing crimes.  He was not

24  committing any crimes.  He was not involved in any crimes and

25  he was not welcoming the invitation to commit a crime.  To the

19q4dat3                          Closing - Mr. Ross

1    contrary he said no.

2              What did Ankur Gupta say in court before you.  He was

3    asked, did you ask Mr. Datta if he had a way he could take that

4    money and send it to you?  Answer:  Yes.  That conversation,

5    was that directed by the agents?  Yes.  In other words, that

6    sort of looks like the very crime that you committed, receiving

7    money one place, right?  Yes.  So that was the effort that was

8    being made, you should try to get Mr. Datta to commit the same

9    crime.  No.  The purpose was to see what his reaction would be.

10   Question:  His reaction you found out was that he declined to

11   do it.  Correct.  Moreover, not only did he decline to do it,

12   he told you that he had other people who had come with him with

13   small bills and a lot of cash and made a similar proposal and

14   he threw them out.  Correct.  And he was waiting for another

15   guy that knew he was coming and he was going to throw him out

16   too.  Correct.

17             He goes on, testifies.  Continuing in response to the

18   proposal Mr. Datta said to you that he doesn't want any

19   problems.  Right.  And this quote I just gave you.  I do not

20   want, I do not need to make this money.  Is that correct.  He

21   said yes.  Most importantly, did you discuss with the agents.

22   I did what you told me to do and he wouldn't take the money.

23   Answer:  Yes.

24             The agents have set this up.  This is it.  This is how

25   they go about dealing with people they suspect may be up to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1  something.   They put out a proposal to get them to money

2  launder and this man said no and let there be no mistake about

3  it, he said no.   Ankur said I did everything I was supposed to

4  to do and he wouldn't take our money.

5          I suggest they should have left him alone.   I said

6  that to you in my opening.   I say it to you now.   The

7  government should not be out entrapping people who are not

8  predisposed to commit a crime.   People who said no should be

9  left alone.   This man said no.   That was not the end of it.

10  January 19, a month and a half later, Ankur calls him up again.

11  This time, it was purchasing, he was describing purchasing

12  perfume.   He was ordering perfume.   At the end of that

13  conversation, do you recall making another proposition to him

14  of illegal conduct?

15  "A.   At the direction of the agents, yes.

16  "Q.   You again proposed that cash be dropped in his San Ysidro,

17  California store that you just learned about and goods

18  delivered elsewhere?

19  "A.   Yes.

20          Again, Mr. Datta said no.   Yes.   Did you tell the

21  agents in January that Mr. Datta said no again.   Yes.

22          I respectfully suggest to you that they should have

23  left him alone.   If he was money laundering as the government

24  suggests in Count 2, investigate that, prove it, let's go.   But

25  don't entrap the guy, don't keep on a guy who keeps saying no.

19q4dat3                         Closing - Mr. Ross

1              Then the next thing that happened was March 1.  This

2     is January 19.  Now we are at March 1.  What happened at March

3     1.  The agents are in Las Vegas.  They are there for the

4     perfume show, perfume exposition.  Ankur said 2,000 vendors,

5     some number, gigantic perfume show.  The agents are there

6     looking for business, looking to make a case.  They are out

7     there.  They are looking for someone in particular who is

8     called their target.  Vikram Datta.  They are looking for

9     Vikram Datta.

10             While they are out there looking for Vikram Datta on

11    March 1, agent Correa is walking around wired up, recording

12    conversations.  Roberto, also wired up if I recall the

13    testimony, and he has a conversation, Correa has a conversation

14    with Ankur and Ajay Gupta which is offered to you for far more

15    than just is this entrapment.  It's offered to show you how far

16    the United States agents, law enforcement people will go to

17    make a criminal case where one does not exist.  That is what

18    happened.

19             I refer to it as a pep talk.  How did it go.  Ankur

20    said he told you that his group that he works with, they go

21    after things, and they don't stop or slow down if something

22    happens, did he tell you that, he says I believe so.  Let me

23    stop right there.  What does that mean.  When I get to Correa,

24    Correa says, yes, I said that.  This guy was sort of proud,

25    proud of himself he was saying.  What is it that happens that

1    the agents don't stop for.  I suggest to you when someone says

2    no not once, but twice, when someone says no, we don't stop.

3              Gupta goes on.  Did he tell you you have to be more

4    aggressive, yes.  Did he tell you whatever it takes, generate

5    something.  His answer actually was something to that effect

6    you will hear in a moment directly from Correa.  Did you tell

7    him that you have to push that angle, you have to push it, yes,

8    and regarding Vikram Datta, make sure you make him want to work

9    with us, yes.

10             Correa testified, he told you, did you tell him that

11   they needed to be more aggressive and they were not being as

12   aggressive as they should be, yes, yes, sir, that is correct,

13   he said.  Did you tell him that you were trying to be as nice

14   as you could possibly be but I am trying to say we need to

15   start getting some results, he said yes, sir, that is correct.

16   Did you tell them that you need to start being a little more

17   aggressive, you need to reach out, you need to have to have

18   find someone.  Yes.  You need to have to find someone.  What we

19   ask you of is not enough.  Yes, sir, I said that.  I don't care

20   what you told them.

21             Wouldn't you think that there would be some limitation

22   on what an undercover person could tell a potential target of

23   the investigation before it just becomes nasty and just

24   entrapment.  Wouldn't you think.  There are no rules, not with

25   this group.  This group doesn't stop when someone says no and

19q4dat3                          Closing - Mr. Ross

1    they have to restriction on what they are going to say or do to

2    make it happen.  You have to be more aggressive, that's

3    correct.  I don't care what you tell them, generate something.

4    That's correct.  The other one said, Gupta says something like

5    that.  He said that's correct.  Finally, do whatever it takes.

6         That's the instructions on March 1.  With those

7    instructions in mind, what happens.  On March 2 they have a

8    meeting in Las Vegas.  Who are the undercovers.  The undercover

9    is Jose Correa and his partner Roberto.  Roberto is a bit of a

10   mystery in this case because we really aren't too sure if he's

11   an agent, an informant, a cooperating witness.  We have heard

12   all of that at various times and we have not seen him in the

13   courtroom.  So we don't know the answer.  But those two are

14   going to be introduced.  How are they introduced.  They are

15   introduced to Vikram Datta as wholesalers from Baja California

16   who have cash customers in Mexico.

17        All of this in the context of a perfume show with

18   2,000 vendors.  That's where all this is going to occur.

19   That's the introduction.  Do you hear anything about the March

20   2 meeting.  No, you don't.  Why, because there was nothing that

21   happened other than what I just told you.  There was this

22   introduction that was made.  Then what happens.  Five months

23   and 7 days passes.  Think about that.  Think about that.  Five

24   months and 7 days passes.  During that period of time, does

25   Vikram Datta pick up the phone and call Jose and say I met you,

19q4dat3                          Closing - Mr. Ross

1   you guys are wholesalers in Baja, I have my new store in San

2   Ysidro, it's right down the road, come over, buy some stuff, I

3   want to get some business going.  No, not once, not ever.

4   Actions speak louder than words.  He never called.

5           The next perfume show is August 9, 2010.  The words

6   that were used by Mario, he said an operational decision was

7   made that he would become an undercover, his words, operational

8   decision.  What does that mean.  Let me suggest what that means

9   is, you know what, we have amateur hour here, we struck out, we

10  struck out on November 24 because Ankur couldn't do it right,

11  we struck out on January 19 because Ankur couldn't it right,

12  and we struck out on March 2 despite the pep talk that occurred

13  the day before Jose who is obviously much younger than Mario

14  couldn't pull it off and couldn't get this guy to commit a

15  crime.

16          That's what the undercover operation is all about,

17  about getting him to commit a crime.  Before the meeting with

18  Mario, Ankur and Ajay and Roberto talked to Vikram.  Vikram

19  testified.  He told you that.  There are a couple reasons why

20  you are going to know that happened that are corroborated by

21  the evidence.  What he says was he met with them, he was not

22  100 percent sure it was Roberto talking, but he knew it was

23  Ankur and Ajay and that Roberto's business had taken a big hit

24  because of some merchandise that was seized in Mexico and that

25  Mario is going to be introduced.

1          This is what he is told ahead of time at the

2     Nandansons booth on August 9, and Mario is going to be

3     introduced because he is going to be and investor and please,

4     this is his testimony, please make it easy for us, Roberto's

5     business hangs on it.  Let me note to you right here that you

6     heard something in this case that didn't have to be pursued.

7     If something is missing, it's missing.  You will recall Mario

8     Recinos' testimony.  Yes, he said, there was a malfunction, I

9     remember a malfunction with the recording equipment, there was

10    a conversation that wasn't recorded.

11         I suggest to you this is that conversation.  Vikram

12    Datta testified to it.  How do you know this conversation

13    occurred.  Because at the beginning of the very next recording,

14    the preliminary meeting, the short meeting, two meetings on

15    August 9, one lasted about 8, 9 pages, just a few minutes long,

16    then 11:00 that evening they met for drinks at the Palazzo, had

17    a somewhat intoxicated lengthy conversation.

18         At the beginning of that first phone call he calls

19    they are here again, they are here again.  If Roberto hadn't

20    been there earlier he wouldn't be saying they're here again.

21    That's the first thing.  When you go to the conversation that

22    night, that night August 9, you will see three times where

23    Vikram Datta says saying he never said.  Aren't I making it

24    easy for you because that was the request that Roberto had

25    made, make it easy.  Those corroborate his testimony.  Those

19q4dat3                    Closing - Mr. Ross

1   events, that there it is playing out exactly like he was asked,

2   the missing recording, no one accounted for that, no one.

3           The operational decision is let's bring in the 32 year

4   veteran undercover guy.  We are going to give him the best we

5   got.  Everybody else has blown it, let's bring in Mario

6   Recinos.  The first meeting with Mario Recinos, Mario says to

7   him, let's step outside.  They do.  They go outside of the

8   convention center.  They have a very short conversation.  But

9   you know what, it's a short conversation, but two things are

10  said in that short conversation.

11          First, he says he wants to buy perfume.  He talks

12  about buying perfume, doesn't talk about moving money, doesn't

13  do any of that, he talks about buying perfume.  What he says to

14  him about buying perfume is Vikram asked how do you want to

15  buy.  He starts the conversation by saying we are going to

16  start small, 40 to $50,000, and Vikram said a month, he says

17  no, a week.  A week.  Two pages later in the same conversation,

18  they up the ante.  Vikram knows this is supposed to be the

19  starting number.  He said how much do you want to buy every

20  month.  Answer:  We are talking millions, millions a month.

21          This is in the first 8 pages of an 8 or 9 page

22  transcript, right there at the beginning of this.  What

23  happened afterwards.  They came back inside after the short

24  conversation.  Vikram Datta goes back inside and he goes to

25  Ankur Gupta, and Ankur, please recall his testimony, Ankur

19q4dat3                              Closing - Mr. Ross

1   testified in front of you in this court as follows.  After that

2   introduction what happened.  After that introduction, the

3   agents took Mr. Datta outside the trade show to speak briefly,

4   and then about 5 to 10 minutes later, Mr. Datta came back to

5   our booth and he said that the customers, they are talking very

6   large numbers, that he didn't feel that he would be capable to

7   service them.  At that point in time I mentioned to him just do

8   business as you normally would, they might be just trying to

9   show you large numbers to try to impress you.

10            Vikram Datta is not even then, even for those numbers,

11  he is not jumping up and down.  Here is a guy who had said no

12  twice, clearly, no.  No.

13            Then they come back and they say OK, we are going to

14  40 to $50,000 a week.  That's 2 million to $2.5 million a year.

15  Two pages later he says we are going to do millions of dollars

16  each month.  Let's just go with the lowest, millions with an S,

17  that's $2 million, that's 24 million.  Then later as you are

18  going to see when we get there at the later conversation on

19  August 9, when none of this resulted in his agreement to do

20  anything illegal, because he didn't agree to do anything

21  illegal, they ramped it up even more.

22            At page 60 of that last transcript, you will find that

23  Mario Recinos told him that we are going to do 1 or $2 million

24  a week.  That number, the number to a guy who said no, started

25  in the first couple of minutes at 2 million to 2-1/2 million a

19q4dat3                          Closing - Mr. Ross

1   year, ramped itself up to $20 million a year two pages later

2   and a few hours later when he still was not on board to do

3   anything illegal, ramped up to between 50 and $100 million.

4   That makes John DeLorean look like chump change.

5              With these facts in mind the court is going to

6   instruct you about entrapment.  A defendant may not be

7   convicted of a crime if it was the government who gave the

8   defendant the idea to commit the crime and, at the same time,

9   if the defendant was not ready and willing to commit the crime

10  before the government agents first spoke to him.  What is the

11  measure.  The measure is when they first spoke to him.  Who

12  were the agents.  What are we talking about here.  We are

13  talking about Ankur Gupta becomes an agent.  He acted under,

14  all these people are law enforcement.  We are going to get to

15  it.  There is another instruction the court is going to give

16  you that you can't conspire with a government agent.  It's

17  probably the first time you heard that.  You cannot conspire

18  with a government agent.

19             He can't conspire with Ajay Gupta.  He can't conspire

20  with Ankur Gupta.  He can't conspire with Jose Correa.  He

21  can't conspire with Mario Recinos.  He can't conspire with

22  Roberto or this guy Miguel who went to the San Diego store.  He

23  can't conspire with a government agent.  Why.  Because

24  government agents don't have the mindset.  You have to have a

25  meeting of the minds.  You both have to be on board.

1              In the case of Count 1, the court is going to tell

2      you, that the co-conspirators that he and whoever else he

3      supposedly conspired with and it can't be any of those people,

4      both of them had to both have been told that it was dope money

5      and had to have believed it.  Let's stop the inquiry right

6      there.  What evidence is there anywhere in this record,

7      anywhere in the two weeks you sat here for trial, that anybody

8      other than Vikram Datta was ever told by the agents that it's

9      Sinaloa money.  No one.  Unless there is another person out

10     there who knows that and agrees with him to enter into a

11     financial transaction, he is not guilty of that offense.  You

12     can't conspire with a government agent.  The court is going to

13     instruct you on exactly that.

14             Finish entrapment.  You have these two elements.

15     First element, the government took the first step.  It's couple

16     step process.  The government took the first step.  Did they.

17     The answer is yes.  Ankur took the first step on November 24

18     arguably, actually October 13, but by November 24 for sure, the

19     second step on January 19, Jose took the third strep on March

20     2, and Mario took the fourth step on August 9, and Vikram Datta

21     never took the first step anywhere along that line.  It's the

22     government coming to him planting the idea, asking him to

23     launder money.

24             Second inquiry, was the defendant's state of mind

25     before he was first approached by the agents predisposed to

19q4dat3                        Closing - Mr. Ross

1    commit crime.  The answer is no.  You know that.  Actions are

2    louder than words.  Actions are louder than words.  But both

3    his actions and his words said no.  He told them no.  In fact,

4    he didn't engage in conduct.

5         The government has not proven beyond or to the

6    exclusion of a reasonable doubt that Vikram Datta was

7    predisposed to commit the crime before Ankur approached him.

8    That little statement may surprise you.  You may be saying to

9    yourself, wait a minute, you are saying this is entrapment.

10   Don't you, the defendant, have to prove.  The defendant does

11   not have prove anything.  The defendant does not have to prove

12   to you that he was not predisposed to commit the crime.  It is

13   the government and to the government alone that you look to for

14   proof.

15        THE COURT:  Counsel, I am planning on instructing the

16   jury, please don't do my job for me.  The jury will take the

17   law from me, folks.

18        MR. ROSS:  If a crime occurred at all, I suggest one

19   did not, Vikram Datta was entrapped.

20        In another area of the instructions the court is going

21   to tell you about co-conspirators.  He is going to tell as I

22   suggest to you, that unless you can find another person who was

23   told that this is Sinaloa money, this is drug trafficking

24   money, that they believed, this other person believed it, there

25   can't be a conspiracy and you have to find him not guilty of

19q4dat3                              Closing - Mr. Ross

1    Count 1, whether you find him entrapped or not.  Those are

2    different issues.  If you found he committed a crime and he

3    joined a conspiracy, you should find him not guilty because he

4    was entrapped.

5            But you don't have to reach entrapment.  Is there even

6    another conspirator.  These are the agents getting a guy to

7    talk nonsense.  Who else is there that he conspired with.  The

8    government wants you to believe it's Cynthia because he gets on

9    the phone and calls her up.  Where is the evidence that Cynthia

10   was told that Mario or Jose or Roberto was a bad guy.  Never.

11   None.  The government wants you to guess the defendant is

12   guilty.

13           Once having been entrapped, Mr. Datta said a lot of

14   things.  Once he gets to this meeting now he has from 4:00 in

15   the afternoon to 11:00 at night on August 9.  He's already been

16   offered at least $20 million before he walks into the meeting.

17   Now he admitted to you, he said, look, it was greed, yes, I was

18   intoxicated.  We are not offering intoxication as an excuse.

19   The fact is the first words out of his mouth at the meeting in

20   the evening was I am drunk.  The agent testified while he was

21   with him he had another 4 or 5 drinks.  That was his testimony.

22   So the guy was drunk.  But actions speak louder than words.

23           (Continued on next page)

24

25

19qddat4                         Summation - Mr. Ross

1           MR. ROSS:  So the guy's intoxicated.  But actions

2    speak louder than words.  For all the things he said, what did

3    he do?  He didn't do any of them.  He did nothing.  He did

4    absolutely nothing.

5           The discussion on August 9th wasn't about moving the

6    money, it was moving the merchandise.  What they told him was

7    that he was dissatisfied -- Mario is saying, it takes, with

8    Roberto's help, it takes like two or three weeks when we're

9    dealing with Nandanson in New York, it takes like two or three

10   weeks before we get it all done, before we get the merchandise.

11   And here's a guy right there on the Mexican border who has got

12   5 to $7 million in inventory so they're looking to him to get

13   it faster.

14          Nothing happens, however.  Nothing happens, however.

15   They walk out of that meeting on August 9th, and nobody -- you

16   can search this meeting high and low -- nobody tells him this

17   is drug trafficking.  Nobody tells him anything about Sinaloa.

18   Except later.  What was said?  Not only on August 9th do they

19   not tell him they're working for Sinaloa but they actually

20   suggest the opposite late in that conversation.  Listen to the

21   recording -- and this was not played by government.  The

22   government played selective parts of it.

23          There is a reference to Sinaloa.  And what happens is

24   Mario Recinos says in the conversation, oh, and something

25   Sinaloa.  And right away Roberto, who has already had the

19qddat4                    Summation - Mr. Ross

1    conversation with him and already told him, hey, my business is

2    failing, I need this guy Mario to come along, I need this guy

3    to invest money, he's got to save me, I lost all this stuff,

4    when he tells him all that then Mario goes, no, no, no, and

5    then Recinos says, I'm just kidding, I'm just kidding.

6          So not only have they not told him that there's some

7    drug trafficking thing going on here on August 9th, they've

8    really told him not.  They've really told him not.  I'm just

9    kidding.  I'm just kidding.  So that's how the meeting ends.

10         So when the transaction occurs -- and he admits this

11   from the stand, Mr. Datta tells you -- I thought these guys

12   were crooks.  I don't know exactly what kind of crooks.  And I

13   didn't want to get into a debate about, you know, what the

14   cartel's -- you mean the cartel's principal business isn't

15   drugs?  I don't know if the cartel's business is drugs or not.

16   And I don't know if you know it or not, but his testimony was,

17   hey, the cartels are into a lot of things.  Here is something

18   they are into, kidnapping.  We know that to be the case.  We

19   know that.  They are into all kinds of crimes, he said.  One of

20   the crimes is drug dealing.  One of them is drug dealing.

21         At the end of the conversation on the 9th, there is an

22   agreement of some sort between the agents and Mr. Datta and

23   nobody else, and for that reason alone you have to find him not

24   guilty.

25         We move ahead to September 27th.  This is the first

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19qddat4                        Summation - Mr. Ross

1   time that there is a mention by the agent of the Sinaloa

2   Cartel.  He is told, I'm working with the Sinaloa Cartel.  And

3   what happens at that meeting?  What happens at that meeting is

4   when he's told that this guy's working for the Sinaloa Cartel,

5   he's done -- he is done -- and wants nothing to do with these

6   people.

7           How do you know that?  Because Mario says to him that

8   four days earlier -- three days earlier, on September 24th,

9   they had wired $50,000 down for the next transaction, the next

10  purchase of perfume.  You recall the discussion was Mr. Datta

11  didn't recall that he had to call Yolanda, he had to have her

12  checks the books to make sure because it was embarrassing to

13  him that he didn't know the $50,000 was there.  And having done

14  that, he then -- he then is told by Mario, hold on to the

15  $50,000 and I'll contact you, I'll call you.

16          Well, guess who didn't wait for a phone call?  Vikram

17  Datta.  50,000 is sent the next day.  The next day it's

18  returned.  Just like that.

19          So the government is telling you that what's going on

20  in this undercover operation is the same evidence that you

21  should consider as showing that he knew what was going on in

22  his real business, and I suggest to you that you can't do that.

23  And the reason you can't do it is because he was entrapped, and

24  he wasn't entrapped just by the lure of money.  It gets worse.

25  Because despite the fact that he didn't want anything to do

19qddat4                     Summation - Mr. Ross

1    with these people, despite that fact, on November 18th, his

2    dear friend and longtime business associate -- and let there be

3    no doubt, you saw the reference in the book that I pointed to

4    in a couple of days transaction, $100,000, $150,000 in cash

5    back in 2001, in 2002 -- that guy Octavio gets kidnapped, and

6    for that reason he reaches out.  He, Mr. Datta, reaches out to

7    Mario.

8            If he was involved in money laundering, he would have

9    his own criminal sources to contact in Mexico.  But he doesn't.

10   He contacts the one and the only person he knows in the whole

11   world that he believes can help with his friend who is

12   kidnapped.  And that's Agent Mario -- Agent Mario.  And that's

13   the reason he contacts him.

14           So now what motive does he have to play along and to

15   say things?  Now he's got the motive of saving his friend's

16   life.  And he shows up on December 7th in Las Vegas.  That is

17   not a perfume show, folks.  He says right on the tape, the

18   reason I'm here -- this is why I'm here -- I'm here to help my

19   friend Octavio.  The whole time he's there saying I'm here to

20   help my friend Octavio, the agents throw in pitches to see if

21   he will take a swing at it, the same as Ankur did on

22   November 24th and January 19th.  The pitches keep oncoming.

23   Nothing ever happens.  Actions speak louder than words.

24   Nothing.  No matter how many times he gets invited to the

25   dance, he doesn't go.  He doesn't go.

19qddat4                    Summation - Mr. Ross

1              Count Two.

2              Count Two is a slightly different charge.  They are

3       charging him with conducting his business in a way that

4       launders money.  And for this offense, the government has to

5       show different things.  The government has to show that in

6       fact, in fact, those were drug proceeds.

7              So you have to be able to determine beyond and to the

8       exclusion of a reasonable doubt both, whether or not the

9       government in fact has proven that the proceeds that Vikram

10      Datta has been receiving from -- in 2009, in 2010 in La

11      Versailles were in fact drug proceeds.  You don't have any

12      evidence that they were.  What you have is speculation that

13      they might be -- that they might be.  That's what you have.

14             In addition, the government has to prove a meeting of

15      the minds with some other person, who has the same knowledge,

16      to either promote the carrying on of drug trafficking, or to

17      conceal and disguise the nature, location, source, ownership or

18      control of the proceeds of drug trafficking.  And I suggest to

19      you that you don't have that either.

