UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                    :

               - v. -                    :                    S1 11 Cr. 102 (LAK)

VIKRAM DATTA,                    :

               Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**


PREET BHARARA
United States of America
Southern District of New York
Attorney for the United States
of America


PETER SKINNER
ALVIN BRAGG
Assistant United States Attorneys
      - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,        :

        - v. -           :             S1 11 Cr. 102 (LAK)

VIKRAM DATTA,            :

           Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

      The Government respectfully submits this memorandum in advance of the sentencing of defendant Vikram Datta ("Datta"), which is scheduled for January 20, 2012, at 10:30 a.m.

### PRELIMINARY STATEMENT

      Datta awaits sentencing for two offenses arising from channeling millions of drug dollars through his business and, thereby, helping violent drug traffickers receive their drug proceeds.  In committing these offenses, and subsequently perjuring himself at trial, Datta has demonstrated himself to be a man who will say and do anything that serves his interests.  His willingness to say and do anything continues with his sentencing submission, which perpetuates his falsehoods, goes to great lengths to minimize his conduct, and demonstrates virtually no appreciation, much less contrition, for the harm his crimes have caused.  In light of the seriousness of Datta's crimes, and his demonstrated lack of respect for this Court and the system of justice the Court is charged with administering, the Court should impose a lengthy term of imprisonment — a term within the United States Sentencing Guidelines ("U.S.S.G." and the "Guidelines") range of 292 to 365 months' imprisonment.

B<small>ACKGROUND</small>

**A.      Procedural Background**

Datta was charged in a Superseding Indictment in three counts.  Count One charged Datta

with, from in or about August 2010 up to and including on or about January 15, 2011, conspiring

to launder funds that were represented to be drug proceeds by undercover law enforcement

officers.  Count Two charged Datta with, from at least in or about June 2009 up to and including

in or about January 2011, participating in a multi-object conspiracy to launder actual drug

proceeds.  Count Three, which involved the same time period and substantially the same conduct

as Count Two, charged Datta with conspiring to violate the Travel Act.[1]   The jury convicted

Datta of all three counts.

Pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure, Datta moved,

on all three counts, for a judgment of acquittal or a new trial.  Datta's motions each were based

upon the argument that there was not sufficient evidence at trial to establish that Datta acted with

any co-conspirators.  The Court granted Datta's motion for a judgment of acquittal on Count One

and denied his motions with respect to Counts Two and Three.

**B.      Offense Conduct**

Datta was part of a conspiracy to launder the cash proceeds of drug trafficking by filtering

the money through Datta's business.  More specifically, Datta participated in a money laundering

scheme known as the Black Market Peso Exchange ("BMPE") from at least June 2009 until the

---

[1]  A second Superseding Indictment was filed on August 23, 2011, but Datta proceeded to
trial on the first Superseding Indictment.  The Presentence Investigative Report outlines the
counts in the second Superseding Indictment as opposed to the first Superseding Indictment.

time of his arrest in January 2011.  (PSR ¶ 12).[2]  The BMPE is a means of filtering cash drug proceeds through legitimate businesses to conceal where the money comes from and to insert it into the legitimate banking system.  (Id.).

More specifically, drug traffickers in Latin America ship drugs to the United States, where they are sold for United States dollars.  (Id.).  The Latin American drug traffickers then sell the dollars for pesos to money exchangers, or peso brokers, for less than the dollars are worth on the legitimate currency exchange markets.  (Id.). The peso brokers sell the dollars to Latin American businesspeople for pesos and then arrange to have the dollars delivered to United States businesspeople as payment for goods.  (Id.).  The goods are then shipped to the Latin American businesspeople, who sell the goods to generate pesos that are used to purchase more dollars from the peso brokers, and the process is repeated.  (Id.).