20             If the government has not proven beyond a reasonable

21      doubt that any agreed-upon financial transaction actually was

22      derived from or obtained as a result of drug trafficking, you

23      must find Mr. Datta not guilty of Count Two.  It's different.

24      Do you see the difference from Count One?  Count One is the

25      agent is going to represent that it has to be believed by the

19qddat4                        Summation - Mr. Ross

1    defendant and another person, which they don't have.  This one

2    is in fact -- in fact -- it's drug money and it was intended to

3    promote and it was intended -- or it was intended to conceal.

4         Mr. Datta had to have knowledge that the money was

5    drug money, and the government has to prove that beyond a

6    reasonable doubt.  He told Ankur on October 13th he didn't

7    know, and he told you here when he testified that he didn't

8    know.  Has the government proven that beyond a reasonable

9    doubt?  I suggest not.

10        I want to talk to you about an argument the government

11   has brought up -- conscious avoidance -- conscious avoidance,

12   and the Court is going to instruct you.

13        But among the things the Court is going to tell you

14   about conscious avoidance is that conscious avoidance cannot be

15   used as a substitute for finding that the defendant joined in

16   any alleged conspiracy in the first place.  Think about what I

17   just said.  Does the government, even if they could prove --

18   and they cannot and I'll tell you why -- even if they could

19   prove conscious avoidance, does it mean that the defendant is

20   guilty or committed a crime?  The answer is absolutely not, so

21   the Court is going to instruct you.

22        MR. BRAGG:  Objection.

23        THE COURT:  Members of the jury, the objection is

24   sustained.  That is not a correct statement on the law.  I will

25   instruct you on the law.

1          MR. ROSS:  I believe the Court's instructions are

2   going to include that an argument of conscious avoidance is not

3   a substitute for proof of anything, and you'll hear that.

4          MR. BRAGG:  Objection.

5          THE COURT:  Sustained.

6          Counsel, stick to the facts --

7          MR. ROSS:  OK.

8          THE COURT:  -- or you are going to finish.

9          MR. ROSS:  Yes, sir.

10         Mr. Datta has to intend to commit a crime.  Mr. Datta

11  has to have not just the knowledge but the belief and the

12  understanding that this is in fact drug money, it has to in

13  fact be drug money.  And I suggest that it is not.

14         Now, the government has to prove beyond a reasonable

15  doubt, in order to even argue to you this conscious avoidance,

16  that Mr. Datta believed that there was a high probability that

17  this was drug money.  What evidence is there that he knew?

18  This dollar looks the same as this dollar as this dollar.  Was

19  there anything other than just receiving the money that

20  Mr. Datta had been told or learned from any source?  And the

21  answer was no, absolutely not.

22         The evidence is that Mr. Datta never gave a thought to

23  where dollars were being purchased or used by a casa de cambio

24  selected by one of his customers in Mexico and where they were

25  obtaining it.  Why would he?  Why would he even concern himself

19qddat4                    Summation - Mr. Ross

1   with where -- his customer is his customer.  His customer buys

2   from him.  His customer has to pay him.  And he is going to

3   concern himself with where, what casa de cambio is his customer

4   going to pay me?  He is a businessman.  I get paid.  I get

5   paid.

6           He had been receiving the same cash for over ten years

7   from the same people the same way -- casa de cambios, Alpha,

8   they brought the cash, nothing had changed.  The defendant was

9   always jammed up against his accounts receivable and his

10  accounts payable.  He had to pay within 60 days; he had to

11  receive within 45 days.  And people were late.

12          Folks, I suggest to you that if the money were that

13  easy, if this was flowing, if he was in the business of money

14  laundering and he could get money on consignment, consignment,

15  like Fausto, if he was involved, he could do that.  He wouldn't

16  be jammed.  He wouldn't be calling every morning to find out

17  has so and so paid, has so and so paid because I got to pay

18  this and I got to pay that.  The customers bought dollars from

19  the casa de cambios in every one of the years; nothing has

20  changed from '01 to 2011, nothing out of the ordinary.  Vikram

21  Datta's customers are not drug dealers nor money launderers.

22  There are photographs in evidence of all of these.  This is one

23  of them.

24          This is the store of Kaliman.  The government wants

25  you to believe this is the man's one and only store.  That is

19qddat4                    Summation - Mr. Ross

 1   not what you heard.  You heard that this man, Luis Contreras,

 2   has stores -- a number of stores here and stores at the

 3   Apartado and he does wholesale.  Yet another.  These are his

 4   customers, folks.  These are perfume dealers.  These are not

 5   money launderers.  These are perfume dealers.  These are

 6   perfume stores.  That's what they are.  And these were all in

 7   the Apartado Mall.

 8           The government has argued that Vikram said on

 9   December 7th, that's when he said, you know, 90 percent -- I'm

10   90 percent sure it's Sinaloa money; they are taking their

11   discount somewhere.  Before you take his opinion, because

12   that's apparently what it is, opined on December 7th, you need

13   to look back at the context in which it was said and the

14   circumstances in which it was said.  He was there

15   December 7th fore a meeting with an agent.  He was -- who he

16   knew, because he found out September 27th, worked with the

17   Sinaloa Cartel.  He was there to save his friend.  His friend

18   Octavio had not been released.  His friend Octavio on December

19   7th was still being held by his captors.  He said whatever it

20   was he had to say.  He said anything that kept this guy happy.

21   He -- you cannot rely, I suggest, on anything that he said.

22           And even there it's without a basis of knowledge.  If

23   in fact Vikram Datta knew that the money he had been receiving

24   in his business was drug money, why is he only 90 percent sure,

25   even if you take what he said on that day straightforward and

19qddat4                    Summation - Mr. Ross

1    accept it?  You either know something or you don't.  So it's

2    obviously, at worst, or most, a hunch.  I'm 90 percent sure.

3            The government has not proven that one cent of money

4    received at La Versailles is in fact drug money.  They just

5    haven't done that.  And they haven't proven that he conspired

6    with anyone else to receive drug money.

7            The objects of these conspiracies are promoting drug

8    trafficking.  There is no evidence of that.

9            Another is to conceal the ownership.  If you look at

10   all these records, he's concealing nothing.  Everything is

11   straightforward.

12           The ownership of the money?  It's his clients' money.

13   He believed his clients were selling perfume and getting pesos

14   and giving those pesos to a casa de cambio who was in turn

15   paying his bill.  That's what this man believed was happening.

16           There are a couple of exhibits -- I don't want you to

17   get confused by Exhibits 205 and 206.  The government talked

18   about these IRS letters.  They have nothing to do with the

19   issue that you're trying here.  That has to do with whether or

20   not the forms had a correct address or not.

21           The records of La Versailles tell you how much cash,

22   what denominations.  If you look at the cash books, those are

23   201 and 204.  Look at Exhibits 209 and 2010, which are these

24   receipt books.  The money is deposited.  You have this whole

25   chain of evidence of who did it, when they did it, how much

1    they did it, what were the denominations, who carried it, and

2    who it was for.  It all goes in the bank.  It's all reported.

3              Actions speak louder than words.  His actions speak

4    volumes.

5              He didn't believe he had anything to hide.

6              According to Frank DiGregorio, the government's

7    expert, apparently Jose Correa, the now retired officer, just

8    selling for cash is enough because, to hear them say it, all

9    cash is drug money.  Every dollar they ever saw is drug money.

10   But that's just not true.  You heard from Mr. Adams, $200

11   billion a year -- I'm sorry, $20 billion a year goes in, in

12   U.S. dollars, goes into Mexico every single year -- from

13   legitimate sources.

14             Another exhibit, the summary exhibit, 1004, which is

15   this chart that Agent Reinhardt had prepared, and it was

16   offered to you and the government suggests that you look at it

17   and rely upon it.  But what happened on cross-examination

18   regarding that chart?  What happened was that Agent Reinhardt

19   was shown that where he said $200,000 hadn't been reported, he

20   was shown the page.  It turned out to be Exhibit 201.  You can

21   look at it for yourself.  201, page 167.  And he goes, I must

22   have missed that.

23             He was asked about a $70,000 transaction on

24   January 12th, and he was shown where he reported it didn't

25   happen, and he said I must have missed that.

1   And then, finally, with regard to adding up all the

2   numbers, he missed the $23,000 check that Hilario had written

3   out of the Falcon account, and he said I must have missed that.

4   Is that the kind of evidence that you can rely upon to

5   the exclusion of every reasonable doubt?  I suggest that it is

6   not.

7   Are these the records of someone -- two things.  Are

8   these the records of someone who is trying to hide something?

9   Are these the records of someone who even believed that he had

10  something to hide?  I suggest not.  I suggest not.

11  These are thorough.  They are complete.  They are

12  straightforward.  Yes, there was a mistake done by his staff on

13  the 8300 on the second line, but that's cured by the signatures

14  on the receipt and it's cured by the CMIRs.  The same

15  information from both of those.

16  The actions speak louder than words.

17  Now, the circumstances of this fellow Lara over here

18  at the Newark Airport and the $30,000 and all of that, let's

19  all agree, that was suspicious.  You just don't get worse than

20  that.  I mean, that looked bad.  This guy is going around

21  depositing money in bank accounts.  And the government is

22  somehow suggesting that Mr. Datta was somehow involved in that.

23  These are the same customers who have his wire transfer

24  information.  That's your account number.  That's your routing

25  number.  That's a wire transfer.  They don't need Mr. Datta's

19qddat4                    Summation - Mr. Ross

1    permission.   A customer of his knows where his account is?

2    There is no evidence that he agreed with somebody and gave up

3    information on where to go and how to deposit -- at all.

4              And while I may appreciate the government's criticism

5    that he wasn't as quick as he might have been, those deposits

6    were in March and then he had a couple more, he said, in the

7    summer, later in the summer, but once those were brought to his

8    attention he wrote this, Defendant's Exhibit E, and it was

9    translated into T, and it was sent to every one of his

10   customers.   This is not like with him knowing he's being

11   investigated; this is when he discovers that this stuff has

12   happened.

13             So is he promoting?   Is he encouraging?   Is he

14   supporting this?   No.   He's taking action to communicate to

15   people, don't do that.

16             And what his letter says is if you do that, I'm not

17   going to give you credit in your account.   It is just that

18   simple.   Just don't do it.

19             Actions speak louder than words.

20             Agent Reinhardt said that records -- and this is how,

21   you know, in the beginning in an entrapment case you want to

22   know what was the government really thinking right at the

23   beginning, and Agent Reinhardt told us.   The thing that

24   attracted him to make Mr. Datta a target in their investigation

25   is two things.   One was ET Perfumes, they executed a search

1    warrant there June of '09 and they found records of his

2    purchases of wholesale perfumes from ET.  That was one of the

3    reasons, because it was in round numbers.

4         I suggest to you, ladies and gentlemen, when you're

5    paying your vendor, your supplier, and you don't have all of

6    it, you send them 10,000 at a time, can't you imagine the

7    conversation?  Vikram, can you get me 20 by Friday?  Could you

8    get me 10 by Friday?  It is of absolutely no suspicion at all

9    that Vikram Datta is paying on his account in round numbers.

10   He is paying down the balance of his account.

11        The other reason was there was one suspicious activity

12   report from a bank in January of 2009.  For what?  Receiving

13   wire transfers from Mexico.

14        Folks, that is what he does for a living.  This is

15   what he has been doing forever.  It doesn't suggest money

16   laundering or anything, but that's how the investigation began.

17        Now, the government says Mr. Datta should have been

18   suspicious and should have been suspicious because the banks

19   are asking him questions.  Well, he explained to you why the

20   first bank this lady testified about, when she asked him for

21   his invoices, that there was somebody at the bank who was very

22   friendly with his -- one of his biggest competitors, Sunny

23   Perfumes, and that he wasn't about to give up his proprietary

24   stuff, and that is the names of his customers and the prices

25   that he was selling for.  If everybody knows the prices that he

19qddat4                         Summation - Mr. Ross

1    is selling for, he is out of business because everyone can beat

2    his price.  It's just that simple.  So he elected not to.

3         The second bank, BBVA Compass, a year later, asks him

4    for information.  Now, there is nobody in BBVA Compass who is

5    working for Sunny's Perfume.  He cooperates fully.  He gives

6    them -- you heard this tape recording.  It is the discussion of

7    him bringing over all the 8300s, of him bringing over all the

8    invoices.  He says I brought over 1.7 -- it is on the tape and

9    he testified to it.  He brought over 1.7 million point-of-sale

10   receipts.  That is, 1.7 million receipts were produced for BBVA

11   Compass to show them.  And they were apparently satisfied at

12   least for a while, but it's a problem.

13        There is a level of exploitation in this case on

14   several levels.  Mr. Datta is exploited.  He is exploited by

15   Ankur and Ajay, who need a deal.  He is exploited by Fausto and

16   other people who don't tell him that they are obtaining their

17   money illegally.  He is exploited because they don't let him

18   know what's going on.  He is exploited because they continue to

19   make the dollars look like the other dollars.  Drug dealers

20   exploit everyone.  The black market peso exchange, they exploit

21   that.  The black market peso exchange, you heard from the

22   experts, it's been there forever.  Been there forever.  Long

23   before drug dealers.  Drug dealers came in, they exploited

24   that.  Mr. Datta has been exploited.

25        Look at Mr. Datta's conduct even after being offered

1    the millions of dollars that he was on August 9th.  He

2    continues to go on and say will you take cash and wire it to

3    Panama?  No.  How many points will you charge us?  I have no

4    knowledge of this.

5              He couldn't even answer -- he couldn't even tell them,

6    because he is not a money launderer.  He doesn't know about

7    these things.  He wouldn't have an answer.

8              Can you receive cash in New York?  If I could find

9    somebody.  I need to take more time is what Vikram Datta says

10   to them.

11             Something that's gone -- well, I mentioned this

12   already.

13             Mario, this is a little misleading but I just have to

14   make the observation.  They asked Mario, and Mario made it

15   sound like, oh, Mr. Datta was -- he was calling me, we used to

16   call each other.  That wasn't the evidence.  On

17   cross-examination, you quickly learned he had just called him.

18   They didn't show you that phone call.  But he had just called

19   him, and Vikram picks up the phone and says can I call you

20   right back.  OK.  Now, their phone call that they put into

21   evidence shows him calling, and so now suddenly the agent is

22   going to be up there and frankly mislead you by making it sound

23   like this guy is a willing participant, this guy is willing to

24   go?

25             In September 27th, when he hears Sinaloa, what are the

19qddat4                        Summation - Mr. Ross

1    things he says at that meeting?  There is no way I could do

2    wire transfers.  I can't do a phoney invoice.  I cannot do

3    nothing.  I cannot do it.  I cannot deposit no more dollars in

4    my account.  So he's telling them he can't even buy perfume.

5    Once he hears Sinaloa, he can't even buy perfume from him.

6            And if there is any doubt that that's what was

7    understood, Mario says, at page 10 of that transcript, I

8    thought we were going to be able to do business.  That's tough.

9    I wish I would have known that before.  We have a problem.

10   Vikram Datta says, I cannot do nothing.  Mario says, Any

11   suggestions?  And Vikram has none.  None.

12           There is reference to the chilango, and there was also

13   testimony about sales tax and people who come across from

14   Mexico don't have to pay sales tax.  And the chilango is spun

15   here to make it sound sinister.  There is nothing sinister

16   about it.  Either a person comes across from Nueva Laredo into

17   the Laredo store with a Mexican passport or they pay

18   8.25 percent sales tax; I mean, that's it.  He's talking to

19   customers, guys who want to be customers who want to buy from

20   him, and he says get me a chilango, get me a Mexican, so I have

21   his passport so I don't have to charge you the sales tax.

22   There is nothing sinister about it.  Even if there were, he had

23   conspired with no one.

24           Vikram Datta says, like anybody else, I like to make

25   money, but the thing is I don't want to destroy my business.

19qddat4                    Summation - Mr. Ross

1      They suggest to him, with regard to the $50,000, that it was in

2      his account before he returned it.  They tried every way

3      possible to get him to do something with this money.  And he

4      said no.  He said no.

5                  They said to him, take 5,000, 6,000, 10,000, whatever.

6      No.  I send it back to where it came from.  And that's to hold

7      and I'll call you.

8                  At the end of that conversation, you know there is no

9      agreement, you know there is no understanding, and there is

10     certainly no agreement with any third parties ever.  Think of

11     options.  You think about it.  I cannot do nothing like that.

12                 The government wants you to find from this

13     conversation no, no, no, and he's finally entrapped by the lure

14     of millions of dollars?  That he was predisposed to commit the

15     crime?  The government wants you to look at a situation where

16     his business has been receiving since 2001 the same dollars,

17     with no additional information, and say that that somehow

18     proves that he was predisposed to commit a crime.  And I

19     suggest to you that his actions speak louder than his words.

20                 The Court I believe is going to tell you, you got to

21     look inside these people's heads.  You really got to be mind

22     readers.  But you can't do that, so you got to look at their

23     actions.  You got to look at their actions.

24                 I suggest you do that.  Because Vikram Datta did

25     nothing.

1              Look at all the stuff he talked about -- Singapore,

2     Hong Kong, Belize, Panama, Chile, Europe, England.  I asked the

3     agent, is there any evidence in world that there was one step

4     taken towards any of that, and the answer is no.  Actions speak

5     louder than words.

6              Vikram keeps saying I'll do anything to get help for

7     his friend.  He keeps talking about his friend.  Mario says, to

8     him, and this was a bit misleading, Mario says to him -- and

9     this was sort of arbitrary, it seemed to come out of nowhere --

10    Mario says -- after finding out on November 18th, there were a

11    couple of conversations after Octavio had been kidnapped, Mario

12    says to him, I could get you like a rebate, I can get you part

13    of the ransom money that was paid and given back.  And he

14    indicates, right on the recording that you heard, that he's not

15    interested.  All he cares about is the safety of Octavio.  He

16    doesn't want anything about money.

17             Then what happens is when he shows up in New York to

18    say thank you and to tell him, on the recording -- it is right

19    there -- to say, on the recording, and my friend Octavio would

20    like to meet you and thank you personally, because he bought

21    hook, line and sinker that this guy saved him.  He bought hook,

22    line and sinker that this guy participated, that Mario saved

23    Octavio.  And then what happens?  They ask him in the

24    post-arrest statement, well, did you come up here to receive

25    money from him?  He said no.  That happens to be true, but they

1   tell you it's a lie.  He never showed an interest in getting

2   this money.  It's not important to whether he is a money

3   launderer or not.  What's important is whether he is a liar or

4   not because he didn't lie to him.  He told you the truth, I

5   suggest.

6        Even after December 7th -- remember, it is eight days

7   later that Octavio is released, October 15th, that's been

8   established -- does Vikram call the agent?  No.  The agent

9   cause Vikram.  He wants him to come to New York.  He wants to

10  talk to him.  Vikram has other business; he comes here.

11        January 15th, look at that conversation.  This is a

12  guy who had been entrapped by the government hanging on,

13  hanging on, hanging on.  Already said a bunch of stupid things,

14  none of which ever happened, none were ever going to happen.

15  Actions speak louder than words.  And proposals are being made.

16  He is there saying thank you, and proposals are being made.

17  His answer:  You don't need me.  You don't need me.

18        And then finally he had said -- Mario turns to him and

19  says, We're gonna be partners.

20        And his answer, You don't need me.

21        You see the pictures of Vikram's customers.  While

22  this undercover operation is going on, you heard the testimony

23  of Fred Chalmers.  He was an interesting guy.  Remember, he was

24  with L'Oreal.  He was with Puge.  That's funny; we have a

25  witness P-u-i-g, that's Puig, and we have a company named

1   P-u-i-g that is called Puig.  He was interested because he has

2   this wonderful background.  Obviously, the guy knows the

3   perfume business; he has been involved for years.  Exactly

4   during the period of time while the undercover people are

5   working over Vikram trying to get him to commit a crime, he is

6   out hiring a guy to cross the T's and dot the I's.  He is out

7   hiring a guy to make sure that everything is accounted for.  He

8   is out making sure that Yolanda is filing the 8300 forms.  He

9   is out making sure that his records are all perfect.  He is

10  doing just the opposite, just the opposite of what the

11  undercover people are having him do.  But actions speak louder

12  than words.  Actions speak louder than words.

13          With regard to Count Three, in addition to the same

14  kind of proof where you have to look inside someone's head and

15  find another person that was of like mind that had the same

16  information and that you agreed not only to do something but to

17  do it for a specific purpose, both parties have to agree both

18  on the conspiracy, agree to become conspirators, for the same

19  object.  It is complicated.  It is complicated.  But that's

20  what the Court is going to instruct you on so that you

21  understand how to do that.

22          In Count Three, there is an additional proof that the

23  government has to have.  The government has to prove that not

24  only was the money that was being transported drug money but

25  that the narcotics trafficking activity which generated that

19qddat4                          Summation - Mr. Ross

1    drug money is a business enterprise and an ongoing enterprise

2    that has been ongoing.  Where is any evidence about that?

3    Where is there any evidence in this courtroom about a business

4    enterprise and about ongoing drug trafficking?  There is none.

5          You would be happy to know I am at the end here

6    because we are going to talk about Mr. Datta's testimony.

7          A defendant doesn't have to testify.  If he had not

8    testified, you would have been instructed you couldn't hold it

9    against him.  But he testified, and I suggest to you he

10   testified truthfully.

11         He told you how his businesses came to be.  He told

12   you that his customers are the ones who choose the casa de

13   cambio, that he never gave a thought to where the casa de

14   cambios were getting their dollars.  He told you that he

15   presented to David Puig all these point-of-sale tickets, all

16   these documents; that he didn't want to give his sale

17   information to IBC Bank because it was giving up to his

18   competition all of this proprietary information -- that being

19   my words, proprietary information -- his sales figures and who

20   they were and how much.  That he exaggerated the $1.3 million.

21   That he hadn't been filing the 8300s, but he was prompted

22   because this guy that he had heard about did so.  That he

23   didn't know anything about this being drug money and didn't

24   really ever give it a thought until September 27th, and that

25   was a month after the transaction took place.  That he had

1    discussed his future business with Mario, but he had never

2    intended to do it.  Actions speak louder than words.  He never

3    did any of that ever, anything, ever.  None of those things,

4    none of those myriad of things, ever.  And he looked you in the

5    eye and he told you "I have never laundered money."

6         The post-arrest statement that they admitted into

7    evidence is very telling because I think this is true.  He

8    said, "I did not do anything wrong and I would not be in

9    trouble if I didn't speak to Mario."  I suggest to you that's

10   true.  I suggest that's absolutely true.

11        The last issue the Court is going to on the

12   instructions that you might want to pay attention to is venue.

13   As you were listening to this trial, you might have sat there

14   and thought to yourself, wow, this case is in New York City in

15   the Southern District of New York.  Why isn't it in Laredo,

16   Texas?  Why isn't it in San Diego, California?

17        The Court is going to instruct you on venue.  And all

18   you need to know is when you look at that issue and hear the

19   Court's instruction, you will evaluate it, and if you find that

20   this case should not have been brought here, it didn't have

21   proper venue, you could find the defendant not guilty for those

22   reasons.

23        At the beginning of this argument, I said to you that

24   the Court will instruct you that proof beyond a reasonable

25   doubt is proof of such a convincing character that you wouldn't

1    hesitate to act and rely upon it in the most important of your

2    own affairs.   That's what the Court is going to say.