Two co-conspirators — Faustino Garza and Hilario Martinez — served as peso brokers in a BMPE scheme involving Datta.  (Id. ¶ 13). Garza owned a money exchange business located in Nueva Laredo, Mexico, and Martinez was his employee.  (Id.).  In mid-2009, Garza decided to start buying United States dollars located in Mexico that were the proceeds of narcotics sales. (Id.).  Garza bought the dollars for less than they were worth on the legitimate exchange market. (Id.). Garza then sold the dollars for pesos to perfume merchants located in Mexico. (Id.).  Based on instructions from his perfume merchant clients, Garza transported the dollars from Mexico to

---

[2] In this memorandum, the following abbreviations are used to refer to the following documents: "Def. Mem." refers to the "Initial Sentencing Memorandum on Behalf of Vikram Datta"; "Def. Mem., Ex. A-1s" refers to Datta's December 8, 2011 letter to the Court; "PSR" refers to the Presentence Report of the United States Probation Office, dated December 14, 2011; "Tr." refers to the trial transcript; and "GX" refers to a Government Exhibit introduced at the trial.

La Versailles Fragrances, Datta's business in Laredo, Texas.  (<u>Id.</u>).  The dollars were used to pay for perfume that Datta then shipped to Garza's clients. (<u>Id.</u>).  Martinez physically carried the dollars over the border to Datta's warehouse, delivering tens of thousands of dollars to Datta at a time and a total of $6.7 million from June 2009 until January 2011.  (<u>Id.</u>).  Martinez delivered the money to Datta and two of his employees — Cynthia Garza and Yolanda Carillo.  (<u>Id.</u>).

Once Datta received the cash from Garza and Martinez, he filed Form 8300s with the Internal Revenue Service reporting the cash transactions.  (<u>Id.</u> ¶ 14). The Forms 8300s were compiled by Carillo (Datta's bookkeeper), and signed by Datta. (<u>Id.</u>). On the forms, Datta hid the origins of the cash by falsely reporting that he had received the cash directly from his perfume customers, rather than disclosing that Faustino Garza and Hilario Martinez had delivered the cash on behalf of Datta's customers.  (<u>Id.</u>).  The cash was then deposited into La Versailles' bank accounts.  (<u>Id.</u>).

In this manner, Datta accepted millions of dollars in United States currency that had been transported over the Mexican border as payment for perfume.  (<u>Id.</u> ¶ 15).  Datta knew the dollars were drug proceeds generated by the Sinaloa Cartel, a major Mexican narcotics trafficking operation.  (<u>Id.</u>).  And Datta understood that the people delivering the cash to La Versailles were profiting by purchasing the dollars cheaply.  (<u>Id.</u>).

In addition to accepting millions of dollars in drug proceeds that were transported over the Mexican border by Faustino Garza, Hilario Martinez, and others, Datta agreed to launder cash that undercover officers had represented to be drug money.  (<u>Id.</u> ¶ 16).  Datta met with the agents in Las Vegas in August 2010, where, despite believing they were criminals, he agreed to take their money.  (<u>Id.</u>).  As payment for perfume, he then accepted nearly $38,000 in cash that

the agents had represented to be drug money.  (Id.).  After engaging in this transaction, Datta met

on three other occasions with the undercover agents and continued to discuss further money

laundering activities he would perform for the agents.  (Id.).[3]

### C.    Datta's Failure To Accept Responsibility For The Offense Conduct

Datta's sentencing submission accepts <u>no</u> responsibility for laundering millions of dollars

through his business.  Although Datta's sentencing submission claims that it does not seek to

challenge his conviction, it repeatedly denies that he intended to launder drug money. (See, e.g.,

Def. Ex. A-1 at 15) ("How could I even think of helping someone to launder money?").  Datta

accepts responsibility <u>only</u> for his $38,000 transaction with the undercover agents and, even in

that context, his acceptance is begrudging, as he seeks to hold onto his entrapment defense.  (Def.