3            What does that really mean?   What does that mean?

4    What's the most important of your own affairs?   I don't know.

5    Buying a car, that's a big ticket item, but is that really the

6    most important of your own affairs?   Probably not.   How about

7    buying a house?   Buying a house.   Well, what if you bought a

8    house and the state of the title was as iffy as the issues in

9    this case?   It was opinions.   Would you have a title search

10   done?   I suggest you probably would.

11           Imagine, if you would, that I received a phone call

12   from the hospital.   One of my family members was seriously

13   injured, I should come.   And I run down to the hospital.   And

14   when I get there I meet -- I meet Dr. Ankur, I meet Dr. Mario,

15   I meet Dr. Jose, I meet all of these same people.   And they

16   tell me, with the same level of uncertainty as they have in

17   this case, they tell me that my loved one, who is now on life

18   support, should be terminated because he or she would never

19   recover.   Should I ask for a second opinion?   Would you

20   hesitate to react, to rely upon this proof in this case?

21   Because that's what proof beyond a reasonable doubt is.   It is

22   not "possible."   It is not "very possible."   It's not

23   "probable."   It's not "very probable."   It's not "more likely

24   than not."   It's not "very likely."

25           It's so beyond:   "Proof beyond a reasonable doubt" is

1    proof of such a convincing character you wouldn't hesitate to

2    react -- to act and rely upon it in the most important of your

3    own affairs.

4            I respectfully suggest to you, for the reasons I've

5    stated -- there is no co-conspirator who had a like mind, who

6    was told the information, this is drug money -- Mr. Datta, the

7    government hasn't proven that in fact it is drug money and,

8    never mind, hasn't proven that he knew that it was, they are

9    not entitled to this conscious avoidance instruction and

10   application --

11           MR. BRAGG:  Objection.

12           THE COURT:  Sustained.

13           I will give a conscious avoidance instruction because

14   the government is entitled to it as a matter of law.

15           MR. ROSS:  I misspoke, your Honor.  I apologize.

16           THE COURT:  You did, yes.

17           MR. ROSS:  The conscious avoidance instruction I

18   suggest is inapplicable when you hear it because he did not

19   believe that he was dealing with drug money and turned a blind

20   eye to it.  He didn't believe it.  Had he had that belief and

21   turned a blind eye, that would be different.

22           Ladies and gentlemen, there is only two options on the

23   verdict form.  One is one word; one is two.  There are three

24   counts.  I urge you, look back.  Filter through the presumption

25   of innocence.  At the end of this case, if it's reasonably

19qddat4                          Summation - Mr. Ross

1    debatable between you, members of your jury, reasonable people,

2    then there is a reasonable doubt; then you should vote not

3    guilty.

4              Thank you.

5              THE COURT:  Thank you, counsel.

6              OK.  Members of the jury, we are going to break until

7    2 o'clock.  I want the lawyers back at ten to 2, and we'll see

8    you then.

9              THE CLERK:  All rise.

10             (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19qddat4

                    A F T E R N O O N   S E S S I O N

                              1:50 p.m.

          (Jury not present)

          THE COURT:  OK.  Mr. Skinner.

          MR. SKINNER:  Your Honor, I've spoken to defense

counsel and I believe the issue is resolved because defense

counsel is going to withdraw his request to have this put to

the jury.

          MR. WHITE:  It's true, your Honor.

          THE COURT:  OK.  Done.  That's easy.

          So we could sing Melancholy Baby until jury is ready,

or let's see if we can get them out here early.

          (Pause)

          (Continued on next page)

19qddat4                              Rebuttal - Mr. Bragg

1                  (Time noted at 1:59 p.m., jury present)

2                  THE CLERK:  Jury entering.

3                  Please be seated, everyone.

4                  THE COURT:  OK.  Good afternoon.  The jurors and the

5      defendant all are present.

6                  We'll now hear rebuttal by the government.

7                  MR. BRAGG:  Thank you, your Honor.

8                  Let's start with Count One, which is the undercover

9      investigation that counsel spent some time on.

10                 There were a number of arguments set forth:

11     Entrapment, that the defendant did not know that this was drug

12     money in August of 2010.  It also was argued that at a certain

13     point after Octavio was kidnapped there was no real intent to

14     engage with the undercover agents, just sort of stringing them

15     along, and then, in addition, counsel argued that there was no

16     conspiracy, there were no coconspirators.  So I want to take

17     those in turn.

18                 Let's walk through the chronology on entrapment.

19     Defense counsel did this, and there were a few things that I

20     want to point your attention to.

21                 The first meeting at the Guptas' office, Mr. Datta

22     dropped in on them.  The government -- the agents didn't send

23     the Guptas out.  He dropped by.  He was the one that dropped

24     by, essentially unannounced, came in for a meeting that ended

25     up being two hours.  Bragging.  Talking about his work, and the

19qddat4                          Rebuttal - Mr. Bragg

1    Guptas had gotten information.  But the important thing to

2    remember about that is that Mr. Datta went to the Guptas.

3           Then go forward to the November 24th call.  Defense

4    counsel said "no" a number of times.  We look at that call, and

5    it is in evidence at Government Exhibit 439.  They talk for a

6    bit.  And then Mr. Datta says, Yeah, because if they declare

7    the money under Customs, they give it to me.  I will put under

8    your name and I -- because then I can, you know, then I can do

9    anything, whatever you want.

10          That's what Mr. Datta said to Mr. Gupta on the phone.

11          Mr. Gupta said:  All right.  So let me tell the

12   customer if he's ready to do that.

13          Then Mr. Datta:  Yeah, yeah.

14          So to the contrary of the "no" you heard, you hear

15   "yeah, yeah.  I can do anything."

16          It's in evidence, Exhibit 439.

17          And we go forward to January 19th.  There is another

18   call between Mr. Datta and Mr. Gupta.  And it was pointed out

19   during defense summation, talking about customers in Baja,

20   California.  And Mr. Gupta -- Ankur Gupta, that is -- says,

21   Well, you know, the Baja, California is a good market because,

22   you know, even we have customers that approach us from there.

23          A little more conversation.  And then Mr. Datta, he's

24   the one.  He says:  "So you can send all the customers to me."

25          Mr. Datta's proposal.  That was January 19th.

1049

1          And then let's go to March, the meeting at the perfume

2     exposition.  I believe it was accurately described.  It was an

3     introduction.  That's what happened, there was an introduction.

4     Rather than talk about that meeting, the focus was put on this

5     so-called pep talk beforehand.

6          I mean, this is clear, but, you know, Ankur Gupta is

7     not on trial here.  Ajay Gupta is not on trial here.  Agent

8     Jose Correa is not on trial here.  You should focus on the

9     interactions that actually involve the defendant.

10          But with that said, what goes on in that conversation?

11    Jose Correa, as he testified, he's encouraging the Guptas.  And

12    then what happens after that?  Does something sinister happen?

13    Do the Guptas go and do something to Mr. Datta?  No.  What

14    happens?  An introduction, just as counsel said.

15          Now we're in August.  The first introduction, and then

16    we move to August.  Defense counsel says, well, what happened

17    in all that time?  What was going on?  Well, let's answer the

18    question.  There were recorded calls, wire intercepts, and a

19    number of them are in evidence.  I will just call your

20    attention to a couple.  April 14, 2010, it is the call with

21    Liz.

22          What does the defendant say?  "Sinaloa is big drug

23    cartel."

24          So that's what's going on.  The defendant is talking,

25    is being intercepted, and the agents are listening.  And in

19qddat4                    Rebuttal - Mr. Bragg

this instance he is talking about Sinaloa, describing it as a

big drug cartel.

        March 22nd, it is a call, it is in evidence, it is

Exhibit 403.  Yolanda, the bookkeeper.  You heard about her.

She's talking to a fellow named Marcos.  They are talking about

money coming in, and she is asking about not reporting it to

the IRS.

        So that's what's going on between March and August.

It's not there is no investigation.  There are these wiretap

calls, and they are in evidence, you can look at them.  And

they are probative.  They point to criminal conduct by the

defendant.  So that's what's happening.  That answers that

question.

        So now we get to August and we're at the perfume

exposition.  And, parenthetically, there are a number of

recordings in this case.  You've listened to them all.  Defense

counsel asks about this so-called missing recording, another

recording.  It is not in evidence and I respectfully submit to

focus on what is in evidence.

        We have the first meeting, and that is when the

defendant testified there was some discussion about what "down

south" meant.  He said, what are the parameters of his

knowledge?  Did he know these were drug dealers?  He testified

he thought down south meant Mississippi, perhaps Texas -- I

think he named some other states -- about 10, 15, 20 steps from

1    the border between Texas and Mexico.  Mario at that point had

2    introduced himself as someone who is from Guatemala.  And in

3    that very first meeting, Mr. Datta says, "Because when I sell

4    to Guatemala."  So there is no -- the testimony may be unclear,

5    but look at what's in evidence.  Don't just rely on Mr. Datta's

6    words.  They have been described by himself and by his counsel

7    as exaggerations.  I think in the context of the 8300 as

8    imperfect, let's call them what they are.  Lies.  They are

9    lies.

10            He says so right there, "Because when I sell to

11   Guatemala."  So he knows from the first interaction he is

12   dealing with selling to Latin America.

13            Then when Mr. Skinner was before you earlier -- I

14   repeat all of it, but he talked about how at the dinner that

15   night there was discussion, raised again by Mr. Datta, about

16   you want Guatemala, you want Colombia, and then they spin out a

17   transaction between U.S. to Mexico and Mexico to Colombia.

18   These are Mr. Datta's suggestions.

19            I skipped a step.  Between the first meeting on

20   August 9th and then that dinner defense counsel talked about,

21   Mr. Ross, the defendant went to Mr. Gupta and said, well,

22   they're talking big numbers here.  What kind of businessman,

23   legitimate businessman, has a concern about too much business?

24   Let's just -- another additional evidence that from the

25   beginning of this meeting in August, the defendant knew, he

1052

1    knew it was dirty, he knew it was criminal, he admitted it, but

2    he also knew that it was drugs, and it was Guatemalan and it

3    was South American and he suggested going -- getting goods to

4    Colombia.   You heard the expert testimony about the role of

5    Colombia in the drug trade.

6            Just one, just to drop a footnote here on the August

7    dinner.   The defendant testified it was intoxication and greed.

8    You heard a little bit about that in defense summation.   It was

9    greed, plain and simple.   You know that because he didn't stay

10   intoxicated for the entire month of August and September.   And

11   after that August 9th meeting, what did he do?   He talked to

12   Mario, and they set up a transaction.   They set up that $38,000

13   purchase.   He wasn't drunk then.   So it wasn't intoxication and

14   greed; that is just a fancy dressing.   It was greed.

15           And you heard over and over again this morning,

16   "Actions speak louder than words."   Well, what is the one

17   action defense counsel didn't draw your attention to?   They

18   went out and they bought perfume.   They bought perfume from

19   Mr. Datta, that $38,000 transaction out in San Ysidro; that is

20   a transaction, it is a pretty big one, the purchase of perfume

21   to launder money that he believed to be drugs.

22           You hear about the concept of predisposition, that he

23   wasn't predisposed, that Mr. Datta was a sort of innocent,

24   unwary man when the law enforcement agents approached him.

25   Let's talk about what was going on on parallel tracks.   I

1    mentioned the wire conversations.  Those weren't with the

2    agents, those were with others in that period between March and

3    August.

4          Also, he is a cooperating witness when he testified

5    here, Faustino Garza, but at the time he wasn't.  He was

6    orchestrating the delivery of millions of dollars of drug money

7    to this man, Mr. Datta.  That's what's going on.  He wasn't

8    some wary, innocent person.  He was accepting millions of

9    dollars from Mr. Garza at the same time.  And he was filing

10   those sham 8300s.  Parallel to the point in time when the

11   undercover investigation was going on.

12         And we also heard the calls when he's dealing with the

13   other business people.  The call talking about using violence

14   to collect debts, that was in September 2010, right around the

15   time, and excuse my language, but the defendant says, "If one

16   motherfucker is taking money from all over, we have to kill the

17   motherfucker."  Is that an innocent person?  Unweary?  No.

18   This is how he was doing business separate and apart from the

19   undercover investigation.  Right around the time -- that was

20   September 17th.  And the other calls, too.  It is all in

21   evidence, and you look at the evidence and it will be before

22   you.

23         Now, so I talked about entrapment, predisposition, how

24   he knew it was drug money.  Let's talk about the Octavio

25   kidnapping.  Mr. Skinner addressed some of this this morning.

1    It sort of doesn't add up.  Right?  He comes all the way to New

2    York in January -- and, by the way, Manhattan, the Southern

3    District of New York.  You heard about venue.  He came here.

4    To say thank you?  To someone he thought was in the Sinaloa

5    Cartel.  Let's unpack it.  Let's walk that through.

6              September, that meeting in San Diego when Mario first

7    says he's working for the Sinaloa, what does Mr. Datta do?

8    Does he push back from table and politely excuse himself?  No.

9    Figuratively, he leans in.  And they talk -- they talk more

10   business, more ways to launder.  That's before Octavio is

11   kidnapped.  So what explains that?

12             You hear from defense counsel talk about this $50,000

13   wire and money was returned.  Again, actions may speak louder

14   than words but when the defendant is talking, you should

15   listen.  And at the December meetings, 107, in evidence, the

16   defendant was talking about the $50,000 wire, he explains why

17   he can't do it.  And it is not I don't want to do business with

18   drug dealers, he says it's my name.  And then a little later he

19   says, I do not take chances.  That's what's going on there.

20             So before the notion of this kidnapping occurred --

21   obviously, the kidnapping did occur, but before it occurred you

22   have the defendant engaging with the agents after he believes

23   they are a part of the Sinaloa Cartel.  And then after Octavio

24   is released, he comes here to the Southern District of New

25   York, breaks bread at Smith & Wollensky, and they talk about

19qddat4                          Rebuttal - Mr. Bragg

1    more ways to launder money.

2         And the notion -- I think it was suggested this

3    morning by defense counsel, the notion that that meeting was

4    just, you know, well, they were done.  They were just talking

5    about Octavio and talking about all this other stuff.  This is

6    what the defendant says, Exhibit 108:  We can control all the

7    freight because they are looking for somebody to move the

8    freight from Laredo into Mexico.  That's where I can talk with

9    my best friend, because he was doing that, and with that I can

10   put a condition, they have to buy all the perfumes from me.

11        So January he doesn't come to say thank you; he comes

12   because he is greedy.  You know he is greedy because he told

13   you.

14        It is a lie.  It is not an exaggeration.  It is not

15   imperfect.  He's lying when he says he came here to thank Mario

16   from the Sinaloa drug cartel.

17        I have one additional way you know that he is lying

18   about this whole Octavio story.  He is arrested January and the

19   agents ask him a lot of questions.  Understandably, maybe he is

20   nervous, but he doesn't tell them then, oh, look, my friend was

21   kidnapped, I was leading that guy Mario along, this is what

22   happened.  You know, I didn't really do it.

23        No.  He didn't say that then.  That was January 15th,

24   right there in the moment, he didn't say that.  He says that

25   now to you, the jury.

19qddat4                     Rebuttal - Mr. Bragg

1              So that's the Octavio issue.

2              One more issue on Count One, and that's this notion

3    that the defendant was, you know, a rogue actor, acting all

4    alone and doing it by himself.  It just doesn't add up.  I

5    mean, you heard a lot of testimony about Cynthia.  The first

6    time Jose meets Mr. Datta in March, who does he put on the

7    phone?  Cynthia.

8              Then when Jose goes out to San Ysidro to buy the

9    perfume and he talks to Ms. Beltran, she testifies she talks to

10   Cynthia to talk about the transaction.  And Cynthia says, oh,

11   just sell him other stuff that's in the store.  And when

12   Ms. Beltran can't navigate it, doesn't go forward with it, she

13   jumps in the middle of it and she starts dealing directly with

14   Jose.

15             Then you have the call that Mr. Skinner reviewed this

16   morning about the $50,000 wire, where she and the defendant --

17   Cynthia I am talking about and the defendant talk about, you

18   know, how they're going to structure it and having to have an

19   invoice.  She's right in the thick of it.  She's in the middle

20   of it.  So that's as to the involvement with the undercovers.

21             She is also in the middle of it, and you can sort of

22   infer that she knows what's going on with the undercovers from

23   what she does with the defendant's real business.  She talks to

24   Faustino Garza time and time again, and you have those

25   recordings in evidence.  And she's really the point person.

19qddat4                   Rebuttal - Mr. Bragg

1    She's the point person in the warehouse taking in all this

2    cash.

3              And it's not just Cynthia.  You also have Yolanda.

4    Roxana Beltran testified she told you her role.  She's the

5    bookkeeper.  What happened?  You know, it is a meticulously

6    organized business -- fills out all the papers, does all the

7    paperwork, does it right, dots the I's, crosses the T's.  What

8    happens with that $38,000 purchase from the undercovers?  You

9    heard from Ms. Beltran.  She is not in on this.  She did her

10   job.  She faxed the bank deposits to Yolanda.  You saw it in

11   her handwriting to Yolanda.  Goes there.  That's over $10,000.

12   That's should trigger an 8300, this business that crosses the

13   T's and dots the I's.  What happens?

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1            MR. BRAGG:  No 8300.  So, Yolanda's in the mix too.

2   And in addition, I just talked about when I talk about what

3   happened between March or August, her call with Marco about not

4   reporting certain things to the IRS.  It's not just the

5   undercover part.  As with Cynthia, she is involved with the

6   legitimate real, not the legitimate, the actual drug money,

7   it's very illegitimate.  In addition to those players, you also

8   have Mr. Datta raised a quote a bit about, putting in the

9   condition about buying all the perfumes from me, talks about a

10  friend he has who's going to help him out.  So pick a

11  co-conspirator.  There are a number of them.

12          Let's go on to the other counts, counts about the real

13  drug money.  The question is how does this man, Mr. Datta, know

14  it's drug money.  Actions speak louder than words, but the

15  words talk about there is a lot of cash coming to me, it's all

16  Sinaloa money.  It's very convenient to say actions speak

17  louder than words when the words are that damning, coming out

18  of the defendant's own mouth, it's all Sinaloa money.

19          He tries to walk it back a little, feeling Mario out,

20  he might be an FBI agent.  90 percent sure.  One of those lies,

21  imperfections, one of those exaggerations.  It came out of his

22  mouth, I just said I launder money for the Sinaloa cartel.  He

23  walked that back 90 percent sure.  I suggest it's all the same.

24  What are the defense arguments about the real actual drug

25  money.

1          First you heard about this notion it has to be a

2   business enterprise.  The Sinaloa drug cartel, a lot of

3   evidence about the scope, the size, it's a business enterprise

4   for drugs.  You can conclude that from the evidence I

5   respectfully suggest.  What are the arguments on his business

6   unrelated to the undercover investigation.  The defense says,

7   look, you heard from Dr. Adams, you heard from the accountant,

8   dotted his Is, crossed his Ts.  The government has it all

9   backwards.  The government is turning the world on its head,

10  because all of a sudden, if you do all the paperwork, we are

11  not going to come up with anything.

12          The government didn't make this concept up.  September

13  27, Government Exhibit 106, page 10, the defendant, I don't

14  have a legitimate business, when you mix up, nobody can figure

15  out.  That's his business plan.  His business plan is take in

16  my perfume money, take in my drug money, I will mix them

17  together, I will fill the forms, nobody will be any wiser.

18  It's not the government that turns the world on its head.  It's

19  this man who turned the world on its head by his business plan.

20  He said it to Mario a few other times; it can blend in.  It's

21  all in evidence.  You can listen to it.  That's the point.

22  It's not government who did that; it's this man, the defendant.

23          Let's talk about the professionals that the defendant

24  surrounded himself with.  The accountant testified.  He is one

25  of the guys who makes this operation 100 percent legitimate.  I

1    am not suggesting he was necessarily in on that.  Let's talk

2    about what he knows about the relevant facts here.  The

3    question he was asked, you were inquiring whether or not the

4    8300s had been filed?  Well, I didn't really go through the

5    detail part of it.  I just made sure she was doing it on a

6    regular basis, the she being Yolanda.

7         He was in the weeds on this, told them about the

8    8300s, sort of cut it lose.  The accountant also didn't testify

9    at all about that form, remember that form the defendant said

10   he was using before the 8300, the one that someone else, not

11   the accountant who testified, someone else told him about, he

12   couldn't tell you where it was filed, filed with some

13   government enterprise, that was what he was doing before the

14   8300s.

15        The accountant does not review in any detail the 8300s

16   that are filed.  What was filed before that apparently he is

17   completely unaware of.  That's part of the scheme.  If you

18   listen to the conversations between Mr. Datta and Mario, he

19   talks about having an accountant, how the accountant is

20   important to the business model, to paper it up, make it look

21   legitimate.

22        Part of the defense summation talks about this audit,

23   of I am not sure what, but the accountant testified about an

24   audit.  It's unclear.  Maybe it was an audit of defendant's

25   personal finances.  It seems to be apropos of nothing, and it

1    could be reasonably inferred from the record that audit

2    conducted by the IRS which was sort of on the receiving end of

3    a number of exaggerations, imperfections or lies from the

4    defendant.  So you don't know much about that audit.  Let me

5    leave it at that.  Draw your own conclusions.

6          You also heard during the defense summation about

7    Mr. Chalmers.  Mr. Chalmers was the person who worked in the

8    perfume business for a while, and he was brought in apparently

9    to legitimatize, help out with the business.  When he

10   testified, he testified about how involved he was, he said he

11   had no knowledge about cash deposits.  Again, someone was

12   brought out before you to show how legitimate this company is,

13   no knowledge about the cash deposits, talking about into the

14   millions.  That's his testimony.  You can have it read back to

15   you.

16         A few more points on this legitimacy of the business.

17   Let's talk about New Jersey.  You heard the expert use the term

18   smurfing, making deposits under $10,000 to fly below the bank's

19   radar.  On defense's summation it was put up to you a CTR was

20   filed in connection with that, they can't figure it out.  How

21   can you figure out 8300 if they can't figure it out.  They are

22   two difference forms; comparing apples and oranges.

23         That whole transaction was structured in such a way to

24   fly below bank scrutiny.  The person who flew up from Mexico,

25   was in an airplane hotel with account documents relating to La

1    Versailles, didn't walk up and introduce himself.  He did it

2    below $10,000 to hide his identity so when the bank files a

3    CTR, they don't have his name, it says La Versailles.

4           A completely different situation with this man and his

5    customers Fausto Garza and Hilario Martinez-Garcia walking into

6    his shop, in Martinez's case day by day.  His business knows

7    this man.  More to the point, to use the New Jersey transaction

8    as an example is interesting.  Think about that for a moment.

9    Someone flies up from Mexico, he is going around to different

10   bank accounts depositing money below the $10,000 threshold, and

11   the response is a letter, how did they get information.

12          This is perhaps preposterous criminal conduct.  It is

13   completely consistent with money laundering as Mr. DiGregorio

14   testified.  That's what you should focus on, not the CTR that

15   was generated because the bank didn't know the smurfer's name.

16   The fact that dirty money is coming into this man's account

17   miles, regions away from the border.