Ex. A-1 at 11) ("I gave into the temptation, and only then is when I failed and betrayed the values

I believe in.").  Datta would further dismiss the advance course in money laundering that he

offered to the undercover agents as nothing more than "loose talking." (Def. Ex. A-1 at 20).

Indeed, according to Datta, this case is just a "misunderstanding" and a mistake.  (Def. Ex. A-1 at

20; Def. Mem. at 11 ("Mr. Datta was mistaken.")).

Without belaboring each of Datta's contentions about the proof at trial, the following are

a few examples of his failure to accept responsibility for his conduct:

- Datta suggests that, "[d]espite his best efforts," he failed to file Form 8300s for a time and then, when he learned of this obligation, his omissions of Fausto Garza and Hilario Martinez were just an "innocent mistake."  (Def. Mem. at 12; Def. Ex. A-1 at 10; id. at 13).  This was no mistake; it was the very essence of the money laundering scheme.  Datta wanted law enforcement to trace the funds back to

---

[3]  Although the Court acquitted Datta of the conspiracy charge arising from this conduct, his actions with the undercover agents are relevant conduct that may be considered in formulating his sentence.  See U.S.S.G. § 1B1.3(a)(2).

perfume businesses, and not to Fausto Garza and Hilario Martinez.  Indeed, Datta's so-called loose talk provides a roadmap for exactly this conduct: "I'm getting a lot of cash, I'm reporting everything under their [i.e., his perfume customers'] names."  (GX 107-T at 32).  Further, Datta's failure to file Form 8300s was not "despite his best efforts," but rather a purposeful decision that he abandoned only because another perfume company in Miami was being investigated.  (See GX 804 (Principals of ET Perfumes in Miami arrested for money laundering); GX-430-T and GX-432-T  (recorded calls establishing Datta spoke to ET Perfumes); GX-103-T at 8 (Datta says he is being "audited" and that "[e]verything started from Miami"); GX-106-T at 30 (Datta says "Because IRS has, this whole thing has started from Miami.  One guy had a problem in Miami from there people, people, people, people, people, people, that is it.").

- Datta claims that, besides the $38,000 transaction, he "steadfastly" refused to launder money for the undercover agents, because "he always sought to run his business legitimately."  (Def. Mem. at 12).  First, Datta did agree to launder additional funds for the undercover agents by sending wire transfers.  He simply told the agents that he needed a few weeks to set everything up.  (GX-107-T at 5).  Second, Datta's concern was not with running a legitimate business, it was with getting caught.  He was in the middle of a bank inquiry about his cash deposits, and he explained again and again to the undercover agents the importance of carefully laundering money to avoid detection.  (See, e.g., GX-107-T at 10) ("[W]hen you mix up, nobody can figure out.").

- The evidence at trial showed that, during two trips to the New York area in early 2010, Miguel Lara, a Mexican national made deposits of under $10,000 in a number of bank accounts, including an account of La Versailles.  Datta claims, as he did at trial, that he wrote a letter to his customers to stop them from making these deposits.  (Def. Ex. A-1 at 10).  As the Government pointed out to the jury, however, Lara's structuring took place in the beginning of March and Datta's letter to his clients was written five months later and appears to have been sent only after a bank inquiry was initiated into cash deposits in Texas and in excess of $10,000.

Finally, Datta seeks to foist responsibility onto others.  He claims that it was up to customs officers (and not Datta) to determine the source of the cash delivered to his business.  (Def. Ex. A-1 at 10, 13).  He also claims that Fausto Garza and Hilario Martinez were the only true criminals, as they dealt directly with drug dealers and profited because of the favorable exchange rate they used.  Datta ignores that it was this (and other) drug money that caused his

-6-

cash business to jump from $7.8 million in 2008 to $14.3 million in 2009 and $18 million in

2010.  (GX-301, GX-304; Tr. 47-82).  And while he acknowledged at trial that "greed" caused

him to engage in the $38,000 transaction with the undercover agents, he still fails to

acknowledges that it was this same greed that drove him to launder drug money for Garza and

Martinez.