18          This whole notion about Dr. Adams telling you about

19   the border economy.  So what.  Who cares.  Waste of time.  He

20   he did legitimate business.  That's the business model.  No one

21   suggested the State of Texas is dirty.  Of course, there is

22   legitimate business between Texas and Mexico.  This man mixed

23   the legitimate business with dirty drug money, money

24   laundering.  The notion that on one hand Mr. Datta acted alone,

25   was a rogue actor in connection with the undercover

1   investigation, didn't know no one else was involved, that's

2   what defense counsel argued.

3        When it comes to time to talk about what happened, I

4   signed those.  Yolanda's problem.  There is some serious

5   tension there.  What is convenient.  What's the explanation

6   that's convenient.  We know from Mr. Chalmers that he was

7   involved.  He was involved.  He's talking to Yolanda and

8   Cynthia day in and day out.  We know from about some of the

9   calls in evidence with Cynthia and Yolanda, lots of them, this

10  was hands-on management.

11        Fausto Garza and Hilario Martinez-Garcia, a lot of

12  argument, you saw use of the elmo.  I don't have a fancy

13  depiction.  The dollars they were all the same from year to

14  year to year.  The currency was all the same.  We don't have

15  enough room to stack it up.  You know what's different,

16  Mr. Skinner went through this, the number of dollars, we are

17  not talking about one dollar bills.

18        2008, $7.8 million.  2009, almost 100 percent jump,

19  $14 million.  You want to stack something, let's not stack

20  dollar bills up.  Defendant throws those away, that's little

21  money to him.  Let's stack up the millions of dollars.  That's

22  something that should catch someone's eye.  7.8 million in

23  2008.  14 million in 2009.  18 million in 2010.  That should

24  have prompted a trip across the border.  He visits perfume

25  customers multiple times, but he didn't see Fausto's business.

1  That's what the dollars may look like.  If you go to Fausto's

2  business, other perfume businesses, they don't anything alike,

3  would have confirmed, as Mr. Skinner said, plain as the nose on

4  his face.

5          On dotting the Is, crossings the Ts, I don't have them

6  here, Mr. Ross had the receipt books, the other things, said it

7  was all documented.  The government got those through searches

8  as agent Reinhardt testified, those were not documents that

9  were filed and put on file with the government.  They were

10 through searches, went out and got that stuff.  What he wanted

11 us to know, what Mr. Skinner pointed out was what was on the

12 8300 forms, take a trail back to the perfume customers, not to

13 people in the receipt book.  That was the very secret.  That

14 was what was in the handwriting in his files.  That was for

15 Cynthia and Yolanda and Vikram Datta, not for the government,

16 not for IRS, not for the bank.

17          That brings up conscious avoidance.  I am almost done.

18 The suggestion that defendant didn't turn a blind eye is

19 staggering.  As early as October 2009, he was point blank

20 asked, is it drug money.  November 2009, International Bank of

21 Commerce, Mr. Garza testified.  Where is this cash coming from.

22 He didn't give them, these are invoices, Sunny Perfume versus

23 the bank.  Perhaps that's another exaggeration or imperfection

24 or lie.  The BBVA Bank, 2010, comes knocking at the door.  You

25 heard the call.  Mr. Skinner read part of it.  You are sort of

1    legit, the bank customer rep said.

2         He gave them forms, right, but did he give them the

3    truth.  Did he tell them the money was coming from Fausto Garza

4    and Hilario Martinez-Garcia.  No.  Mr. Ross's defense summation

5    suggested don't worry about Exhibit 205 and 206, those are

6    letters from the IRS, don't have anything to do with the case.

7    He said something about the name being wrong.  Look at 205 and

8    206.  Look at all the evidence.  They are letters from the IRS

9    telling this man, you didn't fill the 8300 forms out right.

10        There is another way he was on notice.  Ankur Gupta

11   asked him.  International Bank of Commerce asked him.  BBVA

12   asked him.  The IRS asked him.  We know the answer.  August 9,

13   tells Mario, I don't need to know where you get your money

14   from, it's not my business.  Part of his business plan.  How

15   the cash comes is not my business.  Who says that kind of thing

16   unless you know the money is dirty.

17        So, you are about to get the case soon.  You heard

18   from Mr. Ross.  Few things, reasonable doubt standard, I am

19   going to leave it to the judge to instruct you what that is.

20   The government respectfully submits that it met its burden to [

21   prove that this man, Vikram Datta, is guilty of all three

22   counts beyond any reasonable doubt.  While the suggestion is

23   that actions speak louder than words, focus on the actions, the

24   purchase of $38,000, the actions of Hilario Martinez-Garcia

25   walking across the bridge with thousands of dollars in his

1    socks, the action of sham 8300 forms being filed, the action of

2    giving those to BBVA, the action of not giving it to IBC, focus

3    on that.

4         Look at the words too.  Words are important.  This man

5    said the words.  I want to end where we started two weeks ago,

6    December, 7, Mario and Mr. Datta are out, and apparently

7    Mr. Datta disagrees with his counsel, because earlier today

8    Mr. Ross told you this is a legitimate business, they filed all

9    the paperwork, the government got it all wrong, this is not

10   some front.  Listen to his client.  Let's listen to the words:

11   Mario: the bottom line is we are moving merchandise, but the

12   merchandise is a front.  Mr. Datta: yeah.

13        What happens moments after that, moments after he

14   belied his counsel's argument, he goes on to say, this is what

15   I left you with the last time I had the privilege to speak to

16   you, it is just washing the whole money, it is just the washing

17   the whole money.  That's what this case is about.  Thank you,

18   ladies and gentlemen.

19        THE COURT:  Mr. Bragg.

20        THE DEPUTY CLERK:  The court is about to charge the

21   jury.  All spectators must either remain seated throughout the

22   duration of the charge or leave at this time.

23        Marshal, please lock the door.

24        THE COURT:  Members of the jury, we have now come to

25   the point at which you are going to perform your final

1   function.  My instructions to you are in four parts.  First of

2   all, I am going to describe the law that you must apply to the

3   facts as you find the facts to have been established by the

4   proof.  Second, I will instruct you a little bit about the

5   trial process.  Third, I will speak to you about your

6   evaluation of the evidence.  And finally, I will talk to you

7   about the conduct of your deliberations.

8           Now, this is going to take a little while.  I am very

9   aware of that.  We will at some point in the course of this

10  take a break because everybody has got to get up and stretch

11  here and there, not the least of them being me, and I will try

12  to do this in a way that will be entirely understandable and

13  not burdensome to you as best as I can.

14          The indictment in this case charges the defendant

15  Vikram Datta in three separate counts that you are asked to

16  consider.  The indictment, as I told you when we began this

17  process, is not evidence and it is not proof.  It does not

18  create any presumption, nor does it permit any inference that

19  the defendant is guilty.

20          Counts 1 and 2 charge the defendant with having

21  participated in two different conspiracies to commit money

22  laundering.  Count 3 charges the defendant with participating

23  in a third conspiracy to travel in interstate commerce with the

24  intent to distribute the proceeds of drug trafficking and to

25  promote, manage, establish, carry on and facilitate the

1    carrying on of drug trafficking and money laundering.

2              Each of these three counts charges the defendant with

3    a different crime.  You must consider each count separately and

4    return a separate verdict of guilty or not guilty on each of

5    the three counts.  Whether you find the defendant or not guilty

6    as to one count should not affect your verdict as to the

7    others.

8              One other preliminary comment.  I have used the term

9    money laundering.  Money laundering is a broad term, both in

10   the legal system and in everyday life.  It's used to refer to a

11   number of different criminal behaviors.  It's kind of like an

12   umbrella term.  From time to time in these instructions, I will

13   use the term money laundering in this very general way to refer

14   to this broad area of endeavor.  But please note that the term

15   money laundering that's relevant here has very specific

16   definitions, somewhat different in different counts.  They

17   differ in various ways that I will explain.

18             So in deciding this case you must be careful to follow

19   my specific instructions and not some general concept or idea

20   of what you may think constitutes money laundering or for that

21   matter what someone might have included under that umbrella

22   term in speaking rather loosely and colloquially about it.

23             The defendant has pleaded not guilty to the charges in

24   this indictment.  The burden is on the government prove guilt

25   beyond a reasonable doubt.  That burden never shifts to the

1   defendant.  The defendant is presumed innocent of the charges

2   against him.  I therefore instruct you that he is presumed

3   innocent throughout your deliberations until such time, if

4   ever, you as the jury are satisfied that the government has

5   proven him guilty beyond a reasonable doubt.  If the government

6   fails to sustain that burden, you must find the defendant not

7   guilty.

8           With any criminal charge there are certain basic facts

9   that the government must prove beyond a reasonable doubt before

10  the defendant may be found guilty.  Those basic necessary facts

11  are called the essential elements of the charge.  I have said

12  that the government must prove the defendant guilty beyond a

13  reasonable doubt, so let me say a word about that.

14          A reasonable doubt is a doubt based upon reason and

15  common sense.  It is a doubt that a reasonable person would

16  have after carefully weighing all of the evidence.  It's a

17  doubt that would cause a reasonable person to hesitate to act

18  in a matter of importance in his or her personal life.  Proof

19  beyond a reasonable doubt, therefore, is a proof of such

20  convincing character that a reasonable person would not

21  hesitate to rely and act upon it in the most important of his

22  or her own affairs.

23          If after fair and impartial consideration of all the

24  evidence you have a reasonable doubt about the defendant's

25  guilt with respect to a charge in the indictment, it is your

1    duty to acquit the defendant on that charge.  On the other

2    hand, if after a fair and impartial consideration of all the

3    evidence, you are satisfied of the defendant's guilt on a

4    particular charge beyond a reasonable doubt, you should vote to

5    convict on that charge.

6         Let me turn to Count 1.  Count 1 of the indictment, a

7    copy of which you will have in the jury room, charges the

8    defendant with participating in a conspiracy to commit money

9    laundering and charges as I will now read to you exactly what

10   that means in this context.  The relevant part of Count 1 reads

11   as follows:

12        "From at least in or about August 2010 up to and

13   including on or about January 15, 2011 in the Southern District

14   of New York and elsewhere, Vikram Datta, the defendant, and

15   others known and unknown, willfully and knowingly did combine,

16   conspire, confederate and agree together and with each other to

17   violate 18 U.S.C. Sections 1956(a)(3)(A), and (a)(3)(B).

18        It was a part and an object of the conspiracy that

19   Vikram Datta, the defendant, and others known and unknown, in

20   an offense involving and affecting interstate commerce

21   willfully and knowingly would and did conduct and attempt to

22   conduct a financial transaction involving property represented

23   by a person at the direction of and with the approval of a

24   federal official authorized to investigate and prosecute

25   violations of 18 U.S.C. Section 1956 to be the proceeds of

1    specified unlawful activity, to wit, narcotics trafficking,

2    with the intent to promote the carrying on of said specific

3    unlawful activity, in violation of 18 U.S.C. Section

4    1956(a)(3)(A)."

5              Continuing with the quotation:

6              "It was further a part and an object of the conspiracy

7    that Vikram Datta, the defendant, and others known and unknown,

8    in an offense involving and affecting interstate and foreign

9    commerce, willfully and knowingly would and did conduct and

10   attempt to conduct a financial transaction involving property

11   represented by a person at the direction of and with the

12   approval of a federal official authorized to investigate and

13   prosecute violations of 18 U.S.C. Section 1956, to be the

14   proceeds of specified unlawful activity, to wit, narcotics

15   trafficking, with the intent to conceal and disguise the

16   nature, location, source, ownership and control of property

17   believed to be the proceeds of said specified unlawful

18   activity, in violation of 18 U.S.C. Section 1956(a)(3)(B).

19             Count 1 then lists, as you will see, and I have now

20   stopped quoting from the indictment, overt acts that are

21   alleged to have been committed in furtherance of the conspiracy

22   about which I will say something else in a little bit.

23             I do note that some of are you talking notes.  I

24   should alert you right up front you are free to do that or not.

25   You will get this all in writing in the jury room.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          The statute that's involved here provides that, and I

2     quote, "any person who conspires to commit any offense defined

3     in the money laundering statutes shall be subject to the same

4     penalties as those prescribed for the offense the commission of

5     which was the object of the conspiracy."

6          Let me start out with concept of conspiracy which I

7     know we have talked about a little bit already.

8          A conspiracy is a kind of criminal partnership.  It's

9     an agreement of two or more persons to join together to

10    accomplish some unlawful purpose.  It is an entirely separate

11    and different offense from the substantive crime or crimes

12    which may be the object of the conspiracy.  The essence of the

13    crime of conspiracy is an agreement or understanding to violate

14    another law.  Thus, if a conspiracy exists, it is a crime

15    regardless whether the conspirators accomplished their unlawful

16    purpose.  Consequently, in a conspiracy charge there is no need

17    to prove that the crime or crimes that were the objective or

18    objectives of the conspiracy actually ever were committed.

19         I think on the first day when you were selected I used

20    the example of an agreement between two people to commit

21    murder.  Such an agreement is a crime in and of itself

22    regardless whether anybody ever gets murdered.  That's the

23    point of what I just said to you.

24         The defendant here is charged in Count 1 only with

25    conspiracy to launder money and not with the substantive crime

1    of money laundering.  Because a  conspiracy and a substantive

2    crime are separate and distinct offenses, you may find the

3    defendant guilty of the crime of conspiracy to commit money

4    laundering even if you find that he never the committed

5    substantive offense of money laundering that was the object of

6    the alleged conspiracy.

7              Now in order to prove the defendant guilty of the

8    particular conspiracy charged in Count 1, the government must

9    prove beyond a reasonable doubt each of two elements.

10             The first element is the existence of the conspiracy

11   alleged in Count 1.  In other words, it must prove that two or

12   more persons entered into an unlawful agreement to commit at

13   least one of the two money laundering offenses that are alleged

14   in Count 1 to have been objects of the conspiracy.

15             The second is that the defendant knowingly and

16   willfully became a member of that conspiracy, in other words,

17   that he knowingly and willfully joined and participated in that

18   conspiracy in order to promote at least one of its unlawful

19   goals.

20             Now, in order to carry its burden on the first

21   element, in other words to prove the existence of the alleged

22   conspiracy, the government must prove beyond a reasonable doubt

23   that there was a combination, an agreement, an understanding of

24   two or more persons to accomplish by concerted or collective

25   action the criminal or unlawful purpose or purposes alleged in

1    the indictment.

2            Because no conspiracy exists unless at least two

3    culpable individuals agree to commit an unlawful act, a

4    defendant's agreement to commit an unlawful act must be with

5    someone other than a law enforcement officer or a person acting

6    at the direction of a law enforcement officer.  An agreement

7    solely between a defendant and a government agent or an

8    informant or some other person acting at the direction of law

9    enforcement officers is not enough.  There have to be at least

10   two non-law enforcement participants.

11           With respect to Count 1, the unlawful purposes alleged

12   to have been the object of the conspiracy were to commit money

13   laundering by engaging in financial transactions that involved

14   property that was represented by undercover law enforcement

15   officers and believed by the conspirators to be the proceeds of

16   drug trafficking and to do so with either one of two

17   intentions: first, to promote the carrying on of drug

18   trafficking as alleged in Count 1; secondly, to conceal or

19   disguise the nature, location, source, ownership or control of

20   property believed to be drug proceeds as alleged in the second

21   object of the conspiracy charged in Count 1.

22           I will speak about it more in a little bit.  The

23   government does not have to prove both.  They have to prove one

24   of those intentions.  They may prove both, they may prove none,

25   but they must prove at least one to convict.  Let me talk a

1    little more about proof of a  conspiracy.

2            As I told you, the essence of the crime of conspiracy

3    is an unlawful agreement to violate the law.  To establish that

4    a conspiracy existed, the government is not required to show

5    that two or more people sat down at a table and entered into a

6    pact orally or in writing stating "we have formed a conspiracy

7    to violate the law" and spelling out all the details.

8            You need not find that the alleged conspirators said

9    in words or in writing what the scheme was, what its objects or

10   purposes were, or every detail of the scheme or the means by

11   which the object of the alleged conspiracy were to be

12   accomplished.  Conspirators do not usually reduce their

13   agreements to writing for publicly announce their plans.  By

14   its very nature, a conspiracy almost is all secret in its

15   origin and its execution.  Thus you may infer its existence

16   from the circumstances of the case and the conduct of the

17   parties involved.

18           It is sufficient in order to prove the existence of a

19   conspiracy if two or more persons other than government agents

20   or informants in some way or manner came to some understanding,

21   a common understanding to violate the law.  Express language or

22   specific words are not required to indicate an assent or an

23   agreement or an attachment to a conspiracy.  Nor is it required

24   that you find that any particular number of alleged

25   co-conspirators joined in the conspiracy in order to find that

1    a conspiracy existed.  You need find only that two or more

2    persons entered into the unlawful agreement alleged in the

3    indictment in order to find that a conspiracy existed.

4         Of course, proof concerning the accomplishment of the

5    alleged object or objects of the conspiracy may be evidence

6    that the conspiracy existed.  As I mentioned earlier, it is not

7    necessary a conspiracy actually succeed in order for you to

8    conclude that the conspiracy existed.

9         In determining whether the conspiracy charged in Count

10   1 actually existed, you may consider all the evidence of the

11   acts, conduct and declarations or statements of the alleged

12   conspirators and the reasonable inferences to be drawn from

13   such evidence.  The adage "actions speak louder than words" may

14   be applicable here.  For the sake of clarity, words are to be

15   considered also.  Your to attach the significance to the pieces

16   of evidence that you think is appropriate; actions and words

17   are relevant.

18        It is sufficient to establish existence of a

19   conspiracy if, after considering all the relevant evidence,

20   both direct and circumstantial, you find beyond a reasonable

21   doubt that the minds of at least two alleged conspirators, as I

22   have said these must be people other than government agents and

23   informants, met in an understanding way and that they agreed to

24   work together in furtherance of at least one of the alleged

25   objects of the conspiracy charged in Count 1.

19Q4DAT5                          Charge

1          Let me talk about the objects.

2          The objects of a conspiracy, as I think I just said,

3    are the illegal goals that the conspirators agree and hope to

4    achieve.  In order to prove the first element of conspiracy,

5    the government must prove not only the existence of the

6    conspiracy, in other words, an agreement, but also that any

7    such conspiracy's goals included at least one of the unlawful

8    objects alleged in the particular count of the indictment you

9    are considering.

10         Count 1 alleges two objects.  As you see the other

11   counts allege different numbers of objects and we will talk

12   about that.  Count 1 alleges two objects: to commit money

13   laundering by engaging in financial transactions that involve

14   property represented by law enforcement officers and believed

15   by the conspirators to be the proceeds of drug trafficking

16   transactions and to do so with either/or both of two

17   intentions, first, to promote the carrying on of drug

18   trafficking or second, to conceal or disguise the nature,

19   location, source, ownership or control of property believed to

20   be the proceeds of drug trafficking.

21         I am going to define the relevant terms for you in a

22   minute.  Right now I just want to emphasize that the government

23   needs to prove only one of these two alleged objects in order

24   to convict on Count 1.  The government may but it is not

25   obliged to prove both.  It need prove only an agreement with

1    respect to one of these objects so long as you all agree, all

2    12 jurors or if the number is different at some point, whatever

3    the number is, so long as all the jurors agree on that specific

4    object.

5              So in other words, let me illustrate that, you have

6    two objects, alleged objects of this conspiracy, assuming all

7    the other elements of the offense are proved.  If all 12 of you

8    agree that object number 1 was a part of the conspiracy, was an

9    objective of the conspiracy, you may convict even if you

10   condition agree on object number 2 or even if you think object

11   number 2 was not part of the deal, not part of the agreement.

12   If six of you agree on object number 1 and other six disagree

13   and six of you agree on object number 2 and six of you

14   disagree, there is no object as to which all 12 of you are in

15   agreement and you may not convict.  There must be unanimous

16   agreement on at least one object in order to find that the

17   conspiracy existed.  That's what I mean.

18             If the government fails to prove that at least one of

19   the two objects was a goal of any conspiracy you find to have

20   existed, then you must find the defendant not guilty on Count

21   1.

22             Let me explain the two objects that are alleged here

23   in Count 1.

24             The first alleged object of the conspiracy charged in

25   Count 1 was to commit money laundering by conducting or

1    attempting to conduct financial transactions involving property

2    represented by law enforcement officers and believed by the

3    conspirators to be the proceeds of drug trafficking

4    transactions with the intent to promote the carrying on of drug

5    trafficking.   That's the alleged first object of the

6    conspiracy.

7              Let me define the terms.

8              The term conducts includes the act of initiating,

9    concluding or participating in initiating or concluding a

10   transaction.   A transaction includes a purchase, sale, loan,

11   pledge, gift, transfer, delivery, or other disposition of

12   property.

13             The term financial transaction means either a

14   transaction involving a financial institution which is engaged

15   in or the activities of which affect interstate or foreign

16   commerce in any way or degree or a transaction which in any way

17   or degree affects interstate or foreign commerce and involves

18   the movement of funds by wire or other means or involves one or

19   more monetary instruments or involves the transfer of title to

20   any real property, vehicle, vessel or aircraft.

21             Interstate commerce includes any transmission,

22   transfer or transportation of goods or services whether

23   tangible or intangible, communications, and/or persons, between

24   persons, places or entities located in one state and persons,

25   places or entities located in another state, regardless whether

1    done for a business purpose or otherwise.

2              Foreign commerce means exactly the same things except

3    it's between a person, place or entity in the United States and

4    a person, place or entity in a foreign country.   In determining

5    whether somebody's activities affect interstate or foreign

6    commerce, the involvement in interstate or foreign commerce can

7    be minimal.   Any involvement at all satisfies this element.

8              Moreover, it's not necessary for the government to

9    show that the alleged conspirators actually intended or

10   anticipated an effect on interstate or foreign commerce by

11   their actions or that commerce actually was affected.   All

12   that's necessary is that the natural and probable consequences

13   of the acts of the conspirators, in other words, the acts

14   conspirators agreed to undertake, would affect interstate or

15   foreign commerce.

16             The term law enforcement officers includes federal law

17   enforcement officers and anybody acting under the direction or

18   with the approval of a federal official authorized to

19   investigate or prosecute money laundering.

20             I used the term representative earlier in the context

21   of speaking about property represented by a law enforcement

22   officer to be proceeds of narcotics trafficking.   A

23   representation is just a fancy way of saying a statement, in

24   this context, a statement made by a law enforcement officer or

25   another person at the law enforcement officer's direction or

1    with his approval.  The government is not required, however, to

2    prove that the law enforcement officer made an express

3    affirmative statement to a conspirator or conspirators that the

4    property in question was illegal proceeds or drug proceeds.

5            Rather, the requirement of such representation is met,

6    if the government has proved beyond a reasonable doubt that a

7    law enforcement officer or someone acting under his control

8    made the conspirator or conspirators aware of circumstances

9    from which a reasonable person would have inferred that the

10   property was the proceeds of unlawful or illegal activity.

11           I just used the word proceeds, so let me say a word

12   about that.  The term proceeds means any property or any

13   interest in property that someone acquires or retains as

14   profits resulting from the commission of the specified unlawful

15   activity.  Specified unlawful activity means any one of a

16   variety of criminal offenses defined by the statute.  In this

17   case, the government contends that the money involved in the

18   financial transaction involving Count 1 was represented by

19   undercover law enforcement officers to be derived from or

20   obtained as a result a drug trafficking.

21           I instruct you as a matter of law that drug

22   trafficking falls within the definition of specified unlawful

23   activity.  It is, however, for to you decide whether the funds

24   were represented by law enforcement officers and believed by

25   the conspirators to be the proceeds of drug trafficking as

1    charged in Count 1.