SENTENCING

**A.      Application Of The Guidelines**

**1.      The Correct Calculation Of The Guidelines Range Is 292 To 365 Months,
Based On An Offense Level Of 40**

The PSR calculates an offense level of 36, a Criminal History Category of I, and a

Guidelines range of 188 to 235 months.  (PSR ¶ 74).  The PSR correctly groups the conspiracy

counts, because the offense level is determined largely on the total loss amount.[4]  (Id. ¶ 22).

Pursuant to U.S.S.G. Section 2S1.1(a)(2), the PSR applies a base offense level of twenty-eight

(eight plus twenty levels pursuant to 2B1.1(b)(1)(K) because Datta laundered between $7 million

and $20 million).  (Id. ¶ 23).  The Probation Department further added six levels, pursuant to

U.S.S.G. Section 2S1.1(b)(1), because Datta knew that the laundered funds were the proceeds of

drug trafficking, and two levels, pursuant to U.S.S.G. Section 2S1.1(b)(2)(B), because Datta was

convicted under Title 18, United States Code Section 1956.  (Id. ¶¶ 24, 25).  The Probation

Department thus calculated a total offense level of 36.  The Government believes additional

enhancements apply because Datta was in the business of money laundering and because Datta

---

[4]The Guidelines calculation in the PSR is based upon convictions for all three counts
presented to the jury.  The Court's judgment of acquittal on Count One does not affect the
Guidelines calculation.

obstructed justice, which results in a total offense level of 40.

First, a net two-level increase over the Probation Department's calculation applies because Datta was in the business of money laundering, which triggers the four-level enhancement under U.S.S.G. Section 2S1.1(b)(2)(C).[5]  The Application Notes for Section 2S1.1 set forth "a non-exhaustive list of factors that may indicate the defendant was in the business of laundering funds": (i) "[t]he defendant regularly engaged in laundering funds"; (ii) "[t]he defendant engaged in laundering funds during an extended period of time; (iii) "[t]he defendant engaged in laundering funds from multiple sources"; (iv) "[t]he defendant generated a substantial amount of revenue in return for laundering funds"; (v) the defendant has prior money laundering offenses; and (vi) the defendant said during an undercover investigation that he engaged in any of the foregoing conduct.  U.S.S.G. § 2S1.1, comment. (N. 4).  All of these factors, except a prior conviction, are present here.

Martinez delivered, multiple times per week, a total of approximately $6.7 million of drug money to Datta's business over an approximately one-and-a-half-year period.  (Tr. 226-27, 234, 484, 583).  These deliveries were regular and for an extended period of time, satisfying the first and second factors listed in the Application Notes.

Datta also received drug money from multiple sources.  In addition to the millions he received from Garza and Martinez, the following evidence establishes that other people were delivering millions of dollars in drug money to Datta's business:

---

[5]  Application of Section 2S1.1(b)(2)(C) results in a net two-point increase.  Under U.S.S.G. Section 2S1.1(b)(2)(C), there is a four-level increase, but the two-level increase for a conviction under 18 U.S.C. Section 1956,which was applied by the Probation Department, does not apply when Section 2S1.1(b)(2)(C) is implicated.

- Datta admitted to the undercover agents that all of the cash he was receiving from his wholesale customers was "Sinaloa money" and that he was (falsely) reporting that money on Form 8300s under his customers' names. (GX-107-T at 32-33). From August 31, 2009 until December 31, 2010, Datta filed form 8300s with the Treasury Department reporting a total amount of $18,277,966 in cash receipts. (GX-302). By Datta's own admission, this was all drug money. Since Hilario Martinez only delivered $6.7 million in drug money to Datta (Tr. 484), Datta received roughly $11.5 million in narcotics proceeds from other sources.