2           Finally, to act intentionally means to act willfully

3    and purposely, not by mistake or accident, with a particular

4    deliberate purpose.

5           You should apply these definitions in deciding whether

6    the government has proved beyond a reasonable doubt that an

7    object of the conspiracy charged in Count 1 was to commit money

8    laundering by conducting or attempting to conduct financial

9    transactions involving property represented by law enforcement

10   officers and believed by the conspirators to be the proceeds of

11   drug trafficking with the intent to promote the carrying on of

12   drug trafficking.

13          The second alleged object in Count 1 was to launder

14   money by conducting or attempting to conduct financial

15   transactions involving property represented by law enforcement

16   officers and believed by the conspirators to be the proceeds of

17   drug trafficking transactions with a different intent than the

18   first object.  The intent in the second object is the intent to

19   conceal or disguise the nature, location, source, ownership or

20   control of property believed to be the proceeds of drug

21   trafficking.

22          As I just suggested to you, the second alleged object

23   differs from the first alleged object only in one respect.

24   It's the intent with which persons agreed to act.  Everything

25   else I said about the first object applies to the second

1    object.  But in order to prove the second object, the

2    government has to prove beyond a reasonable doubt that two or

3    more persons agreed to engage in exactly the same kind of

4    financial transaction that I already just discussed but with a

5    different intent of concealing or disguising the nature,

6    location, source, ownership or control of property they

7    believed were drug proceeds, as distinct from promoting drug

8    trafficking which was the intent on the first object.

9            You will apply all the definitions I previously gave

10   you in determining whether the government has proved that this

11   was an object of the conspiracy charged in Count 1.

12            In sum, to carry its burden on the first element of

13   Count 1, the existence of the conspiracy, the government has to

14   prove beyond a reasonable doubt that a conspiracy was formed

15   between two or more persons other than government agents or

16   informants, and that an object or objects of that conspiracy

17   were to launder money by engaging in financial transactions

18   that involved property represented by law enforcement officers

19   and believed by the conspirators to be drug trafficking with

20   the intent either, first, to promote the carrying on of drug

21   trafficking as alleged in the first object or, second, to

22   conceal or disguise the nature, location, source, ownership or

23   control of property believed to be drug proceeds, drug

24   trafficking proceeds, as alleged in the second object.

25            If the government fails to prove beyond a reasonable

1   doubt that the charged conspiracy, having at least one of these

2   two objects as its goal, existed, then you must find the

3   defendant not guilty on Count 1.  However, if you find beyond a

4   reasonable doubt that two or more persons other than government

5   agents or informants formed an unlawful agreement to accomplish

6   either of the objects charged in Count 1, then the first

7   element, the existence of the charged conspiracy, will have

8   been satisfied.

9        We have come to the second element the government must

10  prove in order to convict on Count 1, namely, that the

11  defendant became a member of such conspiracy.

12       If you conclude that the government has beyond a

13  reasonable doubt that the conspiracy charged in Count 1

14  existed, then you must next determine whether the defendant

15  joined and participated in that conspiracy knowing of its

16  unlawful purpose and to further it unlawful objectives.

17       In order to prove this second element, the defendant's

18  membership in the conspiracy, the government must prove beyond

19  a reasonable doubt that the defendant knowingly and willfully

20  entered into the charged conspiracy with criminal intent, that

21  is, with a purpose to violate the law, and that he agreed to

22  take part in the conspiracy to further promote at least one of

23  its alleged unlawful objectives.

24       As to this element, knowingly means to act voluntarily

25  and deliberately, rather than by mistake or by accident.

1    Willfully means to act knowingly and purposefully with an

2    intent to do something that the law forbids, that is to say

3    with a bad purpose either to disobey or disregard the law.

4              Together these terms mean that you must be satisfied

5    that in joining the conspiracy, assuming that you find that the

6    defendant did join the conspiracy, the defendant knew what he

7    was doing, that is, that his actions must have been his

8    conscious objective rather than the product of mistake,

9    accident, negligence or some other innocent reason.

10             I have talked about knowledge.  Knowledge is something

11   to be inferred from the proven facts.  We don't yet have a way

12   of looking at someone's mind and knowing what the person is

13   thinking.  However, you have before you evidence of certain

14   acts, conversations and statements alleged to involve the

15   defendant and others.  The government contends that these acts,

16   conversations and statements show beyond a reasonable doubt the

17   defendant's knowledge of the unlawful purpose of the conspiracy

18   and that he participated in it.

19             The defendant denies that he took part in the alleged

20   conspiracy.  He contends that the acts that are alleged to have

21   been taken by him or were to have occurred in his presence do

22   not shows knowledge of conspiracy.  It's for you to determine

23   whether the government has established to your satisfaction and

24   beyond a reasonable doubt that the defendant had such knowledge

25   and such intent.

1          It is not necessary for the government to show that

2     the defendant was fully informed as to all the details of the

3     alleged conspiracy in order for you to infer knowledge on his

4     part.  To have guilty knowledge, a defendant need not have

5     known the full extent of the conspiracy.  He need not have

6     known all of its activities.  It is not even necessary that a

7     defendant know or be acquainted with all of the other people

8     that may be participants in the conspiracy.  In fact, it's

9     possible that a defendant might know only one other member of a

10    conspiracy and still be a co-conspirator.  Nor is it necessary

11    that a defendant have received any monetary benefit from

12    participating in a conspiracy or have any financial stake in

13    the outcome, so long as he participated unlawfully, willfully

14    and knowingly as I have described those terms.

15         The duration and extent of the defendant's

16    participation in a conspiracy has no bearing on the issue of a

17    defendant's guilt.  He need not have joined a conspiracy at the

18    very outset.  He may have joined it at any time in its

19    progress, that is, at the beginning, in the middle, or at the

20    end.

21         Every member of a conspiracy may perform separate and

22    distinct acts.  Some play major rolls; others play minor roles.

23    The law does not require an equal role.  In fact, even a single

24    act can be sufficient to draw a defendant within the ambit or

25    the borders of the conspiracy.

1          I do want to caution you, however, that a person's

2    mere association with a member of the conspiracy does not make

3    the person a member of the conspiracy, even if the person knows

4    that a conspiracy is under way.  In other words, knowledge of a

5    conspiracy without agreement is not enough.  What is necessary

6    is that the defendant have participated in the conspiracy with

7    knowledge of at least one of its unlawful purpose and with an

8    intent to aid in the accomplishment of its unlawful objective

9    or objectives.

10          In sum, the defendant, with an understanding of the

11   unlawful nature of the conspiracy, must intentionally have

12   engaged in lies or assisted in the conspiracy for the purpose

13   of furthering the illegal undertaking.  If that occurred, a

14   defendant thereby became a knowing and willing participant in

15   the unlawful agreement, that is to say, a conspirator.

16          Once a conspiracy is formed it's presumed to continue

17   until its objective is accomplished or until there is some

18   affirmative act of termination by its members.  So too, once a

19   person is found to be a member of a conspiracy, that person is

20   presumed to continue being a member in it until the conspiracy

21   is terminated, unless it is shown by some affirmative proof

22   that the person withdrew and disassociated himself from it.

23          As I mentioned a little earlier, Count 1 of the

24   indictment which you will have in the jury room contains a

25   bunch of paragraphs that appear under the heading overt acts.

1   These overt acts are examples of conduct that the government
2   alleges were undertaken by members of the conspiracy to further
3   or promote the illegal objectives of the conspiracy charged in
4   Count 1.
5           You need to understand that it is not necessary for
6   the government to prove that those overt acts or any others
7   alleged in Count 1 took place.  What the government has to
8   prove is simply that the conspiracy charged in Count 1 existed
9   and that the defendant knowingly and willfully joined it.  The
10  overt acts are just examples.  They need not be proved on Count
11  1.
12          A final thing, I believe, I hope it's final, I am sure
13  do you, a final thing I need to address about Count 1.  The
14  defendant argues that even if the alleged conspiracy existed
15  and even if he joined in it, he was entrapped into doing so by
16  the government and that he therefore may not be convicted on
17  Count 1.
18          Now, entrapment is a word that gets bandied about
19  quite a bit, but it has a very precise legal meaning which you
20  must apply to the evidence in this case.  While the law permits
21  government agents to trap an unwary criminally minded person,
22  the law does not permit them to entrap unwary innocent.
23          Thus, a defendant cannot be convicted of a crime if it
24  was the government who gave the defendant the idea to commit
25  the crime, if it was the government that persuaded him to

1    commit it, and if the defendant was not ready and willing to

2    commit the crime before the government officials or agents

3    first spoke to him.  That's what I mean by entrapment.  On the

4    other hand, if the defendant was ready and willing to violate

5    the law and the government merely presented him with the

6    opportunity to do so, that is not entrapment.

7            In assessing whether the defendant was entrapped into

8    committing the crime charged in Count 1, the first thing you

9    need to consider is whether a government agent took the first

10   step that led to the crime charged in Count 1, assuming for

11   purposes of discussion that the crime was committed.  If you

12   conclude that there was no evidence that the government took

13   the first step, then as a matter of law there could be no

14   entrapment and your consideration of alleged entrapment should

15   end.

16           If, however, you find some evidence that a government

17   agent initiated the criminal conduct charged in Count 1, then

18   you must consider the issue of predisposition; in other words,

19   you must decide if the government has proved beyond a

20   reasonable doubt that the defendant was predisposed to commit

21   the charged crime in the first place, that is, before the

22   government approached him if the government approached him.

23           A person is predisposed when he is ready and willing

24   to commit a crime without any persuasion and was merely

25   awaiting a favorable opportunity to do so.  The focus of the

1    predisposition inquiry is on the defendant's state of mind

2    before he first was approached by the government.  It is of

3    course impossible to look inside someone's head and see what he

4    was thinking at the relevant moment which in this particular

5    context is before the first approach by the government agent.

6          So the government may show that the defendant was

7    predisposed to commit a crime charged by proving any of the

8    following: first, that the defendant participated in an

9    existing course of criminal conduct that was similar to the

10   crime with which he is now charged; or second, that the

11   defendant had formed a design or plan to commit the crime for

12   which he is charged before the opportunity presented itself; or

13   third, that the defendant indicated his willingness to commit

14   the charged crime by his ready response to the government

15   agent's inducement.

16         Remember that the focus of the inquiry is on the

17   defendant's state of mind before his first contact with the

18   government agent.  You may consider all of the evidence or the

19   lack of evidence relating to the defendant's conduct before he

20   first was approached by a government agent as you consider

21   whether the government has proved beyond a reasonable doubt

22   that the defendant was prepared to commit the crime charged in

23   Count 1.

24         In particular, Count 2 of the indictment alleges that

25   the defendant had begun to engage in a different money

1    laundering conspiracy prior to the undercover investigation

2    that allegedly discovered the crime charged in Count 1.   In

3    determining the question of the defendant's predisposition with

4    respect to the entrapment defense for Count 1, you may consider

5    any evidence of prior conduct by the defendant relating to

6    Count 2.

7         So to sum up on Count 1, in order to convict on Count

8    1, the government must prove beyond a reasonable doubt that

9    both elements of the conspiracy charged in Count 1, that is,

10   first, that there was in fact an unlawful agreement or

11   understanding between two or more persons other than government

12   agents or informants or others acting on the government's

13   behalf, an object of which was to conduct a financial

14   transaction with property or proceeds represented by law

15   enforcement officers and believed by the conspirators to be the

16   proceeds of drug trafficking, either for the purpose of

17   promoting drug trafficking or for the purpose of concealing or

18   disguising the nature, location, source, ownership or control

19   of property believed to be drug trafficking proceeds; and

20   secondly, that the defendant knowingly and willfully joined

21   that conspiracy in order to promote its unlawful goal or goals.

22        If you find that the government has proved both of

23   these elements beyond a reasonable doubt, then you should

24   consider the subject of entrapment.   If you find that the

25   government has not met its burden with respect to either of

19Q4DAT5                       Charge

 1   these elements, the ones I have just talked about, in other

 2   words, if you are not the convinced beyond a reasonable doubt

 3   that the alleged conspiracy existed or assuming that it did

 4   exist, you are not convinced beyond a reasonable doubt that the

 5   defendant knowingly and willfully joined it, then you must find

 6   the defendant not guilty on Count 1 with regard to entrapment.

 7   If you reach the subject of entrapment, you will apply the

 8   instructions I have just given you and decide Count 1

 9   accordingly.

10        I am sure you will be happy to know that takes care of

11   Count 1.  You will not be as happy to learn that Count 2 has

12   more objects, but I think I can do this more than adequately in

13   considerably less time than I did Count 1.

14        So, I turn to Count 2.

15        Count 2, like Count 1, charges the defendant with

16   participating in a conspiracy to launder money but it's a

17   different conspiracy.  The relevant part of Count 2 reads as

18   follow, and I quote:

19        "From at least in or about June 2009, up to and

20   including in or about January 2011, in the Southern District of

21   New York and elsewhere, Vikram Datta, the defendant, and others

22   known and unknown, willfully and knowingly did combine,

23   conspire, confederate and agree together and with each other to

24   violate 18 U.S.C. Section 1956(a)(1)(A)(i)."

25        And unless counsel have an overwhelming desire for me

1   to do otherwise, I will simply say and a whole bunch of other

2   statutory references that I will not repeat, because they will

3   not mean anything to you, unless you have the code book with

4   you.   Does anybody want me to enumerate?

5            MR. ROSS:   No, sir.

6            MR. BRAGG:   No.

7            THE COURT:   OK.   We are making progress.

8            I continue to quote:

9            "It was a part and an object of the conspiracy that

10  Vikram Datta, the defendant, and others known and unknown, in

11  an offense involving and affecting interstate and foreign

12  commerce, knowing that the property involved in certain

13  financial transactions represented the proceeds of some form of

14  unlawful activity, willfully and knowingly would and did

15  conduct and attempt to conduct such financial transactions

16  which, in fact, involved the proceeds of specified unlawful

17  activity, to wit, the proceeds of narcotics transactions, with

18  the intent to promote the carrying on of specified unlawful

19  activity, in violation of statute."

20           Continuing:

21           "It was a further part and object of the conspiracy

22  that Vikram Datta, the defendant, and others known and unknown,

23  in an offense involving and affecting interstate and foreign

24  commerce, knowing that the property involved in certain

25  financial transactions represented the proceeds of some form of

1   unlawful activity, willfully and knowingly would and did

2   conduct and attempt to conduct such financial transactions,

3   which in fact involved the proceeds of specified unlawful

4   activity, to wit, the proceeds of illegal narcotics

5   transactions, knowing that the transactions were designed in

6   whole or in part to conceal and disguise the nature, the

7   location, the source, the ownership, and the control of the

8   proceeds of specified unlawful activity in violation of

9   statute.

10           It was a further part and an object of the conspiracy

11  that Vikram Datta, the defendant, and others known and unknown,

12  willfully and knowingly would and did transport, transmit and

13  transfer and attempt to transport, transmit and transfer a

14  monetary instrument and funds to a place in the United States

15  from and through a place outside the United States, to wit,

16  Mexico, with the intent to promote the carrying on of specified

17  unlawful activity, to wit, narcotics trafficking, in violation

18  of statute."

19           Continuing:

20           "It was a further part and an object of the conspiracy

21  that Vikram Datta, the defendant, and others known and unknown,

22  willfully and knowingly would and did transport, transmit

23  transfer and attempt to transport, transmit and transfer a

24  monetary instrument and funds to a place in the United States

25  from and through a place outside the United States, to wit,

1    Mexico, knowing that the monetary instrument and funds involved

2    in the transportation, transmission and transfer represented

3    the proceeds of some form of unlawful activity and knowing that

4    such transportation, transmission and transfer was designed in

5    whole or in part to conceal or disguise the nature, the

6    location, the source, the ownership and the control of the

7    proceeds of specified unlawful activity unlawful activity, to

8    wit, narcotics trafficking, in violation of statute.

9         I will explain this much more slowly and in much more

10   understandable terms than at least my impression of the

11   indictment suggested it did.

12        Continuing:

13        "It was a further part and an object of the conspiracy

14   that is Vikram Datta, the defendant, and others known and

15   unknown, within the United States and involving United States

16   persons, in an offense involving and affecting interstate and

17   foreign commerce, willfully and knowingly would and did engage

18   and attempt phony invoice monetary transactions in criminally

19   derived property of a value greater than $10,000 that was

20   derived from specified unlawful activity, to wit, narcotics

21   trafficking activities, in violation of statute.

22        Like Count 1, Count 2, I am not quoting anymore, Count

23   2 lists overt acts alleged to have been committed in

24   furtherance of this conspiracy.  I will talk about that in a

25   minute or two also.

1          THE COURT:  Now, just as in Count One, in order to

2    prove the defendant guilty of the conspiracy charged in Count

3    Two, the government must prove beyond a reasonable doubt each

4    of the following two elements:  First, that two or more persons

5    entered into an unlawful agreement to accomplish one or more of

6    the unlawful objects alleged in Count Two, which I had read to

7    you and will now explain to you in more detail in just a

8    minute, and, second, the government must prove beyond a

9    reasonable doubt, just as in Count One, that the defendant

10   knowingly and willfully joined in the conspiracy alleged in

11   Count Two.

12         Now, everything I said about the elements of

13   conspiracy in Count One apply to Count Two.  I therefore am not

14   going to repeat them, not even a little bit.  So everything I

15   said about what it means to prove an unlawful conspiracy or

16   agreement and what it means to require knowing and willful

17   participation apply to Count Two just as they apply to Count

18   One.  The conspiracies charged in Counts One and Two differ

19   only as to the alleged objectives of the two conspiracies and I

20   believe also that in some small degree there is a slight

21   difference in time periods.

22         Now, so let's get right to the five objects that are

23   alleged as the objects of the conspiracy charged in Count Two.

24         The first two of the alleged objects in Count Two are

25   similar to the two objects that are charged in Count One.

1    Here's the difference.  Whereas the objects alleged in Count

2    One related to transactions involving property that was

3    represented by undercover law enforcement officers to

4    constitute proceeds of drug trafficking, the first two objects

5    alleged in Count Two concern transactions involving property

6    that allegedly in fact was the proceeds of drug trafficking.

7              That's the difference between the first two objects

8    and the only two objects in Count One and the first two objects

9    in Count Two -- what was represented to be drug proceeds as

10   opposed to what was drug proceeds.

11             Now, specifically, Count Two charges that the first

12   two objects of the conspiracy alleged in Count Two were to

13   conduct or attempt to conduct financial transactions involving

14   the proceeds of narcotics trafficking knowing that the property

15   involved in those transactions represented the proceeds of some

16   form of unlawful activity and either that the intent was to

17   promote the carrying on of narcotics trafficking or knowing,

18   secondly, that the transactions were designed, in whole or in

19   part, to conceal and disguise the nature, location, source,

20   ownership and control of the proceeds of narcotics trafficking.

21             I instructed you earlier on the meaning of the terms

22   "proceeds," "intent," "knowledge" and "financial transactions."

23   You will apply those instructions here as well.

24             I remind you, however, that financial transactions for

25   these purposes must affect interstate or foreign commerce, as

1  I've previously instructed you.  You apply those same

2  instructions here.

3          To prove either of these first two objects of the

4  conspiracy charged in Count Two, the government first must

5  prove that the money involved in any agreed-upon financial

6  transaction actually was derived from or obtained as a result

7  of drug trafficking.  It's up to you to decide whether the

8  government proved that beyond a reasonable doubt.

9          In addition, the government must prove that the

10 conspirators agreed to engage in these financial transactions

11 knowing that the transaction or transactions involved the

12 proceeds of some form, though not necessarily which form, of

13 unlawful activity that constitutes a felony under state,

14 federal or foreign law.  The government does not have to prove

15 that the conspirators specifically knew that the property

16 represented the proceeds of drug trafficking or any other

17 specific offense.  It need only prove that the conspirators

18 knew that the transaction involved the proceeds of some illegal

19 activity that was a felony.  Moreover, it is not necessary for

20 all the conspirators to have believed that the proceeds came

21 from the same unlawful activity.  It's enough if each potential

22 conspirator believed that the proceeds came from some unlawful

23 activity.

24          Finally, in order to establish that any conspiracy

25 that may have existed had as its object or objects either of

1   the first two objectives alleged in Count Two, the government

2   must prove also beyond a reasonable doubt that the conspirators

3   entered into any agreement to engage in the financial

4   transactions with at least one of the two following purposes,

5   which I've already alluded to:  The intent to promote the

6   carrying on of narcotics trafficking, or the intent to conceal

7   or disguise the nature, location, source, ownership or control

8   of the proceeds of narcotics trafficking.

9          That takes care of the first two objectives.

10         I turn now to the third object of the conspiracy

11  charged in Count Two, which deals with transporting,

12  transmitting or transferring funds into the United States.

13  Specifically, the third alleged object of the conspiracy was to

14  transmit, transport and transfer or attempt to transport,

15  transmit or transfer a monetary instrument and funds to a place

16  in the U.S. from and through a place outside the United States,

17  in this case Mexico, with the intent to promote the carrying on

18  of narcotics trafficking.

19         The term "monetary instrument" means coin or currency

20  of the United States, or of another country, travelers checks,

21  personal checks, bank checks, money orders, investment

22  securities in bearer form or otherwise in such form that title

23  passes on delivery, and negotiable instruments in bearer form

24  or otherwise in such form that title thereto passes on

25  delivery.  The term "funds" refers to money or negotiable paper

1    which can be converted into currency.

2          In order to establish the third count, the government

3    need not prove that the conspirators agreed physically to carry

4    the funds or monetary instrument in order to prove that they

5    conspired to transport, transfer or transmit it.  All that's

6    required in this respect is proof beyond a reasonable doubt

7    that they agreed to cause the funds or monetary instrument to

8    be transported, transmitted or transferred from Mexico to

9    someplace in the United States, and they must, as I said, have

10   done so with the intent, as I've previously defined that term,

11   of promoting the carrying on of narcotics trafficking.

12         You should note with respect to this third object,

13   unlike the first two objects in Count Two, the government does

14   not have to prove that the conspirators agreed to transport

15   monetary instruments or funds that were in fact the proceeds of

16   drug trafficking.  The origin of the funds to be transported

17   and the conspirators belief or knowledge as to their origin is

18   not relevant to the government's proof of the third object.

19         The fourth object in Count Two similarly deals with

20   transporting, transmitting or transferring funds into the

21   United States.

22         Now, for the sake of convenience, this phrase,

23   "transport, transmit or transfer," it gets repeated endlessly

24   here, and to save everybody's time, if there is no objection

25   from counsel, I am just going to use the word "transport," and

1    we are all going to understand every time I say the word

2    "transport" it means transport, transmit or transfer.

3              Does anybody have a problem?

4              MR. SKINNER:  No objection.

5              THE COURT:  Counsel is signifying no objection.  Fine.

6              Specifically, the fourth alleged object of the

7    conspiracy was to transport, or attempt to transport, a

8    monetary instrument or funds to a place in the United States

9    from Mexico knowing that the monetary instrument or funds

10   involved were the proceeds of some form of unlawful activity

11   and knowing that their transport, transmission or transfer -- a

12   different form of the word -- was designed, in whole or in

13   part, to conceal or disguise the nature, location, source,

14   ownership or control of the proceeds of narcotics trafficking.

15             Now, much of this fourth object is exactly the same as

16   the third object; namely, that the conspirators intended to

17   transport, or attempt to transport, a monetary instrument or

18   funds to the United States from Mexico.  The fourth object

19   differs from the third, however; the alleged purpose of the

20   transportation is different.