- On March 25, 2010, a phone call was intercepted between Cynthia Garza, Datta's principal lieutenant, and Sharon, an employee who worked at one of Data's retail stores. (GX-404-T). During the call, Sharon said that she had "friends of Polo's" in her store, and that they were asking for perfume. (GX-404-T at 3-8). Sharon explained that they "came with Polo's referral" and that "Polo had sent them to Versa[i]lles." (Id. at 6). Sharon wanted to know at what price she could sell perfume to Polo's friends. (Id. at 4-6). Cynthia responded that Sharon could sell to Polo's friends as long as they would accept a "higher price." (Id. at 6). Cynthia then asked, "Besides, they are going to buy from you in cash[?]" Sharon responded affirmatively, and Cynthia then said, "if they grumble too much, well . . . well, then let them come to the warehouse." (Id.).

  Given that the customers were coming with Polo's reference, Cynthia assumed they would be paying with cash. And Cynthia knew they would be willing to pay higher prices, demonstrating that she understood they were delivering drug money (only money launderers would willingly pay more just to get rid of their cash). Cynthia thus authorized Sharon to sell to Polo's friends so long as they would pay higher prices, and she instructed Sharon to "send them to the warehouse" (in other words, to see Cynthia), if they refused. This call thus demonstrates that Polo, one of Datta's largest perfume customers (Tr. 789), referred other customers who paid with narcotics proceeds to Datta's business, and that Datta would sell to those customers so long as they paid higher prices for perfume.

- On November 8, 2010, the Government intercepted a phone call between Cynthia Garza and Geraldo Lopez. (GX-416-T). The call demonstrates that Lopez was a perfume customer who sent cash to Datta. In the call, Lopez reported that "Don Fernando" had said that La Versailles "can't receive money from him" because "you want to ask him for identification and all those things." (GX-416-T at 3). Garza then made clear that she had never asked Don Fernando for identification or for identification for anyone working for Don Fernando. (Id. at 3-5).

  This call demonstrates that Datta was receiving cash from a money exchanger named Don Fernando. The call further indicates that the cash was the proceeds of narcotics trafficking, because the people delivering on behalf of Don Fernando did

not want to present identification.  Don Fernando, like Faustino Garza, was thus another participant in the Black Market Peso Exchange who was delivering narcotics proceeds to Datta's business.

- Miguel Lara, a Mexican national who periodically flew into the New York area, made structured cash deposits totaling $50,000 into La Versailles' account.  (Tr. 381-400; GX-501, GX-503, GX-505, GX-515, GX-517, GX-602).  As the Government's money laundering expert explained at the trial, peso brokers frequently employ couriers who deliver drug money to United States businesspeople by making structured cash deposits into their bank accounts.  (Tr. 186-87).

The third factor (multiple sources) and the fourth factor (substantial revenue) for determining whether a defendant was "in the business" of money laundering are thus satisfied here.

For all of these reasons, a four-point enhancement under Section 2S1.1(b)(2)(C) for being in the business of money laundering should apply to Datta's Guidelines range.

Two points should also be added, pursuant to U.S.S.G. Section 3C1.1, for obstruction based upon Datta's perjury at trial.  The core of Datta's testimony — that he did not knowingly accept millions of dollars in drug money as payment for perfume — was false and was rejected by the jury.  Datta further pressed at trial many of the same incredible explanations he now offers in his sentencing submission.  For example, Datta testified under oath that:

- He "never gave a thought" about whether the casas de cambio got the cash they were delivering to his business (Tr. 803), despite the fact that Ajay Gupta asked him in October 2009 if it was drug money (Tr. 905) and Datta later told the undercover agents that he knew it was drug money (GX-107-T at 32-33).

- He believed the Form 8300s were "properly filled out" (Tr. 810), despite the fact that he failed to identify the person delivering the money, as plainly required by the form (see GX-211).