21             In order to establish the fourth object, the

22   government must prove beyond a reasonable doubt that the

23   conspirators agreed to take these actions with knowledge that

24   the transport was designed, in whole or in part, to conceal or

25   disguise the nature, location, source, ownership or control of

1    the narcotics trafficking proceeds.

2            In addition, to prove the fourth object, the

3    government must prove that the conspirators did so with

4    knowledge also that the monetary instrument or funds involved

5    the proceeds of some form of unlawful activity.  It does not

6    have to prove that the conspirators specifically knew that the

7    property involved in the transaction represented drug

8    trafficking proceeds, as opposed to any other specific offense,

9    nor with respect to this fourth object does the government have

10   to prove that the property in fact was the proceeds of drug

11   trafficking.  Rather, in this respect, the government need

12   prove only beyond a reasonable doubt that the conspirators

13   agreed to transport property they knew or believed to be the

14   proceeds of some illegal activity that was a felony.

15           Finally, we come to the fifth and final alleged object

16   of the conspiracy charged in Count Two.

17           The fifth alleged object was to engage, or attempt to

18   engage, in a monetary transaction in criminally derived

19   property of a value greater than $10,000 that in fact was

20   derived from specified unlawful activity -- here, narcotics

21   trafficking.

22           To prove that this was an object of the conspiracy

23   charged in Count Two, the government must prove, first, beyond

24   a reasonable doubt, that two or more persons knowingly entered

25   into an agreement to engage or attempt to engage in a monetary

1    transaction in or affecting interstate commerce.  The term

2    "monetary transaction," I'm sure it will not surprise you to

3    know, means the deposit, withdrawal, transfer or exchange in or

4    affecting interstate commerce of funds or a monetary instrument

5    by, through or to a financial institution.  I previously

6    defined what it means to affect interstate or foreign commerce.

7    You will refer back to that definition.

8              In addition, with respect to this fifth object only,

9    the government must prove that the transaction took place in

10   the United States or that the defendant is a citizen or

11   national of the United States.

12             Second, the government must prove beyond a reasonable

13   doubt that the agreed-upon monetary transaction involved

14   criminally derived property of a value greater than $10,000,

15   and that this property in fact was derived from specified

16   unlawful activity -- here, narcotics trafficking.

17             The word "proceeds" here has the same definition I

18   gave you earlier.

19             The term "criminally derived property" means any

20   property constituting or derived from proceeds obtained from a

21   criminal offense.  Specifically, the government here alleges

22   that the conspiracy concerned property that in fact was derived

23   from drug proceeds.  I instruct you as a matter of law that any

24   property derived from drug trafficking proceeds is criminally

25   derived.

1          It's for you to decide, however, whether the

2     government has proved beyond a reasonable doubt that the

3     conspirators agreed to conduct a monetary transaction with

4     property worth at least $10,000 that in fact was derived from

5     drug trafficking proceeds.  The government is not required to

6     prove, however, that all of the property involved in the

7     transaction was derived from narcotics trafficking; rather, the

8     government must prove beyond a reasonable doubt that more than

9     $10,000 of the property involved was so derived.

10         Third, and finally, in order to prove that this

11    alleged fifth object was a goal of the conspiracy charged in

12    Count Two, the government must prove beyond a reasonable doubt

13    that the conspirators knew that the transaction involved

14    proceeds of some form of unlawful activity.  The government is

15    not required to prove that the conspirators knew that the

16    particular offense from which -- strike the word "that."  I

17    will reread the sentence.  The government is not required to

18    prove that the conspirators knew the particular offense from

19    which the criminally derived property was derived.  However,

20    the government must prove beyond a reasonable doubt that the

21    conspirators knew that the transaction involved criminally

22    derived property, which, I remind you, means any property

23    constituting or derived from proceeds obtained from a criminal

24    offense.

25         Now, this count of the Indictment that you'll have in

1   there also has overt acts in it.  Just as with Count One, the

2   government doesn't have to prove any of the overt acts.  It

3   need not prove any overt act in order to convict on Count Two.

4          So, to sum up on Count Two, and then we are going to

5   take a break:  If you find that the government has proved

6   beyond a reasonable doubt both that the money laundering

7   conspiracy charged in Count Two existed -- in other words, that

8   two or more people formed an agreement to achieve at least one

9   of the five alleged objects set forth in Count Two, as I just

10  explained them to you and, secondly, that the defendant

11  knowingly and willfully joined that conspiracy in order to

12  promote at least one of its unlawful objects -- then you should

13  find the defendant guilty on Count Two.  In order to convict on

14  this count, however, you must, just as in the case of Count

15  One, be unanimous that at least one specific goal of the five

16  alleged in the Indictment was an object of the alleged

17  conspiracy, and you all must agree as to that one specific

18  goal.

19         If you find that the government has not proved beyond

20  a reasonable doubt either that the conspiracy charged in Count

21  Two existed, that is, that a conspiracy having at least one of

22  the five alleged objects as its goal was formed, or that the

23  defendant knowingly and willfully joined in any such conspiracy

24  that you find to have existed, then you must find the defendant

25  not guilty.

1          Now, one tiny wrinkle and then we are done with Count

2     Two and we will take a break.

3          If, and only if, you find the defendant guilty on

4     Count Two, you will find on the verdict form an additional

5     question; it's numbered question 2A.  If you find the defendant

6     not guilty on Count Two, you do not answer the little question.

7     But if you find him guilty, you must answer the little

8     question.

9          The question asks whether the government has proved

10    beyond a reasonable doubt that at least one of the objects of

11    the conspiracy, of which you found the defendant to have been a

12    member, was -- and there is a typo here that I am going to

13    correct -- was the first, the second, the third or the fourth

14    object charged in Count Two, as I've described the objects to

15    you -- and they are all laid out in the charge and you've got

16    the indictment -- in other words, if you convict on Count Two,

17    you must then decide, or you must inform us whether you found

18    beyond a reasonable doubt that the conspiracy had as its object

19    either the first object, the second object, the third, or the

20    fourth.  We are not going to ask you which one; we just want to

21    know that it was one of those four, at least one of those four.

22    OK?

23         Your answer to that question, like everything else,

24    whether it is "yes" or "no," must be unanimous.

25         Now, just to illustrate here, if you convict on Count

1    Two only on the fifth object -- in other words, that's the only

2    object of the conspiracy you find -- then the answer is "no."

3    If you convict on Count Two and you either have found that the

4    fifth object was not an object of it at all, or you found that

5    it was but you also found that the first, second, third or

6    fourth, or all of them, were an object, then you answer "yes."

7    It is that simple.

8         OK.  That takes care of Count Two.  Count Three is

9    blessedly shorter.  The rest of this is a lot more -- it is a

10   lot easier, and so we will take a break and we will come back

11   in ten minutes and finish up.

12         Unless there is some insurmountable problem by a

13   juror, we will stay until at least 6 tonight.  So you will let

14   me know in a note if there is a problem or not.

15         (Recess)

16         THE CLERK:  Jury entering.

17         (Jury present)

18         THE COURT:  Welcome back, folks.  The record will

19   reflect the presence of the jury and the defendant.

20         OK.  Juror No. 6 writes:  I have a meeting at 5:30

21   that I must attend.  The attendees" -- I can't actually read

22   the word but I imagine it is phone, or something, in for this

23   meeting -- oh, I see, flew in for this meeting.  If I can get

24   to my phone, I can push it off until 6:30.

25         From Juror Number 6.  That will be marked the court

1    exhibit next in order.  We will make arrangements so that you

2    can make a phone call.  Either that, or Andy will make the call

3    for you, whichever.  He will work it out.  Andy is the

4    impresario in charge of communications.

5         OK.  The third and final count of the Indictment

6    charges the defendant with participating in another different

7    conspiracy, this one to violate the Travel Act, which prohibits

8    interstate travel or the use of interstate facilities for the

9    purpose of carry on certain unlawful activity.

10        Count Three, and I quote, charges as follows:  "From

11   at least in or about June 2009, up to and including in or about

12   January 2011, in the Southern District of New York and

13   elsewhere, Vikram Datta, the defendant, and others known and

14   unknown, willfully and knowingly did combine, conspire,

15   confederate and agree together and with each other to commit an

16   offense against the United States, to wit, to violate the

17   Travel Act.

18        "It was a part and an object of the conspiracy that

19   Vikram Datta, the defendant, and others known and unknown,

20   willfully and knowingly would and did travel in interstate and

21   foreign commerce and use and cause to be used the mail and

22   facilities in interstate and foreign commerce with the intent

23   to distribute the proceeds of unlawful activity, to wit,

24   narcotics trafficking activity, in violation of the federal

25   narcotic laws, and thereafter did perform and attempt to

1    perform an act and aid and abet the performance of said act to

2    distribute the proceeds of said unlawful activity.

3               "It was further a part and an object of the conspiracy

4    that Vikram Datta, the defendant, and others known and unknown,

5    willfully and knowingly would and did travel in interstate and

6    foreign commerce and used and caused to be used the mail and

7    facilities in interstate and foreign commerce with the intent

8    to promote, manage, establish, carry on and facilitate the

9    promotion, management, establishment and carrying on of an

10   unlawful activity, to wit, money laundering activity, in

11   violation of the money laundering statutes, and narcotics

12   activity, in violation of the federal narcotics laws, and

13   thereafter did perform and attempt to perform an act and aid

14   and abet the performance of said act to promote, manage,

15   establish, carry on, and facilitate the promotion, management,

16   establishment and carrying on of said unlawful activity."

17              Count Three then lists overt acts that are alleged to

18   have been committed in furtherance of the conspiracy and I'll

19   discuss them in a minute.

20              Now, in order to prove that the defendant is guilty of

21   the conspiracy alleged in Count Three, the government must

22   prove beyond a reasonable doubt each of the following three

23   elements.  The first two elements are like the others.  The

24   first element is that two or more persons entered into an

25   unlawful agreement to achieve at least one of the two unlawful

1    objects alleged in Count Three.  The second element is that the

2    defendant knowingly and willfully joined that conspiracy in

3    order to promote its unlawful goal and goals.  You are familiar

4    with those two concepts already.

5         The third element the government must prove beyond a

6    reasonable doubt to convict on Count Three is this:  It must

7    prove that at least one of the conspirators, not necessarily

8    the defendant, but any one of the individuals involved in the

9    conspiracy knowingly committed at least one overt act in

10   furtherance of the conspiracy during the life of the

11   conspiracy.

12        The first and second elements here are the same as in

13   Counts One and Two, namely, the existence of an agreement to

14   violate the law in the manner charged in each count and,

15   secondly, the defendant's knowing and willful entry into that

16   agreement.  The third element, the overt act requirement, is

17   different.  As I told you, the government doesn't have to prove

18   an overt act to convict on Count One or Count Two.  It must

19   prove at least one overt act in furtherance of the conspiracy

20   to convict on Count Three.

21        The explanation I gave you earlier about what it means

22   to form a conspiracy and what it means knowingly and willfully

23   to enter into a conspiracy or to participate in it applies to

24   Count Three.  I am not going to repeat it.  So I am just going

25   to turn to aspects of Count Three that differ from the other

1  two counts, and there are two respects in which it differs --

2  the overt act requirement and the objects of the conspiracy.

3          Now, both alleged objects of the conspiracy charged in

4  Count Three were to travel in interstate or foreign commerce,

5  or to use the facilities of interstate or foreign commerce, for

6  the purpose of carrying on certain unlawful activities.   The

7  two objects differ only with respect to the particular unlawful

8  intent that was allegedly involved.   So let me address that.

9          The first alleged object of the conspiracy charged in

10  Count Three was to travel in interstate or foreign commerce, or

11  to use and cause to be used the mail and facilities in

12  interstate and foreign commerce, with the intent to distribute

13  the proceeds of an unlawful activity -- in this case, drug

14  trafficking -- and for one or more of the conspirators to

15  perform or attempt to perform, after traveling or using

16  interstate facilities, an act in furtherance of that unlawful

17  activity.

18          To prove that this alleged object in fact was an

19  object of the conspiracy charged in Count Three, the government

20  first must prove beyond a reasonable doubt that the

21  conspirators agreed to travel interstate or use an interstate

22  facility.   Interstate travel is simply travel between one state

23  and another or between the United States and a foreign country.

24  An interstate facility is any vehicle or instrument that

25  crosses state lines, or an international border of the United

1    States, of course, in the course of commerce.

2              For example, a freight carrier, like a trucker, that

3    carries items from New York to New Jersey is an interstate

4    facility.  A telephone call that crosses state lines is the use

5    of an interstate facility.  A telephone call that goes --

6    indeed, I should -- I correct myself.  A telephone call is the

7    use of an interstate facility regardless of whether the call

8    crosses state lines.  OK?

9              Second, the government must prove beyond a reasonable

10   doubt that the agreed-upon purpose of the interstate travel, or

11   the use of an interstate facility, was to distribute the

12   proceeds of an unlawful activity -- here, narcotics

13   trafficking.  It is not enough for the government to prove only

14   that there was an agreement to conduct some unlawful activity

15   that happened to involve interstate travel or use of an

16   interstate facility, rather, the government must prove that the

17   agreement intended the distribution of the unlawful proceeds to

18   result from the interstate travel or use of the interstate

19   facility.

20             The government does not have to prove that

21   distribution of the drug trafficking proceeds was the sole

22   purpose of the agreement to travel interstate or to use an

23   interstate facility.  It's enough if the government proves that

24   one of the reasons for the agreement to travel interstate or to

25   use an interstate facility was to distribute drug trafficking

1    proceeds.  Thus, if you find beyond a reasonable doubt that

2    there was an agreement to travel interstate or to use

3    interstate facilities with the intent to distribute the

4    proceeds of that alleged unlawful activity and you find also

5    beyond a reasonable doubt that there was an agreement to

6    undertake this same travel or use of facilities, or other

7    reasons having nothing do with unlawful activity, you still may

8    find that the government has shown the necessary illegal

9    purpose on the part of the conspirators.

10           You are thus once again being asked to look into the

11   conspirators' minds and ask what their purpose was in agreeing

12   to engage in interstate travel or the use of interstate

13   facilities.  You may determine the conspirators' intent from

14   all the evidence you have before you, including the statements

15   of conspirators and their conduct before and after the travel

16   or use of an interstate facility.

17           Now, as I've instructed you, the government must prove

18   that there was an agreement to travel interstate or to use an

19   interstate facility to distribute the proceeds of the unlawful

20   activity.  The government does not, however, have to prove that

21   the interstate travel or use of interstate facilities was

22   essential to the unlawful activity for the distribution of its

23   proceeds or that the unlawful activity or distribution of

24   proceeds could not have been accomplished without the

25   interstate travel or use of interstate facilities.  As long as

1    the government proves beyond a reasonable doubt that there was

2    an agreement to travel or use the interstate facilities with

3    the necessary unlawful intent, the government may rely on any

4    interstate travel or use of interstate facilities by members of

5    the conspiracy that made the unlawful activity or distribution

6    of proceeds easier to accomplish.

7            The government must prove also that there was an

8    agreement to travel interstate or to use an interstate facility

9    with the intent to facilitate an activity that the conspirators

10   knew was illegal.  The government doesn't have to prove that

11   the conspirators knew that their travel or use of facilities

12   was illegal; rather, it must prove beyond a reasonable doubt

13   that they knew that the activity they intended to facilitate

14   was illegal.  Thus, if there was an agreement to travel

15   interstate or use interstate facilities intending to facilitate

16   a business deal but the participants in the conspiracy didn't

17   know that the deal was illegal or involved unlawful activity,

18   then you must find the defendant not guilty.

19           Third, in order to prove the first object alleged in

20   Count Three, the government must prove beyond a reasonable

21   doubt that in addition to the existence of an agreement to

22   travel interstate, or to use an interstate facility to

23   distribute the proceeds of drug trafficking, there was an

24   agreement to perform or attempt to perform an act to distribute

25   or attempt to distribute the proceeds of drug trafficking after

1   that travel or use of facilities took place.  This act need not

2   itself be unlawful.  However, there must have been an agreement

3   that the act would be committed after the travel or use of an

4   interstate facility.  Any agreement that the act would be

5   committed before the travel or use of an interstate facility

6   does not satisfy this element.

7          Finally, the government must prove also beyond a

8   reasonable doubt that the narcotics trafficking at issue here,

9   the proceeds of which were to be distributed, was a business

10  enterprise; that is, the government must prove that the

11  narcotics trafficking was part of a continuous course of

12  criminal conduct and not just an isolated criminal incident.

13  If you find that the narcotics trafficking was an isolated

14  event and was not part of an ongoing course of criminal

15  activity, you must find the defendant not guilty.

16         However, to prove that the narcotics trafficking was a

17  business enterprise, the government does not have to show that

18  the trafficking was engaged in for any particular length of

19  time nor must the government prove that it actually turned a

20  profit.  What the government must prove in this respect is that

21  there was an agreement to facilitate a continuous course of

22  criminal conduct for the purpose of profit rather than casual,

23  sporadic or isolated criminal activity.

24         So much for the first object.

25         The second alleged object charged in Count Three is

1    very similar to the first alleged object, except that the

2    alleged purpose of the interstate travel or use of interstate

3    facilities is different.  Specifically, the second alleged

4    object was to travel in interstate or foreign commerce, or to

5    use and have caused to be used the mail and facilities in

6    interstate and foreign commerce with the intent to promote,

7    manage, establish, carry on or facilitate the promotion,

8    management, establishment or carrying on of an illegal

9    activity -- in this case, both drug trafficking and money

10   laundering, rather than only drug trafficking, which was the

11   case with the first object -- and for one or more of the

12   conspirators to perform, or attempt to perform, after traveling

13   or using the interstate facilities, an act in furtherance of

14   those unlawful activities.

15          As in the first object, the government here must prove

16   beyond a reasonable doubt that two or more persons agreed to

17   travel interstate, or use an interstate facility, and you

18   should apply my previous instructions about those terms.

19          The second alleged object differs from the first,

20   however, with respect to the alleged purpose of the travel --

21   and when I say "travel" here, I mean to include not just

22   physical travel but the use of an interstate facility -- as it

23   has been proved throughout.

24          To prove the second alleged object, the government

25   must prove beyond a reasonable doubt that the conspirators

1    agreed to travel interstate or use an interstate facility with

2    the intent to promote, manage, establish, carry on, or

3    facilitate the promotion, management, establishment or carrying

4    on of two unlawful activities -- drug trafficking and money

5    laundering.

6           Now, I refer you to my previous discussion with

7    respect to the first alleged object of the government's burden

8    of proof regarding the conspirators' agreed-upon unlawful

9    purpose for traveling interstate or using an interstate

10   facility.  Much of that discussion applies equally with respect

11   to this slightly different alleged unlawful intent.  As a

12   reminder, however, the government must prove that the

13   conspirators intended the advancement of the unlawful

14   activities -- in this case, drug trafficking and money

15   laundering -- to result from the interstate travel or use of

16   facilities.  The advancement cannot have been accidental.  The

17   intent to facilitate drug trafficking and money laundering,

18   however, need not have been the only purpose behind the

19   interstate travel, however, as long as it was one of the

20   reasons for it.

21          And, again, with respect to the allegation that the

22   intent was to facilitate drug trafficking, the government must

23   prove that the narcotics trafficking activity to be advanced

24   was a business enterprise, as I have defined that concept a

25   couple of minutes ago.

1          Finally, as with the first alleged object of the

2     conspiracy, in order to prove the second object alleged in

3     Count Three, the government must prove beyond a reasonable

4     doubt that in addition to the existence of an agreement to

5     travel interstate, or to use an interstate facility, to

6     promote, establish, carry on or facilitate narcotics

7     trafficking and money laundering, the same individuals agreed

8     to perform or attempt to perform an act to further or

9     facilitate these unlawful activities.  That act need not itself

10    have been unlawful.  However, there must have been an agreement

11    that this act would be committed after the use of the

12    interstate facility or the interstate travel.  Any agreement

13    that the act would be committed before cannot satisfy this

14    requirement.

15         So we come to the third and final element on Count

16    Three, thus proving that this, too, will end; I promise you.

17         Now that I've instructed you on the two alleged

18    objects of the conspiracy charged in Count Three, I need to

19    talk about the requirement of an overt act.

20         The overt act element of the third count requires, in

21    essence, that the agreement that's alleged here have gotten

22    beyond the talking stage, or the agreement stage.  It requires

23    that some action have been taken during the life of the

24    conspiracy by at least one of the co-conspirators to further

25    the objective or objectives of the conspiracy.  To sustain its

1    burden of proof on this element, the government must prove

2    beyond a reasonable doubt that at least one overt act knowingly

3    was committed in furtherance of the conspiracy by one of the

4    conspirators, not necessarily the defendant.

5           When this case is all over, if anybody would like to

6    talk about why some counts require an overt act and others

7    don't, that is a subject for later discussion but it is not

8    part of what you need to consider now.

9           Now, Count Three of the Indictment specifically

10   alleges three particular overt acts.  I'm going to spare you my

11   reading of them.  They are in the Indictment that you will have

12   with you.  The overt act requirement can be satisfied by proof

13   of one of those overt acts, but it is also the case that the

14   overt act requirement can be satisfied by proof of some overt

15   act that's not alleged in the Indictment.

16          The government doesn't have to prove any of the overt

17   acts that are specifically enumerated in the Indictment, nor

18   does it have to prove that the defendant was the one who

19   committed the overt act, if anybody did.  It is enough in this

20   respect for the government to show beyond a reasonable doubt

21   that one member of the conspiracy -- not necessarily

22   Mr. Datta -- knowingly took some step or action in furtherance

23   of the alleged conspiracy while the conspiracy existed, and

24   that act could be one of the ones alleged in Count Three or it

25   could be something else.

1          You are instructed further that the overt act you are
2     considering, if it happens to be one of the three that are
3     spelled out in the Indictment, does not have to have been
4     committed at precisely the time the Indictment alleges.  It is
5     enough if you are convinced beyond a reasonable doubt that it
6     occurred at or about the time and place stated in the
7     Indictment, as long as it occurred while the conspiracy still
8     existed.

9          You should bear in mind, in addition, that the overt
10    act standing alone may be an entirely innocent, lawful action.
11    It doesn't have to be an act that in and of itself is criminal
12    or that constitutes an objective of the conspiracy.  It is
13    necessary only that it have been undertaken to further the
14    accomplishment of an illegal aim of the alleged conspiracy.

15         To sum up on Count Three, if you find that the
16    government has proved beyond a reasonable doubt, first, that
17    the conspiracy charged existed -- in other words, that two or
18    more people entered into an unlawful agreement having as its
19    goal at least one of the two alleged objects in Count Three --
20    second, that the defendant knowingly and willfully joined that
21    conspiracy to promote the accomplishment of one or more of its
22    illegal goals, and, third, that some one of the conspirators
23    during the life of the conspiracy knowingly committed an overt
24    act in furtherance of the conspiracy, then you should find the
25    defendant guilty on Count Three.

1            You must, of course, here, as in the other counts, be

2    unanimous as to at least one object of the conspiracy.  That is

3    the explanation I've given you before.  I won't repeat it.

4            If you find that the government has proved those three

5    elements beyond a reasonable doubt, then you should convict on

6    Count Three.  If the government has not proved beyond a

7    reasonable doubt any of those three elements, then you must

8    acquit the defendant on Count Three.