- He went to New York to meet the undercover agent after his kidnapped friend had been freed for the sole purpose of thanking the undercover agent (Tr. 863), yet the recording of that meeting makes clear that Datta continued to discuss various ways to launder money with the agent (e.g., GX-108-T at 7-11) and the notion that

-10-

Datta would travel to New York to meet with a known Sinaloa cartel member merely to thank him for helping his friend is patently ridiculous.

In addition to the false testimony Datta repeats in his sentencing submission, Datta told a number of other lies at trial.  For example:

- He claimed not to know that the Mexican cartels engaged in drug trafficking.  (Tr. at 895-96).

- He claimed that he thought the undercover agent's friends from "down south" were from "Texas, South Carolina, Atlanta, Alabama, [or] Mississippi" (Tr. at 897-98), notwithstanding that the agent told Datta he was from Guatemala (id.).

- Although he believed the undercover agent was a criminal, he claimed he did not know what kind of criminal the agent was (Tr. 851), despite the fact that the agent represented himself to be a Guatemalan who moved money for people "down south" (GX-103-T at 1-8, GX-104-T at 5-6).

All of these statements — separately and certainly when taken together — warrant a two-level increase for obstructing the administration of justice.

With the two-level addition for obstruction and the net two-level addition for being in the business of money laundering, the total offense level is 40.  The resulting Guidelines range for Datta (who is in Criminal History Category I) is 292 to 365 months' imprisonment.

## 2.    The Court Should Reject Datta's Argument For A Lower Guidelines Range

Datta argues that the proof at trial established at most only that Hilario Martinez delivered $6.7 million worth of drug proceeds to Datta's business.  (Def. Mem. at 15).  Accordingly, Datta argues that an 18-level enhancement for laundering funds between $2.5 million and $7 million applies rather than a 20-level enhancement for laundering between $7 million and $20 million. As explained above, Datta laundered at least $18,327,966 in drug proceeds ($18,277,966 disclosed on the Form 8300s and $50,000 from Miguel Lara).  The PSR thus properly applied a

20-point enhancement for the value of the funds laundered, and the Court should reject Datta's argument for the lower enhancement.

**B.     A Sentence Within The Guidelines Range Of 292 To 365 Months' Imprisonment Would Be Both Reasonable And Sufficient, But Not Greater Than Necessary, To Achieve The Legitimate Purposes Of Sentencing**

**1.      Governing Legal Framework**

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although the *Booker* Court held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated in *Gall*, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 50 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing (which are listed below), *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall* v. *United States*, 552 U.S. at 49-50 & n.6.

-12-

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."  *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives,"  *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita* v. *United States*, 551 U.S. at 349.  To the extent a sentencing court varies from the Guidelines sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

Applying these Section 3553(a) factors to Datta's crimes, a term of incarceration within the range of 292 to 365 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing.  The factors most applicable in this case – the nature and circumstances of the offense, the history and characteristics of the defendant, the need to reflect the seriousness of the offense, the need to promote respect for the law, the need to provide just punishment for the offense, and the need to provide adequate deterrence — strongly weigh in favor of a lengthy term of imprisonment.

### 1.      Nature And Circumstances Of The Offense, The Seriousness Of The Offense, And The Need For Just Punishment

Datta engaged in serious money laundering activity that enabled violent drug traffickers to receive their drug proceeds.  Datta's repeated statements that he did not deal directly with drug dealers misses the point.  (Def. Mem., Ex. A-1 at 21).  Datta's role in the Black Market Peso Exchange was critical.  He was the linchpin.  Particularly after banks in Mexico strengthened their anti-money laundering programs in 2009, the cartels needed legitimate businesses in the United States to use as conduits to clean their money.  Couriers, such as Martinez, and peso brokers, such as Garza, are unfortunately plentiful and, for the most part, fungible.  The player in the BMPE who is most difficult to cultivate and to replace is the corrupt businessperson who has sufficient legitimate business interests to cover up the illegitimate drug proceeds.  Datta willingly and capably served that role, and he thus played a significant part in the offense.