9            Now, there is one more substantive piece of law I've

10   got to give you and then we are done with the substantive or

11   nearly done with the substantive part of these instructions.   I

12   should say there are two more pieces.

13           The phrase "conscious avoidance" you heard earlier,

14   and I need to explain that a little bit more.

15           I told you earlier that the defendant, in various

16   respects, in order to be convicted must have acted knowingly

17   with respect to the objects of the conspiracies.  That is true

18   on all three conspiracies.  In order to find that the defendant

19   acted knowingly, he must have known of an illegal object of the

20   particular conspiracy you are considering.

21           In that regard, you must consider whether the

22   defendant deliberately closed his eyes to what otherwise would

23   have been obvious to him.  That's what the phrase "conscious

24   avoidance" refers to.

25           Now, I told you before that acts done knowingly must

1   be a product of the person's conscious intention.  They can't

2   be the result of negligence or carelessness or foolishness or

3   recklessness, but a person cannot willfully blind himself to a

4   fact that he believes is likely to exist; that is to say, a

5   person may not intentionally remain ignorant of facts that are

6   material and important to his conduct in order to escape the

7   consequences of the criminal law.  We refer to this notion of

8   intentionally blinding yourself to what's staring you in the

9   face as conscious avoidance.

10          Now, an argument of conscious avoidance on the part of

11  the government is not a substitute for proof; it's simply

12  another factor that you, the jury, may consider in deciding

13  what the defendant knew.  Thus, if you find beyond a reasonable

14  doubt that the defendant believed that there was a high

15  probability that a fact was so but that the defendant took

16  deliberate action to avoid confirming this fact, such as by

17  purposely closing his eyes to it or by intentionally failing to

18  investigate it, then you may treat this deliberate avoidance of

19  positive knowledge as the equivalent of knowledge.  Such a

20  person can almost be said to have actually known that critical

21  fact.

22          For example, if you find beyond a reasonable doubt

23  that the defendant believed there was a high probability that

24  money with which he was conducting financial transactions was

25  the proceeds of drug trafficking but that the defendant

1    deliberately and consciously avoided confirming that fact, then

2    you may treat this deliberate avoidance as the equivalent of

3    knowledge.

4         Keep in mind, however, that there is an important

5    difference between intentionally participating in a conspiracy,

6    on the one hand, and knowing the specific object or objects of

7    that conspiracy, on the other.  You may consider conscious

8    avoidance in deciding whether the defendant knew the objective

9    or objectives of a conspiracy; that is, whether the defendant

10   reasonably believed that there was a high probability that a

11   goal of the conspiracy was to commit the crime or crimes

12   charged as objects of that conspiracy and deliberately avoided

13   confirming that fact but participated in the conspiracy anyway.

14        But conscious avoidance cannot be used as a substitute

15   for finding that the defendant intentionally enjoined the

16   conspiracy in first place.  It's logically impossible for a

17   defendant to intend and agree to enjoin a conspiracy if he does

18   not actually know it exists, and that's the distinction I'm

19   drawing.

20        In sum, if you find that the defendant believed there

21   was a high probability that a fact was so and that the

22   defendant deliberately and consciously avoided learning of that

23   fact, you may find that the defendant acted knowingly with

24   respect to that fact.  However, if you find that the defendant

25   actually believed the fact was not so, then you may not find

19qddat6                    Charge

1   that he acted knowingly with respect to that fact.  You must

2   judge from all the circumstances and all the proof whether the

3   government did or did not satisfy its burden of proof beyond a

4   reasonable doubt.

5          Now, here is really the last point on the law.

6          I've told you all the elements of the charges in the

7   Indictment.  In addition to the elements I've described to you,

8   the government must also prove that this action has properly

9   been brought in the Southern District of New York, which is the

10  area for which this court acts.  That is, the government must

11  prove, with respect to each count, that the alleged unlawful

12  agreement -- the alleged conspiracy -- was formed, or that some

13  act in furtherance of the alleged conspiracy occurred, within

14  the Southern District of New York.

15         Now, the Southern District of New York includes

16  Manhattan, the Bronx, Westchester, Rockland, Putnam, Dutchess,

17  Orange and Sullivan Counties and, believe it or not, in

18  addition, the waters within the counties of Kings, Nassau,

19  Queens, Richmond and Suffolk Counties.  In other words, right

20  off the beach in Brooklyn is part of the Southern District of

21  New York.  Flushing Bay is part of the Southern District of New

22  York, in addition to Manhattan.  Those are illustrative

23  examples.

24         There is a wonderful story, that I will be happy to

25  tell when the case is all over, about how that came to happen,

19qddat6                    Charge                    1125

1    why Congress did that over a hundred years ago, but there it

2    is; that is the way it is.

3                (Continued on next page)

19q4dat7                    Charge

1       THE COURT:  Now I note that on this issue alone, we

2   call this issue venue, lawyers refer to it as venue also, in

3   other words, the issue of whether the case has been brought in

4   an appropriate court, the government does not have to prove its

5   case beyond a reasonable doubt.  It is enough if the government

6   proves venue by a preponderance of the evidence.

7       A preponderance means only that a fact is more likely

8   true than not.  If you think of it in mathematical terms, it is

9   that the probability is a scintilla greater than 50/50; that's

10  what it means.

11      Thus, the government will have established as to any

12  count that venue is proper and the case is brought in an

13  appropriate court if it shows that is it is more likely than

14  not either that the conspiracy in question was agreed to in the

15  Southern District of New York or some act to further the

16  accomplishment of its objectives happened within the Southern

17  District of New York which is defined as all those counties and

18  waters that I referred to.

19      If you find that the government has failed to meet

20  this venue requirement as to any of these charges, then you

21  must acquit the defendant of that charge.

22      Now you will also see from the indictment and I read

23  it off already that the indictment alleges that various things

24  happened on or about various dates.  There are time periods

25  alleged as different conspiracies.  I instruct you that it does

1   not matter if a particular conspiracy is alleged to have

2   started in one month and ended in another and the evidence

3   shows that the dates are off.  The law requires only a

4   substantial similarity between the dates and months alleged in

5   the indictment and the dates and months established by the

6   evidence.

7              With respect to each alleged conspiracy, it is

8   sufficient if you find beyond a reasonable doubt that the

9   defendant was part of the conspiracy charged in the indictment

10  at some point within the timeframe alleged in that count.

11             Similarly with respect to the overt acts, this really

12  applies most predominantly to Count 3, an overt act need not

13  have been committed precisely at the time or date alleged in

14  the indictment.  Substantial similarity is the test.

15             Those are all my instructions on the law.  From here

16  on, we are talking about the trial process, your deliberations,

17  your evaluation of the evidence.  This is much shorter and will

18  go much easier I promise.

19             I told you, first of all, at the beginning of the

20  trial that you are the sole and exclusive judges of the facts.

21  Nothing I have said or done and nothing that I may say or do is

22  intended to indicate any view on my part as to how you should

23  decide this case or what the facts are.  The rulings I made

24  during the trial, any questions that I may have asked of a

25  witness, any comments I made to the lawyers in managing the

1   trial do not indicate any views on my part about what your

2   decision ought to be or about anything else pertinent to your

3   decision.

4           I have no opinion as to how you ought to decide this

5   case.  You would be wasting your time trying to psychoanalyze

6   me to figure out what I might think.  Among other things,

7   judges who try cases typically, at least this is true for me,

8   listen to the evidence in a whole different way than the person

9   who actually has to decide what happened listen to it.  At

10  least they start out that way and they continue that way until

11  there is a verdict.

12          I remind you that it's your obligation to accept my

13  instructions on the law regardless whether you agree with them

14  and to apply my instructions to the facts as you decide the

15  facts to be.  You are to show no prejudice against a lawyer or

16  his client because the lawyer objected to testimony or evidence

17  or asked for a sidebar.  In addition, although I really don't

18  remember if I asked any questions, and I don't really remember

19  much in the way of comments to the lawyers, you are to

20  disregard the fact that I asked anything or made any comments.

21  None of that is intended to suggest and should not be taken by

22  you as suggesting that I believed or disbelieved any witness.

23  If I asked questions, I did that only to clarify and move

24  things along and you should understand that.  Of course, you

25  should consider the witnesses' answers in those cases.

1          You should find the facts in this case and decide the

2     case without prejudice for or against either party.  Although

3     the case is brought in the name of the United States, the

4     government is entitled to no greater consideration than the

5     defendant.  By the same token, it's entitled to no less.  The

6     parties stand equal before the law.  That's one of the great

7     things about our country.

8          Now let's talk about the evidence and the evaluation

9     of evidence.  The evidence, of course, as I told you on day

10    one, is the sworn testimony of the witnesses, the exhibits that

11    were received in evidence, and the stipulations to which the

12    lawyers agreed.  The stipulations, as I told you, are

13    agreements as to particular facts between the parties, and in

14    some cases, agreements as to what a particular witness, had

15    that witness come to court and testified on the stand, would

16    have said.

17         You must accept the stipulations as controlling and

18    binding.  If the parties stipulated that something happened on

19    a particular day of the week, then for your purposes, that's

20    when it happened.  You can't second-guess it; you can't come to

21    a different conclusion.  In the case of a stipulation that a

22    witness if called would have testified that the moon is made of

23    green cheese or anything else, you must accept that the witness

24    if called would have said that.

25         Now in the case of that kind of stipulation, a

1    stipulation as to what someone would have said, it is up to you

2    decide whether you buy it and whether you think it's important

3    and what weight you should give it.   That stipulation is

4    intended by the parties only to agree that somebody who would

5    have come in would have said X and, therefore, why bother

6    bringing them in here.   The significance of the fact that the

7    witness would have said X is up to you.

8            It's for you alone to decide the weight to be given to

9    the testimony you heard and the exhibits you have seen.   The

10   indictment, as I told you, is not evidence.   No question,

11   argument or objection by a lawyer is evidence.   You are not to

12   consider any statements or testimony I may have stricken or

13   told you to disregard.

14           Generically speaking, there are two kinds of evidence

15   that you may consider in reaching your verdict.   One is called

16   direct evidence and as all watchers of Law & Order and all

17   those other shows know the other is called circumstantial

18   evidence.   Thanks to all the lawyer TV shows, one has to take a

19   little more time on this than otherwise might be desirable.

20           Direct evidence is evidence of a fact that is

21   delivered to you either in the form of some physical object

22   which allows you to observe its condition or evidence by

23   someone who has actually observed the fact who is coming in and

24   swearing under oath this is what happened.   That's direct

25   evidence.   If this little booklet were an exhibit in this case

1    and it were an issue in the case as to what color this booklet

2    is, why, you can look at it with your own two eyes and you can

3    see it's red.  That's direct evidence.

4          Circumstantial evidence is a little bit different.  It

5    is proof by indirection in a sense.  It is proof of fact B,

6    which you can't observe, or as to which you may have other

7    evidence but it's in doubt, it's questionable or open to

8    question, by proving fact A and asking you to draw a logical

9    conclusion that if A is so, well, B is probably so.

10         The example for 200 years probably in this courthouse

11   and environs, suppose it had been beautiful sunny weather this

12   morning and indeed it was and we all had come in here at 9:30

13   and the drapes were all drawn and for some reason you were

14   considering what is the weather now at 4:30.  The drapes are

15   drawn, you can't look out, you can't see it.  You don't have a

16   witness who is going to tell you what it is.  There is no

17   direct evidence.

18         If people start coming in the door, however, with

19   dripping umbrellas and raincoats, you could look at that and

20   say ah hah.  That does not normally happen unless it's raining.

21   The weather must have changed, it must be raining now.  The

22   dripping umbrellas, dripping raincoats are circumstantial

23   evidence of what the weather is outside.  Circumstantial

24   evidence refers to that process of deducing from one fact

25   something else.

1             Now, with that elaborate explanation of the

2    difference, here is what you actually need to know.  The law

3    draws no distinction between the two.  It simply requires that

4    your verdict be based on your conscientious consideration of

5    all the evidence, direct and circumstantial.  Anything you may

6    have heard on television over of the years to the contrary,

7    forget about it for purposes of this case.

8             Now, during the course of the trial you have heard the

9    lawyers I think use the term inference.  In their arguments

10   they might have suggested that you infer on the basis of your

11   reason and your experience and your common sense the existence

12   of one fact from some other fact or established fact.  Drawing

13   inferences from facts is not guessing.  It's not speculation.

14   It's a logical factual conclusion that you can reasonably draw

15   from fact A with respect to fact B.

16            In drawing inferences, which is entirely permissible,

17   just use your common sense.  So when you are considering the

18   evidence presented to you, you are entirely permitted to draw

19   from the facts you find to have been proven reasonable

20   inferences that are justified in light of your experience.

21   There are times when particular facts may yield different

22   inferences, whether from direct or circumstantial evidence.

23   One side may ask you to infer fact B from fact A.  The other

24   said, well, it just follows perfectly logical from fact A that

25   not B is what happened.

1          It's up to you to decide.  It's for you to figure out

2     which way the evidence points and what satisfies you or does

3     not satisfy you beyond a reasonable doubt.

4          Obviously, we have issues in this case with respect to

5     the credibility of witnesses.  It's going to be your job to

6     decide how believable each witness was in his testimony and you

7     are the sole judges of that.  You are the sole judges also of

8     the importance or materiality of the testimony of every

9     witness.

10         In making those judgments, you will use your common

11    sense and apply all the tests for truthfulness and accuracy

12    that you would apply with respect to important matters in

13    everyday life.  Your decision on whether or not to believe a

14    witness may take into account, may depend upon how the witness

15    impressed you.  Was the witness candid and forthright and frank

16    or did the witness seem as if he or she was hiding something or

17    being evasive or behaving in some suspect way?  How did the

18    witness testify on direct compared to cross-examination?  Was

19    the witness consistent in his or her testimony or were there

20    contradictions in different versions of events by the same

21    person over time?  Did the witness appear to know what he or

22    she was talking about or did the witness strike you as somebody

23    who was trying to go beyond what the witness actually knew?

24         As I say, these are all matters for you to decide.  In

25    evaluating the credibility of witnesses, you should of course

1    take into account any evidence that a witness might benefit in

2    some way from the outcome of the case.  An interest in the

3    outcome of course creates a motive to testify falsely and it

4    may sway a witness to testify in a way that advances the

5    witness's own interest.

6            You should also keep in mind, however, that it doesn't

7    automatically follow that testimony by an interested witness

8    should be disbelieved.  It's for you to decide based on your

9    own perceptions and common sense the extent if at all the

10   testimony of any interested witness has been affected by

11   whatever interest you find to be there.

12           You have heard the testimony of a number of law

13   enforcement witnesses.  The fact that a witness may be or may

14   in the past have been employed as a law enforcement officer or

15   employee does not mean that that witness's testimony is more or

16   less deserving of weight, let me put it that way, than the

17   testimony of any other witness.  At the same time, it is

18   perfectly legitimate for a defense lawyer to try to attack the

19   credibility of such a witness on the theory that the witness's

20   testimony might be colored in some way because of some personal

21   or professional interest in the way the case comes out.  It's

22   up to you to decide what weight to give the testimony of these

23   witnesses and to you alone.

24           Some of the testimony you have heard and some of the

25   evidence you have before you has been provided through the use

1    of a court interpreter.  When testimony has been given in a

2    language other than English, you must base your decision on the

3    English version presented by the interpreter rather than any

4    understanding you may have of a particular foreign language.

5              I need to remind you about the same sort of issue with

6    respect to the audio-recordings of which you have a bundle.

7    The first point I need to make about that is that it does not

8    matter whether you approve or don't approve of the recording of

9    the conversations or activities that were recorded here.  That

10   may not enter your deliberations.  I instruct you that all of

11   the recordings here were made in a lawful manner.  They are

12   properly in evidence in this case.  No one's rights were

13   violated.  The use of this evidence is entirely lawful and

14   proper.

15             You have transcripts of these conversations.  To the

16   extent the conversations were in English, you have the

17   audio-recordings as well.  In those cases, the transcripts are

18   aids to your following the audio-recordings.  To whatever

19   extent you have detected or may in your deliberations detect

20   any variance between the English audio-recordings and the

21   transcripts, it's the audio-recordings that control.

22             In summons cases, the recordings are of foreign

23   language conversations.  There was some Spanish, some Hindi,

24   maybe something else; I don't remember.  In those cases you

25   have transcripts and you have English translations of the

1  foreign language statements that are on the recordings.   In

2  those cases, it is the English translations that control, not

3  whatever you understand or think you understand of the foreign

4  language.

5          Of course, there are some mixed conversations.   It

6  should probably go without saying that in those cases it's the

7  audio-recordings of the English and transcripts of the foreign

8  language portions that control.

9          If you want to hear any of the tapes again you will

10 send out a note and we will arrange to have the tapes played or

11 sent in to you.

12         The defendant of course has taken the witness stand.

13 You should examine and evaluate his testimony just as you would

14 any other witness.

15         You have heard testimony that the defendant made

16 certain statements in the past in which the defendant claimed

17 that his conduct was consistent with innocence and not with

18 guilt.   The government claims that these statements in which he

19 exonerated himself or exculpated himself were false.   False

20 exculpatory evidence, in other words, false denials are

21 circumstantial evidence of a defendant's consciousness of

22 guilt.   They have an independent probative value, independent

23 persuasiveness to them.

24         If you find that the defendant gave one or more false

25 statements in order to divert suspicion from himself, you may

1   but you are not required to draw the conclusion that the

2   defendant believed he was guilty.  You may not, however, draw

3   the conclusion on this basis alone that the defendant in fact

4   is guilty of the crime for which he is charged.  This is just a

5   factor you may consider.  Whether or not the evidence as to the

6   defendant's statements shows that he believed he was guilty and

7   the significance of any to be attached to any such evidence are

8   matters for you alone to decide.

9          You have heard testimony from government witnesses who

10  testified that they entered into agreements to plead guilty and

11  cooperate with the government.  I instruct you that you are to

12  draw no conclusions and no inferences of any kind about the

13  guilt of the defendant on trial here from the fact that any

14  prosecution witness chose to enter into such an agreement.  The

15  decision of that witness or those witnesses to cooperate was or

16  were personal decisions made for reasons sufficient unto the

17  witnesses and it may not be used by you as evidence against or

18  unfavorable to Mr. Datta here.

19         In addition, you should know that cooperating

20  witnesses frequently are used by the government.  It is of no

21  concern of yours why the government made agreements of this

22  type with particular witnesses.  Of course, this law

23  enforcement technique is entirely lawful.  Your personal view

24  on its use whether you approve of it or you don't is beside the

25  point and must not affect your evaluation of the evidence here.

19q4dat7                    Charge

 1              You have heard also that these witnesses have pleaded

 2      guilty to certain crimes.  They have not yet been sentenced.

 3      Because of the possible interest a cooperating witness may have

 4      in testifying -- could you please stop the note-passing in the

 5      last row.  I know this is long, but you have to bear with us,

 6      you really do.

 7              Because of the possible interest a cooperating witness

 8      may have in testifying, the cooperating witness's testimony

 9      should be scrutinized with care and caution.  You may consider

10      whether these witnesses, like the other witnesses in this case,

11      have an interest in the outcome of the case and if so whether

12      it has affected their testimony.

13              The fact that a witness is cooperating with the

14      government may be considered by you as bearing on his or her

15      credibility, but like the testimony of any other witness, the

16      testimony of a cooperator should be given whatever weight you

17      think it's entitled to in light of all the evidence before you,

18      taking into account the witnesses' demeanor and candor, the

19      strength and accuracy of their recollection, their backgrounds

20      and the extent to which the testimony was or was not

21      corroborated by other evidence.

22              In evaluating testimony of cooperating witnesses, you

23      should ask yourselves whether this cooperating witness would

24      benefit more by lying or telling the truth, was the testimony

25      made up in any way because the witness believed that he or she

19q4dat7                        Charge

1    would benefit by testifying falsely, or did the witness believe

2    that his or her interests would be served best by telling the

3    truth.   If you believe that a witness was motivated by the hope

4    of personal gain, was the motivation one that would cause him

5    or her to lie or one that would cause him or her to tell the

6    truth?   Did the motivation color the witness's testimony?

7             As with all the witnesses, I emphasize that the issue

8    of credibility does not have to be decided on an all-or-nothing

9    basis.   Even if you find that a witness testified falsely in

10   one respect, you still may accept his or her testimony in other

11   respects, but you may also disregard it entirely.   That's all

12   up to you.

13            You have heard in this trial testimony from what we

14   refer to as expert witnesses.   Expert witnesses are people who

15   by some particular education or experience have some special

16   knowledge of an area.   Witnesses like that are allowed to give

17   opinions as to matters within their expertise and to give their

18   reasons for their opinions.   It's given to you on the theory

19   that someone with that sort of knowledge can help you in

20   understanding the evidence or coming to a decision.

21            Your role in deciding witness credibility applies to

22   experts just as to everybody else.   You should consider the

23   expert testimony that was received.   You should give it as much

24   or as little weight you as think it deserves.   If you decide

25   that expert testimony was not based on sufficient background or

1    education or experience or data, or if you conclude that the

2    witness for some reason was not trustworthy or credible for

3    another reason or if the opinion of the expert is outweighed by

4    something else, then you can disregard the opinion of the

5    expert entirely or in part.  If on the other hand, you think

6    the expert knew what he was talking and you are satisfied that

7    the opinion or testimony he gave you was credible and accurate,

8    then you are justified in relying on it.

9            I think you heard some evidence during the trial that

10   some witnesses may have discussed the case with their lawyers

11   or with lawyers for the government or agents in preparation for

12   testifying.  You are entitled to consider that in evaluating

13   credibility, but I do want to tell you that there is nothing

14   unusual and nothing improper about a witness meeting with

15   lawyers before testifying so the witness knows what's going to

16   happen in the courtroom, can focus on the relevant subjects,

17   and have the opportunity to review exhibits and to prepare in

18   general.

19           Consultation like that helps conserve time, your time

20   and mine.  It would be very unusual for lawyers to call

21   witnesses without having talked to them.  But it's up to you to

22   decide what effect if any the preparation may have had on the

23   credibility of the witnesses' testimony.

24           Some of the people who may have been involved in the

25   offense leading to this trial are not on trial in this case.

1    You are not to draw any inference from that fact.   Those

2    matters are entirely outside your concern.   I need say no more

3    on that.   You can't hold that against the government.   You

4    can't hold that against the defendant.

5              You have heard some reference in the arguments of

6    defense counsel in this case to the fact that certain

7    investigative techniques may not have been used by law

8    enforcement authorities.   There is no legal requirement that

9    the government prove its case by any particular means.   While

10   you are to consider carefully the evidence the government

11   introduced, you are not to speculate as to why it used the

12   techniques it did and why it didn't use others.   The choice of

13   law enforcement techniques is not your concern.

14             The question of possible punishment is not a concern

15   to the jury.   It should not enter into or influence your

16   deliberations.   The duty of sentencing rests with the court in

17   accordance with laws passed by Congress.   You are not to allow

18   punishment or potential punishment to affect your verdict.

19             That brings us to the very last part of this, the

20   conduct of your deliberations.   In just a couple of minutes you

21   are going to retire to begin your deliberations.   You must

22   consult with each other and deliberate with a view to coming to

23   an agreement.   Each of you must decide the case for yourself,

24   but you should do so only after considering it with your fellow

25   jurors.   You should not hesitate to change an opinion if you

1  are convinced that it's erroneous.