With regard to the nature of the offense, Datta himself acknowledges the ruthlessness of the cartels.  (Def. Mem., Ex. A-1 at 14).  Datta's acceptance of millions of dollars — delivered daily by the tens of thousands — and his lies to the IRS and his banks enabled the cartels'

ruthless and senseless violence.  The nature and seriousness of Datta's conduct, as well as the need for just punishment, thus warrant a lengthy term of imprisonment.[6]

      **2.**      **The History And Characteristics Of The Defendant**

In his sentencing submission, Datta highlights his charitable works, job creation, and assistance to his employees.  Although Datta has clearly done some good with his money and his time, his benevolence was at least in part facilitated by his criminal conduct.  Quite simply, he built a business on drug money, and he used that business to create jobs and provide financial assistance to others.  Datta obtained that drug money because of his greed, a characteristic he acknowledged at trial.  It was this characteristic that caused Datta to convert an otherwise lawful, small business into a large-scale, money laundering enterprise.  And it is this characteristic, in addition to any good Datta might have done with his illegal gains, that the Court should keep in mind when formulating Datta's sentence.

The Court should further take into consideration that Datta appears to have done what many criminals do — present one face to his friends and family, and another to those who get in the way of his criminal enterprises.  For example, Datta expressed a ready willingness to use violence:

      •      On September 17, 2010, a phone call was intercepted in which the Government captured conversations between Cynthia Garza and Polo and Datta and Polo.

---

[6]  In an effort to minimize the seriousness of the offense, Datta claims that his money laundering crimes were "atypical," that he did not know the cash he was receiving was drug money, that his false 8300s were an "innocent mistake," and that he "steadfastly refused" to launder more than $38,000 for the undercover agents.  (Def. Mem. 11-12).  These arguments warrant little consideration, as they amount to a wholesale rejection of the Government's evidence at trial and the jury's verdict.  The Court should recognize Datta's minimizing arguments for what they are — the last-ditch efforts of a guilty man willing to say anything to reduce his sentence — and reject them.

(GX-408-T).  In the conversation between Garza and Polo, it is clear that Polo was upset that Datta had sent "people" to collect from another customer named "Namor."  (GX-408-T at 1-2).  Datta then spoke to Polo, and Polo warned Datta to be careful in trying to collect from Namor, because Namor had "people" (id. at 6), which was a reference to Namor's connections to organized crime figures in Nueva Laredo, Mexico.  Later in the call, Datta told Polo, "I have to have my money.  It is like, you know, if one motherfucker is taking money from all over we have to kill the motherfucker."  This statement speaks for itself.

- On September 27, 2010, after the undercover agents told Datta they were working with the Sinaloa cartel, Datta readily considered retaining the undercover agents to collect unpaid debts for them.  (see GX-106-T at 25-27; id. at 26 ("UC: And don't worry we'll give them a choice. They have two choices. They pay or they pay. That's it.  DATTA: That's it. That's their problem.").

    In addition to his violence, Datta also admitted at trial to routinely lying in the course of his business dealings.  For example, in order to impress his supplier, he lied about giving Cynthia Garza $1.3 million in cash to carry in her school backpack to a bank.  (Tr. 867-70).  He lied to bank officials about the scope of his business to try to keep them from closing his account.  (Tr. 866-97).  He further submitted false 8300 Forms to the bank in order to resolve an investigation into the cash proceeds being deposited into his account.  (Tr. 893).  In short, there is more to Datta than the persona he presented to his friends and family, and the impact of the letter submitted in support of Datta's sentencing submission must be tempered by the fact that the writers likely do not know everything the Court knows about Vikram Datta.

**3.      The Need To Provide Adequate Deterrence And Promote Respect For The Law**

    A lengthy sentence is warranted in order to promote respect for the law and provide adequate general deterrence.  Datta argues that the publicity surrounding his arrest, his financial penalties and his conviction have "done more for general deterrence than any prison

sentence that might be imposed." (Def. Mem. at 14). This argument correctly acknowledges the deterrent effect of this case.