2          Your verdict whether guilty or not guilty must be

3  unanimous but you are not bound to surrender your honest

4  convictions concerning the effect or the weight of the evidence

5  simply to return a verdict or solely because of the opinions of

6  others.  Discuss and weigh your respective opinions

7  dispassionately without regard to sympathy, without regard to

8  prejudice or favor for either side, and come to a conclusion

9  that in your good conscience appears from the evidence to be in

10  accordance with the truth.

11          I remind you that any notes you have may have taken

12  during the trial are for your personal use only.  Each of you

13  may consult your own notes during deliberations.  Any notes you

14  may have taken are not to be relied upon during deliberations

15  or to substitute for the collective memory of all of you.  If

16  you didn't take notes, rely on your independent recollection of

17  the proceedings.  Don't be influenced by the notes of others.

18  I emphasize that the notes are entitled to no greater weight

19  than the recollection or impression of each of you as to what

20  the evidence was.

21          When you got my instructions you are going to find

22  various legal citations after paragraphs.  You probably are not

23  going to understand them at all because we write in

24  hieroglyphics as if we were writing prescriptions for

25  medication or something.  But even if you do, pay no attention

1    to them.  You know, judges and lawyers have to consult about

2    the instructions and where the principles of law are gathered

3    from.   These are my audit trail as to which cases and which

4    books the instructions have come out of.   They really are for

5    my convenience and the lawyers alone.   You pay no attention to

6    them.

7              I am going to be submitting a verdict form to you on

8    which to record your verdict.   You will see it lists the counts

9    for your consideration.   They are listed in numerical order but

10   you can take them in any order you want.   You don't have to

11   follow the order on the form.   Once you reach a unanimous

12   decision, you record your answers on one copy of the form.

13   Don't add anything that's not called for on the form.   No

14   editorial comments.   The foreperson will fill it in.   Each of

15   you will sign at the bottom.   The foreperson will then tell the

16   officer that a verdict has been reached.

17             Please do not give the verdict form to the court

18   officer.   Don't tell the officer what the verdict is.   The

19   foreperson should take the verdict sheet, the signed verdict

20   sheet, put it in an envelope that Andy will give to you, bring

21   it into the courtroom, and hang on to it for dear life until I

22   ask you for you it.   I stress that each of you should be in

23   agreement with the verdict when it is announced.   Once the

24   verdict is announced in open court and officially recorded, it

25   ordinarily cannot be changed.

1      You will remember there is one question to be answered

2  on there other than guilty or not guilty pertaining to Count 2.

3  You answer that question only if the verdict on Count 2 is

4  guilty.  You leave it blank if the verdict on Count 2 is not

5  guilty.

6      If during your deliberations you want me to discuss

7  further any of my instructions on the law, you have any

8  questions, the foreperson should send out a note through the

9  officer in a sealed envelope asking whatever the question is.

10  Pages and line numbers are all numbered.  Be as specific as you

11  can referencing what it is that is troubling you.  There is a

12  process I have to go through.  The lawyers and I all have to

13  understand just what the question is and we are helped if we

14  know what part of the charge it pertains to.  I need to get

15  their views on what they think the right answer is.  I have to

16  decide the right answer.  It's a lot easier if you know with

17  precision to which paragraph or whatever a question pertains.

18      If you need to have testimony read to you, we can do

19  that.  Please be sure to exhaust your collective recollection

20  before asking for it and be sure you really need it.  If you

21  need to have testimony read back, you should use the same

22  procedure.  Send out a note in a sealed envelope.  Be as

23  specific as you can, who was the witness, direct or cross or

24  both, what the subject was, because we have to figure out just

25  what it is should be re-presented to you and the more specific

1   the request, the more quickly we will be able to do that, and

2   that will be a great help.

3           If you do communicate with the court before you reach

4   a verdict either in a note or in open court, you are never,

5   ever, ever to tell us what the vote is unless I specifically

6   ask you for it.

7           I remind you that you took an oath to render a

8   judgment impartially and fairly and without prejudice or

9   sympathy and without fear based solely on the evidence in this

10  case and the applicable law.  It would be improper for you to

11  consider in reaching your decision as to whether the government

12  has sustained its burden of proof any feelings you may have

13  about the race, religion, national origin, gender or age of the

14  defendant.  If you were to let prejudice or sympathy interfere

15  with clear thinking, you might not reach a just verdict.  So

16  bear in mind, all parties are entitled to a fair trial.  You

17  must make a fair and impartial decision and come to a just

18  verdict.  I know you are going to do that.

19          Before we now send you back to deliberate, a word to

20  our four stalwart alternates.  You are not at this moment going

21  to go back and deliberate but you are not excused.  You are

22  subject to recall.  That being the case, you may not discuss

23  this case with anybody at all until you know that a verdict has

24  been reached and the rest of the jury, deliberating jury

25  discharged.  Andy will be happy to give you his phone number.

1    You can check in with him as to when that happens.

2              You must understand that if someone were to get sick,

3    God forbid, or there was a problem among the 12 who start to

4    deliberate, you are subject to recall to deliberate in this

5    case.  You must follow all the rules that have applied up until

6    now until the case is entirely over.  Please bear that in mind.

7    I know you will.

8              That said, Andy will go back to the jury room with you

9    now, he will collect your notes from you and hold on to them in

10   case you get called back and then you are free to go today.

11   But make sure Andy knows how to reach you and that you can

12   reach him and we will stay in touch that way.

13             (Alternate jurors discharged)

14             THE COURT:  We will pause for a moment.  I know you

15   have to make a phone call; I have not forgotten.

16             (Pause)

17             THE COURT:  Counsel, if there are any objections I

18   have not heard, come to the sidebar, if you are fine, OK.

19             Come up.

20             (At the sidebar)

21             MR. WHITE:  Just one, your Honor, on page 9, line 6,

22   the last phrase there that illegal activity should be of

23   narcotics trafficking.  This is an instruction on what evidence

24   the government has to show, that property was the proceeds of

25   narcotics trafficking, was represented to be the proceeds of

1    narcotics trafficking.

2              THE COURT:  This should have been raised last week.

3              MR. WHITE:  I just caught it now.

4              THE COURT:  Mr. Skinner.

5              MR. SKINNER:  I am trying to think whether it has to

6    be narcotics trafficking or whether it's sufficient to have

7    been proceeds in this context.  I think he is right.

8              MR. WHITE:  Just in this one instance.

9              THE COURT:  Is it satisfactory if I simply say to the

10   jury that they are going to find an interlineation on page 9,

11   and it's narcotics trafficking, instead of trying to just read

12   them a paragraph totally out of context.

13             MR. WHITE:  Yes.

14             MR. SKINNER:  That's fine.

15             THE COURT:  I will do that.

16             (In open court)

17             THE COURT:  When you go back and we send the

18   typewritten charge in, you will find on page 9 line 6, a

19   handwritten change to two words that I used in the charge, and

20   you will apply the handwritten change instead of what I said

21   orally.  OK.

22             (Marshal sworn)

23             THE COURT:  Members of the jury, we will be sending

24   the exhibits in to you and we will do that as fast as the

25   lawyers and Andy can make sure we have only exhibits that were

1    received in evidence, which may or may not be between now and

2    6:00, if it's not, it's not.  So, I will see you at 6:00 one

3    way or another.  We will send you home at 6:00 today because I

4    know you have meeting.  The phone call, is it acceptable to

5    counsel if Juror No. 6 simply uses the phone in Andy's office

6    now.

7              MR. SKINNER:  Yes.

8              JUROR:  The phone number is on my phone.

9              THE COURT:  Is it downstairs.

10             JUROR:  It is, yes.

11             THE COURT:  Give Andy your tag for the phone.  Andy

12   will get the phone.  If there is no objection, then Andy will

13   take the phone in, she can get the number, come out of the jury

14   room, make the phone call on the land line, and you will return

15   the phone downstairs.  OK.

16             MR. SKINNER:  I don't think the jury has been

17   instructed on selecting a foreperson.

18             THE COURT:  Did I skip over that.

19             MR. SKINNER:  I think so.

20             THE COURT:  Mea culpa.  When you go back to the jury

21   room, pick one of your number as the foreperson.  That person

22   speaks for you in open court and presides over your

23   deliberations.  Satisfactory, folks.

24             MR. SKINNER:  Yes.

25             MR. WHITE:  You skipped over that all jurors must be

Case 1:11-cr-00102-LAK   Document 62   Filed 10/27/11   Page 506 of 520

1    present during deliberations.

2            THE COURT:  Thank you.  All of you must be present

3    during deliberations.  Thank you.  OK.  You may now deliberate.

4            (Jury leaves courtroom to begin deliberations)

5            THE COURT:  Leave the binders here and we will send in

6    what you are supposed to have.

7            (Pause)

8            THE COURT:  Anything else to be accomplished.

9            MR. SKINNER:  No, your Honor.  I think we have had

10   some discussions just with regard to the making sure the

11   exhibits are all in good form; they should be about ready to

12   go.

13           THE COURT:  Let me have a copy or two of the charge.

14   We will do the interlineation, we will mark them, send them in.

15   What is the next court exhibit.

16           THE DEPUTY CLERK:  G.

17           THE COURT:  We will mark as Court Exhibit G, this one

18   copy of the charge and, Andy, that will be the one that goes in

19   when I make the handwritten change.  OK.  Thanks folks.  Stick

20   around, stay on this floor in case something happens between

21   now and 6.  Tomorrow, as I am sure the government knows, my

22   practice is counsel stay on this floor or the case of the

23   government in the building in their reachable room whenever the

24   jury is deliberating except from 12:45 to 2, so that we can get

25   you in case of a note.  Thank you.

1          We have the redacted indictment.  That will be court

2    Exhibit H.  Have both sides seen the redacted indictment.

3          MR. BRAGG:  I showed it to defense counsel.

4          MR. WHITE:  Yes.

5          THE COURT:  Court Exhibit H.

6          Thank you.

7          (Recess pending verdict)

8          (Jury present)

9          THE COURT:  The jurors and the defendant all are

10   present.  It's my practice to make sure I see the whites of

11   your eyes at the beginning and end of every day when you are

12   deliberating.  This is it.  See you at 9:30.  Please be

13   prepared to stay to at least 6 tomorrow night if you are not

14   completed.  I suggest nothing as to time, how much time you

15   should or should not take.  You should take whatever time you

16   think is necessary.  Thank you.  Good night.

17         (Trial adjourned to September 27, 2011, 9:30 a.m.)

18                         -   -   -

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          (S1) 11 Cr. 102 (LAK)

5   VIKRAM DATTA,

6              Defendant.

7   ------------------------------x

8
                                          September 27, 2011
9                                         9:30 a.m.

10
    Before:
11
                    HON. LEWIS A. KAPLAN,
12
                                          District Judge
13

14                      APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  PETER M. SKINNER
17       ALVIN L. BRAGG, JR.
         Assistant United States Attorneys
18

19  ROBBINS, TUNKEY, ROSS, AMSEL, RABEN & WAXMAN PA
         Attorneys for Defendant
20  BY:  ALAN S. ROSS

21  WHITE & WHITE
         Attorneys for Defendant
22  BY:  DIARMUID WHITE

23         - also present -

24  Vanessa Quinones, Government paralegal
    SA Richard Reinhardt, IRS
25


                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

```
1              (Trial resumed; jury not present)
2              MR. ROSS:  May I address the court while Andy is
3    walking back.
4              THE COURT:  Maybe Andy will stop.
5              MR. ROSS:  I note I did not recall what time the court
6    was going to adjourn tomorrow assuming no verdict prior
7    thereto.
8              THE COURT:  If I said, I don't recall it either.
9    Let's look at what I told the jury.  When is your plane?
10             MR. ROSS:  I have not scheduled.  I asked Mr. White,
11   regardless, he of course will cover, and with the court's
12   permission I would be excused.  I have not made a flight at
13   this time.
14             THE COURT:  Here is what I said.  I said the holiday
15   starts on the evening of the 28th, so we would get in at least
16   half a day on the 28th, and I asked you, Mr. Ross, for your
17   view and you said, if we worked half a day you would manage to
18   get home, and then, we never resolved it.
19             MR. ROSS:  It's still the case.
20             THE COURT:  OK.
21             MR. ROSS:  Given the fact that Mr. White is here,
22   please don't feel obliged to worry about my schedule; if I have
23   a leave an hour early that's of no consequence.
24             THE COURT:  Off the record.
25             (Discussion off the record)
```

 1          THE COURT:  What I will do is I will put it to the

 2     jury if we are still in session by the end of the day or before

 3     they go home and we will see whether there is anybody on the

 4     jury who feels they need to leave before the end of the day on

 5     Wednesday.  If nobody on the jury wants to go early, I am here

 6     anyway, so we can continue and Mr. White can cover Wednesday

 7     afternoon and if anybody on the jury wants to leave early, we

 8     will just break whenever the earliest juror departure time is.

 9     I think you are safe; you can get back to Miami.

10          MR. ROSS:  Thank you very much.

11          (Jury enters courtroom)

12          THE COURT:  Good morning folks.  Glad to see you are

13     all here.  The defendant is here.  One bit of housekeeping.

14     Any of my comments or questions to you about scheduling don't

15     imply anything any thought about how long your deliberations

16     will or should take.  That's totally up to you, let's

17     understand that totally.  As you all probably know, tomorrow

18     evening is the start of a religious holiday.

19          If by let's say 2 or 3:00 today, you don't have a

20     verdict and if you think you may be back tomorrow, it's your

21     call, it would be helpful to us if you would send in a note

22     saying whether there are any jurors who would need to leave on

23     Wednesday afternoon by a certain time and what the latest time

24     would be by which you have to get going for the holidays,

25     because we are all prepared to work until 6:00 tomorrow night

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    if that's necessary.  It would be helpful to know if anybody on

2    the jury needs to leave earlier if we are still here tomorrow

3    which I have no idea.  So you will send you us a note sometime

4    in the afternoon, early in the afternoon, and let us know.

5            The only piece of housekeeping, I require the lawyers

6    to stay nearby so if there is a note or verdict we can get to

7    them quickly respond to you quickly.  They have a pass from

8    12:30 to 2:00.  So if you have a note or you have a verdict in

9    that period, we will deal with it after 2:00.  OK.  Thank you.

10   You may resume your deliberations.

11           (Jury leaves courtroom to continue deliberations)

12           MR. WHITE:  Mr. Ross and I were wondering if we could

13   wait in the attorneys lounge right off the elevator bank on the

14   first floor.

15           THE COURT:  Sure.

16           MR. BRAGG:  We are going to give our cellphone numbers

17   to the trial room.

18           THE COURT:  Which I trust are not in your pockets.

19           MR. BRAGG:  No, sir, they are downstairs.

20           (Recess pending verdict)

21           THE COURT:  Well, good morning.  You have the note,

22   court Exhibit I.  I will entertain your views.

23           MR. SKINNER:  Your Honor, I spoke to defense counsel.

24   I think we are of the same opinion that probably the best thing

25   to do is direct the jury's attention back to the instruction

1    with regard to venue on page 33.  It's not entirely clear

2    whether they are referring to the overt acts listed in the

3    indictment, in which case we think the answer to the question

4    would be no, or just referring to any overt act in furtherance

5    of the conspiracy, in which the answer might be yes.

6         THE COURT:  The answer is not yes, I don't think.

7         MR. SKINNER:  It's any act in the furtherance of the

8    conspiracy needs to have occurred in the Southern District of

9    New York.  Whether that's the same thing as an overt act --

10        THE COURT:  I don't believe that's the standard.  That

11   would be sufficient but it is not necessary.  I think.  The

12   agreement has to be formed or an overt act in furtherance.

13        MR. SKINNER:  You are right, your Honor, there is an

14   alternative.  Thinking of the evidence I think we are probably

15   looking at the latter rather than the former.  But the

16   instruction should include both.

17        THE COURT:  It seems to me the appropriate answer is

18   to say:  I have already instructed you on venue.  It appears on

19   pages 33 and 34.  It is not clear to me whether your question

20   presupposes that in order to convict on Count 3, the government

21   is obliged to prove one of the overt acts alleged in the

22   indictment.  If that is your presupposition, that is incorrect.

23   They may prove the over act that way, they may prove a

24   different overt act, as I previously instructed you.

25        Any objection to that?

1            MR. SKINNER:  No objection.

2            MR. WHITE:  The defense has no problem with that, your

3     Honor.

4            THE COURT:  Bring them in please.  I will refer to the

5     instruction on page 30 as to the overt act requirement.

6            (Jury enters courtroom)

7            THE COURT:  The record will reflect the defendant and

8     the jurors all are present.  Members of the jury, I have your

9     note reading:  Does at least one of the overt acts in Count 3

10    have to have occurred in the Southern District of New York.

11           I instructed you on this point with respect to venue

12    at page 33 of the charge.  With respect to Count 3 just as with

13    respect to the other two counts, the government has satisfied

14    its venue obligations if you conclude that it is more likely

15    than not that an unlawful agreement occurred or that an act in

16    furtherance of such an agreement occurred within the Southern

17    District of New York.

18           What I have just read you appears on page 33, lines 25

19    to 27.  Now it was not clear to me from the note whether the

20    note presupposes or assumes with respect to Count 3 that the

21    overt act that the government must prove in order to convict on

22    Count 3 must be one of the three overt acts alleged in the

23    indictment or not.

24           I invite your attention to page 30, lines 22 to 28 of

25    my instructions which say that you may find also that overt

1    acts were committed which were not alleged in Count 3.  For the

2    government to satisfy the overt act requirement, it is not

3    necessary that the government prove all or for that matter any

4    of the overt acts alleged in Count 3.  Nor must it prove that

5    it was the defendant who committed any overt act.

6            It is sufficient in this respect for the government to

7    show beyond a reasonable doubt that one of the members of the

8    conspiracy, not necessarily the defendant, knowingly took some

9    step or action in furtherance of the alleged conspiracy during

10   the life of that conspiracy and that act may be one of those

11   charged in Count 3 or another act altogether.

12           Thank you very much.

13           Any objections, counsel?

14           You may approach if there are?

15           MR. SKINNER:  No, your Honor.

16           MR. ROSS:  No, your Honor.

17           THE COURT:  Thank you.

18           You may continue your deliberations.

19           (Jury leaves to continue deliberations)

20           (Recess pending verdict)

21           THE COURT:  I am informed that we have a verdict.

22           (Jury enters courtroom)

23           THE COURT:  The defendant and the jurors all are

24   present.

25           Madame foreperson, I understand that you have reached

1    a verdict.

2              THE FOREPERSON:  Yes.

3              THE COURT:  Please hand the verdict to Andy.

4              (Pause)

5              THE COURT:  Publish the verdict.

6          The defendant will please rise and face the jury.

7              THE DEPUTY CLERK:  As to Count 1, how do you find the

8    defendant, guilty or not guilty?

9              THE FOREPERSON:  Guilty.

10             THE DEPUTY CLERK:  As to Count 2, how do you find the

11   defendant, guilty or not guilty?

12             THE FOREPERSON:  Guilty.

13             THE DEPUTY CLERK:  As to question 2(a), did the

14   government prove beyond a reasonable doubt that at least one of

15   the objectives of the conspiracy of which you have found the

16   defendant to have been a member was at least one of the first

17   second, third, or fourth objects charged in Count 2, yes or no?

18             THE FOREPERSON:  Yes.

19             THE DEPUTY CLERK:  As to Count 3, how do you find the

20   defendant, guilty or not guilty?

21             THE FOREPERSON:  Guilty.

22             THE DEPUTY CLERK:  Thank you.

23             THE COURT:  Is there any reason why the jury should

24   not be discharged, Mr. Ross?

25             MR. ROSS:  No, sir.

THE COURT:  Members of the jury, it is my practice
never to comment on the substance of a jury verdict and I won't
depart from that longstanding rule now.  But it is clear to
everybody concerned that you worked hard, you paid attention,
you took this case with the gravity that it deserved to be
taken and you are entitled to the thanks of all concerned for
having done so.

In just a minute I am going to release you.  When you
are released you are free of the stricture about talking about
the case with others.  You are free to talk about it or not to
talk about it as you may wish.  I would say two things along
those lines.

First of all, if you decide to talk to anybody about
the case at all, I would just urge you to apply the golden rule
in thinking about anything you might say about fellow jurors or
about what happened in the jury room.  Take into account that
you would like others to perhaps show some sensitivity to your
wishes about what might be said just when you decide what to
say about others.

The second thing I would say is that in the event you
are contacted by anybody connected with either side in this
case, you are perfectly free not to talk to them.  If they
don't take no for an answer should that be your decision
easily, please let Andy know, and I think I can take care of
it; I wouldn't worry about that.

1       That said, you are now free to go, you can go not the

2  jury room and collect your stuff with the thanks of all.  Leave

3  your notes in the jury room; Andy is going to pick them up.

4       Thank you again.

5       (Jury is discharged)

6       THE COURT:  Sentencing, January 20, at 10:30 a.m.

7       Is that satisfactory?

8       MR. SKINNER:  Satisfactory to the government.

9       MR. ROSS:  Yes, your Honor.

10       MR. WHITE:  Yes, your Honor.

11       THE COURT:  I anticipate the possibility that the

12  defense will have quite a lot to say on sentencing, so any

13  submissions on behalf of the defendant are to be to my chambers

14  by December 16.  That includes any request for a Fatico

15  hearing, any evidentiary submission with respect to the

16  guidelines computation, any departure application, any request

17  for nonguidelines sentences, anything of that character,

18  anything at all that bears on sentencing.  The government is to

19  respond by January 4, and any reply by January 11.

20       Anything else we need to do today?

21       MR. WHITE:  Yes, your Honor.  I would like to move at

22  this time under Rule 29 for a judgment of acquittal and under

23  Rule 33 for a new trial, but I would ask for 30 days to file a

24  memorandum in support of those motions, your Honor.

25       THE COURT:  I will give you until October 27, I assume

1       that's a weekday, to file your memorandum.

2                MR. WHITE:  Thank you, your Honor.

3                THE COURT:  What about the forfeiture allegations,

4       where are we going with that?

5                MR. SKINNER:  With regard to whether we are going to

6       be seeking forfeiture of the assets that have already been

7       seized, I told Mr. White that we would have some discussions

8       with him.  I believe he has some information indicating that

9       certain of the accounts that have been frozen are not related

10      to the crime, so we will see if we can work that out.

11               We will be talking to our asset forfeiture people with

12      regard to the remainder of the property and what our intentions

13      are.  The bulk, the vast bulk of what we seized is perfume

14      inventory, so we will be talking to them to find out exactly

15      what they want to do with that now that we have a jury verdict.

16      I think he can forfeit all of it.  There may be not disputes

17      from the defendant but third-party disputes as to the ownership

18      of some of that perfume as quite a bit of it was sold on

19      consignment.

20               THE COURT:  Does that imply that if the matter is not

21      resolved, you are going to pursue with civil forfeiture or what

22      is your expectation?

23               MR. SKINNER:  It would be that we try to resolve it

24      with the parties who are claiming interest in the property and

25      if there is a dispute as to the ownership, I don't remember if

1   the actual forfeiture cited in the indictment is under the

2   civil or criminal forfeiture statute.  I think we would be

3   seeking the type of proceeding contemplated by Rule 32.2 to

4   resolve whatever third-party claims there might be.

5          THE COURT:  Let me know what you intend to do within

6   two weeks.

7          MR. SKINNER:  Very well, your Honor.

8          THE COURT:  Anything else?

9          Thank you all.  I appreciate counsel's performance in

10   this case; it was a well-tried case.  Thank you.

11                         -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25