The Government's continued investigation indicates that the business and banking communities in Laredo have taken notice of this case and are changing their ways. For example, at least two banks have changed their practices concerning the maintenance of accounts that accept high volumes of cash. Further, according to confidential sources and cooperating witness, cash crossing the border from Mexico and perfume sales by businesses on the border decreased dramatically following Datta's arrest.

However, Datta's suggestion that his sentence will not have any deterrent effect defies common sense. Certainly, a very short prison term would send a message to other wrongdoers that — while laundering offenses are being prosecuted — the punishment will not be severe. Likewise, (a sufficient, but not greater than necessary) Guidelines sentence certainly would deter those who might be willing to bear an arrest and forfeiture.

### 4.        The Applicable Guidelines Range

As discussed above, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall* v. *United States*, 552 U.S. 38, 46 (2007); *see also Rita* v. *United States*, 551 U.S. at 349.

Datta's Guidelines range is 292 to 365 months' imprisonment. This range takes into account a number of relevant factors that reflect the seriousness of Datta's crimes, including the

nature of those crimes, the amount of money he laundered, the scope and regularity of his money laundering conduct, and his obstruction of justice.  Given the nature of Datta's conduct, the significant harm caused by his actions, and his complete lack of contrition, a sentence with the range of 292 to 365 months' imprisonment is appropriate.

### 5.      The Need to Avoid Unwarranted Sentencing Disparities

Citing sentencing data from 2008, Datta suggests that this Court should reduce Datta's sentence by 80 percent to avoid unwarranted sentencing disparities.  (Def. Mem. at 15).  There are a number of problems with this argument.

First, Datta's references to the Commission's statistics do not say anything about the sentences given to defendants similarly situated to Datta — that is, defendants who engaged in a long-term scheme to launder $18.3 million in narcotics proceeds and were convicted following a trial in which they perjured themselves.  Presumably, those defendants did not receive sentences 80 percent below the minimum Guidelines range.

Second, Datta relies on 2008 data, whereas the preliminary data for 2011 is available.  A copy of the report containing the 2011 data is attached as Exhibit A.  In 2011, the mean sentence in money laundering cases where a below Guidelines sentence was entered pursuant to the factors enumerated in 18 U.S.C. § 3553 (as opposed to cases where a court entered a below Guidelines sentence for some other reason, such as a recommendation from the Government), was 18 months, which was a 47.8 percent decrease from the Guidelines minimum.  (Exhibit A at 24 (Table 12)).

Lastly, the defendant's sentencing memorandum seems to suggest incorrectly that there was an 80 percent decrease below the minimum Guidelines range in all money laundering cases

in 2008.  (Def. Mem. at 15).  The Sentencing Commission reports percentages below the

Guidelines range in cases where courts entered below Guidelines sentences.[7]  But of course,

many courts entered sentences within or above the Guidelines range.  According to the 2011

data, courts entered sentences within the Guidelines range in 34.2 percent of money laundering

cases and only entered below Guidelines sentences pursuant to Section 3553(a) in 23.3 percent of

money laundering cases.  (Exhibit A at 8-9 (Table 3)).

CONCLUSION

For the reasons stated herein, the Court should sentence Datta to a term of imprisonment

between 292 and 365 months.

Dated:          New York, New York
                January 9, 2012

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the United States
                                        of America


                        By:     _____/s/_____
                                        PETER SKINNER
                                        ALVIN BRAGG
                                        Assistant United States Attorneys
                                        Tel.: (212) 637-2601 / 1085

_____

        [7]      The Government could not locate the 2008 data referenced by the defendant on
the United States Sentencing Commission's website.  The data reviewed by Government for
2008 as well as 2011 indicates that the Commission provides statistics for percentages below the
minimum Guidelines range only for those cases where courts entered below Guidelines
sentences.